Case 9:25-cv-00083-DWM    Document 58-1    Filed 05/04/26    Page 1 of 179



# Buckley v. Fitzsimmons, 509 U.S. 259 (1993)

Overview    Opinions    Materials

**Argued:**
February 22, 1993

**Decided:**
June 24, 1993

## Syllabus

OCTOBER TERM, 1992

Syllabus

BUCKLEY *v.* FITZSIMMONS ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 91-7849. Argued February 22, 1993-Decided June 24,1993

Petitioner Buckley sought damages, under 42 U. S. C. § 1983, from respondent prosecutors for fabricating evidence during the preliminary investigation of a highly publicized rape and murder in Illinois and making false statements at a press conference announcing the return of an indictment against him. He claimed that when three separate lab studies failed to make a reliable connection between a bootprint at the murder site and his boots, respondents obtained a positive identification from one Robbins, who allegedly was known for her willingness to fabricate unreliable expert testimony. Thereafter, they convened a grand jury for the sole purpose of investigating the murder, and 10 months later, respondent Fitzsimmons, the State's Attorney, announced the indictment at the news conference. Buckley was arrested and, unable to meet the bond, held in jail. Robbins provided the principal evidence against him at trial, but the jury was unable to reach a verdict. When Robbins died before Buckley's retrial, all charges were dropped and he was released after three years of incarceration. In the § 1983 action, the District Court held that respondents were entitled to absolute immunity for the fabricated evidence claim but not for the press conference claim. However, the Court of Appeals ruled that they had absolute immunity on both claims, theorizing that prosecutors are entitled to absolute immunity when out-of-court acts cause injury only to the extent a case proceeds in court, but are entitled only to qualified immunity if the constitutional wrong is complete before the case begins. On remand from this Court, it found that nothing in *Burns* v. *Reed,* 500 U. S. 478-in which the Court held that prosecutors had absolute immunity for their actions in participating in a probable-cause hearing but not in giving advice to the police-undermined its initial holding.

*Held:* Respondents are not entitled to absolute immunity. Pp. 267-278.

(a) Certain immunities were so well established when § 1983 was enacted that this Court presumes that Congress would have specifically so provided had it wished to abolish them. Most public officials are entitled only to qualified immunity. However, sometimes their actions fit within a common-law tradition of absolute immunity. Whether they do is determined by the nature of the function performed, not the identity of the actor who performed it, *Forrester* v. *White,* 484 U. S. 219, 229,

---

260

Syllabus

and it is available for conduct of prosecutors that is "intimately associated with the judicial phase of the criminal process." *Imbler* v. *Pacht*man, 424 U. S. 409, 430. Pp. 267-271.

Case 9:25-cv-00083-DWM    Document 58-1    Filed 05/04/26    Page 2 of 179

(b) Acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. However, in endeavoring to determine whether the bootprint had been made by Buckley, respondents were acting not as advocates but as investigators searching for clues and corroboration that might give them probable cause to recommend an arrest. Such activities were not immune from liability at common law. If performed by police officers and detectives, such actions would be entitled to only qualified immunity; the same immunity applies to prosecutors performing those actions. Convening a grand jury to consider the evidence their work produced does not retroactively transform that work from the administrative into the prosecutorial. Pp.271-276.

(c) Fitzsimmons' statements to the media also are not entitled to absolute immunity. There was no common-law immunity for prosecutor's out-of-court statements to the press, and, under *Imbler,* such comments have no functional tie to the judicial process just because they are made by a prosecutor. Nor do policy considerations support extending absolute immunity to press statements, since this Court has no license to establish immunities from § 1983 actions in the interests of what it judges to be sound public policy, and since the presumption is that qualified, rather than absolute, immunity is sufficient to protect government officials in the exercise of their duties. Pp. 276-278.

952 F.2d 965, reversed and remanded.

STEVENS, J., delivered the opinion for a unanimous Court with respect to Parts I, II, III, and IV -B, and the opinion of the Court with respect to Parts IV-A and V, in which BLACKMUN, O'CONNOR, SCALIA, and THOMAS, JJ., joined. SCALIA, J., filed a concurring opinion, *post,* p. 279. KENNEDY, J., filed an opinion concurring in part and dissenting in part, in which REHNQUIST, C. J., and WHITE and SOUTER, JJ., joined, *post,* p. 282.

G. *Flint Taylor* argued the cause for petitioner. With him on the briefs was *John L. Stain thorp.*

*James* G. *Sotos* argued the cause and filed a brief for respondents.

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief

---

261
**Full Text of Opinion**

**Read More**

## Opinions

**Opinions & Dissents**

Case 9:25-cv-00083-DWM    Document 58-1     Filed 05/04/26     Page 3 of 179

OCTOBER TERM, 1992

Syllabus

BUCKLEY *v.* FITZSIMMONS ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 91-7849. Argued February 22, 1993-Decided June 24,1993

Petitioner Buckley sought damages, under 42 U. S. C. § 1983, from respondent prosecutors for fabricating evidence during the preliminary investigation of a highly publicized rape and murder in Illinois and making false statements at a press conference announcing the return of an indictment against him. He claimed that when three separate lab studies failed to make a reliable connection between a bootprint at the murder site and his boots, respondents obtained a positive identification from one Robbins, who allegedly was known for her willingness to fabricate unreliable expert testimony. Thereafter, they convened a grand jury for the sole purpose of investigating the murder, and 10 months later, respondent Fitzsimmons, the State's Attorney, announced the indictment at the news conference. Buckley was arrested and, unable to meet the bond, held in jail. Robbins provided the principal evidence against him at trial, but the jury was unable to reach a verdict. When Robbins died before Buckley's retrial, all charges were dropped and he was released after three years of incarceration. In the § 1983 action, the District Court held that respondents were entitled to absolute immunity for the fabricated evidence claim but not for the press conference claim. However, the Court of Appeals ruled that they had absolute immunity on both claims, theorizing that prosecutors are entitled to absolute immunity when out-of-court acts cause injury only to the extent a case proceeds in court, but are entitled only to qualified immunity if the constitutional wrong is complete before the case begins. On remand from this Court, it found that nothing in *Burns* v. *Reed,* 500 U. S. 478-in which the Court held that prosecutors had absolute immunity for their actions in participating in a probable-cause hearing but not in giving advice to the police-undermined its initial holding.

*Held:* Respondents are not entitled to absolute immunity. Pp. 267-278.

(a) Certain immunities were so well established when § 1983 was enacted that this Court presumes that Congress would have specifically so provided had it wished to abolish them. Most public officials are entitled only to qualified immunity. However, sometimes their actions fit within a common-law tradition of absolute immunity. Whether they do is determined by the nature of the function performed, not the identity of the actor who performed it, *Forrester* v. *White,* 484 U. S. 219, 229,

---

260

Syllabus

and it is available for conduct of prosecutors that is "intimately associated with the judicial phase of the criminal process." *Imbler* v. *Pacht*man, 424 U. S. 409, 430. Pp. 267-271.

(b) Acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. However, in endeavoring to determine whether the bootprint had been made by Buckley, respondents were acting not as advocates but as investigators searching for clues and corroboration that might give them probable cause to recommend an arrest. Such activities were not immune from liability at common law. If performed by police officers and detectives, such actions would be entitled to only qualified immunity; the same immunity applies to prosecutors performing those actions. Convening a grand jury to consider the evidence their work produced does not retroactively transform that work from the administrative into the prosecutorial. Pp.271-276.

(c) Fitzsimmons' statements to the media also are not entitled to absolute immunity. There was no common-law immunity for prosecutor's out-of-court statements to the press, and, under *Imbler,* such comments have no functional tie to the judicial process just because they are made by a prosecutor. Nor do policy considerations support extending absolute immunity to press statements, since this Court has no license to establish immunities from § 1983 actions in the interests of what it judges to be sound public policy, and since the presumption is that qualified, rather than absolute, immunity is sufficient to protect government officials in the exercise of their duties. Pp. 276-278.

Case 9:25-cv-00083-DWM    Document 58-1    Filed 05/04/26    Page 4 of 179

952 F.2d 965, reversed and remanded.

STEVENS, J., delivered the opinion for a unanimous Court with respect to Parts I, II, III, and IV -B, and the opinion of the Court with respect to Parts IV-A and V, in which BLACKMUN, O'CONNOR, SCALIA, and THOMAS, JJ., joined. SCALIA, J., filed a concurring opinion, *post,* p. 279. KENNEDY, J., filed an opinion concurring in part and dissenting in part, in which REHNQUIST, C. J., and WHITE and SOUTER, JJ., joined, *post,* p. 282.

G. *Flint Taylor* argued the cause for petitioner. With him on the briefs was *John L. Stain thorp.*

*James* G. *Sotos* argued the cause and filed a brief for respondents.

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief

261

were Solicitor General Starr, Assistant Attorney General Gerson, and Deputy Solicitor General Mahoney. *

JUSTICE STEVENS delivered the opinion of the Court.

In an action brought under 42 U. S. C. § 1983, petitioner seeks damages from respondent prosecutors for allegedly fabricating evidence during the preliminary investigation of a crime and making false statements at a press conference announcing the return of an indictment. The questions presented are whether respondents are absolutely immune from liability on either or both of these claims.

As the case comes to us, we have no occasion to consider whether some or all of respondents' conduct may be protected by qualified immunity. Moreover, we make two important assumptions about the case: first, that petitioner's allegations are entirely true; and, second, that they allege constitutional violations for which § 1983 provides a remedy. Our statement of facts is therefore derived entirely from petitioner's complaint and is limited to matters relevant to respondents' claim to absolute immunity.

I

Petitioner commenced this action on March 4, 1988, following his release from jail in Du Page County, Illinois. He had been incarcerated there for three years on charges growing out of the highly publicized murder of Jeanine Nicarico, an ll-year-old child, on February 25, 1983. The complaint named 17 defendants, including Du Page County, its sheriff and seven of his assistants, two expert witnesses and the estate of a third, and the five respondents.

Respondent Fitzsimmons was the duly elected Du Page County State's Attorney from the time of the Nicarico

* *Michael D. Bradbury* filed a brief for the Appellate Committee of the California District Attorneys Association as *amicus curiae.*

262

murder through December 1984, when he was succeeded by respondent Ryan, who had defeated him in a Republican primary election on March 21, 1984. Respondent Knight was an assistant state's attorney under Fitzsimmons and served as a special prosecutor in the Nicarico case under Ryan. Respondents Kilander (who came into office with Ryan) and King were assistant prosecutors, also assigned to the case.

The theory of petitioner's case is that in order to obtain an indictment in a case that had engendered "extensive publicity" and "intense emotions in the community," the prosecutors fabricated false evidence, and that in order to gain votes, Fitzsimmons made false statements about petitioner in a press conference announcing his arrest and indictment 12 days before the primary election. Petitioner claims that respondents' misconduct created a "highly prejudicial and inflamed atmosphere" that seriously impaired the fairness of the judicial proceedings against an innocent man and caused him to suffer a serious loss of freedom, mental anguish, and humiliation.

The fabricated evidence related to a bootprint on the door of the Nicarico home apparently left by the killer when he kicked in the door. After three separate studies by experts from the Du Page County Crime Lab, the Illinois

Department of Law Enforcement, and the Kansas Bureau of Identification, all of whom were unable to make a reliable connection between the print and a pair of boots that petitioner had voluntarily supplied, respondents obtained a "positive identification" from one Louise Robbins, an anthropologist in North Carolina who was allegedly well known for her willingness to fabricate unreliable expert testimony. Her opinion was obtained during the early stages of the investigation, which was being conducted under the joint supervision and direction of the sheriff and respondent Fitzsimmons, whose

263

police officers and assistant prosecutors were performing essentially the same investigatory functions.[1]

Thereafter, having failed to obtain sufficient evidence to support petitioner's (or anyone else's) arrest, respondents convened a special grand jury for the sole purpose of investi-

[1] The relevant period and prosecutorial functions are described in petitioner's first amended complaint:

'(28) Defendant Knight, and various others [sic] Defendants, including Doria, Fitzsimmons, and Burandt, apparently not satisfied with Defendant German's conclusions, contacted anthropologist Louise Robbins and Defendant Olsen of the Kansas Bureau of Indentification [sic] Crime Lab in search of a positive boot identification.

'(31) Confronted with three different expert reports which failed to match Plaintiff's boot with the footprint on the door, the Defendants, including Knight, Burandt, and German, procured their 'positive identification' from Louise Robbins, whose theories and reputation in the forensic community were generally discredited and viewed with great skepticism, a fact these Defendants knew or should have known.

'(32) Defendants Knight and King were involved with the Sheriff's police in all the early stages of their investigation, including the interrogation of witnesses and potential suspects. Specifically, Sheriff's detectives, including defendants Wilkosz and Kurzawa, at the direction and under the supervision, and sometimes in the presence and with the assistance of Defendants Knight, King, Soucek and Lepic, repeatedly interrogated alleged suspects, including Plaintiff Buckley and Alex Hernandez, who were not represented by counsel. Despite intense pressure and intimidation, Plaintiff Buckley steadfastly maintained his innocence and demonstrated no knowledge of the crime, while Hernandez told such wild and palpably false stories that his mental instability was obvious to the Defendants.

'(33) As a result of these interrogations, at least one experienced Sheriff's detective who participated[,] concluded that Buckley and Hernandez were not involved in the Nicarico crime. This conclusion was buttressed by his general knowledge of the bootprint 'evidence.'

'(34) He repeatedly communicated his conclusion, and its basis, to the Defendants named herein, including Defendants Doria, Knight, King, Soucek, Lepic, and Wilkosz.

'(35) Unable to solve the case, Defendants Doria, Fitzsimmons, Knight and King convened a special Du Page County 'investigative' grand jury, devoted solely to investigating the Nicarico case." App.8-10.

264

gating the Nicarico case. After an 8-month investigation, during which the grand jury heard the testimony of over 100 witnesses, including the bootprint experts, it was still unable to return an indictment. On January 27, 1984, respondent Fitzsimmons admitted in a public statement that there was insufficient evidence to indict anyone for the rape and murder of Jeanine Nicarico. Although no additional evidence was obtained in the interim, the indictment was returned in March, when Fitzsimmons held the defamatory press conference so shortly before the primary election. Petitioner was then arrested, and because he was unable to meet the bond (set at $3 million), he was held in jail.

Petitioner's trial began 10 months later, in January 1985.

The principal evidence against him was provided by Robbins, the North Carolina anthropologist. Because the jury was unable to reach a verdict on the charges against petitioner, the trial judge declared a mistrial. Petitioner remained in prison for two more years, during which a third party confessed to the crime and the prosecutors

remained in prison for two more years, during which a third party confessed to the crime and the prosecutors prepared for petitioner's retrial. After Robbins died, however, all charges against him were dropped. He was released, and filed this action.

II

We are not concerned with petitioner's actions against the police officers (who have asserted the defense of qualified immunity), against the expert witnesses (whose trial testimony was granted absolute immunity by the District Court, App. 53-57), and against Du Page County (whose motion to dismiss on other grounds was granted in part, *id.,* at 57-61). At issue here is only the action against the prosecutors, who moved to dismiss based on their claim to absolute immunity. The District Court held that respondents were entitled to absolute immunity for all claims except the claim against Fitzsimmons based on his press conference. *Id.,* at 53. With respect to the claim based on the alleged fabrication of evidence, the District Court framed the question as whether

265

the effort "to obtain definitive boot evidence linking [petitioner to the crime] was in the nature of acquisition of evidence or in the nature of evaluation of evidence for the purpose of initiating the criminal process." *Id.,* at 45. The Court concluded that it "appears" that it was more evaluative than acquisitive.

Both petitioner and Fitzsimmons appealed, and a divided panel of the Court of Appeals for the Seventh Circuit ruled that the prosecutors had absolute immunity on both claims. *Buckley* v. *Fitzsimmons,* 919 F.2d 1230 (1990). In the Court of Appeals' view, "damages remedies are unnecessary," *id.,* at 1240, when "[c]ourts can curtail the costs of prosecutorial blunders ... by cutting short the prosecution or mitigating its effects," *id.,* at 1241. Thus, when "out-ofcourt acts cause injury only to the extent a case proceeds" in court, *id.,* at 1242, the prosecutor is entitled to absolute immunity and "the defendant must look to the court in which the case pends to protect his interests," *id.,* at 1241. By contrast, if "a constitutional wrong is complete before the case begins," the prosecutor is entitled only to qualified immunity. *Id.,* at 1241-1242. Applying this unprecedented theory to petitioner's allegations, the Court of Appeals concluded that neither the press conference nor the fabricated evidence caused any constitutional injury independent of the indictment and trial. *Id.,* at 1243, 1244.2

2 With respect to an issue not before us, petitioner's claims that he was subject to coercive interrogations by some of the respondent prosecutors, the court found that the extent of immunity depended on the nature of those claims. The court reasoned that, because claims based on *Miranda* v. *Arizona,* 384 U. S. 436 (1966), and the Self-Incrimination Clause of the Fifth Amendment depend on what happens at trial, prosecutors are entitled to absolute immunity for those claims; by contrast, only qualified immunity is available against petitioner's claims as to "coercive tactics that are independently wrongful." 919 F. 2d, at 1244. Because it could not characterize the nature of those claims, the court remanded for further proceedings concerning Fitzsimmons, King, and Knight on this issue. *Id.,* at 1245.

266

Judge Fairchild dissented in part. He agreed with the District Court that Fitzsimmons was entitled only to qualified immunity for his press statements. He noted that the majority had failed to examine the particular function that Fitzsimmons was performing, and concluded that conducting a press conference was not among "the functions that entitle judges and prosecutors in the judicial branch to absolute immunity." *Id.,* at 1246 (opinion dissenting in part and concurring in part). Responding directly to the majority's reasoning, he wrote:

> "It is true that procedures afforded in our system of justice give a defendant a good chance to avoid such results of prejudicial publicity as excessive bail, difficulty or inability of selecting an impartial jury, and the like. These procedures reduce the cost of impropriety by a prosecutor, but I do not find that the courts have recognized their availability as a sufficient reason for conferring immunity." *Ibid.*

We granted Buckley's petition for certiorari, vacated the judgment, and remanded the case for further proceedings in light of our intervening decision in *Burns* v. *Reed,* 500 U. S. 478 (1991). 502 U. S. 801 (1991). On remand, the same panel, again divided, reaffirmed its initial decision, with one modification not relevant here. 952 F.2d 965 (CA7 1992) *(per curiam).* The Court of Appeals held that "[n]othing in *Burns* undermine[d]" its initial holding that prosecutors are absolutely immune for "normal preparatory steps"; unlike the activities at issue in *Burns,* " [t]alking with (willing) experts is trial preparation." 952 F. 2d, at 966-967. In similar fashion, the court adhered to

its conclusion that Fitzsimmons was entitled to absolute immunity for conducting the press conference. The court recognized that the press conference bore some similarities to the conduct in *Burns* (advising the police as to the propriety of an arrest). It did not take place in court, and it was not part of the prosecutor's

---

267

trial preparation. 952 F. 2d, at 967. The difference, according to the court, is that "[a]n arrest causes injury whether or not a prosecution ensues," whereas the only constitutional injury caused by the press conference depends on judicial action. *Ibid.*

Judge Fairchild again dissented. He adhered to his earlier conclusion that Fitzsimmons was entitled to only qualified immunity for the press conference, but he was also persuaded that *Burns* had drawn a line between "'conduct closely related to the judicial process'" and conduct in the role of" 'administrator or investigative officer.'" He agreed that trial preparation falls on the absolute immunity side of that line, but felt otherwise about the search for favorable evidence that might link the bootprint to petitioner during "a year long pre-arrest and pre-indictment investigation" aggressively supervised by Fitzsimmons. 952 F. 2d, at 969 (opinion dissenting in part).

We granted certiorari for a second time, limited to issues relating to prosecutorial immunity. 506 U. S. 814 (1992).3 We now reverse.

III

The principles applied to determine the scope of immunity for state officials sued under Rev. Stat. § 1979, as amended,

3 Although petitioner also alleged that respondents violated his constitutional rights in presenting the fabricated evidence to the grand jury and his trial jury, see App. 10-11, 14-15, we are not presented with any question regarding those claims. The Court of Appeals agreed with the District Court, see *id.,* at 45-47, and held that those actions were protected by absolute immunity. *Buckley* v. *Fitzsimmons,* 919 F.2d 1230, 1243 *(CA7* 1990) ("The selection of evidence to present to the grand jurors, and the manner of questioning witnesses, can no more be the basis of liability than may the equivalent activities before the petit jury"). That decision was made according to traditional principles of absolute immunity under § 1983, however, and did not depend on the original, injury-focused theory of absolute prosecutorial immunity with which we are concerned here; nor was it included within the questions presented in petitioner's petition for certiorari.

---

268

42 U. S. C. § 1983, are by now familiar. Section 1983 on its face admits of no defense of official immunity. It subjects to liability "[e]very person" who, acting under color of state law, commits the prohibited acts. In *Tenney* v. *Brandhove, 341* U. S. 367, 376 (1951), however, we held that Congress did not intend § 1983 to abrogate immunities "well grounded in history and reason." Certain immunities were so well established in 1871, when § 1983 was enacted, that "we presume that Congress would have specifically so provided had it wished to abolish" them. *Pierson* v. *Ray,* 386 U. S. 547, 554-555 (1967). See also *Newport* v. *Fact Concerts, Inc., 453* U. S. 247, 258 (1981). Although we have found immunities in § 1983 that do not appear on the face of the statute, "[w]e do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy." *Tower* v. *Glover,* 467 U. S. 914, 922-923 (1984). "[O]ur role is to interpret the intent of Congress in enacting § 1983, not to make a freewheeling policy choice." *Malley* v. *Briggs,* 475 U. S. 335, 342 (1986).

Since *Tenney,* we have recognized two kinds of immunities under § 1983. Most public officials are entitled only to qualified immunity. *Harlow* v. *Fitzgerald,* 457 U. S. 800, 807 *(1982); Butz* v. *Economou,* 438 U. S. 478, 508 (1978). Under this form of immunity, government officials are not subject to damages liability for the performance of their discretionary functions when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow* v. *Fitzgerald,* 457 U. S., at 818. In most cases, qualified immunity is sufficient to "protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Butz* v. *Economou, 438* U. S., at 506.

We have recognized, however, that some officials perform "special functions" which, because of their similarity to

We have recognized, however, that some officials perform "special functions" which, because of their similarity to func-

269

tions that would have been immune when Congress enacted § 1983, deserve absolute protection from damages liability. *Id.,* at 508. "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns* v. *Reed,* 500 U. S., at 486; *Antoine* v. *Byers & Anderson, Inc.,* 508 U. S. 429, 432, and n. 4 (1993). Even when we can identify a common-law tradition of absolute immunity for a given function, we have considered "whether § 1983's history or purposes nonetheless counsel against recognizing the same immunity in § 1983 actions." *Tower* v. *Glover,* 467 U. S., at 920. Not surprisingly, we have been "quite sparing" in recognizing absolute immunity for state actors in this context. *Forrester* v. *White,* 484 U. S. 219, 224 (1988).

In determining whether particular actions of government officials fit within a common-law tradition of absolute immunity, or only the more general standard of qualified immunity, we have applied a "functional approach," see, *e. g., Burns,* 500 U. S., at 486, which looks to "the nature of the function performed, not the identity of the actor who performed it," *Forrester* v. *White,* 484 U. S., at 229. We have twice applied this approach in determining whether the functions of contemporary prosecutors are entitled to absolute immunity.

In *Imbler* v. *Pachtman,* 424 U. S. 409 (1976), we held that a state prosecutor had absolute immunity for the initiation and pursuit of a criminal prosecution, including presentation of the State's case at trial. Noting that our earlier cases had been "predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it," *id.,* at 421, we focused on the functions of the prosecutor that had most often invited common-law tort actions. We concluded that the commonlaw rule of immunity for prosecutors was "well settled" and that "the same considerations of public policy that underlie the common-law rule likewise countenance absolute immu-

270

nity under § 1983." *Id.,* at 424. Those considerations 4 supported a rule of absolute immunity for conduct of prosecutors that was "intimately associated with the judicial phase of the criminal process." *Id.,* at 430. In concluding that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983," we did not attempt to describe the line between a prosecutor's acts in preparing for those functions, some of which would be absolutely immune, and his acts of investigation or "administration," which would not. *Id.,* at 431, and n.33.

We applied the *Imbler* analysis two Terms ago in *Burns* v. *Reed,* 500 U. S. 478 (1991). There the § 1983 suit challenged two acts by a prosecutor: (1) giving legal advice to the police on the propriety of hypnotizing a suspect and on whether probable cause existed to arrest that suspect, and (2) participating in a probable-cause hearing. We held that only the latter was entitled to absolute immunity. Immunity for that action under § 1983 accorded with the commonlaw absolute immunity of prosecutors and other attorneys for eliciting false or defamatory testimony from witnesses or for making false or defamatory statements during, and related to, judicial proceedings. *Id.,* at 489–490; *id.,* at 501 (SCALIA, J., concurring in judgment in part and dissenting in

4 In particular, we expressed concern that fear of potential liability would undermine a prosecutor's performance of his duties by forcing him to consider his own potential liability when making prosecutorial decisions and by diverting his "energy and attention ... from the pressing duty of enforcing the criminal law." *Imbler* v. *Pachtman,* 424 U. S., at 424–425. Suits against prosecutors would devolve into "a virtual retrial of the criminal offense of a new forum," *id.,* at 425, and would undermine the vigorous enforcement of the law by providing a prosecutor an incentive not "to go forward with a close case where an acquittal likely would trigger a suit against him for damages," *id.,* at 426, and n. 24. We also expressed concern that the availability of a damages action might cause judges to be reluctant to award relief to convicted defendants in post-trial motions. *Id.,* at 427.

271

part). Under that analysis, appearing before a judge and presenting evidence in support of a motion for a search warrant involved the prosecutor's "'role as advocate for the State.'" *Id.,* at 491, quoting *Imbler,* 424 U. S., at 431, n.

33. Because issuance of a search warrant is a judicial act, appearance at the probable-cause hearing was "'intimately associated with the judicial phase of the criminal process,'" *Burns,* 500 U. S., at 492, quoting *Imbler,* 424 U. S., at 430.

We further decided, however, that prosecutors are not entitled to absolute immunity for their actions in giving legal advice to the police. We were unable to identify any historical or common-law support for absolute immunity in the performance of this function. 500 U. S., at 492-493. We also noted that any threat to the judicial process from "the harassment and intimidation associated with litigation" based on advice to the police was insufficient to overcome the "[a]bsen[ce] [of] a tradition of immunity comparable to the common-law immunity from malicious prosecution, which formed the basis for the decision in *Imbler.*" *Id.,* at 493,494. And though we noted that several checks other than civil litigation prevent prosecutorial abuses in advising the police, "one of the most important checks, the judicial process," will not be effective in all cases, especially when in the end the suspect is not prosecuted. *Id.,* at 496. In sum, we held that providing legal advice to the police was not a function "closely associated with the judicial process." *Id.,* at 495.

IV

In this case the Court of Appeals held that respondents are entitled to absolute immunity because the injuries suffered by petitioner occurred during criminal proceedings. That holding is contrary to the approach we have consistently followed since *Imbler.* As we have noted, the *Imbler* approach focuses on the conduct for which immunity is claimed, not on the harm that the conduct may have caused or the question whether it was lawful. The location of the

272

injury may be relevant to the question whether a complaint has adequately alleged a cause of action for damages (a question that this case does not present, see *supra,* at 261). It is irrelevant, however, to the question whether the conduct of a prosecutor is protected by absolute immunity. Accordingly, although the Court of Appeals' reasoning may be relevant to the proper resolution of issues that are not before us, it does not provide an acceptable basis for concluding that either the preindictment fabrication of evidence or the postindictment press conference was a function protected by absolute immunity. We therefore turn to consider each of respondents' claims of absolute immunity.

A

We first address petitioner's argument that the prosecutors are not entitled to absolute immunity for the claim that they conspired to manufacture false evidence that would link his boot with the bootprint the murderer left on the front door. To obtain this false evidence, petitioner submits, the prosecutors shopped for experts until they found one who would provide the opinion they sought. App. 7-9. At the time of this witness shopping the assistant prosecutors were working hand in hand with the sheriff's detectives under the joint supervision of the sheriff and State's attorney Fitzsimmons.

Petitioner argues that *Imbler's* protection for a prosecutor's conduct "in initiating a prosecution and in presenting the State's case," 424 U. S., at 431, extends only to the act of initiation itself and to conduct occurring in the courtroom. This extreme position is plainly foreclosed by our opinion in *Imbler* itself. We expressly stated that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom," and are nonetheless entitled to absolute immunity. *Id.,* at 431, n. 33. We noted in particular that an out-of-court "effort to control the presen-

273

tation of [a] witness' testimony" was entitled to absolute immunity because it was "fairly within [the prosecutor's] function as an advocate." *Id.,* at 430, n. 32. To be sure, *Burns* made explicit the point we had reserved in *Imbler,* 424 U. S., at 430-431, and n. 33: A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity. See *Burns,* 500 U. S., at 494-496. We have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and

immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

On the other hand, as the function test of *Imbler* recognizes, the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor. Qualified immunity" 'represents the norm'" for executive officers, *Malley* v. *Briggs,* 475 U. S., at 340, quoting *Harlow* v. *Fitzgerald,* 457 U. S., at 807, so when a prosecutor "functions as an administrator rather than as an officer of the court" he is entitled only to qualified immunity. *Imbler,* 424 U. S., at 431, n. 33. There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is "neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Hampton* v. *Chicago,* 484 F.2d 602, 608 (CA7 1973)

274

(internal quotation marks omitted), cert. denied, 415 U. S. 917 (1974). Thus, if a prosecutor plans and executes a raid on a suspected weapons cache, he "has no greater claim to complete immunity than activities of police officers allegedly acting under his direction." 484 F. 2d, at 608-609.

The question, then, is whether the prosecutors have carried their burden of establishing that they were functioning as "advocates" when they were endeavoring to determine whether the bootprint at the scene of the crime had been made by petitioner's foot. A careful examination of the allegations concerning the conduct of the prosecutors during the period before they convened a special grand jury to investigate the crime provides the answer. See *supra,* at 263, n. 1. The prosecutors do not contend that they had probable cause to arrest petitioner or to initiate judicial proceedings during that period. Their mission at that time was entirely investigative in character. A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested.5

5 Of course, a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination, as the opinion dissenting in part points out, *post,* at 290, a prosecutor may engage in "police investigative work" that is entitled to only qualified immunity.

Furthermore, there is no "true anomaly," *post,* at 286, in denying absolute immunity for a state actor's investigative acts made before there is probable cause to have a suspect arrested just because a prosecutor would be entitled to absolute immunity for the malicious prosecution of someone whom he lacked probable cause to indict. That criticism ignores the essence of the function test. The reason that lack of probable cause allows us to deny absolute immunity to a state actor for the former function (fabrication of evidence) is that there is no common-law tradition of immunity for it, whether performed by a police officer or prosecutor. The reason that we grant it for the latter function (malicious prosecution) is that we have found a common-law tradition of immunity for a prosecutor's decision to bring an indictment, whether he has probable cause or not. By insisting on an equation of the two functions merely because a prosecutor

275

It was well after the alleged fabrication of false evidence concerning the bootprint that a special grand jury was empaneled. And when it finally was convened, its immediate purpose was to conduct a more thorough investigation of the crime-not to return an indictment against a suspect whom there was already probable cause to arrest. Buckley was not arrested, in fact, until 10 months after the grand jury had been convened and had finally indicted him. Under these circumstances, the prosecutors' conduct occurred well before they could properly claim to be acting as advocates. Respondents have not cited any authority that supports an argument that a prosecutor's fabrication of false evidence during the preliminary investigation of an unsolved crime was immune from liability at common law, either in 1871 or at any date before the enactment of § 1983. It therefore remains protected only by qualified immunity.

After *Burns,* it would be anomalous, to say the least, to grant prosecutors only qualified immunity when offering legal advice to police about an unarrested suspect, but then to endow them with absolute immunity when conducting investigative work themselves in order to decide whether a suspect may be arrested.6 That the

prosecutors later called

might be subject to liability for one but not the other, the dissent allows its particular policy concerns to erase the function test it purports to respect.

In general, the dissent's distress over the denial of absolute immunity for prosecutors who fabricate evidence regarding unsolved crimes, *post,* at 283-285, like the holding of the Court of Appeals, seems to conflate the question whether a § 1983 plaintiff has stated a cause of action with the question whether the defendant is entitled to absolute immunity for his actions.

6 Cf. *Burns* v. *Reed,* 500 U. S. 478, 495 (1991): "Indeed, it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice .... Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive." If the police, under the guidance of the prosecutors, had solicited the alleg-

276

a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutoriaP A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as "preparation" for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial. When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same.

B

We next consider petitioner's claims regarding Fitzsimmons' statements to the press. Petitioner alleged that, during the prosecutor's public announcement of the indictment, Fitzsimmons made false assertions that numerous pieces of evidence, including the bootprint evidence, tied Buckley to a burglary ring that committed the Nicarico murder. App. 12. Petitioner also alleged that Fitzsimmons released mug shots of him to the media, "which were prominently and repeatedly displayed on television and in the newspapers." *Ibid.* Peti-

edly "fabricated" testimony, of course, they would not be entitled to anything more than qualified immunity.

7 See *Imbler* v. *Pachtman,* 424 U. S. 409, 431, n. 33 (1976): "Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them." Although the respondents rely on the first sentence of this passage to suggest that a prosecutor's actions in "obtaining, reviewing, and evaluating" evidence are always protected by absolute immunity, the sentence that follows qualifies that suggestion. It confirms that some of these actions may fall on the administrative, rather than the judicial, end of the prosecutor's activities, and therefore be entitled only to qualified immunity.

277

tioner's legal theory is that "[t]hese false and prejudicial statements inflamed the populace of DuPage County against" him, *ibid.;* see also *id.,* at 14, thereby defaming him, resulting in deprivation of his right to a fair trial, and causing the jury to deadlock rather than acquit, *id.,* at 19.

Fitzsimmons' statements to the media are not entitled to absolute immunity. Fitzsimmons does not suggest that in 1871 there existed a common-law immunity for a prosecutor's, or attorney's, out-of-court statement to the press. The Court of Appeals agreed that no such historical precedent exists. 952 F. 2d, at 967. Indeed, while prosecutors, like all attorneys, were entitled to absolute immunity from defamation liability for statements made during the course of judicial proceedings and relevant to them, see *Burns,* 500 U. S., at 489-490; *Imbler,* 424 U. S., at 426, n. 23; *id.,* at 439 (WHITE, J., concurring in judgment), most statements made out of court received

only good-faith immunity. The common-law rule was that "[t]he speech of a counsel is privileged by the occasion on which it is spoken .... " *Flint* v. *Pike,* 4 Barn. & Cress. 473, 478, 107 Eng. Rep. 1136, 1138 (K. B. 1825) (Bayley, J.).8

The functional approach of *Imbler,* which conforms to the common-law theory, leads us to the same conclusion. Comments to the media have no functional tie to the judicial process just because they are made by a prosecutor. At the

8 "[Absolute immunity] does not apply to or include any publication of defamatory matter before the commencement, or after the termination of the judicial proceeding (unless such publication is an act incidental to the proper initiation thereof, or giving legal effect thereto); nor does it apply to or include any publication of defamatory matter to any person other than those to whom, or in any place other than that in which, such publication is required or authorized by law to be made for the proper conduct of the judicial proceedings." Veeder, Absolute Immunity in Defamation:

Judicial Proceedings, 9 Colum. L. Rev. 463, 489 (1909) (footnotes omitted). See, *e. g., Viosca* v. *Landfried,* 140 La. 610, 615, 73 So. 698, 700 (1916); *Youmans* v. *Smith,* 153 N. Y. 214, 220-223, 47 N. E. 265, 267-268 (1897). See also G. Bower, Law of Actionable Defamation 103, n. *h,* 104-105 (1908).

278

press conference, Fitzsimmons did not act in "'his role as advocate for the State,'" *Burns* v. *Reed,* 500 U. S., at 491, quoting *Imbler* v. *Pachtman,* 424 U. S., at 431, n. 33. The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the State's case in court, or actions preparatory for these functions. Statements to the press may be an integral part of a prosecutor's job, see National District Attorneys Assn., National Prosecution Standards 107, 110 (2d ed. 1991), and they may serve a vital public function. But in these respects a prosecutor is in no different position than other executive officials who deal with the press, and, as noted, *supra,* at 268, 277, qualified immunity is the norm for them.

Fitzsimmons argues nonetheless that policy considerations support extending absolute immunity to press statements. Brief for Respondents 30-33. There are two responses to his submissions. First, "[w]e do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy." *Tower* v. *Glover, 467* U. S., at 922-923. When, as here, the prosecutorial function is not within the advocate's role and there is no historical tradition of immunity on which we can draw, our inquiry is at an end. Second, "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns* v. *Reed,* 500 U. S., at 486-487. Even if policy considerations allowed us to carve out new absolute immunities to liability for constitutional wrongs under § 1983, we see little reason to suppose that qualified immunity would provide adequate protection to prosecutors in their provision of legal advice to the police, see *id.,* at 494-496, yet would fail to provide sufficient protection in the present context.9

9 The Circuits other than the Seventh Circuit that have addressed this issue have applied only qualified immunity to press statements, see, *e. g., Powers* v. *Coe,* 728 F.2d 97,103 *(CA2 1984); Marrero* v. *Hialeah,* 625 F.2d 499, 506-507 *(CA5* 1980), cert. denied, 450 U. S. 913 (1981); *Gobel* v. *Mari-*

279

V

In his complaint, petitioner also charged that the prosecutors violated his rights under the Due Process Clause through extraction of statements implicating him by coercing two witnesses and paying them money. App. 9-11, 19. The precise contours of these claims are unclear, and they were not addressed below; we leave them to be passed on in the first instance by the Court of Appeals on remand.

As we have stated, *supra,* at 261, 264, 265, n. 2, petitioner does not challenge many aspects of the Court of Appeals' decision, and we have not reviewed them; they remain undisturbed by this opinion. As to the two challenged rulings on absolute immunity, however, the judgment of the United States Court of Appeals for the Seventh Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

JUSTICE SCALIA, concurring.

As the Court observes, respondents have not demonstrated that the function either of fabricating evidence during the preliminary investigation of a crime, or of making out-of-court statements to the press, was protected by a well-established common-law privilege in 1871, when § 1983 was enacted. See *ante,* at 275, 277. It follows that respondents' alleged performance of such acts is not absolutely

*copa County,* 867 F.2d 1201, 1205 *(CA9 1989); England* v. *Hendricks, 880* F. 2d 281, 285 (CAlO 1989), cert. denied, 493 U. S. lO78 (1990); *Marx* v. *Gumbinner,* 855 F.2d 783, 791 (CAll 1988); cf. *Rose* v. *Bartle,* 871 F. 2d *331,345-346 (CA3* 1989), yet Fitzsimmons has not suggested that prosecutors in those Circuits have been unduly constrained in keeping the public informed of pending criminal prosecutions. We also do not perceive why anything except a firm common-law rule should entitle a prosecutor to absolute immunity for his statements to the press when nonprosecutors who make similar statements, for instance, an attorney general's press spokesperson or a police officer announcing the return of an indictment, receive only qualified immunity.

---

280

immune from suit under § 1983, since "the presumed legislative intent not to eliminate traditional immunities is our only justification for limiting the categorical language of the statute." *Burns* v. *Reed,* 500 U. S. 478, 498 (1991) (SCALIA, J., concurring in judgment in part and dissenting in part); accord, *ante,* at 267-269. The policy reasons for extending protection to such conduct may seem persuasive, see *post,* at 283-286 (KENNEDY, J., concurring in part and dissenting in part), but we simply "do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy," *Tower* v. *Glover,* 467 U. S. 914, 922-923 (1984). This is therefore an easy case, in my view, and I have no difficulty joining the Court's judgment.

I join the Court's opinion as well, though I have some reservation about the historical authenticity of the "principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity," *ante,* at 273. By the early years of this century, there was some authority for the proposition that the traditional defamation immunity extends to "act[s] incidental to the proper initiation" or pursuit of a judicial proceeding, such as "[s]tatements made by counsel to proposed witnesses," Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Colum. L. Rev. 463, 489, and n. 82 (1909). See, *e. g.,* G. Bower, Actionable Defamation 103-105, and n. *h* (1908); *Youmans* v. *Smith,* 153 N. Y. 214, 47 N. E. 265 (1897). I have not found any previous expression of such a principle, but accede to the Court's judgment that it existed several decades earlier, when § 1983 was enacted, at least in the sense that it could be logically derived from then-existing decisions, cf. *Burns, supra,* at 505 (SCALIA, J., concurring in judgment in part and dissenting in part). In future cases, I trust the Court (aided by briefing on the point) will look to history to determine more precisely the outlines of this principle. It is certainly

---

281

in accord with the principle to say that prosecutors cannot "properly claim to be acting as advocates" *before* they have "probable cause to have anyone arrested," *ante,* at 274, 275but reference to the common-law cases will be indispensable to show when they can properly claim to be acting "as advocates" *after* that point, though not yet "during the course of judicial proceedings," *ante,* at 277.

I believe, moreover, that the vagueness of the "acting-asadvocate" principle may be less troublesome in practice than it seems in theory, for two reasons. First, the Court reaffirms that the defendant official bears the burden of showing that the conduct for which he seeks immunity would have been privileged at common law in 1871. See *ante,* at 269, 275, 277-278. Thus, if application of the principle is unclear, the defendant simply loses. Second, many claims directed at prosecutors, of the sort that are based on acts not plainly covered by the conventional malicious-prosecution and defamation privileges, are probably not actionable under § 1983, and so may be dismissed at the pleading stage without regard to immunity-undermining the dissent's assertion that we have converted absolute prosecutorial immunity into "little more than a pleading rule," *post,* at 283. I think petitioner's false-evidence claims in the present case illustrate this point. Insofar as they are based on respondents' supposed knowing *use* of fabricated evidence before the grand jury and at trial, see *ante,* at 267, n. 3-acts which might state a claim for denial of due process, see, *e. g., Mooney* v. *Holohan,* 294 U. S. 103, 112 (1935) *(per curiam)-*the

traditional defamation immunity provides complete protection from suit under § 1983. If "reframe[d] ... to attack the preparation" of that evidence, *post,* at 283, the claims are unlikely to be cognizable under § 1983, since petitioner cites, and I am aware of, no authority for the proposition that the mere preparation of false evidence, as opposed to its use in a fashion that deprives someone of a fair trial or otherwise harms him, violates the Constitution. See *Buckley* v. *Fitzsimmons,* 919

---

282

Opinion of KENNEDY, J.

F. 2d 1230, 1244 (CA7 1990), vacated and remanded, 502 U. S. 801 (1991).

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE SOUTER join, concurring in part and dissenting in part.

I agree there is no absolute immunity for statements made during a press conference. But I am unable to agree with the Court's conclusion that respondents are not entitled to absolute immunity on petitioner's claim that they conspired to manufacture false evidence linking petitioner to the bootprint found on the front door of Jeanine Nicarico's home. I join Parts I, II, III, and IV -B of the Court's opinion, but dissent from Part IV-A.

I

As the Court is correct to observe, the rules determining whether particular actions of government officials are entitled to immunity have their origin in historical practice and have resulted in a functional approach. *Ante,* at 267-268. See also *Burns* v. *Reed,* 500 U. S. 478, 484-486 (1991); *Forrester* v. *White,* 484 U. S. 219, 224 (1988); *Malley* v. *Briggs,* 475 U. S. 335, 342-343 (1986); *Cleavinger* v. *Saxner,* 474 U. S. 193, 201 (1985); *Briscoe* v. *LaHue,* 460 U. S. 325, 342 (1983); *Harlow* v. *Fitzgerald,* 457 U. S. 800, 810 (1982); *Butz* v. *Economou,* 438 U. S. 478, 511-513 (1978); *Imbler* v. *Pachtman,* 424 U. S. 409, 420-425 (1976). I share the Court's unwillingness to accept Buckley's argument "that *Imbler's* protection for a prosecutor's conduct 'in initiating a prosecution and in presenting the State's case,' 424 U. S., at 431, extends only to the act of initiation itself and to conduct occurring in the courtroom." *Ante,* at 272. In *Imbler,* we acknowledged that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom," and we explained that these actions of the prosecutor, undertaken in

---

283

his functional role as an advocate, were entitled to absolute immunity, 424 U. S., at 431, n. 33. See *ante,* at 269-270.

There is a reason even more fundamental than that stated by the Court for rejecting Buckley's argument that *Imbler* applies only to the commencement of a prosecution and to in-court conduct. This formulation of absolute prosecutorial immunity would convert what is now a substantial degree of protection for prosecutors into little more than a pleading rule. Almost all decisions to initiate prosecution are preceded by substantial and necessary out-of-court conduct by the prosecutor in evaluating the evidence and preparing for its introduction, just as almost every action taken in the courtroom requires some measure of out-of-court preparation. Were preparatory actions unprotected by absolute immunity, a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves. *Imbler* v. *Pachtman, supra,* at 431, n. 34. Cf. *Eastland* v. *United States Servicemen's Fund,* 421 U. S. 491, 503-507 (1975). Allowing the avoidance of absolute immunity through that pleading mechanism would undermine in large part the protections that we found necessary in *Imbler* and would discourage trial preparation by prosecutors. In this way, Buckley's proffered standard would have the perverse effect of encouraging, rather than penalizing, carelessness, cf. *Forrester* v. *White, supra,* at 223, and it would discourage early participation by prosecutors in the criminal justice process.

Applying these principles to the case before us, I believe that the conduct relating to the expert witnesses falls on the absolute immunity side of the divide. As we recognized in *Imbler* and *Burns,* and do recognize again today, the functional approach does not dictate that all actions of a prosecutor are accorded absolute immunity. "When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the

---

appropriate nor justifiable that, for the same act, immunity should protect the

284

Opinion of KENNEDY, J.

one and not the other.'" *Ante,* at 273, quoting *Hampton* v. *Chicago,* 484 F.2d 602,608 (CA71973), cert. denied, 415 U. s. 917 (1974). Nonetheless, while Buckley labels the prosecutors' actions relating to the bootprint experts as "investigative," I believe it is more accurate to describe the prosecutors' conduct as preparation for trial. A prosecutor must consult with a potential trial witness before he places the witness on the stand, and if the witness is a critical one, consultation may be necessary even before the decision whether to indict. It was obvious from the outset that the bootprint was critical to the prosecution's case, and the prosecutors' consultation with experts is best viewed as a step to ensure the bootprint's admission in evidence and to bolster its probative value in the eyes of the jury.

Just as *Imbler* requires that the decision to use a witness must be insulated from liability, 424 U. S., at 426, it requires as well that the steps leading to that decision must be free of the distortive effects of potential liability, at least to the extent that the prosecutor is engaged in trial preparation. Actions in "obtaining, reviewing, and evaluating" witness testimony, *id.,* at 431, n. 33, are a classic function of the prosecutor as advocate. Pretrial and even preindictment consultation can be "intimately associated with the judicial phase of the criminal process," *id.,* at 430. Potential liability premised on the prosecutor's early consultation would have "an adverse effect upon the functioning of the criminal justice system," *id.,* at 426. Concern about potential liability arising from pretrial consultation with a witness might "hampe[r]" a prosecutor's exercise of his judgment as to whether a certain witness should be used. *Id.,* at 426, and n. 24. The prospect of liability may "induc[e] [a prosecutor] to act with an excess of caution or otherwise to skew [his] decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide [his] conduct." *Forrester* v. *White, supra,* at 223. Moreover, "[e]xposing the prosecutor to liability for the initial phase of

285

his prosecutorial work could interfere with his exercise of independent judgment at every phase of his work, since the prosecutor might come to see later decisions in terms of their effect on his potential liability." *Malley* v. *Briggs,* 475 U. S., at 343. That distortion would frustrate the objective of accuracy in the determination of guilt or innocence. See *Imbler* v. *Pachtman, supra,* at 426.

Furthermore, the very matter the prosecutors were considering, the decision to use particular expert testimony, was "subjected to the 'crucible of the judicial process.'" *Burns* v. *Reed,* 500 U. S., at 496, quoting *Imbler* v. *Pachtman, supra,* at 440 (WHITE, J., concurring in judgment). Indeed, it appears that the only constitutional violations these actions are alleged to have caused occurred within the judicial process. The question Buckley presented in his petition for certiorari itself makes this point: "Whether prosecutors are entitled to absolute prosecutorial immunity for supervision of and participation in a year long pre-arrest and preindictment investigation because the injury suffered by the criminal defendant occurred during the later criminal proceedings?" Pet. for Cert. i. Remedies other than prosecutorialliability, for example, a pretrial ruling of inadmissibility or a rejection by the trier of fact, are more than adequate "to prevent abuses of authority by prosecutors." *Burns* v. *Reed, supra,* at 496. See also *Butz* v. *Economou,* 438 U. S., at 512; *Imbler* v. *Pachtman, supra,* at 429.

Our holding in *Burns* v. *Reed, supra,* is not to the contrary.

There we cautioned that prosecutors were not entitled to absolute immunity for "every litigation-inducing conduct," *id.,* at 494, or for every action that "could be said to be in some way related to the ultimate decision whether to prosecute," *id.,* at 495. The premise of *Burns* was that, in providing advice to the police, the prosecutor acted to guide the police, not to prepare his own case. See *id.,* at 482 (noting that the police officers sought the prosecutor's advice first to find out whether hypnosis was "an unacceptable investiga-

286

Opinion of KENNEDY, J.

tive technique" and later to determine whether there was a basis to "plac[e] [a suspect] under arrest"). In those circumstances, we found an insufficient link to the judicial process to warrant absolute immunity. But the situation here is quite different. For the reasons already explained, subjecting a prosecutor's pretrial or preindictment witness consultation and preparation to damages actions would frustrate and impede the judicial process, the result *Imbler* is designed to avoid.

II

The Court reaches a contrary conclusion on the issue of the bootprint evidence by superimposing a bright-line standard onto the functional approach that has guided our past decisions. According to the Court, "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Ante,* at 274. To allow otherwise, the Court tells us, would create an anomalous situation whereby prosecutors are granted only qualified immunity when offering legal advice to the police regarding an unarrested suspect, see *Burns, supra,* at 492-496, but are endowed with absolute immunity when conducting their own legal work regarding an unarrested suspect. *Ante,* at 275-276.

I suggest that it is the Court's probable-cause demarcation between when conduct can be considered absolutely immune advocacy and when it cannot that creates the true anomaly in this case. We were quite clear in *Imbler* that if absolute immunity for prosecutors meant anything, it meant that prosecutors were not subject to suit for malicious prosecution. 424 U. S., at 421-422, 424, 428. See also *Burns, supra,* at 493 ("[T]he common-law immunity from malicious prosecution ... formed the basis for the decision in *Imbler"*). Yet the central component of a malicious prosecution claim is that the prosecutor in question acted maliciously and *with*out probable cause. See *Wyatt* v. *Cole,* 504 U. S. 158, 165 *(1992); id.,* at 170 (KENNEDY, J., concurring); *id.,* at 177

---

287

(REHNQUIST, C. J., dissenting); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 119 (5th ed. 1984). If the Court means to withhold absolute immunity whenever it is alleged that the injurious actions of a prosecutor occurred before he had probable cause to believe a specified individual committed a crime, then no longer is a claim for malicious prosecution subject to ready dismissal on absolute immunity grounds, at least where the claimant is clever enough to include some actions taken by the prosecutor prior to the initiation of prosecution. I find it rather strange that the classic case for the invocation of absolute immunity falls on the unprotected side of the Court's new dividing line. I also find it hard to accept any line that can be so easily manipulated by criminal defendants turned civil plaintiffs, allowing them to avoid a dismissal on absolute immunity grounds by throwing in an allegation that a prosecutor acted without probable cause. See *supra,* at 283.

Perhaps the Court means to draw its line at the point where an appropriate neutral third party, in this case the Illinois special grand jury, makes a determination of probable cause. This line, too, would generate anomalous results. To begin, it could have the perverse effect of encouraging prosecutors to seek indictments as early as possible in an attempt to shelter themselves from liability, even in cases where they would otherwise prefer to wait on seeking an indictment to ensure that they do not accuse an innocent person. Given the stigma and emotional trauma attendant to an indictment and arrest, promoting premature indictments and arrests is not a laudable accomplishment.

Even assuming these premature actions would not be induced by the Court's rule, separating absolute immunity from qualified immunity based on a third-party determination of probable cause makes little sense when a civil plaintiff claims that a prosecutor falsified evidence or coerced confessions. If the false evidence or coerced confession served as the basis for the third party's determination of probable

---

288

Opinion of KENNEDY, J.

cause, as was alleged here, it is difficult to fathom why securing such a fraudulent determination transmogrifies unprotected conduct into protected conduct. Finally, the Court does not question our conclusion in *Burns* that absolute immunity attached to a prosecutor's conduct before a grand jury because it "'perform[sJ a judicial function.'" 500 U. S., at 490, quoting W. Prosser, Law of Torts § 94, pp. 826-827 (1941). See also *Yaselli* v. *Goff,* 12

F.2d 396 (CA2 1926), aff'd, 275 U. S. 503 (1927). It is unclear to me, then, why preparing for grand jury proceedings, which obviously occur before an indictment is handed down, cannot be "intimately associated with the judicial phase of the criminal process" and subject to absolute immunity. *Burns, supra,* at 492, quoting *Imbler, supra,* at 430.

As troubling as is the line drawn by the Court, I find the reasons for its line-drawing to be of equal concern. The Court advances two reasons for distinguishing between preprobable-cause and post-probable-cause activity by prosecutors. First, the distinction is needed to ensure that prosecutors receive no greater protection than do police officers when engaged in identical conduct. *Ante,* at 276. Second, absent some clear distinction between investigation and advocacy, the Court fears, "every prosecutor might ... shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial." *Ibid.* This step, it is alleged, would enable any prosecutor to "retrospectively describ[e]" his investigative work "as 'preparation' for a possible trial" and therefore request the benefits of absolute immunity. *Ibid.* I find neither of these justifications persuasive.

The Court's first concern, I take it, is meant to be a restatement of one of the unquestioned goals of our § 1983 immunity jurisprudence: ensuring parity in treatment among state actors engaged in identical functions. *Forrester* v. *White,* 484 U. S., at 229; *Cleavinger* v. *Saxner,* 474 U. S., at

---

289

201. But it was for the precise reason of advancing this goal that we adopted the functional approach to absolute immunity in the first place, and I do not see a need to augment that approach by developing bright-line rules in cases where determining whether different actors are engaged in identical functions involves careful attention to subtle details. The Court, moreover, perceives a danger of disparate treatment because it assumes that before establishing probable cause, police and prosecutors perform the same functions. *Ante,* at 276. This assumption seem to me unwarranted. I do not understand the art of advocacy to have an inherent temporal limitation, so I cannot say that prosecutors are never functioning as advocates before the determination of probable cause. More to the point, the Court's assumption further presumes that when both prosecutors and police officers engage in the same conduct, they are of necessity engaged in the same function. With this I must disagree. Two actors can take part in similar conduct and similar inquiries while doing so for different reasons and to advance different functions. It may be that a prosecutor and a police officer are examining the same evidence at the same time, but the prosecutor is examining the evidence to determine whether it will be persuasive at trial and of assistance to the trier of fact, while the police officer examines the evidence to decide whether it provides a basis for arresting a suspect. The conduct is the same but the functions distinct. See Buchanan, Police-Prosecutor Teams, 23 The Prosecutor 32 (summer 1989).

Advancing to the second reason provided for the Court's line-drawing, I think the Court overstates the danger of allowing pre-probable-cause conduct to constitute advocacy entitled to absolute immunity. I agree with the Court that the institution of a prosecution "does not retroactively transform ... work from the administrative into the prosecutorial," *ante,* at 276, but declining to institute a prosecution

---

290

Opinion of KENNEDY, J.

likewise should not "retroactively transform" work from the prosecutorial into the administrative. Cf. *Imbler,* 424 U. S., at 431, n. 33 ("We recognize that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution .... These include questions of whether to present a case to a grand jury, whether to file an information, [and] whether and when to prosecute"). In either case, the primary question, one which I have confidence the federal courts are able to answer with some accuracy, is whether a prosecutor was acting as an advocate, an investigator, or an administrator when he took the actions called into question in a subsequent § 1983 action. As long as federal courts center their attention on this question, a concern that prosecutors can disguise their investigative and administrative actions as early forms of advocacy seems to be unfounded.

III

In recognizing a distinction between advocacy and investigation, the functional approach requires the drawing of

Case 9:25-cv-00083-DWM    Document 58-1    Filed 05/04/26    Page 18 of 179

In recognizing a distinction between advocacy and investigation, the functional approach requires the drawing of difficult and subtle distinctions, and I understand the necessity for a workable standard in this area. But the rule the Court adopts has created more problems than it has solved. For example, even after there is probable cause to arrest a suspect or after a suspect is indicted, a prosecutor might act to further police investigative work, say by finding new leads, in which case only qualified immunity should apply. The converse is also true: Even before investigators are satisfied that probable cause exists or before an indictment is secured, a prosecutor might begin preparations to present testimony before a grand jury or at trial, to which absolute immunity must apply. In this case, respondents functioned as advocates, preparing for prosecution before investigators are alleged to have amassed probable cause and before an indictment was deemed appropriate. In my judgment

---

291

respondents are entitled to absolute immunity for their involvement with the expert witnesses in this case. With respect, I dissent from that part of the Court's decision reversing the Court of Appeals judgment of absolute immunity for respondents' conduct in relation to the bootprint evidence.

## Materials

### Oral Arguments

Oral Argument - February 22, 1993

## Search This Case

Google Scholar          Google Books          Google Web

Google News

## Charlotte, North Carolina Lawyers
Sponsored Listings

### Kelli Y. Allen

(704) 727-4900
**Charlotte, NC**
Family Law, Criminal Law, Immigration Law, Divorce, DUI & DWI, Domestic Violence

FindLaw.

Find a Lawyer

Legal Forms & Services ⌄

Learn About the Law ⌄

Legal Professionals ⌄

Blogs

🔍

# CLYDE RAYMOND SPENCER v. SHARON KRAUSE MICHAEL DAVIDSON (2017)

## United States Court of Appeals, Ninth Circuit.

CLYDE RAYMOND SPENCER, Plaintiff-Appellant/ Cross-Appellee, v. JAMES M. PETERS, Defendant, SHARON KRAUSE, Detective (Clark County); MICHAEL DAVIDSON, Sergeant (Clark County), Defendants-Appellees/ Cross-Appellants.

## Nos. 14-35689

## Decided: May 18, 2017

## Before: Susan P. Graber, Sandra S. Ikuta, and Andrew D. Hurwitz, Circuit Judges.

**COUNSEL Kathleen Zellner (argued), Kathleen T. Zellner & Associates P.C., Downers Grove, Illinois, for Plaintiff-Appellant/Cross-Appellee. Jeffrey A.O. Freimund (argued), Freimund Jackson & Tardif PLLC, Olympia, Washington, for Defendant-Appellee/Cross-Appellant Michael Davidson. Guy M. Bogdanovich (argued), Law Lyman Daniel Kamerrer & Bogdanovich, Olympia, Washington, for Defendant-Appellee/Cross-Appellant Sharon Krause.**

OPINION

SUMMARY *

Civil Rights

The panel reversed the district court's judgment as a matter of law and remanded with instructions to reinstate a jury verdict in a 42 U.S.C. § 1983 action in which plaintiff alleged that a Clark County detective

deliberately fabricated evidence against him and continued her criminal investigation despite knowing that plaintiff was innocent.

Plaintiff alleged that defendant deliberately mischaracterized witness statements in her investigative reports. As a result, plaintiff testified that he entered a plea pursuant to Carolina v. Alford, 500 U.S. 25, 37–38 (1970), causing him to spend nearly twenty years in prison. A jury found for plaintiff, but the district court granted judgment as a matter of law to defendants on the grounds that plaintiff failed to introduce evidence that defendant knew or should have known of plaintiff's innocence.

The panel held that because plaintiff introduced direct evidence of fabrication, he did not have to prove that defendant knew or should have known he was innocent. Addressing defendant's cross-appeal, the panel held that ample evidence in the record supported the jury's finding on causation and given the jury's finding on causation and all other elements, the district court did not err by not separately instructing the jury on "but for" causation and "proximate" causation. The panel further held that the district court did not err by declining to instruct the jury that plaintiff was required to prove, that setting aside the fabricated evidence, probable cause was lacking. Finally, the panel held that the district court did not err by giving a deliberate indifference instruction and by permitting plaintiff to introduce certain evidence.

GRABER, Circuit Judge:

The Fourteenth Amendment prohibits the deliberate fabrication of evidence by a state official. Devereaux v. Abbey, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (en banc). Deliberate fabrication can be established by circumstantial evidence. For example, evidence that officials "continued their investigation of [a person] despite the fact that they knew or should have known that he was innocent, id. at 1076, can raise the inference that the investigator has an "unlawful motivation" to frame an innocent person. Costanich v. Dep't of Soc. & Health Servs., 627 F.3d 1101, 1111 (9th Cir. 2010). Or deliberate fabrication can be shown by direct evidence, for example, when "an interviewer . deliberately mischaracterizes witness statements in her investigative report." Id. In cases involving direct evidence, the investigator's knowledge or reason to know of the plaintiff's innocence need not be proved. Id.

In this 42 U.S.C. § 1983 action, Plaintiff Clyde Raymond Spencer introduced direct evidence of deliberate fabrication, specifically, evidence that Clark County Sheriff's Office Detective Sharon Krause deliberately mischaracterized witnesses' statements in her investigative reports. A jury found for Plaintiff and against Defendants Krause and Sergeant Michael Davidson, Krause's supervisor. But the district court granted judgment as a matter of law to Defendants, on the ground that Plaintiff had failed to introduce evidence that Krause knew or should have known of Plaintiff's innocence. Because the district court misunderstood our precedent, and because Defendants' other challenges to the jury's verdict fail, we reverse and remand with instructions to enter judgment for Plaintiff consistent with the jury's verdict.

FACTUAL AND PROCEDURAL HISTORY 1

Plaintiff and his first wife, DeAnne Spencer, had two children, Matthew and Kathryn. After a divorce, DeAnne retained primary custody of the children in Sacramento, California, and the children visited Plaintiff several times a year near Vancouver, Washington.

After Plaintiff and DeAnne separated, Plaintiff lived with Karen Stone for about two years. Matthew and Kathryn visited Plaintiff for extended periods during that time, and they got to know Stone. In 1983, Plaintiff married his second wife, Shirley Spencer. Shirley's son from a previous relationship, Matthew Hansen ("Hansen"), therefore became Plaintiff's stepson. Plaintiff, Shirley, and Hansen lived together in the Vancouver area.

In the summer of 1984, Matthew and Kathryn visited Plaintiff for a six-week stay ending on Sunday, August 26, 1984. Matthew was 8; Kathryn was 5; and Hansen was 4. On the final weekend of the stay, Kathryn allegedly disclosed to Shirley that she had been sexually abused, including acts of vaginal and oral sex, by four people: her father (Plaintiff), her mother (DeAnne), her father's previous girlfriend (Stone), and her eight-year-old brother (Matthew). Alarmed, Plaintiff and Shirley reported Kathryn's statements to Child Protective Services. Investigations began in California and in Washington.

Sacramento Detective Pat Flood contacted Plaintiff and Shirley, who recounted Kathryn's statements. Detective Flood then visited DeAnne, who denied any sexual abuse and any knowledge of the allegations against others. She later passed a polygraph examination, and Detective Flood terminated the investigation of DeAnne.

Detective Flood also talked with Matthew and Kathryn, who had recently returned from Vancouver. Matthew denied any knowledge of the allegations and denied any sexual abuse. Kathryn was "extremely shy," according to Detective Flood's contemporaneous report. (Detective Flood died before the trial in this case and therefore did not testify.) The report stated that Kathryn "indicated that she did tell Shirley everything that Shirley advised me of but then when asked to explain it or asked specific questions about it, she would say that she couldn't remember the words so she couldn't tell me." Kathryn gave conflicting responses to questions asking whether anyone had touched her inappropriately. DeAnne took Kathryn for a medical exam; the examining doctor found no physical evidence of sexual abuse.

In Washington, Krause investigated Stone (Plaintiff's former girlfriend) and Plaintiff. Stone denied ever abusing Kathryn, and she agreed to take a polygraph test. Although Krause made eight attempts to schedule a polygraph test, Stone never took one. Krause nevertheless ended the investigation of Stone in December 1984.

Plaintiff, too, denied abusing Kathryn, and he also agreed to take a polygraph test. On September 21, 1984, Plaintiff—accompanied by Shirley—took a polygraph test at the Sheriff's Office.[2] The results of the

Case 9:25-cv-00083-DWM    Document 58-1    Filed 05/04/26    Page 22 of 179

polygraph were inconclusive, so Plaintiff agreed to a second polygraph test a few days later. The examiner's report of the results of the second test suggested deception, but not very strongly:

The subject demonstrated consistently greater physiologic responses on the three critical questions . as compared to the control items. While this was sufficient to be indicative of deception, . Spencer's scores were not very high so that the examiner does not feel as certain about the validity of these findings as in most examinations. Hopefully, further corroboration of these results will be obtained.

In mid-October 1984, Krause traveled to Sacramento to continue the investigation. During that trip, she interviewed Matthew, DeAnne, two of DeAnne's sisters, and DeAnne's mother, all of whom denied any knowledge of sexual abuse of Kathryn by anyone. Krause prepared investigative reports of those interviews, including a report attributing many quotations to Matthew. During the trial in this case, Matthew testified that many of those quotations were fabricated—in particular, statements that incorrectly portrayed Matthew as comfortable with Krause and incorrectly portrayed Matthew as generally aware of the allegations of sexual abuse.

Krause also interviewed Kathryn twice. The interviews took place almost entirely in Krause's motel room and her rental car, without anyone else present. Krause's contemporaneous investigative reports claim that Kathryn described, in great detail, sexual abuse by Plaintiff. The reports contain scores of specific, explicit quotations attributed to Kathryn. At trial, however, Kathryn testified that, other than some trivial quotations unrelated to sexual abuse, all the quotations were fabrications. Kathryn testified that, in fact, she denied to Krause that anyone had sexually abused her.

In late November 1984, a prosecutor from King County, Washington, reviewed the investigative file at the request of the Clark County Sheriff's Office. The prosecutor concluded that the case was "legally insufficient" for several reasons. First, Kathryn appeared to be "extremely reluctant to talk about facts," and Kathryn's failure to disclose the abuse to her counselor did "not bode well for testifying in court." Second, the fact that Kathryn identified "multiple suspects is very disturbing," because it suggested a lack of credibility. Third, there were inconsistencies "over all issues": the number of times abuse occurred, what Plaintiff was wearing, and what Kathryn was wearing. Fourth, certain details commonly reported by victims of sexual abuse were lacking from Kathryn's account.

In early December 1984, a Clark County prosecutor, Jim Peters, conducted a videotaped interview of Kathryn. According to Peters, the purpose was to find out "whether she could tell me the story of what happened and whether I thought she might be competent"; it was not an investigative interview. For that reason, Peters was not concerned about using techniques—such as coaching or suggestive questioning —that would be improper if used during an investigation.

On the videotape, which was played for the jury, Kathryn appeared very uncomfortable during the entire 45-minute initial interview. Very early on, she asked Krause to leave the room, even though Krause's

investigative reports portrayed Kathryn as extremely comfortable with her. Kathryn was unable to describe Plaintiff's alleged conduct—until after an hour-long break. After the break, in a 10-minute follow-up interview, Kathryn described various acts of sexual abuse by Plaintiff. Kathryn testified at trial in this case that, during the break, she had been coached about what to say and that she went along with describing acts of sexual abuse just so that the distressing interview would end.

Throughout the interview, Kathryn appeared eager to leave. Peters began the post-break interview by stating, "while the camera was off, [Kathryn] showed me something with the dolls, didn't you?" After some coaxing, Kathryn demonstrated, using two anatomically correct dolls, two acts of sexual abuse. Peters then asked, "anything else?" to which Kathryn responded, "I forgot the last thing." Peters later told his supervisor, in essence, that "I wouldn't charge [the case] and I don't want my name on the charging document."

On January 2, 1985, the prosecutor's office nevertheless charged Plaintiff with two counts of sexually abusing Kathryn. Plaintiff pleaded not guilty and was released.

By February 1985, Plaintiff and Shirley had separated, and Plaintiff was living at a motel. On February 16, Shirley dropped off four-year-old Hansen (Plaintiff's stepson) to spend the night with Plaintiff at the motel. Plaintiff's lawyer described this incident to the jury as a "set up." Counsel argued that Shirley would not have dropped off her own four-year-old son had she believed that Plaintiff was a child rapist and that the incident gave Krause an opportunity to cure the defects in the case that the earlier prosecutors had noted. For example, Krause reported that Hansen described certain details that one of the prosecutors had identified as conspicuously missing from Kathryn's account of sexual abuse.

After the night at the motel, Krause interviewed Hansen. According to the investigative report, Hansen told Krause that Plaintiff sexually abused him on that night, including having anal sex with him. Officers arrested Plaintiff. In a follow-up interview, Hansen recalled molestation by Plaintiff during the summer of 1984 of all three children—him, Matthew, and Kathryn. (Unlike Matthew and Kathryn, Hansen testified at trial that Plaintiff did, in fact, abuse him.)

Krause then re-interviewed Kathryn and Matthew separately and prepared further investigative reports. According to those reports, both children described, in detail, sexual abuse by Plaintiff of all three children. As with the earlier reports, both Kathryn and Matthew testified at trial that many of the quotations attributed to them were fabricated.

On May 3, 1985, the prosecutor charged Plaintiff with statutory rape of all three children. On May 16, 1985, Plaintiff pleaded guilty pursuant to North Carolina v. Alford, 400 U.S. 25, 37–38 (1970). An "Alford plea" allows a defendant to maintain his innocence but to plead guilty in the face of apparent evidence of his guilt. Plaintiff's theory at trial was that he entered an Alford plea because of the extensive fabricated evidence. Plaintiff has always maintained his innocence.

The state court sentenced Plaintiff to two life terms plus 171 months. In 2004, the Governor of Washington commuted his sentence to community supervision. In 2009, the state courts allowed Plaintiff to withdraw his Alford plea. In 2010, the prosecutor dismissed all charges against Plaintiff.

In 2011, Plaintiff brought this civil action, which was tried to a jury on three claims: (1) a violation of the Fourteenth Amendment by Defendant Krause for deliberate fabrication of evidence; (2) respondeat superior liability for Defendant Davidson; and (3) conspiracy by Defendants Krause and Davidson to fabricate evidence deliberately. The district court instructed the jury that, in order to find for Plaintiff on the substantive deliberate-fabrication claim, the jury must find that:

1. Defendant Krause deliberately fabricated evidence against plaintiff;

2. Defendant Krause acted with deliberate indifference toward the constitutional right of plaintiff;

3. Defendant Krause continued her investigation of plaintiff despite the fact that she knew or should have known that plaintiff was innocent of the charges stemming from that evidence;

4. The criminal charges filed against plaintiff were based on that evidence;

5. Plaintiff suffered injury as a result of that evidence; and

6. That evidence was so closely related to the deprivation of plaintiff's right as to be the moving force that caused the ultimate injury.

The jury returned a verdict for Plaintiff on the two substantive claims and a verdict for Defendants on the conspiracy claim. The jury awarded $9 million in damages. After trial, the district court granted judgment as a matter of law to Defendants on the ground that Plaintiff had introduced insufficient evidence to prove that Krause knew or should have known that Plaintiff was innocent.

Plaintiff timely appeals. Defendants timely cross-appeal.[3]

STANDARDS OF REVIEW

We review de novo a judgment as a matter of law. Velazquez v. City of Long Beach, 793 F.3d 1010, 1017 (9th Cir. 2015).

We review a district court's formulation of civil jury instructions for an abuse of discretion, but we consider de novo whether the challenged instruction correctly states the law. "Jury instructions must be supported by the evidence, fairly and adequately cover the issues presented, correctly state the law, and not be misleading." Peralta v. Dillard, 744 F.3d 1076, 1082 (9th Cir. 2014) (en banc). But if any error relating to the jury instructions was harmless, we do not reverse. "In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law

was not fairly and correctly covered. Harmless error review for a civil jury trial shifts the burden to the defendant to demonstrate that it is more probable than not that the jury would have reached the same verdict had it been properly instructed." Gantt v. City of L.A., 717 F.3d 702, 707 (9th Cir. 2013).

Wilkerson v. Wheeler, 772 F.3d 834, 838 (9th Cir. 2014) (alterations omitted).

We review for abuse of discretion the district court's admission of evidence. McEuin v. Crown Equip. Corp., 328 F.3d 1028, 1032 (9th Cir. 2003).

DISCUSSION

To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty. Costanich, 627 F.3d at 1111. To establish the second element of causation, the plaintiff must show that (a) the act was the cause in fact of the deprivation of liberty, meaning that the injury would not have occurred in the absence of the conduct; and (b) the act was the "proximate cause" or "legal cause" of the injury, meaning that the injury is of a type that a reasonable person would see as a likely result of the conduct in question. Whitlock v. Brueggemann, 682 F.3d 567, 582–83 (7th Cir. 2012).

A. Deliberate Fabrication

Plaintiff argues that the district court incorrectly granted judgment as a matter of law to Defendants. "[W]hen reviewing a motion for judgment as a matter of law, we apply the law as it should be, rather than the law as it was read to the jury." Pincay v. Andrews, 238 F.3d 1106, 1109 n.4 (9th Cir. 2001); accord Fisher v. City of San Jose, 558 F.3d 1069, 1074 (9th Cir. 2009) (en banc); cf. Musacchio v. United States, 136 S. Ct. 709, 715 (2016) ("All that a [criminal] defendant is entitled to on a sufficiency challenge is for the court to make a 'legal' determination whether the evidence was strong enough to reach a jury at all.").

As we explained in Costanich, 627 F.3d at 1111, "an interviewer who deliberately mischaracterizes witness statements in her investigative report . commits a constitutional violation." Here, Plaintiff introduced sufficient evidence for a reasonable juror to find that this standard was satisfied. Krause's investigative reports contained scores of quotations attributed to Kathryn and Matthew, both of whom unequivocally testified at trial that they had never made those statements. For example, Krause reported that, in October 1984, Kathryn described detailed acts of sexual abuse by Plaintiff, and Krause's report contained many specific quotations attributed to Kathryn. Kathryn testified at trial that, not only did she not make those statements to Krause, but she affirmatively told Krause that no abuse had occurred. The jury was permitted to credit Kathryn's testimony rather than Krause's contrary testimony. See, e.g., First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr., 631 F.3d 1058, 1069 (9th Cir. 2011) ("[I]t was the jury's province to make any credibility determinations and to resolve any factual disputes.").

To be sure, not all inaccuracies in an investigative report give rise to a constitutional claim. See, e.g., Black v. Montgomery County, 835 F.3d 358, 372 (3d Cir. 2016) (noting the limitations on a fabricated-evidence claim), cert. denied, 2017 WL 1540522 (U.S. May 1, 2017) (No. 16-846); Whitlock, 682 F.3d at 586 (same). Mere "careless[ness]" is insufficient, Gausvik v. Perez, 345 F.3d 813, 817 (9th Cir. 2003), as are mistakes of "tone," Costanich, 627 F.3d at 1113. Errors concerning trivial matters cannot establish causation, a necessary element of any § 1983 claim. Black, 835 F.3d at 372. And fabricated evidence does not give rise to a claim if the plaintiff cannot "show the fabrication actually injured her in some way." Whitlock, 682 F.3d at 585. But, if Kathryn's testimony is credited, the misquotations here cannot be explained as carelessness or as a mistake of tone; nor are they trivial or without consequence. Kathryn told Krause that no abuse had occurred. Krause falsely reported, in quotations attributed to Kathryn, that Kathryn had made detailed, explicit statements of abuse. Plaintiff testified that, due to the fabricated evidence, he entered an Alford plea, causing him to spend nearly two decades in prison.

Because Plaintiff introduced direct evidence of deliberate fabrication, he did not have to prove that Krause knew or should have known that he was innocent. The district court's contrary holding misapprehends our precedent.

In Devereaux, 263 F.3d at 1073–76, the plaintiff alleged that police officers used extremely aggressive interview techniques when questioning children, thus generating false evidence against him. In that context, we "assumed" that a plaintiff must

point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of Devereaux despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.

Id. at 1076. We later applied that standard in cases involving allegedly aggressive interviewing tactics. E.g., Gantt, 717 F.3d at 707–08.

Those two prongs make sense in the absence of direct evidence of deliberate fabrication of evidence. If an investigator knows that a person is innocent, yet continues the investigation nevertheless, then the evidence suggests circumstantially that the investigator has an unlawful motivation to frame an innocent person, which supports a claim that the investigator deliberately fabricated evidence. Similarly, if an investigator knowingly uses coercive and abusive techniques that likely will generate false information, then that circumstantial evidence suggests that the investigator is deliberately fabricating evidence.

But, as we made clear in Costanich, 627 F.3d at 1111–14, those methods of proving deliberate fabrication are unnecessary in a case involving direct evidence of deliberate fabrication. In Costanich, there was direct evidence that the investigator had fabricated evidence—for example, direct misquotation of witnesses in investigative reports. Id. at 1111. The district court had granted summary judgment to the

defendants on the ground that the record contained insufficient evidence of either of the two Devereaux prongs. Id. We reversed, with the following explanation:

The district court read the Devereaux standard too narrowly. Costanich alleges, and has produced evidence supporting her claim, that Duron deliberately misquoted and misrepresented witness statements, i.e., deliberately falsified statements in her investigative report and declaration. The Devereaux test envisions an investigator whose unlawful motivation is illustrated by her state of mind regarding the alleged perpetrator's innocence, or one who surreptitiously fabricates evidence by using coercive investigative methods. These are circumstantial methods of proving deliberate falsification. Here, Costanich argues that the record directly reflects Duron's false statements. If, under Devereaux, an interviewer who uses coercive interviewing techniques that are known to yield false evidence commits a constitutional violation, then an interviewer who deliberately mischaracterizes witness statements in her investigative report also commits a constitutional violation. Similarly, an investigator who purposefully reports that she has interviewed witnesses, when she has actually only attempted to make contact with them, deliberately fabricates evidence.

Id. Elsewhere in our opinion, we reiterated the point:

It is also true that, in the course of her investigation, Duron could have believed that Costanich was guilty of [a state-law crime]. . If the only evidence of deliberate fabrication were inferences from Duron's investigative methods, under Devereaux, Duron's subjective and personal belief of Costanich's guilt might have explained why Duron continued the investigation. 263 F.3d at 1076. That belief, however, does not permit or excuse deliberate falsification of evidence.

Id. at 1113.

In sum, the Constitution prohibits the deliberate fabrication of evidence whether or not the officer knows that the person is innocent. See Devereaux, 263 F.3d at 1074–75 ("[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government."); Halsey v. Pfeiffer, 750 F.3d 273, 292–93 (3d Cir. 2014) ("[N]o sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence."); see also Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997) ("No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee."). The district court erred by granting judgment as a matter of law to Defendants because, in this case involving direct evidence of fabrication, Plaintiff was not required to show that Krause actually or constructively knew that he was innocent.

B. Causation

Defendants challenge the jury instructions on causation, which required Plaintiff to prove that:

5. Plaintiff suffered injury as a result of that [fabricated] evidence; and

6. That evidence was so closely related to the deprivation of plaintiff's right as to be the moving force that caused the ultimate injury.

Defendants contend that the district court erred by not separately instructing the jury on "but for" causation and "proximate" causation, using those terms verbatim.

"In a § 1983 action, the plaintiff must . demonstrate that the defendant's conduct was the actionable cause of the claimed injury. To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation." Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008) (citation omitted). The "moving force" formulation given in this case is most commonly used in cases involving municipal liability: "official policy must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." Polk County v. Dodson, 454 U.S. 312, 326 (1981) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). But we need not decide whether the district court erred or abused its discretion in using the "moving force" formulation in this individual liability case, because any error was harmless.

The jury affirmatively found both that "Plaintiff suffered injury as a result of" the fabricated evidence and that the fabricated evidence was "the moving force that caused the ultimate injury." (Emphases added.) See Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1096 (9th Cir. 2013) (holding that "moving force" in the Monell context includes "both causation-in-fact and proximate causation"). Nor were Defendants prevented from arguing their theory of the case. Defendants argued to the jury that the fabricated evidence was not the moving force because of intervening events—such as non-fabricated evidence and Plaintiff's Alford plea. But the jury necessarily rejected that argument.

Ample evidence in the record supports the jury's findings on causation. If Kathryn's testimony is credited, very little evidence of Plaintiff's guilt actually existed. Indeed, even with the fabricated evidence in the file, two prosecutors independently recommended that charges not be brought. Moreover, roughly the same amount of evidence implicated Stone as implicated Plaintiff—yet prosecutors declined to charge Stone, strongly suggesting that, had Krause not fabricated any evidence, prosecutors likewise would have declined to charge Plaintiff.

Given the jury's findings on causation and all the other elements, we see no likelihood that the jury would have concluded that but-for causation or proximate causation was lacking. We therefore easily conclude that "it is more probable than not that the jury would have reached the same verdict," Gantt, 717 F.3d at 707, had the district court given Defendants' proffered instructions on causation.

C. Probable Cause

Defendants next argue that the district court erred by declining to instruct the jury that Plaintiff was required to prove that, setting aside the fabricated evidence, probable cause was lacking. We disagree.

The only two sister circuits to have addressed this issue directly have held that the plaintiff need not prove a lack of probable cause for the prosecution. Halsey, 750 F.3d at 292–93; Ricciuti, 124 F.3d at 129–31. Although we have not addressed the question squarely, our cases strongly suggest that a lack of probable cause to prosecute a defendant is not an element of a deliberate-fabrication claim. See Gausvik, 345 F.3d at 817–18 (analyzing whether the allegations met the standard for deliberate fabrication, even though probable cause existed); see also Costanich, 627 F.3d at 1113 (holding that the investigator's belief that a crime had been committed "does not permit or excuse deliberate fabrication of evidence"); Crowe v. County of San Diego, 608 F.3d 406, 432–37 (9th Cir. 2010) (upholding a Fourteenth Amendment coercive-interview claim while rejecting Fourth Amendment claims because of the existence of probable cause).

Defendants assert that, when probable cause exists, an investigator's deliberate fabrication of evidence does not shock the conscience. See Gantt, 717 F.3d at 707 ("[D]ue process violations under the Fourteenth Amendment occur only when official conduct shocks the conscience ." (citation and internal quotation marks omitted)). We join our sister circuits in rejecting that assertion as inconsistent with the Fourteenth Amendment's guarantee of due process: "Even if we agreed [that probable cause existed], we believe that no sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence." Halsey, 750 F.3d at 292–93; see id. at 293 ("A rule of law foreclosing civil recovery against police officers who fabricate evidence, so long as they have other proof justifying the institution of the criminal proceedings against a defendant, would not follow the statute's [§ 1983] command or serve its purpose."); Ricciuti, 124 F.3d at 130 ("To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice."); see also Black, 835 F.3d at 371 ("[D]eliberate framing by officials offends the most strongly held values of our nation." (internal quotation marks omitted)).

We have held that, to establish a Fourth Amendment violation where officers allegedly have included false information in a warrant affidavit, "the plaintiff must establish that the remaining information in the affidavit is insufficient to establish probable cause." Hervey v. Estes, 65 F.3d 784, 789 (9th Cir. 1995). But the reasoning of our Fourth Amendment cases does not apply here. Probable cause definitively resolves a Fourth Amendment claim for including false information in a warrant affidavit, because the Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. If bona fide information in the warrant affidavit establishes probable cause, then the plaintiff necessarily cannot state a Fourth Amendment violation because the warrant was, in fact, issued upon probable cause, supported by oath or affirmation. The warrant would have issued

regardless of the false information; the plaintiff cannot "establish that, but for the dishonesty, the challenged action would not have occurred." Liston v. County of Riverside, 120 F.3d 965, 973 (9th Cir. 1997). In other words, in the Fourth Amendment warrant-issuance context, the probable-cause inquiry collapses into the causation inquiry.

By contrast, the existence of probable cause does not resolve Plaintiff's Fourteenth Amendment claim for deliberate fabrication of evidence. Plaintiff's theory of the case—accepted by the jury—was that the fabricated evidence caused him to enter an Alford plea, which led to his serving nearly two decades in prison. Whether probable cause existed is entirely beside the point of that inquiry. The only causation question for the jury was whether the fabricated evidence did, in fact, cause his nearly two decades of imprisonment. See Part B, above. We therefore need not decide whether an instruction on probable cause would be proper in a case involving alleged damages stemming only from a prosecutor's charging decision.[4]

For those reasons, the district court properly declined to instruct the jury on the issue of probable cause.

D. Deliberate Indifference

The district court instructed the jury that, to find for Plaintiff, the jury must find that:

1. Defendant Krause deliberately fabricated evidence against plaintiff;

2. Defendant Krause acted with deliberate indifference toward the constitutional right of plaintiff; [and four other elements.]

Deliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions. It entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.

Defendants argue that the district court erred by giving the instruction on deliberate indifference and the accompanying definition. Necessarily, requiring that Plaintiff prove an additional element—an added burden—cannot, by itself, have prejudiced Defendants.

Defendants further argue that, because the first and second elements used similar words—"deliberately fabricated" and "deliberate indifference"—the jury may have misunderstood the first element as encompassing a deliberate indifference standard. We find no reasonable likelihood of confusion here. "A jury is presumed to follow its instructions." Weeks v. Angelone, 528 U.S. 225, 234 (2000). The first and second elements are plainly separate; the phrase "deliberately fabricated" is not a technical term likely to confuse the jury; and the definition in the paragraph at the end of the instruction clearly defines "deliberate indifference," not "deliberately fabricated." Nor does the jury's question regarding the

instruction establish a likelihood of confusion. Rather, the jury's question concerned the relationship between deliberate indifference and negligence, not between deliberate indifference and deliberate fabrication.

## E. Admission of Evidence

Finally, we hold that the district court did not abuse its discretion by permitting Plaintiff to introduce certain evidence. The district court identified the correct legal standard, Federal Rule of Evidence 403, and its application of that standard was not illogical, implausible, or without support in inferences that may be drawn from the facts in the record. United States v. Torres, 794 F.3d 1053, 1059 (9th Cir. 2015), cert. denied, 136 S. Ct. 2005 (2016). The evidence was relevant on many grounds, including to show credibility and state of mind, and the court gave a proper limiting instruction that is unchallenged on appeal. The fact that the evidence was also relevant to claims that were dismissed before or during trial does not affect the relevance of the evidence to the deliberate-fabrication claim that was presented to the jury. Evidence is often relevant to more than one claim.

REVERSED and REMANDED with instructions to reinstate the verdict.

FOOTNOTES

FOOTNOTE.   This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

1.      Because we are reviewing the district court's judgment as a matter of law following a verdict in favor of Plaintiff, we must view the evidence in the light most favorable to Plaintiff, and we must draw all reasonable inferences in his favor. Oracle Corp v. SAP AG, 765 F.3d 1081, 1086 (9th Cir. 2014).

2.      Sergeant Davidson was present, and Shirley met him for the first time. Plaintiff's theory at trial was that Davidson was immediately attracted to Shirley, which may have motivated Davidson to be less than scrupulous—or outright unethical—when it came to the investigation of Plaintiff's actions. For example, it was undisputed that Shirley and Plaintiff separated during the investigation; that Shirley and Davidson moved in together very shortly after Plaintiff was sentenced; and that Shirley and Davidson lived together for about five years. Similarly, Plaintiff introduced evidence that Davidson improperly visited Plaintiff while he was in jail pending trial and that, during those visits, Davidson pressured Plaintiff to sign a quitclaim deed to Shirley's benefit.

3.      The cross-appeal advances only alternative arguments in support of the judgment. Accordingly, a cross-appeal was unnecessary. See, e.g., El Paso Nat. Gas Co. v. Neztsosie, 526 U.S. 473, 479 (1999) ("Absent a cross-appeal, an appellee may urge in support of a decree any matter appearing in the record ." (internal quotation marks omitted)); Rivero v. City of San Francisco, 316 F.3d 857, 862 (9th Cir. 2002)

("Prevailing parties need not have filed cross-appeals in order to correct errors in the district court's reasoning nor to preserve alternative grounds for affirming the judgment." (internal quotation marks and alterations omitted)). Nonetheless, "[a] protective cross-appeal is permissible once an initial appeal is filed." Warfield v. Alaniz, 569 F.3d 1015, 1019 n.3 (9th Cir. 2009). We treat Defendants' arguments on cross-appeal as alternative arguments to affirm the judgment. See Stormans, Inc. v. Wiesman, 794 F.3d 1064, 1085 (9th Cir. 2015) ("Because the cross-appeal requirement is a rule of practice and not a jurisdictional bar, an appellate court has broad power to make such dispositions as justice requires." (internal quotation marks omitted)), cert. denied, 136 S. Ct. 2433 (2016); see also Shepard v. Quillen, 840 F.3d 686, 693 (9th Cir. 2016) ("We can affirm on any ground supported by the record." (internal quotation marks omitted)).

4.     Our sister circuits have split on the closely related issue of whether a "deliberate fabrication of evidence" claim necessarily fails if the plaintiff was acquitted. See Black, 835 F.3d at 371 & n.12 (collecting cases). This case does not raise that issue because Plaintiff was not acquitted.

Opinion by Judge Graber

**Was this helpful?**    Yes 👍     No 👎



## Welcome to FindLaw's Cases & Codes

A free source of state and federal court opinions, state laws, and the United States Code. For more information about the legal concepts addressed by these cases and

Case 9:25-cv-00083-DWM     Document 58-1     Filed 05/04/26     Page 33 of 179

**FindLaw.**    Find a Lawyer    Legal Forms & Services ⌄    Learn About the Law ⌄    Legal Professionals ⌄    Blogs   🔍

FINDLAW / CASE LAW / WASHINGTON / WA CT. APP. /
COSTANICH V. WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES

# COSTANICH v. WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES (2007)

## Court of Appeals of Washington,Division 1.

Kathie COSTANICH, Respondent, v. WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, Appellant.

## No. 57214–8–I.

## Decided: January 29, 2007

**Michael W. Collins, Attorney at Law, Seattle, WA, for Appellant. David Ruzumna, Carly Cozine Hansen, Seattle, for Other Party Valerie Rogan. Carol Farr, The Law Offices of Leonard W. Moen & Asso., Renton, WA, for Respondent.**

¶ 1 Kathie Costanich and her husband Ken were foster parents devoted to caring for some of the neediest and most difficult foster children in the system.   Costanich's foster home received accolades from the state, but she also regularly used profanity, sometimes swearing around her foster children.   The Department of Social and Health Services (DSHS) found that Costanich's language was emotionally abusive and revoked her foster care license.   Both the Administrative Law Judge (ALJ) and the superior court disagreed, concluding that Costanich's language did not constitute emotional abuse and did not justify revocation of her license.   But the DSHS review judge substituted his own view of the evidence for that of the ALJ, based primarily on the hearsay testimony and reports of the Child Protective Services (CPS) investigator, and upheld the abuse finding and the revocation.   Because the review judge exceeded his authority under DSHS hearing rules, we agree with the superior court and the ALJ and reverse his decision.

FACTS

¶ 2 Costanich was a licensed foster parent in Washington for over 20 years.   Her license allowed her to provide foster care for up to six children at a time, and she sometimes had waivers to care for additional children.   All of these children had been victims of abuse or neglect and many had severe behavioral, developmental, and medical problems.   She specialized in violent, sexually aggressive youth (SAY) and medically fragile infants.   Costanich was also the president of Foster Parents of Washington State (FPAWS) and a trainer for DSHS. Before the abuse allegations, the most recent state evaluation described the Costanich foster home as a "unique and valuable resource . unsurpassed by any foster home in the State."

¶ 3 During the summer of 2001, DSHS investigated an allegation that Costanich emotionally and physically abused her foster children, based on what K, one of her foster children, told his therapist.[1]   At the time of the investigation, Costanich had six foster children living in her home:  F(17), K(15), J(12), P(10), and two sisters, E(8) and B(4).   Sandra Duron investigated the allegations for CPS and reported there was inconclusive evidence of physical abuse, but the emotional abuse allegations were "founded."   This finding was based primarily on two specific incidents.   K claimed that Costanich said "I'll kill you bastard" to F, when she had to pull him off one of her female aides.   The aide and F had gotten into an altercation because F was spying on her while she was sunbathing.   K also said Costanich told P, the only African–American child in the house, to move his "black ass."   Additionally, he alleged Costanich had a general habit of swearing at the children and had called E a "cunt."   Later investigation resulted in allegations that Costanich also called E a "bitch."   On March 14, 2002, DSHS informed Costanich that it upheld the finding of emotional abuse after an internal review.   On August 16, 2002, DSHS revoked Costanich's foster care license based primarily on this finding of abuse.

¶ 4 Costanich appealed both the finding of abuse and the revocation of her license in an administrative hearing.   The ALJ overturned DSHS' decision, finding that the children had not been emotionally abused and were, in fact, "thriving" based on their therapists' and social workers' testimony.   DSHS appealed this decision to the DSHS Board of Appeals.   The review judge reversed the ALJ's initial decision.   He found there was substantial evidence that Costanich had threatened to kill F, told P to move his "black ass," called E names, and swore at the children in her home.   The review judge concluded this constituted emotional abuse and justified revoking her license.   Costanich sought judicial review, and the superior court reversed the review judge's final administrative decision.   The court awarded Costanich attorney fees under the Equal Access to Justice Act (EAJA), RCW 4.84.350.   DSHS appeals.

DISCUSSION

¶ 5 The Washington Administrative Procedure Act (APA), chapter 34.05 RCW, governs judicial review of final agency action.[2]   When reviewing an agency action, we sit in the same position as the superior court, applying the standards of the APA directly to the record before the agency.[3]   There are a number

Case 9:25-cv-00083-DWM    Document 58-1    Filed 05/04/26    Page 35 of 179

of statutory bases for setting aside an administrative decision, including: (1) the decision is not based on substantial evidence; (2) the agency has erroneously interpreted or applied the law; (3) the agency failed to follow a prescribed procedure; or (4) the order is inconsistent with a rule of the agency.[4]    The party challenging an agency's decision has the burden of establishing error.[5]

I.    Authority of the Review Judge

¶ 6 The primary issue in this case is what level of deference the review judge owed the ALJ. DSHS relies on Tapper v. Employment Sec. Dep't for the proposition that the review judge has the power to make his or her own factual findings and to modify or set aside the findings of the ALJ.[6] But Tapper was not a DSHS case.   Here, DSHS hearing rules delineate the authority of the review judge, and DSHS is bound by those rules.[7]   WAC 388–02–0600(1) states that in licensing and similar administrative cases, the review judge has the same decision-making authority as an ALJ.[8] But, in all other cases, the review judge cannot change the ALJ's hearing decision unless:

(a)  There are irregularities, including misconduct of a party or misconduct of the ALJ or abuse of discretion by the ALJ, that affected the fairness of the hearing;

(b)  The findings of fact are not supported by substantial evidence based on the entire record;

(c)  The decision includes errors of law;

(d)  The decision needs to be clarified before the parties can implement it;  or

(e)  Findings of fact must be added because the ALJ failed to make an essential factual finding.   The additional findings must be supported by substantial evidence in view of the entire record and must be consistent with the ALJ's findings that are supported by substantial evidence based on the entire record. [9]

¶ 7 This standard requires significant deference to the ALJ, which is appropriate because an independent ALJ hears the case to "insure that the contestant has a fair and impartial fact finder." [10] If the review judge could simply substitute his own view of the evidence for that of the ALJ in every case, review by an ALJ would be superfluous.   As we explained in Deffenbaugh v. Dep't of Soc. & Health Servs., when considering a similarly-worded earlier version of the hearing rules, this deferential standard is "analogous" to appellate court review of a trial court's decision.[11]

¶ 8 DSHS fails to address WAC 388–02–0600(2) and essentially argues this case should be treated as a licensing case under WAC 388–02–600(1), the section that gives the review judge wide latitude to substitute his own evidentiary findings and legal conclusions for those of the ALJ. But DSHS predicated

its decision to revoke Costanich's license on a formal finding that she had emotionally abused the children.   Findings of abuse are separate from licensing decisions and require the review judge to use the more deferential standard of WAC 388–02–0600(2).[12]   DSHS cannot now argue that the licensing standard should apply to the abuse finding merely because the two decisions were reviewed together. This is particularly true because DSHS predicated the license revocation on its finding of abuse.   There was no independent basis for the revocation.   Thus, the review judge should have applied the standard of review for abuse cases, WAC 388–02–0600(2).

II.   Factual Findings

¶ 9 Under WAC 388–02–600(2), the review judge was justified in substituting his factual findings for those of the ALJ only if the ALJ's factual findings were not supported by substantial evidence or if the ALJ failed to make an essential factual finding.   Substantial evidence is that which is "sufficient to persuade a reasonable person that the declared premise is true."[13]   The reviewing agency or court must accept the fact finder's "views regarding the credibility of witnesses and the weight to be given reasonable but competing inferences."[14]   While hearsay is admissible in the administrative context, under WAC 388–02–0475(3) the fact-finder may only base a finding on hearsay evidence if he or she finds that "the parties had the opportunity to question or contradict it."

¶ 10 Here, the review judge purported to apply the correct standard, reciting that the ALJ's findings needed to be changed because they were not supported by substantial evidence and the ALJ failed to make an essential factual finding.   The ALJ found that, although Costanich used profanity around the children, her swearing was "never directed at the children."   He also found that she told P to move his "black ass."   There was substantial evidence for these findings.   He based them solely on the testimony of the adult witnesses at the hearing, including the children's therapists and the aides who worked in the Costanich home.   The ALJ explicitly chose not to rely on the CPS investigator's hearsay statements about what the children told her.   In contrast, the review judge based his decision to uphold the revocation of Costanich's license on four factual findings:  (1) Costanich's telling F, "I'll kill you bastard," (2) telling P to move his "black ass," (3) calling E a "bitch" and a "cunt," and (4) swearing at the children. The review judge added findings one and three, and finding four is in direct conflict with the ALJ's characterization of Costanich's swearing.   The propriety of these three findings is at the core of Costanich's appeal.

¶ 11 Costanich argues that the DSHS review judge erred by reversing the ALJ's decision because he substituted his own factual findings for the ALJ's and relied on hearsay evidence that the ALJ specifically found lacked credibility.   The review judge's three contested findings are all based primarily on the CPS investigators' hearsay statements which the ALJ found not credible.

Case 9:25-cv-00083-DWM    Document 58-1    Filed 05/04/26    Page 37 of 179

¶ 12 The review judge relied heavily on the investigator's claim that she took near-verbatim notes from her interviews with E, F, and K, none of whom testified before the ALJ. The review judge stated: "[T]he undersigned presumes that the statements of the children reported in Ms. Duron's near-verbatim notes are the words of the children rather than the interpretation or summary of Ms. Duron."   But Duron herself admitted that she did not always take near-verbatim notes, stating on cross-examination that K "wouldn't say much, so I just kind of summarized what he was saying."   Duron conducted all but one of her interviews with the children without a third person present and did not record any of the interviews.

  The only documentary evidence of the interviews in the administrative record is her Service Episode Reports (SERs), which represent the data she entered into the computer from her handwritten notes. The original near-verbatim notes were not produced at the hearing.   And the SERs show that she put words in the mouth of at least one of the children.   When interviewing J, Duron asked "When you say [ ], 'go to your fucken [sic] room' whom does she [Costanich] say that to [ ]?" But J never claimed Costanich said that.   Additionally, even the review judge acknowledged that there were a number of problems with Duron's reporting of her conversations with adults, including that she made up the statement of one witness and misquoted a number of others.   The review judge acknowledged that Duron's reports of her interviews with adults were incredible, but assumed that her interviews with the children were accurate "near verbatim" recordings simply because she said so.   The review judge's decision to give greater weight to Duron's hearsay testimony than to all the other witnesses who testified before the ALJ is clearly inappropriate under WAC 388–02–0600(2).

¶ 13 Costanich also argues that the review judge failed to "give due regard" to the ALJ's opportunity to observe the witnesses, as required by RCW 34.05.464(4).   The review judge justified this lack of deference by asserting that the ALJ "failed to record any observations about 48 of the 49 witnesses."[15] This is a misreading of the record.   While the ALJ specifically recorded the demeanor of only one witness, four pages of his decision are devoted to a section entitled "Credibility of Witnesses."   In that section, the ALJ explicitly based his decision only on the testimony of the witnesses at the hearing, not on Duron's reports and hearsay statements.   He found it was impossible to determine whether she was "taking the answers out of context or to know whether or not the answering party fully understood the nature of the question being asked."   He also found K's statements as recorded by his therapist lacking in credibility.   The review judge not only ignored the ALJ's credibility determinations, he also chose to base his decision on the very evidence the ALJ rejected as lacking credibility, the testimony of the CPS investigator and K's hearsay statements to his therapist.   The review judge substituted his own view of the evidence for the ALJ's findings which are supported by substantial evidence.   This is clearly error under the deferential standard that applies to appeals from the ALJ's decision about abuse allegations.

¶ 14 The review judge also asserted that it was necessary to add his finding that Costanich called E names because the ALJ did not make a specific finding that Costanich did not call E a "bitch" or a "cunt."   But the absence of a finding does not mean that the ALJ omitted a finding directly contrary to his other

Case 9:25-cv-00083-DWM    Document 58-1    Filed 05/04/26    Page 38 of 179

findings.   Although Costanich admitted swearing when speaking to the children, the ALJ found that she did not direct her swearing at the children.   Based on the non-hearsay testimony of all the adult witnesses, we conclude this finding meant that her swearing was not used to discipline, demean, or shame the children, but rather was just part of her vocabulary.   Certainly, calling a child "bitch" or "cunt" would be considered swearing directed at the children.   Thus, the ALJ's factual finding that Costanich did not direct her swearing at the children necessarily encompasses the worst of the statements the review judge attributes to her, including calling E names.   The review judge also added a finding that Costanich said "fuck you" to the children.   This would have been classified as swearing directed at the children.   As with his finding that Costanich called E names, this finding was also based solely on the hearsay statements Duron reported and is not "consistent with the ALJ's findings that are supported by substantial evidence." [16]   Because the review judge based his additional, contradictory factual findings solely on hearsay evidence the ALJ rejected as lacking credibility, we hold the review judge acted outside the scope his authority under WAC 388–02–0600(2) in adding them.

III.   Error of Law

¶ 15 Under WAC 388–02–0600(2)(c), a review judge may change an ALJ's decision if it includes an error of law.   As we noted earlier, this standard is analogous to an appellate court's standard of review.[17]   In reversing the ALJ and ruling that Costanich's language toward her foster children constituted emotional abuse and violated foster care licensing regulations, the review judge stated that the ALJ made two errors of law:  (1) he required evidence of actual harm, when only a "substantial risk" of harm is necessary to prove emotional abuse and (2) he failed to find that swearing violates WAC 388–148–0470, a foster care licensing regulation.

A.   Emotional Abuse

¶ 16 The review judge concluded that Costanich's language toward the children constituted emotional abuse under the regulation in effect at the time, former WAC 388–15–130(3), which provides in relevant part:

¶ 17 Abusive, neglectful, or exploitative acts defined in RCW 26.44.020 .

.

(d)  Committing acts which are cruel or inhumane regardless of observable injury.   Such acts include, but are not limited to, instances of extreme discipline demonstrating a disregard of a child's pain and/or mental suffering.

.

(g) Engaging in actions or omissions resulting in injury to, or creating a substantial risk to the physical or mental health or development of a child.[[[[[18]

Because there was no actual observable injury to the children, the ALJ had to determine whether telling an African–American child to move his "black ass" or swearing around the children was either cruel and inhumane or posed a "substantial risk" to the mental health or development of the children. Unfortunately, there is no case law interpreting former WAC 388–15–130(3) or providing examples of language that would create a substantial risk to the mental health of a child.   But even Duron, the CPS investigator, who regularly decides what is and is not abusive, admitted that cursing at one's children is not per se abusive and that the language must be considered in context.   Accordingly, the ALJ looked to the context of the language and considered the testimony of all of the medical professionals and social workers who had direct contact with the children as well as the DSHS experts who testified but had not interviewed the children.   He found:

None of the experts who provided testimony on behalf of DSHS could say with any degree of certainty that there was a risk of harm. They spoke in terms of possibility not in terms of likelihood.   All of those professionals who had direct contact with the children determined that they were thriving in the Costanich home environment. This is clearly a statement that the use of profanity around these children did not constitute a risk of harm because there was no harm.

¶ 18 It is clear from this statement that the ALJ found there was no "substantial risk" to the children from Costanich's use of profanity.   But his last sentence, evaluating the risk of harm in the context of actual harm, is a misstatement of the law.   The ALJ made several erroneous statements of this nature. Had the ALJ left out these statements, his opinion would have been unassailable.   But despite his occasional recitation of the wrong standard, his ultimate conclusion that the evidence does not support a finding of "substantial risk" of harm, is legally sound.   Because WAC 388–02–0600(2) imposes an appellate standard of review on the DSHS review judge, the mere recitation of the wrong standard in a few places by the ALJ does not warrant reversal where the ultimate legal conclusions were supported by the findings and those findings were based on substantial evidence.

B.   Violation of Foster Care Licensing Regulation

¶ 19 The review judge asserted that the ALJ erred by failing to find that Costanich violated WAC 388–148–0470, which prohibits discipline that is "cruel, unusual, frightening, unsafe or humiliating" and lists "name calling," and "threatening" as two practices which are per se violations of foster care licensing regulations.   The review judge erred in reversing the ALJ's conclusion because he relied primarily on his own additional findings, that Costanich called E names and threatened F, which he lacked the authority to add under WAC 388–02–0600(2).

Case 9:25-cv-00083-DWM    Document 58-1    Filed 05/04/26    Page 40 of 179

¶ 20 He also ruled that the ALJ erred in finding that swearing does not constitute humiliating discipline because under Morgan v. Dep't of Soc. & Health Servs.,[19] "the use of profanity alone is sufficient to prove a violation." This is an unwarranted extension of the holding in Morgan. There, the court said the way in which Morgan used profanity was humiliating discipline, not that all profanity constitutes a per se violation.[20] In Morgan, the court did not explain how Morgan's swearing was humiliating for the children and did not specify exactly which statements it considered humiliating. The only specific allegation mentioned in Morgan is that the foster parent told one of the children to stop "acting like a little bitch."[21] While this is similar to the allegation that Costanich called E a "bitch," that allegation was not proven. Further, the conclusion that all swearing is a violation of WAC 388–148–0470, is undercut by the fact that swearing is not on the list of per se violations. Thus the review judge erred in reversing the ALJ's decision that Costanich's swearing did not constitute humiliating discipline in violation of WAC 388–148–0470.

IV. Attorney Fees

¶ 21 The superior court awarded Costanich attorney fees under the Equal Access to Justice Act (EAJA), RCW 4.84.350, which provides in relevant part:

(1) Except as otherwise specifically provided by statute, a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust.

¶ 22 DSHS argues Costanich was not entitled to attorney fees because it was "substantially justified" in finding her language toward her foster children constituted emotional abuse and revoking her foster care license. "[A]gency action is substantially justified if it has a reasonable basis both in law and fact."[22] We review a determination that agency action was not substantially justified for abuse of discretion.[23] A court abuses its discretion when it bases its decision on untenable grounds or reasons.[24]

¶ 23 The superior court awarded Costanich attorney fees, finding that DSHS' actions were not substantially justified primarily because the DSHS review judge exceeded the scope of his power in reversing the ALJ. Although there are no cases holding that a DSHS review judge's decision falls within the definition of "agency action" for purposes of granting fees under the EAJA, the statutes defining agency action support such an award. RCW 4.84.340 states that "agency action" is defined by chapter 34.05 RCW. While RCW 34.05.010(3) does not specifically include or exclude adjudicative proceedings from the definition of agency action, a review board that conducts adjudicative proceedings falls within RCW 34.05.010(2)'s definition of what constitutes an "agency". In Muckleshoot Indian Tribe v. Dept. of Ecology, we held that the APA's definition of "agency action" must be applied broadly.[25] THUS, WE

HOLD THAT the review judge's decision constitutes agency action because he is part of the agency and his actions are not expressly excluded from the definition of "agency action."

¶ 24 Additionally, although DSHS was justified initially in its concerns about Costanich's use of profanity, the evidence before the ALJ shows that DSHS was not substantially justified in revoking her license once it became aware of the problems with Duron's investigation.

¶ 25 We conclude there was no abuse of discretion and affirm the superior court's award of fees.   For the same reasons, Costanich is entitled to attorney fees on appeal under RAP 18.1.

¶ 26 We set aside the DSHS review judge's decision and reinstate the ALJ's decision.   We affirm the superior court's decision to award Costanich attorney fees and award attorney fees on appeal on the same grounds.

FOOTNOTES

1.    In order to protect the privacy of the foster children, we refer to them by their first initials.

2.    RCW 34.05.510;  Conway v. Dep't of Soc. & Health Servs., 131 Wash.App. 406, 414, 120 P.3d 130 (2005) (citing Tapper v. Employment Sec. Dep't, 122 Wash.2d 397, 402, 858 P.2d 494 (1993)).

3.    Conway, 131 Wash.App. at 414, 120 P.3d 130.

4.    RCW 34.05.570(3).

5.    RCW 34.05.570(1)(a);  RCW 34.05.574(1).

6.    Tapper, 122 Wash.2d 397, 404, 858 P.2d 494 (1993).

7.    Deffenbaugh v. Dep't of Soc. & Health Servs., 53 Wash.App. 868, 871, 770 P.2d 1084 (1989).

8.    The other types of cases in which the review judge the same authority as the ALJ are certification and related fines, rate-making, and parent address disclosure.   WAC 388–02–0600(1).

9.    WAC 388–02–0600(2).

10.    Deffenbaugh, 53 Wash.App. at 871, 770 P.2d 1084.

11.    53 Wash.App. 868, 871, 770 P.2d 1084 (1989).

12.    See WAC 388–02–0215(l )–(m) (listing abuse findings and licensing decisions as two separate kinds of decisions for which a party may seek review).

Case 9:25-cv-00083-DWM    Document 58-1    Filed 05/04/26    Page 42 of 179

13.    Alberton's, Inc. v. Employment Sec. Dep't, 102 Wash.App. 29, 36, 15 P.3d 153 (2000) (citing Galvin v. Employment Sec. Dep't, 87 Wash.App. 634, 640–41, 942 P.2d 1040 (1997), review denied, 134 Wash.2d 1004, 953 P.2d 95 (1998)).

14.    Freeburg v. City of Seattle, 71 Wash.App. 367, 371–72, 859 P.2d 610 (1993).

15.    (Emphasis omitted.)    See RCW 34.05.461(3) (requiring ALJ to identify "findings based substantially on credibility of evidence or demeanor of witnesses").

16.    WAC 388–02–0600(2)(e).

17.    Deffenbaugh, 53 Wash.App. at 871, 770 P.2d 1084.

18.    Former WAC 388–15–130(3) (2001), repealed by WSR 02–15–098 and 02–17–045 (effective February 10, 2003).    The current version of this regulation, WAC 388–15–009(5), is similarly worded.

19.    99 Wash.App. 148, 992 P.2d 1023 (2000).

20.    Id. at 155, 992 P.2d 1023.

21.    Id. at 151, 992 P.2d 1023.

22.    H & H P'ship v. State, 115 Wash.App. 164, 171, 62 P.3d 510 (2003) (citing Pierce v. Underwood, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)).

23.    Id. (citing Alpine Lakes Prot. Soc'y v. Dep't of Natural Res., 102 Wash.App. 1, 19, 979 P.2d 929 (1999)).

24.    Cobra Roofing Serv. v. Dep't of Labor & Indus., 122 Wash.App. 402, 420, 97 P.3d 17 (2004) (citing Moreman v. Butcher, 126 Wash.2d 36, 40, 891 P.2d 725 (1995)), aff'd, 157 Wash.2d 90, 135 P.3d 913 (2006).

25.    112 Wash.App. 712, 722, 50 P.3d 668 (2002), review denied, 150 Wash. 2d 1016, 79 P.3d 446 (2003).

AGID, J.

WE CONCUR:  MARLIN APPELWICK and RONALD COX, JJ.

Was this helpful?    Yes 👍    No 👎

Case 9:25-cv-00083-DWM    Document 58-1    Filed 05/04/26    Page 43 of 179

# JUSTIA

# Robert Devereaux, Plaintiff-appellant, v. Timothy David Abbey; Laurie Alexander; Kate Carrow; Linda Wood; Kenneth Badgley, in His Official Capacity As Chief of Police of the City of Wenatchee; Washington State Dept of Social and Health Services; Robert Ricardo Perez, Opinion Defendants-appellees,andearl Tilly, in His Official Capacity As Public Safety Commissioner for the City of Wenatchee; City of Wenatchee, a Municipal Corporation, Defendants, 263 F.3d 1070 (9th Cir. 2001)

**Full Name:** Robert Devereaux, Plaintiff-appellant, v. Timothy David Abbey; Laurie Alexander; Kate Carrow; Linda Wood; Kenneth Badgley, in His Official Capacity As Chief of Police of the City of... **Show More**

**Citation:** 263 F.3d 1070

**Date:** September 5, 2001

## U.S. Court of Appeals for the Ninth Circuit - 263 F.3d 1070 (9th Cir. 2001)

**Argued and Submitted March 20, 2001Filed September 5, 2001**

[Copyrighted Material Omitted]

Steven C. Lacy, East Wenatchee, Washington, for the plaintiff-appellant.

Jeff Freimund, Assistant Attorney General, Olympia, Washington, for the defendants-appellees.

Appeal from the United States District Court for the Eastern District of Washington Robert H. Whaley, District Judge, Presiding D.C. No. CV 96-0115 RHW

Before: Mary M. Schroeder, Chief Judge, and Harry Pregerson, Diarmuid F. O'Scannlain, Ferdinand F. Fernandez, Thomas G. Nelson, Andrew J. Kleinfeld, A. Wallace Tashima, Sidney R. Thomas, Kim McLane Wardlaw, Richard A. Paez, and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Tashima; Concurrence by Judge Fernandez; Partial Concurrence and Partial Dissent by Judge Kleinfeld

Tashima, Circuit Judge.

Plaintiff Robert Devereaux brought suit in federal district court for alleged violations of his federal civil rights, and also on various state law grounds. The district court granted summary judgment in favor of all defendants as to the federal claims and then declined to exercise supplemental jurisdiction over the state law claims, dismissing them without prejudice. This timely appeal followed. We have jurisdiction pursuant to 28 U.S.C. §§ 1291, and we affirm.

This case arises out of the investigation and prosecution of Devereaux for alleged sexual abuse of foster children living in his home, an investigation that mushroomed into a sexual abuse "witch hunt" in which 43 adults were charged with over 29,000 counts of sexual molestation. We summarize the pertinent facts only briefly. The facts are set forth in detail

in the three-judge panel opinion. See Devereaux v. Perez, 218 F.3d 1045, 1047-51 (9th Cir.), reh'g en banc granted, 235 F.3d 1206 (9th Cir. 2000) ("Devereaux I").

On August 3, 1994, Detective Robert Ricardo Perez of the Wenatchee, Washington, Police Department interviewed A.R., a foster child of Devereaux's, to determine whether A.R. was being sexually abused by Devereaux. A.R. initially denied that she was being abused but, upon further questioning, went on to tell Perez that she had been both a victim of and a witness to sexual abuse by Devereaux. On this basis, Perez brought Devereaux to the police station for questioning. Perez interviewed Devereaux about the alleged abuse, and Devereaux denied that he had sexually abused any of his foster children.

While Perez was interviewing Devereaux, DefendantAppellee Linda Wood, an employee of the Washington Department of Social and Health Services ("DSHS"), arrived at the police station with A.S., another of Devereaux's foster children. Perez briefly interrupted his interview with Devereaux to talk to A.S., who denied that there was any sexual abuse taking place in the Devereaux home. Perez then finished his interview with Devereaux and had him booked on one count of rape of a child in the third degree, on the basis of the alleged abuse of A.R.

Later on the same day, Perez also interviewed two more of Devereaux's foster children and, with Wood, conducted a lengthy second interview of A.S. This interview lasted from 5:00 p.m. to 11 p.m. In it, A.S. repeatedly denied having been sexually abused by Devereaux. After six hours of questioning, however, she finally changed her story and said that he had abused her. Perez then had Devereaux booked for the rape and molestation of A.S.

From there the investigation grew and the accusations spread. Roughly one year later, the felony charges against Devereaux were dropped in exchange for his plea of guilty to two misdemeanor counts -one count of rendering criminal assistance and one count of fourth-degree assault (for having spanked one of his foster children). The conditions of his sentence prohibited him from having contact with certain children, from being a foster parent for two years, and from being employed in a field that caters to or has regular contact with minor children.

Devereaux then commenced this action under 42 U.S.C. §§ 1983, naming the following parties as defendants: Perez; Wood; DSHS; the City of Wenatchee; Timothy David Abbey, Laurie Alexander, and Kate Carrow, all of whom were employees of DSHS; Kenneth Badgley, in his official capacity as police chief for the Wenatchee Police Department; and Earl Tilly, the Wenatchee Public Safety Commissioner. Devereaux alleged violations of his federal rights and also brought several state law claims.

The defendants moved for summary judgment on the §§ 1983 claim, and the district court granted their motions. It declined to exercise supplemental jurisdiction over the state law claims, dismissing them without prejudice to their being prosecuted in state court. See 28 U.S.C.§§ 1367(c). This timely appeal followed. A divided panel of this court affirmed the district court. See Devereaux I, 218 F.3d at 1045. We subsequently granted rehearing en banc. 235 F.3d at 1206.

Pursuant to a settlement agreement, Devereaux's appeal with respect to Perez and Badgley was dismissed with prejudice. In addition, Devereaux has not challenged the dismissal of the state law claims or the grant of summary judgment in favor of the City of Wenatchee, DSHS, or Tilly.

Consequently, the only matter now before this court is Devereaux's challenge to the grant of summary judgment in favor of Abbey, Alexander, Carrow, and Wood (hereinafter "Defendants") on the §§ 1983 claim. The district court granted summary judgment to Defendants on that claim on the basis of qualified immunity, stating that Devereaux has"not cite [d], nor has this Court's research revealed, case law to suggest that any of the State Defendants violated Plaintiff's clearly established rights based upon the evidence in the record."

We review a grant of summary judgment de novo. Weiner v. San Diego County, 210 F.3d 1025, 1028 (9th Cir. 2000). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights. 42 U.S.C.§§ 1983. Qualified immunity, however, shields §§ 1983 defendants " [f]rom liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

In Saucier v. Katz, 121 S. Ct. 2151 (2001), the Supreme Court clarified the two-step qualified immunity inquiry. To decide whether a defendant is protected by qualified immunity, a court must first determine whether, " [t]aken in the light most favorable to the party asserting injury, . . . the facts alleged show the officer's conduct violated a constitutional right." Id. at 2156. If the plaintiff's factual allegations do add up to a violation of the plaintiff's federal rights, then the court must proceed to determine whether the right

was"clearly established," i.e., whether the contours of the right were already delineated with sufficient clarity to make a reasonable officer in the defendant's circumstances aware that what he was doing violated the right. Id. In essence, at the first step, the inquiry is whether the facts alleged constitute a violation of the plaintiff's rights. If they do, then, at the second step, the question is whether the defendant could nonetheless have reasonably but erroneously believed that his or her conduct did not violate the plaintiff's rights. See id. at 2158 ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.").

Undertaking the first step of the two-step qualified immunity inquiry, we are persuaded that there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government. Perhaps because the proposition is virtually self-evident, we are not aware of any prior cases that have expressly recognized this specific right, but that does not mean that there is no such right. Rather, what is required is that government officials have "fair and clear warning" that their conduct is unlawful. See United States v. Lanier, 520 U.S. 259, 271 (1997) (noting that "general statements of the law are not inherently incapable of giving fair and clear warning," and that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though `the very action in question has [not ] previously been held unlawful' " (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (alteration in original)); see also Giebel v. Sylvester, 244 F.3d 1182, 1189 (9th Cir. 2001) ("Precedent directly on point is not necessary to demonstrate that a right is clearly established. Rather, if the unlawfulness is apparent in light of pre-existing law, then the standard is met. In addition, even if there is no closely analogous case law, a right can be clearly established on the basis of common sense. " (emendations, internal quotation marks, and citations omitted)).

Under Pyle v. Kansas, 317 U.S. 213, 216 (1942), the knowing use by the prosecution of perjured testimony in order to secure a criminal conviction violates the Constitution. While Pyle does not deal specifically with the bringing of criminal charges, as opposed to the securing of a conviction, we find that the wrongfulness of charging someone on the basis of deliberately fabricated evidence is sufficiently obvious, and Pyle is sufficiently analogous, that the right to be free from such charges is a constitutional right.

We are also persuaded, however, that there is no constitutional due process right to have child witnesses in a child sexual abuse investigation interviewed in a particular manner, or to have the investigation carried out in a particular way. Interviewers of child witnesses of suspected sexual abuse must be given some latitude in determining when to credit

witnesses' denials and when to discount them, and we are not aware of any federal law - constitutional, decisional, or statutory -that indicates precisely where the line must be drawn. See generally Myers v. Morris, 810 F.2d 1437, 1460-61 (8th Cir. 1987) (discussing in detail this "grey area of investigative procedure as to which there were, and probably still are, less than clearly established legal norms"). Cf. Idaho v. Wright, 497 U.S. 805, 819 (1990) (noting, in a Confrontation Clause context, that " [a]lthough the procedural guidelines propounded by the court below may well enhance the reliability of out-of-court statements of children regarding sexual abuse, we decline to read into the Confrontation Clause a preconceived and artificial litmus test for the procedural propriety of professional interviews in which children make hearsay statements against a defendant"). Consequently, mere allegations that Defendants used interviewing techniques that were in some sense improper, or that violated state regulations, without more, cannot serve as the basis for a claim under §§ 1983.

Given this legal background, the central issues presented on this appeal are the following: (1) Did Devereaux properly present to the district court and to this court a deliberate fabrication-of-evidence claim, or merely an improperinterview-techniques claim? (2) If the former, has Devereaux adduced sufficient evidence in support of such a claim to withstand summary judgment?For the reasons given below, we conclude that, to the extent that Devereaux has raised a deliberate-fabrication-ofevidence claim, he has not adduced or pointed to any evidence in the record that supports it. For purposes of our analysis, we assume that, in order to support such a claim, Devereaux must, at a minimum, point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of Devereaux despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information. See Devereaux I, 218 F.3d at 1063 (Kleinfeld, J., dissenting) (describing the "critical element" in Devereaux's deliberatefabrication-of-evidence claim, namely, "that the defendants who questioned the children knew or should have known that they were eliciting false accusations"); see also Myers, 810 F.2d at 1458 (requiring, in an analogous context,"a specific affirmative showing of dishonesty").

A. Devereaux's Arguments Before the District Court

The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of fact for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the nonmoving party has the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."

Id. at 325; see also Fairbank v. Wunderman Cato Johnson, 212 F.3d 528, 532 (9th Cir. 2000) (holding that the Celotex "showing" can be made by "pointing out through argument -the absence of evidence to support plaintiff's claim"). Once the moving party carries its initial burden, the adverse party "may not rest upon the mere allegations or denials of the adverse party's pleading," but must provide affidavits or other sources of evidence that "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Celotex, 477 U.S. at 323-24; Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1107 (9th Cir. 2000) (holding that once the moving party carries its initial burden of production, "the nonmoving parties were obligated to produce evidence in response").

In their memorandum in support of their motion for summary judgment, Defendants argued that "there is no evidence that any of the defendant [s] actually believed plaintiff was innocent or that the children were lying when they participated in the interviews." On this basis (among others), Defendants argued that they were entitled to summary judgment.

In his memorandum in opposition to Defendants' motion for summary judgment, Devereaux never expressly accepted or rejected the proposition that his §§ 1983 claim required a showing of dishonesty, and he never purported to have made such a showing. Most of his memorandum indicated that Devereaux was raising only an improper-interviewtechniques claim. For example, he asserted that Defendants failed "to adhere to established guidelines and policies concerning the questioning of child witnesses," and that they departed "from accepted professional judgment, practice, and standards." He also claimed that " [w]hat is at issue for this action is the failure of the State Defendants to conduct and monitor these interrogations in a manner that would ensure the veracity of the information obtained." All of those allegations, even if supported by record evidence, are insufficient to support a deliberate-fabrication-of-evidence claim. Failing to follow guidelines or to carry out an investigation in a manner that will ensure an error-free result is one thing; intentionally fabricating false evidence is quite another.

Devereaux did, however, go on to claim that Defendants' "intentional attempt to alter the testimony of alleged child victims" was also "at issue." He did not, however, expressly develop that "issue" or connect it with other, more specific factual allegations, or with any record evidence. His "Statement of Material Facts" in opposition to Defendants' motion for summary judgment contains several descriptions of interviews of children in which the children initially denied abuse, were questioned further, and ultimately accused Devereaux of abusing them. These, as far as we can discern, are the only "attempts to alter the testimony of alleged child victims" to which Devereaux referred.

The problem with Devereaux's line of argument is that, as we noted earlier, interviewers of child witnesses of suspected sexual abuse must be permitted to exercise some discretion in deciding when to accept initial denials at face value and when to reject them (or withhold judgment on them) and proceed further. Consequently, an allegation that an interviewer disbelieved an initial denial and continued with aggressive questioning of the child cannot, without more, support a deliberate-fabrication-of-evidence claim, even if the allegation is amply supported by the evidence. What is required is an allegation or a showing that the interviewer knew or should have known that the alleged perpetrator was innocent, or that the interview techniques employed were so coercive and abusive that the interviewer knew or should have known that they would yield false information. Devereaux never even alleged facts of this sort, much less supported such allegations with citations to evidence in the record.

An example will illustrate the point. In his memorandum submitted to the district court, Devereaux emphasized the fact that in the August 3 interview of A.S., in which A.S. initially denied being a victim of abuse but later changed her story and accused Devereaux, Wood repeatedly admonished A.S. to tell the truth. It is difficult to see, however, how repeated admonitions to be truthful can amount to a constitutional violation for deliberate fabrication of evidence, in the absence of any independent allegations or evidence that Wood knew or should have known that Devereaux was innocent and that A.S., in testifying to that effect, had already told the truth. Because Devereaux never made that independent argument, his complaints about Wood's admonitions to the child to tell the truth cannot support a deliberate-fabrication claim. For similar reasons, the other incidents that Devereaux described before the district court also are inadequate to support such a claim.

Thus, to the extent that Devereaux's memorandum in opposition to Defendants' motion for summary judgment did raise a deliberate-fabrication-of-evidence claim, he failed to make or support any factual allegations that were logically capable of supporting such a claim. The district court's decision to grant the motion was therefore proper.

"It is well-established that an appellate court will not consider issues that were not properly raised before the district court." Slaven v. American Trading Transp. Co., 146 F.3d 1066, 1069 (9th Cir. 1998). Although our discussion above demonstrates that Devereaux barely presented and never supported his deliberate-fabrication-of-evidence claim before the district court, we nonetheless discuss the additional arguments that he has raised on appeal. As that discussion shows, his failure to allege and to offer proof of the requisite facts continues.

In his opening brief on appeal, Devereaux generally argues only that Defendants used improper methods in interviewing witnesses. He never argues that they pursued their investigation of him even though they knew or should have known that he was innocent. The closest that he comes to making such an argument is a vague reference to "evidence that the state defendants . . . held an animus and preconception against Devereaux which led to their intentional manipulation of child witnesses." But the "animus and preconception " referred to could just as well be Defendants' good-faith belief that Devereaux was guilty, which could lead to aggressive or manipulative questioning of the child witnesses in order to get them to testify truthfully, if reluctantly, to his guilt. We conclude that if Devereaux's brief is intended to raise a deliberate-fabrication-of-evidence claim, it is not based on any allegation that Defendants knew or should have known that he was innocent. [1]

Thus, if there is a deliberate-fabrication-of-evidence argument in Devereaux's opening brief on appeal, then it must be based on a claim that Defendants' interviewing techniques were so coercive and abusive that Defendants knew or should have known that the interviews would yield false information. Liberally construed, Devereaux's brief does raise this argument: It includes a discussion of Pyle, and it makes repeated reference to "coerc [ion] or influence [ ] to provide false testimony," and the like.

The problem once again, however, is that the improprieties Devereaux describes cannot possibly support his claim. The alleged improprieties are well described and addressed in the panel opinion. See Devereaux I, 218 F.3d at 1054-55. For example, Devereaux repeatedly focuses on the interview in which Perez, in Carrow's presence, confronted A.R. regarding her prior recantation of her allegations of abuse and threatened her with charges for "false reporting" if she stuck to her recantation. Devereaux emphasizes the fact that A.R. suffers from fetal alcohol syndrome and is therefore a particularly vulnerable witness. What Devereaux mentions only in passing is that, despite the coercive nature of the threat and despite A.R.'s heightened susceptibility, A.R. stuck to her recantation -Devereaux expressly recognizes that Perez " unsuccessfully applied pressure upon A.R." by threatening "to prosecute her for perjury." (Emphasis added.) Because this coercive technique did not, on Devereaux's theory of the facts, yield any false testimony even though it was applied to an especially vulnerable witness, it can hardly serve as a basis for a claim that Defendants violated Devereaux's rights by using techniques that they knew or should have known would yield false information.

We conclude that to the extent that Devereaux has raised a deliberate-fabrication-of-evidence claim in his opening brief, he has again failed to allege facts that would support

such a claim. The grant of summary judgment in favor of Defendants must therefore be affirmed.

When we granted rehearing en banc, we ordered supplemental briefing from the parties. As a general matter, " [w]e review only issues which are argued specifically and distinctly in a party's opening brief," Greenwood v. FAA, 28 F.3d 971, 977 (9th Cir. 1994), and an issue will therefore be deemed waived if it is raised for the first time in a supplemental brief, Kreisner v. City of San Diego, 1 F.3d 775, 778 n.2 (9th Cir. 1993). Despite these well-established principles and the fact that Devereaux's opening brief did not contain any meritorious arguments for reversal, we briefly address the arguments in his supplemental brief.

In his supplemental brief, Devereaux sensibly adopts the deliberate-fabrication-of-evidence argument that was so forcefully developed by Judge Kleinfeld in his dissent from the panel majority's opinion. See Devereaux I, 218 F.3d at 1057-63 (Kleinfeld, J., dissenting). Nonetheless, Devereaux still fails to allege any facts or point to any evidence in the record that supports the argument.

For example, Devereaux points out that Carrow was involved in the "parade of homes," an incident in which one of Devereaux's foster children was driven around Wenatchee and asked to point out the locations at which abuse had occurred. But driving a child around the community and asking where the crimes that the child allegedly witnessed took place is surely not such a coercive and abusive technique that Carrow should have known it would lead to false information. Devereaux points out that Carrow "ignored" another child's denials that Devereaux was abusing his foster children, but, again, interviewers of child witnesses of suspected sexual abuse surely must be given some latitude in determining when to credit witnesses' denials and when to discount them -the mere fact that an interviewer did not immediately believe such a denial cannot suffice to show that the interviewer violated the Constitution by using techniques that the interviewer knew or should have known would yield false information.

Devereaux also accuses Carrow of withholding exculpatory evidence, but (1) he does not argue that the requirements of Brady v. Maryland, 373 U.S. 83 (1963), apply to social workers at the investigative and charging stages, and (2) in any event, a Brady violation cannot in itself support a deliberatefabrication-of-evidence claim -if it did, then any prisoner with a successful Brady claim would be able to bring a §§ 1983 action against the prosecutor for deliberate fabrication of evidence, and would be able to get past summary judgment. The other accusations against Carrow are even less substantial than these.

Devereaux's only accusation regarding Wood is her participation in the "tell the truth" interview of A.S., which we have already addressed.

Devereaux points out that Alexander participated in the "parade of homes" as well, that she withheld exculpatory information, and that she used Linda Miller's confession in questioning Miller's daughter. None of this shows, however, that Alexander knew or should have known that Devereaux was innocent, and none of it amounts to the use of investigative techniques that were so coercive and abusive that Alexander knew or should have known that they would yield false information.

The only accusation that Devereaux levels against Abbey is that he participated in Perez's interview of D.E. after D.E. had been in Perez's foster care for six months. Without more, that does not show that Abbey knew or should have known that Devereaux was innocent, or that he used techniques that he knew or should have known would yield false information.

Again, Devereaux has not alleged that Defendants knew or should have known that he was innocent, or that their investigative techniques were so coercive and abusive that they knew or should have known that the techniques would yield false information. He has therefore failed, even in his supplemental brief, to support a claim that Defendants deliberately fabricated evidence to be used against him.

The partial dissent agrees that in order to support a deliberate-fabrication claim, Devereaux must show more than "that an interviewer disbelieved an initial denial and continued with aggressive questioning." Kleinfeld, J., dissenting in part at 12226 ("partial dissent"). The partial dissent's analysis of the evidence, however, is inconsistent with that requirement.

As part of its case against Wood, the partial dissent describes deposition testimony from A.S.'s mental health counselor to the effect that A.S. had threatened, on numerous occasions, to accuse the counselor of abusing her. Id. at 12228-29. The partial dissent fails to acknowledge, however, that the deponent was asked whether A.S. appeared to be capable of carrying out such a threat, but that the answer to that question was not included in the deposition excerpt that was provided to the district court and to this court. Most importantly, there is no evidence that Wood was aware of any of this, or even that the deponent had ever told anyone, let alone Wood, about any of A.S.'s threats. For all we know, the deponent never took the threats seriously enough to think them worth reporting.

The partial dissent also states that "in a later interview" A.S. both accused another social worker of participating in the alleged orgies and admitted having made false accusations of rape. The partial dissent concludes that " [a ] reasonable interviewer would have to be very wary indeed of accusations of sexual misconduct by this dangerous girl." Id. at 12229. The "later interview" in question was conducted by Devereaux's attorney and took place on June 26, 1995, nearly one year after Wood's allegedly improper interview of A.S., and approximately four months after Devereaux filed his complaint. The partial dissent fails to explain how A.S.'s statements in June 1995 should have made Wood aware in August 1994 of A.S.'s supposed "dangerousness."[2]

Apart from these unsupported or irrelevant allegations, the case against Wood comes to this: (1) A.S. initially did not accuse Devereaux, (2) she was subsequently left alone with Wood, and then, (3) after a lengthy interrogation by Wood and Perez, she accused Devereaux. The partial dissent notes that Devereaux, as the nonmoving party, is entitled to all reasonable inferences in his favor. It then concludes that a jury could infer that "Wood knew the story was false. " Id. at 12229.

There are several problems with this line of reasoning. The first is that a jury would be authorized to draw such an inference any time an interviewer discounts an initial denial and continues with aggressive questioning that produces an accusation -indeed, that is all that the inference would be based on in this case. Were we to reverse the grant of summary judgment as to Wood, then, we would thereby eliminate completely any latitude that interviewers of child victims of suspected sexual abuse must have, because pressing on past an initial denial would always give rise to potential liability. This we cannot do. Errors of this kind -inferring deliberate fabrication from the fact that an investigator discounted a witness's statement and pressed on -also occur elsewhere in the partial dissent's analysis. See, e.g., id. at 12233 (permitting the jury to infer that "Carrow . . . knew that Perez was making all the children lie" from the fact that A.R. said to Perez "you make all the children lie").[3]

Second, as we explained, supra, Devereaux has never alleged that Wood or any other Defendant knew that he was innocent. His claim must therefore be based entirely on improper interviewing techniques, i.e., techniques that are inherently so coercive or abusive as to give rise to liability even if used in good faith. By repeatedly basing its arguments on inferences to "guilty knowledge" on the part of Defendants, see id. at 12229-30 (Wood); id. at 12232, 12234 (Carrow); id. at 12235 (Alexander), the partial dissent grounds its analysis upon factual allegations that Devereaux has never made.[4]

Other, similar problems pervade the remainder of the partial dissent's analysis. For example, it discusses the interview in which Perez, with Carrow present, threatened A.R. with charges for false reporting. It concludes that a jury could draw inferences on this basis about Carrow's "modus operandi," to the effect that she "had probably used similarly coercive techniques" in other interviews with other girls. Id. at 12233. The flaw in this reasoning is that there is no evidence that Carrow has ever used this "coercive" technique (i.e., the making of threats), or any other, on anyone, including A.R. All that the record shows is that on one occasion Carrow was present when someone else used threats -we do not even have any evidence that Carrow approved use of the technique. How this evidence shows that the use of threats and "similarly coercive techniques" was Carrow's "modus operandi" has been left unexplained.

The partial dissent's case against Alexander is that, having received medical evidence that C.M. might have been abused but not to the full extent that C.M. claimed, Alexander subsequently "obtained reconfirmation" of C.M.'s story, in part by truthfully informing C.M. that C.M.'s mother had told a similar story. Id. at 12235.

At the time of this incident, Alexander had reason to believe that C.M. had been abused (because her hymen was partially torn and she had made allegations of abuse), but Alexander also had reason to believe that C.M.'s story could not be true in its entirety (because the condition of C.M.'s hymen was not consistent with the full extent of the abuse she had alleged). Notwithstanding the partial dissent's conclusions to the contrary, truthfully informing a witness about another witness' corroboration is not such an inherently coercive or abusive technique that Alexander knew or should have known it would lead to false information -rather, Alexander could have reasonably believed that by taking C.M.'s side, so to speak, she could gain C.M.'s trust and persuade her to describe what sort of abuse had really taken place. This may or may not be the wisest approach to a witness whose story has already been falsified in part, but it cannot serve as the foundation for a deliberate-fabrication-of-evidence claim.

Devereaux has had ample opportunity to marshal his evidence and focus his arguments on Defendants, rather than on Perez. If the partial dissent's observation that the"record and briefs are not as clear as we might like" because"the case was focused on Detective Perez," id. at 12227, is meant to excuse Devereaux's failure to marshal the evidence against Defendants, we are unpersuaded. In the district court, Abbey, Alexander, Carrow, and Wood moved for summary judgment separately from Perez. Devereaux then filed a memorandum in opposition to their motion separately from his opposition to Perez's motion. Devereaux has repeatedly been put on notice that he must present and argue the

evidence against Defendants. If his case was "focused" on Perez, it was only because the only evidence Devereaux had was against Perez, and he had none against Defendants. In that state of the record, it cannot be gainsaid that the district court correctly granted summary judgment in favor of Abbey, Alexander, Carrow, and Wood.

One final point merits emphasis: The partial dissent does not purport to present arguments that it finds in Devereaux's pleadings and briefs. Rather, it creates the factual allegations that Devereaux needs and then proceeds directly to the record, mining it for evidence to support the necessary allegations. We reject this approach for the simple reason that we are not Devereaux's attorneys. It is not the role of this court to "manufacture arguments for an appellant." Greenwood, 28 F.3d at 977.

The investigatory behavior of which Devereaux complains is indeed troubling, and we do not condone it. But, in three attempts to do so, Devereaux has never made or provided evidentiary support for allegations that warrant the imposition of §§ 1983 liability on Defendants. The judgment of the district court is, therefore,

AFFIRMED.

FERNANDEZ, Circuit Judge, concurring:

I concur in the majority opinion insofar as it rests on the ground of qualified immunity for investigative techniques. I do not, however, join the discussion regarding knowing[1] fabrication of evidence because I do not believe that Devereaux ever properly raised or developed that issue before the district court.

Thus, I express no opinion on whether the mere development of evidence (even knowingly false evidence) or the bringing of charges (even knowingly false ones) can by itself constitute a procedural or substantive due process violation within the meaning of the United States Constitution. That kind of conduct would surely be reprehensible, and only a rapscallion in official raiment would do such a thing. However, I would not establish (or refine) a possibly far reaching principle of constitutional law based on the record and presentation in this case.

It may be easy to decide the question here, although, as the dissent demonstrates, even that is not necessarily true. But if that right exists, we must answer a number of questions. For example, when does the violation accrue? Is it at the first evil interview, at the first presentation to the prosecutor, at the time charges are filed, at arraignment on those charges, or at some earlier or later point? All of those issues remain to be decided. And when should an officer have had such positive knowledge that the defendant was truly

innocent that the further conduct of the investigation, or presentation to the prosecutor, violated the defendant's constitutional rights? The dissent says that the evidence in this case would easily support a jury finding that the defendants have violated the newly delineated right. The majority says that the evidence is not even weighty enough to allow jury consideration. That is to say, no reasonable jury could decide that the right was violated. Given that degree of clarity, I must say that"a [social worker's] lot is not a happy one." W.S. Gilbert & A. Sullivan, The Pirates of Penzance (1879).

In short, along with the majority of the original panel, I would hold that Devereaux has not spelled out a constitutional right to have investigations conducted in any particular manner. Devereaux v. Perez, 218 F.3d 1045, 1054 (9th Cir. 2000). I would also declare that to the extent that there may be a constitutional right to be free from the development of knowingly false charges, Devereaux has not properly presented that issue. I would leave it at that.

With that caveat, I concur.

KLEINFELD, Circuit Judge, with whom PREGERSON and WARDLAW, Circuit Judges, join, concurring in part, and dissenting in part:

Use of children to satisfy adults' sexual cravings is a gravely serious crime, subject to very severe penalties. Manufacturing false evidence and using the criminal law system to ruin the lives of innocent people is also a gravely serious wrong. The more terrible the crime and penalties, the more terrible is the wrong of "framing" someone for it. The seriousness of a crime never justifies manufacturing evidence and convicting the innocent. Our system of justice does not allow for the position taken by the notorious Crusader general, "kill them all, God will know his own."[1]

Wenatchee Washington seems to have been among the many towns engulfed by sexual witchhunts in the 1980's and 1990's. Its newly appointed child abuse detective on his first child sex molestation case, together with its much more experienced social workers, and its prosecutors, filed 29,727 charges of child abuse against 43 men and women. At the end of it all, few charges stood up in court except against the government's own witness, Linda Miller, the woman whose implausible (and, as soon proved, impossible) story of sex orgies lay at the foundation of the charges against many or most of the others. Devereaux eventually was allowed to plead guilty to a minor misdemeanor with no sexual connotation, for spanking a disobedient foster child on the buttocks with an open hand. Many of the others convicted in the Wenatchee sex prosecutions have had their convictions overturned on appeal. The Washington Court of Appeals has appointed a judge to conduct a formal

inquiry into what went wrong in its criminal justice system. The affair has been popularly regarded as a Northwestern Salem.[2]

I concur in the majority opinion, insofar as it sets out the law to be applied to this case. I join in its express holdings, that (1) "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government";[3] (2) "there is no constitutional due process right to have child witnesses in a child sexual abuse investigation interviewed in a particular manner, or to have the investigation carried out in a particular way";[4] and (3) Devereaux must show, to avoid summary judgment as to deliberate fabrication, not just that an interviewer disbelieved an initial denial and continued with aggressive questioning, but that the interviewer knew or should have known that the alleged perpetrator was innocent or that the interview techniques were so abusive that the interviewer knew or should have known that they would yield false information.[5] These express holdings necessarily imply an additional holding: these rules of constitutional law apply not only to police, but also to the appellees in this case, who were social workers, and to others who act on behalf of the state. Anyone who acts on behalf of the government should know that a person has a constitutional right not to be "framed."

I respectfully dissent in part, but my dissent is limited to whether Devereaux's evidence established a genuine issue of material fact as to three of the four remaining appellants. Devereaux is, in my view, entitled to present his case to a jury as to Carrow, Wood and Alexander, because he has established a genuine issue of fact as to each of their claims for qualified immunity.[6] Devereaux has established a genuine issue of fact as to whether Carrow, Wood, and Alexander could have reasonably believed that their conduct did not violate Devereaux's constitutional rights.[7] I would therefore reverse the summary judgment against Devereaux as to those three appellees. I join fully in the majority opinion as to Abbey.

Reasonable jurors could conclude from Devereaux's evidence that Wood, Carrow and Alexander "continued their investigation of Devereaux despite the fact that they knew or should have known Devereaux was innocent" and "used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information."[8]

The record and briefs are not as clear as we might like, for two reasons. First, the case was focused on Detective Perez through the initial panel decision but he settled while the appeal was pending, leaving only the four social workers as defendants. Second, much of the appellant's brief focuses on the incorrect argument that section 1983 liability could be

based on the social workers' violations of state regulations as opposed to the United States Constitution or federal law. Nonetheless, Devereaux has both in the district court and here, provided sufficient argument and evidence to establish a genuine issue of fact as to the section 1983 claims. Our initial inquiry, under Katz, must be whether "the facts alleged show the officer's conduct violated a constitutional right," and the facts must be "taken in the light most favorable to the party asserting the injury."[9] The majority opinion acknowledges that the right at issue was clearly established, but asserts that Devereaux has not alleged facts sufficient to put any violation of the right at issue. I respectfully disagree with the majority's reading of the record, because it violates the requirement that the facts be "taken in the light most favorable to the party asserting the injury."[10]

Reasonable jurors could conclude that Wood "used investigative techniques that were so coercive and abusive that [she] knew or should have known that those techniques would yield false information"[11] and did so in circumstances where a reasonable person would have desisted if concerned about convicting an innocent individual. The new detective on the child sex abuse beat, Perez, had brought in A.S. for questioning. Devereaux himself had previously advised the social workers that this twelve year old girl had acted inappropriately on various occasions, including displaying sexual aggressiveness.

The evidence submitted, taken in a light most favorable to Devereaux, established that Wood knew or should have known that she was likely to be eliciting false accusations of sexual misconduct from A.S. In deposition testimony, A.S.'s mental health counselor acknowledged that A.S. "threatened to make a report of sexual abuse against [him ] specifically because she, at least in her perception, wasn't having one of her needs met," and that she made "numerous " threats of this kind.[12] A.S. later said in an interview that another of the Child Protective Services social workers "would attend the group sex sessions nearly every time," where "each of the adults would have intercourse with each of the children."[13] A.S. acknowledged in her statement that she "made false rape accusations against Mr. John B. who "worked at Albertson's and had caught her eating a doughnut without paying for it."[14] A reasonable interviewer would have to be very wary indeed of accusations of sexual misconduct by this dangerous girl.

In her interview with Wood and Perez, A.S. initially denied that Devereaux had done anything sexual to her. Perez then left A.S. alone with Wood.[15] A.S. eventually changed her story during this long interview.[16] Devereaux submitted evidence from which a jury could find that A.S. denied any sexual conduct from 5:00 P.M. to 10:00 P.M.[17] But after six hours of interrogation, A.S. changed her story, a change which A.S. said was "so she could get out of the office"[18] because she "got sick and tired of sitting there."[19] After that, her

stories got increasingly lurid, expanding to nightly orgies with Devereaux and numerous other men, women and children.[20]

On summary judgment, the respondent is entitled to have the evidence evaluated and reasonable inferences drawn in his favor.[21] Although a jury could find in Wood's favor, it could also, on this evidence, find against her. A jury could infer that Wood and Perez held this child against her will until after six hours of confinement, fairly late at night, she told the story they wanted. The jury could infer that Wood knew the story was false because it took so long to extract, because A.S. had a history of threatening and making false sexual accusations, and because the means of extracting it were reasonably calculated to produce a false accusation. Holding a child captive and alone in a police station, and drenching her with sex talk until a late hour likely to be past her bedtime, until she says what the interrogators want, has a strongly coercive element. If someone were to force a twelve year old girl to watch pornographic movies for six hours and told her she could stop watching only if she accused a man she knew of a crime, that might be the kind of coercive pressure that could make a girl lie in order to escape. Making a twelve year old girl talk about sex in the police station for many hours could be comparable (or worse, because of its personal aspect). A jury could infer that, combined with A.S.'s known tendency to make false sexual accusations, this was a technique that Wood knew was likely to produce a false accusation.

The majority finds fault with my analysis on two grounds, that A.S. might only have threatened to make false accusations and not actually have done so, and that Wood, the social worker obtaining and using A.S.'s accusations, might not have known about A.S.'s proclivity for these kinds of lies. I see little significance to the majority's contention that A.S. had threatened to make false charges, and not actually done so. By her own admissions, A.S. did in fact make false sex accusations and not just threaten them. As for whether Wood knew that A.S. was inclined to make false sex charges, the record allows for a jury inference either way. Devereaux is entitled to have the evidence taken in the light most favorable to him, and that is decisive.[22] Devereaux's own prior reports of inappropriate sexual aggressiveness by A.S. were made to Wood's office, which would suggest an inference that the girl had sexual problems and that Devereaux was not trying to keep the girl's sexual activity secret. A counselor in Wood's office knew of A.S.'s numerous threats to make false sex accusations to get things she wanted. A.S. had made an allegation against someone in Wood's own office.[23] A jury would be permitted to infer that she would know of A.S.'s history with other individuals in her own Child Protective Services office in the little town of Wenatchee. Wood has not denied that she knew of A.S.'s history.[24]

4/29/26, 11:32 AM
Case 9:25-cv-00083-DWM    Document 58-1    Filed 05/04/26    Page 61 of 179
Robert Devereaux, Plaintiff-appellant, v. Timothy David Abbey; Laurie Alexander; Kate Carrow; Linda Wood; Kenneth Badgley, in H…

The majority opinion seems to suggest that if Wood does not get the benefit of qualified immunity, then it would be denied "any time an interviewer discounts an initial denial and continues with aggressive questioning that produces an accusation."[25] This ignores the length and time of the interview, the coercive technique, and the history of the person being interviewed. It is one thing to follow up on a denial with further questioning. Getting A.S. alone with a female interviewer after her initial denial to Perez and Wood together might have been entirely reasonable, had that been all there was. It is quite another to use a coercive method of questioning -five hours of isolation of a child while drenching her in sexual conversation -to obtain an accusation by a person known to threaten and make false sex accusations.

Carrow participated in about fifty interviews.[26] A jury could infer from the depositions of girls interviewed that Carrow's method was to harangue the girls as liars until they accused Devereaux of sexual misconduct. In D.E.'s first interview, D.E. said Devereaux "treated her fine."[27] But a jury could infer from the evidence that Carrow later prevented this exonerating remark from being disclosed to Devereaux's attorney and lied about it under oath.[28] A jury could infer from the remark, and from Carrow's subsequent dishonest nondisclosure, that she knew Devereaux was innocent and covered up exonerating evidence.

With another girl, A.R., Carrow and Perez interviewed her together.[29] A.R. had initially accused Devereaux of sexual abuse, but recanted the next day.[30] A.R. was quite an interview subject. The way the police became involved with Devereaux in the first place was when he called them to report that A.R. had attempted to poison another girl at his house, A.S., and also Devereaux himself, by putting iodine in their soft drinks.[31] Perez had initially interviewed A.R., but asked nothing about her attempt to poison A.S. and Devereaux; Perez's only interest was sex. Both Perez and Carrow knew that A.R. was a victim of fetal alcohol syndrome, a brain disorder of children impaired in utero by maternal alcohol consumption, some characteristics of which are "inappropriate social behavior, memory deficits . . . lack of judgment, lack of remorse for misbehavior, lying,. . . unusual aggressiveness, and wide variations in learning abilities at different times."[32] The police report about the interview states that A.R. "suffers from fetal alcohol syndrome and has difficulty in remembering some events."[33]

A jury could infer that Carrow had reason to know that A.R.'s accusation of Devereaux was false because she had recanted, was mentally impaired, and because the accusation had been forced out of her. When she recanted, Perez threatened her with prosecution for false reporting if she stuck to her recantation, yet she stuck to it[34] A jury could infer that Carrow

knew she must be telling the truth, because so vulnerable a girl was resisting such great pressure to give the detective and social worker what they wanted. The girl said to Perez "you make all the children lie,"[35] from which the jury could infer that Carrow, who was there when A.R. said this, knew that Perez was making all the children lie. The majority suggests that the proper inference to be drawn from this statement is that Carrow merely "discounted a witness's statement and pressed on."[36] That is one inference that a jury could draw, but not the most obvious one, and not the only one they could draw. As for the majority's suggestion that"we do not even have any evidence that Carrow approved use of the technique"[37] of threatening the girls to force accusations out of them, of course we do - she was present and acting in concert with Perez and she was silent when he made the threats.[38] A.R. told another of the social workers and Perez that Carrow lied to her, by telling her that Devereaux had been"found" guilty and that a semen sample had been found,[39] from which a jury could infer that Carrow knew Devereaux was innocent and was intentionally misleading a non-victim to make her testify falsely that she was a victim.

The majority opinion correctly notes that A.R., despite all the pressure, continued to maintain that her original accusation had been false and that Devereaux did not engage in any sexual misconduct with her.[40] A jury might nonetheless regard this evidence as material, on the theory that it showed that Carrow had probably used similarly coercive techniques to extract accusations she knew were false from other girls. Carrow participated in many interviews of girls who made accusations and did not recant, so her modus operandi was material to whether she was knowingly coercing production of false testimony, even if that modus operandi did not work with A.R. The majority opinion says "all we know is that on one occasion Carrow was present when someone else used threats," discounting the possibility of a "modus operandi" inference.[41] But with another interviewee who consistently maintained that Devereaux had not sexually molested her or anyone else in the home, Carrow showed the same pattern, simply refusing to take no as an answer.[42] Moreover, juries are generally allowed to hear evidence of conduct, even conduct not directly at issue as this was, to support an inference of similar conduct on other occasions.[43]

Again, a jury could find in Carrow's favor. It could interpret the evidence to be that Carrow had a good faith belief that Devereaux was guilty, and that any girl who denied it was lying, and ought reasonably to be questioned again and again until she found the "courage" to "tell the truth." But a jury would not have to interpret the evidence that way. A jury could also find that Carrow had every reason to think Devereaux was innocent, yet refused to accept this, and used all the coercion she could muster -lies to the girls, repeated

interrogations, dragging them to the police station, threats of prosecution if they recanted any accusatory statements -to make them lie, and that she succeeded with some of them.

Alexander together with Detective Perez repeatedly interviewed C.M.[44] C.M. told lurid stories of sexual ceremonies conducted by her pastor at church and sex orgies with numerous male and female adults and children. She also stated that she had participated over twenty times in sex orgies at Devereaux's house where he and other men, all wearing sunglasses so that they could not be identified, had sexual intercourse with her as well as other girls.[45] The bizarre nature of C.M.'s account is highlighted by her flat statement that a woman who had lived with her family was "a witch " and "I think she cast a spell on my brothers and sisters."[46]

After Alexander and Perez interviewed C.M. the first time, Alexander sent her to a physician for an examination. The examining physician reported that although she had had a tear in her hymen, indicating some penetration, it was healed, leaving a vaginal orifice with a diameter of six to seven millimeters (a little over a quarter of an inch).[47] This tear was consistent with sexual abuse, but not with frequent and repeated full penetration by numerous adult men. The physician sent the report to Alexander.[48] After receiving it, Alexander together with Perez conducted a second interview of C.M.[49] During this second interview, Alexander and Perez obtained reconfirmation of the story, which they now had to know was false, of the "over twenty times" when Devereaux and other men raped C.M.[50]

A jury might give Alexander the benefit of the doubt because C.M.'s interviews are somewhat vague and seem to veer off into fantasy, such as her witchcraft accusation. A jury might understand her to mean that the sexual abuse consisted of digital penetration, which would be consistent with the medical report, rather than repeated and frequent mass rape with full penile penetration, which would not. But a jury could also conclude that, despite having obtained medical verification establishing that C.M. had not been frequently and repeatedly penetrated genitally by numerous adult men, Alexander nevertheless took advantage of C.M.'s childish vulnerability to obtain what Alexander knew to be a false accusation that she had been.

C.M.'s statement in evidence says that Alexander told her that "everything I said was true" and that "my mom confessed to everything I said."[51] This bolstering of C.M. had to take place at the second interview, when Alexander had to know that the account was false, because Linda Miller's confession came after the first interview.[52] Linda Miller had confessed that she herself sexually abused her children, but that so did many other men and women in the town, in numerous mass orgies at the Pentecostal church and various other locations, lasting most of the night, in which numerous men frequently and

repeatedly had full genital sexual intercourse with C.M. and many other girls. The Wenatchee witch hunt may all stem from official acceptance of Linda Miller's excuse for her own sex crimes, that "everybody does it." C.M. told substantially the same story. But a jury could reasonably conclude that Alexander knew when she obtained it the second time (after she had obtained the medical report) that C.M.'s story was false, and that her use of C.M.'s mother's confession to obtain it was likely to elicit a false accusation of Devereaux consistent with C.M.'s mother's confession.

The majority argues for an inference exonerating Alexander: there was nothing wrong with "truthfully informing a witness about another witness' corroboration", and "by taking C.M.'s side, so to speak, she could gain C.M.'s trust and persuade her to describe what sort of abuse had really taken place."[53] Alexander's lawyer could make that argument to a jury, but the evidence would lend itself readily to Devereaux's side of the case. The jury could think that once a girl makes medically impossible claims, and alleges witchcraft and spells, a reasonable interviewer ought to be wary indeed of believing any accusations the girl makes. While a jury could draw the excusing inference the majority suggests, it could also draw a damning one, that continued interrogation of this disturbed girl was not a reasonable means of finding out "what sort of abuse had really taken place."[54]

Conclusion

Witch hunts seem to be something universally regretted in retrospect, yet abetted by the legal system while they proceed. During the 1980's and 1990's, many towns in America were convulsed by accusations of mass sexual abuse of children in day care and foster care settings such as Devereaux's.[55] The accusations have often been replete with physically unlikely or impossible events. The accusations here included a witch casting spells, the child victim of repeated group rape who nevertheless retained her hymen, sex orgies in church, and the ability of numerous middle aged men to stay awake all night, night after night, and perform sexually dozens of times each night. Other day care and foster care mass sex cases have involved witches who flew on broomsticks, sacrificed babies, and bizarre occurrences in tunnels, despite the absence of baby deaths and excavations demonstrating the absence of tunnels. Common sense gets trampled in the rush to affirm fashionable hysterias. The creaky rigidity of our mechanisms for importing common sense into legal disputes sometimes keeps them from working.

After C.M. had claimed that a woman was a "witch " who had "cast a spell on my brothers and sisters, " and a medical report had proved that C.M.'s sex story could not be true, most sensible people would think of the Salem witch trials, and say to themselves "here we go again." The Salem witch trials were part of a mania, mostly in Europe but also in Salem,

that ruined the lives of thousands of innocents.[56] The witchcraft accusations then, as now, often involved children and sex, such as the common accusation of being made to "submit to many unholy and disgusting ceremonies, " being "forced . . . to kiss . . . the superior on . . . the breech,"[57] roasting babies over fires,[58] and"every species of unmentionable debauchery,"[59] including "sexual intercourse with Satan."[60] In Salem, those who confessed to witchcraft generally received some leniency, but those who staunchly and truthfully maintained their innocence were hanged, as being what is now called "in denial." The Salem witch trials, like the modern ones, were based not on lynch mob action, but on formal trials based on expert witnesses' testimony. The Salem witch hunt began when a physician unable to relieve the apparently hysterical symptoms of a local minister's daughter, told the father "that the girls `were under the evil hand.' "[61] Both in Europe and the American colonies, highly educated people led the mania, instead of restraining it.[62]

Our judicial system ought not to be helpless to protect and vindicate the victims of witch hunts. Fortunately the majority opinion today clarifies the law of qualified immunity so that it will not continue to embolden those who manufacture false evidence to abet witch hunts. Unfortunately, it does not apply the law correctly. The fault in the majority opinion application of the law is that it overlooks the requirement that the evidence must be "taken in the light most favorable to the party asserting the injury."[63] As to the three remaining defendants with respect to whom we disagree, a jury could, on the evidence in the record before us, draw inferences either way. Devereaux is entitled, therefore, to get his case to a jury.

The doctrine of qualified immunity is useful when it enables government officials to do their duty with vigor, unafraid of enmeshment in lawsuits about new, doubtful or unclear constitutional claims they had no reason to know about. The doctrine would be harmful rather than useful if it protected government officials who deprived people of such fundamental and well known constitutional rights as the right not to have government officials manufacture false evidence against them. The vulnerability of government officials to lawsuits if they intentionally deprive people of their plain constitutional rights is an important deterrent to official abuse of individual rights. This is true regardless of whether they work in the police department or some other department. Nor can officials be immunized because they act with good underlying motives, such as to protect children from sexual exploitation. "The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."[64]

4/29/26, 11:32 AM Case 9:25-cv-00083-DWM Document 58-1 Filed 05/04/26 Page 66 of 179

Robert Devereaux, Plaintiff-appellant, v. Timothy David Abbey; Laurie Alexander, Kate Carrow, Linda Wood, Kenneth Badgley, in H…

In this regard, it is worth noting that the medical examination of Linda Miller's daughter, which allegedly showed that Miller's allegations of abuse could not be true, took place after nearly all of the allegedly improper conduct of which Devereaux complains. Thus, even if the medical falsification of Miller's story proved that Devereaux was innocent (rather than just proving that Miller's story, or certain parts of it, were false), it happened too late to serve as evidence that Defendants knew Devereaux was innocent when they engaged in the conduct of which he complains.

Similarly, the partial dissent notes, in its case against Wood, that "A.S. had made an allegation against someone in Wood's own office." Id. at 12230. The allegation was made in the same June 1995 interview conducted by Devereaux's attorney. The record of the interview does not indicate that A.S. had ever voiced that allegation before that date.

We do not suggest that such inferences would, in all circumstances, be unreasonable. What we do hold is that such tenuous inferences, standing alone, do not constitute sufficient evidence to survive summary judgment.

We return to this point, infra.

By "knowing" the majority seems to mean knew or should have known.

Albigensian Crusade, (visited May 31, 2001)http://crusades. Boisestate.edu/Albi/.

See Dorothy Rabinowitz, Reckoning in Wenatchee, The Wall Street Journal, September 21, 1999. "The 1994-95 child sex abuse witch-hunt in Wenatchee, Wash., resulted in a massive frame-up. " Paul Craig Roberts, Saved by Pursuit of the Truth, The Washington Times, April 6, 2000; see also, Mike Barber, Wenatchee Haunted By Investigations, Seattle PostIntelligencer, September 10, 1999. Whitman County Superior Court Judge Friel stated that "no rational trier of fact would believe these allegations." Rabinowitz, Reckoning in Wenatchee, The Wall Street Journal, September 21, 1999.

Maj. Op. at 12209. Judge Fernandez's separate concurrence raises the question whether creation of false evidence, by itself, violates any constitutional right, even if there is no criminal proceeding based on it. Concurrence at 12223. We need not answer that question in this case, because the evidence did lead to a criminal proceeding. Devereaux was arrested and put in jail, See Doc. 27 Ex. 1; Doc. 50 Ex. A, formally charged with rape of a child and other crimes, See Doc. 49 Ex. F, and subjected to bail conditions on his release for an extended period. See Doc. 27 Ex. 4.

Maj. Op. at 12210.

Maj. Op. at 12211.

See Pierce v. Multnomah County, Oregon, 76 F.3d 1032, 1038-39 (9th Cir. 1996) (holding that when foundational facts regarding a qualified immunity claim remain in dispute, these facts must be decided by the jury); Act Up!/Portland v. Bagley, 988 F.2d, 868, 873 (9th Cir. 1993) ("If a genuine issue of fact exists preventing a determination of qualified immunity at summary judgment, the case must proceed to trial.").

See Saucier v. Katz, 121 S. Ct. 2151, 2158 (2001).

Maj. Op. at 12211.

Katz, 121 S. Ct. at 2156.

Id.

Maj. Op. at 12211.

Doc. 36 Ex. Z, p. 77.

3

Doc. 144 Ex. E p. 4.

4

Doc. 144 Ex. E. p. 8.

5

Doc. 36 Ex. E1 P. 8-9.

6

Doc. 36 Ex. E1 P. 8-9.

7

Doc. 144 Ex. E p. 6.

8

Doc. 144 Ex E p. 6.

9

Doc. 37 P. 2.

20

Doc. 144 Ex. E p. 3-5.

21

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Orsini v. O/S Seabrooke O.N., 247 F.3d 953, 958 (9th Cir. 2001).

22

See Katz, 121 S. Ct. at 2156.

23

Doc. 144 Ex. E p. 4.

24

Doc. 33.

25

Maj. Op. at 12220.

Doc. 76 P. 5-6.

Doc. 36 Ex. N p. 1; Doc. 88 Ex. B Pippen Dep. p. 81.

Doc. 36 Lacey Aff. Pg. 7 l. 1-18; Doc. 36 Ex. U, Carrow Dep. p. 129-30.

Doc. 76 P. 8-9.

Doc. 36 Ex. W p. 5.

Doc. 149 Ex. 1 P. 2.

Barbara A. Morse, Information Processing: Identifying the Behavior Disorders of Fetal Alcohol Syndrome, in Fantastic Antone Succeeds: Experiences in Educating Children with Fetal Alcohol Syndrome 26-27 (1993, Judith S. Kleinfeld and Siobhan Wescott, editors).

Doc. 36 Ex. K p.3.

Doc. 36 Ex. K p. 6; Doc. 76 P. 51-52.

Doc. 36 Ex. K p. 4.

Maj. Op. at 12220.

Maj. Op. at 12221.

See 4 Wigmore on Evidence§§ 1071 (Chadbourn rev. 1972) (noting silence has traditionally been taken to support an inference of assent to a third party's statement).

9

Doc. 36 Ex. K p. 4.

10

Maj. Op. at 12216.

11

Maj. Op. at 12221.

12

Doc. 77 P. 1-2.

13

See Fed. R. Evid. 404(b).

14

Doc. 149 Ex. 3; Doc. 149 Ex. 7; Doc. 144 Ex. G.

15

Doc. 149 Ex. 3 P. 9.

16

Doc. 149 Ex. 7 P. 6.

17

Doc. 144 Ex. C p. 4.

18

Doc. 144 Ex. C p. 5.

19

Doc. 149 Ex. 7.

20

Doc. 149 Ex. 7 P. 8.

21

Doc. 36 Ex. N1 P. 26.

;2

Doc. 36 Ex. F.

;3

Maj. Op. at 12221.

;4

Maj. Op. at 12221.

;5

See People of the Territory of Guam v. McGravey, 14 F.3d 1344, 1350 n.1 (Reinhardt, J. dissenting) ("Simply put, I am aware of no trial since those held in Salem in which a group of adults suggested occurrences similar to those alleged in the McMartin and Akiki cases."); Dorothy Rabinowitz, The Hate-Crimes Bandwagon, The Wall Street Journal, June 27, 2000 (listing past child abuse hysterias based on false allegations); see also Dorothy Rabinowitz, "Finality" for the Amiraults, The Wall Street Journal, June 30, 1999; A Darkness in Massachusetts, The Wall Street Journal, February 15, 1995; Dorothy Rabinowitz, Television, Parents and Children on Trial, The Wall Street Journal, May 6, 1991.

;6

See Charles M. Mackay, Extraordinary Popular Delusions and the Madness of Crowds 462-564 (Harmony Books 1980) (1852); Katherine W. Richardson, The Salem Witchcraft Trials 4 (1983).

;7

See Mackay, supra note 40, at 475.

;8

See id. at 476.

;9

See id.

;0

See id. at 481

51

Leo Bonfanti, 2 The Witchcraft Hysteria of 1692 3 (1977).

52

See generally, Mackay supra note 40; Richardson supra note 40; Bonfanti, supra note 45.

53

Katz, 121 S. Ct. at 2156.

54

Olmstead v. United States, 277 U.S. 438, 479 (1928) (Brandeis, J. dissenting).

Some case metadata and case summaries were written with the help of AI, which can produce inaccuracies. You should read the full case before relying on it for legal research purposes.

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WILLIAM J. RICHARDS,<br>*Plaintiff-Appellant,*<br><br>v.<br><br>COUNTY OF SAN BERNARDINO;<br>MARK NOURSE; NORMAN PARENT;<br>TOM BRADFORD; JOHN NAVARRO;<br>DANIEL GREGONIS; NORMAN<br>SPERBER; DOES, 1 through 20,<br>inclusive,<br>*Defendants-Appellees,*<br><br>and<br><br>SAN BERNARDINO COUNTY DISTRICT<br>ATTORNEY OFFICE; SAN<br>BERNARDINO COUNTY SHERIFFS<br>OFFICE; RAMOS MICHAEL; MICHAEL<br>RISLEY; CRAIG OGINO,<br>*Defendants.* | No. 19-56205<br><br>D.C. No.<br>5:17-cv-00497-<br>SJO-SP<br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted February 7, 2022
Pasadena, California

2      RICHARDS V. COUNTY OF SAN BERNADINO

Filed June 24, 2022

Before:  Kermit V. Lipez,* Richard C. Tallman, and
Kenneth K. Lee, Circuit Judges.

Opinion by Judge Tallman

## SUMMARY**

## Civil Rights

The panel reversed the district court's summary judgment for the County of San Bernardino and County investigator Daniel Gregonis in an action brought pursuant to 42 U.S.C. § 1983 alleging defendants violated plaintiff's constitutional rights during his murder investigation and prosecution, resulting in his erroneous conviction for the murder of his wife, Pamela Richards.

Plaintiff alleged that Gregonis fabricated evidence against him by planting, on Pamela's body, blue fibers from a shirt that plaintiff was wearing on the night of the murder. Plaintiff further alleged claims for municipal liability pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), against the County, arguing that the County's customs and policies, and the absence of better customs and policies, resulted in the alleged constitutional violations.

---

* The Honorable Kermit V. Lipez, United States Circuit Judge for the First Circuit, sitting by designation.

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

As a preliminary matter, the panel determined that the district court incorrectly held that plaintiff was required to show that Gregonis had a motive to manipulate the evidence. Plaintiff did not need to rely on motive evidence because he supported his claim with direct evidence of fabrication.

Viewing the facts in the light most favorable to the non-moving party, plaintiff raised a triable issue as to whether Gregonis deliberately planted the blue fibers under Pamela's fingernail. A jury could reasonably draw the inference that the blue fibers were not under Pamela's fingernail at the time of the autopsy and were planted on Pamela's body later after the autopsy was performed. Because Gregonis was the only person who accessed plaintiff's shirt and Pamela's severed fingers before the fibers were discovered, a reasonable jury could conclude that Gregonis was the person who planted the blue fibers. The panel further held that the very same rationale motivating the materiality causation standard for claims brought under *Brady v. Maryland*, 373 U.S. 83 (1963), is also present in § 1983 claims for deliberate fabrication of evidence, which implicate a plaintiff's fundamental right to a fair trial.

The panel held that because the district court erred by failing to find potential civil rights liability as to Gregonis, its derivative ruling as to potential County liability under *Monell* should also be reversed. The panel further held that the district court erred by not addressing whether plaintiff could show that he suffered a constitutional injury by the County unrelated to the individual officers' liability under § 1983. Plaintiff put forth at least two *Monell* claims that were not premised on a theory of liability that first required a finding of liability on the part of the individual officers: (1) that the County's policy of prohibiting coroner investigators from entering a crime scene until cleared by

4        RICHARDS V. COUNTY OF SAN BERNADINO

homicide detectives resulted in the loss of exculpatory time-of-death evidence, and (2) that the lack of any training or policy on *Brady* by the Sheriff's Department resulted in critical exculpatory evidence being withheld by the prosecution. The panel therefore remanded to the district court to consider these claims against Gregonis and the County in the first instance.

In a concurrently filed memorandum disposition, the panel affirmed the district court's dismissal of plaintiff's remaining claims.

---

## COUNSEL

Caitlin S. Weisberg (argued), Marilyn E. Bednarski, David S. McLane, and Ben Shaw, McLane, Bednarski & Litt LLP, Pasadena, California, for Plaintiff-Appellant.

Susan E. Coleman (argued), Burke, Williams & Sorensen, LLP, Los Angeles, California, for Defendants-Appellees.

**OPINION**

TALLMAN, Circuit Judge:

In 1997, after four trials and two hung juries, Plaintiff-Appellant William Richards was convicted of the first-degree murder of his wife, Pamela. In 2016, the California Supreme Court vacated Richards's conviction, finding that it was based on "false evidence" as characterized in subsequently enacted legislation defining the term, Cal. Penal Code § 1473(e)(1), and Richards has since been exonerated of Pamela's murder, see Memorandum Decision, *People v. Richards*, No. FVI00826 (San Bernardino Super. Ct. June 18, 2021).

Richards now brings this 42 U.S.C. § 1983 action against Defendants-Appellees—various sheriff's officers and the County of San Bernardino—alleging that Defendants violated his constitutional rights during the 1993 murder investigation and prosecution, resulting in his erroneous conviction. The district court granted summary judgment for Defendants, finding that Richards did not "carry his burden to show that the investigating officers committed any [federal] constitutional errors in their investigation of Pamela's murder." We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse the district court's judgment regarding the claims discussed herein and remand for further proceedings solely as to them.[1]

---

[1] This opinion addresses only Richards's claim against Daniel Gregonis for deliberate fabrication of blue fiber evidence, and his municipal liability claims against the County, which we reverse. We affirm the district court's rulings on the remaining claims in a memorandum disposition filed concurrently with this opinion.

# I

At 11:58 p.m. on the night of August 10, 1993, the San Bernardino Sheriff's Department (SBSD) received a call that a dead body had been discovered at a remote residential location in the Mojave Desert in San Bernardino County, California.[2] The victim, Pamela Richards, had been brutally beaten and suffered two fatal injuries—strangulation and blunt force trauma to the head.[3]

An SBSD deputy was first to arrive at the rural property at approximately 12:38 a.m., where he was met by Pamela's husband, William Richards. Richards told the deputy he had discovered Pamela's body lying face-down on the ground outside their home shortly after he returned from work. According to Richards, Pamela was "stone cold" and likely had been dead for hours.

The deputy conducted a visual and physical inspection of Pamela's body. Pamela's head had been crushed and there was a large pool of blood beside her. There were numerous bloodstains and spatter on Pamela's body and the surrounding area, and a bloody cinder block and steppingstone were lying nearby. The deputy felt for a pulse at Pamela's neck and wrist and, after determining that

---

[2] We summarize the facts on this summary judgment motion in the light most favorable to Richards, who resisted summary judgment below. *See E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 770 (2015).

[3] At Pamela's autopsy, the medical examiner determined that Pamela had been strangled, and that after Pamela was dead or nearly dead from the strangulation, blunt force trauma was inflicted on her skull.

Pamela was deceased, called for homicide investigators to respond.

In the early morning hours of August 11, several homicide investigators arrived at the scene. Richards argues that the investigators fabricated evidence against him and otherwise performed a recklessly biased and unreliable investigation.[4]   One such investigator was Criminalist Daniel Gregonis, who was employed in the SBSD Crime Lab.   As a criminalist, Gregonis worked with homicide investigators to process the crime scene, to collect physical evidence, and to package and preserve that evidence so that it could be transported to the crime lab for further analysis. Gregonis was also responsible for later examining the forensic evidence at the lab.

Richards alleges that while forensic evidence was being examined at the crime lab, Gregonis deliberately fabricated inculpatory evidence against him.   Specifically, Richards claims that Gregonis planted blue fibers from a cotton work shirt that Richards was wearing on the night of the murder, fibers which Gregonis says he found under one of Pamela's fingernails.

---

[4] There are numerous disputes of fact amongst the parties concerning the adequacy of the murder investigation.  In this action, Richards brought § 1983 claims arguing that a reckless investigation was performed because investigators:   failed to erect a barrier or to preserve the scene; failed to keep a log of who came in and out of the scene; failed to call a coroner in time to collect time-of-death information; failed to take fingerprints at several locations, including the cement block that appeared to be the murder weapon; failed to properly record tire marks and shoe prints; failed to scrape Richards's nails for trace evidence; failed to seriously investigate other potential perpetrators; and more. These allegations are addressed in the concurrently filed memorandum disposition and will not be further discussed in this opinion.

8      RICHARDS V. COUNTY OF SAN BERNADINO

At the autopsy, the medical examiner had scraped Pamela's fingernails in search of "any type of trace evidence, anything that might be adhered to the nails," and then the examiner severed two of Pamela's fingers for further processing. On September 13, 1993, Gregonis checked out of evidence Pamela's two severed fingers for further examination. On September 14, Gregonis checked out Richards's clothing, including the blue cotton work shirt that Richards was wearing on the night of Pamela's murder. At that point in time, aside from Gregonis, no one else had examined either Richards's clothing or the severed fingers since the time they were first logged into evidence at SBSD's secure property section.

Gregonis claimed that, on September 13, he found a tuft of blue cotton fibers wedged in a crack of a broken fingernail on one of the severed fingers. Gregonis videorecorded his removal of the blue fibers on September 14—the same date that he had custody of both the severed fingers and Richards's clothing. The tuft of fibers was 1/2 centimeter long and contained 15 individual fibers, grouped together. Gregonis subsequently compared the blue fibers to a sample from Richards's shirt and concluded that "[t]he fibers recovered from the broken fingernail . . . from [Pamela] are consistent with originating from the light blue shirt . . . from [Richards]."[5]

The blue fibers were visible to the naked eye, yet they had not been observed by any other investigator prior to Gregonis's discovery. The blue fibers were not located during the autopsy, nor were they detected by the medical examiner during the finger-scraping, fingerprinting, or

---

[5] Gregonis later discarded the sample of Richards's shirt that he used for comparison, in violation of SBSD protocol.

finger-severing process in which the examiner was in close contact with Pamela's hands. Moreover, the fibers are clearly visible in photographs taken from Gregonis's removal video, but are noticeably absent from photographs taken of Pamela's hands during the prior autopsy.

On September 3, 1993, Richards was ultimately arrested and booked for his wife's murder. The evidence against him was circumstantial, and three attempts to prosecute Richards failed to result in a conviction. The first two trials ended in a hung jury, and the third trial ended in a mistrial during jury selection.

Before the prosecution's fourth and successful attempt to convict Richards, the County retained a forensic odontologist to present bitemark evidence on behalf of the prosecution. This bitemark evidence was based on a crescent-shaped bruise found on Pamela's right hand. During the autopsy, the medical examiner determined that the bruise was "most certainly" not a bitemark because "[b]asically it ha[d] none of the features of a bitemark." Therefore, standard bitemark procedure was not followed, and only a single, distorted photograph of the bruise was taken. Nevertheless, the County's expert forensic odontologist used the distorted photograph along with dental impressions of Richards's teeth to conclude that the bruise might be a bitemark, and that "[Richards's] remaining lower teeth are consistent with the bitemark." After the trial that included the bitemark evidence, Richards was finally convicted in 1997 for his wife's murder.

In 2007, Richards brought a habeas corpus petition in San Bernardino County Superior Court claiming that his 1997 murder conviction was based on false bitemark evidence, and that new evidence unerringly established his

10      RICHARDS V. COUNTY OF SAN BERNADINO

innocence.[6] In support of the false evidence claim, Richards submitted with his petition a declaration by the County's expert forensic odontologist recanting his earlier opinion based, in part, on subsequently performed computer enhancement of the bitemark photograph. Based on this recantation and new evidence, the trial court granted Richards's habeas petition. The California Supreme Court, however, overturned this decision, finding that Richards "failed to establish that any of the evidence offered at his 1997 trial was false" and the "newly discovered evidence does not point unerringly to innocence or reduced culpability." *In re Richards*, 289 P.3d 860, 876 (Cal. 2012) (simplified).

The California Legislature subsequently enacted a new law that amended the California habeas statute to define "false evidence" as including the "opinions of experts that have either been repudiated by the expert who originally provided the opinion at a hearing or trial or that have been undermined by later scientific research or technological advances." Cal. Penal Code § 1473(e)(1). Richards then brought a second habeas proceeding on the basis of this legislative amendment to false evidence jurisprudence. Ultimately, the California Supreme Court granted Richards's second habeas petition and vacated his conviction. *In re Richards*, 371 P.3d 195, 211 (Cal. 2016). After nearly twenty years in custody, Richards was released from prison.

---

[6] The new evidence Richards offered included evidence that a third-party's DNA was discovered on the cinder block that could have been used to kill Pamela, that a hair from a third-party was recovered from Pamela's body, and that the tuft of blue fibers did not become lodged in Pamela's fingernail during her struggle with her killer.

After his conviction was vacated, Richards commenced the instant lawsuit in the Central District of California. Richards brought claims under 42 U.S.C. § 1983 against various sheriff's officers and the County of San Bernardino for constitutional violations allegedly committed during the murder investigation and prosecution. Relevant to this opinion, Richards brought a claim against Gregonis for deliberate fabrication of the blue fiber evidence, and claims for municipal liability pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), against the County, arguing that the County's customs and policies, and the absence of better customs and policies, resulted in the alleged constitutional violations that he suffered.

The district court ultimately granted summary judgment for all Defendants. The court found that even if it made all inferences in favor of Richards's version of the facts, Richards did "not carry his burden to show that the investigating officers committed any constitutional errors in their investigation of Pamela's murder." Accordingly, the district court also found that Richards's "allegations against the County fail because proving liability under *Monell* requires a predicate constitutional violation by a government official."

This appeal timely followed.

## II

"This court reviews a grant of summary judgment de novo." *Garris v. Fed. Bureau of Investigation*, 937 F.3d 1284, 1291 (9th Cir. 2019). "Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Grand Canyon Tr. v. Provencio*,

12      RICHARDS V. COUNTY OF SAN BERNADINO

26 F.4th 815, 820 (9th Cir. 2022) (simplified). We "may affirm the district court on any ground supported in the record." *Miranda v. City of Casa Grande*, 15 F.4th 1219, 1224 (9th Cir. 2021).

### III

Richards alleges that Gregonis deliberately fabricated evidence by planting blue fibers on Pamela's body. The district court held that Richards could not establish a claim for deliberate fabrication because: (1) Richards was "unable to point to facts that show that Mr. Gregonis had a motive to deliberately manipulate the evidence"; (2) there were "far more plausible explanations for the late discovery of the blue fibers"; and (3) Richards had "not carried his burden of showing that any purported planting of the blue fibers resulted in his conviction." We reverse and remand this claim because there are contested issues of material fact, and the district court did not correctly apply the relevant substantive law.

"[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (en banc). A plaintiff can prove deliberate fabrication in two ways. "Most basically, a plaintiff can produce direct evidence of deliberate fabrication." *Caldwell v. City & Cnty. of S.F.*, 889 F.3d 1105, 1112 (9th Cir. 2018). "Alternatively, a plaintiff can produce circumstantial evidence related to a defendant's motive." *Id.* To prove fabrication using circumstantial motive evidence, a plaintiff must establish that either: (a) "[d]efendants continued their investigation of [plaintiff] despite the fact that they knew or should have known that he was innocent"; or (b) "[d]efendants used investigative techniques that were so

coercive and abusive that they knew or should have known that those techniques would yield false information." *Devereaux*, 263 F.3d at 1076.

## A

As a preliminary matter, the district court incorrectly held that Richards was required to show that Gregonis had a motive to manipulate the evidence. This conclusion misapprehends Ninth Circuit precedent. While motive is recognized as potentially strong circumstantial evidence in support of a claim of fabrication, *see Caldwell*, 889 F.3d at 1112, motive evidence is never *required*, *see id.* at 1113 ("[R]etaliatory motive is not an element of a fabrication of evidence claim . . . ."). Stated differently, motive is merely one type of circumstantial evidence that may be used to support a claim of deliberate fabrication. *Id.* at 1112; *see also Spencer v. Peters*, 857 F.3d 789, 798–800 (9th Cir. 2017). And here, Richards need not rely on motive evidence because he supports his claim with direct evidence of fabrication. The district court therefore erred in concluding Richards was required to show that "Gregonis had a motive to deliberately manipulate the evidence."

## B

The district court also granted summary judgment because it believed that "far more plausible explanations for the late discovery of the blue fibers" existed. But it was not the court's role on summary judgment to weigh the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). Instead, viewing the facts in the light most favorable to the non-moving party, Richards has

14    RICHARDS V. COUNTY OF SAN BERNADINO

raised a triable issue as to whether Gregonis deliberately planted the blue fibers under Pamela's fingernail.

First, Richards provides sufficient facts to plausibly establish that Gregonis was in exclusive control of the relevant evidence at the time of the alleged fabrication. Both Pamela's severed fingers and Richards's blue cotton work shirt had been checked into evidence at the SBSD's secure property storage unit. The fingers were logged into the evidence unit after the autopsy, and Richards's shirt was logged in the morning after the murder. Aside from Gregonis, no one else checked out either Richards's clothing or the severed fingers between the time that they were initially logged and the time that Gregonis removed them for further analysis and allegedly discovered the tuft of blue fibers. On September 14, 1993, Gregonis videorecorded his removal of the blue fibers—the same date on which Gregonis had exclusive custody of both the severed fingers and Richards's clothing.

Second, Richards raises a triable issue as to whether the blue fibers were planted. The tuft of fibers was made up of 15 individual fibers, all about 1/2 of a centimeter long—the approximate length of a 14-point-font em dash (—). Richards's expert stated that fibers of this size and length would be visible to the naked eye, and even Gregonis himself admits this to be true. Yet no one who was in close contact with Pamela's hands at the autopsy—including the medical examiner who scraped Pamela's fingernails for trace evidence—ever saw the blue fibers.

Further, the record contains several photographs of Pamela's fingers before and during the autopsy. In the autopsy photographs, no blue fibers are visible under Pamela's fingernails. Yet, in photographs from Gregonis's removal video, the blue fibers are clearly visible. A jury

RICHARDS V. COUNTY OF SAN BERNADINO        15

reviewing the autopsy photographs could conclude that they would have depicted any blue fibers under Pamela's fingernails if they had been present. This conclusion would support a jury's finding that the blue fibers were not present under Pamela's fingernails at the time of the autopsy.





Autopsy photographs          Removal video photographs

Expert analysis provides further support for the false evidence claim. *See Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1270 (9th Cir. 1994) ("Expert opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion."). Richards's expert analytic forensic photographer concluded "with a high degree of certainty" that in the autopsy photographs "there is no visible tuft of blue fibers on the top of the . . . fingernail in the location demonstrated in the fiber removal video." The expert stated that the resolution of the camera and lens used in the autopsy photographs "were reasonably good enough to . . . depict a tuft of blue fibers if the fibers were present," and that certain variable factors— such as the difference in angle between the autopsy and removal video photographs, the resolution of the images, the color temperature of the light, and the direction of the light— would not "negatively impact the autopsy images to a degree that would obscure the mass of blue fibers if it was present

at the time the photograph was taken." Moreover, a different expert using "Photoshop and color saturation techniques" also concluded that "no strands of blue clothing fiber are present under a fingernail of the decedent" in the autopsy photographs. In fact, the second expert went so far as to say that "[t]he forensic evidence brought forth . . . in relation to the fiber evidence" is "consistent with forensic deception."

From the foregoing evidence, a jury could reasonably draw the inference that the blue fibers were not under Pamela's fingernail at the time of the autopsy. A jury could further infer that, because the fibers were not present during the autopsy, they were later planted on Pamela's body after the autopsy was performed. Finally, because Gregonis was the only person who accessed Richards's shirt and Pamela's severed fingers before the fibers were discovered, a reasonable jury could conclude that Gregonis was the person who planted the blue fibers. *See Pelenty v. City of Seal Beach*, 588 F. App'x 623, 624–25 (9th Cir. 2014) (unpublished) (reversing summary judgment when defendant officers had access to the source of the allegedly planted evidence, which spontaneously appeared in crime scene photographs).

Even if, in the district court's view, "more plausible explanations" exist for the delayed discovery of the blue fibers, at the summary judgment stage the trial court must accept Richards's evidence as true without making credibility determinations or weighing the conflicting evidence. *Anderson*, 477 U.S. at 249. Applying this standard, we conclude that Richards has shown a triable issue as to whether Gregonis deliberately fabricated the blue fiber evidence. A jury will have to resolve it.

## C

As a final matter, the district court also granted summary judgment for Gregonis because it concluded that "the bite mark evidence, not the blue fiber evidence, was necessary to convict Plaintiff." We disagree.

The district court's holding here was based on its conclusion that Richards could not show that the blue fiber evidence was a factual cause of his conviction. The traditional means of proving factual causation is the "but for" causation test. "Under this standard, a plaintiff must demonstrate that, but for the defendant's unlawful conduct, [his or her] alleged injury would not have occurred." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020).

It is true that a showing of but-for causation regarding the blue fiber evidence cannot easily be made here. As the district court recognized, in the first two trials the prosecution presented significant circumstantial evidence, including the blue fibers discovered under Pamela's fingernail. Despite the blue fiber evidence, however, the first two trials resulted in a hung jury. It was not until the third trial, where the prosecution presented false bitemark evidence, that Richards was convicted of his wife's murder. Therefore, it could more readily be said that the false bitemark evidence, and not the blue fiber evidence, was the but-for cause of Richards's conviction.

But factual causation is not per se lacking when a showing of but-for causation cannot be made. As the Supreme Court has recognized, "alternative and less demanding causal standards are necessary in certain circumstances to vindicate the law's purposes." *Paroline v. United States*, 572 U.S. 434, 452 (2014); *see also Burrage v.*

18      RICHARDS V. COUNTY OF SAN BERNADINO

*United States*, 571 U.S. 204, 214 (2014) (acknowledging "the undoubted reality that courts have not *always* required strict but-for causality, even where criminal liability is at issue").[7] We find a less demanding causation standard is necessitated here.

The constitutional right at issue in this case is the fundamental due process right to a fair trial. *See Estelle v. Williams*, 425 U.S. 501, 503 (1976) ("The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment."). This is the very same constitutional right that is implicated when the prosecution suppresses evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). *See United States v. Bagley*, 473 U.S. 667, 678 (1985) ("[S]uppression of evidence amounts to a constitutional violation . . . if it deprives the defendant of a fair trial."). We have previously concluded that in the *Brady* context, a plaintiff's due process right to a fair trial is "not conditioned on his ability to demonstrate that he *would* or even *probably would* prevail at trial if the evidence were disclosed." *Osborne v. Dist. Atty's Off. for Third Jud. Dist.*, 521 F.3d 1118, 1132 (9th Cir. 2008), *rev'd on other grounds by*, 557 U.S. 52 (2009). This is because under *Brady* and its progeny, it is the suppression

---

[7] One such test is aggregate causation. Under this test, "[w]hen the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause in fact of the event." *Paroline*, 572 U.S. at 451 (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, 268 (5th ed. 1984)). "The Restatement adopts a similar exception for multiple sufficient causal sets . . . where a wrongdoer's conduct, though alone insufficient to cause the plaintiff's harm, is, when combined with conduct by other persons, more than sufficient to cause the harm." *Id.* at 451–52 (simplified) (quoting 1 Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 27, 380–81, cmt. f (2005)).

of material evidence—and not the plaintiff's ultimate conviction—that deprives the plaintiff of their liberty interest in a fair trial. *See Poventud v. City of N.Y.*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc) ("[P]roof of the constitutional violation need not be at odds with [the plaintiff's] guilt."). Accordingly, causation is satisfied for *Brady* claims if the plaintiff can show that the suppressed evidence was "material"—i.e., that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *Bagley*, 473 U.S. at 682).

The very same rationale motivating the materiality causation standard for *Brady* claims is also present in § 1983 claims for deliberate fabrication of evidence. The deliberate fabrication of evidence implicates a plaintiff's fundamental right to a fair trial. *See Devereaux*, 263 F.3d at 1074–75; *Smalls v. Collins*, 10 F.4th 117, 132 (2d Cir. 2021). And this right is implicated whenever the state deliberately fabricates evidence, regardless of the plaintiff's innocence or guilt. It would be anomalous to turn away a plaintiff who has been injured by deliberately fabricated evidence simply because that evidence alone was not sufficient to cause the conviction—the right to a fair trial is impinged either way. Accordingly, a plaintiff's due process right to a fair trial should not be conditioned on his ability to demonstrate that he *would* or even *probably would* prevail at trial if the evidence had not been deliberately fabricated. *Cf. Osborne*, 521 F.3d at 1132.

Presumably based on this rationale, most other federal circuits have applied variations of the *Brady* materiality causation standard to § 1983 claims for deliberate

20      RICHARDS V. COUNTY OF SAN BERNADINO

fabrication of evidence.[8]  For example, the Seventh Circuit has held a § 1983 plaintiff need only show that allegedly fabricated "evidence was material—that is, . . . there is a reasonable likelihood the evidence affected the judgment of the jury." *Patrick v. City of Chi.*, 974 F.3d 824, 835 (7th Cir. 2020).  And a similar standard applies in the Second Circuit, which requires a § 1983 plaintiff to show that "the false information was likely to influence a jury's decision." *Smalls*, 10 F.4th at 132 (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016)).

Given the foregoing, we conclude that the less demanding materiality causation standard is necessary under these circumstances to vindicate Richards's fundamental right to a fair trial.  *See Paroline*, 572 U.S. at 452.  We therefore hold that Richards can establish factual causation if he can show a reasonable likelihood that the allegedly

---

[8] *See, e.g., Truman v. Orem City*, 1 F.4th 1227, 1236 n.5 (10th Cir. 2021) ("To satisfy [the causation] element where . . . the plaintiff was allegedly deprived of a fair trial, the fabricated evidence must be material, meaning there is a reasonable likelihood that without the use of the fabricated evidence, the defendant would not have been deprived of a fair trial."); *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014) ("[T]he defendant has a stand-alone claim . . . if there is a reasonable likelihood that, without the use of that [fabricated] evidence, the defendant would not have been convicted."); *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006) ("It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury."); *cf. United States v. Agurs*, 427 U.S. 97, 103 (1976) (stating that when a conviction is obtained by the knowing use of false testimony it "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury").

fabricated blue fiber evidence could have affected the judgment of the jury.[9]

The district court did not apply this standard. Instead, the court's causation ruling made an improper leap from its conclusion that the false bitemark testimony was a *necessary* cause of Richards's conviction to it being the *sole* cause. Because Richards has shown a triable issue as to whether Gregonis deliberately planted the blue fibers on Pamela's body, *see supra*, Part III.B, we reverse and remand to the district court to reassess, in light of this opinion, whether a triable issue also exists as to causation.

## IV

The district court held that Richards's *Monell* claims fail because "proving liability under *Monell* requires a predicate constitutional violation by a government official." We disagree.

First, because potential civil rights liability as to at least one individual defendant (Criminalist Gregonis) was in error, *see supra*, the district court's derivative ruling as to the County on potential *Monell* liability should also be reversed.

Second, this Court has rejected the view that municipal liability is precluded as a matter of law under § 1983 when the individual officers are exonerated of constitutional wrongdoing. *See Fairley v. Luman*, 281 F.3d 913, 917 (9th

---

[9] Defendants argue that a "materiality" standard would eliminate causation, which is a necessary element of any § 1983 claim. That is not true. Under the materiality standard, there must be a reasonable probability that the defendant would not have been convicted without the wrongful fabrication of evidence. The materiality standard therefore integrates—and does not eliminate—causation.

Cir. 2002). Instead, "[i]f a plaintiff established he suffered constitutional injury *by the County*, the fact that individual officers are exonerated is immaterial to liability under § 1983." *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1250 n.12 (9th Cir. 2016) (simplified). "This is true whether the officers are exonerated on the basis of qualified immunity, because they were merely negligent, or for other failure of proof." *Fairley*, 281 F.3d at 917 n.4. Here, Richards puts forth at least two *Monell* claims that are not premised on a theory of liability that first requires a finding of liability on the part of the individual officers: (1) that the County's policy of prohibiting coroner investigators from entering a crime scene until cleared by homicide detectives resulted in the loss of exculpatory time-of-death evidence, and (2) that the lack of any training or policy on *Brady* by SBSD resulted in critical exculpatory evidence being withheld by the prosecution. Irrespective of the merits of these claims, the district court erred by not addressing whether Richards could show that he suffered a constitutional injury by the County unrelated to the individual officers' liability under § 1983.

We therefore remand to the court to consider these claims against Gregonis and the County in the first instance.

## V

Having concluded that the district court erroneously granted summary judgment for Defendant Gregonis as to the claims involving the blue fiber evidence and the County of San Bernardino, we **REVERSE these claims, and REMAND** for further proceedings consistent with this opinion. We **AFFIRM dismissal of the remaining claims** in the corresponding memorandum disposition.

Each party shall bear its own costs.

Case 9:25-cv-00083-DWM    Document 58-1    Filed 05/04/26    Page 95 of 179

**551 F.3d 1108 (2009)**

**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Glenn HELLER, Defendant-Appellant.**

No. 07-30452.

**United States Court of Appeals, Ninth Circuit.**

Argued and Submitted August 28, 2008.
Filed January 8, 2009.

*1109 Anthony R. Gallagher, Federal Defender, and Michael Donahoe, Senior Litigator, Federal Defenders of Montana, Helena, MO, for the defendant-appellant.

William W. Mercer, United States Attorney, and Kurt G. Alme and Marcia Hurd, Assistant United States Attorneys, Billings, MO, for the plaintiff-appellee.

*1110 Before: HAWKINS, M. MARGARET McKEOWN, and JAY S. BYBEE, Circuit Judges.

McKEOWN, Circuit Judge:

Glenn Heller appeals his conviction following a bench trial for receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2), and possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). Heller's conviction stems from Heller's activities while serving as a caretaker for a developmentally disabled man, J.W. The government alleged J.W. downloaded child pornography at Heller's direction for their mutual viewing. Heller first challenges the district court's pretrial rulings related to his suppression motion and his motion in limine. Heller next faults the district court's determination that his confession was voluntary. Finally, Heller asserts the government presented insufficient evidence at trial to support his conviction. We affirm his conviction.

## BACKGROUND

Between 2001 and 2004, Heller served as a caretaker for J.W., a 42-year-old developmentally disabled ward of the State of Montana. In 2004, Heller was terminated as caretaker because he was spending time with J.W. after hours. J.W. later disclosed to his guardian that he had a sexual relationship with Heller while Heller was his caretaker. Heller was convicted in Montana state court on charges of criminal endangerment and sexual assault. During the course of the prosecution, child pornography files were found on J.W.'s computer. Heller denied that he had any involvement with the pornography. Heller's home and home computer were searched but authorities found no child pornography.

In 2006, a Montana police officer stopped Heller on the street and told him that he needed to go to the station to update his sex offender registration. The officer told Heller that he was not under arrest and would not be arrested when he arrived at the station. Heller agreed to go to the station later that day.

Once at the station, Heller met with the officer for a compliance check of his sex offender registration requirements. The meeting took place in a small interrogation room, and the door was never shut. At the beginning of the encounter, the officer reminded Heller that he was not under arrest. After Heller finished filling out compliance paperwork, the officer told Heller he was free to leave the station. An FBI agent then entered the room and asked Heller if they could talk about child pornography Heller may have received while caring for J.W. Heller agreed to talk to the agent, but initially denied any involvement with J.W.'s child pornography collection. The agent told Heller that new information had come to light since the state proceeding, including new statements made by J.W. and a box of compact discs ("CDs") containing child pornography. Heller stated that child pornography was saved on J.W.'s computer, and that one of the folders was entitled "glenn's files." Heller further acknowledged that he had a sexual relationship with J.W. and that they viewed child pornography together while engaging in sexual acts.

Throughout the questioning, the officer and the FBI agent reminded Heller he was free to leave and was not under arrest. After about an hour of conversation, Heller provided a written statement and initialed every line of a typewritten statement prepared by the officers. Once he finished his statements, Heller left the station. Heller was later indicted and convicted for one count of receipt of child *1111 pornography and one count of possession of child pornography.

## ANALYSIS

## I. THE PRE-TRIAL MOTIONS

Before trial, Heller moved to suppress the statements he provided to the officer and the FBI agent. The government filed a response to the suppression motion five days late, justifying its untimely reply by explaining that the parties had been negotiating a plea agreement and the government thought a response was unnecessary while negotiations were still pending.

The district court determined that the government's explanation was corroborated by the case file. Indeed, the record supports the government's position that plea negotiations were ongoing and, during this period, Heller's counsel even asked for an extension of the plea agreement deadline.

The district court's determination that it would overlook the government's untimely filing was governed by Rule 12.1(c) of the Local Rules of Procedure for the United States District Court for the District of Montana, which states: "Failure to file briefs within the prescribed time may subject any motion to summary ruling." We review the district court's application of this local rule for an abuse of discretion. See *Bias v. Moynihan,* 508 F.3d 1212, 1223 (9th Cir.2007) ("A district court's compliance with local rules is reviewed for `an abuse of discretion.'" (quoting *Hinton v. Pac. Enters.,* 5 F.3d 391, 395 (9th Cir.1993))). "Only in rare cases will we question the exercise of discretion in connection with the application of local rules." *United States v. Warren,* 601 F.2d 471, 474 (9th Cir.1979) (per curiam).

Rule 12.1(c) does not mandate a summary ruling for late filings. Rather, Rule 12.1(c) is permissive and a late filing "may subject [a] motion to summary ruling." In this instance, there is no indication the district court abused its discretion. The district court fairly considered the chronology of events documented by the parties. The discretionary determination to accept the late filing was not an abuse of discretion.

Heller also challenges the government's failure to respond to his motion in limine to preclude reference to his sexual relationship with J.W. and his related state court conviction. Before the government responded and before the court had the chance to rule on his motion, Heller waived his right to a jury trial. Heller feared potential jury bias could result if the jury were presented with "evidence of the homosexual relationship" between Heller and J.W. At the suppression hearing, in reference to Heller's request for a bench trial, the government informed the district court that Heller's motion in limine "may be a moot point" because there would be no jury if Heller had a bench trial.

The district court made no express ruling concerning the government's failure to reply to Heller's motion in limine. The absence of a ruling is not surprising. The need for in limine motions was moot once it was clear that Heller had waived his right to a jury trial. See *Johnson v. Doughty,* 433 F.3d 1001, 1007 (7th Cir. 2006) ("Johnson also had filed a motion in limine to restrict the defendants from mentioning his criminal history and prison disciplinary record at trial. (The motion later became moot when the matter was converted from a jury trial to a bench trial.)").

The term "in limine" means "at the outset." Black's Law Dictionary 803 (8th ed.2004). A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area. *See id.* at 1038-39. In the case of a jury trial, a court's ruling "at the outset" gives counsel *1112 advance notice of the scope of certain evidence so that admissibility is settled before attempted use of the evidence before the jury. Because the judge rules on this evidentiary motion, in the case of a bench trial, a threshold ruling is generally superfluous. It would be, in effect, "coals to Newcastle," asking the judge to rule in advance on prejudicial evidence so that the judge would not hear the evidence. For logistical and other reasons, pretrial evidentiary motions may be appropriate in some cases. But here, once the case became a bench trial, any need for an advance ruling evaporated.

## II. THE VOLUNTARINESS OF HELLER'S CONFESSION

4/29/26, 11:51 AM
Case 9:25-cv-00083-DWM
Document 58-1
Filed 05/04/26
Page 97 of 179
US v. Heller, 551 F. 3d 1108 - Court of Appeals, 9th Circuit 2009 - Google Scholar

We now turn to the substance of Heller's suppression motion. Heller asserts that his confessions were involuntary because he was impaired by medication at the time he provided the handwritten and initialed statements to law enforcement. We review de novo the voluntariness of a confession and the factual findings supporting the determination for clear error. *United States v. Gamez, 301 F.3d 1138, 1144 (9th Cir.2002)*. The test is well known: we determine whether, "considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir.1988)*.

Heller testified at the suppression hearing that he ingested a 7.5 milligram dose of Tylenol III with codeine ("Tylenol III") in the morning of the day he made his confessions. He took the medication because he suffered from an undiagnosed illness that caused him to experience uncontrollable movement of his legs. At the time of the confessions, he felt "tired" and his hands shook uncontrollably. Heller asserted the Tylenol III "led [him] to make bad decisions" and "slowed [him] down and made [him] sleepy." He explained that the medication, when coupled with being in a small meeting room with no windows for an extended time, made his confession involuntary, as he "didn't know what else to do except admit to what the police wanted [him] to admit."

After considering Heller's claim, the district court denied the motion to suppress, finding the confessions voluntary. *See United States v. Heller,* No. CR 07-02-H-CCL, 2007 WL 2358631, at *6, *10 (D.Mt. Aug. 17, 2007). The district court made detailed findings in response to Heller's motion. Significantly, it found Heller knew he was free to leave the interview. *Id.* at *3. The district court further determined the atmosphere of the interview was "friendly and cordial on all sides." *Id.* Regarding Heller's medication, the district court found that Heller did not inform the officer or the FBI agent about the medication, even though he had taken the pill that morning. *Id.* at *4. Heller appeared to the officer and agent "to be cognitively alert and able" and Heller admitted that the amount of medication "was a low dose." *Id.* Overall, the district court found Heller's "testimony regarding his inability to reason when he was interviewed by law enforcement on April 6, 2006, not to be credible." *Id.*

Based on the record, the district court's determination that Heller believed he was free to leave and that the environment was "friendly and cordial," *id.* at *3, was not clearly erroneous. The questioning was not "extended and oppressive." *See United States v. Martin, 781 F.2d 671, 674 (9th Cir.1985)*. Heller was at the station for approximately two hours, but questioning took place for about one hour, and the officers told Heller repeatedly that he was free to leave.

*1113 Heller's argument concerning his medication goes to a slightly different inquiry — whether he was unable to exercise free will due to an impaired mental state. We are guided in this question by our decision in *Martin*.[1] Martin had received Demerol, a painkiller, and was groggy when a detective and a federal agent questioned him in the hospital. *Id.* at 672-73. Though he had ingested Demerol, Martin was awake and fairly coherent, and there was no evidence that he received excessive quantities or unusual combinations of drugs. *Id.* at 674. Like Heller, Martin "was not reluctant to tell his story." *Id.* We agreed with the district court's conclusion that the "type, dosage, and schedule of painkilling narcotic administered to [Martin] was not sufficient to overbear his will to resist the questioning or impair his rational faculties." *Id.* (alteration in original).

As in *Martin,* Heller appeared "cognitively alert and able." *Heller,* 2007 WL 2358631, at *4, but, unlike the defendant in *Martin,* there was no suggestion that he was groggy. The district court found that Heller had ingested the Tylenol III at least two hours before he came to the station. Heller admitted that he took a "low dose," he was not rendered "unconscious" or "comatose," and there is no other evidence to suggest that the type, dosage, or timing of the Tylenol III influenced Heller's will to resist questioning. *See Martin, 781 F.2d at 674*. The district court did not clearly err in its determination that Heller's "reason and judgment were not impaired" by his prior ingestion of Tylenol III. *Heller,* 2007 WL 2358631, at *5. Heller's confessions were not the result of "physical or psychological coercion" such that his "will was overborne." *Leon Guerrero, 847 F.2d at 1366*. The district court properly determined that Heller's confessions were voluntary.

## III. THE SUFFICIENCY OF THE EVIDENCE

Finally, we consider Heller's assertion that the district court erroneously denied his Federal Rule of Criminal Procedure Rule 29 motion because the evidence was insufficient to support his conviction for receipt and possession of child pornography. In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the defendant guilty of each element of the crime beyond a reasonable doubt. *United States v. Rosales, 516 F.3d 749, 751-52 (9th Cir.2008)* (citing *United States v. Hinton, 222 F.3d 664, 669 (9th Cir.2000))*.

Case 9:25-cv-00083-DWM    Document 58-1    Filed 05/04/26    Page 98 of 179

The parties stipulated that the movies on J.W.'s computer were child pornography and had been transported over the internet. Thus, we confront only the question whether the evidence is sufficient to demonstrate that Heller knowingly received and knowingly possessed child pornography. To establish receipt and possession of child pornography, there must be a "'sufficient connection between the defendant and the contraband to support the inference that the defendant exercised dominion and control over [it].'" *United States v. Romm,* 455 F.3d 990, 999 (9th Cir.2006) (quoting *United States v. Carrasco,* 257 F.3d 1045, 1049 (9th Cir.2001)) (alteration in original).

*1114 Heller's primary focus is that J.W.'s actions — downloading and storing child pornography — may not serve as a proxy for Heller's own guilt. Heller reasons the government's theory that J.W. acted as a conduit to Heller's receipt and possession of child pornography is fatally undermined by two facts: 1) the evidence did not sufficiently demonstrate that the period in which J.W. downloaded the child pornography coincided with Heller's service as J.W.'s caretaker; and 2) the evidence shows J.W. downloaded and possessed child pornography both before and after his association with Heller. Thus, Heller argues, the evidence is insufficient to support his conviction beyond a reasonable doubt.

We are not persuaded by Heller's characterization of the evidence. It is true that J.W. downloaded and possessed pornography for periods beyond the tenure of Heller's care taking. But this fact does nothing to change the evidence of what occurred while Heller served as the caretaker. The actual timeline just doesn't jibe with Heller's argument.

Though J.W. physically performed the acts of downloading and storing the child pornography, Heller sought out the prohibited material, actively directed J.W. to obtain pornography, and "exercised dominion and control over it." *Romm,* 455 F.3d at 999. *See also United States v. Tucker,* 305 F.3d 1193, 1205 (10th Cir.2002) (affirming a conviction for possession where defendant "intentionally sought out and viewed child pornography"). J.W. testified that Heller "wanted me to download" and asked J.W. to download movies involving boys; that it was Heller's idea to find and download movies depicting kids and young teenagers involved in sexual situations with adult men; and that they watched the downloaded movies together.

Heller admitted that he "directed [J.W.] to download movies which contained child pornography," "directed him to save these movies onto his computer and then to a CD," and "directed him to download the child movies and keep them at his house because [Heller] did not want [his] wife to find out that [he] liked child pornography." J.W. saved the files and labeled CDs to remember which ones Heller liked. One CD was labeled "XXX Glenn." Heller had access to the pornographic materials whenever he visited J.W., both on and off duty.

Considering the evidence, Heller's challenge to his conviction falls short. The evidence demonstrates Heller directed J.W. to obtain the materials for Heller's viewing and that, once the files were downloaded and stored, Heller "exercised dominion and control over [them]." *Romm,* 455 F.3d at 999. This evidence, viewed in the light most favorable to the government, is sufficient to establish Heller received and possessed the materials. The district court did not err in denying Heller's Rule 29 motion.

AFFIRMED.

[1] Heller urges us to look to *United States v. Howard,* 381 F.3d 873 (9th Cir.2004), in which we determined an evidentiary hearing was appropriate to discern whether the defendant's use of a painkiller affected the voluntariness of his guilty plea. *Id.* at 881. *Howard*'s holding regarding the necessity of an evidentiary hearing is inapposite. Here, the district court's detailed findings followed an evidentiary hearing at which Heller and the officers testified.

Save trees - read court opinions online on Google Scholar.

**FILED**

DEC 1 1 2017

Clerk, U.S District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DIST4RICT OF MONTANA
BUTTE DIVISION

---

ANTHONY PATRICK REED,

Plaintiff,

vs.

DOUG LIEURANCE, in his individual
capacity; BRIAN GOOTKIN, in his
individual capacity; GALLATIN
COUNTY SHERIFF'S OFFICE, a
department of Gallatin County; and
GALLATIN COUNTY,

Defendants.

CV 13–17–BU–DWM

OPINION
and ORDER

---

In May 2012, Defendant Doug Lieurance ("Deputy Lieurance" ) cited

Plaintiff Anthony Reed ("Reed") for obstructing a bison[1] herding operation

outside of Yellowstone National Park ("the Park"). Reed is a volunteer with the

---

[1] The *Encyclopedia Britannica* explains that buffalo "are indigenous to South Asia (water buffalo) and Africa (Cape buffalo), while bison are found in North America and parts of Europe." *What's the Difference Between Buffalo and Bison?* (https://www.britannica.com/demystified/whats-the-difference-between -bison-and-buffalo) (accessed 8 Dec. 2017). The Buffalo Field Campaign website addresses this issue, concluding "common usage has made the term 'buffalo' an acceptable synonym for the American bison." *Buffalo Basics* (http://www. buffalofieldcampaign.org/about- buffalo/buffalo-basics) (accessed 8 Dec. 2018). For the sake of consistency, the term "bison" is used throughout this opinion.

-1-

Buffalo Field Campaign ("Campaign"), a § 501(c)(3) non-profit conservation organization that sends volunteers to observe and document the herding or "hazing" of bison in or near the Park. *Reed v. Lieurance*, 863 F.3d 1196, 1201 (9th Cir. 2017). Pursuant to an interagency agreement, government personnel from a number of state and federal agencies carry out hazing operations as many as four or five times per week between December and July. *Id.* The Campaign provides video footage and information about the hazing to news outlets and government agencies. *Id.*

Reed brought this action pursuant to 42 U.S.C. § 1983, alleging that Deputy Lieurance's conduct violated Reed's First and Fourth Amendment rights and related Montana constitutional rights, and that Gallatin County, the Gallatin County Sheriff's Office, and Sheriff Brian Gootkin failed to train officers on Montana's obstruction statute and the First and Fourth Amendments. (Doc. 1.)

## FACTUAL BACKGROUND

The facts as outlined below are those the parties have agreed to, (*see* Addt'l Stip. Facts, Doc. 147), and those viewed in the light most favorable to Reed, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam).

### I.    Bison Hazing Operations

At all times relevant to this case, Agent Rob Tierney, a Bison Program

-2-

Specialist from the Montana Department of Livestock ("Livestock Department"), was responsible for overseeing bison management operations outside of the Park. ((Doc. 147 at ¶¶ 1, 2.) Operations within the Park were the responsibility of the National Park Service ("Park Service"). (*Id.*) At that time, and in accordance with the Operating Procedures agreed to as part of the Bison Management Plan, the Livestock Department frequently requested law enforcement assistance from the Gallatin County Sheriff's Office ("Sheriff's Office"). (*Id.* at ¶ 3.) When the Livestock Department planned a bison hazing operation, a briefing was held between officers of the Department, the Sheriff's Office, and any other agencies that had personnel involved in the operation. (*Id.* at ¶ 4.) At the briefing, the Livestock Department officer in charge of the operation, typically Agent Tierney, explained the planned operation and the approximate location, (*id.*), and the Sheriff's Office would coordinate haze-related law enforcement, (*id.* at ¶ 5).

## II.    The Incident

On May 23, 2012, there was a hazing operation which involved moving bison from the area of the Madison Arm Resort eastward and then across U.S. Highway 191, and back into the Park. (*Id.* at ¶ 6.) Reed and Kasi Craddock-Crocker were in a vehicle driving ahead of the operation as it headed east on Madison Arm Road. (*Id.* at ¶ 7.) Reed left the operation and drove to the junction

-3-

of Highway 191, Madison Arm Road, and Conservation Lane and parked near that junction. (*Id.* at ¶ 8.) While Reed was parked in that spot, Agent Tierney approached Reed's vehicle and spoke with Reed. (*Id.* at ¶ 9.) After speaking with Agent Tierney, Reed drove north of the Madison River and parked on a gravel road that runs parallel to Highway 191. (*Id.* at ¶ 10.) Tierney then radioed Deputy Lieurance. (*Id.* at ¶ 11.) Lieurance in turn radioed to the riders with the operation and told them to stop moving the bison, (*id.* at ¶ 12), which they did, (*id.* at ¶ 13). Deputy Lieurance drove to Reed's location and after speaking with Reed, cited him for misdemeanor obstruction, Mont. Code Ann. § 45-7-302. (*Id.* at ¶¶ 14, 15.) On July 10, 2012, the county prosecutor moved to voluntarily dismiss the citation. (Doc. 154-4 at 2.)

## III.   The Recording

The parties dispute the specifics of Reed's conversations with Agent Tierney and Deputy Lieurance, primarily the nature of the directions Agent Tierney gave them when he initially told them to move their car as well as how exactly they were obstructing the haze. There is a 22-minute recording of the second portion of Deputy Lieurance's stop, recorded by Craddock-Crocker. (*See* DVD, Ex. D, Doc. 151-4.). The recording begins after the initial conversation between Lieurance and Reed. Reed and Craddock-Crocker discuss the stop.

-4-

Craddock-Crocker then has brief interaction with law enforcement, where law enforcement insists she and Reed "failed to follow directions" and she insists the directions were not clear. Reed and Craddock-Crocker repeatedly refer to the "selective enforcement" of the law based on the other vehicles driving on the highway and even note they could probably sue if Reed were to be arrested. The video shows Reed's citation being issued. At that point, Deputy Lieurance explains that Reed is being cited for obstruction, which, according to Deputy Lieurance, is basically "doing something you were told not to do" or "stopping an operation of some sort." (*Id.* at 15:40.) Lieurance further explains Reed's obligation to contact the court. At one point, Lieurance asks Craddock-Crocker, who is filming, to take a step back. Reed clarifies that he is receiving a ticket. After the citation is issued, Craddock-Crocker again asks why they are being "selectively enforced against," and Deputy Lieurance states that he is not going to argue about it, and that they can either leave or he can take them to jail. (*Id.* at 18:10.) After a bit more back and forth, Reed and Craddock-Crocker drive away.

Neither parties' story is "blatantly contradicted" by the recording. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). While the video does not depict all of the events at issue, it does show the relative distance from the haze area and numerous other cars and trucks driving by on the highway during the stop.

-5-

## PROCEDURAL BACKGROUND

In March 2013, Reed filed suit, asserting that Deputy Lieurance's conduct violated Reed's First and Fourth Amendment rights and related Montana constitutional rights, and that Gallatin County, the Sheriff's Office, and Sheriff Gootkin failed to train officers regarding Montana's obstruction statute and the First and Fourth Amendments. (*See* Doc. 1.) The parties filed cross-motions for summary judgment and motions in limine. On July 23, 2014, the Court granted the defendants' motion for summary judgment on Reed's unreasonable seizure and failure-to-train claims, denied summary judgment on the First Amendment claims, and excluded Reed's police practices expert witness. On August 20, 2014, Reed moved to amend his complaint; that motion was denied on October 6, 2014. A jury trial was held in January 2015 on Reed's First Amendment claims. After Reed presented his case, the defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50, which was granted as to all remaining claims.

Reed appealed.[2] On appeal, the Ninth Circuit held that: (1) the defendants were not entitled to summary judgment as to Reed's unlawful seizure claim; (2) it

---

[2] The trial judge also denied the defendants' motion for attorneys fees pending resolution of an appeal. The defendants cross-appealed that ruling, and the Ninth Circuit held that it lacked jurisdiction to consider fees in the absence of a "final decision" from the district court as to that issue. *Reed*, 863 F.3d at 1212.

was improper to *sua sponte* dismiss Reed's failure-to-train claim under Rule 12(b)(6); (3) the wrong legal standard was applied in excluding Reed's expert witness; and, (4) the defendants were not entitled to judgment as a matter of law as to Reed's First Amendment claims. *See Reed*, 863 F.3d at 1204-12. The case was remanded and reassigned. *See id.* at 1213.

Following remand, Reed filed a First Amended Complaint, alleging six causes of action, including: Count I (unreasonable seizure - Fourth Amendment), Count II (unreasonable restriction - First Amendment), Count III (retaliation - First Amendment), Count IV (failure to train - *Monell*[3]), Count V (privacy - Mont. Const. art. II, sections 10 and 11), and Count VI (unreasonable restriction - Mont. Const. art. II, sections 6 and 7). (Doc. 146.) Two defense motions are currently pending: (1) a motion for summary judgment as to Reed's failure-to-train claim, (Doc. 150) and (2) a motion to exclude the expert testimony of Reed's police practices expert, Timothy Longo, (Doc. 144). Having considered the parties' briefing and oral argument, both motions are denied.

### SUMMARY CONCLUSION

The defendants argue that summary judgment is appropriate as to Reed's failure-to-train claim because the undisputed evidence shows that Deputy

---

[3] *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978).

-7-

Lieurance was trained and Reed fails to identify a "specific inadequacy" in the training deputies receive. However, there exists a genuine dispute of material fact as to: (1) whether the training received by deputies on Montana's obstruction statute, the First Amendment, and the Fourth Amendment was adequate; (2) whether there was an obvious or recurring need for more or better training; and (3) whether there is a causal link between a deficiency in training and the alleged constitutional harm. Drawing all reasonable inferences in favor of Reed, *Tolan*, 134 S. Ct. at 1866, a jury could find that the defendants' failure to train amounts to a "deliberate indifference to the rights of persons with whom [its] employees come into contact," *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (internal quotation marks and alteration omitted). Additionally, because the testimony of Reed's police practices expert, Timothy Longo, is reliable and relevant to that failure-to-train claim, Fed. R. Evid. 702, it is not excluded.

### ANALYSIS

### I.    Motion for Summary Judgment

#### A.    Legal Standard

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where

the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248.

### B.    Failure to Train

The defendants seek summary judgment as to Reed's *Monell* claim, which alleges failure to train as to the First and Fourth Amendments and Montana's obstruction statute. (Doc. 150.) They previously moved for summary judgment on this claim, (*see* Doc. 13), but Reed's claim was dismissed *sua sponte* under Rule 12(b)(6). The Ninth Circuit reversed, holding that it was error not to provide proper notice and not give Reed an opportunity to amend. *Reed*, 863 F.3d at 1207-08. The Ninth Circuit further declined to consider Plaintiff's failure-to-train claim under Rule 56, "affording the district court a chance to consider this question." *Id.* at 1208 n.5.

Reed alleges that the defendants "do not provide adequate training for sheriff's deputies on the elements, meaning, and lawful application of Montana's obstruction statute, or on the constitutional rights of members of the public, namely the Fourth Amendment right to be free from unreasonable seizure and First

Amendment rights under the U.S. Constitution." (Doc. 146 at ¶ 147.) He further alleges that the defendants "have an unconstitutional policy that allows sheriff's deputies to use the Montana obstruction statute to arrest individuals who are engaged in constitutionally protected conduct." (*Id.* at ¶ 148.)

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Flores v. Cnty. of L.A.*, 758 F.3d 1154, 1158 (9th Cir. 2014) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Because "a municipality can be liable under § 1983 only where its policies are the moving force behind the constitutional violation," *City of Canton*, 489 U.S. at 388 (quotation marks and alteration omitted), Reed "must demonstrate a conscious or deliberate choice on the part of" the defendants, *Flores*, 758 F.3d at 1158 (quotation marks omitted). He must allege facts showing the defendants "disregarded the known or obvious consequence that a particular omission in their training program would cause [county] employees to violate citizens' constitutional rights." *Id.* at 1159 (quoting *Connick*, 563 U.S. at 62).

Although "a pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference," *id.*, the Supreme Court has "not foreclose[d] the possibility that evidence of a single

-10-

violation of federal rights, accompanied by a showing that a municipality has

failed to train its employees to handle recurring situations presenting an obvious

potential for such a violation, could trigger municipal liability," *Bd. of Cnty.*

*Com'rs of Bryan Cnty., Okl. v. Brown (Brown)*, 520 U.S. 397, 409 (1997). As

further explained:

> in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.

*Id.* at 409-10. Construing the evidence in Reed's favor, a jury could find that the

defendants' failure to train amounts to deliberate indifference to the rights of

persons with whom deputies come into contact. *City of Canton*, 489 U.S. at 388.

### 1.    A Constitutional Violation

As a threshold matter, the defendants argue that because Reed cannot

establish a constitutional violation by Deputy Lieurance, he cannot maintain a

*Monell* claim. *See Jackson v. City of Bremerton*, 268 F.3d 646, 653-54 (9th Cir.

-11-

2001) ("Neither a municipality nor a supervisor . . . can be held liable under § 1983 where no injury or constitutional violation has occurred."). The Ninth Circuit, however, held that a reasonable jury could conclude that Deputy Lieurance's seizure of Reed was unreasonable, *see Reed*, 863 F.3d at 1205-07, or that Deputy Lieurance violated Reed's First Amendment rights, *see id.* at 1211-12.

## 2. Deputy Lieurance's Training

The defendants further insist that Deputy Lieurance was more than adequately trained on the parameters of Montana's obstruction statute and the First and Fourth Amendments. They note Deputy Lieurance received BASIC police training and was certified through the Arizona Law Enforcement Academy, and then attended an equivalency program through the Montana Law Enforcement Academy. (Doc. 151, at ¶¶ 1-2.) However, Daniel Springer, the designated representative of the Sheriff's Office for training issues, merely states that the Montana Law Enforcement Academy and in the equivalency program spend time on training in these areas, (*see* Springer Depo., Doc. 151-2 at 4), but does not identify what it entails. *See Bordanaro v. McLeod*, 871 F.2d 1151, 1159-60 (1st Cir. 1989) (noting that reasonable inferences could be drawn in plaintiff's favor if there was little to no formal training at initial academy courses and then no updated training afterward). Moreover, Deputy Lieurance admits that he did not

-12-

receive any training specifically related to the First Amendment or the cross-section between the First Amendment, Fourth Amendment, and Montana's obstruction statute. (Doc. 151-1 at 5-6.) That lack of training is reflected in his training records. (*See* Doc. 154-7.) Yet the defendants insist that Craddock-Crocker's video depicting the issuance of the citation definitively establishes Deputy Lieurance was adequately trained. Such an interpretation of the video ignores the Ninth Circuit's conclusion to the contrary. *See Reed* 863 F.3d at 1211-12 (discussing the myriad of ways a jury could find a First Amendment violation).

The defendants then insist that it is not enough to show that Deputy Lieurance alone did not receive adequate training. While Deputy Lieurance's training alone is not dispositive, *Blankenhorn v. City of Orange*, 485 F.3d 463, 484-85 (9th Cir. 2007) (holding that showing individual officer was not adequately trained is not sufficient to show deliberate indifference), it is evidence of the alleged overarching inadequacy. Moreover, additional evidence indicates that deputies generally receive little to no training on First Amendment issues and that the Sheriff's Office believes no such training is necessary.

### 3. First Amendment Claim

"In resolving the issue of a [county]'s liability, the focus must be on the adequacy of the training program in relation to the tasks the particular officers

-13-

must perform." *See City of Canton*, 489 U.S. 389. The defendants insist that Reed's claim must fail because he does not identify a "specific inadequacy" in the training program. However, Reed raises a genuine factual dispute as to what First Amendment training the deputies receive, if any, and whether that training is adequate given the deputies' regular contact with Campaign volunteers.

Sheriff Gootkin testified in his deposition that the First Amendment may be part of the Field Training Program, but that he was not aware of the specific training his deputies receive. (Doc. 154-6 at 6-9.) Springer, contradicting Gootkin, stated that the Field Training Manual does not include anything specific to the First Amendment, (Doc. 151-2 at 4), and that during the time period of Deputy Lieurance's employment, "[t]here [wa]s nothing – there is no documented training on freedom of speech training that I am aware of," (Doc. 154-8 at 8). (*See also* Daugherty Depo., Doc. 154-9 at 6 (stating he also did not receive any First Amendment training).) A review of the table of contents of the Field Training Manual also shows no specific First Amendment entry. (*See* Doc. 154-3 at 3.) There is an entry related to obstruction citations, (*id.*), but no further detail.

Springer also implied such training is not necessary:

[The] First Amendment is very simple – we – we instruct our guys that you are – you cannot impede someone's ability to freedom [sic] of speech, you cannot impede their ability to film you unless there's a

particular – you know, reasonable time, place and manner for that. It's not a very difficult thing to train on. It's something that is discussed, but it's a very – it's fairly basic.

(Doc. 151-2 at 4.) He further stated, "there is a standard that is set at the basic level and it's not one that changes. Freedom of speech has been that way for a very long time, so it's a very simple concept." (Doc. 154-8 at 8.)

Based on the testimony of Sheriff Gootkin and Springer, there is a genuine issue of material fact as to whether the Sheriff's Office believes First Amendment training is necessary and what training, if any, deputies receive. Reed's police practices expert, Mr. Longo, opines that First Amendment issues are more complicated than Springer indicated and training on those issues is vital. (*See, e.g.,* Expert Report ¶¶ 118-19, 237-39.) Moreover, Longo's report presents evidence as to what type of training should be administered and why. (*See id.,* ¶¶ 191-94 (referencing guidance from the Rutherford Institute); *id.* at. ¶ 106 (referencing technical assistance letters produced by the Department of Justice).) The necessity and adequacy of such training is only made more acute considering the regular contact between the Sheriff's Office and volunteers of the Campaign. (*See* Springer Depo., Doc. 154-8 at 11 (stating that the Sheriff's Office supports hazing operations "a number of times a year," estimating "10 to 12")); *Reed,* 863 F.3d at 1201 (9th Cir. 2017) (estimating government personnel carry out hazing

-15-

operations as many as four or five times per week between December and July).

The defendants further argue that Reed fails to show the requisite causal connection between the perceived inadequacy and his alleged harm. However, the recurrent contact between the Sheriff's Office and Campaign volunteers "and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflect[s] 'deliberate indifference' to the obvious consequence of the policymakers' choice—namely the violation of [the] specific constitutional or statute rights" Reed identifies. *Brown.*, 520 U.S. at 409. That predictability "also support[s] an inference of causation—that the [defendants'] indifference led directly to the very consequence that was so predictable." *Id.* at 410.

Reed also presents evidence that the prosecutor's office has dismissed obstruction citations under similar circumstances on more than one occasion. (*See* Doc. 154-5 at 2, 4, and 6 (identical motions to dismiss in cases against Reed, Noah Richards, and Andrea Rightsell).) Although such evidence may not independently show "a pattern of similar constitutional violations by untrained employees," *Flores*, 758 F.3d at 1159, it supports Reed's contention that the interaction between deputies and Campaign members is a recurrent issue and that a resulting constitutional violation was predictable. The defendants present an

-16-

affidavit from the prosecuting attorney insisting that Reed's dismissal was not because the citation was infirm, but rather due to a "shortage of prosecutors," and "speedy trial concerns." (Aff. Murphy, Doc. 151-5 at 3.) The motions to dismiss themselves, however, state the grounds for dismissal as "best interests of justice." (*See* Doc. 154-5.) Drawing all reasonable inferences in favor of Reed, a jury could find that the citations were dismissed as improperly issued. A reasonable jury could therefore find that the Sheriff's Office "disregarded the known or obvious consequence" of its failure to train and that its failure caused the alleged constitutional violation. *Flores*, 758 F.3d at 1158-59. Even if Reed cannot show that Sheriff Gootkin knew of such dismissals or the reason for them, (Doc. 154-6 at 16), the admission that the Sheriff's Office did not even consider tracking dismissed citations may also be evidence of deliberate indifference, (*id.* at 18). *See Larez v. City of L.A.*, 946 F.2d 630, 645 (9th Cir. 1991) (explaining that policy or custom can be inferred from a subsequent acceptance of a subordinate's actions or a lack of discipline or reprimand in the face of such action).

### 4.    Fourth Amendment Claim

Reed comes precariously close to waiving his failure-to-train claim as it relates to the Fourth Amendment and probable cause under Montana's obstruction statute. That claim, while premised on much of the same argument and evidence

as his First Amendment claim, is more narrow. Essentially, Reed alleges that the deputies are inadequately trained on the limits Montana jurisprudence places on the obstruction statute. *See City of Kalispell v. Cameron*, 46 P.3d 46, 47 (2002). The Ninth Circuit held that a jury could find either that Deputy Lieurance lacked probable cause to believe Reed was obstructing the haze or, alternatively, lacked probable cause to believe Reed had the necessary specific intent to impede the haze. *Reed*, 863 F.3d at 1205-06. It also held that a jury could find that Deputy Lieurance "issued the citation for one or more reasons that do not satisfy the Fourth Amendment." *Id.* at 1206. Based on the evidence discussed above and the previous rulings of the Ninth Circuit, genuine factual disputes prevent summary disposition of this claim. That said, depending on the evidence presented at trial, this claim—like all others—may be subject to a Rule 50 motion.

## C.    Sheriff's Office

The defendants argue in a footnote that the Sheriff's Office should be dismissed from the case as an improper defendant. Reed correctly argues that the request is improperly made, *City of Emeryville v. Robinson*, 621 F.3d 1251, 1262 n.10 (9th Cir. 2010) ("By failing to address the issue in its opening brief except in a footnote, Sherwin-Williams waived [its] claim . . . ."), and is without support in the law, *Streit v. Cnty .of L.A.*, 236 F.3d 552, 555-56 (9th Cir. 2001) (concluding

that the Los Angeles Sheriff's Department "is separately suable in federal court").

Accordingly, the defendants' motion for summary judgment is denied.

## II.    Motion to Exclude

The defendants also seek to exclude the opinions and testimony of Reed's expert, Timothy Longo, Sr., the Chief of Police of Charlottesville, Virginia. (Doc. 144.)  The Court previously excluded Mr. Longo from offering expert testimony on various grounds.[4]  (*See* Doc. 45 at ¶ 4.)  On appeal, the Ninth Circuit determined that an improper legal standard was applied.  *See Reed*, 863 F.3d at 1208-09.  It further clarified that Mr. Longo's testimony may be relevant to the revived failure-to-train claim, but that this Court may consider on remand whether Mr. Longo's testimony may be stricken "under the proper legal standard."  *Id.*

At issue here, the defendants seek to exclude Mr. Longo's testimony as irrelevant.  Rule 702, Fed. R. Evid., provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in

---

[4] First, the trial judge concluded that an expert may only rely upon evidence that is in the record or is "of the sort that any expert would rely on." *Reed*, 863 F.3d at 1208.  Second, he found Mr. Longo's testimony commented on the ability of others to do their job. *Id.* at 1208-09.  Third, he found the report made disparaging comments about the prosecution. *Id.* at 1209.

issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Expert testimony on police practices has generally been found to be admissible in cases involving allegations of police misconduct. *See, e.g., Larez*, 946 F.2d at 635 (discussing trial testimony of police practices expert); *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc) (offering expert testimony as to police dog use and training); *Davis v. Mason Cnty.*, 927 F.2d 1473, 1484-85 (9th Cir. 1991) (allowing expert testimony as to failure-to-train claim). However, under Rule 702, the district court has an independent duty to ensure that such testimony is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *see also Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007). The question of reliability asks "whether an expert's testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (quoting *Kumho Tire*, 526 U.S. at 149). But even reliable expert testimony must still be helpful to the jury's determination of the material factual questions at hand. *See Stilwell*, 482 F.3d at 1192 (requiring "a link between the expert's testimony and the matter to be

proved"). The opinion must be sufficiently tied to the facts of the case to aid the

trier of fact in resolving a disputed fact, "fit" the facts of the case, and serve a

"helpful" purpose to the jury. *Daubert*, 509 U.S. at 591.

Here, Mr. Longo's report describes his background and experience, (¶¶ 1-

12), and outlines a factual summary of the case, (¶¶ 13-30). The report then

outlines two questions presented:

> 31. Whether the actions taken by Deputy Doug Lieurance on the morning of May 23, 2012, were consistent with generally accepted law enforcement practices at the time of the incident.
>
> 32. Whether the policies, training, and supervision of the Gallatin County Sheriff's Office were consistent with generally acceptable law enforcement practices at the time of this incident.

(Report, Doc. 145-1.) The report first addresses Deputy Lieurance's actions, (¶¶

33-82), and then addresses municipal liability in the context of "Policy," (¶¶ 94-

119), "Practices," (¶¶ 120-65), "Training," (¶¶ 166-200), and "Supervision and

Investigation," (¶¶ 201-36). Finally, the report states Mr. Longo's conclusions as

to both issues, (¶¶ 237-79).

Although the defendants primarily challenge the relevancy—not the

reliability—of Mr. Longo's testimony, both elements of Rule 702 are discussed

below. *See Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1018 (9th

Cir. 2004) (requiring district courts to make a reliability determination).

## A.    Reliability

Mr. Longo's testimony is reliable.  He has an extensive history as a law enforcement officer with the Baltimore Police Department and additional experience training and teaching other law enforcement officers.  (*See* Report, ¶¶ 1-9.)  As of the date of his report, he was the Chief of Police in Charlottesville, Virginia, and was consistently involved with police training and procedure programs throughout the nation.  (*Id.*)  His methods are also those used by other experts in this field and applied in a predictable, reasonable manner.  Mr. Longo reviewed relevant documents in the case, including video and audio recordings, as well as the Gallatin County training manuals.  (*Id.* at ¶¶ 10, 166.)  He then reached an opinion as to the facts he reviewed "based upon [his] education, specialized experience, training, and knowledge of police practices as well as [his] continued research and work with law enforcement nationally."  (*Id.* at ¶ 11.)  His report specifically states that his opinions are not based on credibility determinations, (*id.* at ¶ 12), and that he did not make any findings as to probable cause, (*id.* at ¶ 33), or whether Deputy Lieurance's actions amounted to a constitutional violation, (*id.* at ¶ 34).  As his report makes clear, Mr. Longo lays out the facts that form the basis of his opinions and explains how he reached his conclusions.

-22-

## B.    Relevance

Mr. Longo's testimony is relevant.  Specifically, Mr. Longo's testimony will help the jury assess Reed's failure-to-train claim.[5]  The crux of the defendants' argument is that Mr. Longo's opinions should be excluded because they relate to questions of negligence, as opposed to constitutional deficiency.  *See Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) ("Mere negligence in training . . . does not give rise to a *Monell* claim.").  The defendants' distinction is one without difference in this context.  *See* Fed. R. Evid. 401(a).  Following the defendants' argument to its logical conclusion, a police practices expert cannot testify to mere adequacy of training because to do so would be irrelevant, but that expert also cannot testify as to the constitutionality of police conduct because that would be an impermissible legal conclusion.  The defendants' argument would effectively foreclose any expert testimony under these circumstances.  That position is not tenable.  As discussed above, for the failure to train to serve as a basis for § 1983 liability, it must "amount[] to deliberate indifference to the rights of persons with whom the police come into contact." *Flores*, 758 F.3d at 1158 (quoting *City of Canton*, 489 U.S. at 388).  Mr. Longo's proffered opinions

_____

[5] Reed's response is limited to Mr. Longo's testimony about failure-to-train, and he agrees that Mr. Longo will not testify as to whether individual constitutional violations occurred.  (Doc. 149 at 28.)

-23-

regarding the adequacy of the training received are relevant to that question. *See* Ninth Cir. Model Civ. Jury Instr. No. 9.8 (2017) (outlining the elements of a failure-to-train claim, including the requirement the plaintiff prove the defendant's training policies "were not adequate").

In arguing that Mr. Longo's testimony should be excluded, the defendants rely heavily on *Smith v. State of New Jersey*, 2013 WL 3658786 (D.N.J. 2013), a case also involving Mr. Longo's expert opinion. There, the plaintiffs alleged claims pursuant to 42 U.S.C. § 1983 on the grounds of unlawful arrest, excessive force in making an arrest, and unlawful warrantless entry. *Smith*, at *1. In excluding Mr. Longo's proffered testimony, the court ultimately concluded that "Rule 702 . . . does not permit the testimony of a police practices expert who is rendering opinions about whether particular conduct violated the relevant constitutional provisions." *Id.* at *5. However, the *Smith* plaintiffs did not raise a failure-to-train claim. *See id.* at *4 (noting the plaintiffs "do not claim that the State failed to properly train [the officer]" or that officer training was an issue). *Smith* therefore provides limited guidance here.

The defendants also rely on Judge Lynch's decision regarding Mr. Longo's testimony in *Chaney v. Wadsworth*, 2015 WL 4388420 (D. Mont. 2015). In *Chaney*, Mr. Longo was asked to opine as to the use of force and detention arising

-24-

out of a physical altercation between law enforcement and two brothers outside of a bar. In his opinion, Judge Lynch excluded certain portions of Mr. Longo's report and testimony based on specific objections by the defendants. However, the determination in *Chaney* that Mr. Longo's testimony may be relevant to a claim for negligent failure to train, *id.* at *8, does not foreclose its potential relevance to a § 1983 claim for failure to train as well, *see id.* at *15 (holding that the "ultimate determination as to the relevance of th[at] opinion is deferred until trial to be made in the proper context of the evidence presented at trial"). As discussed above, adequate training for identifying and addressing the intersection between the First Amendment, Fourth Amendment, and Montana's obstruction statute is disputed. Because Mr. Longo has specialized experience with police practices, his testimony may help the jury interpret and understand the evidence, *see Muktar v. Cal. St. Univ. Hosp.*, 299 F.3d 1053, 1063 n.7 (9th Cir. 2002) ("Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the 'central concern' of Rule 702."), and determine whether the deputies receive adequate training, *Davis*, 927 F.2d at 1483 ("The issue is not whether the officers had received *any* training—most of the deputies involved had some training, even if it was minimal at best—rather the issue is the adequacy of that training.").

That said, as was the case in *Chaney*, Mr. Longo's testimony is limited in certain respects by the Federal Rules of Evidence and related case law.  First, his testimony is limited insofar as portions of his report state the facts of the case, (*see* ¶¶ 13-30, 66, 54-81, 176-78, 186-88), comment on the evidence (*see* ¶¶ 68, 69, 72, 73, 75, 76, 78, 79, 124, 183-85, 189), or outline the applicable law, (*see* ¶¶ 36-52, 65, 67, 70, 83-93, 137-44, 179).  While those facts and legal principles are those upon which Mr. Longo may rely in forming his opinion, they need not be presented through his testimony, *Chaney*, at *7, and the Court will instruct the jury on the law, *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993).

Additionally, Mr. Longo "cannot give an opinion as to h[is] *legal conclusion, i.e.,* an opinion on an ultimate issue of law." *See Muktar*, 299 F.3d at 1065 n.10 (emphasis in original); *see also Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058-60 (9th Cir. 2008).  Rule 704(a) explicitly allows expert witnesses such as Mr. Longo to express an opinion that "embraces an ultimate issue."  And, as stated in the previous appeal in this matter, "a police practices expert may provide helpful testimony regarding whether there was a failure to train without veering into improper legal opinions." *Reed*, 863 F.3d at 1209 (citing *Johnson v. Hawe*, 388 F.3d 676, 686 (9th Cir. 2004)); *Hangarter*, 373 F.3d at 1016.  Nevertheless, the Ninth Circuit recently emphasized the fine line

-26-

drawn by Rule 704(a):

> Although the value of expert testimony lies in the specialized knowledge that an expert brings to bear on an issue in dispute, Fed. R. Evid. 702(a), it is sometimes impossible for an expert to render his or her opinion on a subject without resorting to language that recurs in the applicable legal standard. We hold that if the terms used by an expert witness do not have a specialized meaning in law and do not represent an attempt to instruct the jury on the law, or how to apply the law to the facts of the case, the testimony is not an impermissible legal conclusion. *See* Fed. R. Evid. 702(a), 704(a).

*United States v. Diaz*, ___ F.3d ___, 2017 WL 6030724, at *4 (9th Cir. Dec. 6, 2017) (holding that expert testimony that prescriptions were not given for "legitimate medical purpose" did not contain impermissible legal conclusion) (footnotes omitted). The primary term of art that raises concern here is "constitutional." Mr. Longo's report indicates that he may offer an opinion as to whether the training provided by the Sheriff's Office was constitutionally adequate or whether there is a causal connection between the failure to train and the constitutional harm alleged. During oral argument, Reed's counsel indicated Mr. Longo does not plan to open this particular pandora's box. We shall see. Such testimony may be properly subject to objection and further discussion in the context of trial.

Finally, the defendants raise specific relevancy objections in only four areas. The ultimate determination as to the relevance of Mr. Longo's testimony in these

four areas is more appropriately "made in the proper context of the evidence presented at trial." *Chaney*, at *15. However, these topics are discussed below as to establish threshold relevancy to meet the requirements of Rule 702. *See Kumho Tire Co.*, 526 U.S. at 147. First, the defendants object to statements and testimony related to a lawsuit against the City of Baltimore alleging First and Fourth Amendment violations. (*See* Report, ¶¶ 100-117.) These paragraphs describe the circumstances upon which the Department of Justice issued a technical assistance letter to the Baltimore Police Department regarding First Amendment training. (*See, e.g.,* ¶ 106.) This portion of Mr. Longo's report is relevant to the nature and necessity of First Amendment training and the bases for his opinion. While Mr. Longo may not restate legal standards or principles of law, his testimony will not be prematurely excluded.

Second, the defendants challenge the portions of Mr. Longo's report that opine on "contempt of cop." (*See* Report, ¶¶ 146-157.) Judge Lynch excluded such testimony in *Chaney*, explaining that it speaks to the legal application of probable cause to arrest as it "may influence a law enforcement officer to unlawfully arrest a citizen in the absence of probable cause." *Chaney*, at *5. Such testimony is more relevant here than it was in *Chaney* as Reed is likely to argue that Deputy Lieurance issued the citation based on Reed's perceived failure to

-28-

follow law enforcement's directions, not based on obstructing the hazing operation. While Mr. Longo cannot instruct the jury on the applicable law or opine as to whether Deputy Lieurance had probable cause, the Court will not prematurely exclude such testimony.

Third, the defendants seek to exclude Mr. Longo's report and testimony as it relates to the Rutherford Institute, (*see* Report, ¶¶ 190-97), a civil liberties organization that is used by law enforcement to aid in the development of policy and training for officers, (*id.* at ¶¶ 190-91). Because this Institute and its work are generally relevant to both the necessity and nature of First Amendment training, as well as the bases for Mr. Longo's opinions, it is not excluded. Once again, however, Mr. Longo's testimony is limited as outlined above.

Finally, the defendants seek to exclude testimony as to supervisory issues and the failure to track dismissed citations. The actions taken by law enforcement in response to an officer's conduct (such as reporting, discipline, reprimand) may be relevant to a "deliberate indifference" inquiry. *See Larez*, 946 F.2d at 645. It would be premature to exclude any of this testimony until Reed presents evidence under his theory of *Monell* liability at trial.

Because Mr. Longo's testimony meets Rule 702's threshold requirements, the defendants' motion to exclude Mr. Longo's testimony on those grounds is

-29-

denied, subject to the limits outlined above. The defendants are also permitted to renew the specific objections discussed above in the context Mr. Longo's trial testimony. *See* Fed. R. Evid. 103(b).

## C. Rule 403

Rule 403 states, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In their briefing, the defendants do not identify a Rule 403 concern. At oral argument, however, defense counsel intimated that allowing Mr. Longo to testify to an industry standard of care, i.e., a negligence standard, would confuse the jury and could cause the jury to find liability despite the heightened requirements of municipal liability under § 1983. Not only is that concern not borne out by the Mr. Longo's report or the opinions proffered therein, but the jury instructions issued prior to deliberation will prevent prejudice as they specifically outline the standard for "deliberate indifference." *See* Ninth Cir. Model Civ. Instr. No. 9.8. Rule 403 does not compel the exclusion of Mr. Longo's testimony.

### CONCLUSION

Based on the foregoing, IT IS ORDERED that the defendant's motion for

-30-

summary judgment (Doc. 150) is DENIED. The defendants' motion to exclude

Mr. Longo's expert testimony (Doc. 144) is also DENIED, but that testimony is

subject to the limitations outlined above. The defendants may renew their specific

relevancy objections in the context of trial. *See Bechtold v. Billings Police Dep't*,

2010 WL 11534416, at *1 (D. Mont. 2010).

DATED this ____ day of December, 2017.

Donald W. Molloy, District Judge
United States District Court

-31-



**FILED**

DEC 2 1 2017

Clerk, U.S District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| ANTHONY PATRICK REED, | CV 13–17–BU–DWM |
| Plaintiff, | |
| vs. | ORDER |
| DOUG LIEURANCE, in his individual capacity; BRIAN GOOTKIN, in his individual capacity; GALLATIN COUNTY SHERIFF'S OFFICE, a department of Gallatin County; and GALLATIN COUNTY, | |
| Defendants. | |

In May 2012, Defendant Doug Lieurance ("Deputy Lieurance" ) cited Plaintiff Anthony Reed ("Reed") for obstructing a bison herding operation outside of Yellowstone National Park ("the Park"). Reed is a volunteer with the Buffalo Field Campaign ("Campaign"), a § 501(c)(3) non-profit conservation organization that sends volunteers to observe and document the herding or "hazing" of bison in or near the Park. *Reed v. Lieurance*, 863 F.3d 1196, 1201 (9th Cir. 2017). Reed brought this action pursuant to 42 U.S.C. § 1983, alleging that Deputy Lieurance's conduct violated his First and Fourth Amendment rights and related Montana

-1-

constitutional rights, and that Gallatin County, the Gallatin County Sheriff's

Office, and Sheriff Brian Gootkin failed to train officers on Montana's obstruction

statute and the First and Fourth Amendments. (Doc. 1.)

Trial is set for February 20, 2018. (Doc. 141.) Both parties have filed

motions in limine. (*See* Docs. 159, 161.) Those motions are granted-in-part and

denied-in-part as discussed below.

## I.   Reed's Motions in Limine (Doc. 159)

Reed first seeks to bar the defendants from presenting evidence at trial

regarding Reed's criminal record other than the May 23, 2012 incident at issue.

That motion is **GRANTED**, subject to Reed himself "opening the door." *See* Fed.

R. Evid. 608(a), 609, 403.

Reed further asks the defendants be precluded from submitting undisclosed

expert testimony at trial. The defendants did not respond to this request. *Cf.* L.R.

7.1(d)(1)(B)(ii) (deeming the failure to file a response brief as an indication that

the motion is well-taken). That motion is **GRANTED**. *See Yeti by Molly, Ltd. v.*

*Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).

Reed also asks that the defendants be precluded from presenting or

soliciting any evidence or representations during trial of crimes, wrongs, or other

bad acts by individuals that may have scared horses, bison, or riders during haze

-2-

operations in the past. That motion is **DENIED** insofar as such evidence is relevant to establishing Reed's intent and Deputy Lieurance's knowledge of that intent under the Montana obstruction statute. Fed. R. Evid. 404(b)(2); *see Reed*, 863 F.3d at 1206. Reed may renew his objection at trial. *See* Fed. R. Evid. 103(b).

Reed further requests that the defendants not be allowed to present any evidence at trial regarding training that occurred prior to September 18, 2006 or after May 23, 2012. That motion is **DENIED** subject to renewal at trial. *See* Fed. R. Evid. 103(b); *Cech v. State*, 604 P.2d 97, 101-02 (Mont. 1979) (affirming admission of evidence of subsequent remedial measures as relevant to feasibility of remedy and possible impeachment).

Finally, Reed invokes Rule 615 of the Federal Rules of Evidence and asks that lay witnesses who are not parties be excluded from the courtroom during trial. The defendants did not oppose this request. *Cf.* L.R. 7.1(d)(1)(B)(ii). That motion is **GRANTED**. Additionally, counsel cannot disclose testimony or tell excluded witnesses about what happened in court other than in the ordinary preparation of witnesses. Counsel are also obligated to admonish witnesses not to blog, tweet, text, email, or communicate about the case or read any such items on the internet to prepare for testimony.

## II.    The Defendants' Motions in Limine (Doc. 161)

The defendants seek to exclude any reference to insurance and settlement negotiations. Because Reed does not identify a situation in which such evidence may be properly admitted in the context of this case, those motions are **GRANTED**. *See* Fed. R. Evid. 408, 411.

The defendants also seek to prohibit Reed and his companion Kasi Craddock-Crocker from testifying where the bison hazing operation crossed Highway 191 on May 23, 2012. The defendants insist testimony on this point would be improper because Reed and Craddock-Crocker lack personal knowledge. *See* Fed. R. Evid. 602. The defendants' request is premature. As the defendant's own motion indicates, Reed has knowledge of where he believed the haze occurred, provided both by Tierney and relayed to him over the radio. (*See* Doc. 162 at 6-8.) The admissibility of particular statements will be addressed in the context of trial. The defendants' motion to exclude this testimony is **DENIED**, subject to renewal in the context of trial. *See* Fed. R. Evid. 103(b).

Finally, the defendants seek to exclude all evidence relating to the prior trial, the Ninth Circuit appeal, and the Ninth Circuit's decision on appeal. (Doc. 162 at 2-4.) Taking the opposite extreme, Reed insists that all factual decisions and legal issues are "the law of the case" and admissible as substantive evidence.

-4-

(Doc. 167 at 5-12.)  The "evidence" at issue can be placed in three categories: (1) previous factual determinations, (2) previous legal determinations, and (3) previous evidentiary rulings.  As to the first, Reed is correct that those matters "disposed of by [the Ninth Circuit's] decree" binds this Court.  *Visciotti v. Martel*, 862 F.3d 749, 763 (9th Cir. 2016).  However, the crux of the Ninth Circuit's decision on appeal is that factual disputes warrant a determination of the substantive matters by a jury.  *See Reed*, 863 F.3d at 1206-07, 1211-12 (outlining the myriad factual conclusions a jury *could* draw as to the constitutional violations alleged).  Because the Ninth Circuit did not definitively find these facts, the very premise of Reed's argument fails.  Use of the existing factual record and testimony is limited to impeachment and the rules governing the admission of prior inconsistent statements.  *See* Fed. R. Evid. 801(d)(1)(A).  To the extent Reed attempts to argue Rule 801(d)(1)(A) opens the door to any and all prior testimony, that argument is foreclosed by the very language of the rule which requires an inconsistency before the prior statement can be introduced.

As to the second, Reed once again correctly identifies this Court's obligation to follow the legal conclusions of the Ninth Circuit.  *Viscotti*, 862 F.3d at 763.  The Court intends to do so.  However, these legal conclusions, like their factual cousins, may be cabined by the procedural posture in which they were

made. Insofar as Reed plans to pursue certain jury instructions based on appellate decisions in this case, those specific arguments will be addressed in the context of settling jury instructions.

As to the third, the parties dispute the admissibility of pretrial and appellate rulings in this case. Although those rulings have governed and will continue to govern the adjudication of this matter, neither the rulings themselves nor the context in which they were made is relevant to the disposition of this matter. Accordingly, the parties shall not reference the previous rulings, trial, or appeal of this case. If necessary, prior proceedings in the case shall be referred to as just that, a "prior proceeding." Accordingly, the defendants' motion is **GRANTED** to the extent outlined above. Further specific objections must be raised at trial.

**IT IS SO ORDERED.**

DATED this 21st day of December, 2017.

Donald W. Molloy, District Judge
United States District Court

-6-

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | | |
|---|---|---|
| AMANDA WISE, | ) | CV 09-137-M-DWM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| RICHARD RUST, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I. Introduction

This motor vehicle tort action comes before the Court on three distinct

motions for summary judgment and two separate motions in limine. Plaintiff

moves for partial summary judgment on the issue of Defendant's liability. She

also filed an interrelated motion in limine to exclude evidence of her alcohol

consumption. Defendant seeks partial summary judgment regarding Plaintiff's

shoulder surgeries and alleged brain injury. Defendant also filed an interrelated

motion in limine to exclude Plaintiff's treating physician from testifying about

1

Plaintiff's shoulder injury and surgeries. For the reasons that follow, Plaintiff is entitled to summary judgment on the issue of liability, but her motion in limine is denied. At the same time, Defendant is entitled to summary judgment on Plaintiff's brain injury claim, his motion for summary judgment regarding shoulder injuries is granted in part and denied in part, and his motion in limine prevails.

## II. Background

At approximately 5:15 p.m. on June 15, 2007, Plaintiff Amanda Wise ("Wise") was driving westbound on Montana Highway 2 near Happy's Inn. SGI ¶ 1 (dkt #26). At the same time, Defendant Richard Rust ("Rust") was exiting the Happy's Inn parking lot and turning left onto Highway 2 West. Id. Rust apparently did not see Wise's vehicle approaching from the east and, consequently, Wise's vehicle collided with Rust's vehicle, resulting in injuries to Wise. Id. at ¶ 5. At the time of the accident, Renae Erickson and her infant son were passengers in Wise's vehicle and Rust's wife was a passenger in his vehicle. Id. at ¶ 50 (dkt #26).

In September 2008, Wise brought this negligence action against Rust in Montana's Lincoln County District Court. Wise's primary allegation is that Rust was negligent when entering the highway, and she claims to have suffered head,

2

shoulder and spinal injuries as a result, in addition to pain and suffering. She seeks over $50,000 in medical expenses and $650,000 in general damages. In response to Wise's allegations, Rust answers that Wise's alcohol consumption was a contributing cause of the accident. Id. at ¶ 5. Rust also argues that the evidence fails to show that Wise suffered a brain injury as a result of the accident, or that her shoulder surgeries were necessitated by the accident. In September 2009, Rust removed the action to this Court based on diversity jurisdiction. The timing of removal was not questioned.

Before the Court are (1) Plaintiff's Motion in Limine regarding evidence of her intoxication (dkt #21), (2) Plaintiff's Motion for Summary Judgment as to Liability (dkt #13), (3) Defendant's Motion in Limine to Exclude Testimony by Dr. Knecht concerning Wise's shoulder surgeries (dkt #23), (4) Defendant's Motion for Summary Judgment Re: Plaintiff's Shoulder Injury and Shoulder Surgeries (dkt #15), and (5) Defendant's Motion for Summary Judgment Re: Traumatic Brain Injury (dkt #18).

Wise's motion in limine seeks to exclude any evidence related to her intoxication as irrelevant or otherwise inadmissible. Because the Court can only consider admissible evidence when addressing Wise's related summary judgment motion on liability, the two motions are discussed sequentially. Rust's motion in

3

limine, which seeks to limit Wise's treating physician from testifying about her shoulder surgeries, is similarly related to his motion for summary judgment on Wise's shoulder surgeries. These two motions are also considered in tandem. Rust's motion for summary judgment on the brain injury is distinct from the other motions, so it is addressed separately. The facts pertaining to liability, the shoulder surgeries and the brain injury are set forth below under the respective heading.

### III.  Legal Standards

Summary judgement is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgement as a matter of law." Fed.R.Civ.P. 56(c)(2). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986). Once this burden is met, the opposing party must, by affidavits or otherwise, set forth specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(e)(2). The opposing party "may not rely merely on allegations or denials in its own pleading." <u>Id.</u> If there is no genuine issue of material fact, the court must determine whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56 (c).

4

To prove negligence under Montana law,[1] a plaintiff must prove the following elements: (1) the defendant owed a duty, (2) the defendant breached that duty, (3) the breach caused injury to the plaintiff, and (4) damages resulted. Peterson v. Eichhorn, 189 P.3d, ¶ 23008).  If a plaintiff fails to offer proof on any one of the four elements of negligence, then summary judgment in favor of the defendant is proper.  Id.

A district court "may only consider admissible evidence in ruling on a motion for summary judgment."  Ballen v. City of Redmond, 466 F.3d 736, 745 (9th Cir. 2006).  "Evidentiary rulings made in the context of summary judgment motions are reviewed for an abuse of discretion," and "can only be reversed if it was both 'manifestly erroneous and prejudicial.' "  Id. (quoting Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002)).

A district court's ruling on a motion in limine is also reviewed for an abuse of discretion.  United States v. Ross, 299 F.3d 1130, 1138 (9th Cir. 2002).  To reverse on the basis of an erroneous evidentiary ruling, the appellate court must conclude not only that the district court abused its discretion, but also that the error was prejudicial.  Tritchler v. County of Lake, 358 F.3d 1150, 1155 (9th Cir.

---

[1] Because this case is before the Court through diversity jurisdiction, the Court applies Montana substantive law. See Allstate Ins. Co. v. Hughes, 358 F.3d 1089, 1094 (9th Cir. 2004).

5

2004).

## IV. Analysis

### A.   Liability

#### 1. Facts

At the scene of the accident, Montana Highway Patrol Trooper Bryce Ford ("Trooper Ford") inspected the inside of Wise's vehicle and observed "several" open bottles of beer and a partial box of full beer bottles. SGI ¶¶ 30, 33 (dkt #26). He further observed an open bottle of beer that had spilled on the driver's side floor. Id. One witness testified that she could smell alcohol on Wise's breath. Id. at ¶ 57. Trooper Ford's initial accident report listed alcohol consumption as a contributing circumstance to the accident. Id. at ¶ 30. Trooper Ford later testified under oath, however, that Rust alone was at fault for the collision and Wise's intoxication was not a contributing factor. SUF ¶ 6 (dkt #49). A witness who observed the accident also testified that Wise could not have avoided Rust's vehicle. Id. at ¶ 5. Wise's expert witness, an accident reconstructionist, concluded that Rust was the sole cause of the collision. Id. at ¶ 7. He also found though that Wise's reaction time was slower than could be expected.[2]

---

[2]It is unclear, exactly, what the expert's findings are regarding Wise's reaction time. The report states:

Wise actually locked up her brakes approximately 2.0 seconds after Mr. Rust first began

6

Approximately 90 minutes after the accident, Wise submitted to a blood test at Kalispell Regional Medical Center. Id. at ¶ 41. The test revealed a blood alcohol concentration of .259, over three times the legal limit. Id. at ¶¶ 41-42. Wise has testified that a person should not drive with a blood alcohol concentration of .259, and that it would be negligent for her to drive in that condition. SGI ¶¶ 21-22 (dkt #26). Rust's expert witness, a toxicologist, concluded that Wise's blood alcohol level–which he calculated to fall somewhere in the range of .220 and .290 at the time of the accident–diminished her ability to drive. SGI ¶¶ 43, 46-48 (dkt #26).

Although Wise admits that she had been drinking on the day of the accident, she moves the Court to exclude any evidence of her alcohol consumption. In addition to this blanket exclusion, Wise seeks to exclude (1) evidence of her blood alcohol content, (2) evidence of her DUI citation, (3) any reference to the

---

crossing onto the highway. A typical perception-reaction-lockup time is 1.3 seconds for a 50th percentile driver. Thus Ms. Wise reacted approximately .7 seconds after the nose of Mr. Rust's vehicle first entered the highway. Our calculations show that this is approximately the moment when Mr. Rust's right front wheel crossed the eastbound fog line. Thus Ms. Wise perceived that she had an emergency situation and needed to swerve and lock up the brakes as quickly as could be expected for a typical driver.

Lee Report 3-4 (dkt #49-4) (citation omitted). The expert thus suggests that Wise's reaction time of 2.0 seconds was slower than the typical time of 1.3 seconds, yet he concludes that she reacted "as quickly as could be expected for a typical driver." No explanation is given for this discrepancy. Insofar as the Court views the report in the light most favorable to Rust, the Court resolves this apparent ambiguity in his favor.

information contained in Trooper Ford's accident report, and (4) any reference to, or photos of, the beer bottles found in her vehicle. Id. Wise also moves for summary judgment on the issue of liability, arguing Rust's negligence is the sole cause of the accident.

### 2. Wise's Motion in Limine

### a. Evidence of Alcohol Consumption

Wise maintains that evidence of her alcohol consumption should be "excluded as irrelevant . . . because there [is] no evidence linking alcohol consumption with the cause of the accident." In support, Wise relies on Montana case law, but her reliance is misplaced because federal law, not state law, governs the admissibility of evidence in diversity cases. Primiano v. Cook, __F.3d__, 2010 WL 1660303 at *3 (9th Cir. Apr. 27, 2010).[3]

The Federal Rules of evidence apply in diversity negligence actions when determining whether alcohol consumption is relevant or overly prejudicial. Romine v. Parman, 831 F.2d 944, 945 (10th Cir. 1987).

---

[3] The only authority Wise cites in support of her contention that state law controls is an unpublished Ninth Circuit opinion. Pl.'s Reply Br. Support Mot. in Limine 3-4 (dkt #42) (citing Segner v. Gladsjo, 944 F.2d 909 (table), 1991 U.S. App. Lexis 22500 (9th Cir. 1991)). In Segner, the Ninth Circuit remanded the case to the district court for the limited purpose of determining whether blood alcohol content evidence was admissible under state law. The Ninth Circuit did not analyze whether state or federal law controlled because the appellant failed to raise her "choice of law argument" in district court.

In Romine, plaintiff was injured when her vehicle collided with defendant's vehicle. 831 F.2d at 944. The defendant raised comparative negligence as an affirmative defense because evidence indicated that the driver of plaintiff's vehicle had consumed "some beer" on the day of the accident. Id. at 944-45. Applying the Federal Rules of Evidence, the district court admitted evidence of the driver's alcohol consumption because the "jury was entitled to know the circumstances of the accident." Id. at 945. On appeal, the Tenth Circuit affirmed and held that the "evidence was relevant to the question of [the driver's] reflexes, reaction time, and overall ability to drive the car at the time the accident occurred." Id. (citations omitted).

The Eighth Circuit made a similar finding. In Miles v. General Motors, plaintiff was injured after his motorcycle collided with a vehicle manufactured by defendant. 262 F.3d at 721. Multiple eyewitnesses testified that "they could smell alcohol on [plaintiff's] breath," and plaintiff admitted that "he had consumed at least a portion of two beers before the accident." Id. at 723. Applying the Federal Rules of Evidence, the district court admitted the evidence of alcohol consumption "because [defendant] had raised comparative fault as an affirmative defense." Id. at 722. On appeal, the Eighth Circuit affirmed and held that "[plaintiff's] alcohol consumption was relevant to the question of whether [he] contributed to the

9

accident." Id. at 723.

Here, Rust has asserted an affirmative defense that Wise's claim is barred or proportionately diminished based on her comparative negligence. Wise's alcohol consumption is relevant to the defense. Wise admits that she would be negligent if she drove with a blood alcohol level of .259, Trooper Ford initially listed her alcohol consumption as a contributing circumstance, and Rust's toxicologist testified that Wise's intoxication diminished her reflexes and ability to drive. Moreover, Wise's own expert found that Wise's reaction time was below average. Collectively, these facts indicate that Wise's blood alcohol content may have contributed to her injuries. Accordingly, evidence of Wise's intoxication is relevant for the jury to consider when determining if Wise contributed to the accident.[4]

### b. Blood Alcohol Content Evidence

Wise insists that evidence of her blood alcohol content, even if relevant, should nevertheless be excluded for three reasons.

First, she argues that no foundation has been laid for the blood alcohol report generated by Kalispell Regional Medical Center. Rust counters that he

---

[4]This finding is distinct from the issue of liability addressed below. Liability turns on whether there is a genuine issue if Rust was the predominant cause of the accident, not whether Wise's negligence might have contributed to her injuries.

"could simply lay the proper foundation . . . at trial by calling the hospital's records custodian and eliciting testimony that would satisfy Fed.R.Evid. 803(6)." Def.'s Br. Opposing Pl.'s Mot. in Limine 11 (dkt #28). Wise is free to object at trial, but there is no reason to evaluate the report's foundation at this time.

Next, Wise argues that her blood alcohol content should be excluded because the test was not performed in accordance "with the Administrative Rules governing the proper procedure for drawing blood." Pl.'s Br. Support Mot. in Limine 3 (dkt #22). Wise's argument is based on Admin. R. Mont. 23.4.220(1), which only applies to blood samples drawn at the written request of a peace officer. The argument is frivolous. Although she submitted to a blood test, it was not at the request of a peace officer. Moreover, even if the Administrative Rule did apply, Wise fails to explain how that would provide a basis to exclude the test result under the Federal Rules of Evidence.

Finally, Wise argues that evidence of her blood alcohol content should be excluded because it is improper and speculative to extrapolate a person's blood alcohol content back to the time of an accident. Wise contends that Rust's own expert admitted that it is improper to do so. Even if he did, it is a question of weight not relevance but such is not the case.

Wise inaccurately represents the toxicologist's testimony. Lynn Kurtz,

11

Rust's toxicology expert, testified that he could not determine Wise's "exact" blood alcohol content at the time of the accident without knowing certain information, such as exact drinking history, body weight, metabolism, elimination rate, and absorption. He went on to testify that, in the absence of such information, it is proper to calculate a "range" in which a person's blood alcohol content would fall for a particular time previous to a known blood test. Here, the toxicologist provided that Wise's blood alcohol level at the time of the accident was somewhere in the range of .220 and .290, and that this determination was subject to a reasonable degree of scientific certainty. SGI ¶ 43 (dkt #26). As such, the toxicologist's opinion on Wise's blood alcohol level is not conjecture or speculation but instead based on facts that allow for a reasonably accurate conclusion. This is admissible evidence to be weighed by the fact finding jury.

### c. Evidence of Wise's DUI Citation

Wise moves the Court to exclude evidence of the DUI citation issued to her as a result of this accident. Because the DUI charge has been dismissed, Rust concedes that the citation should be excluded. This portion of Wise's motion is granted; evidence of the dismissed DUI citation is excluded.

### d. Trooper Ford's Investigation Report

Wise also moves to exclude any reference to the information contained in

12

Trooper Ford's investigation report. Wise takes the broad position that all police reports are inadmissible pursuant to Fed.R.Evid. 803(8). Id. Wise's position is contrary to the Federal Rules of Evidence.

Under Rule 803(8), reports "setting forth . . . factual findings resulting from an investigation made pursuant to authority granted by law" are admissible in civil actions, unless the "sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(8)(C). This rule applies to police reports, meaning Rule 803(8) does not preclude them. United States v. Sims, 617 F.2d 1371, 1377 (9th Cir. 1980). Because Wise seeks exclusion on no other grounds, there is no reason for the report to be excluded.

### e. Evidence of Beer Bottles

Wise seeks exclusion of any reference to, or photos of, the beer bottles found in her vehicle. Wise argues that the evidence is irrelevant and prejudicial. In response, Rust argues the evidence is relevant to the issue of Wise's comparative negligence. To the extent Wise's intoxication and her ability to operate the vehicle at the time of the accident are in dispute, the evidence is relevant. The evidence may, however, prove to be cumulative or more prejudicial than probative at trial, depending on the purpose for and context in which the evidence is offered. See Fed.R.Evid. 403. Thus, the motion to exclude evidence

13

of the beer bottles is denied, subject to renewal at trial.

### 3. Wise's Motion for Summary Judgment as to Liability

Wise argues that she is entitled to summary judgment on the issue of liability because "Rust was the sole cause of the collision." Her argument is based on the flawed premise that there is no evidence linking her alcohol consumption with the cause of the accident. She relies on the testimony of Trooper Ford and Leona McKean, a waitress at Happy's Inn who witnessed the accident. Id. at 9. Trooper Ford testified that Rust was the sole cause of the accident and that Wise's alcohol consumption was not a contributing factor. SUF ¶ 6 (dkt #49). McKean testified that Wise could not have avoided the collision. Id. at ¶ 5. Wise also relies on the expert testimony of Denny Lee, an accident reconstructionist. In Lee's opinion, Wise's reaction time was below average, but Rust was nonetheless the sole cause of the collision. Id. at ¶ 7. In response, Rust argues that a question of fact exists on liability because there is ample evidence showing that Wise's alcohol consumption was a contributing cause of the accident.

Each party misses the issue here. In Montana, "a plaintiff's contributory negligence may be raised as a defense to a negligence claim." Larchick v. Diocese of Great Falls-Billings, 208 P.3d 836, ¶ 55 (Mont. 2009). However, "contributory negligence does not bar a plaintiff from recovering damages if the contributory

negligence was not greater than the negligence of the person . . . against whom recovery is sought." Id. Recovery will be barred only if the plaintiff is "more than fifty percent negligent." Id.

Thus, Wise need not show that Rust was the sole cause of the accident to prevail, and Rust needs to do more than simply show there is a genuine issue as to Wise's comparative negligence to avoid summary judgment on liability. Viewing the evidence in Rust's favor, he has failed to create a genuine issue as to his liability.

Rust does not dispute that the evidence shows he was negligent. Instead, he tries to create a genuine issue for trial by arguing Wise was more negligent than him. He offers testimony that Wise's blood alcohol content at the time of the accident was between .220 and .290, and this diminished her ability to perceive and respond to hazards while driving. SGI ¶¶ 43-44.

While Wise's alcohol consumption may have contributed to the accident, based on the summary judgment record there is no genuine issue that her negligence was a greater cause of the accident than Rust's negligence. Leona McKean witnessed the accident and testified that Wise could not have avoided the collision. Denny Lee, the accident reconstructionist, opined that Rust was the sole

15

cause of the collision.[5]  This evidence is uncontested by Rust.  Instead, Rust offers only testimony from his expert that Wise should not have been driving at the time of the accident because she was intoxicated.  But when asked whether Wise could have avoided the collision if she had no alcohol in her system the expert responded:

> I cannot tell you that answer.  And the reason being is because I'm not the accident reconstructionist.  And I don't know at what – what speed [Wise] may have been traveling or anything else and how that played into the fact of her reaction time.

Kurtz Dep. 73:17-22, July 19, 2010 (dkt #14-5).  In other words, the toxicologist offers no evidence that Wise's diminished reaction time was the predominant cause.  He cannot contradict testimony by the eyewitness and the accident reconstructionist that Rust was predominantly at fault for the collision.  Viewed in the light most favorable to Rust, a reasonable jury could not conclude that Wise's drinking was the principle cause of the accident.  Accordingly, Wise is entitled to summary judgment on the issue of Rust's liability.  It will be up to a jury to determine the extent to which Wise's reaction time contributed to her injuries.

**B.**     **Shoulder Injury**

---

[5]Trooper Ford testified that Rust was the sole cause of the accident, but he also indicated in the accident report that Wise's intoxication was a contributing circumstance.  This discrepancy is for the jury to resolve.

## 1. Facts

Wise has a history of shoulder injuries predating the car accident. In December 2000, Wise dislocated her right shoulder in a fight. Dr. Clyde Knecht, Wise's physician, first treated her in October 2003 when she reported problems with shoulder dislocations. Dr. Knecht informed Wise that her shoulder would require surgery in order to prevent further dislocations. In January 2006, her shoulder was surgically repaired during a procedure known as a Bankart repair.[6] SUF ¶ 16 (dkt #17). In March 2007, she dislocated her shoulder after slipping on ice. Id. at ¶ 36. In June 2007, approximately 11 days before the car accident with Rust, Wise dislocated her shoulder while carrying groceries. Id. at ¶ 37.

Following the car accident with Rust, Wise's shoulder dislocated more frequently than it had before the accident. SGI ¶¶ 7-8 (dkt #30). In July 2007, Dr. Ken Stimpson, an orthopedic surgeon, examined Wise and diagnosed her with "recurrent instability of the right shoulder." SUF ¶¶ 15-17 (dkt #17). On July 26, 2007, Dr. Stimpson surgically repaired Wise's shoulder. Id. at ¶ 22. During the procedure, Dr. Stimpson found that Wise had a torn labrum and concluded that the Bankart repair in January 2006 had failed. Id. In order to repair the labrum, Dr.

---

[6] A "Bankart repair" is a surgical procedure in which a torn anterior labrum is reattached to the anterior part of the glenoid. A torn labrum is usually the result of a traumatic shoulder dislocation. See SUF ¶¶ 9-12 (dkt #17).

17

Stimpson cut the subscapularis tendon so that he could more easily access the shoulder joint. Id. at ¶ 23. Once the labrum was repaired, Dr. Stimpson reattached the subscapularis tendon. Id. Shortly after the surgery, Wise dislocated her shoulder while getting dressed. Id. at ¶ 26. Consequently, Dr. Stimpson performed a second surgery on Wise's shoulder in December 2007. Id. at ¶ 31. During the surgery, Dr. Stimpson found that the Bankart repair was stable, but the subscapularis tendon was torn. Id. at ¶ 32. According to Dr. Stimpson, some type of trauma is usually required to tear a subscapularis tendon; it does not just fall apart. Id. Shortly after the second surgery, Wise slipped in the shower and may have dislocated her shoulder.[7] Id. at ¶ 35.

In Dr. Stimpson's opinion, Wise's history of shoulder dislocations indicates that her shoulder was unstable before the car accident with Rust. Id. at ¶ 18. He testified that Wise likely suffered a torn labrum before the accident because she had "two known" dislocations prior to the accident. Id. at ¶ 20. According to Dr. Stimpson, the prior dislocations indicate that the Bankart repair in January 2006 had failed. Id. at ¶ 18. He also testified that Wise likely tore her subscapularis tendon when she dislocated her shoulder shortly after the July 2007 surgery. Id. at

---

[7] Wise is unsure if her shoulder dislocated when she slipped in the shower. However, it appears that her shoulder sustained at least some level of trauma.

¶ 28. According to Dr. Stimpson, the initial dislocation following surgery would not have occurred unless Wise put herself into a position that she was not supposed to be in. Id. at ¶ 26. Dr. Stimpson testified that Wise missed two scheduled follow-up visits and failed to follow strict post-op protocol for a Bankart repair. Id. at ¶¶ 25-26. He also stated that Wise's shoulder condition was likely aggravated by the accident. Id. at ¶ 21. When asked whether Wise would have needed the July 2007 surgery if the accident had not occurred, Dr. Stimpson declined to offer an opinion. Id. He did, however, testify that if Wise's shoulder was unstable following the January 2006 surgery, it would remain unstable until she had it surgically repaired. Id.

In March 2010, Dr. Catherine Capps, an orthopedic surgeon, examined Wise. Id. at ¶ 38. Based on the examination and her review of Wise's pre- and post-accident medical records, Dr. Capps diagnosed Wise with "recurrent instability of the right shoulder, pre-existing and current." Id. at ¶ 42. In Dr. Capps' opinion, Wise's shoulder suffered no significant trauma in the car accident and there is no evidence that the accident caused further damage to her shoulder. Id. at ¶ 44. According to Dr. Capps, the July 2007 surgery would have been necessary regardless of the car accident. Id. at ¶ 47.

In July 2010, an MR arthrogram revealed that Wise had re-torn her

subscapularis tendon.  Id. at ¶ 48.  In Dr. Capps' opinion, any future surgery to reattach the tendon would not be related to the car accident with Rust.  Id. at ¶ 49.  The record indicates that Dr. Knecht reviewed the arthrogram results, however, it is unclear if he reviewed the results in the course of his treatment of Wise or in the course of this litigation.

Dr. Knecht opined that the car accident aggravated Wise's shoulder condition.  SGI ¶ 7 (dkt #30).  Specifically, he testified that the accident increased the frequency of her shoulder dislocations.  Id.  Dr. Knecht's testimony is supported by the opinion of Dr. Patrick Galvas, a physiatrist.  According to Dr. Galvas, the car accident aggravated Wise's pre-existing shoulder condition.  Id. at ¶ 14.  Additionally, Dr. Galvas testified that there is "no medically reliable way" to apportion Wise's shoulder injury between her pre-existing condition and the car accident with Rust.  Id.  Although Dr. Knecht believed Wise's shoulder required surgery, he also testified that he does not perform shoulder surgeries and "would never do a shoulder surgery."  Knecht Dep. 17:22-25, Aug. 12, 2009.  He further stated that he has never reviewed any of the medical records from Wise's January 2006 surgery and has never heard of a Bankart repair.  Id. at 22:10-23:20.  Dr. Knecht admitted that the procedure is beyond his area of expertise.  Id. at 23:23.

Dr. Knecht treated Wise in August 2007, approximately seven weeks after

the car accident and two weeks after her second shoulder surgery. Like the January 2006 surgery, Dr. Knecht admitted that he did not have any of the medical records from Wise's second surgery and does not know what surgery was performed. He also admitted that he does not know what was done during Wise's third surgery in December 2007. He revealed that offering any opinion on Wise's prognosis for future surgery is "outside of [his] area of expertise." Id. at 53:3-3.

### 2. Rust's Motion in Limine to Exclude Testimony by Dr. Knecht

Rust moves to exclude Dr. Clyde Knecht from offering opinions on (1) Wise's right shoulder surgeries, including the injuries repaired during the surgeries, the types of procedures performed, and the outcome of the procedures; (2) the prognosis for any future shoulder surgeries Wise may undergo; and (3) the findings from the MR arthrogram performed on July 8, 2010, including any opinions concerning the cause of any of the findings on the MR arthrogram.

Rust argues that Dr. Knecht should be prohibited from offering opinions on these issues because Dr. Knecht has not reviewed the records for the surgeries, he is unfamiliar with the surgical procedures performed, and he otherwise lacks a foundation to opine on the surgeries, the potential need for future surgeries, and the findings from the arthrogram. In response, Wise takes the broad position that Dr. Knecht is her treating physician and, as such, he can offer opinions on the

21

nature of her shoulder condition.

Wise's argument is slightly off base. Rust does not seek to prohibit Dr. Knecht from offering any opinion testimony. Instead, he seeks to limit the scope of Dr. Knecht's testimony. Thus, the question presented is to what extent can Dr. Knecht, as a treating physician, offer opinion testimony on Wise's shoulder surgeries.

Treating physicians are generally not subject to the mandatory expert witness disclosure requirements. Arneson v. Mich. Tissue Bank, 2007 WL 4698986 at *10 (D.Mont. Mar. 26, 2007). To be admissible in the absence of an expert disclosure under Fed.R.Civ.P. 26(a)(2)(B), a treating physician's opinion must be acquired through the treatment of a patient. Id. A "treating physician's opinion on matters such as causation, future treatment, extent of disability and the like are part of the ordinary care of a patient." Id. If properly based on personal knowledge, treatment of the patient, and facts of his or her examination and diagnosis, then a treating physician may give an opinion as to the cause of an injury or degree of the injury in the future. Id.

Here, Dr. Knecht can only testify in his capacity as Wise's treating physician because he was not disclosed as an expert pursuant Fed.R.Civ.P. 26(a)(2)(B). Therefore, he can only offer an opinion if it was acquired through the

treatment of Wise.  In terms of Wise's shoulder surgeries, Dr. Knecht admits that he has not reviewed any of the medical records from the January 2006, July 2007, or December 2007 surgeries and does not know what injuries were repaired or what types of surgeries were performed.  He testified that he is unfamiliar with a "Bankart repair" because it is "orthopedics beyond what [he] know[s]."  Knecht Dep. 23:17-23.  He also stated that he does not perform shoulder surgeries and "would never do a shoulder surgery."  Id. at 17:22-25.  Any opinion of Dr. Knecht regarding Wise's shoulder surgeries would not be based on his personal knowledge and treatment of Wise.  Therefore, Dr. Knecht may not offer any opinions on the injuries repaired during the shoulder surgeries, the types of procedures performed, and the outcome from the procedures.

Dr. Knecht is also precluded from offering an opinion on Wise's prognosis for recovery from any future surgery because, in his own words, that is "outside of [his] area of expertise."  Id. at 53:2-3.

Lastly, in terms of the findings from the arthrogram, Rust argues that, because Dr. Knecht knows nothing about the shoulder surgeries, he lacks the necessary foundation to offer an opinion on the findings from the MR arthrogram, including any opinion on the cause of those findings.  It is unclear what sort of testimony Dr. Knecht would provide based on the arthrogram.  However, his

unfamiliarity with Wise's surgeries deprives him of a foundation to testify as to the relation between the July 2010 arthrogram findings and the June 2007 accident. Accordingly, Dr. Knecht is precluded from testifying on how the arthrogram's findings relate to the 2007 car accident.

### 3. Rust's Motion for Summary Judgment Re: Wise's Shoulder Surgeries and Current Shoulder Condition

Rust moves for summary judgment on the issues (1) that his negligence was not the cause of Wise's shoulder surgery in July 2007, (2) that his negligence was not the cause of Wise's shoulder surgery in December 2007, and (3) that his negligence was not the cause of Wise's current shoulder condition, including any need for future surgery. The motion succeeds in part.

Rust's argument here is narrow. He is not arguing that Wise did not suffer any shoulder injury in the accident. In fact, he acknowledges that the accident may have aggravated Wise's pre-existing shoulder condition. SUF ¶ 21 (dkt #17). Instead, Rust insists that the surgeries in July 2007 and December 2007 were not the result of the car accident. Id. at ¶ 47. He argues that Wise's pre-existing shoulder condition necessitated her July 2007 surgery, not the accident. Id. He also argues that the car accident is unrelated to the fact that her surgeries were unsuccessful. Id. at ¶¶ 26-32. According to Rust, there is no evidence suggesting

24

the two surgeries failed for any reason other than Wise's own conduct. Id.
Finally, Rust contends that Wise's current shoulder condition and her need for future surgery are unrelated to the car accident. Id. at ¶ 49.

In response, Wise argues that the surgeries were reasonable and necessary as a result of the aggravation from the collision. SGI ¶ 12 (dkt #30). Because the accident aggravated her pre-existing condition, Wise contends that it is necessary for a jury to apportion damages between those caused by her pre-existing condition and those caused by the car accident. Id. at 6.

Wise's statement of the law is correct. In Montana, when a pre-existing injury is aggravated by an accident a jury is responsible for apportioning damages between those caused by the pre-existing condition and those caused by the accident. Callihan v. Burlington Northern Inc., 654 P.2d 972, 976 (Mont. 1982); Priest v. Taylor, 740 P.2d 648, 651 (Mont. 1987).

Viewing the evidence in a light most favorable to Wise, a genuine issue of material fact exists regarding Wise's July 2007 surgery. Although Rust's expert testified that the July 2007 surgery would have been necessary regardless of the car accident, three other doctors acknowledged that the accident aggravated Wise's shoulder condition. SGI ¶¶ 7, 12, 14 (dkt #30). According to Wise and her treating physician, this aggravation resulted in "daily" shoulder dislocations

compared to "infrequent" dislocations prior to the accident. Id. at ¶¶ 7, 8. A question of fact exists as to whether Rust's negligence, which aggravated Wise's shoulder condition, necessitated the July 2007 surgery.[8] Rust's motion for summary judgment regarding the July 2007 surgery is denied.

In regard to the December 2007 surgery and Wise's current shoulder condition, the undisputed facts demonstrate that the December 2007 surgery and Wise's current shoulder condition were not caused by the car accident. Dr. Stimpson testified that the July 2007 surgery was successful and that Wise's shoulder was stable immediately following the operation. SUF ¶¶ 23-24 (dkt #17). Shortly after surgery, Wise dislocated her shoulder while getting dressed. Id. at ¶ 26. According to Dr. Stimpson, this would only happen if Wise put herself into a position that she was not supposed to be in. Id. On December 18, 2007, Dr. Stimpson performed a second surgery on Wise's shoulder. During the operation, he found that the Bankart repair was stable but the subscapularis tendon was torn.

---

[8]In his reply brief, Rust compares this case to Bancroft v. Mitchell Offshore Marine, LLC, 44 So.3d 711 (La. App. 2010). There, a Louisiana court found a plaintiff's back surgery was not necessitated by the accident in question after noting the surgeon stated he repaired a pre-existing injury and plaintiff's pre-accident MRI was consistent with his post-accident MRI. Id. at 717-18. Here, there are no similar facts. Wise's surgeon could not say whether the July 2007 surgery would have been needed if Wise was not in the accident. Nor is there evidence, such as the MRI's in Bancroft, that Wise's shoulder condition was the same before as it was after the accident. To the contrary, the evidence indicates Wise experienced more frequent dislocations after the accident.

26

Id. at ¶ 32. According to Dr. Stimpson, some type of trauma is usually required to tear a subscapularis tendon; it does not just fall apart. Id. Dr. Stimpson testified that Wise likely tore the tendon when she first dislocated her shoulder while getting dressed. Id. at ¶ 28. Shortly after the second surgery, Wise slipped in the shower and her shoulder sustained some level of trauma. Id. at ¶ 35. In March 2010, Dr. Capps examined Wise and diagnosed her with instability of the right shoulder. Id. at ¶ 42. In Dr. Capps' opinion, Wise's ongoing shoulder instability is not related to the accident. Id. at ¶ 45. In July 2010, an MR arthrogram revealed that Wise had re-torn her subscapularis tendon. Id. at ¶ 48. According to Dr. Capps, any future surgery to reattach the tendon would not be related to the car accident. Id. at ¶ 49. Based on this evidence, Rust has met his burden of demonstrating the absence of a genuine issue of material fact in regard to the December 2007 surgery and Wise's current shoulder condition.

Wise fails to set forth specific facts showing a genuine issue for trial in regard to the December 2007 surgery and her current shoulder condition. She presents no evidence that the post-accident surgeries failed for any reason other than her own conduct. The undisputed facts demonstrate that (1) Dr. Stimpson repaired Wise's shoulder during the July 2007 surgery, (2) Wise was non-compliant with proper post-op protocol, (3) Wise dislocated her shoulder shortly

after surgery because she put herself into a position she was not supposed to be in, and (4) Wise tore her subscapularis tendon when she dislocated her shoulder shortly after the July 2007 surgery. In the absence of specific facts linking the December 2007 surgery and Wise's current shoulder condition to the car accident with Rust, there is no genuine issue for trial. Rust is entitled to summary judgment as to the December 2007 surgery and Wise's current shoulder condition, including any need for future surgery. The motion is otherwise denied.

## C.     **Brain Injury**

Wise claims she suffered a head injury as a result of the collision. Compl. ¶ 3. Rust moves for summary judgment on this injury arguing there is no admissible evidence supporting the allegation. In response, Wise insists she has testimony from medical providers that she, on a more probable than not basis, suffered a traumatic brain injury. Rust has it right.

### 1. Facts

At the scene of the accident, Wise was found unconscious. SGI ¶ 2 (dkt #38). Two years later, she was examined by Dr. Patrick Galvas, a physical medicine and rehabilitation expert. Id. at ¶ 3. Dr. Galvas had concerns that Wise suffered a mild traumatic brain injury, and he referred her to Dr. Mark Johnson for a neuropsychological assessment. Id.; SUF ¶ 6 (dkt #20).

28

After examining Wise, Dr. Johnson "found her to be functioning in the borderline range with regard to intellectual ability as well as below-average ability with regard to scholastic functioning." SUF ¶ 7 (dkt #20). He found that she had "difficulties with visual-spatial ability, language difficulties and abstract reasoning difficulties." Id. These findings came with a caveat "about possible lack of consistency and motivation." Johnson's Report 4 (dkt #20-3). Dr. Johnson concluded that Wise's "performance may be [] a result of trauma to the head." Id. at 7. He could not, however, determine whether that was the case due to "multiple variables"–such as "motivational issues; sleep and pain issues; depression; medication issues; and possible previous injury contribution of visual-spatial processing"– potentially impacting test performance. Id. Dr. Johnson recommended "further workup to include ophthalmologic and possibly PET scan data" to identify "what, if any" test results can be attributed to "trauma to the brain." Id.

After reviewing Dr. Johnson's report, Dr. Galvas testified that neuropsychological testing showed Wise exhibited cognitive disorders but that causation was unclear. SUF ¶ 10 (dkt #20). Wise was also examined by Rust's expert, Dr. Capps, who could not say whether Wise suffered a traumatic brain injury as it was beyond her field of expertise. SGI ¶ 5 (dkt #38).

## 2. Discussion

The issue here is whether Wise can submit her claim for brain injury damages to the jury.  Rust contends, through a two-step argument, that she cannot.

First, Rust posits that under Montana law Wise's brain injury claim requires expert testimony showing that the injury more likely than not was caused by the accident in question.  The Montana Supreme Court has held that expert testimony is required to establish causation for injuries when causation is not readily apparent to a layperson.  See Cain v. Stevenson, 706 P.2d 128, 131 (Mont. 1985); Morallis v. Lake County, 839 P.2d 1287, 1289 (Mont. 1992).  Rust insists that the existence and causation of Wise's brain injury is such an issue.  Additionally, Rust posits that the required expert testimony must show the injury "more likely than not" resulted from the accident, and that this burden is not met through testimony that an injury was possibly caused by the accident.  Kramer v. EBI Co.'s, 878 P.2d 266, 270 (Mont. 1994).

Rust then argues Wise lacks such evidence.  Rust highlights, among other things, that Dr. Johnson and Dr. Galvas could not determine whether Wise suffered a brain injury as a result of the accident.  SUF ¶¶ 7, 11 (dkt #20).

Wise does not dispute that her brain injury is a complicated issue that requires admissible expert medical testimony.  Given the record supporting this

motion, there is no reason to think otherwise.  Instead, Wise insists she has met her burden.  First, she notes that she was knocked unconscious in the accident.  SGI ¶ 2 (dkt #38).  Next, she points to Dr. Galvas' "concern" that she suffered a brain injury.  Id. at ¶ 3.  Finally, Wise offers Dr. Johnson's opinion that she exhibited symptoms indicative of a closed head injury.[9]  Id. at ¶ 4.

The evidence Wise puts forward falls short of what is required.  She has failed to identify any medical expert opinion on the causal relationship between her injury and the accident.  Dr. Galvas' opinion only establishes that he had a concern that she suffered a brain injury.  This concern instigated her being tested, but after reviewing the test results, Dr. Galvas found that causation was unclear.  SGI ¶ 5 (dkt #38).  Similarly, while Dr. Johnson opined that Wise exhibited symptoms of a brain injury, this falls short of medical expert testimony about causation.  Dr. Johnson withheld an opinion on causation and instead recommended "further workup" to "elucidat[e] the potential causal contributors" to her symptoms.  SUF ¶ 7 (dkt #20).  These proofs are insufficient to create a material issue of fact.  On this proof a jury could only speculate about a brain

---

[9]Wise also notes that Rust's expert, Dr. Capps, could not say whether Wise suffered a traumatic brain injury.  It is unclear how this is relevant to the issue at hand.  It is Wise's burden to show she suffered such an injury.  The fact that Rust's expert cannot opine on the matter does nothing to meet that burden.

injury or its cause. Without any expert testimony to establish the causation of Wise's alleged brain injury, Rust is entitled to summary judgment on the claim.

## V. Conclusion

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Plaintiff Wise's Motion in Limine (dkt #21) is GRANTED in part and DENIED in part. The Motion is granted so as to exclude Plaintiff's DUI citation, and denied in all other respects;

2. Plaintiff Wise's Motion for Summary Judgment as to Liability (dkt #13) is GRANTED;

3. Defendant Rust's Motion in Limine to Exclude Testimony By Dr. Knecht (dkt #23) is GRANTED;

4. Defendant Rust's Motion for Summary Judgement Re: Plaintiff's Shoulder Injury and Shoulder Surgeries is GRANTED in part and DENIED in part (dkt #15). There is a genuine issue whether Wise's July 2007 surgery was necessitated by the accident. The Motion is otherwise granted; and

5. Finally, Defendant Rust's Motion for Summary Judgment Re: Traumatic Brain Injury (dkt #18) is GRANTED.

Dated this 30th day of November, 2010.

DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT

33



**FILED**

JAN 0 6 2014

Clerk, U.S. District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| TAMARA DOWNEN, Individually and as Personal Representative for the ESTATE OF STANLEY L. DOWNEN, Deceased,<br><br>Plaintiff,<br><br>vs.<br><br>MONTANA VETERANS' HOME; STATE OF MONTANA DEPARTMENT OF PUBLIC HEALTH AND HUMAN SERVICES; CITY OF COLUMBIA FALLS; MIKE JOHNSON and DAVID G. PERRY,<br><br>Defendants. | CV 13–121–M–DWM<br><br>ORDER |

Plaintiff Tamara Downen is suing the City of Columbia Falls, Mike

Johnson, and David Perry (collectively "City Defendants") as well as Montana

Veterans' Home and the State of Montana Department of Health and Human

Services (collectively "State Defendants"), alleging injury arising out of a tasing

incident involving her now deceased grandfather, Stanley Downen ("Downen").

Pending are numerous motions in limine filed by Plaintiff as well as Plaintiff's

motion for spoilation sanctions. (Doc. 30.) For the reasons discussed below,

1

Plaintiff's motions in limine are granted in part, denied in part, and ruling is reserved in part. Plaintiff's motion for spoliation sanctions is denied.

## I.    Motions in limine

The purpose of a motion in limine is to obtain a ruling on the admissibility of evidence prior to trial. Judges have broad discretion when ruling on motions in limine. *See Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002). Such a motion should only be granted if

> the evidence [is] inadmissible on all potential grounds. Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in the proper context. . . [A] court is almost always better situated during the actual trial to assess the value and utility of evidence.

*Goodman v. Las Vegas Metro. Police Dept.*, ___ F. Supp. 2d ___, 2013 WL 4006159, at *4 (D. Nev. 2013). Such ruling are provisional and "are not binding on the trial judge [who] may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n. 3 (2000) (noting that in limine rulings are always subject to change, especially if the evidence unfolds in an unanticipated manner). "Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted to the trial. Denial merely means that without the context of trial, the court is unable to determine whether

the evidence in question should be excluded." *Goodman*, at *4.

IT IS ORDERED:

Plaintiff's motion in limine # 1 to exclude evidence or testimony regarding Downen's prior criminal convictions is GRANTED.

Plaintiff's motion in limine # 3 to exclude evidence or testimony related to other members of the Downen family, including drug or alcohol use, is GRANTED.

Plaintiff's motion in limine #4 to exclude evidence or testimony that the motive for Plaintiff's suit is monetary is GRANTED. *Cf. Dahlin v. Holmquist*, 766 P.2d 239, 241 (Mont. 1988) (holding the state trial judge abused his discretion by allowing the introduction of evidence of secondary gain).

Plaintiff's motion in limine # 6 to exclude evidence or testimony regarding apportionment of injuries is DENIED.

Plaintiff's motion in limine # 7 to exclude comment, evidence, or testimony regarding the identity of their attorneys or their cases is DENIED subject to proper objection at trial if the issue is raised. It would be inappropriate to mention experience with the Buffalo Bills, Randy Moss, or any other failed effort regarding football or football players.

Plaintiff's motion in limine # 8 to exclude evidence or testimony referencing

3

motions in limine is GRANTED.

The Court RESERVES JUDGMENT until trial regarding Plaintiff's motions in limine # 2 (to exclude evidence or testimony regarding specific instances of Downen's episodes of violent outbursts which are unrelated to the tasing incident), and # 5 (to exclude evidence or testimony from Columbia Falls Police Officers regarding Downen's medical condition).

## II.    Motion for Spoilation Sanctions

Plaintiff wants sanctions due to a claimed spoliation of evidence. She insists the Columbia Falls Police Department failed to: (1) record the incident with Mr. Downen, (2) identify and take statements from eyewitnesses, and (3) preserve the rocks Mr. Downen carried. Plaintiff's motion is denied.

"Spoilation" is defined as "[t]he intentional destruction, mutilation, alteration, or concealment of evidence[.]" *Blacks Law Dictionary*, 1531 (Bryan Garner, ed., 9th ed., West 2009). A district court may, under its inherent power to control litigation, levy sanctions for the spoliation of evidence. *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). Sanctions may be levied only when a party knew, or reasonably should have known, that the spoliated evidence was potentially relevant to a claim. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993). "Bad faith" is not required to justify the imposition of sanctions for

4

the spoliation of evidence. *Id.* ("Surely a finding of bad faith will suffice, but so will simple notice of 'potential relevance to the litigation.'").

Restraint and discretion must be exercised in imposing sanctions for the spoliation of evidence. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, (1980). If there is spoliation, the court should fashion a sanction that:

(1) sufficiently penalizes the spoliating party. *Natl. Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976);

(2) has a sufficient deterrent value to the immediate spoliating party and future litigants. *Id.*;

(3) sufficiently cures any prejudice to an affected party by restoring that party to the position it would have been in but for the spoliation. *See Unigard Security Ins. Co. v. Lakewood Engg. & Mfg. Corp.*, 982 F.2d 363, 369 (9th Cir. 1992); *Kronisch v. United States*, 150 F.3d 112, 126 (2nd Cir. 1998);

(4) sufficiently restores the accuracy of the fact-finding process. *Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 167 F.R.D. 90, 106 (D. Colo. 1996); and

(5) places the risk of an erroneous judgment on the spoliating party. *Kronisch*, 150 F.3d at 126.

Measured by these standards are two questions: has spoliation occurred and, if so, whether a sanction should be imposed.

## A.   Failure to Record

Plaintiff argues spoliation on the grounds that the officers failed to record the incident prior to the tasing. Plaintiff relies on *Peschel v. City of Missoula*, 664 F. Supp. 2d 1137, 1143 (D. Mont. 2009), where this Court held the city had a duty, under Montana law, to preserve an existing video recording of Peschel's arrest. Judge Lynch further found the duty remained following the criminal proceedings as it was reasonably foreseeable that civil litigation would ensue. *Peschel*, 664 F. Supp. 2d at 1143 (citing *State v. Swanson*, 722 P.2d 1155, 1158 (Mont. 1986)). Here, no recording was ever made.

There is a difference between collecting and preserving evidence. As noted by Judge Lynch in his 2008 ruling based on the incident involving Peschel,

> The circumstances of a criminal investigation and prosecution, and the associated collection of evidence, impose various obligations on law enforcement officers to preserve and disclose evidentiary matters to an accused. The Court is mindful of the criminal rule declaring that law enforcement officers have no duty to gather exculpatory evidence on behalf of a criminal defendant. Nonetheless, there is a distinction between gathering evidence and preserving evidence. Therefore, once potentially exculpatory evidence is gathered or collected by the police, and is in the police officers' possession, then the officers are obligated to preserve such "possible" exculpatory evidence; the police have a duty to see to its safekeeping so that a defendant can exercise his or her right

6

to gather possible exculpatory evidence.

*Peschel v. City of Missoula*, at 2008 WL 5131369, at \*14 (D. Mont. December 5, 2008) (internal citations and quotation marks omitted); *see also Swanson*, 722 P.2d at 1158 ("Once the sample was taken from Swanson, the police had a duty to see to its safekeeping.")  Here, the evidence in question was never "collected" as the events leading up to the tasing were not recorded.  Although the officers have a duty to preserve such evidence once obtained, they did not have a duty to obtain it.  Therefore, the imposition of sanctions on these grounds is inappropriate.

**B.    Failure to Identify Eyewitnesses**

Plaintiff contends the Columbia Falls Police Department failed to preserve potentially exculpatory evidence when it failed to collect independent, eyewitness statements.  Eyewitnesses were present at a nearby baseball field, however, officers did not take their statements.  To the extent Plaintiff relies on the "preservation" duty outlined in *Swanson*, the failure to identify eyewitnesses or take their statements does not amount to spoliation for the reasons discussed above.  Once again, there is a distinction between the collection and preservation of evidence.  *See Peschel*, 2008 WL 5131369, at \*14.  Therefore, sanctions would also be inappropriate based on these facts.

### C.   Failure to Preserve Rocks

Plaintiff argues the Columbia Falls Police Department failed to preserve the rocks Downen was holding during the incident with the officers. Of the three spoliation arguments raised by Plaintiff, this is the only one involving an item the officers obtained and thus had a duty to preserve. Although City Defendants concede the rocks were not kept, they maintain the photographs the officers took of the rocks are sufficient. Plaintiff argues the photograph does not give an accurate indication of weight or substance. Although the failure to preserve the rocks after they were collected and photographed amounts to spoliation under *Peschel* and *Swanson*, sanctions are not warranted as the available evidence is sufficient to protect against prejudice and allow for accuracy in the fact-finding process. This ruling does not preclude cross-examination or argument about the weight of available evidence or the duty to preserve.

Contrary to Plaintiff's argument, the photograph of the rocks includes a ruler for scale, providing an accurate depiction of size. (Doc. 45-1.) Unlike the situation in *Peschel*, the failure to preserve the rocks does not leave the fact-finder empty-handed. Rather, an objective measure of the evidence still exists. In *Peschel*, Judge Lynch correctly determined that because the only remaining evidence was potentially differing accounts by witnesses, the evidence that was

8

lost could not be sufficiently replicated. 664 F. Supp. 2d at 1144-45 (noting that "each [witness] characterizes [the force used] in a somewhat different manner."). Although the witnesses in this case are likely to characterize the nature of the rocks differently—either as "weapons" or merely as "rocks"—the photograph taken by the officers provides an objective measure that grounds the Parties' respective characterizations. The photograph will allow the jury to determine the proper characterization of the rocks based on all the evidence and argument presented.

Accordingly, IT IS ORDERED that Plaintiff's motion for spoliation sanctions is DENIED.

Dated this 6th day of January, 2014.

Donald W. Molloy, District Judge
United States District Court