Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 1 of 217



# Buckley v. Fitzsimmons, 509 U.S. 259 (1993)

Overview     Opinions     Materials

**Argued:**              **Decided:**
February 22, 1993        June 24, 1993

## Syllabus

OCTOBER TERM, 1992

Syllabus

BUCKLEY *v.* FITZSIMMONS ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 91-7849. Argued February 22, 1993-Decided June 24,1993

Petitioner Buckley sought damages, under 42 U. S. C. § 1983, from respondent prosecutors for fabricating evidence during the preliminary investigation of a highly publicized rape and murder in Illinois and making false statements at a press conference announcing the return of an indictment against him. He claimed that when three separate lab studies failed to make a reliable connection between a bootprint at the murder site and his boots, respondents obtained a positive identification from one Robbins, who allegedly was known for her willingness to fabricate unreliable expert testimony. Thereafter, they convened a grand jury for the sole purpose of investigating the murder, and 10 months later, respondent Fitzsimmons, the State's Attorney, announced the indictment at the news conference. Buckley was arrested and, unable to meet the bond, held in jail. Robbins provided the principal evidence against him at trial, but the jury was unable to reach a verdict. When Robbins died before Buckley's retrial, all charges were dropped and he was released after three years of incarceration. In the § 1983 action, the District Court held that respondents were entitled to absolute immunity for the fabricated evidence claim but not for the press conference claim. However, the Court of Appeals ruled that they had absolute immunity on both claims, theorizing that prosecutors are entitled to absolute immunity when out-of-court acts cause injury only to the extent a case proceeds in court, but are entitled only to qualified immunity if the constitutional wrong is complete before the case begins. On remand from this Court, it found that nothing in *Burns* v. *Reed,* 500 U. S. 478-in which the Court held that prosecutors had absolute immunity for their actions in participating in a probable-cause hearing but not in giving advice to the police-undermined its initial holding.

*Held:* Respondents are not entitled to absolute immunity. Pp. 267-278.

(a) Certain immunities were so well established when § 1983 was enacted that this Court presumes that Congress would have specifically so provided had it wished to abolish them. Most public officials are entitled only to qualified immunity. However, sometimes their actions fit within a common-law tradition of absolute immunity. Whether they do is determined by the nature of the function performed, not the identity of the actor who performed it, *Forrester* v. *White,* 484 U. S. 219, 229,

---

260

Syllabus

and it is available for conduct of prosecutors that is "intimately associated with the judicial phase of the criminal process." *Imbler* v. *Pacht*man, 424 U. S. 409, 430. Pp. 267-271.

(b) Acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. However, in endeavoring to determine whether the bootprint had been made by Buckley, respondents were acting not as advocates but as investigators searching for clues and corroboration that might give them probable cause to recommend an arrest. Such activities were not immune from liability at common law. If performed by police officers and detectives, such actions would be entitled to only qualified immunity; the same immunity applies to prosecutors performing those actions. Convening a grand jury to consider the evidence their work produced does not retroactively transform that work from the administrative into the prosecutorial. Pp.271-276.

(c) Fitzsimmons' statements to the media also are not entitled to absolute immunity. There was no common-law immunity for prosecutor's out-of-court statements to the press, and, under *Imbler,* such comments have no functional tie to the judicial process just because they are made by a prosecutor. Nor do policy considerations support extending absolute immunity to press statements, since this Court has no license to establish immunities from § 1983 actions in the interests of what it judges to be sound public policy, and since the presumption is that qualified, rather than absolute, immunity is sufficient to protect government officials in the exercise of their duties. Pp. 276-278.

952 F.2d 965, reversed and remanded.

STEVENS, J., delivered the opinion for a unanimous Court with respect to Parts I, II, III, and IV -B, and the opinion of the Court with respect to Parts IV-A and V, in which BLACKMUN, O'CONNOR, SCALIA, and THOMAS, JJ., joined. SCALIA, J., filed a concurring opinion, *post,* p. 279. KENNEDY, J., filed an opinion concurring in part and dissenting in part, in which REHNQUIST, C. J., and WHITE and SOUTER, JJ., joined, *post,* p. 282.

G. *Flint Taylor* argued the cause for petitioner. With him on the briefs was *John L. Stain thorp.*

*James* G. *Sotos* argued the cause and filed a brief for respondents.

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief

---

261
**Full Text of Opinion**

**Read More**

## Opinions

**Opinions & Dissents**

OCTOBER TERM, 1992

Syllabus

BUCKLEY *v*. FITZSIMMONS ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 91-7849. Argued February 22, 1993-Decided June 24,1993

Petitioner Buckley sought damages, under 42 U. S. C. § 1983, from respondent prosecutors for fabricating evidence during the preliminary investigation of a highly publicized rape and murder in Illinois and making false statements at a press conference announcing the return of an indictment against him. He claimed that when three separate lab studies failed to make a reliable connection between a bootprint at the murder site and his boots, respondents obtained a positive identification from one Robbins, who allegedly was known for her willingness to fabricate unreliable expert testimony. Thereafter, they convened a grand jury for the sole purpose of investigating the murder, and 10 months later, respondent Fitzsimmons, the State's Attorney, announced the indictment at the news conference. Buckley was arrested and, unable to meet the bond, held in jail. Robbins provided the principal evidence against him at trial, but the jury was unable to reach a verdict. When Robbins died before Buckley's retrial, all charges were dropped and he was released after three years of incarceration. In the § 1983 action, the District Court held that respondents were entitled to absolute immunity for the fabricated evidence claim but not for the press conference claim. However, the Court of Appeals ruled that they had absolute immunity on both claims, theorizing that prosecutors are entitled to absolute immunity when out-of-court acts cause injury only to the extent a case proceeds in court, but are entitled only to qualified immunity if the constitutional wrong is complete before the case begins. On remand from this Court, it found that nothing in *Burns* v. *Reed,* 500 U. S. 478-in which the Court held that prosecutors had absolute immunity for their actions in participating in a probable-cause hearing but not in giving advice to the police-undermined its initial holding.

*Held:* Respondents are not entitled to absolute immunity. Pp. 267-278.

(a) Certain immunities were so well established when § 1983 was enacted that this Court presumes that Congress would have specifically so provided had it wished to abolish them. Most public officials are entitled only to qualified immunity. However, sometimes their actions fit within a common-law tradition of absolute immunity. Whether they do is determined by the nature of the function performed, not the identity of the actor who performed it, *Forrester* v. *White,* 484 U. S. 219, 229,

260

Syllabus

and it is available for conduct of prosecutors that is "intimately associated with the judicial phase of the criminal process." *Imbler* v. *Pacht*man, 424 U. S. 409, 430. Pp. 267-271.

(b) Acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. However, in endeavoring to determine whether the bootprint had been made by Buckley, respondents were acting not as advocates but as investigators searching for clues and corroboration that might give them probable cause to recommend an arrest. Such activities were not immune from liability at common law. If performed by police officers and detectives, such actions would be entitled to only qualified immunity; the same immunity applies to prosecutors performing those actions. Convening a grand jury to consider the evidence their work produced does not retroactively transform that work from the administrative into the prosecutorial. Pp.271-276.

(c) Fitzsimmons' statements to the media also are not entitled to absolute immunity. There was no common-law immunity for prosecutor's out-of-court statements to the press, and, under *Imbler,* such comments have no functional tie to the judicial process just because they are made by a prosecutor. Nor do policy considerations support extending absolute immunity to press statements, since this Court has no license to establish immunities from § 1983 actions in the interests of what it judges to be sound public policy, and since the presumption is that qualified, rather than absolute, immunity is sufficient to protect government officials in the exercise of their duties. Pp. 276-278.

952 F.2d 965, reversed and remanded.

STEVENS, J., delivered the opinion for a unanimous Court with respect to Parts I, II, III, and IV -B, and the opinion of the Court with respect to Parts IV-A and V, in which BLACKMUN, O'CONNOR, SCALIA, and THOMAS, JJ., joined. SCALIA, J., filed a concurring opinion, *post,* p. 279. KENNEDY, J., filed an opinion concurring in part and dissenting in part, in which REHNQUIST, C. J., and WHITE and SOUTER, JJ., joined, *post,* p. 282.

G. *Flint Taylor* argued the cause for petitioner. With him on the briefs was *John L. Stain thorp.*

*James* G. *Sotos* argued the cause and filed a brief for respondents.

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief

261

were Solicitor General Starr, Assistant Attorney General Gerson, and Deputy Solicitor General Mahoney. *

JUSTICE STEVENS delivered the opinion of the Court.

In an action brought under 42 U. S. C. § 1983, petitioner seeks damages from respondent prosecutors for allegedly fabricating evidence during the preliminary investigation of a crime and making false statements at a press conference announcing the return of an indictment. The questions presented are whether respondents are absolutely immune from liability on either or both of these claims.

As the case comes to us, we have no occasion to consider whether some or all of respondents' conduct may be protected by qualified immunity. Moreover, we make two important assumptions about the case: first, that petitioner's allegations are entirely true; and, second, that they allege constitutional violations for which § 1983 provides a remedy. Our statement of facts is therefore derived entirely from petitioner's complaint and is limited to matters relevant to respondents' claim to absolute immunity.

I

Petitioner commenced this action on March 4, 1988, following his release from jail in Du Page County, Illinois. He had been incarcerated there for three years on charges growing out of the highly publicized murder of Jeanine Nicarico, an ll-year-old child, on February 25, 1983. The complaint named 17 defendants, including Du Page County, its sheriff and seven of his assistants, two expert witnesses and the estate of a third, and the five respondents.

Respondent Fitzsimmons was the duly elected Du Page County State's Attorney from the time of the Nicarico

* *Michael D. Bradbury* filed a brief for the Appellate Committee of the California District Attorneys Association as *amicus curiae.*

262

murder through December 1984, when he was succeeded by respondent Ryan, who had defeated him in a Republican primary election on March 21, 1984. Respondent Knight was an assistant state's attorney under Fitzsimmons and served as a special prosecutor in the Nicarico case under Ryan. Respondents Kilander (who came into office with Ryan) and King were assistant prosecutors, also assigned to the case.

The theory of petitioner's case is that in order to obtain an indictment in a case that had engendered "extensive publicity" and "intense emotions in the community," the prosecutors fabricated false evidence, and that in order to gain votes, Fitzsimmons made false statements about petitioner in a press conference announcing his arrest and indictment 12 days before the primary election. Petitioner claims that respondents' misconduct created a "highly prejudicial and inflamed atmosphere" that seriously impaired the fairness of the judicial proceedings against an innocent man and caused him to suffer a serious loss of freedom, mental anguish, and humiliation.

The fabricated evidence related to a bootprint on the door of the Nicarico home apparently left by the killer when he kicked in the door. After three separate studies by experts from the Du Page County Crime Lab, the Illinois

Department of Law Enforcement, and the Kansas Bureau of Identification, all of whom were unable to make a reliable connection between the print and a pair of boots that petitioner had voluntarily supplied, respondents obtained a "positive identification" from one Louise Robbins, an anthropologist in North Carolina who was allegedly well known for her willingness to fabricate unreliable expert testimony. Her opinion was obtained during the early stages of the investigation, which was being conducted under the joint supervision and direction of the sheriff and respondent Fitzsimmons, whose

263

police officers and assistant prosecutors were performing essentially the same investigatory functions.1

Thereafter, having failed to obtain sufficient evidence to support petitioner's (or anyone else's) arrest, respondents convened a special grand jury for the sole purpose of investi-

1 The relevant period and prosecutorial functions are described in petitioner's first amended complaint:

'(28) Defendant Knight, and various others [sic] Defendants, including Doria, Fitzsimmons, and Burandt, apparently not satisfied with Defendant German's conclusions, contacted anthropologist Louise Robbins and Defendant Olsen of the Kansas Bureau of Indentification [sic] Crime Lab in search of a positive boot identification.

'(31) Confronted with three different expert reports which failed to match Plaintiff's boot with the footprint on the door, the Defendants, including Knight, Burandt, and German, procured their 'positive identification' from Louise Robbins, whose theories and reputation in the forensic community were generally discredited and viewed with great skepticism, a fact these Defendants knew or should have known.

'(32) Defendants Knight and King were involved with the Sheriff's police in all the early stages of their investigation, including the interrogation of witnesses and potential suspects. Specifically, Sheriff's detectives, including defendants Wilkosz and Kurzawa, at the direction and under the supervision, and sometimes in the presence and with the assistance of Defendants Knight, King, Soucek and Lepic, repeatedly interrogated alleged suspects, including Plaintiff Buckley and Alex Hernandez, who were not represented by counsel. Despite intense pressure and intimidation, Plaintiff Buckley steadfastly maintained his innocence and demonstrated no knowledge of the crime, while Hernandez told such wild and palpably false stories that his mental instability was obvious to the Defendants.

'(33) As a result of these interrogations, at least one experienced Sheriff's detective who participated[,] concluded that Buckley and Hernandez were not involved in the Nicarico crime. This conclusion was buttressed by his general knowledge of the bootprint 'evidence.'

'(34) He repeatedly communicated his conclusion, and its basis, to the Defendants named herein, including Defendants Doria, Knight, King, Soucek, Lepic, and Wilkosz.

'(35) Unable to solve the case, Defendants Doria, Fitzsimmons, Knight and King convened a special Du Page County 'investigative' grand jury, devoted solely to investigating the Nicarico case." App.8-10.

264

gating the Nicarico case. After an 8-month investigation, during which the grand jury heard the testimony of over 100 witnesses, including the bootprint experts, it was still unable to return an indictment. On January 27, 1984, respondent Fitzsimmons admitted in a public statement that there was insufficient evidence to indict anyone for the rape and murder of Jeanine Nicarico. Although no additional evidence was obtained in the interim, the indictment was returned in March, when Fitzsimmons held the defamatory press conference so shortly before the primary election. Petitioner was then arrested, and because he was unable to meet the bond (set at $3 million), he was held in jail.

Petitioner's trial began 10 months later, in January 1985.

The principal evidence against him was provided by Robbins, the North Carolina anthropologist. Because the jury was unable to reach a verdict on the charges against petitioner, the trial judge declared a mistrial. Petitioner remained in prison for two more years, during which a third party confessed to the crime and the prosecutors

remained in prison for two more years, during which a third party confessed to the crime and the prosecutors prepared for petitioner's retrial. After Robbins died, however, all charges against him were dropped. He was released, and filed this action.

II

We are not concerned with petitioner's actions against the police officers (who have asserted the defense of qualified immunity), against the expert witnesses (whose trial testimony was granted absolute immunity by the District Court, App. 53-57), and against Du Page County (whose motion to dismiss on other grounds was granted in part, *id.,* at 57-61). At issue here is only the action against the prosecutors, who moved to dismiss based on their claim to absolute immunity. The District Court held that respondents were entitled to absolute immunity for all claims except the claim against Fitzsimmons based on his press conference. *Id.,* at 53. With respect to the claim based on the alleged fabrication of evidence, the District Court framed the question as whether

265

the effort "to obtain definitive boot evidence linking [petitioner to the crime] was in the nature of acquisition of evidence or in the nature of evaluation of evidence for the purpose of initiating the criminal process." *Id.,* at 45. The Court concluded that it "appears" that it was more evaluative than acquisitive.

Both petitioner and Fitzsimmons appealed, and a divided panel of the Court of Appeals for the Seventh Circuit ruled that the prosecutors had absolute immunity on both claims. *Buckley* v. *Fitzsimmons,* 919 F.2d 1230 (1990). In the Court of Appeals' view, "damages remedies are unnecessary," *id.,* at 1240, when "[c]ourts can curtail the costs of prosecutorial blunders ... by cutting short the prosecution or mitigating its effects," *id.,* at 1241. Thus, when "out-ofcourt acts cause injury only to the extent a case proceeds" in court, *id.,* at 1242, the prosecutor is entitled to absolute immunity and "the defendant must look to the court in which the case pends to protect his interests," *id.,* at 1241. By contrast, if "a constitutional wrong is complete before the case begins," the prosecutor is entitled only to qualified immunity. *Id.,* at 1241-1242. Applying this unprecedented theory to petitioner's allegations, the Court of Appeals concluded that neither the press conference nor the fabricated evidence caused any constitutional injury independent of the indictment and trial. *Id.,* at 1243, 1244.2

2 With respect to an issue not before us, petitioner's claims that he was subject to coercive interrogations by some of the respondent prosecutors, the court found that the extent of immunity depended on the nature of those claims. The court reasoned that, because claims based on *Miranda* v. *Arizona,* 384 U. S. 436 (1966), and the Self-Incrimination Clause of the Fifth Amendment depend on what happens at trial, prosecutors are entitled to absolute immunity for those claims; by contrast, only qualified immunity is available against petitioner's claims as to "coercive tactics that are independently wrongful." 919 F. 2d, at 1244. Because it could not characterize the nature of those claims, the court remanded for further proceedings concerning Fitzsimmons, King, and Knight on this issue. *Id.,* at 1245.

266

Judge Fairchild dissented in part. He agreed with the District Court that Fitzsimmons was entitled only to qualified immunity for his press statements. He noted that the majority had failed to examine the particular function that Fitzsimmons was performing, and concluded that conducting a press conference was not among "the functions that entitle judges and prosecutors in the judicial branch to absolute immunity." *Id.,* at 1246 (opinion dissenting in part and concurring in part). Responding directly to the majority's reasoning, he wrote:

> "It is true that procedures afforded in our system of justice give a defendant a good chance to avoid such results of prejudicial publicity as excessive bail, difficulty or inability of selecting an impartial jury, and the like. These procedures reduce the cost of impropriety by a prosecutor, but I do not find that the courts have recognized their availability as a sufficient reason for conferring immunity." *Ibid.*

We granted Buckley's petition for certiorari, vacated the judgment, and remanded the case for further proceedings in light of our intervening decision in *Burns* v. *Reed,* 500 U. S. 478 (1991). 502 U. S. 801 (1991). On remand, the same panel, again divided, reaffirmed its initial decision, with one modification not relevant here. 952 F.2d 965 (CA7 1992) *(per curiam).* The Court of Appeals held that "[n]othing in *Burns* undermine[d]" its initial holding that prosecutors are absolutely immune for "normal preparatory steps"; unlike the activities at issue in *Burns,* "[t]alking with (willing) experts is trial preparation." 952 F. 2d, at 966-967. In similar fashion, the court adhered to

its conclusion that Fitzsimmons was entitled to absolute immunity for conducting the press conference. The court recognized that the press conference bore some similarities to the conduct in *Burns* (advising the police as to the propriety of an arrest). It did not take place in court, and it was not part of the prosecutor's

267

trial preparation. 952 F. 2d, at 967. The difference, according to the court, is that "[a]n arrest causes injury whether or not a prosecution ensues," whereas the only constitutional injury caused by the press conference depends on judicial action. *Ibid.*

Judge Fairchild again dissented. He adhered to his earlier conclusion that Fitzsimmons was entitled to only qualified immunity for the press conference, but he was also persuaded that *Burns* had drawn a line between "'conduct closely related to the judicial process'" and conduct in the role of" 'administrator or investigative officer.'" He agreed that trial preparation falls on the absolute immunity side of that line, but felt otherwise about the search for favorable evidence that might link the bootprint to petitioner during "a year long pre-arrest and pre-indictment investigation" aggressively supervised by Fitzsimmons. 952 F. 2d, at 969 (opinion dissenting in part).

We granted certiorari for a second time, limited to issues relating to prosecutorial immunity. 506 U. S. 814 (1992).3 We now reverse.

III

The principles applied to determine the scope of immunity for state officials sued under Rev. Stat. § 1979, as amended,

3 Although petitioner also alleged that respondents violated his constitutional rights in presenting the fabricated evidence to the grand jury and his trial jury, see App. 10-11, 14-15, we are not presented with any question regarding those claims. The Court of Appeals agreed with the District Court, see *id.,* at 45-47, and held that those actions were protected by absolute immunity. *Buckley* v. *Fitzsimmons,* 919 F.2d 1230, 1243 *(CA7* 1990) ("The selection of evidence to present to the grand jurors, and the manner of questioning witnesses, can no more be the basis of liability than may the equivalent activities before the petit jury"). That decision was made according to traditional principles of absolute immunity under § 1983, however, and did not depend on the original, injury-focused theory of absolute prosecutorial immunity with which we are concerned here; nor was it included within the questions presented in petitioner's petition for certiorari.

268

42 U. S. C. § 1983, are by now familiar. Section 1983 on its face admits of no defense of official immunity. It subjects to liability "[e]very person" who, acting under color of state law, commits the prohibited acts. In *Tenney* v. *Brandhove, 341* U. S. 367, 376 (1951), however, we held that Congress did not intend § 1983 to abrogate immunities "well grounded in history and reason." Certain immunities were so well established in 1871, when § 1983 was enacted, that "we presume that Congress would have specifically so provided had it wished to abolish" them. *Pierson* v. *Ray,* 386 U. S. 547, 554-555 (1967). See also *Newport* v. *Fact Concerts, Inc., 453* U. S. 247, 258 (1981). Although we have found immunities in § 1983 that do not appear on the face of the statute, "[w]e do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy." *Tower* v. *Glover,* 467 U. S. 914, 922-923 (1984). "[O]ur role is to interpret the intent of Congress in enacting § 1983, not to make a freewheeling policy choice." *Malley* v. *Briggs,* 475 U. S. 335, 342 (1986).

Since *Tenney,* we have recognized two kinds of immunities under § 1983. Most public officials are entitled only to qualified immunity. *Harlow* v. *Fitzgerald, 457* U. S. 800, 807 *(1982); Butz* v. *Economou,* 438 U. S. 478, 508 (1978). Under this form of immunity, government officials are not subject to damages liability for the performance of their discretionary functions when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow* v. *Fitzgerald, 457* U. S., at 818. In most cases, qualified immunity is sufficient to "protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Butz* v. *Economou, 438* U. S., at 506.

We have recognized, however, that some officials perform "special functions" which, because of their similarity to

We have recognized, however, that some officials perform "special functions" which, because of their similarity to func-

269

tions that would have been immune when Congress enacted § 1983, deserve absolute protection from damages liability. *Id.,* at 508. "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns* v. *Reed,* 500 U. S., at 486; *Antoine* v. *Byers & Anderson, Inc.,* 508 U. S. 429, 432, and n. 4 (1993). Even when we can identify a common-law tradition of absolute immunity for a given function, we have considered "whether § 1983's history or purposes nonetheless counsel against recognizing the same immunity in § 1983 actions." *Tower* v. *Glover,* 467 U. S., at 920. Not surprisingly, we have been "quite sparing" in recognizing absolute immunity for state actors in this context. *Forrester* v. *White,* 484 U. S. 219, 224 (1988).

In determining whether particular actions of government officials fit within a common-law tradition of absolute immunity, or only the more general standard of qualified immunity, we have applied a "functional approach," see, *e. g., Burns,* 500 U. S., at 486, which looks to "the nature of the function performed, not the identity of the actor who performed it," *Forrester* v. *White,* 484 U. S., at 229. We have twice applied this approach in determining whether the functions of contemporary prosecutors are entitled to absolute immunity.

In *Imbler* v. *Pachtman,* 424 U. S. 409 (1976), we held that a state prosecutor had absolute immunity for the initiation and pursuit of a criminal prosecution, including presentation of the State's case at trial. Noting that our earlier cases had been "predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it," *id.,* at 421, we focused on the functions of the prosecutor that had most often invited common-law tort actions. We concluded that the commonlaw rule of immunity for prosecutors was "well settled" and that "the same considerations of public policy that underlie the common-law rule likewise countenance absolute immu-

270

nity under § 1983." *Id.,* at 424. Those considerations 4 supported a rule of absolute immunity for conduct of prosecutors that was "intimately associated with the judicial phase of the criminal process." *Id.,* at 430. In concluding that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983," we did not attempt to describe the line between a prosecutor's acts in preparing for those functions, some of which would be absolutely immune, and his acts of investigation or "administration," which would not. *Id.,* at 431, and n.33.

We applied the *Imbler* analysis two Terms ago in *Burns* v. *Reed,* 500 U. S. 478 (1991). There the § 1983 suit challenged two acts by a prosecutor: (1) giving legal advice to the police on the propriety of hypnotizing a suspect and on whether probable cause existed to arrest that suspect, and (2) participating in a probable-cause hearing. We held that only the latter was entitled to absolute immunity. Immunity for that action under § 1983 accorded with the commonlaw absolute immunity of prosecutors and other attorneys for eliciting false or defamatory testimony from witnesses or for making false or defamatory statements during, and related to, judicial proceedings. *Id.,* at 489-490; *id.,* at 501 (SCALIA, J., concurring in judgment in part and dissenting in

4 In particular, we expressed concern that fear of potential liability would undermine a prosecutor's performance of his duties by forcing him to consider his own potential liability when making prosecutorial decisions and by diverting his "energy and attention ... from the pressing duty of enforcing the criminal law." *Imbler* v. *Pachtman,* 424 U. S., at 424-425. Suits against prosecutors would devolve into "a virtual retrial of the criminal offense of a new forum," *id.,* at 425, and would undermine the vigorous enforcement of the law by providing a prosecutor an incentive not "to go forward with a close case where an acquittal likely would trigger a suit against him for damages," *id.,* at 426, and n. 24. We also expressed concern that the availability of a damages action might cause judges to be reluctant to award relief to convicted defendants in post-trial motions. *Id.,* at 427.

271

part). Under that analysis, appearing before a judge and presenting evidence in support of a motion for a search warrant involved the prosecutor's "'role as advocate for the State.'" *Id.,* at 491, quoting *Imbler,* 424 U. S., at 431, n.

33. Because issuance of a search warrant is a judicial act, appearance at the probable-cause hearing was "'intimately associated with the judicial phase of the criminal process,'" *Burns,* 500 U. S., at 492, quoting *Imbler,* 424 U. S., at 430.

We further decided, however, that prosecutors are not entitled to absolute immunity for their actions in giving legal advice to the police. We were unable to identify any historical or common-law support for absolute immunity in the performance of this function. 500 U. S., at 492-493. We also noted that any threat to the judicial process from "the harassment and intimidation associated with litigation" based on advice to the police was insufficient to overcome the "[a]bsen[ce] [of] a tradition of immunity comparable to the common-law immunity from malicious prosecution, which formed the basis for the decision in *Imbler.*" *Id.,* at 493,494. And though we noted that several checks other than civil litigation prevent prosecutorial abuses in advising the police, "one of the most important checks, the judicial process," will not be effective in all cases, especially when in the end the suspect is not prosecuted. *Id.,* at 496. In sum, we held that providing legal advice to the police was not a function "closely associated with the judicial process." *Id.,* at 495.

IV

In this case the Court of Appeals held that respondents are entitled to absolute immunity because the injuries suffered by petitioner occurred during criminal proceedings. That holding is contrary to the approach we have consistently followed since *Imbler.* As we have noted, the *Imbler* approach focuses on the conduct for which immunity is claimed, not on the harm that the conduct may have caused or the question whether it was lawful. The location of the

272

injury may be relevant to the question whether a complaint has adequately alleged a cause of action for damages (a question that this case does not present, see *supra,* at 261). It is irrelevant, however, to the question whether the conduct of a prosecutor is protected by absolute immunity. Accordingly, although the Court of Appeals' reasoning may be relevant to the proper resolution of issues that are not before us, it does not provide an acceptable basis for concluding that either the preindictment fabrication of evidence or the postindictment press conference was a function protected by absolute immunity. We therefore turn to consider each of respondents' claims of absolute immunity.

A

We first address petitioner's argument that the prosecutors are not entitled to absolute immunity for the claim that they conspired to manufacture false evidence that would link his boot with the bootprint the murderer left on the front door. To obtain this false evidence, petitioner submits, the prosecutors shopped for experts until they found one who would provide the opinion they sought. App. 7-9. At the time of this witness shopping the assistant prosecutors were working hand in hand with the sheriff's detectives under the joint supervision of the sheriff and State's attorney Fitzsimmons.

Petitioner argues that *Imbler's* protection for a prosecutor's conduct "in initiating a prosecution and in presenting the State's case," 424 U. S., at 431, extends only to the act of initiation itself and to conduct occurring in the courtroom. This extreme position is plainly foreclosed by our opinion in *Imbler* itself. We expressly stated that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom," and are nonetheless entitled to absolute immunity. *Id.,* at 431, n. 33. We noted in particular that an out-of-court "effort to control the presen-

273

tation of [a] witness' testimony" was entitled to absolute immunity because it was "fairly within [the prosecutor's] function as an advocate." *Id.,* at 430, n. 32. To be sure, *Burns* made explicit the point we had reserved in *Imbler,* 424 U. S., at 430-431, and n. 33: A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity. See *Burns,* 500 U. S., at 494-496. We have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and

immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

On the other hand, as the function test of *Imbler* recognizes, the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor. Qualified immunity" 'represents the norm'" for executive officers, *Malley* v. *Briggs,* 475 U. S., at 340, quoting *Harlow* v. *Fitzgerald,* 457 U. S., at 807, so when a prosecutor "functions as an administrator rather than as an officer of the court" he is entitled only to qualified immunity. *Imbler,* 424 U. S., at 431, n. 33. There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is "neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Hampton* v. *Chicago,* 484 F.2d 602, 608 (CA7 1973)

---

274

(internal quotation marks omitted), cert. denied, 415 U. S. 917 (1974). Thus, if a prosecutor plans and executes a raid on a suspected weapons cache, he "has no greater claim to complete immunity than activities of police officers allegedly acting under his direction." 484 F. 2d, at 608-609.

The question, then, is whether the prosecutors have carried their burden of establishing that they were functioning as "advocates" when they were endeavoring to determine whether the bootprint at the scene of the crime had been made by petitioner's foot. A careful examination of the allegations concerning the conduct of the prosecutors during the period before they convened a special grand jury to investigate the crime provides the answer. See *supra,* at 263, n. 1. The prosecutors do not contend that they had probable cause to arrest petitioner or to initiate judicial proceedings during that period. Their mission at that time was entirely investigative in character. A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested.5

5 Of course, a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination, as the opinion dissenting in part points out, *post,* at 290, a prosecutor may engage in "police investigative work" that is entitled to only qualified immunity.

Furthermore, there is no "true anomaly," *post,* at 286, in denying absolute immunity for a state actor's investigative acts made before there is probable cause to have a suspect arrested just because a prosecutor would be entitled to absolute immunity for the malicious prosecution of someone whom he lacked probable cause to indict. That criticism ignores the essence of the function test. The reason that lack of probable cause allows us to deny absolute immunity to a state actor for the former function (fabrication of evidence) is that there is no common-law tradition of immunity for it, whether performed by a police officer or prosecutor. The reason that we grant it for the latter function (malicious prosecution) is that we have found a common-law tradition of immunity for a prosecutor's decision to bring an indictment, whether he has probable cause or not. By insisting on an equation of the two functions merely because a prosecutor

---

275

It was well after the alleged fabrication of false evidence concerning the bootprint that a special grand jury was empaneled. And when it finally was convened, its immediate purpose was to conduct a more thorough investigation of the crime-not to return an indictment against a suspect whom there was already probable cause to arrest. Buckley was not arrested, in fact, until 10 months after the grand jury had been convened and had finally indicted him. Under these circumstances, the prosecutors' conduct occurred well before they could properly claim to be acting as advocates. Respondents have not cited any authority that supports an argument that a prosecutor's fabrication of false evidence during the preliminary investigation of an unsolved crime was immune from liability at common law, either in 1871 or at any date before the enactment of § 1983. It therefore remains protected only by qualified immunity.

After *Burns,* it would be anomalous, to say the least, to grant prosecutors only qualified immunity when offering legal advice to police about an unarrested suspect, but then to endow them with absolute immunity when conducting investigative work themselves in order to decide whether a suspect may be arrested.6 That the

... prosecutors later called

might be subject to liability for one but not the other, the dissent allows its particular policy concerns to erase the function test it purports to respect.

In general, the dissent's distress over the denial of absolute immunity for prosecutors who fabricate evidence regarding unsolved crimes, *post,* at 283-285, like the holding of the Court of Appeals, seems to conflate the question whether a § 1983 plaintiff has stated a cause of action with the question whether the defendant is entitled to absolute immunity for his actions.

6 Cf. *Burns* v. *Reed,* 500 U. S. 478, 495 (1991): "Indeed, it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice .... Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive." If the police, under the guidance of the prosecutors, had solicited the alleg-

276

a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutoriaP A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as "preparation" for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial. When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same.

B

We next consider petitioner's claims regarding Fitzsimmons' statements to the press. Petitioner alleged that, during the prosecutor's public announcement of the indictment, Fitzsimmons made false assertions that numerous pieces of evidence, including the bootprint evidence, tied Buckley to a burglary ring that committed the Nicarico murder. App. 12. Petitioner also alleged that Fitzsimmons released mug shots of him to the media, "which were prominently and repeatedly displayed on television and in the newspapers." *Ibid.* Peti-

edly "fabricated" testimony, of course, they would not be entitled to anything more than qualified immunity.

7 See *Imbler* v. *Pachtman,* 424 U. S. 409, 431, n. 33 (1976): "Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them." Although the respondents rely on the first sentence of this passage to suggest that a prosecutor's actions in "obtaining, reviewing, and evaluating" evidence are always protected by absolute immunity, the sentence that follows qualifies that suggestion. It confirms that some of these actions may fall on the administrative, rather than the judicial, end of the prosecutor's activities, and therefore be entitled only to qualified immunity.

277

tioner's legal theory is that "[t]hese false and prejudicial statements inflamed the populace of DuPage County against" him, *ibid.;* see also *id.,* at 14, thereby defaming him, resulting in deprivation of his right to a fair trial, and causing the jury to deadlock rather than acquit, *id.,* at 19.

Fitzsimmons' statements to the media are not entitled to absolute immunity. Fitzsimmons does not suggest that in 1871 there existed a common-law immunity for a prosecutor's, or attorney's, out-of-court statement to the press. The Court of Appeals agreed that no such historical precedent exists. 952 F. 2d, at 967. Indeed, while prosecutors, like all attorneys, were entitled to absolute immunity from defamation liability for statements made during the course of judicial proceedings and relevant to them, see *Burns,* 500 U. S., at 489-490; *Imbler,* 424 U. S., at 426, n. 23; *id.,* at 439 (WHITE, J., concurring in judgment), most statements made out of court received

Case 9:25-cv-00083-DWM Document 59-1 Filed 05/04/26 Page 12 of 217

only good-faith immunity. The common-law rule was that "[t]he speech of a counsel is privileged by the occasion on which it is spoken .... " *Flint* v. *Pike,* 4 Barn. & Cress. 473, 478, 107 Eng. Rep. 1136, 1138 (K. B. 1825) (Bayley, J.).8

The functional approach of *Imbler,* which conforms to the common-law theory, leads us to the same conclusion. Comments to the media have no functional tie to the judicial process just because they are made by a prosecutor. At the

8 "[Absolute immunity] does not apply to or include any publication of defamatory matter before the commencement, or after the termination of the judicial proceeding (unless such publication is an act incidental to the proper initiation thereof, or giving legal effect thereto); nor does it apply to or include any publication of defamatory matter to any person other than those to whom, or in any place other than that in which, such publication is required or authorized by law to be made for the proper conduct of the judicial proceedings." Veeder, Absolute Immunity in Defamation:

Judicial Proceedings, 9 Colum. L. Rev. 463, 489 (1909) (footnotes omitted). See, *e. g., Viosca* v. *Landfried,* 140 La. 610, 615, 73 So. 698, 700 (1916); *Youmans* v. *Smith,* 153 N. Y. 214, 220-223, 47 N. E. 265, 267-268 (1897). See also G. Bower, Law of Actionable Defamation 103, n. *h,* 104-105 (1908).

---

278

press conference, Fitzsimmons did not act in "'his role as advocate for the State,'" *Burns* v. *Reed,* 500 U. S., at 491, quoting *Imbler* v. *Pachtman,* 424 U. S., at 431, n. 33. The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the State's case in court, or actions preparatory for these functions. Statements to the press may be an integral part of a prosecutor's job, see National District Attorneys Assn., National Prosecution Standards 107, 110 (2d ed. 1991), and they may serve a vital public function. But in these respects a prosecutor is in no different position than other executive officials who deal with the press, and, as noted, *supra,* at 268, 277, qualified immunity is the norm for them.

Fitzsimmons argues nonetheless that policy considerations support extending absolute immunity to press statements. Brief for Respondents 30-33. There are two responses to his submissions. First, "[w]e do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy." *Tower* v. *Glover, 467* U. S., at 922-923. When, as here, the prosecutorial function is not within the advocate's role and there is no historical tradition of immunity on which we can draw, our inquiry is at an end. Second, "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns* v. *Reed,* 500 U. S., at 486-487. Even if policy considerations allowed us to carve out new absolute immunities to liability for constitutional wrongs under § 1983, we see little reason to suppose that qualified immunity would provide adequate protection to prosecutors in their provision of legal advice to the police, see *id.,* at 494-496, yet would fail to provide sufficient protection in the present context.9

9 The Circuits other than the Seventh Circuit that have addressed this issue have applied only qualified immunity to press statements, see, *e. g., Powers* v. *Coe,* 728 F.2d 97,103 *(CA2* 1984); *Marrero* v. *Hialeah,* 625 F.2d 499, 506-507 *(CA5* 1980), cert. denied, 450 U. S. 913 (1981); *Gobel* v. *Mari-*

---

279

V

In his complaint, petitioner also charged that the prosecutors violated his rights under the Due Process Clause through extraction of statements implicating him by coercing two witnesses and paying them money. App. 9-11, 19. The precise contours of these claims are unclear, and they were not addressed below; we leave them to be passed on in the first instance by the Court of Appeals on remand.

As we have stated, *supra,* at 261, 264, 265, n. 2, petitioner does not challenge many aspects of the Court of Appeals' decision, and we have not reviewed them; they remain undisturbed by this opinion. As to the two challenged rulings on absolute immunity, however, the judgment of the United States Court of Appeals for the Seventh Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

JUSTICE SCALIA, concurring.

As the Court observes, respondents have not demonstrated that the function either of fabricating evidence during the preliminary investigation of a crime, or of making out-of-court statements to the press, was protected by a well-established common-law privilege in 1871, when § 1983 was enacted. See *ante,* at 275, 277. It follows that respondents' alleged performance of such acts is not absolutely

*copa County,* 867 F.2d 1201, 1205 *(CA9 1989); England v. Hendricks, 880* F. 2d 281, 285 (CAlO 1989), cert. denied, 493 U. S. lO78 (1990); *Marx v. Gumbinner,* 855 F.2d 783, 791 (CAll 1988); cf. *Rose v. Bartle,* 871 F. 2d *331,345-346 (CA3* 1989), yet Fitzsimmons has not suggested that prosecutors in those Circuits have been unduly constrained in keeping the public informed of pending criminal prosecutions. We also do not perceive why anything except a firm common-law rule should entitle a prosecutor to absolute immunity for his statements to the press when nonprosecutors who make similar statements, for instance, an attorney general's press spokesperson or a police officer announcing the return of an indictment, receive only qualified immunity.

---

280

immune from suit under § 1983, since "the presumed legislative intent not to eliminate traditional immunities is our only justification for limiting the categorical language of the statute." *Burns v. Reed,* 500 U. S. 478, 498 (1991) (SCALIA, J., concurring in judgment in part and dissenting in part); accord, *ante,* at 267-269. The policy reasons for extending protection to such conduct may seem persuasive, see *post,* at 283-286 (KENNEDY, J., concurring in part and dissenting in part), but we simply "do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy," *Tower v. Glover,* 467 U. S. 914, 922-923 (1984). This is therefore an easy case, in my view, and I have no difficulty joining the Court's judgment.

I join the Court's opinion as well, though I have some reservation about the historical authenticity of the "principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity," *ante,* at 273. By the early years of this century, there was some authority for the proposition that the traditional defamation immunity extends to "act[s] incidental to the proper initiation" or pursuit of a judicial proceeding, such as "[s]tatements made by counsel to proposed witnesses," Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Colum. L. Rev. 463, 489, and n. 82 (1909). See, *e. g.,* G. Bower, Actionable Defamation 103-105, and n. *h* (1908); *Youmans v. Smith,* 153 N. Y. 214, 47 N. E. 265 (1897). I have not found any previous expression of such a principle, but accede to the Court's judgment that it existed several decades earlier, when § 1983 was enacted, at least in the sense that it could be logically derived from then-existing decisions, cf. *Burns, supra,* at 505 (SCALIA, J., concurring in judgment in part and dissenting in part). In future cases, I trust the Court (aided by briefing on the point) will look to history to determine more precisely the outlines of this principle. It is certainly

---

281

in accord with the principle to say that prosecutors cannot "properly claim to be acting as advocates" *before* they have "probable cause to have anyone arrested," *ante,* at 274, 275but reference to the common-law cases will be indispensable to show when they can properly claim to be acting "as advocates" *after* that point, though not yet "during the course of judicial proceedings," *ante,* at 277.

I believe, moreover, that the vagueness of the "acting-asadvocate" principle may be less troublesome in practice than it seems in theory, for two reasons. First, the Court reaffirms that the defendant official bears the burden of showing that the conduct for which he seeks immunity would have been privileged at common law in 1871. See *ante,* at 269, 275, 277-278. Thus, if application of the principle is unclear, the defendant simply loses. Second, many claims directed at prosecutors, of the sort that are based on acts not plainly covered by the conventional malicious-prosecution and defamation privileges, are probably not actionable under § 1983, and so may be dismissed at the pleading stage without regard to immunity-undermining the dissent's assertion that we have converted absolute prosecutorial immunity into "little more than a pleading rule," *post,* at 283. I think petitioner's false-evidence claims in the present case illustrate this point. Insofar as they are based on respondents' supposed knowing *use* of fabricated evidence before the grand jury and at trial, see *ante,* at 267, n. 3-acts which might state a claim for denial of due process, see, *e. g., Mooney* v. *Holohan,* 294 U. S. 103, 112 (1935) *(per curiam)-the*

traditional defamation immunity provides complete protection from suit under § 1983. If "reframe[d] ... to attack the preparation" of that evidence, *post,* at 283, the claims are unlikely to be cognizable under § 1983, since petitioner cites, and I am aware of, no authority for the proposition that the mere preparation of false evidence, as opposed to its use in a fashion that deprives someone of a fair trial or otherwise harms him, violates the Constitution. See *Buckley* v. *Fitzsimmons,* 919

---

282

Opinion of KENNEDY, J.

F. 2d 1230, 1244 (CA7 1990), vacated and remanded, 502 U. S. 801 (1991).

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE SOUTER join, concurring in part and dissenting in part.

I agree there is no absolute immunity for statements made during a press conference. But I am unable to agree with the Court's conclusion that respondents are not entitled to absolute immunity on petitioner's claim that they conspired to manufacture false evidence linking petitioner to the bootprint found on the front door of Jeanine Nicarico's home. I join Parts I, II, III, and IV -B of the Court's opinion, but dissent from Part IV-A.

I

As the Court is correct to observe, the rules determining whether particular actions of government officials are entitled to immunity have their origin in historical practice and have resulted in a functional approach. *Ante,* at 267-268. See also *Burns* v. *Reed,* 500 U. S. 478, 484-486 (1991); *Forrester* v. *White,* 484 U. S. 219, 224 (1988); *Malley* v. *Briggs,* 475 U. S. 335, 342-343 (1986); *Cleavinger* v. *Saxner,* 474 U. S. 193, 201 (1985); *Briscoe* v. *LaHue,* 460 U. S. 325, 342 (1983); *Harlow* v. *Fitzgerald,* 457 U. S. 800, 810 (1982); *Butz* v. *Economou,* 438 U. S. 478, 511-513 (1978); *Imbler* v. *Pachtman,* 424 U. S. 409, 420-425 (1976). I share the Court's unwillingness to accept Buckley's argument "that *Imbler's* protection for a prosecutor's conduct 'in initiating a prosecution and in presenting the State's case,' 424 U. S., at 431, extends only to the act of initiation itself and to conduct occurring in the courtroom." *Ante,* at 272. In *Imbler,* we acknowledged that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom," and we explained that these actions of the prosecutor, undertaken in

---

283

his functional role as an advocate, were entitled to absolute immunity, 424 U. S., at 431, n. 33. See *ante,* at 269-270.

There is a reason even more fundamental than that stated by the Court for rejecting Buckley's argument that *Imbler* applies only to the commencement of a prosecution and to in-court conduct. This formulation of absolute prosecutorial immunity would convert what is now a substantial degree of protection for prosecutors into little more than a pleading rule. Almost all decisions to initiate prosecution are preceded by substantial and necessary out-of-court conduct by the prosecutor in evaluating the evidence and preparing for its introduction, just as almost every action taken in the courtroom requires some measure of out-of-court preparation. Were preparatory actions unprotected by absolute immunity, a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves. *Imbler* v. *Pachtman, supra,* at 431, n. 34. Cf. *Eastland* v. *United States Servicemen's Fund,* 421 U. S. 491, 503-507 (1975). Allowing the avoidance of absolute immunity through that pleading mechanism would undermine in large part the protections that we found necessary in *Imbler* and would discourage trial preparation by prosecutors. In this way, Buckley's proffered standard would have the perverse effect of encouraging, rather than penalizing, carelessness, cf. *Forrester* v. *White, supra,* at 223, and it would discourage early participation by prosecutors in the criminal justice process.

Applying these principles to the case before us, I believe that the conduct relating to the expert witnesses falls on the absolute immunity side of the divide. As we recognized in *Imbler* and *Burns,* and do recognize again today, the functional approach does not dictate that all actions of a prosecutor are accorded absolute immunity. "When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the

appropriate nor justifiable that, for the same act, immunity should protect the

284

Opinion of KENNEDY, J.

one and not the other.'" *Ante,* at 273, quoting *Hampton* v. *Chicago,* 484 F.2d 602,608 (CA71973), cert. denied, 415 U. s. 917 (1974). Nonetheless, while Buckley labels the prosecutors' actions relating to the bootprint experts as "investigative," I believe it is more accurate to describe the prosecutors' conduct as preparation for trial. A prosecutor must consult with a potential trial witness before he places the witness on the stand, and if the witness is a critical one, consultation may be necessary even before the decision whether to indict. It was obvious from the outset that the bootprint was critical to the prosecution's case, and the prosecutors' consultation with experts is best viewed as a step to ensure the bootprint's admission in evidence and to bolster its probative value in the eyes of the jury.

Just as *Imbler* requires that the decision to use a witness must be insulated from liability, 424 U. S., at 426, it requires as well that the steps leading to that decision must be free of the distortive effects of potential liability, at least to the extent that the prosecutor is engaged in trial preparation. Actions in "obtaining, reviewing, and evaluating" witness testimony, *id.,* at 431, n. 33, are a classic function of the prosecutor as advocate. Pretrial and even preindictment consultation can be "intimately associated with the judicial phase of the criminal process," *id.,* at 430. Potential liability premised on the prosecutor's early consultation would have "an adverse effect upon the functioning of the criminal justice system," *id.,* at 426. Concern about potential liability arising from pretrial consultation with a witness might "hampe[r]" a prosecutor's exercise of his judgment as to whether a certain witness should be used. *Id.,* at 426, and n. 24. The prospect of liability may "induc[e] [a prosecutor] to act with an excess of caution or otherwise to skew [his] decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide [his] conduct." *Forrester* v. *White, supra,* at 223. Moreover, " [e]xposing the prosecutor to liability for the initial phase of

285

his prosecutorial work could interfere with his exercise of independent judgment at every phase of his work, since the prosecutor might come to see later decisions in terms of their effect on his potential liability." *Malley* v. *Briggs,* 475 U. S., at 343. That distortion would frustrate the objective of accuracy in the determination of guilt or innocence. See *Imbler* v. *Pachtman, supra,* at 426.

Furthermore, the very matter the prosecutors were considering, the decision to use particular expert testimony, was "subjected to the 'crucible of the judicial process.'" *Burns* v. *Reed,* 500 U. S., at 496, quoting *Imbler* v. *Pachtman, supra,* at 440 (WHITE, J., concurring in judgment). Indeed, it appears that the only constitutional violations these actions are alleged to have caused occurred within the judicial process. The question Buckley presented in his petition for certiorari itself makes this point: "Whether prosecutors are entitled to absolute prosecutorial immunity for supervision of and participation in a year long pre-arrest and preindictment investigation because the injury suffered by the criminal defendant occurred during the later criminal proceedings?" Pet. for Cert. i. Remedies other than prosecutorialliability, for example, a pretrial ruling of inadmissibility or a rejection by the trier of fact, are more than adequate "to prevent abuses of authority by prosecutors." *Burns* v. *Reed, supra,* at 496. See also *Butz* v. *Economou,* 438 U. S., at 512; *Imbler* v. *Pachtman, supra,* at 429.

Our holding in *Burns* v. *Reed, supra,* is not to the contrary.

There we cautioned that prosecutors were not entitled to absolute immunity for "every litigation-inducing conduct," *id.,* at 494, or for every action that "could be said to be in some way related to the ultimate decision whether to prosecute," *id.,* at 495. The premise of *Burns* was that, in providing advice to the police, the prosecutor acted to guide the police, not to prepare his own case. See *id.,* at 482 (noting that the police officers sought the prosecutor's advice first to find out whether hypnosis was "an unacceptable investiga-

286

Opinion of KENNEDY, J.

tive technique" and later to determine whether there was a basis to "plac[e] [a suspect] under arrest"). In those circumstances, we found an insufficient link to the judicial process to warrant absolute immunity. But the situation here is quite different. For the reasons already explained, subjecting a prosecutor's pretrial or preindictment witness consultation and preparation to damages actions would frustrate and impede the judicial process, the result *Imbler* is designed to avoid.

II

The Court reaches a contrary conclusion on the issue of the bootprint evidence by superimposing a bright-line standard onto the functional approach that has guided our past decisions. According to the Court, "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Ante,* at 274. To allow otherwise, the Court tells us, would create an anomalous situation whereby prosecutors are granted only qualified immunity when offering legal advice to the police regarding an unarrested suspect, see *Burns, supra,* at 492-496, but are endowed with absolute immunity when conducting their own legal work regarding an unarrested suspect. *Ante,* at 275-276.

I suggest that it is the Court's probable-cause demarcation between when conduct can be considered absolutely immune advocacy and when it cannot that creates the true anomaly in this case. We were quite clear in *Imbler* that if absolute immunity for prosecutors meant anything, it meant that prosecutors were not subject to suit for malicious prosecution. 424 U. S., at 421-422, 424, 428. See also *Burns, supra,* at 493 ("[T]he common-law immunity from malicious prosecution ... formed the basis for the decision in *Imbler"*). Yet the central component of a malicious prosecution claim is that the prosecutor in question acted maliciously and *with*out probable cause. See *Wyatt* v. *Cole,* 504 U. S. 158, 165 *(1992); id.,* at 170 (KENNEDY, J., concurring); *id.,* at 177

---

287

(REHNQUIST, C. J., dissenting); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 119 (5th ed. 1984). If the Court means to withhold absolute immunity whenever it is alleged that the injurious actions of a prosecutor occurred before he had probable cause to believe a specified individual committed a crime, then no longer is a claim for malicious prosecution subject to ready dismissal on absolute immunity grounds, at least where the claimant is clever enough to include some actions taken by the prosecutor prior to the initiation of prosecution. I find it rather strange that the classic case for the invocation of absolute immunity falls on the unprotected side of the Court's new dividing line. I also find it hard to accept any line that can be so easily manipulated by criminal defendants turned civil plaintiffs, allowing them to avoid a dismissal on absolute immunity grounds by throwing in an allegation that a prosecutor acted without probable cause. See *supra,* at 283.

Perhaps the Court means to draw its line at the point where an appropriate neutral third party, in this case the Illinois special grand jury, makes a determination of probable cause. This line, too, would generate anomalous results. To begin, it could have the perverse effect of encouraging prosecutors to seek indictments as early as possible in an attempt to shelter themselves from liability, even in cases where they would otherwise prefer to wait on seeking an indictment to ensure that they do not accuse an innocent person. Given the stigma and emotional trauma attendant to an indictment and arrest, promoting premature indictments and arrests is not a laudable accomplishment.

Even assuming these premature actions would not be induced by the Court's rule, separating absolute immunity from qualified immunity based on a third-party determination of probable cause makes little sense when a civil plaintiff claims that a prosecutor falsified evidence or coerced confessions. If the false evidence or coerced confession served as the basis for the third party's determination of probable

---

288

Opinion of KENNEDY, J.

cause, as was alleged here, it is difficult to fathom why securing such a fraudulent determination transmogrifies unprotected conduct into protected conduct. Finally, the Court does not question our conclusion in *Burns* that absolute immunity attached to a prosecutor's conduct before a grand jury because it "'perform[sJ a judicial function.'" 500 U. S., at 490, quoting W. Prosser, Law of Torts § 94, pp. 826-827 (1941). See also *Yaselli* v. *Goff,* 12

F.2d 396 (CA2 1926), aff'd, 275 U. S. 503 (1927). It is unclear to me, then, why preparing for grand jury proceedings, which obviously occur before an indictment is handed down, cannot be "intimately associated with the judicial phase of the criminal process" and subject to absolute immunity. *Burns, supra,* at 492, quoting *Imbler, supra,* at 430.

As troubling as is the line drawn by the Court, I find the reasons for its line-drawing to be of equal concern. The Court advances two reasons for distinguishing between preprobable-cause and post-probable-cause activity by prosecutors. First, the distinction is needed to ensure that prosecutors receive no greater protection than do police officers when engaged in identical conduct. *Ante,* at 276. Second, absent some clear distinction between investigation and advocacy, the Court fears, "every prosecutor might ... shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial." *Ibid.* This step, it is alleged, would enable any prosecutor to "retrospectively describ[eJ" his investigative work "as 'preparation' for a possible trial" and therefore request the benefits of absolute immunity. *Ibid.* I find neither of these justifications persuasive.

The Court's first concern, I take it, is meant to be a restatement of one of the unquestioned goals of our § 1983 immunity jurisprudence: ensuring parity in treatment among state actors engaged in identical functions. *Forrester* v. *White,* 484 U. S., at 229; *Cleavinger* v. *Saxner,* 474 U. S., at

---

289

201. But it was for the precise reason of advancing this goal that we adopted the functional approach to absolute immunity in the first place, and I do not see a need to augment that approach by developing bright-line rules in cases where determining whether different actors are engaged in identical functions involves careful attention to subtle details. The Court, moreover, perceives a danger of disparate treatment because it assumes that before establishing probable cause, police and prosecutors perform the same functions. *Ante,* at 276. This assumption seem to me unwarranted. I do not understand the art of advocacy to have an inherent temporal limitation, so I cannot say that prosecutors are never functioning as advocates before the determination of probable cause. More to the point, the Court's assumption further presumes that when both prosecutors and police officers engage in the same conduct, they are of necessity engaged in the same function. With this I must disagree. Two actors can take part in similar conduct and similar inquiries while doing so for different reasons and to advance different functions. It may be that a prosecutor and a police officer are examining the same evidence at the same time, but the prosecutor is examining the evidence to determine whether it will be persuasive at trial and of assistance to the trier of fact, while the police officer examines the evidence to decide whether it provides a basis for arresting a suspect. The conduct is the same but the functions distinct. See Buchanan, Police-Prosecutor Teams, 23 The Prosecutor 32 (summer 1989).

Advancing to the second reason provided for the Court's line-drawing, I think the Court overstates the danger of allowing pre-probable-cause conduct to constitute advocacy entitled to absolute immunity. I agree with the Court that the institution of a prosecution "does not retroactively transform ... work from the administrative into the prosecutorial," *ante,* at 276, but declining to institute a prosecution

---

290

Opinion of KENNEDY, J.

likewise should not "retroactively transform" work from the prosecutorial into the administrative. Cf. *Imbler,* 424 U. S., at 431, n. 33 ("We recognize that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution .... These include questions of whether to present a case to a grand jury, whether to file an information, [and] whether and when to prosecute"). In either case, the primary question, one which I have confidence the federal courts are able to answer with some accuracy, is whether a prosecutor was acting as an advocate, an investigator, or an administrator when he took the actions called into question in a subsequent § 1983 action. As long as federal courts center their attention on this question, a concern that prosecutors can disguise their investigative and administrative actions as early forms of advocacy seems to be unfounded.

III

In recognizing a distinction between advocacy and investigation, the functional approach requires the drawing of

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 18 of 217

In recognizing a distinction between advocacy and investigation, the functional approach requires the drawing of difficult and subtle distinctions, and I understand the necessity for a workable standard in this area. But the rule the Court adopts has created more problems than it has solved. For example, even after there is probable cause to arrest a suspect or after a suspect is indicted, a prosecutor might act to further police investigative work, say by finding new leads, in which case only qualified immunity should apply. The converse is also true: Even before investigators are satisfied that probable cause exists or before an indictment is secured, a prosecutor might begin preparations to present testimony before a grand jury or at trial, to which absolute immunity must apply. In this case, respondents functioned as advocates, preparing for prosecution before investigators are alleged to have amassed probable cause and before an indictment was deemed appropriate. In my judgment

---

291

respondents are entitled to absolute immunity for their involvement with the expert witnesses in this case. With respect, I dissent from that part of the Court's decision reversing the Court of Appeals judgment of absolute immunity for respondents' conduct in relation to the bootprint evidence.

## Materials

### Oral Arguments

Oral Argument - February 22, 1993

## Search This Case

Google Scholar          Google Books          Google Web

Google News

## Charlotte, North Carolina Lawyers
Sponsored Listings

### Kelli Y. Allen

(704) 727-4900

**Charlotte, NC**
Family Law, Criminal Law, Immigration Law, Divorce, DUI & DWI, Domestic Violence

>

Case 9:25-cv-00083-DWM Document 59-1 Filed 05/04/26 Page 19 of 217



# Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)

Overview    Opinions    Materials

**Argued:**
December 3, 1985

**Decided:**
June 25, 1986

## Syllabus

## U.S. Supreme Court

**Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)**

**Anderson v. Liberty Lobby, Inc.**

No. 84-1602

**Argued December 3, 1985**

**Decided June 25, 1986**

**477 U.S. 242**

*Syllabus*

In *New York Times Co. v. Sullivan,* 376 U. S. 254, it was held that, in a libel suit brought by a public official (extended by later cases to public figures), the First Amendment requires the plaintiff to show that, in publishing the alleged defamatory statement, the defendant acted with actual malice. It was further held that such actual malice must be shown with "convincing clarity." Respondents, a nonprofit corporation described as a "citizens' lobby" and its founder, filed a libel action in Federal District Court against petitioners, alleging that certain statements in a magazine published by petitioners were false and derogatory. Following discovery, petitioners moved for summary judgment pursuant to Federal Rule of Civil Procedure 56, asserting that, because respondents were public figures, they were required to prove their case under the *New York Times standards,* and that summary judgment was proper because actual malice was absent as a matter of law in view of an affidavit by the author of the articles in question that they had been thoroughly researched and that the facts were obtained from numerous sources. Opposing the motion, respondents claimed that an issue of actual malice was presented because the author had relied on patently unreliable sources in preparing the articles. After holding that *New York Times* applied because respondents were limited-purpose public figures, the District Court entered summary judgment for petitioners on the ground that the author's investigation and research and his reliance on numerous sources precluded a finding of actual malice. Reversing as to certain of the allegedly defamatory statements, the Court of Appeals held that the requirement that actual malice be proved by clear and convincing evidence need not be considered at the summary judgment stage, and that, with respect to those statements, summary judgment had been improperly granted, because a jury could reasonably have concluded that the allegations were defamatory, false, and made with actual malice.

*Held:* The Court of Appeals did not apply the correct standard in reviewing the District Court's grant of summary judgment. Pp. 477 U. S. 247-257.

(a) Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. At the summary judgment stage, the trial

judge's function is not himself to weigh the evidence and

Page 477 U. S. 243

determine the truth of the matter, but to determine whether there is a genuine issue for trial. There is no such issue unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. Pp. 477 U. S. 247-252.

(b) A trial court ruling on a motion for summary judgment in a case such as this must be guided by the *New York Times* "clear and convincing" evidentiary standard in determining whether a genuine issue of actual malice exists, that is, whether the evidence is such that a reasonable jury might find that actual malice had been shown with convincing clarity. Pp. 477 U. S. 252-256.

(c) A plaintiff may not defeat a defendant's properly supported motion for summary judgment in a libel case such as this one without offering any concrete evidence from which a reasonable jury could return a verdict in his favor, and by merely asserting that the jury might disbelieve the defendant's denial of actual malice. The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict. Pp. 477 U. S. 256-257.

241 U.S.App.D.C. 246, 746 F.2d 1563, vacated and remanded.

WHITE, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, POWELL, STEVENS, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, *post,* p. 477 U. S. 257. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C.J., joined, *post,* p. 477 U. S. 268.

Page 477 U. S. 244

**Read More**

## Opinions

### Opinions & Dissents

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 21 of 217

# U.S. Supreme Court

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)

Anderson v. Liberty Lobby, Inc.

No. 84-1602

Argued December 3, 1985

Decided June 25, 1986

477 U.S. 242

*CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR*

*THE DISTRICT OF COLUMBIA CIRCUIT*

*Syllabus*

In *New York Times Co. v. Sullivan,* 376 U. S. 254, it was held that, in a libel suit brought by a public official (extended by later cases to public figures), the First Amendment requires the plaintiff to show that, in publishing the alleged defamatory statement, the defendant acted with actual malice. It was further held that such actual malice must be shown with "convincing clarity." Respondents, a nonprofit corporation described as a "citizens' lobby" and its founder, filed a libel action in Federal District Court against petitioners, alleging that certain statements in a magazine published by petitioners were false and derogatory. Following discovery, petitioners moved for summary judgment pursuant to Federal Rule of Civil Procedure 56, asserting that, because respondents were public figures, they were required to prove their case under the *New York Times standards,* and that summary judgment was proper because actual malice was absent as a matter of law in view of an affidavit by the author of the articles in question that they had been thoroughly researched and that the facts were obtained from numerous sources. Opposing the motion, respondents claimed that an issue of actual malice was presented because the author had relied on patently unreliable sources in preparing the articles. After holding that *New York Times* applied because respondents were limited-purpose public figures, the District Court entered summary judgment for petitioners on the ground that the author's investigation and research and his reliance on numerous sources precluded a finding of actual malice. Reversing as to certain of the allegedly defamatory statements, the Court of Appeals held that the requirement that actual malice be proved by clear and convincing evidence need not be considered at the summary judgment stage, and that, with respect to those statements, summary judgment had been improperly granted, because a jury could reasonably have concluded that the allegations were defamatory, false, and made with actual malice.

*Held:* The Court of Appeals did not apply the correct standard in reviewing the District Court's grant of summary judgment. Pp. 477 U. S. 247-257.

(a) Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. At the summary judgment stage, the trial judge's function is not himself to weigh the evidence and

Page 477 U. S. 243

determine the truth of the matter, but to determine whether there is a genuine issue for trial. There is no such issue unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. Pp. 477 U. S. 247-252.

(b) A trial court ruling on a motion for summary judgment in a case such as this must be guided by the *New York Times* "clear and convincing" evidentiary standard in determining whether a genuine issue of actual malice exists, that is, whether the evidence is such that a reasonable jury might find that actual malice had been shown with convincing clarity. Pp. 477 U. S. 252-256.

(c) A plaintiff may not defeat a defendant's properly supported motion for summary judgment in a libel case such as this one without offering any concrete evidence from which a reasonable jury could return a verdict in his favor.

and by merely asserting that the jury might disbelieve the defendant's denial of actual malice. The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict. Pp. 477 U. S. 256-257.

241 U.S.App.D.C. 246, 746 F.2d 1563, vacated and remanded.

WHITE, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, POWELL, STEVENS, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, *post,* p. 477 U. S. 257. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C.J., joined, *post,* p. 477 U. S. 268.

Page 477 U. S. 244

JUSTICE WHITE delivered the opinion of the Court.

In *New York Times Co. v. Sullivan,* 376 U. S. 254, 376 U. S. 279-280 (1964), we held that, in a libel suit brought by a public official, the First Amendment requires the plaintiff to show that, in publishing the defamatory statement, the defendant acted with actual malice -- "with knowledge that it was false, or with reckless disregard of whether it was false or not." We held further that such actual malice must be shown with "convincing clarity." *Id.* at 376 U. S. 285-286. *See also Gertz v. Robert Welch, Inc.,* 418 U. S. 323, 418 U. S. 342 (1974). These *New York Times* requirements we have since extended to libel suits brought by public figures as well. *See, e.g., Curtis Publishing Co. v. Butts,* 388 U. S. 130 (1967).

This case presents the question whether the clear-and-convincing-evidence requirement must be considered by a court ruling on a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure in a case to which *New York Times* applies. The United States Court of Appeals for the District of Columbia Circuit held that that requirement need not be considered at the summary judgment stage. 241 U.S.App.D.C. 246, 746 F.2d 1563 (1984). We granted certiorari, 471 U.S. 1134 (1985), because that holding was in conflict with decisions of several other Courts of Appeals, which had held that the *New York Times* requirement of clear and convincing evidence must be considered on a motion for summary judgment. [Footnote 1] We now reverse.

**I**

Respondent Liberty Lobby, Inc., is a not-for-profit corporation and self-described "citizens' lobby." Respondent Willis Carto is its founder and treasurer. In October, 1981,

Page 477 U. S. 245

The Investigator magazine published two articles: "The Private World of Willis Carto" and "Yockey: Profile of an American Hitler." These articles were introduced by a third, shorter article entitled "America's Neo-Nazi Underground: Did Mein Kampf Spawn Yockey's Imperium, a Book Revived by Carto's Liberty Lobby?" These articles portrayed respondents as neo-Nazi, anti-Semitic, racist, and Fascist.

Respondents filed this diversity libel action in the United States District Court for the District of Columbia, alleging that some 28 statements and 2 illustrations in the 3 articles were false and derogatory. Named as defendants in the action were petitioner Jack Anderson, the publisher of The Investigator, petitioner Bill Adkins, president and chief executive officer of the Investigator Publishing Co., and petitioner Investigator Publishing Co. itself.

Following discovery, petitioners moved for summary judgment pursuant to Rule 56. In their motion, petitioners asserted that, because respondents are public figures, they were required to prove their case under the standards set forth in *New York Times.* Petitioners also asserted that summary judgment was proper because actual malice was absent as a matter of law. In support of this latter assertion, petitioners submitted the affidavit of Charles Bermant, an employee of petitioners and the author of the two longer articles. [Footnote 2] In this affidavit, Bermant stated that he had spent a substantial amount of time researching and writing the articles, and that his facts were obtained from a wide variety of sources. He also stated that he had at all times believed, and still believed, that the facts contained in the articles were truthful and accurate. Attached to this affidavit was an appendix in which Bermant detailed the sources for each of the statements alleged by respondents to be libelous.

Page 477 U. S. 246

Respondents opposed the motion for summary judgment, asserting that there were numerous inaccuracies in the

articles and claiming that an issue of actual malice was presented by virtue of the fact that, in preparing the articles, Bermant had relied on several sources that respondents asserted were patently unreliable. Generally, respondents charged that petitioners had failed adequately to verify their information before publishing. Respondents also presented evidence that William McGaw, an editor of The Investigator, had told petitioner Adkins before publication that the articles were "terrible" and "ridiculous."

In ruling on the motion for summary judgment, the District Court first held that respondents were limited-purpose public figures, and that *New York Times* therefore applied. [Footnote 3] The District Court then held that Bermant's thorough investigation and research and his reliance on numerous sources precluded a finding of actual malice. Thus, the District Court granted the motion and entered judgment in favor of petitioners.

On appeal, the Court of Appeals affirmed as to 21 and reversed as to 9 of the allegedly defamatory statements. Although it noted that respondents did not challenge the District Court's ruling that they were limited-purpose public

Page 477 U. S. 247

figures, and that they were thus required to prove their case under *New York Times,* the Court of Appeals nevertheless held that, for the purposes of summary judgment, the requirement that actual malice be proved by clear and convincing evidence, rather than by a preponderance of the evidence, was irrelevant: to defeat summary judgment, respondents did not have to show that a jury could find actual malice with "convincing clarity." The court based this conclusion on a perception that to impose the greater evidentiary burden at summary judgment

"would change the threshold summary judgment inquiry from a search for a minimum of facts supporting the plaintiff's case to an evaluation of the weight of those facts and (it would seem) of the weight of at least the defendant's uncontroverted facts as well."

241 U.S.App.D.C. at 253, 746 F.2d at 1570. The court then held, with respect to nine of the statements, that summary judgment had been improperly granted because "a jury could reasonably conclude that the . . . allegations were defamatory, false, and made with actual malice." *Id.* at 260, 746 F.2d at 1577.

II
A

Our inquiry is whether the Court of Appeals erred in holding that the heightened evidentiary requirements that apply to proof of actual malice in this *New York Times* case need not be considered for the purposes of a motion for summary judgment. Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

"shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported

Page 477 U. S. 248

motion for summary judgment; the requirement is that there be no genuine issue of material fact.

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *See generally* 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim, and not a criterion for evaluating the evidentiary underpinnings of those disputes.

More important for present purposes, summary judgment will not lie if the dispute about a material fact is

"genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. In *First National Bank of Arizona v. Cities Service Co.,* 391 U. S. 253 (1968), we affirmed a grant of summary judgment for an antitrust defendant where the issue was whether there was a genuine factual dispute as to the existence of a conspiracy. We noted Rule 56(e)'s provision that a party opposing a properly supported motion for summary judgment

"may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."

We observed further that

"[i]t is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to

Page 477 U. S. 249

trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."

391 U.S. at 391 U. S. 288-289. We went on to hold that, in the face of the defendant's properly supported motion for summary judgment, the plaintiff could not rest on his allegations of a conspiracy to get to a jury without "any significant probative evidence tending to support the complaint." *Id.* at 391 U. S. 290.

Again, in *Adickes v. S. H. Kress & Co.,* 398 U. S. 144 (1970), the Court emphasized that the availability of summary judgment turned on whether a proper jury question was presented. There, one of the issues was whether there was a conspiracy between private persons and law enforcement officers. The District Court granted summary judgment for the defendants, stating that there was no evidence from which reasonably minded jurors might draw an inference of conspiracy. We reversed, pointing out that the moving parties' submissions had not foreclosed the possibility of the existence of certain facts from which "it would be open to a jury . . . to infer from the circumstances" that there had been a meeting of the minds. *Id.* at 398 U. S. 158-159.

Our prior decisions may not have uniformly recited the same language in describing genuine factual issues under Rule 56, but it is clear enough from our recent cases that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. As *Adickes, supra,* and *Cities Service, supra,* indicate, there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Cities Service, supra,* at 391 U. S. 288-289. If the evidence is merely colorable, *Dombrowski v. Eastland,* 387 U. S. 82 (1967) (per curiam), or is not significantly probative,

Page 477 U. S. 250

*Cities Service, supra,* at 391 U. S. 290, summary judgment may be granted.

That this is the proper focus of the inquiry is strongly suggested by the Rule itself. Rule 56(e) provides that, when a properly supported motion for summary judgment is made, [Footnote 4] the adverse party "must set forth specific facts showing that there is a genuine issue for trial." [Footnote 5] And, as we noted above, Rule 56(c) provides that the trial judge shall then grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. There is no requirement that the trial judge make findings of fact. [Footnote 6] The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

Petitioners suggest, and we agree, that this standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Brady v. Southern R. Co.,* 320 U. S. 476, 320 U. S. 479-480 (1943). If reasonable minds could differ as to the import of the evidence, however,

Page 477 U. S. 251

a verdict should not be directed. *Wilkerson v. McCarthy,* 336 U. S. 53, 336 U. S. 62 (1949). As the Court long ago said in *Improvement Co. v. Munson,* 14 Wall. 442, 81 U. S. 448 (1872), and has several times repeated:

"Nor are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that, if there was what is called a *scintilla* of evidence in support of a case, the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed."

(Footnotes omitted.) *See also 89 U. S. Fant,* 22 Wall. 116, 89 U. S. 120-121 (1875); *Coughran v. Bigelow,* 164 U. S. 301, 164 U. S. 307 (1896); *Pennsylvania R. Co. v. Chamberlain,* 288 U. S. 333, 288 U. S. 343 (1933).

The Court has said that summary judgment should be granted where the evidence is such that it "would require a directed verdict for the moving party." *Sartor v. Arkansas Gas Corp.,* 321 U. S. 620, 321 U. S. 624 (1944). And we have noted that the "genuine issue" summary judgment standard is "very close" to the "reasonable jury" directed verdict standard:

"The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted."

*Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U. S. 731, 461 U. S. 745, n. 11 (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission

Page 477 U. S. 252

to a jury, or whether it is so one-sided that one party must prevail as a matter of law.

*B*

Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict --

"whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed."

*Munson, supra,* at 81 U. S. 448.

In terms of the nature of the inquiry, this is no different from the consideration of a motion for acquittal in a criminal case, where the beyond-a-reasonable-doubt standard applies and where the trial judge asks whether a reasonable jury could find guilt beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U. S. 307, 443 U. S. 318-319 (1979). Similarly, where the First Amendment mandates a "clear and convincing" standard, the trial judge, in disposing of a directed verdict motion, should consider whether a reasonable factfinder could conclude, for example, that the plaintiff had shown actual malice with convincing clarity.

Page 477 U. S. 253

The case for the proposition that a higher burden of proof should have a corresponding effect on the judge when deciding whether to send the case to the jury was well made by the Court of Appeals for the Second Circuit in *United States v. Taylor,* 464 F.2d 240 (1972), which overruled *United States v. Feinberg,* 140 F.2d 592 (1944), a case holding that the standard of evidence necessary for a judge to send a case to the jury is the same in both civil and criminal cases, even though the standard that the jury must apply in a criminal case is more demanding than in civil proceedings. Speaking through Judge Friendly, the Second Circuit said:

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 26 of 217

"It would seem at first blush -- and we think also at second -- that more 'facts in evidence' are needed for the judge to allow [reasonable jurors to pass on a claim] when the proponent is required to establish [the claim] not merely by a preponderance of the evidence but . . . beyond a reasonable doubt."

464 F.2d at 242. The court could not find a

"satisfying explanation in the *Feinberg* opinion why the judge should not place this higher burden on the prosecution in criminal proceedings before sending the case to the jury."

*Ibid.* The *Taylor* court also pointed out that almost all the Circuits had adopted something like Judge Prettyman's formulation in *Curley v. United States,* 160 F.2d 229, 232-233 (1947):

"The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether, upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that, upon the evidence, there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion must be granted. If he concludes that either of the

Page 477 U. S. 254

two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter."

This view is equally applicable to a civil case to which the "clear and convincing" standard applies. Indeed, the *Taylor* court thought that it was implicit in this Court's adoption of the clear-and-convincing-evidence standard for certain kinds of cases that there was a "concomitant duty on the judge to consider the applicable burden when deciding whether to send a case to the jury." 464 F.2d at 243. Although the court thought that this higher standard would not produce different results in many cases, it could not say that it would never do so.

Just as the "convincing clarity" requirement is relevant in ruling on a motion for directed verdict, it is relevant in ruling on a motion for summary judgment. When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times.* For example, there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.

Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden. This conclusion is mandated by the nature of this determination. The question here is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not. Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: it makes no sense to say that a jury could reasonably find for either party without some

Page 477 U. S. 255

benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Adickes,* 398 U.S. at 398 U. S. 158-159. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment, or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. *Kennedy v. Silas Mason Co.,* 334 U. S. 249 (1948).

In sum, we conclude that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case. This is true at both the directed verdict

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 27 of 217

and summary judgment stages. Consequently, where the *New York Times* "clear and convincing" evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding

Page 477 U. S. 256

either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not. [Footnote 7]

### III

Respondents argue, however, that, whatever may be true of the applicability of the "clear and convincing" standard at the summary judgment or directed verdict stage, the defendant should seldom, if ever, be granted summary judgment where his state of mind is at issue and the jury might disbelieve him or his witnesses as to this issue. They rely on *Poller v. Columbia Broadcasting Co.,* 368 U. S. 464 (1962), for this proposition. We do not understand *Poller,* however, to hold that a plaintiff may defeat a defendant's properly supported motion for summary judgment in a conspiracy or libel case, for example, without offering any concrete evidence from which a reasonable juror could return a verdict in his favor, and by merely asserting that the jury might, and legally could, disbelieve the defendant's denial of a conspiracy or of legal malice. The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing, in turn, evidence that would support a jury verdict. Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. Based on that Rule, *Cities Service,* 391 U.S. at 391 U. S. 290, held that the plaintiff could not defeat the properly supported summary judgment motion of a defendant charged with a conspiracy without offering "any significant probative evidence tending to support the complaint." As we have recently said, "discredited testimony

Page 477 U. S. 257

is not [normally] considered a sufficient basis for drawing a contrary conclusion." *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U. S. 485, 466 U. S. 512 (1984). Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery. We repeat, however, that the plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial.

### IV

In sum, a court ruling on a motion for summary judgment must be guided by the *New York Times* "clear and convincing" evidentiary standard in determining whether a genuine issue of actual malice exists -- that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity. Because the Court of Appeals did not apply the correct standard in reviewing the District Court's grant of summary judgment, we vacate its decision and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

[Footnote 1]

*See, e.g., Rebozo v. Washington Post Co.,* 637 F.2d 375, 381 (CA5), *cert. denied,* 454 U.S. 964 (1981); *Yiamouyiannis v. Consumers Union of United States, Inc.,* 619 F.2d 932, 940 (CA2), *cert. denied,* 449 U.S. 839 (1980); *Carson v. Allied News Co.,* 529 F.2d 206, 210 (CA7 1976).

[Footnote 2]

The short, introductory article was written by petitioner Anderson, and relied exclusively on the information obtained by Bermant.

[Footnote 3]

In *Gertz v. Robert Welch, Inc.,* 418 U. S. 323, 418 U. S. 351 (1974), this Court summarized who will be considered to be a public figure to whom the *New York Times* standards will apply:

"[The public figure] designation may rest on either of two alternative bases. In some instances, an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy, and thereby becomes a public figure for a limited range of issues. In either case, such persons assume special prominence in the resolution of public questions."

The District Court found that respondents, as political lobbyists, are the second type of political figure described by the *Gertz* court -- a limited-purpose public figure. *See also Waldbaum v. Fairchild Publications Inc.,* 201 U.S.App.D.C. 301, 306, 627 F.2d 1287, 1292, *cert. denied.* 449 U.S. 898 (1980).

[Footnote 4]

Our analysis here does not address the question of the initial burden of production of evidence, placed by Rule 56 on the party moving for summary judgment. *See Celotex Corp. v. Catrett, post,* p. 477 U. S. 317. Respondents have not raised this issue here, and, for the purposes of our discussion, we assume that the moving party has met initially the requisite evidentiary burden.

[Footnote 5]

This requirement in turn is qualified by Rule 56(f)'s provision that summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition. In our analysis here, we assume that both parties have had ample opportunity for discovery.

[Footnote 6]

In many cases, however, findings are extremely helpful to a reviewing court.

[Footnote 7]

Our statement in *Hutchinson v. Proxmire,* 443 U. S. 111, 443 U. S. 120, n. 9 (1979), that proof of actual malice "does not readily lend itself to summary disposition" was simply an acknowledgment of our general reluctance

"to grant special procedural protections to defendants in libel and defamation actions in addition to the constitutional protections embodied in the substantive laws."

*Calder v. Jones,* 465 U. S. 783, 465 U. S. 790-791 (1984).

JUSTICE BRENNAN, dissenting.

*The Court today holds that*

"whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case,"

*ante* at 477 U. S. 255. [Footnote 2/1] In my view, the Court's analysis is deeply flawed,

Page 477 U. S. 258

and rests on a shaky foundation of unconnected and unsupported observations, assertions, and conclusions. Moreover, I am unable to divine from the Court's opinion how these evidentiary standards are to be considered, or what a trial judge is actually supposed to do in ruling on a motion for summary judgment. Accordingly, I respectfully dissent.

To support its holding that, in ruling on a motion for summary judgment, a trial court must consider substantive evidentiary burdens, the Court appropriately begins with the language of Rule 56(c), which states that summary judgment shall be granted if it appears that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court then purports to restate this Rule, and asserts that

summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Ante* at 477 U. S. 248. No direct authority is cited for the proposition that, in order to determine whether a dispute is "genuine" for Rule 56 purposes, a judge must ask if a "reasonable" jury could find for the nonmoving party. Instead, the Court quotes from *First National Bank of Arizona v. Cities Service Co.,* 391 U.S.

Page 477 U. S. 259

253, 391 U. S. 288-289 (1968), to the effect that a summary judgment motion will be defeated if

"sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial,"

*ante* at 477 U. S. 249, and that a plaintiff may not, in defending against a motion for summary judgment, rest on mere allegations or denials of his pleadings. After citing *Adickes v. S. H. Kress & Co.,* 398 U. S. 144 (1970), for the unstartling proposition that "the availability of summary judgment turn[s] on whether a proper jury question [is] presented," *ante* at 477 U. S. 249, the Court then reasserts, again with no direct authority, that, in determining whether a jury question is presented, the inquiry is whether there are factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Ante* at 477 U. S. 250. The Court maintains that this summary judgment inquiry "mirrors" that which applies in the context of a motion for directed verdict under Federal Rule of Civil Procedure 50(a):

"whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law."

*Ante* at 477 U. S. 251-252.

Having thus decided that a "genuine" dispute is one which is not "one-sided," and one which could "reasonably" be resolved by a "fair-minded" jury in favor of either party, *ibid.,* the Court then concludes:

"Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: it makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are, in fact, provided by the applicable evidentiary standards."

*Ante* at 477 U. S. 254-255.

Page 477 U. S. 260

As far as I can discern, this conclusion, which is at the heart of the case, has been reached without the benefit of any support in the case law. Although, as noted above, the Court cites *Adickes* and *Cities Service,* those cases simply do not stand for the proposition that, in ruling on a summary judgment motion, the trial court is to inquire into the "one-sidedness" of the evidence presented by the parties. *Cities Service* involved the propriety of a grant of summary judgment in favor of a defendant alleged to have conspired to violate the antitrust laws. The issue in the case was whether, on the basis of the facts in the record, a jury could *infer* that the defendant had entered into a conspiracy to boycott. No direct evidence of the conspiracy was produced. In agreeing with the lower courts that the *circumstantial* evidence presented by the plaintiff was insufficient to take the case to the jury, we observed that there was "one fact" that petitioner had produced to support the existence of the illegal agreement, and that that single fact could not support petitioner's theory of liability. Critically, we observed that

"[t]he case at hand presents peculiar difficulties because the issue of fact crucial to petitioner's case is also an issue of law, namely the existence of a conspiracy."

391 U.S. at 391 U. S. 289. In other words, *Cities Service* is, at heart, about whether certain facts can support inferences that are, as a matter of antitrust law, sufficient to support a particular theory of liability under the Sherman Act. Just this Term, in discussing summary judgment in the context of suits brought under the antitrust laws, we characterized both *Cities Service* and *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U. S. 752 (1984), as cases in which "*antitrust law* limit[ed] the range of permissible inferences from ambiguous evidence. . . ." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U. S. 574, 475 U. S. 588 (1986) (emphasis added). *Cities Service* thus provides no authority for the conclusion that Rule 56 requires a trial court to consider whether

direct evidence produced by the parties is "one-sided." To the contrary, in *Matsushita,* the most recent

Page 477 U. S. 261

case to cite and discuss *Cities Service,* we stated that the requirement that a dispute be "genuine" means simply that there must be more than "some metaphysical doubt as to the material facts." 475 U.S. at 475 U. S. 586. [Footnote 2/2]

Nor does *Adickes,* also relied on by the Court, suggest in any way that the appropriate summary judgment inquiry is whether the evidence overwhelmingly supports one party. *Adickes,* like *Cities Service,* presented the question of whether a grant of summary judgment in favor of a defendant on a conspiracy count was appropriate. The plaintiff, a

Page 477 U. S. 262

white schoolteacher, maintained that employees of defendant Kress conspired with the police to deny her rights protected by the Fourteenth Amendment by refusing to serve her in one of its lunchrooms simply because she was white and accompanied by a number of black schoolchildren. She maintained, among other things, that Kress arranged with the police to have her arrested for vagrancy when she left the defendant's premises. In support of its motion for summary judgment, Kress submitted statements from a deposition of one of its employees asserting that he had not communicated or agreed with the police to deny plaintiff service or to have her arrested, and explaining that the store had taken the challenged action not because of the race of the plaintiff, but because it was fearful of the reaction of some of its customers if it served a racially mixed group. Kress also submitted affidavits from the Chief of Police and the arresting officers denying that the store manager had requested that petitioner be arrested, and noted that, in the plaintiff's own deposition, she conceded that she had no knowledge of any communication between the police and any Kress employee, and was relying on circumstantial evidence to support her allegations. In opposing defendant's motion for summary judgment, plaintiff stated that defendant, in its moving papers, failed to dispute an allegation in the complaint, a statement at her deposition, and an unsworn statement by a Kress employee, all to the effect that there was a policeman in the store at the time of the refusal to serve, and that it was this policeman who subsequently made the arrest. Plaintiff argued that this sequence of events "created a substantial enough possibility of a conspiracy to allow her to proceed to trial. . . ." 398 U.S. at 398 U. S. 157.

We agreed, and therefore reversed the lower courts, reasoning that Kress

"did not carry its burden because of its failure to foreclose the possibility that there was a policeman in the Kress store while petitioner was awaiting service, and that this policeman reached an understanding with some

Page 477 U. S. 263

Kress employee that petitioner not be served."

*Ibid.* Despite the fact that *none of the materials relied on by plaintiff* met the requirements of Rule 56(e), we stated nonetheless that Kress failed to meet its initial burden of showing that there was no genuine dispute of a material fact. Specifically, we held that, because Kress failed to negate plaintiff's materials suggesting that a policeman was in fact in the store at the time of the refusal to serve,

"it would be open to a jury . . . to infer from the circumstances that the policeman and a Kress employee had a 'meeting of the minds,' and thus reached an understanding that petitioner should be refused service."

*Id.* at 398 U. S. 158.

In *Adickes,* we held that a jury might permissibly infer a conspiracy from the mere presence of a policeman in a restaurant. We never reached, and did not consider, whether the evidence was "one-sided," and, had we done so, we clearly would have had to affirm, rather than reverse, the lower courts, since, in that case, there was no admissible evidence submitted by petitioner, and a significant amount of evidence presented by the defendant tending to rebut the existence of a conspiracy. The question we did reach was simply whether, as a matter of conspiracy law, a jury would be entitled, again, as a matter of law, to infer from the presence of a policeman in a restaurant the making of an agreement between that policeman and an employee. Because we held that a jury was entitled so to infer, and because the defendant had not carried its initial burden of production of demonstrating that there was no evidence that there was not a policeman in the lunchroom, we concluded that summary

that there was no evidence that there was not a policeman in the lunchroom, we concluded that summary judgment was inappropriate.

Accordingly, it is surprising to find the case cited by the majority for the proposition that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Ante* at 477 U. S. 249. There was, of course, *no* admissible evidence in *Adickes* favoring the nonmoving plaintiff; there was only an

Page 477 U. S. 264

unrebutted assertion that a Kress employee and a policeman were in the same room at the time of the alleged constitutional violation. Like *Cities Service, Adickes* suggests that, on a defendant's motion for summary judgment, a trial court must consider whether, as a matter of the substantive law of the plaintiff's cause of action, a jury will be permitted to draw inferences supporting the plaintiff's legal theory. In *Cities Service,* we found, in effect, that the plaintiff had failed to make out a *prima facie* case; in *Adickes,* we held that the moving defendant had failed to rebut the plaintiff's *prima facie* case. In neither case is there any intimation that a trial court should inquire whether plaintiff's evidence is "significantly probative," as opposed to "merely colorable," or, again, "one-sided." Nor is there in either case any suggestion that, once a nonmoving plaintiff has made out a *prima facie* case based on evidence satisfying Rule 56(e) that there is any showing that a defendant can make to prevail on a motion for summary judgment. Yet this is what the Court appears to hold, relying, in part, on these two cases. [Footnote 2/3]

As explained above, and as explained also by JUSTICE REHNQUIST in his dissent, *see post* at 477 U. S. 271, I cannot agree that the authority cited by the Court supports its position. In my view, the Court's result is the product of an exercise

Page 477 U. S. 265

akin to the child's game of "telephone," in which a message is repeated from one person to another and then another; after some time, the message bears little resemblance to what was originally spoken. In the present case, the Court purports to restate the summary judgment test, but, with each repetition, the original understanding is increasingly distorted.

But my concern is not only that the Court's decision is unsupported; after all, unsupported views may nonetheless be supportable. I am more troubled by the fact that the Court's opinion sends conflicting signals to trial courts and reviewing courts which must deal with summary judgment motions on a day-to-day basis. This case is about a trial court's responsibility when considering a motion for summary judgment, but in my view, the Court, while instructing the trial judge to "consider" heightened evidentiary standards, fails to explain what that means. In other words, how does a judge assess how one-sided evidence is, or what a "fair-minded" jury could "reasonably" decide? The Court provides conflicting clues to these mysteries, which I fear can lead only to increased confusion in the district and appellate courts.

The Court's opinion is replete with boilerplate language to the effect that trial courts are not to weigh evidence when deciding summary judgment motions:

"[I]t is clear enough from our recent cases that, at the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter. . . ."

*Ante* at 477 U. S. 249.

"Our holding . . . does not denigrate the role of the jury. . . . Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."

*Ante* at 477 U. S. 255.

Page 477 U. S. 266

But the Court's opinion is also full of language which could surely be understood as an invitation -- if not an instruction -- to trial courts to assess and weigh evidence much as a juror would:

"When determining if a genuine factual issue . . . exists . . a trial judge must *bear in mind the actual quantum and quality* of proof necessary to support liability. . . . For example, *there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity* to allow a rational finder of fact to find actual malice by clear and convincing evidence."

*Ante* at 477 U. S. 254 (emphasis added).

"[T]he inquiry . . . [is] whether the evidence presents a *sufficient* disagreement to require submission to a jury, or whether *it is so one-sided* that one party must prevail as a matter of law."

*Ante* at 477 U. S. 251-252 (emphasis added).

"[T]he judge must ask himself . . . whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."

*Ante* at 477 U. S. 252.

I simply cannot square the direction that the judge "is not himself to weigh the evidence" with the direction that the judge also bear in mind the "quantum" of proof required and consider whether the evidence is of sufficient "caliber or quantity" to meet that "quantum." I would have thought that a determination of the "caliber and quantity," *i.e.,* the importance and value, of the evidence in light of the "quantum," *i.e.,* amount "required," could *only* be performed by weighing the evidence.

If, in fact, this is what the Court would, under today's decision, require of district courts, then I am fearful that this new rule -- for this surely would be a brand new procedure -- will transform what is meant to provide an expedited "summary"

Page 477 U. S. 267

procedure into a full-blown paper trial on the merits. It is hard for me to imagine that a responsible counsel, aware that the judge will be assessing the "quantum" of the evidence he is presenting, will risk either moving for or responding to a summary judgment motion without coming forth with all of the evidence he can muster in support of his client's case. Moreover, if the judge on motion for summary judgment really is to weigh the evidence, then, in my view, grave concerns are raised concerning the constitutional right of civil litigants to a jury trial.

It may well be, as JUSTICE REHNQUIST suggests, *see post* at 477 U. S. 270-271, that the Court's decision today will be of little practical effect. I, for one, cannot imagine a case in which a judge might plausibly hold that the evidence on motion for summary judgment was sufficient to enable a plaintiff bearing a mere preponderance burden to get to the jury -- *i.e.,* that a *prima facie* case had been made out -- but insufficient for a plaintiff bearing a clear-and-convincing burden to withstand a defendant's summary judgment motion. Imagine a suit for breach of contract. If, for example, the defendant moves for summary judgment and produces one purported eyewitness who states that he was present at the time the parties discussed the possibility of an agreement, and unequivocally denies that the parties ever agreed to enter into a contract, while the plaintiff produces one purported eyewitness who asserts that the parties did in fact come to terms, presumably that case would go to the jury. But if the defendant produced not one, but 100 eyewitnesses, while the plaintiff stuck with his single witness, would that case, under the Court's holding, still go to the jury? After all, although the plaintiff's burden in this hypothetical contract action is to prove his case by a mere preponderance of the evidence, the judge, so the Court tells us, is to "ask himself . . . whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Ante* at 477 U. S. 252. Is there, in this hypothetical example, "a sufficient disagreement to require submission

Page 477 U. S. 268

to a jury," or is the evidence "so one-sided that one party must prevail as a matter of law"? *Ante* at 477 U. S. 251-252. Would the result change if the plaintiff's one witness were now shown to be a convicted perjurer? Would the result change if, instead of a garden variety contract claim, the plaintiff sued on a fraud theory, thus requiring him to prove his case by clear and convincing evidence?

It seems to me that the Court's decision today unpersuasively answers the question presented, and in doing so raises a host of difficult and troubling questions for which there may well be no adequate solutions. What is

particularly unfair is that the mess we make is not, at least in the first instance, our own to deal with; it is the district courts and courts of appeals that must struggle to clean up after us.

In my view, if a plaintiff presents evidence which either directly or by permissible inference (and these inferences are a product of the substantive law of the underlying claim) supports all of the elements he needs to prove in order to prevail on his legal claim, the plaintiff has made out a *prima facie* case, and a defendant's motion for summary judgment must fail, regardless of the burden of proof that the plaintiff must meet. In other words, whether evidence is "clear and convincing," or proves a point by a mere preponderance, is for the factfinder to determine. As I read the case law, this is how it has been, and because of my concern that today's decision may erode the constitutionally enshrined role of the jury, and also undermine the usefulness of summary judgment procedure, this is how I believe it should remain.

[Footnote 2/1]

The Court's holding today is not, of course, confined in its application to First Amendment cases. Although this case arises in the context of litigation involving libel and the press, the Court's holding is that,

"in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."

*Ante* at 477 U. S. 254. Accordingly, I simply do not understand why JUSTICE REHNQUIST, dissenting, feels it appropriate to cite *Calder v. Jones,* 465 U. S. 783 (1984), and to remind the Court that we have consistently refused to extend special procedural protections to defendants in libel and defamation suits. The Court today does nothing of the kind. It changes summary judgment procedure for all litigants, regardless of the substantive nature of the underlying litigation.

Moreover, the Court's holding is not limited to those cases in which the evidentiary standard is "heightened," *i.e.,* those in which a plaintiff must prove his case by more than a mere preponderance of the evidence. Presumably, if a district court ruling on a motion for summary judgment in a libel case is to consider the "quantum and quality" of proof necessary to support liability under *New York Times, ante* at 477 U. S. 254, and then ask whether the evidence presented is of "sufficient caliber or quantity" to support that quantum and quality, the court must ask the same questions in a garden variety action where the plaintiff need prevail only by a mere preponderance of the evidence. In other words, today's decision, by its terms, applies to *all* summary judgment motions, irrespective of the burden of proof required and the subject matter of the suit.

[Footnote 2/2]

Writing in dissent in *Matsushita,* JUSTICE WHITE stated that he agreed with the summary judgment test employed by the Court, namely, that

"[w]here the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

475 U.S. at 475 U. S. 599. Whether the shift, announced today, from looking to a "reasonable," rather than a "rational," jury is intended to be of any significance, there are other aspects of the *Matsushita* dissent which I find difficult to square with the Court's holding in the present case. The *Matsushita* dissenters argued:

". . . [T]he Court summarizes *Monsanto Co. v. Spray-Rite Service Corp., supra,* as holding that 'courts should not permit factfinders to infer conspiracies when such inferences are implausible. . . .'"

*Ante* at 477 U. S. 593. Such language suggests that a judge hearing a defendant's motion for summary judgment in an antitrust case should go beyond the traditional summary judgment inquiry and decide for himself whether the weight of the evidence favors the plaintiff. *Cities Service* and *Monsanto* do not stand for any such proposition. Each of those cases simply held that a particular piece of evidence, standing alone, was insufficiently probative to justify sending a case to the jury. These holdings in no way undermine the doctrine that all evidence must be construed in the light most favorable to the party opposing summary judgment.

"If the Court intends to give every judge hearing a motion for summary judgment in an antitrust case the job of determining if the evidence makes the inference of conspiracy more probable than not, it is overturning settled law. If the Court does not intend such a pronouncement, it should refrain from using unnecessarily broad and confusing language."

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 34 of 217

*Id.* at 475 U. S. 600-601 (footnote omitted). In my view, these words are as applicable and relevant to the Court's opinion today as they were to the opinion of the Court in *Matsushita.*

[Footnote 2/3]

I am also baffled by the other cases cited by the majority to support its holding. For example, the Court asserts that

"[i]f . . . evidence is merely colorable, *Dombrowski v. Eastland,* 387 U. S. 82 (1967) (per curiam), . . . summary judgment may be granted."

*Ante* at 477 U. S. 249-250. In *Dombrowski,* we reversed a judgment granting summary judgment to the counsel to the Internal Security Subcommittee of the Judiciary Committee of the United States Senate because there was "controverted evidence in the record . . . which affords more than merely colorable substance" to the petitioners' allegations. 387 U.S. at 387 U. S. 84. *Dombrowski* simply cannot be read to mean that summary judgment may be *granted* if evidence is merely colorable; what the case actually says is that summary judgment will be *denied* if evidence is "*controverted,*" because when evidence is controverted, assertions become colorable for purposes of motions for summary judgment law.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

The Court, apparently moved by concerns for intellectual tidiness, mistakenly decides that the "clear and convincing evidence" standard governing finders of fact in libel cases must be applied by trial courts in deciding a motion for summary judgment in such a case. The Court refers to this as a "substantive standard," but I think is is actually a procedural

Page 477 U. S. 269

requirement engrafted onto Rule 56, contrary to our statement in *Calder v. Jones,* 465 U. S. 783 (1984), that

"[w]e have already declined in other contexts to grant special procedural protections to defendants in libel and defamation actions in addition to the constitutional protections embodied in the substantive laws."

*Id.* at 465 U. S. 790-791. The Court, I believe, makes an even greater mistake in failing to apply its newly announced rule to the facts of this case. Instead of thus illustrating how the rule works, it contents itself with abstractions and paraphrases of abstractions, so that its opinion sounds much like a treatise about cooking by someone who has never cooked before, and has no intention of starting now.

There is a large class of cases in which the higher standard imposed by the Court today would seem to have no effect at all. Suppose, for example, on motion for summary judgment in a hypothetical libel case, the plaintiff concedes that his only proof of malice is the testimony of witness A. Witness A testifies at his deposition that the reporter who wrote the story in question told him that she, the reporter, had done absolutely no checking on the story, and had real doubts about whether or not it was correct as to the plaintiff. The defendant's examination of witness A brings out that he has a prior conviction for perjury.

May the Court grant the defendant's motion for summary judgment on the ground that the plaintiff has failed to produce sufficient proof of malice? Surely not, if the Court means what it says when it states:

"Credibility determinations . . . are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."

*Ante* at 477 U. S. 255.

The case proceeds to trial, and, at the close of the plaintiff's evidence, the defendant moves for a directed verdict on the

Page 477 U. S. 270

ground that the plaintiff has failed to produce sufficient evidence of malice. The only evidence of malice produced by the plaintiff is the same testimony of witness A, who is duly impeached by the defendant for the prior perjury

conviction. In addition, the trial judge has now had an opportunity to observe the demeanor of witness A, and has noticed that he fidgets when answering critical questions, his eyes shift from the floor to the ceiling, and he manifests all other indicia traditionally attributed to perjurers.

May the trial court, at this stage, grant a directed verdict? Again, surely not; we are still dealing with "credibility determinations. "

The defendant now puts on its testimony, and produces three witnesses who were present at the time when witness A alleges that the reporter said she had not checked the story and had grave doubts about its accuracy as to plaintiff. Witness A concedes that these three people were present at the meeting, and that the statement of the reporter took place in the presence of all these witnesses. Each witness categorically denies that the reporter made the claimed statement to witness A.

May the trial court now grant a directed verdict at the close of all the evidence? Certainly the plaintiff's case is appreciably weakened by the testimony of three disinterested witnesses, and one would hope that a properly charged jury would quickly return a verdict for the defendant. But as long as credibility is exclusively for the jury, it seems the Court's analysis would still require this case to be decided by that body.

Thus, in the case that I have posed, it would seem to make no difference whether the standard of proof which the plaintiff had to meet in order to prevail was the preponderance of the evidence, clear and convincing evidence, or proof beyond a reasonable doubt. But if the application of the standards makes no difference in the case that I hypothesize, one may fairly ask in what sort of case *does* the difference in standards

Page 477 U. S. 271

make a difference in outcome? Cases may be posed dealing with evidence that is essentially documentary, rather than testimonial; but the Court has held in a related context involving Federal Rule of Civil Procedure 52(a) that inferences from documentary evidence are as much the prerogative of the finder of fact as inferences as to the credibility of witnesses. *Anderson v. Bessemer City,* 470 U. S. 564, 470 U. S. 574 (1985). The Court affords the lower courts no guidance whatsoever as to what, if any, difference the abstract standards that it propounds would make in a particular case.

There may be more merit than the Court is willing to admit to Judge Learned Hand's observation in *United States v. Feinberg,* 140 F.2d 592, 594 (CA2), *cert. denied,* 322 U.S. 726 (1944), that "[w]hile at times it may be practicable" to

"distinguish between the evidence which should satisfy reasonable men and the evidence which should satisfy reasonable men beyond a reasonable doubt[,] . . . in the long run, the line between them is too thin for day-to-day use."

The Court apparently approves the overruling of the *Feinberg* case in the Court of Appeals by Judge Friendly's opinion in *United States v. Taylor,* 464 F.2d 240 (1972). But even if the Court is entirely correct in its judgment on this point, Judge Hand's statement seems applicable to this case, because the criminal case differs from the libel case in that the standard in the former is proof "beyond a reasonable doubt," which is presumably easier to distinguish from the normal "preponderance of the evidence" standard than is the intermediate standard of "clear and convincing evidence."

More important for purposes of analyzing the present case, there is no exact analog in the criminal process to the motion for summary judgment in a civil case. Perhaps the closest comparable device for screening out unmeritorious cases in the criminal area is the grand jury proceeding, though the comparison is obviously not on all fours. The standard for allowing a criminal case to proceed to trial is not whether the government has produced *prima facie* evidence of guilt beyond

Page 477 U. S. 272

a reasonable doubt for every element of the offense, but only whether it has established probable cause. *See United States v. Mechanik,* 475 U. S. 66, 475 U. S. 70 (1986). Thus, in a criminal case, the standard used prior to trial is much more lenient than the "clear beyond a reasonable doubt" standard which must be employed by the finder of fact.

The three differentiated burdens of proof in civil and criminal cases, vague and impressionistic though they

necessarily are, probably do make some difference when considered by the finder of fact, whether it be a jury or a judge in a bench trial. Yet it is not a logical or analytical message that the terms convey, but instead almost a state of mind; we have previously said:

"Candor suggests that, to a degree, efforts to analyze what lay jurors understand concerning the differences among these three tests . . . may well be largely an academic exercise. . . . Indeed, the ultimate truth as to how the standards of proof affect decisionmaking may well be *unknowable*, given that factfinding is a process shared by countless thousands of individuals throughout the country. We probably can assume no more than that the difference between a preponderance of the evidence and proof beyond a reasonable doubt probably is better understood than either of them in relation to the intermediate standard of clear and convincing evidence."

*Addington v. Texas,* 441 U. S. 418, 441 U. S. 424-425 (1979) (emphasis added).

The Court's decision to engraft the standard of proof applicable to a factfinder onto the law governing the procedural motion for a summary judgment (a motion that has always been regarded as raising a question of law, rather than a question of fact, *see, e.g., La Riviere v. EEOC,* 682 F.2d 1275, 1277-1278 (CA9 1982) (Wallace, J.)), will do great mischief, with little corresponding benefit. The primary effect of the Court's opinion today will likely be to cause the decisions of trial judges on summary judgment motions in libel cases to be

Page 477 U. S. 273

more erratic and inconsistent than before. This is largely because the Court has created a standard that is different from the standard traditionally applied in summary judgment motions without even hinting as to how its new standard will be applied to particular cases.

## Materials

### Oral Arguments

Oral Argument - December 03, 1985

## Search This Case

Google Scholar     Google Books     Google Web

Google News

## Charlotte, North Carolina Lawyers
Sponsored Listings

**D. Maurer**

(888) 258-1087

Cornelius, NC
Personal Injury
View All
10.0

**J. Bradl**

PREMIU

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 37 of 217



# Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986)

Overview    Opinions    Materials

**Argued:**
November 12, 1985

**Decided:**
March 25, 1986

## Syllabus

## U.S. Supreme Court

**Matsushita v. Zenith Radio Corp., 475 U.S. 574 (1986)**

**Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.**

**No. 83-2004**

**Argued November 12, 1985**

**Decided March 26, 1986**

**475 U.S. 574**

*Syllabus*

Petitioners are 21 Japanese corporations or Japanese-controlled American corporations that manufacture and/or sell "consumer electronic products" (CEPs) (primarily television sets). Respondents are American corporations that manufacture and sell television sets. In 1974, respondents brought an action in Federal District Court, alleging that petitioners, over a 20-year period, had illegally conspired to drive American firms from the American CEP market by engaging in a scheme to fix and maintain artificially high prices for television sets sold by petitioners in Japan and, at the same time, to fix and maintain low prices for the sets exported to and sold in the United States. Respondents claim that various portions of this scheme violated, *inter alia,* §§ 1 and 2 of the Sherman Act, § 2(a) of the Robinson-Patman Act, and § 73 of the Wilson Tariff Act. After several years of discovery, petitioners moved for summary judgment on all claims. The District Court then directed the parties to file statements listing all the documentary evidence that would be offered if the case went to trial. After the statements were filed, the court found the bulk of the evidence on which respondents relied was inadmissible, that the admissible evidence did not raise a genuine issue of material fact as to the existence of the alleged conspiracy, and that any inference of conspiracy was unreasonable. Summary judgment therefore was granted in petitioners' favor. The Court of Appeals reversed. After determining that much of the evidence excluded by the District Court was admissible, the Court of Appeals held that the District Court erred in granting a summary judgment, and that there was both direct and circumstantial evidence of a conspiracy. Based on inferences drawn from the evidence, the Court of Appeals concluded that a reasonable factfinder could find a conspiracy to depress prices in the American market in order to drive out American competitors, which conspiracy was funded by excess profits obtained in the Japanese market.

*Held.* The Court of Appeals did not apply proper standards in evaluating the District Court's decision to grant petitioners' motion for summary judgment. Pp. 475 U. S. 582-598.

(a) The "direct evidence" on which the Court of Appeals relied -- petitioners' alleged supracompetitive pricing in Japan, the "five-company

Page 475 U. S. 575

rule" by which each Japanese producer was permitted to sell only to five American distributors, and the "check-prices" (minimum prices fixed by agreement with the Japanese Government for CEPs exported to the United States) insofar as they established minimum prices in the United States -- cannot, by itself, give respondents a cognizable claim against petitioners for antitrust damages. Pp. 475 U. S. 582-583.

(b) To survive petitioners' motion for a summary judgment, respondents must establish that there is a genuine issue of material fact as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury. If the factual context renders respondents' claims implausible, *i.e.,* claims that make no economic sense, respondents must offer more persuasive evidence to support their claims than would otherwise be necessary. To survive a motion for a summary judgment, a plaintiff seeking damages for a violation of § 1 of the Sherman Act must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. Thus, respondents here must show that the inference of a conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents. Pp. 475 U. S. 585-588.

(c) Predatory pricing conspiracies are, by nature, speculative. They require the conspirators to sustain substantial losses in order to recover uncertain gains. The alleged conspiracy is therefore implausible. Moreover, the record discloses that the alleged conspiracy has not succeeded in over two decades of operation. This is strong evidence that the conspiracy does not in fact exist. The possibility that petitioners have obtained supracompetitive profits in the Japanese market does not alter this assessment. Pp. 475 U.S. 588-593.

(d) Mistaken inferences in cases such as this one are especially costly, because they chill the very conduct that the antitrust laws are designed to protect. There is little reason to be concerned that, by granting summary judgment in cases where the evidence of conspiracy is speculative or ambiguous, courts will encourage conspiracies. Pp. 475 U. S. 593-595.

(e) The Court of Appeals erred in two respects: the "direct evidence" on which it relied had little, if any, relevance to the alleged predatory pricing conspiracy, and the court failed to consider the absence of a plausible motive to engage in predatory pricing. In the absence of any rational motive to conspire, neither petitioners' pricing practices, their conduct in the Japanese market, nor their agreements respecting prices and distributions in the American market sufficed to create a "genuine issue for trial" under Federal Rule of Civil Procedure 56(e). On remand, the Court of Appeals may consider whether there is other, unambiguous evidence of the alleged conspiracy. Pp. 475 U. S. 595-598.

723 F.2d 238, reversed and remanded.

Page 475 U. S. 576

POWELL, J., delivered the opinion of the Court, in which BURGER, C.J., and MARSHALL, REHNQUIST, and O'CONNOR, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN, BLACKMUN, and STEVENS, JJ., joined, *post,* p. 475 U. S. 598.

**Read More**

## Opinions

### Opinions & Dissents

Case 9:25-cv-00083-DWM      Document 59-1      Filed 05/04/26      Page 39 of 217

# U.S. Supreme Court

Matsushita v. Zenith Radio Corp., 475 U.S. 574 (1986)
Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.

No. 83-2004

Argued November 12, 1985

Decided March 26, 1986

475 U.S. 574

*CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR*

*THE THIRD CIRCUIT*

*Syllabus*

Petitioners are 21 Japanese corporations or Japanese-controlled American corporations that manufacture and/or sell "consumer electronic products" (CEPs) (primarily television sets). Respondents are American corporations that manufacture and sell television sets. In 1974, respondents brought an action in Federal District Court, alleging that petitioners, over a 20-year period, had illegally conspired to drive American firms from the American CEP market by engaging in a scheme to fix and maintain artificially high prices for television sets sold by petitioners in Japan and, at the same time, to fix and maintain low prices for the sets exported to and sold in the United States. Respondents claim that various portions of this scheme violated, *inter alia,* §§ 1 and 2 of the Sherman Act, § 2(a) of the Robinson-Patman Act, and § 73 of the Wilson Tariff Act. After several years of discovery, petitioners moved for summary judgment on all claims. The District Court then directed the parties to file statements listing all the documentary evidence that would be offered if the case went to trial. After the statements were filed, the court found the bulk of the evidence on which respondents relied was inadmissible, that the admissible evidence did not raise a genuine issue of material fact as to the existence of the alleged conspiracy, and that any inference of conspiracy was unreasonable. Summary judgment therefore was granted in petitioners' favor. The Court of Appeals reversed. After determining that much of the evidence excluded by the District Court was admissible, the Court of Appeals held that the District Court erred in granting a summary judgment, and that there was both direct and circumstantial evidence of a conspiracy. Based on inferences drawn from the evidence, the Court of Appeals concluded that a reasonable factfinder could find a conspiracy to depress prices in the American market in order to drive out American competitors, which conspiracy was funded by excess profits obtained in the Japanese market.

*Held.* The Court of Appeals did not apply proper standards in evaluating the District Court's decision to grant petitioners' motion for summary judgment. Pp. 475 U. S. 582-598.

(a) The "direct evidence" on which the Court of Appeals relied -- petitioners' alleged supracompetitive pricing in Japan, the "five-company

Page 475 U. S. 575

rule" by which each Japanese producer was permitted to sell only to five American distributors, and the "check-prices" (minimum prices fixed by agreement with the Japanese Government for CEPs exported to the United States) insofar as they established minimum prices in the United States -- cannot, by itself, give respondents a cognizable claim against petitioners for antitrust damages. Pp. 475 U. S. 582-583.

(b) To survive petitioners' motion for a summary judgment, respondents must establish that there is a genuine issue of material fact as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury. If the factual context renders respondents' claims implausible, *i.e.,* claims that make no economic sense, respondents must offer more persuasive evidence to support their claims than would otherwise be necessary. To survive a motion for a summary judgment, a plaintiff seeking damages for a violation of § 1 of the Sherman Act must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. Thus, respondents here must show that the inference of a conspiracy is reasonable in light of the

competing inferences of independent action or collusive action that could not have harmed respondents. Pp. 475 U. S. 585-588.

(c) Predatory pricing conspiracies are, by nature, speculative. They require the conspirators to sustain substantial losses in order to recover uncertain gains. The alleged conspiracy is therefore implausible. Moreover, the record discloses that the alleged conspiracy has not succeeded in over two decades of operation. This is strong evidence that the conspiracy does not in fact exist. The possibility that petitioners have obtained supracompetitive profits in the Japanese market does not alter this assessment. Pp. 475 U.S. 588-593.

(d) Mistaken inferences in cases such as this one are especially costly, because they chill the very conduct that the antitrust laws are designed to protect. There is little reason to be concerned that, by granting summary judgment in cases where the evidence of conspiracy is speculative or ambiguous, courts will encourage conspiracies. Pp. 475 U. S. 593-595.

(e) The Court of Appeals erred in two respects: the "direct evidence" on which it relied had little, if any, relevance to the alleged predatory pricing conspiracy, and the court failed to consider the absence of a plausible motive to engage in predatory pricing. In the absence of any rational motive to conspire, neither petitioners' pricing practices, their conduct in the Japanese market, nor their agreements respecting prices and distributions in the American market sufficed to create a "genuine issue for trial" under Federal Rule of Civil Procedure 56(e). On remand, the Court of Appeals may consider whether there is other, unambiguous evidence of the alleged conspiracy. Pp. 475 U. S. 595-598.

723 F.2d 238, reversed and remanded.

Page 475 U. S. 576

POWELL, J., delivered the opinion of the Court, in which BURGER, C.J., and MARSHALL, REHNQUIST, and O'CONNOR, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN, BLACKMUN, and STEVENS, JJ., joined, *post,* p. 475 U. S. 598.

JUSTICE POWELL delivered the opinion of the Court.

This case requires that we again consider the standard district courts must apply when deciding whether to grant summary judgment in an antitrust conspiracy case.

**I**

Stating the facts of this case is a daunting task. The opinion of the Court of Appeals for the Third Circuit runs to 69 pages; the primary opinion of the District Court is more than three times as long. *In re Japanese Electronic Products*

Page 475 U. S. 577

Antitrust Litigation, 723 F.2d 238 (CA3 1983); 513 F. Supp. 1100 (ED Pa.1981). Two respected District Judges each have authored a number of opinions in this case; the published ones alone would fill an entire volume of the Federal Supplement. In addition, the parties have filed a 40-volume appendix in this Court that is said to contain the essence of the evidence on which the District Court and the Court of Appeals based their respective decisions.

We will not repeat what these many opinions have stated and restated, or summarize the mass of documents that constitute the record on appeal. Since we review only the standard applied by the Court of Appeals in deciding this case, and not the weight assigned to particular pieces of evidence, we find it unnecessary to state the facts in great detail. What follows is a summary of this case's long history.

*A*

Petitioners, defendants below, are 21 corporations that manufacture or sell "consumer electronic products" (CEPs) -- for the most part, television sets. Petitioners include both Japanese manufacturers of CEPs and American firms, controlled by Japanese parents, that sell the Japanese-manufactured products. Respondents, plaintiffs below, are Zenith Radio Corporation (Zenith) and National Union Electric Corporation (NUE). Zenith is an American firm that manufactures and sells television sets. NUE is the corporate successor to Emerson Radio Company, an American firm that manufactured and sold television sets until 1970, when it withdrew from the market after sustaining substantial losses. Zenith and NUE began this lawsuit in 1974, [Footnote 1] claiming that

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 41 of 217

4/29/26, 12:18 PM                    Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp. | 475 U.S. 574 (1986) | Justia U.S. Supreme Court Center

petitioners had illegally conspired to drive

Page 475 U. S. 578

American firms from the American CEP market. According to respondents, the gist of this conspiracy was a

"'scheme to raise, fix and maintain artificially *high* prices for television receivers sold by [petitioners] in Japan and, at the same time, to fix and maintain *low* prices for television receivers exported to and sold in the United States.'"

723 F.2d at 251 (quoting respondents' preliminary pretrial memorandum). These "low prices" were allegedly at levels that produced substantial losses for petitioners. 513 F. Supp. at 1125. The conspiracy allegedly began as early as 1953, and, according to respondents, was in full operation by sometime in the late 1960's. Respondents claimed that various portions of this scheme violated §§ 1 and 2 of the Sherman Act, § 2(a) of the Robinson-Patman Act, § 73 of the Wilson Tariff Act, and the Antidumping Act of 1916.

After several years of detailed discovery, petitioners filed motions for summary judgment on all claims against them. The District Court directed the parties to file, with preclusive effect, "Final Pretrial Statements" listing all the documentary evidence that would be offered if the case proceeded to trial. Respondents filed such a statement, and petitioners responded with a series of motions challenging the admissibility of respondents' evidence. In three detailed opinions, the District Court found the bulk of the evidence on which Zenith and NUE relied inadmissible. [Footnote 2]

The District Court then turned to petitioners' motions for summary judgment. In an opinion spanning 217 pages, the court found that the admissible evidence did not raise a genuine issue of material fact as to the existence of the alleged

Page 475 U. S. 579

conspiracy. At bottom, the court found, respondents' claims rested on the inferences that could be drawn from petitioners' parallel conduct in the Japanese and American markets, and from the effects of that conduct on petitioners' American competitors. 513 F. Supp. at 1125-1127. After reviewing the evidence both by category and *in toto,* the court found that any inference of conspiracy was unreasonable, because (i) some portions of the evidence suggested that petitioners conspired in ways that did not injure respondents, and (ii) the evidence that bore directly on the alleged price-cutting conspiracy did not rebut the more plausible inference that petitioners were cutting prices to compete in the American market, and not to monopolize it. Summary judgment therefore was granted on respondents' claims under § 1 of the Sherman Act and the Wilson Tariff Act. Because the Sherman Act § 2 claims, which alleged that petitioners had combined to monopolize the American CEP market, were functionally indistinguishable from the § 1 claims, the court dismissed them also. Finally, the court found that the Robinson-Patman Act claims depended on the same supposed conspiracy as the Sherman Act claims. Since the court had found no genuine issue of fact as to the conspiracy, it entered judgment in petitioners' favor on those claims as well. [Footnote 3]

Page 475 U. S. 580

*B*

The Court of Appeals for the Third Circuit reversed. [Footnote 4] The court began by examining the District Court's evidentiary rulings, and determined that much of the evidence excluded by the District Court was, in fact, admissible. 723 F.2d at 260-303. These evidentiary rulings are not before us. *See* 471 U.S. 1002 (1985) (limiting grant of certiorari).

On the merits, and based on the newly enlarged record, the court found that the District Court's summary judgment decision was improper. The court acknowledged that "there are legal limitations upon the inferences which may be drawn from circumstantial evidence," 723 F.2d at 304, but it found that "the legal problem . . . is different" when "there is direct evidence of concert of action." *Ibid.* Here, the court concluded,

"there is both direct evidence of certain kinds of concert of action and circumstantial evidence having some tendency to suggest that other kinds of concert of action may have occurred."

*Id.* at 304-305. Thus, the court reasoned, cases concerning the limitations on inferring conspiracy from ambiguous evidence were not dispositive. *Id.* at 305. Turning to the evidence, the court determined that a

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 42 of 217

ambiguous evidence were not dispositive. *Id.* at 305. Turning to the evidence, the court determined that a factfinder reasonably could draw the following conclusions:

"1. The Japanese market for CEPs was characterized by oligopolistic behavior, with a small number of producers meeting regularly and exchanging information on price and other matters. *Id.* at 307. This created the opportunity for a stable combination to raise both prices and profits in Japan. American firms could not attack such a combination, because the Japanese Government imposed significant barriers to entry. *Ibid.*"

"2. Petitioners had relatively higher fixed costs than their American counterparts, and therefore needed to

Page 475 U. S. 581

operate at something approaching full capacity in order to make a profit. *Ibid.*"

"3. Petitioners' plant capacity exceeded the needs of the Japanese market. *Ibid.*"

"4. By formal agreements arranged in cooperation with Japan's Ministry of International Trade and Industry (MITI), petitioners fixed minimum prices for CEPs exported to the American market. *Id.* at 310. The parties refer to these prices as the 'check-prices,' and to the agreements that require them as the 'check-price agreements.'"

"5. Petitioners agreed to distribute their products in the United States according to a 'five-company rule': each Japanese producer was permitted to sell only to five American distributors. *Ibid.*"

"6. Petitioners undercut their own check-prices by a variety of rebate schemes. *Id.* at 311. Petitioners sought to conceal these rebate schemes both from the United States Customs Service and from MITI, the former to avoid various customs regulations as well as action under the antidumping laws, and the latter to cover up petitioners' violations of the check-price agreements."

Based on inferences from the foregoing conclusions, [Footnote 5] the Court of Appeals concluded that a reasonable factfinder could find a conspiracy to depress prices in the American market in order to drive out American competitors, which conspiracy was funded by excess profits obtained in the Japanese market. The court apparently did not consider whether it was as plausible to conclude that petitioners' price-cutting behavior was independent, and not conspiratorial.

Page 475 U. S. 582

The court found it unnecessary to address petitioners' claim that they could not be held liable under the antitrust laws for conduct that was compelled by a foreign sovereign. The claim, in essence, was that, because MITI required petitioners to enter into the check-price agreements, liability could not be premised on those agreements. The court concluded that this case did not present any issue of sovereign compulsion, because the check-price agreements were being used as "evidence of a low export price conspiracy," and not as an independent basis for finding antitrust liability. The court also believed it was unclear that the check-prices, in fact, were mandated by the Japanese Government, notwithstanding a statement to that effect by MITI itself. *Id.* at 315.

We granted certiorari to determine (i) whether the Court of Appeals applied the proper standards in evaluating the District Court's decision to grant petitioners' motion for summary judgment, and (ii) whether petitioners could be held liable under the antitrust laws for a conspiracy in part compelled by a foreign sovereign. 471 U.S. 1002 (1985). We reverse on the first issue, but do not reach the second.

## II

We begin by emphasizing what respondents' claim is not. Respondents cannot recover antitrust damages based solely on an alleged cartelization of the Japanese market, because American antitrust laws do not regulate the competitive conditions of other nations' economies. *United States v. Aluminum Co. of America,* 148 F.2d 416, 443 (CA2 1945) (L. Hand, J.); 1 P. Areeda & D. Turner, Antitrust Law � 236d (1978). [Footnote 6] Nor can respondents recover damages for

Page 475 U. S. 583

any conspiracy by petitioners to charge higher than competitive prices in the American market. Such conduct would indeed violate the Sherman Act, *United States v. Trenton Potteries Co.,* 273 U. S. 392 (1927); *United States v. Socony-Vacuum Oil Co.,* 310 U. S. 150, 310 U. S. 223 (1940), but it could not injure respondents: as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price in CEPs. *Cf. Brunswick*

*Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U. S. 477, 429 U. S. 488-489 (1977). Finally, for the same reason, respondents cannot recover for a conspiracy to impose nonprice restraints that have the effect of either raising market price or limiting output. Such restrictions, though harmful to competition, actually *benefit* competitors by making supracompetitive pricing more attractive. Thus, neither petitioners' alleged supracompetitive pricing in Japan, nor the five-company rule that limited distribution in this country, nor the check-prices, insofar as they established minimum prices in this country, can, by themselves, give respondents a cognizable claim against petitioners for antitrust damages. The Court of Appeals therefore erred to the extent that it found evidence of these alleged conspiracies to be "direct evidence" of a conspiracy that injured respondents. *See* 723 F.2d at 304-305.

Page 475 U. S. 584

Respondents nevertheless argue that these supposed conspiracies, if not themselves grounds for recovery of antitrust damages, are circumstantial evidence of another conspiracy that is cognizable: a conspiracy to monopolize the American market by means of pricing below the market level. [Footnote 7] The thrust of respondents' argument is that petitioners used their monopoly profits from the Japanese market to fund a concerted campaign to price predatorily, and thereby drive respondents and other American manufacturers of CEPs out of business. Once successful, according to respondents, petitioners would cartelize the American CEP market, restricting output and raising prices above the level that fair competition would produce. The resulting monopoly profits, respondents contend, would more than compensate petitioners for the losses they incurred through years of pricing below market level.

The Court of Appeals found that respondents' allegation of a horizontal conspiracy to engage in predatory pricing, [Footnote 8]

Page 475 U. S. 585

if proved, [Footnote 9] would be a *per se* violation of § 1 of the Sherman Act. 723 F.2d at 306. Petitioners did not appeal from that conclusion. The issue in this case thus becomes whether respondents adduced sufficient evidence in support of their theory to survive summary judgment. We therefore examine the principles that govern the summary judgment determination.

## III

To survive petitioners' motion for summary judgment, [Footnote 10] respondents must establish that there is a genuine issue of material

Page 475 U. S. 586

fact as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury. Fed.Rule Civ.Proc. 56(e); [Footnote 11] *First National Bank of Arizona v. Cities Service Co.,* 391 U. S. 253, 391 U. S. 288-289 (1968). This showing has two components. First, respondents must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from the illegal conduct. Respondents charge petitioners with a whole host of conspiracies in restraint of trade. *Supra* at 475 U. S. 582-583. Except for the alleged conspiracy to monopolize the American market through predatory pricing, these alleged conspiracies could not have caused respondents to suffer an "antitrust injury," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. at 492 U. S. 489, because they actually tended to benefit respondents. *Supra* at 475 U. S. 582-583. Therefore, unless, in context, evidence of these "other" conspiracies raises a genuine issue concerning the existence of a predatory pricing conspiracy, that evidence cannot defeat petitioners' summary judgment motion.

Second, the issue of fact must be "genuine." Fed.Rules Civ.Proc. 56(c), (e). When the moving party has carried its burden under Rule 56(c), [Footnote 12] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *See DeLuca v. Atlantic Refining Co.,* 176 F.2d 421, 423 (CA2 1949) (L. Hand, J.), *cert. denied,* 338 U.S. 943 (1950); 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727 (1983); Clark, Special Problems

Page 475 U. S. 587

in Drafting and Interpreting Procedural Codes and Rules, 3 Vand.L.Rev. 493, 504-505 (1950). *Cf. Sartor v. Arkansas Natural Gas Corp.,* 321 U. S. 620, 321 U. S. 627 (1944). In the language of the Rule, the nonmoving

party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Fed.Rule Civ.Proc. 56(e) (emphasis added). *See also* Advisory Committee Note to 1963 Amendment of Fed.Rule Civ.Proc. 56(e), 28 U.S.C.App. p. 626 (purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial"). Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Cities Service, supra,* at 391 U. S. 289.

It follows from these settled principles that, if the factual context renders respondents' claim implausible -- if the claim is one that simply makes no economic sense -- respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary. *Cities Service* is instructive. The issue in that case was whether proof of the defendant's refusal to deal with the plaintiff supported an inference that the defendant willingly had joined an illegal boycott. Economic factors strongly suggested that the defendant had no motive to join the alleged conspiracy. 391 U.S. at 391 U. S. 278-279. The Court acknowledged that, in isolation, the defendant's refusal to deal might well have sufficed to create a triable issue. *Id.* at 391 U. S. 277. But the refusal to deal had to be evaluated in its factual context. Since the defendant lacked any rational motive to join the alleged boycott, and since its refusal to deal was consistent with the defendant's independent interest, the refusal to deal could not, by itself, support a finding of antitrust liability. *Id.* at 391 U. S. 280.

Respondents correctly note that,

"[o]n summary judgment, the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."

*United States v. Diebold, Inc.,* 369

Page 475 U. S. 588

U.S. 654, 369 U. S. 655 (1962). But antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U. S. 752 (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Id.* at 465 U. S. 764. *See also Cities Service, supra,* at 391 U. S. 280. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. 465 U.S. at 465 U. S. 764. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents. *See Cities Service, supra,* at 391 U. S. 280.

Petitioners argue that these principles apply fully to this case. According to petitioners, the alleged conspiracy is one that is economically irrational, and practically infeasible. Consequently, petitioners contend, they had no motive to engage in the alleged predatory pricing conspiracy; indeed, they had a strong motive *not* to conspire in the manner respondents allege. Petitioners argue that, in light of the absence of any apparent motive and the ambiguous nature of the evidence of conspiracy, no trier of fact reasonably could find that the conspiracy with which petitioners are charged actually existed. This argument requires us to consider the nature of the alleged conspiracy and the practical obstacles to its implementation.

**IV**

*A*

A predatory pricing conspiracy is, by nature, speculative. Any agreement to price below the competitive level requires the conspirators to forgo profits that free competition would offer them. The forgone profits may be considered an investment in the future. For the investment to be rational,

Page 475 U. S. 589

the conspirators must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered. As then-Professor Bork, discussing predatory pricing by a single firm, explained:

"Any realistic theory of predation recognizes that the predator as well as his victims will incur losses during the fighting, but such a theory supposes it may be a rational calculation for the predator to view the losses as an investment in future monopoly profits (where rivals are to be killed) or in future undisturbed profits (where rivals are to be disciplined). The future flow of profits, appropriately discounted, must then exceed the present size of

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 45 of 217

4/29/26, 12:18 PM                    Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp. | 475 U.S. 574 (1986) | Justia U.S. Supreme Court Center

the losses."

R. Bork, The Antitrust Paradox 145 (1978). *See also* McGee, Predatory Pricing Revisited, 23 J.Law & Econ. 289, 295-297 (1980). As this explanation shows, the success of such schemes is inherently uncertain: the short-run loss is definite, but the long-run gain depends on successfully neutralizing the competition. Moreover, it is not enough simply to achieve monopoly power, as monopoly pricing may breed quick entry by new competitors eager to share in the excess profits. The success of any predatory scheme depends on *maintaining* monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain. Absent some assurance that the hoped-for monopoly will materialize, *and* that it can be sustained for a significant period of time, "[t]he predator must make a substantial investment with no assurance that it will pay off." Easterbrook, Predatory Strategies and Counterstrategies, 48 U.Chi.L.Rev. 263, 268 (1981). For this reason, there is a consensus among commentators that predatory pricing schemes are rarely tried, and even more rarely successful. *See, e.g.,* Bork, *supra,* at 149-155; Areeda & Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv.L.Rev. 697, 699 (1975); Easterbrook, *supra;* Koller, The Myth of Predatory Pricing -- An Empirical Study,

Page 475 U. S. 590

4 Antitrust Law & Econ.Rev. 105 (1971); McGee, Predatory Price Cutting: The *Standard Oil (N.J.) Case,* 1 J.Law & Econ. 137 (1958); McGee, Predatory Pricing Revisited, 23 J.Law & Econ., at 292-294. *See also Northeastern Telephone Co. v. American Telephone & Telegraph Co.,* 651 F.2d 76, 88 (CA2 1981) ("[N]owhere in the recent outpouring of literature on the subject do commentators suggest that [predatory] pricing is either common or likely to increase"), *cert. denied,* 455 U.S. 943 (1982).

These observations apply even to predatory pricing by a *single firm* seeking monopoly power. In this case, respondents allege that a large number of firms have conspired over a period of many years to charge below-market prices in order to stifle competition. Such a conspiracy is incalculably more difficult to execute than an analogous plan undertaken by a single predator. The conspirators must allocate the losses to be sustained during the conspiracy's operation, and must also allocate any gains to be realized from its success. Precisely because success is speculative and depends on a willingness to endure losses for an indefinite period, each conspirator has a strong incentive to cheat, letting its partners suffer the losses necessary to destroy the competition while sharing in any gains if the conspiracy succeeds. The necessary allocation is therefore difficult to accomplish. Yet if conspirators cheat to any substantial extent, the conspiracy must fail, because its success depends on depressing the market price for *all* buyers of CEPs. If there are too few goods at the artificially low price to satisfy demand, the would-be victims of the conspiracy can continue to sell at the "real" market price, and the conspirators suffer losses to little purpose.

Finally, if predatory pricing conspiracies are generally unlikely to occur, they are especially so where, as here, the prospects of attaining monopoly power seem slight. In order to recoup their losses, petitioners must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess profits

Page 475 U. S. 591

what they earlier gave up in below-cost prices. *See Northeastern Telephone Co. v. American Telephone & Telegraph Co., supra,* at 89; Areeda & Turner, 88 Harv.L.Rev. at 698. Two decades after their conspiracy is alleged to have commenced, [Footnote 13] petitioners appear to be far from achieving this goal: the two largest shares of the retail market in television sets are held by RCA and respondent Zenith, not by any of petitioners. 6 App. to Brief for Appellant in No. 81-2331 (CA3), pp. 2575a-2576a. Moreover, those shares, which together approximate 40% of sales, did not decline appreciably during the 1970's. *Ibid.* Petitioners' collective share rose rapidly during this period, from one-fifth or less of the relevant markets to close to 50%. 723 F.2d at 316. [Footnote 14] Neither the District Court nor the Court of Appeals found, however, that petitioners' share presently allows them to charge monopoly prices; to the contrary, respondents contend that the conspiracy is ongoing -- that petitioners are still artificially *depressing* the market price in order to drive Zenith out of the market. The data in the record strongly suggest that that goal is yet far distant. [Footnote 15]

Page 475 U. S. 592

The alleged conspiracy's failure to achieve its ends in the two decades of its asserted operation is strong evidence that the conspiracy does not, in fact, exist. Since the losses in such a conspiracy accrue before the gains, they must be "repaid" with interest. And because the alleged losses have accrued over the course of two decades, the

be "repaid" with interest. And because the alleged losses have accrued over the course of two decades, the conspirators could well require a correspondingly long time to recoup. Maintaining supracompetitive prices, in turn, depends on the continued cooperation of the conspirators, on the inability of other would-be competitors to enter the market, and (not incidentally) on the conspirators' ability to escape antitrust liability for their *minimum* price-fixing cartel. [Footnote 16] Each of these factors weighs more heavily as the time needed to recoup losses grows. If the losses have been substantial -- as would likely be necessary

Page 475 U. S. 593

in order to drive out the competition [Footnote 17] -- petitioners would most likely have to sustain their cartel for years simply to break even.

Nor does the possibility that petitioners have obtained supracompetitive profits in the Japanese market change this calculation. Whether or not petitioners have the *means* to sustain substantial losses in this country over a long period of time, they have no *motive* to sustain such losses, absent some strong likelihood that the alleged conspiracy in this country will eventually pay off. The courts below found no evidence of any such success, and -- as indicated above -- the facts actually are to the contrary: RCA and Zenith, not any of the petitioners, continue to hold the largest share of the American retail market in color television sets. More important, there is nothing to suggest any relationship between petitioners' profits in Japan and the amount petitioners could expect to gain from a conspiracy to monopolize the American market. In the absence of any such evidence, the possible existence of supracompetitive profits in Japan simply cannot overcome the economic obstacles to the ultimate success of this alleged predatory conspiracy. [Footnote 18]

*B*

In *Monsanto,* we emphasized that courts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct. *Monsanto,* 465 U.S. at 465 U. S. 762-764.

Page 475 U. S. 594

Respondents, petitioners' competitors, seek to hold petitioners liable for damages caused by the alleged conspiracy to cut prices. Moreover, they seek to establish this conspiracy indirectly, through evidence of other combinations (such as the check-price agreements and the five-company rule) whose natural tendency is to raise prices, and through evidence of rebates and other price-cutting activities that respondents argue tend to prove a combination to suppress prices. [Footnote 19] But cutting prices in order to increase business often is the very essence of competition. Thus, mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect. *See Monsanto, supra,* at 465 U. S. 763-764.

"[W]e must be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up by discouraging legitimate price competition."

*Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 234 (CA1 1983).

In most cases, this concern must be balanced against the desire that illegal conspiracies be identified and punished. That balance is, however, unusually one-sided in cases such as this one. As we earlier explained, *supra* at 475 U.S. 588-593, predatory pricing schemes require conspirators to suffer losses in order eventually to realize their illegal gains; moreover, the

Page 475 U. S. 595

likely to fail than to succeed. These economic realities tend to make predatory pricing conspiracies self-deterring: unlike most other conduct that violates the antitrust laws, failed predatory pricing schemes are costly to the conspirators. *See* Easterbrook, The Limits of Antitrust, 63 Texas L.Rev. 1, 26 (1984). Finally, unlike predatory pricing by a single firm, *successful* predatory pricing conspiracies involving a large number of firms can be identified and punished once they succeed, since some form of minimum price-fixing agreement would be necessary in order to reap the benefits of predation. Thus, there is little reason to be concerned that, by granting summary judgment in cases where the evidence of conspiracy is speculative or ambiguous, courts will encourage such conspiracies.

**V**

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 47 of 217

4/29/26, 12:18 PM    Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp. | 475 U.S. 574 (1986) | Justia U.S. Supreme Court Center

As our discussion in 475 U. S. petitioners had no motive to enter into the alleged conspiracy. To the contrary, as presumably rational businesses, petitioners had every incentive *not* to engage in the conduct with which they are charged, for its likely effect would be to generate losses for petitioners with no corresponding gains. *Cf. Cities Service,* 391 U.S. at 391 U. S. 279. The Court of Appeals did not take account of the absence of a plausible motive to enter into the alleged predatory pricing conspiracy. It focused instead on whether there was "direct evidence of concert of action." 723 F.2d at 304. The Court of Appeals erred in two respects: (i) the "direct evidence" on which the court relied had little, if any, relevance to the alleged predatory pricing conspiracy; and (ii) the court failed to consider the absence of a plausible motive to engage in predatory pricing.

The "direct evidence" on which the court relied was evidence of *other* combinations, not of a predatory pricing conspiracy. Evidence that petitioners conspired to raise prices in Japan provides little, if any, support for respondents'

Page 475 U. S. 596

claims: a conspiracy to increase profits in one market does not tend to show a conspiracy to sustain losses in another. Evidence that petitioners agreed to fix *minimum* prices (through the check-price agreements) for the American market actually works in petitioners' favor, because it suggests that petitioners were seeking to place a floor under prices, rather than to lower them. The same is true of evidence that petitioners agreed to limit the number of distributors of their products in the American market -- the so-called five-company rule. That practice may have facilitated a horizontal territorial allocation, *see United States v. Topco Associates, Inc.,* 405 U. S. 596 (1972), but its natural effect would be to raise market prices, rather than reduce them. [Footnote 20] Evidence that tends to support any of these collateral conspiracies thus says little, if anything, about the existence of a conspiracy to charge below-market prices in the American market over a period of two decades.

That being the case, the absence of any plausible motive to engage in the conduct charged is highly relevant to whether a "genuine issue for trial" exists within the meaning of Rule 56(e). Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations,

Page 475 U. S. 597

the conduct does not give rise to an inference of conspiracy. *See Cities Service, supra,* at 391 U. S. 278-280. Here, the conduct in question consists largely of (i) pricing at levels that succeeded in taking business away from respondents, and (ii) arrangements that may have limited petitioners' ability to compete with each other (and thus kept prices from going even lower). This conduct suggests either that petitioners behaved competitively, or that petitioners conspired to *raise* prices. Neither possibility is consistent with an agreement among 21 companies to price below market levels. Moreover, the predatory pricing scheme that this conduct is said to prove is one that makes no practical sense: it calls for petitioners to destroy companies larger and better established than themselves, a goal that remains far distant more than two decades after the conspiracy's birth. Even had they succeeded in obtaining their monopoly, there is nothing in the record to suggest that they could recover the losses they would need to sustain along the way. In sum, in light of the absence of any rational motive to conspire, neither petitioners' pricing practices, nor their conduct in the Japanese market, nor their agreements respecting prices and distribution in the American market, suffice to create a "genuine issue for trial." Fed.Rule Civ.Proc. 56(e). [Footnote 21]

On remand, the Court of Appeals is free to consider whether there is other evidence that is sufficiently unambiguous to permit a trier of fact to find that petitioners conspired to price predatorily for two decades despite the absence of any apparent motive to do so. The evidence must "ten[d] to exclude the possibility" that petitioners underpriced respondents to compete for business, rather than to implement an economically

Page 475 U. S. 598

senseless conspiracy. *Monsanto,* 465 U.S. at 465 U. S. 764. In the absence of such evidence, there is no "genuine issue for trial" under Rule 56(e), and petitioners are entitled to have summary judgment reinstated.

**VI**

Our decision makes it unnecessary to reach the sovereign compulsion issue. The heart of petitioners' argument on that issue is that MITI, an agency of the Government of Japan, required petitioners to fix minimum prices for export to the United States, and that petitioners are therefore immune from antitrust liability for any scheme of

which those minimum prices were an integral part. As we discussed in 475 U. S. *supra,* respondents could not have suffered a cognizable injury from any action that *raised* prices in the American CEP market. If liable at all, petitioners are liable for conduct that is distinct from the check-price agreements. The sovereign compulsion question that both petitioners and the Solicitor General urge us to decide thus is not presented here.

The decision of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

[Footnote 1]

NUE had filed its complaint four years earlier, in the District Court for the District of New Jersey. Zenith's complaint was filed separately in 1974, in the Eastern District of Pennsylvania. The two cases were consolidated in the Eastern District of Pennsylvania in 1974.

[Footnote 2]

The inadmissible evidence included various government records and reports, *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F. Supp. 1125 (ED Pa.1980), business documents offered pursuant to various hearsay exceptions, *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F. Supp. 1190 (ED Pa.1980), and a large portion of the expert testimony that respondents proposed to introduce. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F. Supp. 1313 (ED Pa.1981).

[Footnote 3]

The District Court ruled separately that petitioners were entitled to summary judgment on respondents' claims under the Antidumping Act of 1916. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 494 F. Supp. 1190 (ED Pa.1980). Respondents appealed this ruling, and the Court of Appeals reversed in a separate opinion issued the same day as the opinion concerning respondents' other claims. *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 319 (CA3 1983).

Petitioners ask us to review the Court of Appeals' Antidumping Act decision along with its decision on the rest of this mammoth case. The Antidumping Act claims were not, however, mentioned in the questions presented in the petition for certiorari, and they have not been independently argued by the parties. *See* this Court's Rule 21.1(a). We therefore decline the invitation to review the Court of Appeals' decision on those claims.

[Footnote 4]

As to 3 of the 24 defendants, the Court of Appeals affirmed the entry of summary judgment. Petitioners are the 21 defendants who remain in the case.

[Footnote 5]

In addition to these inferences, the court noted that there was expert opinion evidence that petitioners' export sales "generally were at prices which produced losses, often as high as twenty-five percent on sales." 723 F.2d at 311. The court did not identify any direct evidence of below-cost pricing; nor did it place particularly heavy reliance on this aspect of the expert evidence. *See* n19, *infra.*

[Footnote 6]

The Sherman Act does reach conduct outside our borders, but only when the conduct has an effect on American commerce. *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U. S. 690, 370 U. S. 704 (1962) ("A conspiracy to monopolize or restrain the domestic or foreign commerce of the United States is not outside the reach of the Sherman Act just because part of the conduct complained of occurs in foreign countries"). The effect on which respondents rely is the artificially depressed level of prices for CEPs in the United States.

Petitioners' alleged cartelization of the Japanese market could not have caused that effect over a period of some two decades. Once petitioners decided, as respondents allege, to reduce output and raise prices in the Japanese market, they had the option of either producing fewer goods or selling more goods in other markets. The most plausible conclusion is that petitioners chose the latter option because it would be more profitable than the former. That choice does not flow from the cartelization of the Japanese market. On the contrary, were the

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 49 of 217

4/29/26, 12:18 PM                    Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp. | 475 U.S. 574 (1986) | Justia U.S. Supreme Court Center

~~former. That choice does not flow from the cartelization of the Japanese market. On the contrary, were the~~ Japanese market perfectly competitive, petitioners would still have to choose whether to sell goods overseas, and would still presumably make that choice based on their profit expectations. For this reason, respondents' theory of recovery depends on proof of the asserted price-cutting conspiracy in this country.

[Footnote 7]

Respondents also argue that the check-prices, the five-company rule, and the price-fixing in Japan are all part of one large conspiracy that includes monopolization of the American market through predatory pricing. The argument is mistaken. However one decides to describe the contours of the asserted conspiracy -- whether there is one conspiracy or several -- respondents must show that the conspiracy caused them an injury for which the antitrust laws provide relief. *Associated General Contractors of California, Inc. v. Carpenters,* 459 U. S. 519, 538-540 (1983); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U. S. 477, 429 U. S. 488-489 (1977); *see also* Note, Antitrust Standing, Antitrust Injury, and the Per Se Standard, 93 Yale L.J. 1309 (1984). That showing depends in turn on proof that petitioners conspired to price predatorily in the American market, since the other conduct involved in the alleged conspiracy cannot have caused such an injury.

[Footnote 8]

Throughout this opinion, we refer to the asserted conspiracy as one to price "predatorily." This term has been used chiefly in cases in which a single firm, having a dominant share of the relevant market, cuts its prices in order to force competitors out of the market, or perhaps to deter potential entrants from coming in. *E.g., Southern Pacific Communications Co. v. American Telephone & Telegraph Co.,* 238 U.S.App.D.C. 309, 331-336, 740 F.2d 980, 1002-1007 (1984), *cert. denied,* 470 U.S. 1005 (1985). In such cases, "predatory pricing" means pricing below some appropriate measure of cost. *E.g., Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 232-235 (CA1 1983); *see Utah Pie Co. v. Continental Baking Co.,* 386 U. S. 685, 386 U. S. 698, 386 U. S. 701, 386 U. S. 702, n. 14 (1967).

There is a good deal of debate, both in the cases and in the law reviews, about what "cost" is relevant in such cases. We need not resolve this debate here, because, unlike the cases cited above, this is a Sherman Act §1 case. For purposes of this case, it is enough to note that respondents have not suffered an antitrust injury unless petitioners conspired to drive respondents out of the relevant markets by (i) pricing below the level necessary to sell their products, or (ii) pricing below some appropriate measure of cost. An agreement without these features would either leave respondents in the same position as would market forces or would actually benefit respondents by raising market prices. Respondents therefore may not complain of conspiracies that, for example, set maximum prices above market levels, or that set minimum prices at *any* level.

[Footnote 9]

We do not consider whether recovery should *ever* be available on a theory such as respondents' when the pricing in question is above some measure of incremental cost. *See generally* Areeda § Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv.L.Rev. 697, 709-718 (1975) (discussing cost-based test for use in § 2 cases). As a practical matter, it may be that only direct evidence of below-cost pricing is sufficient to overcome the strong inference that rational businesses would not enter into conspiracies such as this one. *See* 475 U. S. *infra.*

[Footnote 10]

Respondents argued before the District Court that petitioners had failed to carry their initial burden under Federal Rule of Civil Procedure 56(c) of demonstrating the absence of a genuine issue of material fact. *See Adickes v. S. H. Kress & Co.,* 398 U. S. 144, 398 U. S. 157 (1970). *Cf. Catrett v. Johns-Manville Sales Corp.,* 244 U.S.App.D.C. 160, 756 F.2d 181, *cert. granted,* 474 U.S. 944 (1985). That issue was resolved in petitioners' favor, and is not before us.

[Footnote 11]

Rule 56(e) provides, in relevant part:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond,

summary judgment, if appropriate, shall be entered against him."

[Footnote 12]

*See* n 10, *supra.*

[Footnote 13]

NUE's complaint alleges that petitioners' conspiracy began as early as 1960; the starting date used in Zenith's complaint is 1953. NUE Complaint � 52; Zenith Complaint � 39.

[Footnote 14]

During the same period, the number of American firms manufacturing television sets declined from 19 to 13. 6 App. to Brief for Appellant in No. 81-2331 (CA3), p.1961a. This decline continued a trend that began at least by 1960, when petitioners' sales in the United States market were negligible. *Ibid. See* Zenith Complaint � � 35, 37.

[Footnote 15]

Respondents offer no reason to suppose that entry into the relevant market is especially difficult, yet, without barriers to entry, it would presumably be impossible to maintain supracompetitive prices for an extended time. Judge Easterbrook, commenting on this case in a law review article, offers the following sensible assessment:

"The plaintiffs [in this case] maintain that, for the last fifteen years or more, at least ten Japanese manufacturers have sold TV sets at less than cost in order to drive United States firms out of business. Such conduct cannot possibly produce profits by harming competition, however. If the Japanese firms drive some United States firms out of business, they could not recoup. Fifteen years of losses could be made up only by very high prices for the indefinite future. (The losses are like investments, which must be recovered with compound interest.) If the defendants should try to raise prices to such a level, they would attract new competition. There are no barriers to entry into electronics, as the proliferation of computer and audio firms shows. The competition would come from resurgent United States firms, from other foreign firms (Korea and many other nations make TV sets), and from defendants themselves. In order to recoup, the Japanese firms would need to suppress competition among themselves. On plaintiffs' theory, the cartel would need to last at least thirty years, far longer than any in history, even when cartels were not illegal. None should be sanguine about the prospects of such a cartel, given each firm's incentive to shave price and expand its share of sales. The predation recoupment story therefore does not make sense, and we are left with the more plausible inference that the Japanese firms did not sell below cost in the first place. They were just engaged in hard competition."

Easterbrook, The Limits of Antitrust, 63 Texas L.Rev. 1, 26-27 (1984) (footnotes omitted).

[Footnote 16]

The alleged predatory scheme makes sense only if petitioners can recoup their losses. In light of the large number of firms involved here, petitioners can achieve this only by engaging in some form of price-fixing after they have succeeded in driving competitors from the market. Such price-fixing would, of course, be an independent violation of § 1 of the Sherman Act. *United States v. Socony-Vacuum Oil Co.,* 310 U. S. 150 (1940).

[Footnote 17]

The predators' losses must actually *increase* as the conspiracy nears its objective: the greater the predators' market share, the more products the predators sell; but since every sale brings with it a loss, an increase in market share also means an increase in predatory losses.

[Footnote 18]

The same is true of any supposed excess production capacity that petitioners may have possessed. The existence of plant capacity that exceeds domestic demand does tend to establish the ability to sell products abroad. It does not, however, provide a motive for selling at prices lower than necessary to obtain sales; nor does it explain why petitioners would be willing to *lose* money in the United States market without some reasonable prospect of recouping their investment.

[Footnote 19]

Case 9:25-cv-00083-DWM   Document 59-1   Filed 05/04/26   Page 51 of 217

4/29/26, 12:18 PM          Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp. | 475 U.S. 574 (1986) | Justia U.S. Supreme Court Center

Respondents also rely on an expert study suggesting that petitioners have sold their products in the American market at substantial losses. The relevant study is not based on actual cost data; rather, it consists of expert opinion based on a mathematical construction that, in turn, rests on assumptions about petitioners' costs. The District Court analyzed those assumptions in some detail and found them both implausible and inconsistent with record evidence. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F. Supp. at 1356-1363. Although the Court of Appeals reversed the District Court's finding that the expert report was inadmissible, the court did not disturb the District Court's analysis of the factors that substantially undermine the probative value of that evidence. *See* 723 F.2d at 277-282. We find the District Court's analysis persuasive. Accordingly, in our view, the expert opinion evidence of below-cost pricing has little probative value in comparison with the economic factors, discussed in 475 U. S. *supra,* that suggest that such conduct is irrational.

[Footnote 20]

The Court of Appeals correctly reasoned that the five-company rule might tend to insulate petitioners from competition with each other. 723 F.2d at 306. But this effect is irrelevant to a conspiracy to price predatorily. Petitioners have no incentive to underprice each other if they already are pricing *below* the level at which they could sell their goods. The far more plausible inference from a customer allocation agreement such as the five-company rule is that petitioners were conspiring to *raise* prices, by limiting their ability to take sales away from each other. Respondents -- petitioners' competitors -- suffer no harm from a conspiracy to raise prices. *Supra* at 475 U. S. 582-583. Moreover, it seems very unlikely that the five-company rule had any significant effect of any kind, since the "rule" permitted petitioners to sell to their American subsidiaries, and did not limit the number of distributors to which the subsidiaries could resell. 513 F. Supp. at 1190.

[Footnote 21]

We do not imply that, if petitioners had had a plausible reason to conspire, ambiguous conduct could suffice to create a triable issue of conspiracy. Our decision in *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U. S. 752 (1984), establishes that conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy. *Id.* at 465 U. S. 763-764. *See supra* at 475 U.S. 588.

JUSTICE WHITE, with whom JUSTICE BRENNAN, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

It is indeed remarkable that the Court, in the face of the long and careful opinion of the Court of Appeals, reaches the result it does. The Court of Appeals faithfully followed the relevant precedents, including *First National Bank of Arizona v. Cities Service Co.,* 391 U. S. 253 (1968), and *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U. S. 752 (1984), and it kept firmly in mind the principle that proof of a conspiracy should not be fragmented, *see Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U. S. 690, 370 U. S. 699 (1962). After surveying the massive record, including very

Page 475 U. S. 599

significant evidence that the District Court erroneously had excluded, the Court of Appeals concluded that the evidence, taken as a whole, creates a genuine issue of fact whether petitioners engaged in a conspiracy in violation of §§ 1 and 2 of the Sherman Act and § 2(a) of the Robinson-Patman Act. In my view, the Court of Appeals' opinion more than adequately supports this judgment.

The Court's opinion today, far from identifying reversible error, only muddies the waters. In the first place, the Court makes confusing and inconsistent statements about the appropriate standard for granting summary judgment. Second, the Court makes a number of assumptions that invade the factfinder's province. Third, the Court faults the Third Circuit for nonexistent errors, and remands the case although it is plain that respondents' evidence raises genuine issues of material fact.

I

The Court's initial discussion of summary judgment standards appears consistent with settled doctrine. I agree that,

"[w]here the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 52 of 217

4/29/26, 12:18 PM    Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp. | 475 U.S. 574 (1986) | Justia U.S. Supreme Court Center

*Ante* at 475 U. S. 587 (quoting *Cities Service, supra,* at 391 U. S. 289). I also agree that,

"[o]n summary judgment, the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."

*Ante* at 475 U. S. 587 (quoting *United States v. Diebold, Inc.,* 369 U. S. 654, 369 U. S. 655 (1962)). But other language in the Court's opinion suggests a departure from traditional summary judgment doctrine. Thus, the Court gives the following critique of the Third Circuit's opinion:

"[T]he Court of Appeals concluded that a reasonable factfinder could find a conspiracy to depress prices in the American market in order to drive out American competitors, which conspiracy was funded by excess profits obtained in the Japanese market. The court apparently did not consider whether it was as plausible to conclude

Page 475 U. S. 600

that petitioners' price-cutting behavior was independent, and not conspiratorial."

*Ante* at 475 U. S. 581.

In a similar vein, the Court summarizes *Monsanto Co. v. Spray-Rite Service Corp., supra,* as holding that "courts should not permit factfinders to infer conspiracies when such inferences are implausible. . . ." *Ante* at 475 U. S. 593. Such language suggests that a judge hearing a defendant's motion for summary judgment in an antitrust case should go beyond the traditional summary judgment inquiry and decide for himself whether the weight of the evidence favors the plaintiff. *Cities Service* and *Monsanto* do not stand for any such proposition. Each of those cases simply held that a particular piece of evidence, *standing alone,* was insufficiently probative to justify sending a case to the jury. [Footnote 2/1] These holdings in no way undermine

Page 475 U. S. 601

the doctrine that all evidence must be construed in the light most favorable to the party opposing summary judgment.

If the Court intends to give every judge hearing a motion for summary judgment in an antitrust case the job of determining if the evidence makes the inference of conspiracy more probable than not, it is overturning settled law. If the Court does not intend such a pronouncement, it should refrain from using unnecessarily broad and confusing language.

**II**

In defining what respondents must show in order to recover, the Court makes assumptions that invade the factfinder's province. The Court states with very little discussion that respondents can recover under § 1 of the Sherman Act only if they prove that

"petitioners conspired to drive respondents out of the relevant markets by (i) pricing below the level necessary to sell their products, or (ii) pricing below some appropriate measure of cost."

*Ante* at 475 U. S. 585, n. 8. This statement is premised on the assumption that

"[a]n agreement without these features would either leave respondents in the same position as would market forces or would actually benefit respondents by raising market prices."

*Ibid.* In making this assumption, the Court ignores the contrary conclusions of respondents' expert DePodwin, whose report in very relevant part was erroneously excluded by the District Court.

The DePodwin Report, on which the Court of Appeals relied along with other material, indicates that respondents were harmed in two ways that are independent of whether petitioners priced their products below "the level necessary to sell their products or . . . some appropriate measure of cost." *Ibid.* First, the Report explains that the price-raising scheme in Japan resulted in lower consumption of petitioners' goods in that country, and the exporting of more of petitioners' goods to this country, than would have occurred had prices in Japan been at the competitive level. Increasing

Page 475 U. S. 602

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 53 of 217

4/29/26, 12:18 PM          Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp. | 475 U.S. 574 (1986) | Justia U.S. Supreme Court Center

exports to this country resulted in depressed prices here, which harmed respondents. [Footnote 2/2] Second, the DePodwin Report indicates that petitioners exchanged confidential proprietary information and entered into agreements such as the five-company rule with the goal of avoiding intragroup competition in the United States market. The Report explains that petitioners' restrictions on intragroup competition caused respondents to lose business that they would not have lost had petitioners competed with one another. [Footnote 2/3]

Page 475 U. S. 603

The DePodwin Report alone creates a genuine factual issue regarding the harm to respondents caused by Japanese cartelization and by agreements restricting competition among petitioners in this country. No doubt the Court prefers its own economic theorizing to Dr. DePodwin's, but that is not a reason to deny the factfinder an opportunity to consider Dr. DePodwin's views on how petitioners' alleged collusion harmed respondents. [Footnote 2/4]

Page 475 U. S. 604

The Court, in discussing the unlikelihood of a predatory conspiracy, also consistently assumes that petitioners valued profit-maximization over growth. *See, e.g., ante* at 475 U. S. 595. In light of the evidence that petitioners sold their goods in this country at substantial losses over a long period of time, *see* Part III-B, infra, I believe that this is an assumption that should be argued to the factfinder, not decided by the Court.

## III

In reversing the Third Circuit's judgment, the Court identifies two alleged errors:

"(i) [T]he 'direct evidence' on which the [Court of Appeals] relied had little, if any, relevance to the alleged predatory pricing conspiracy; and (ii) the court failed to consider the absence of a plausible motive to engage in predatory pricing."

*Ante* at 475 U. S. 595. The Court's position is without substance.

### A

The first claim of error is that the Third Circuit treated evidence regarding price-fixing in Japan and the so-called five-company rule and check-prices as "*direct evidence' of a conspiracy that injured respondents." Ante at 475 U. S. 583 (citing In re Japanese Electronics Products Antitrust Litigation, 723 F.2d 238, 304-305 (1983)). The passage from the Third*

Page 475 U. S. 605

Circuit's opinion in which the Court locates this alleged error makes what I consider to be a quite simple and correct observation, namely, that this case is distinguishable from traditional "conscious parallelism" cases in that there is direct evidence of concert of action among petitioners. *Ibid.* The Third Circuit did not, as the Court implies, jump unthinkingly from this observation to the conclusion that evidence regarding the five-company rule could support a finding of antitrust injury to respondents. [Footnote 2/5] The Third Circuit twice specifically noted that horizontal agreements allocating customers, though illegal, do not ordinarily injure competitors of the agreeing parties. *Id.* at 306, 310-311. However, after reviewing evidence of cartel activity in Japan, collusive establishment of dumping prices in this country, and long-term, below-cost sales, the Third Circuit held that a factfinder could reasonably conclude that the five-company rule was not a simple price-raising device:

"[A] factfinder might reasonably infer that the allocation of customers in the United States, combined with price-fixing in Japan, was intended to permit concentration of the effects of dumping upon American competitors while eliminating competition among the Japanese manufacturers in either market."

*Id.* at 311. I see nothing erroneous in this reasoning.

### B

The Court's second charge of error is that the Third Circuit was not sufficiently skeptical of respondents' allegation that petitioners engaged in predatory pricing conspiracy. But

Page 475 U. S. 606

4/29/26, 12:18 PM       Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp. | 475 U.S. 574 (1986) | Justia U.S. Supreme Court Center

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 54 of 217

the Third Circuit is not required to engage in academic discussions about predation; it is required to decide whether respondents' evidence creates a genuine issue of material fact. The Third Circuit did its job, and remanding the case so that it can do the same job again is simply pointless.

The Third Circuit indicated that it considers respondents' evidence sufficient to create a genuine factual issue regarding long-term, below-cost sales by petitioners. *Ibid.* The Court tries to whittle away at this conclusion by suggesting that the

"expert opinion evidence of below-cost pricing has little probative value in comparison with the economic factors . . . that suggest that such conduct is irrational."

*Ante* at 475 U. S. 594, n.19. But the question is not whether the Court finds respondents' experts persuasive, or prefers the District Court's analysis; it is whether, viewing the evidence in the light most favorable to respondents, a jury or other factfinder could reasonably conclude that petitioners engaged in long-term, below-cost sales. I agree with the Third Circuit that the answer to this question is "yes."

It is misleading for the Court to state that the Court of Appeals

"did not disturb the District Court's analysis of the factors that substantially undermine the probative value of [evidence in the DePodwin Report respecting below-cost sales]."

*Ibid.* The Third Circuit held that the exclusion of the portion of the DePodwin Report regarding below-cost pricing was erroneous because

"the trial court ignored DePodwin's uncontradicted affidavit that all data relied on in his report were of the type on which experts in his field would reasonably rely."

723 F.2d at 282. In short, the Third Circuit found DePodwin's affidavit sufficient to create a genuine factual issue regarding the correctness of his conclusion that petitioners sold below cost over a long period of time. Having made this determination, the court saw no need -- nor do I -- to address the District Court's analysis point by point. The District Court's criticisms of DePodwin's

Page 475 U. S. 607

methods are arguments that a factfinder should consider.

## IV

Because I believe that the Third Circuit was correct in holding that respondents have demonstrated the existence of genuine issues of material fact, I would affirm the judgment below and remand this case for trial.

[Footnote 2/1]

The Court adequately summarizes the quite fact-specific holding in *Cities Service. Ante* at 475 U. S. 587.

In *Monsanto,* the Court held that a manufacturer's termination of a price-cutting distributor after receiving a complaint from another distributor is not, *standing alone,* sufficient to create a jury question. 465 U.S. at 465 U. S. 763-764. To understand this holding, it is important to realize that, under *United States v. Colgate & Co.,* 250 U. S. 300 (1919), it is permissible for a manufacturer to announce retail prices in advance and terminate those who fail to comply, but that under *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U. S. 373 (1911), it is impermissible for the manufacturer and its distributors to agree on the price at which the distributors will sell the goods. Thus, a manufacturer's termination of a price-cutting distributor after receiving a complaint from another distributor is lawful under *Colgate, unless* the termination is pursuant to a shared understanding between the manufacturer and its distributors respecting enforcement of a resale price maintenance scheme. *Monsanto* holds that, to establish liability under *Dr. Miles,* more is needed than evidence of behavior that is consistent with a distributor's exercise of its prerogatives under *Colgate.* Thus,

"[t]here must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently."

465 U.S. at 465 U. S. 764. *Monsanto* does *not* hold that, if a terminated dealer produces some further evidence of conspiracy beyond the bare fact of postcomplaint termination, the judge hearing a motion for summary judgment should balance all the evidence pointing toward conspiracy against all the evidence pointing toward independent

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 55 of 217

4/29/26, 12:18 PM          Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp. | 475 U.S. 574 (1986) | Justia U.S. Supreme Court Center

action.

[Footnote 2/2]

Dr. DePodwin summarizes his view of the harm caused by Japanese cartelization as follows:

"When we consider the injuries inflicted on United States producers, we must again look at the Japanese television manufacturers' export agreement as part of a generally collusive scheme embracing the Japanese domestic market as well. This scheme increased the supply of television receivers to the United States market while restricting supply in the Japanese market. If Japanese manufacturers had competed in both domestic and export markets, they would have sold more in the domestic market and less in the United States. A greater proportion of Japanese production capacity would have been devoted to domestic sales. Domestic prices would have been lower, and export prices would have been higher. The size of the price differential between domestic and export markets would have diminished practically to the vanishing point. Consequently, competition among Japanese producers in both markets would have resulted in reducing exports to the United States, and United States prices would have risen. In addition, investment by the United States industry would have increased. As it was, however, the influx of sets at depressed prices cut the rates of return on television receiver production facilities in the United States to so low a level as to make such investment uneconomic."

"We can therefore conclude that the American manufacturers of television receivers would have made larger sales at higher prices in the absence of the Japanese cartel agreements. Thus, the collusive behavior of Japanese television manufacturers resulted in a very severe injury to those American television manufacturers, particularly to National Union Electric Corporation, which produced a preponderance of television sets with screen sizes of nineteen inches and lower, especially those in the lower range of prices."

5 App. to Brief for Appellants in No. 81-2331 (CA3), pp. 1629a-1630a.

[Footnote 2/3]

The DePodwin Report has this, among other things, to say in summarizing the harm to respondents caused by the five-company rule, exchange of production data, price coordination, and other allegedly anticompetitive practices of petitioners:

"The impact of Japanese anticompetitive practices on United States manufacturers is evident when one considers the nature of competition. When a market is fully competitive, firms pit their resources against one another in an attempt to secure the business of individual customers. However, when firms collude, they violate a basic tenet of competitive behavior, *i.e.,* that they act independently. United States firms were confronted with Japanese competitors who collusively were seeking to destroy their established customer relationships. Each Japanese company had targeted customers which it could service with reasonable assurance that its fellow Japanese cartel members would not become involved. But, just as importantly, each Japanese firm would be assured that what was already a low price level for Japanese television receivers in the United States market would not be further depressed by the actions of its Japanese associates."

"The result was a phenomenal growth in exports, particularly to the United States. Concurrently, Japanese manufacturers, and the defendants in particular, made large investments in new plant and equipment and expanded production capacity. It is obvious, therefore, that the effect of the Japanese cartel's concerted actions was to generate a larger volume of investment in the Japanese television industry than would otherwise have been the case. This added capacity both enabled and encouraged the Japanese to penetrate the United States market more deeply than they would have had they competed lawfully."

*Id.* at 1628a-1629a.

For a more complete statement of DePodwin's explanation of how the alleged cartel operated and the harms it caused respondents, *see id.* at 1609a-1642a. This material is summarized in a chart found *id.* at 1633a.

[Footnote 2/4]

In holding that Parts IV and V of the Report had been improperly excluded, the Court of Appeals said:

"The trial court found that DePodwin did not use economic expertise in reaching the opinion that the defendants participated in a Japanese television cartel. 505 F. Supp. at 1342-46. We have examined the excluded portions of

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 56 of 217

Parts IV and V in light of the admitted portions, and we conclude that this finding is clearly erroneous. As a result, the court also held the opinions to be unhelpful to the factfinder. What the court in effect did was to eliminate all parts of the report in which the expert economist, after describing the conditions in the respective markets, the opportunities for collusion, the evidence pointing to collusion, the terms of certain undisputed agreements, and the market behavior, expressed the opinion that there was concert of action consistent with plaintiffs' conspiracy theory. Considering the complexity of the economic issues involved, it simply cannot be said that such an opinion would not help the trier of fact to understand the evidence or determine that fact in issue."

*In re Japanese Electronics Products Antitrust Litigation,* 723 F.2d 238, 280 (1983).

The Court of Appeals had similar views about Parts VI and VII.

[Footnote 2/5]

I use the Third Circuit's analysis of the five-company rule by way of example; the court did an equally careful analysis of the parts the cartel activity in Japan and the check-prices could have played in an actionable conspiracy. *See generally id.* at 303-311.

In discussing the five-company rule, I do not mean to imply any conclusion on the validity of petitioners' sovereign compulsion defense. Since the Court does not reach this issue, I see no need of my addressing it.

## Materials

### Oral Arguments

Oral Argument - November 12, 1985

## Search This Case

**Google Scholar**        **Google Books**        **Google Web**

**Google News**

## Charlotte, North Carolina Lawyers
Sponsored Listings

**Kelli Y. Allen**

(704) 727-4900
**Charlotte, NC**
Family Law, Criminal Law, Immigration Law, Divorce, DUI & DWI, Domestic Violence

PREMIUM

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 57 of 217



# Celotex Corp. v. Catrett, 477 U.S. 317 (1986)

Overview    Opinions    Materials

**Argued:**
April 1, 1986

**Decided:**
June 25, 1986

## Annotation

**PRIMARY HOLDING**

A defendant cannot get summary judgment through a conclusory assertion that the plaintiff does not have evidence to support the complaint. Instead, the defendant must show the absence of evidence in the discovery record. Also, supporting affidavits are not required if the party moving for summary judgment does not have the burden of proof at trial.

**Read More**

## Syllabus

# U.S. Supreme Court

**Celotex Corp. v. Catrett, 477 U.S. 317 (1986)**

**Celotex Corp. v. Catrett**

**No. 85-198**

**Argued April 1, 1986**

**Decided June 25, 1986**

**477 U.S. 317**

*Syllabus*

In September, 1980, respondent administratrix filed this wrongful death action in Federal District Court, alleging that her husband's death in 1979 resulted from his exposure to asbestos products manufactured or distributed by the defendants, who included petitioner corporation. In September, 1981, petitioner filed a motion for summary judgment, asserting that, during discovery, respondent failed to produce any evidence to support her allegation that the decedent had been exposed to petitioner's products. In response, respondent produced documents tending to show such exposure, but petitioner argued that the documents were inadmissible hearsay, and thus could not be considered in opposition to the summary judgment motion. In July, 1982, the court granted the motion because there was no showing of exposure to petitioner's products, but the Court of Appeals reversed, holding that summary judgment in petitioner's favor was precluded because of petitioner's failure to support its motion with evidence tending to negate such exposure, as required by Federal Rule of Civil Procedure 56(e) and the decision in *Adickes v. S. H. Kress & Co.,* 398 U. S. 144.

*Held:*

Case 9:25-cv-00083-DWM Document 59-1 Filed 05/04/26 Page 58 of 217

1. The Court of Appeals' position is inconsistent with the standard for summary judgment set forth in Rule 56(c), which provides that summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Pp. 477 U. S. 322-326.

(a) The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to

Page 477 U. S. 318

make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. Pp. 477 U. S. 322-323.

(b) There is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim. On the contrary, Rule 56(c), which refers to the affidavits, "if any," suggests the absence of such a requirement, and Rules 56(a) and (b) provide that claimants and defending parties may move for summary judgment "with or without supporting affidavits." Rule 56(e), which relates to the form and use of affidavits and other materials, does not require that the moving party's motion always be supported by affidavits to show initially the absence of a genuine issue for trial. *Adickes v. S. H. Kress & Co., supra,* explained. Pp. 477 U. S. 323-326.

(c) No serious claim can be made that respondent was "railroaded" by a premature motion for summary judgment, since the motion was not filed until one year after the action was commenced, and since the parties had conducted discovery. Moreover, any potential problem with such premature motions can be adequately dealt with under Rule 56(f). P. 477 U. S. 326.

2. The questions whether an adequate showing of exposure to petitioner's products was in fact made by respondent in opposition to the motion, and whether such a showing, if reduced to admissible evidence, would be sufficient to carry respondent's burden of proof at trial, should be determined by the Court of Appeals in the first instance. Pp. 477 U. S. 326-327.

244 U.S.App.D.C. 160, 756 F.2d 181, reversed and remanded.

REHNQUIST, J., delivered the opinion of the Court, in which WHITE, MARSHALL, POWELL, and O'CONNOR, JJ., joined. WHITE, J., filed a concurring opinion, *post,* p. 477 U. S. 328. BRENNAN, J., filed a dissenting opinion, in which BURGER, C.J., and BLACKMUN, J., joined, *post,* p. 477 U. S. 329. STEVENS, J., filed a dissenting opinion, *post,* p. 477 U. S. 337.

Page 477 U. S. 319

**Read More**

## Opinions

### Opinions & Dissents

# U.S. Supreme Court

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)
Celotex Corp. v. Catrett

No. 85-198

Argued April 1, 1986

Decided June 25, 1986

477 U.S. 317

*CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR*

*THE DISTRICT OF COLUMBIA CIRCUIT*

*Syllabus*

In September, 1980, respondent administratrix filed this wrongful death action in Federal District Court, alleging that her husband's death in 1979 resulted from his exposure to asbestos products manufactured or distributed by the defendants, who included petitioner corporation. In September, 1981, petitioner filed a motion for summary judgment, asserting that, during discovery, respondent failed to produce any evidence to support her allegation that the decedent had been exposed to petitioner's products. In response, respondent produced documents tending to show such exposure, but petitioner argued that the documents were inadmissible hearsay, and thus could not be considered in opposition to the summary judgment motion. In July, 1982, the court granted the motion because there was no showing of exposure to petitioner's products, but the Court of Appeals reversed, holding that summary judgment in petitioner's favor was precluded because of petitioner's failure to support its motion with evidence tending to negate such exposure, as required by Federal Rule of Civil Procedure 56(e) and the decision in *Adickes v. S. H. Kress & Co.,* 398 U. S. 144.

*Held:*

1. The Court of Appeals' position is inconsistent with the standard for summary judgment set forth in Rule 56(c), which provides that summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Pp. 477 U. S. 322-326.

(a) The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to

Page 477 U. S. 318

make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. Pp. 477 U. S. 322-323.

(b) There is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim. On the contrary, Rule 56(c), which refers to the affidavits, "if any," suggests the absence of such a requirement, and Rules 56(a) and (b) provide that claimants and defending parties may move for summary judgment "with or without supporting affidavits." Rule 56(e), which relates to the form and use of affidavits and other materials, does not require that the moving party's motion always be supported by affidavits to show initially the absence of a genuine issue for trial. *Adickes v. S. H.*

*Kress & Co., supra,* explained. Pp. 477 U. S. 323-326.

(c) No serious claim can be made that respondent was "railroaded" by a premature motion for summary judgment, since the motion was not filed until one year after the action was commenced, and since the parties had conducted discovery. Moreover, any potential problem with such premature motions can be adequately dealt with under Rule 56(f). P. 477 U. S. 326.

2. The questions whether an adequate showing of exposure to petitioner's products was in fact made by respondent in opposition to the motion, and whether such a showing, if reduced to admissible evidence, would be sufficient to carry respondent's burden of proof at trial, should be determined by the Court of Appeals in the first instance. Pp. 477 U. S. 326-327.

244 U.S.App.D.C. 160, 756 F.2d 181, reversed and remanded.

REHNQUIST, J., delivered the opinion of the Court, in which WHITE, MARSHALL, POWELL, and O'CONNOR, JJ., joined. WHITE, J., filed a concurring opinion, *post,* p. 477 U. S. 328. BRENNAN, J., filed a dissenting opinion, in which BURGER, C.J., and BLACKMUN, J., joined, *post,* p. 477 U. S. 329. STEVENS, J., filed a dissenting opinion, *post,* p. 477 U. S. 337.

Page 477 U. S. 319

JUSTICE REHNQUIST delivered the opinion of the Court.

The United States District Court for the District of Columbia granted the motion of petitioner Celotex Corporation for summary judgment against respondent Catrett because the latter was unable to produce evidence in support of her allegation in her wrongful death complaint that the decedent had been exposed to petitioner's asbestos products. A divided panel of the Court of Appeals for the District of Columbia Circuit reversed, however, holding that petitioner's failure to support its motion with evidence tending to negate such exposure precluded the entry of summary judgment in its favor. *Catrett v. Johns-Manville Sales Corp.,* 244 U.S.App.D.C. 160, 756 F.2d 181 (1985). This view conflicted with that of the Third Circuit in *In re Japanese Electronic Products,* 723 F.2d 238 (1983), *rev'd on other grounds sub nom. Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U. S. 574 (1986). [Footnote 1] We granted certiorari to resolve the conflict, 474 U.S. 944 (1985), and now reverse the decision of the District of Columbia Circuit.

Respondent commenced this lawsuit in September, 1980, alleging that the death in 1979 of her husband, Louis H. Catrett, resulted from his exposure to products containing asbestos manufactured or distributed by 15 named corporations. Respondent's complaint sounded in negligence, breach of warranty, and strict liability. Two of the defendants filed motions challenging the District Court's *in personam* jurisdiction, and the remaining 13, including petitioner, filed motions for summary judgment. Petitioner's motion, which was first filed in September, 1981, argued that summary judgment was proper because respondent had

"failed to produce evidence that any [Celotex] product . . . was the proximate cause of the injuries alleged within the jurisdictional

Page 477 U. S. 320

limits of [the District] Court."

In particular, petitioner noted that respondent had failed to identify, in answering interrogatories specifically requesting such information, any witnesses who could testify about the decedent's exposure to petitioner's asbestos products. In response to petitioner's summary judgment motion, respondent then produced three documents which she claimed "demonstrate that there is a genuine material factual dispute" as to whether the decedent had ever been exposed to petitioner's asbestos products. The three documents included a transcript of a deposition of the decedent, a letter from an official of one of the decedent's former employers whom petitioner planned to call as a trial witness, and a letter from an insurance company to respondent's attorney, all tending to establish that the decedent had been exposed to petitioner's asbestos products in Chicago during 1970-1971. Petitioner, in turn, argued that the three documents were inadmissible hearsay, and thus could not be considered in opposition to the summary judgment motion.

In July, 1982, almost two years after the commencement of the lawsuit, the District Court granted all of the motions filed by the various defendants. The court explained that it was granting petitioner's summary judgment

motion because

"there [was] no showing that the plaintiff was exposed to the defendant Celotex's product in the District of Columbia or elsewhere within the statutory period."

App. 217. [Footnote 2] Respondent

Page 477 U. S. 321

appealed only the grant of summary judgment in favor of petitioner, and a divided panel of the District of Columbia Circuit reversed. The majority of the Court of Appeals held that petitioner's summary judgment motion was rendered "fatally defective" by the fact that petitioner "made no effort to adduce *any* evidence, in the form of affidavits or otherwise, to support its motion." 244 U.S.App.D.C. at 163, 756 F.2d at 184 (emphasis in original). According to the majority, Rule 56(e) of the Federal Rules of Civil Procedure, [Footnote 3] and this Court's decision in *Adickes v. S. H. Kress & Co.,* 398 U. S. 144, 398 U. S. 159 (1970), establish that

"the party opposing the motion for summary judgment bears the burden of responding *only after* the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact."

244 U.S.App.D.C. at 163, 756

Page 477 U. S. 322

F.2d at 184 (emphasis in original; footnote omitted). The majority therefore declined to consider petitioner's argument that none of the evidence produced by respondent in opposition to the motion for summary judgment would have been admissible at trial. *Ibid.* The dissenting judge argued that

"[t]he majority errs in supposing that a party seeking summary judgment must always make an affirmative evidentiary showing, even in cases where there is not a triable, factual dispute."

*Id.* at 167, 756 F.2d at 188 (Bork, J., dissenting). According to the dissenting judge, the majority's decision "undermines the traditional authority of trial judges to grant summary judgment in meritless cases." *Id.* at 166, 756 F.2d at 187.

We think that the position taken by the majority of the Court of Appeals is inconsistent with the standard for summary judgment set forth in Rule 56(c) of the Federal Rules of Civil Procedure. [Footnote 4] Under Rule 56(c), summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation,

Page 477 U. S. 323

there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. "[T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a). . . ." *Anderson v. Liberty Lobby, Inc., ante* at 477 U. S. 250.

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. But unlike the Court of Appeals, we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. On the contrary, Rule 56(c), which refers to "the affidavits, *if any*" (emphasis

added), suggests the absence of such a requirement. And if there were any doubt about the meaning of Rule 56(c) in this regard, such doubt is clearly removed by Rules 56(a) and (b), which provide that claimants and defendants, respectively, may move for summary judgment "*with or without supporting affidavits*" (emphasis added). The import of these subsections is that, regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied. One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported

Page 477 U. S. 324

claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose. [Footnote 5]

Respondent argues, however, that Rule 56(e), by its terms, places on the nonmoving party the burden of coming forward with rebuttal affidavits, or other specified kinds of materials, only in response to a motion for summary judgment "made and supported as provided in this rule." According to respondent's argument, since petitioner did not "support" its motion with affidavits, summary judgment was improper in this case. But as we have already explained, a motion for summary judgment may be made pursuant to Rule 56 "with or without supporting affidavits." In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred.

Page 477 U. S. 325

The Court of Appeals in this case felt itself constrained, however, by language in our decision in *Adickes v. S. H. Kress & Co.,* 398 U. S. 144 (1970). There we held that summary judgment had been improperly entered in favor of the defendant restaurant in an action brought under 42 U.S.C. § 1983. In the course of its opinion, the *Adickes* Court said that

"both the commentary on and the background of the 1963 amendment conclusively show that it was not intended to modify the burden of the moving party . . . to show initially the absence of a genuine issue concerning any material fact."

*Id.* at 398 U. S. 159. We think that this statement is accurate in a literal sense, since we fully agree with the *Adickes* Court that the 1963 amendment to Rule 56(e) was not designed to modify the burden of making the showing generally required by Rule 56(c). It also appears to us that, on the basis of the showing before the Court in *Adickes,* the motion for summary judgment in that case should have been denied. But we do not think the *Adickes* language quoted above should be construed to mean that the burden is on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof. Instead, as we have explained, the burden on the moving party may be discharged by "showing" -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case.

The last two sentences of Rule 56(e) were added, as this Court indicated in *Adickes,* to disapprove a line of cases allowing a party opposing summary judgment to resist a properly made motion by reference only to its pleadings. While the *Adickes* Court was undoubtedly correct in concluding that these two sentences were not intended to reduce the burden of the moving party, it is also obvious that they were not adopted to *add* to that burden. Yet that is exactly the result which the reasoning of the Court of Appeals would produce; in effect, an amendment to Rule 56(e) designed to

Page 477 U. S. 326

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 63 of 217

*facilitate* the granting of motions for summary judgment would be interpreted to make it *more difficult* to grant such motions. Nothing in the two sentences themselves requires this result, for the reasons we have previously indicated, and we now put to rest any inference that they do so.

Our conclusion is bolstered by the fact that district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence. *See* 244 U.S.App.D.C. at 167-168, 756 F.2d at 189 (Bork, J., dissenting); 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2720, pp. 28-29 (1983). It would surely defy common sense to hold that the District Court could have entered summary judgment *sua sponte* in favor of petitioner in the instant case, but that petitioner's filing of a motion requesting such a disposition precluded the District Court from ordering it.

Respondent commenced this action in September, 1980, and petitioner's motion was filed in September, 1981. The parties had conducted discovery, and no serious claim can be made that respondent was in any sense "railroaded" by a premature motion for summary judgment. Any potential problem with such premature motions can be adequately dealt with under Rule 56(f), [Footnote 6] which allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity to make full discovery.

In this Court, respondent's brief and oral argument have been devoted as much to the proposition that an adequate showing of exposure to petitioner's asbestos products was

Page 477 U. S. 327

made as to the proposition that no such showing should have been required. But the Court of Appeals declined to address either the adequacy of the showing made by respondent in opposition to petitioner's motion for summary judgment or the question whether such a showing, if reduced to admissible evidence, would be sufficient to carry respondent's burden of proof at trial. We think the Court of Appeals, with its superior knowledge of local law, is better suited than we are to make these determinations in the first instance.

The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact. Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. l; *see* Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984). Before the shift to "notice pleading" accomplished by the Federal Rules, motions to dismiss a complaint or to strike a defense were the principal tools by which factually insufficient claims or defenses could be isolated and prevented from going to trial, with the attendant unwarranted consumption of public and private resources. But with the advent of "notice pleading," the motion to dismiss seldom fulfills this function any more, and its place has been taken by the motion for summary judgment. Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

Page 477 U. S. 328

The judgment of the Court of Appeals is accordingly reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

[Footnote 1]

Since our grant of certiorari in this case, the Fifth Circuit has rendered a decision squarely rejecting the position adopted here by the District of Columbia Circuit. *See Fontenot v. Upjohn Co.,* 780 F.2d 1190 (1986).

[Footnote 2]

JUSTICE STEVENS, in dissent, argues that the District Court granted summary judgment only because respondent presented no evidence that the decedent was exposed to Celotex asbestos products *in the District of*

*Columbia. See post* at 477 U. S. 338-339. According to JUSTICE STEVENS, we should affirm the decision of the Court of Appeals, reversing the District Court, on the "narrower ground" that respondent "made an adequate showing" that the decedent was exposed to Celotex asbestos products in Chicago during 1970-1971. *See ibid.*

JUSTICE STEVENS' position is factually incorrect. The District Court expressly stated that respondent had made no showing of exposure to Celotex asbestos products "in the District of Columbia *or elsewhere.*" App. 217 (emphasis added). Unlike JUSTICE STEVENS, we assume that the District Court meant what it said. The majority of the Court of Appeals addressed the very issue raised by JUSTICE STEVENS, and decided that

"[t]he District Court's grant of summary judgment must therefore have been based on its conclusion that there was 'no showing that the plaintiff was exposed to defendant Celotex's product in the District of Columbia *or elsewhere* within the statutory period.'"

*Catrett v. Johns-Manville Sales Corp.,* 244 U.S.App.D.C. 160, 162, n. 3, 756 F.2d 181, 183, n. 3 (1985) (emphasis in original). In other words, no judge involved in this case to date shares JUSTICE STEVENS' view of the District Court's decision.

[Footnote 3]

Rule 56(e) provides:

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

[Footnote 4]

Rule 56(c) provides:

"The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

[Footnote 5]

*See* Louis, Federal Summary Judgment Doctrine: A Critical Analysis, 83 Yale L.J. 745, 752 (1974); Currie, Thoughts on Directed Verdicts and Summary Judgments, 45 U.Chi.L.Rev. 72, 79 (1977).

[Footnote 6]

Rule 56(f) provides:

"Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

JUSTICE WHITE, concurring.

I agree that the Court of Appeals was wrong in holding that the moving defendant must always support his motion with evidence or affidavits showing the absence of a genuine dispute about a material fact. I also agree that the movant may rely on depositions, answers to interrogatories, and the like, to demonstrate that the plaintiff has no evidence to prove his case, and hence that there can be no factual dispute. But the movant must discharge the burden the Rules place upon him: it is not enough to move for summary judgment without supporting the motion

in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case.

A plaintiff need not initiate any discovery or reveal his witnesses or evidence unless required to do so under the discovery Rules or by court order. Of course, he must respond if required to do so; but he need not also depose his witnesses or obtain their affidavits to defeat a summary judgment motion asserting only that he has failed to produce any support for his case. It is the defendant's task to negate, if he can, the claimed basis for the suit.

Petitioner Celotex does not dispute that, if respondent has named a witness to support her claim, summary judgment should not be granted without Celotex somehow showing that the named witness' possible testimony raises no genuine issue of material fact. Tr. of Oral Arg. 43, 45. It asserts, however, that respondent has failed on request to produce any basis for her case. Respondent, on the other hand, does not contend that she was not obligated to reveal her witnesses and evidence, but insists that she has revealed enough to defeat the motion for summary judgment. Because the Court of Appeals found it unnecessary to address this aspect

Page 477 U. S. 329

of the case, I agree that the case should be remanded for further proceedings.

JUSTICE BRENNAN, with whom THE CHIEF JUSTICE and JUSTICE BLACKMUN join, dissenting.

This case requires the Court to determine whether Celotex satisfied its initial burden of production in moving for summary judgment on the ground that the plaintiff lacked evidence to establish an essential element of her case at trial. I do not disagree with the Court's legal analysis. The Court clearly rejects the ruling of the Court of Appeals that the defendant must provide affirmative evidence disproving the plaintiff's case. Beyond this, however, the Court has not clearly explained what is required of a moving party seeking summary judgment on the ground that the nonmoving party cannot prove its case. [Footnote 2/1] This lack of clarity is unfortunate: district courts must routinely decide summary judgment motions, and the Court's opinion will very likely create confusion. For this reason, even if I agreed with the Court's result, I would have written separately to explain more clearly the law in this area. However, because I believe that Celotex did not meet its burden of production under Federal Rule of Civil Procedure 56, I respectfully dissent from the Court's judgment.

Page 477 U. S. 330

I

Summary judgment is appropriate where the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.Rule Civ.Proc. 56(c). The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727, p. 121 (2d ed.1983) (hereinafter Wright) (citing cases); 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice � 56.15[3] (2d ed.1985) (hereinafter Moore) (citing cases). *See also ante* at 477 U. S. 323; *ante* at 477 U. S. 328 (WHITE, J., concurring). This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party. *See* 10A Wright § 2727. The court need not decide whether the moving party has satisfied its ultimate burden of persuasion [Footnote 2/2] unless and until the court finds that the moving party has discharged its initial

Page 477 U. S. 331

burden of production. *Adickes v. S. H. Kress & Co.,* 398 U. S. 144, 398 U. S. 157-161 (1970); 1963 Advisory Committee's Notes on Fed.Rule Civ.Proc. 56(e), 28 U.S.C.App. p. 626.

The burden of production imposed by Rule 56 requires the moving party to make a *prima facie* showing that it is entitled to summary judgment. 10A Wright § 2727. The manner in which this showing can be made depends upon which party will bear the burden of persuasion on the challenged claim at trial. If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial. *Ibid.* Such an affirmative showing shifts the burden of production to the party opposing the motion, and requires that party either to produce evidentiary materials that demonstrate the existence of a "genuine issue" for trial or to submit an affidavit requesting additional time for discovery. *Ibid.;* Fed.Rules Civ.Proc. 56(e), (f).

If the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment

may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *See* 10A Wright § 2727, pp. 130-131; Louis, Federal Summary Judgment Doctrine: A Critical Analysis, 83 Yale L.J. 745, 750 (1974) (hereinafter Louis). If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless, and the moving party is entitled to summary judgment as a matter of law. *Anderson v. Liberty Lobby, Inc., ante* at 477 U. S. 249.

Where the moving party adopts this second option and seeks summary judgment on the ground that the nonmoving party -- who will bear the burden of persuasion at trial -- has

Page 477 U. S. 332

no evidence, the mechanics of discharging Rule 56's burden of production are somewhat trickier. Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient. *See ante* at 477 U. S. 328 (WHITE, J., concurring). Such a "burden" of production is no burden at all, and would simply permit summary judgment procedure to be converted into a tool for harassment. *See* Louis 750-751. Rather, as the Court confirms, a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. *Ante* at 477 U. S. 323. This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories, and other exchanges between the parties that are in the record. Either way, however, the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party.

If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied, and the court need not consider whether the moving party has met its ultimate burden of persuasion. Accordingly, the nonmoving party may defeat a motion for summary judgment that asserts that the nonmoving party has no evidence by calling the court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party. In that event, the moving party must respond by making an attempt to demonstrate the inadequacy of this evidence, for it is only by attacking all the record evidence allegedly supporting the nonmoving party that a party seeking summary judgment satisfies Rule 56's burden of production. [Footnote 2/3] Thus, if the record disclosed that the moving

Page 477 U. S. 333

party had overlooked a witness who would provide relevant testimony for the nonmoving party at trial, the court could not find that the moving party had discharged its initial burden of production unless the moving party sought to demonstrate the inadequacy of this witness' testimony. Absent such a demonstration, summary judgment would have to be denied on the ground that the moving party had failed to meet its burden of production under Rule 56.

The result in *Adickes v. S. H. Kress & Co., supra,* is fully consistent with these principles. In that case, petitioner was refused service in respondent's lunchroom, and then was arrested for vagrancy by a local policeman as she left. Petitioner brought an action under 42 U.S.C. § 1983, claiming that the refusal of service and subsequent arrest were the product of a conspiracy between respondent and the police; as proof of this conspiracy, petitioner's complaint alleged that the arresting officer was in respondent's store at the time service was refused. Respondent subsequently moved for summary judgment on the ground that there was no actual evidence in the record from which a jury could draw an inference of conspiracy. In response, petitioner pointed to a statement from her own deposition and an unsworn statement by a Kress employee, both already in the record and both ignored by respondent, that the policeman who arrested petitioner was in the store at the time she was refused service. We agreed that

"[i]f a policeman were present, . . . it would be open to a jury, in light of the sequence that fol

Page 477 U. S. 334

lowed, to infer from the circumstances that the policeman and Kress employee had a 'meeting of the minds,' and thus reached an understanding that petitioner should be refused service."

398 U. S. at 398 U. S. 158. Consequently, we held that it was error to grant summary judgment "on the basis of this

398 U. S. at 398 U. S. 158. Consequently, we held that it was error to grant summary judgment "on the basis of this record," because respondent had "failed to fulfill its initial burden" of demonstrating that there was no evidence that there was a policeman in the store. *Id.* at 398 U. S. 157-158.

The opinion in *Adickes* has sometimes been read to hold that summary judgment was inappropriate because the respondent had not submitted affirmative evidence to negate the possibility that there was a policeman in the store. *See* Brief for Respondent 20, n. 30 (citing cases). The Court of Appeals apparently read *Adickes* this way, and therefore required Celotex to submit evidence establishing that plaintiff's decedent had not been exposed to Celotex asbestos. I agree with the Court that this reading of *Adickes* was erroneous, and that Celotex could seek summary judgment on the ground that plaintiff could not prove exposure to Celotex asbestos at trial. However, Celotex was still required to satisfy its initial burden of production.

## II

I do not read the Court's opinion to say anything inconsistent with or different than the preceding discussion. My disagreement with the Court concerns the application of these principles to the facts of this case.

Defendant Celotex sought summary judgment on the ground that plaintiff had "failed to produce" any evidence that her decedent had ever been exposed to Celotex asbestos. [Footnote 2/4] App. 170. Celotex supported this motion with a

Page 477 U. S. 335

two-page "Statement of Material Facts as to Which There is No Genuine Issue" and a three-page "Memorandum of Points and Authorities" which asserted that the plaintiff had failed to identify any evidence in responding to two sets of interrogatories propounded by Celotex, and that therefore the record was "totally devoid" of evidence to support plaintiff's claim. *See id.* at 171-176.

Approximately three months earlier, Celotex had filed an essentially identical motion. Plaintiff responded to this earlier motion by producing three pieces of evidence which she claimed "[a]t the very least . . . demonstrate that there is a genuine factual dispute for trial," *id.* at 143: (1) a letter from an insurance representative of another defendant describing asbestos products to which plaintiff's decedent had been exposed, *id.* at 160; (2) a letter from T. R. Hoff, a former supervisor of decedent, describing asbestos products to which decedent had been exposed, *id.* at 162; and (3) a copy of decedent's deposition from earlier workmen's compensation proceedings, *id.* at 164. Plaintiff also apparently indicated

Page 477 U. S. 336

at that time that she intended to call Mr. Hoff as a witness at trial. Tr. of Oral Arg. 6-7, 27-29.

Celotex subsequently withdrew its first motion for summary judgment. *See* App. 167. [Footnote 2/5] However, as a result of this motion, when Celotex filed its second summary judgment motion, the record did contain evidence -- including at least one witness -- supporting plaintiff's claim. Indeed, counsel for Celotex admitted to this Court at oral argument that Celotex was aware of this evidence and of plaintiff's intention to call Mr. Hoff as a witness at trial when the second summary judgment motion was filed. Tr. of Oral Arg. 5-7. Moreover, plaintiff's response to Celotex' second motion pointed to this evidence -- noting that it had already been provided to counsel for Celotex in connection with the first motion -- and argued that Celotex had failed to "meet its burden of proving that there is no genuine factual dispute for trial." App. 188.

On these facts, there is simply no question that Celotex failed to discharge its initial burden of production. Having chosen to base its motion on the argument that there was no evidence in the record to support plaintiff's claim, Celotex was not free to ignore supporting evidence that the record clearly contained. Rather, Celotex was required, as an initial matter, to attack the adequacy of this evidence. Celotex' failure to fulfill this simple requirement constituted a failure to discharge its initial burden of production under Rule 56, and thereby rendered summary judgment improper. [Footnote 2/6]

Page 477 U. S. 337

This case is indistinguishable from *Adickes.* Here, as there, the defendant moved for summary judgment on the ground that the record contained no evidence to support an essential element of the plaintiff's claim. Here, as there, the plaintiff responded by drawing the court's attention to evidence that was already in the record and that had been ignored by the moving party. Consequently, here, as there, summary judgment should be denied on the

ground that the moving party failed to satisfy its initial burden of production. [Footnote 2/7]

[Footnote 2/1]

It is also unclear what the Court of Appeals is supposed to do in this case on remand. JUSTICE WHITE -- who has provided the Court's fifth vote -- plainly believes that the Court of Appeals should reevaluate whether the defendant met its initial burden of production. However, the decision to reverse, rather than to vacate the judgment below, implies that the Court of Appeals should assume that Celotex has met its initial burden of production and ask only whether the plaintiff responded adequately, and, if so, whether the defendant has met its ultimate burden of persuasion that no genuine issue exists for trial. Absent some clearer expression from the Court to the contrary, JUSTICE WHITE's understanding would seem to be controlling. *Cf. Marks v. United States,* 430 U. S. 188, 430 U. S. 193 (1977).

[Footnote 2/2]

The burden of persuasion imposed on a moving party by Rule 56 is a stringent one. 6 Moore � 56.15[3], p. 56-466; 10A Wright § 2727, p. 124. Summary judgment should not be granted unless it is clear that a trial is unnecessary, *Anderson v. Liberty Lobby, Inc., ante* at 477 U. S. 255, and any doubt as to the existence of a genuine issue for trial should be resolved against the moving party, *Adickes v. S. H. Kress & Co.,* 398 U. S. 144, 398 U. S. 158-159 (1970). In determining whether a moving party has met its burden of persuasion, the court is obliged to take account of the entire setting of the case, and must consider all papers of record as well as any materials prepared for the motion. 10A Wright § 2721, p. 44; *see, e.g., Stepanischen v. Merchants Despatch Transportation Corp.,* 722 F.2d 922, 930 (CA1 1983); *Higgenbotham v. Ochsner Foundation Hospital,* 607 F.2d 653, 656 (CA5 1979). As explained by the Court of Appeals for the Third Circuit in *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238 (1983), *rev'd on other grounds sub nom. Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U. S. 574 (1986),

"[i]f . . . there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment. . . ."

723 F.2d at 258.

[Footnote 2/3]

Once the moving party has attacked whatever record evidence -- if any -- the nonmoving party purports to rely upon, the burden of production shifts to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f). *See* 10A Wright § 2727, pp. 138-143. Summary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial. *See, e.g., First National Bank of Arizona v. Cities Service Co.,* 391 U. S. 253, 391 U. S. 289 (1968).

[Footnote 2/4]

JUSTICE STEVENS asserts that the District Court granted summary judgment on the ground that the plaintiff had failed to show exposure in the District of Columbia. He contends that the judgment of the Court of Appeals reversing the District Court's judgment should be affirmed on the "narrow ground" that it was "palpably erroneous" to grant summary judgment on this basis. *Post* at 477 U. S. 339 (dissenting). The Court replies that what the District Court said was that plaintiff had failed to show exposure in the District of Columbia "or elsewhere." *Ante* at 477 U. S. 320, n. 2. In my view, it does not really matter which reading is correct in this case. For, contrary to JUSTICE STEVENS' claim, deciding this case on the ground that Celotex failed to meet its burden of production under Rule 56 does not involve an "abstract exercise in Rule construction." *Post* at 477 U. S. 339 (STEVENS, J., dissenting). To the contrary, the principles governing a movant's burden of proof are straightforward and well established, and deciding the case on this basis does not require a new construction of Rule 56 at all; it simply entails applying established law to the particular facts of this case. The choice to reverse because of "palpable erro[r]" with respect to the burden of a moving party under Rule 56 is thus no more "abstract" than the choice to reverse because of such error with respect to the elements of a tort claim. Indeed, given that the issue of the moving party's burden under Rule 56 was the basis of the Court of Appeals' decision.

4/29/26, 12:19 PM

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 69 of 217
Celotex Corp. v. Catrett | 477 U.S. 317 (1986) | Justia U.S. Supreme Court Center

the question upon which certiorari was granted, and the issue briefed by the parties and argued to the Court, it would seem to be the preferable ground for deciding the case.

[Footnote 2/5]

Celotex apparently withdrew this motion because, contrary to the assertion made in the first summary judgment motion, its second set of interrogatories had not been served on the plaintiff.

[Footnote 2/6]

If the plaintiff had answered Celotex' second set of interrogatories with the evidence in her response to the first summary judgment motion, and Celotex had ignored those interrogatories and based its second summary judgment motion on the first set of interrogatories only, Celotex obviously could not claim to have discharged its Rule 56 burden of production. This result should not be different simply because the evidence plaintiff relied upon to support her claim was acquired by Celotex other than in plaintiff's answers to interrogatories.

[Footnote 2/7]

Although JUSTICE WHITE agrees that,

"if [plaintiff] has named a witness to support her claim, summary judgment should not be granted without Celotex somehow showing that the named witness' possible testimony raises no genuine issue of material fact,"

he would remand "[b]ecause the Court of Appeals found it unnecessary to address this aspect of the case." *Ante* at 477 U. S. 328-329 (concurring). However, Celotex has admitted that plaintiff had disclosed her intent to call Mr. Hoff as a witness at trial before Celotex filed its second motion for summary judgment. Tr. of Oral Arg. 6-7. Under the circumstances, then, remanding is a waste of time.

JUSTICE STEVENS, dissenting.

As the Court points out, *ante* at 477 U. S. 319-320, petitioner's motion for summary judgment was based on the proposition that respondent could not prevail unless she proved that her deceased husband had been exposed to petitioner's products "within the jurisdictional limits" of the District of Columbia. [Footnote 3/1]

Page 477 U. S. 338

Respondent made an adequate showing -- albeit possibly not in admissible form [Footnote 3/2] -- that her husband had been exposed to petitioner's product in Illinois. [Footnote 3/3] Although the basis of the motion and the argument had been the lack of exposure *in the District of Columbia,* the District Court stated at the end of the argument:

"The Court will grant the defendant Celotex's motion for summary judgment, there being no showing that the plaintiff was exposed to the defendant Celotex's product in the District of Columbia *or elsewhere* within the statutory period. App. 217 (emphasis added). The District Court offered no additional explanation and no written opinion. The Court of Appeals reversed on the basis that Celotex had not met its burden; the court noted the incongruity of the District Court's opinion in the context of the motion and argument, but did not rest on that basis because of the 'or elsewhere' language. [Footnote 3/4]"

Taken in the context of the motion for summary judgment on the basis of no exposure in the District of Columbia, the

Page 477 U. S. 339

District Court's decision to grant summary judgment was palpably erroneous. The court's bench reference to "or elsewhere" neither validated that decision nor raised the complex question addressed by this Court today. In light of the District Court's plain error, therefore, it is perfectly clear that, even after this Court's abstract exercise in Rule construction, we should nonetheless affirm the reversal of summary judgment on that narrow ground. [Footnote 3/5]

I respectfully dissent.

[Footnote 3/1]

*See* Motion of Defendant Celotex Corporation for Summary Judgment, App. 170 ("Defendant Celotex Corporation, pursuant to Rule 56 (b) of the Federal Rules of Civil Procedure, moves this Court for an Order granting Summary Judgment on the ground that plaintiff has failed to produce evidence that any product designed, manufactured or distributed by Celotex Corporation was the proximate cause of the injuries alleged *within the jurisdictional limits of this Court*") (emphasis added); Memorandum of Points and Authorities in Support of Motion of Defendant Celotex Corporation for Summary Judgment, *id.* at 175 (Plaintiff "must demonstrate some link between a Celotex Corporation product claimed to be the cause of the decedent's illness and the decedent himself. The record is totally devoid of any such evidence *within the jurisdictional confines of this Court*") (emphasis added); Transcript of Argument in Support of Motion of Defendant Celotex Corporation for Summary Judgment, *id.* at 211 ("Our position is . . . there has been no product identification of any Celotex products . . . that have been used *in the District of Columbia* to which the decedent was exposed") (emphasis added).

[Footnote 3/2]

*But cf. ante* at 477 U. S. 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment").

[Footnote 3/3]

*See* App. 160 (letter from Aetna Life Insurance Co.) (referring to the "asbestos that Mr. Catrett came into contact with while working for Anning-Johnson Company" and noting that the "manufacturer of this product" was purchased by Celotex); *id.* at 162 (lettter from Anning-Johnson Co.) (confirming that Catrett worked for the company and supervised the installation of asbestos produced by the company that Celotex ultimately purchased); *id.* at 164, 164c (deposition of Catrett) (description of his work with asbestos "in Chicago").

[Footnote 3/4]

*See Catrett v. Johns-Manville Sales Corp.,* 756 F.2d 181, 185, n. 14 (1985) ("[T]he discussion at the time the motion was granted actually spoke to venue. It was only the phrase *or elsewhere,' appearing with no prior discussion, in the judge's oral ruling at the close of argument that made the grant of summary judgment even conceivably proper").

[Footnote 3/5]

*Cf.* 477 U.S. 317fn3/2|>n. 2, *supra.* The Court's statement that the case should be remanded because the Court of Appeals has a "superior knowledge of local law," *ante* at 477 U. S. 327, is bewildering because there is no question of local law to be decided. *Cf. Bishop v. Wood,* 426 U. S. 341, 426 U. S. 345-347 (1976).

The Court's decision to remand when a sufficient ground for affirmance is available does reveal, however, the Court's increasing tendency to adopt a presumption of reversal. *See, e.g., New York v. P. J. Video, Inc.,* 475 U. S. 868, 475 U. S. 884 (1986) (MARSHALL, J., dissenting); *Icicle Seafoods, Inc. v. Worthinston,* 475 U. S. 709, 475 U. S. 715 (1986) (STEVENS, J., dissenting); *City of Los Angeles v. Heller,* 475 U. S. 796, 475 U. S. 800 (1986) (STEVENS, J., dissenting); *Pennsylvania v. Goldhammer,* 474 U. S. 28, 474 U. S. 81 (1985) (STEVENS, J., dissenting). As a matter of efficient judicial administration and of respect for the state and federal courts, I believe the presumption should be precisely the opposite.

## Materials

### Oral Arguments

Oral Argument - April 01, 1986

## Search This Case

**Google Scholar**          **Google Books**          **Google Web**

**Google News**

# Charlotte, North Carolina Lawyers
Sponsored Listings

**D. Maurer**

(888) 258-1087

Cornelius, NC

Personal Injury

View All
**10.0**

**Jonatha**

PREMIU

FindLaw.    Find a Lawyer    Legal Forms & Services ⌄    Learn About the Law ⌄    Legal Professionals ⌄    Blogs    🔍

# CLYDE RAYMOND SPENCER v. SHARON KRAUSE MICHAEL DAVIDSON (2017)

## United States Court of Appeals, Ninth Circuit.

CLYDE RAYMOND SPENCER, Plaintiff-Appellant/ Cross-Appellee, v. JAMES M. PETERS, Defendant, SHARON KRAUSE, Detective (Clark County); MICHAEL DAVIDSON, Sergeant (Clark County), Defendants-Appellees/ Cross-Appellants.

## Nos. 14-35689

## Decided: May 18, 2017

**Before: Susan P. Graber, Sandra S. Ikuta, and Andrew D. Hurwitz, Circuit Judges.**

**COUNSEL Kathleen Zellner (argued), Kathleen T. Zellner & Associates P.C., Downers Grove, Illinois, for Plaintiff-Appellant/Cross-Appellee. Jeffrey A.O. Freimund (argued), Freimund Jackson & Tardif PLLC, Olympia, Washington, for Defendant-Appellee/Cross-Appellant Michael Davidson. Guy M. Bogdanovich (argued), Law Lyman Daniel Kamerrer & Bogdanovich, Olympia, Washington, for Defendant-Appellee/Cross-Appellant Sharon Krause.**

OPINION

SUMMARY *

Civil Rights

The panel reversed the district court's judgment as a matter of law and remanded with instructions to reinstate a jury verdict in a 42 U.S.C. § 1983 action in which plaintiff alleged that a Clark County detective

deliberately fabricated evidence against him and continued her criminal investigation despite knowing that plaintiff was innocent.

Plaintiff alleged that defendant deliberately mischaracterized witness statements in her investigative reports. As a result, plaintiff testified that he entered a plea pursuant to Carolina v. Alford, 500 U.S. 25, 37–38 (1970), causing him to spend nearly twenty years in prison. A jury found for plaintiff, but the district court granted judgment as a matter of law to defendants on the grounds that plaintiff failed to introduce evidence that defendant knew or should have known of plaintiff's innocence.

The panel held that because plaintiff introduced direct evidence of fabrication, he did not have to prove that defendant knew or should have known he was innocent. Addressing defendant's cross-appeal, the panel held that ample evidence in the record supported the jury's finding on causation and given the jury's finding on causation and all other elements, the district court did not err by not separately instructing the jury on "but for" causation and "proximate" causation. The panel further held that the district court did not err by declining to instruct the jury that plaintiff was required to prove, that setting aside the fabricated evidence, probable cause was lacking. Finally, the panel held that the district court did not err by giving a deliberate indifference instruction and by permitting plaintiff to introduce certain evidence.

GRABER, Circuit Judge:

The Fourteenth Amendment prohibits the deliberate fabrication of evidence by a state official. Devereaux v. Abbey, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (en banc). Deliberate fabrication can be established by circumstantial evidence. For example, evidence that officials "continued their investigation of [a person] despite the fact that they knew or should have known that he was innocent, id. at 1076, can raise the inference that the investigator has an "unlawful motivation" to frame an innocent person. Costanich v. Dep't of Soc. & Health Servs., 627 F.3d 1101, 1111 (9th Cir. 2010). Or deliberate fabrication can be shown by direct evidence, for example, when "an interviewer . deliberately mischaracterizes witness statements in her investigative report." Id. In cases involving direct evidence, the investigator's knowledge or reason to know of the plaintiff's innocence need not be proved. Id.

In this 42 U.S.C. § 1983 action, Plaintiff Clyde Raymond Spencer introduced direct evidence of deliberate fabrication, specifically, evidence that Clark County Sheriff's Office Detective Sharon Krause deliberately mischaracterized witnesses' statements in her investigative reports. A jury found for Plaintiff and against Defendants Krause and Sergeant Michael Davidson, Krause's supervisor. But the district court granted judgment as a matter of law to Defendants, on the ground that Plaintiff had failed to introduce evidence that Krause knew or should have known of Plaintiff's innocence. Because the district court misunderstood our precedent, and because Defendants' other challenges to the jury's verdict fail, we reverse and remand with instructions to enter judgment for Plaintiff consistent with the jury's verdict.

FACTUAL AND PROCEDURAL HISTORY 1

Plaintiff and his first wife, DeAnne Spencer, had two children, Matthew and Kathryn. After a divorce, DeAnne retained primary custody of the children in Sacramento, California, and the children visited Plaintiff several times a year near Vancouver, Washington.

After Plaintiff and DeAnne separated, Plaintiff lived with Karen Stone for about two years. Matthew and Kathryn visited Plaintiff for extended periods during that time, and they got to know Stone. In 1983, Plaintiff married his second wife, Shirley Spencer. Shirley's son from a previous relationship, Matthew Hansen ("Hansen"), therefore became Plaintiff's stepson. Plaintiff, Shirley, and Hansen lived together in the Vancouver area.

In the summer of 1984, Matthew and Kathryn visited Plaintiff for a six-week stay ending on Sunday, August 26, 1984. Matthew was 8; Kathryn was 5; and Hansen was 4. On the final weekend of the stay, Kathryn allegedly disclosed to Shirley that she had been sexually abused, including acts of vaginal and oral sex, by four people: her father (Plaintiff), her mother (DeAnne), her father's previous girlfriend (Stone), and her eight-year-old brother (Matthew). Alarmed, Plaintiff and Shirley reported Kathryn's statements to Child Protective Services. Investigations began in California and in Washington.

Sacramento Detective Pat Flood contacted Plaintiff and Shirley, who recounted Kathryn's statements. Detective Flood then visited DeAnne, who denied any sexual abuse and any knowledge of the allegations against others. She later passed a polygraph examination, and Detective Flood terminated the investigation of DeAnne.

Detective Flood also talked with Matthew and Kathryn, who had recently returned from Vancouver. Matthew denied any knowledge of the allegations and denied any sexual abuse. Kathryn was "extremely shy," according to Detective Flood's contemporaneous report. (Detective Flood died before the trial in this case and therefore did not testify.) The report stated that Kathryn "indicated that she did tell Shirley everything that Shirley advised me of but then when asked to explain it or asked specific questions about it, she would say that she couldn't remember the words so she couldn't tell me." Kathryn gave conflicting responses to questions asking whether anyone had touched her inappropriately. DeAnne took Kathryn for a medical exam; the examining doctor found no physical evidence of sexual abuse.

In Washington, Krause investigated Stone (Plaintiff's former girlfriend) and Plaintiff. Stone denied ever abusing Kathryn, and she agreed to take a polygraph test. Although Krause made eight attempts to schedule a polygraph test, Stone never took one. Krause nevertheless ended the investigation of Stone in December 1984.

Plaintiff, too, denied abusing Kathryn, and he also agreed to take a polygraph test. On September 21, 1984, Plaintiff—accompanied by Shirley—took a polygraph test at the Sheriff's Office.[2] The results of the

polygraph were inconclusive, so Plaintiff agreed to a second polygraph test a few days later. The examiner's report of the results of the second test suggested deception, but not very strongly:

The subject demonstrated consistently greater physiologic responses on the three critical questions . as compared to the control items. While this was sufficient to be indicative of deception, . Spencer's scores were not very high so that the examiner does not feel as certain about the validity of these findings as in most examinations. Hopefully, further corroboration of these results will be obtained.

In mid-October 1984, Krause traveled to Sacramento to continue the investigation. During that trip, she interviewed Matthew, DeAnne, two of DeAnne's sisters, and DeAnne's mother, all of whom denied any knowledge of sexual abuse of Kathryn by anyone. Krause prepared investigative reports of those interviews, including a report attributing many quotations to Matthew. During the trial in this case, Matthew testified that many of those quotations were fabricated—in particular, statements that incorrectly portrayed Matthew as comfortable with Krause and incorrectly portrayed Matthew as generally aware of the allegations of sexual abuse.

Krause also interviewed Kathryn twice. The interviews took place almost entirely in Krause's motel room and her rental car, without anyone else present. Krause's contemporaneous investigative reports claim that Kathryn described, in great detail, sexual abuse by Plaintiff. The reports contain scores of specific, explicit quotations attributed to Kathryn. At trial, however, Kathryn testified that, other than some trivial quotations unrelated to sexual abuse, all the quotations were fabrications. Kathryn testified that, in fact, she denied to Krause that anyone had sexually abused her.

In late November 1984, a prosecutor from King County, Washington, reviewed the investigative file at the request of the Clark County Sheriff's Office. The prosecutor concluded that the case was "legally insufficient" for several reasons. First, Kathryn appeared to be "extremely reluctant to talk about facts," and Kathryn's failure to disclose the abuse to her counselor did "not bode well for testifying in court." Second, the fact that Kathryn identified "multiple suspects is very disturbing," because it suggested a lack of credibility. Third, there were inconsistencies "over all issues": the number of times abuse occurred, what Plaintiff was wearing, and what Kathryn was wearing. Fourth, certain details commonly reported by victims of sexual abuse were lacking from Kathryn's account.

In early December 1984, a Clark County prosecutor, Jim Peters, conducted a videotaped interview of Kathryn. According to Peters, the purpose was to find out "whether she could tell me the story of what happened and whether I thought she might be competent"; it was not an investigative interview. For that reason, Peters was not concerned about using techniques—such as coaching or suggestive questioning —that would be improper if used during an investigation.

On the videotape, which was played for the jury, Kathryn appeared very uncomfortable during the entire 45-minute initial interview. Very early on, she asked Krause to leave the room, even though Krause's

investigative reports portrayed Kathryn as extremely comfortable with her. Kathryn was unable to describe Plaintiff's alleged conduct—until after an hour-long break. After the break, in a 10-minute follow-up interview, Kathryn described various acts of sexual abuse by Plaintiff. Kathryn testified at trial in this case that, during the break, she had been coached about what to say and that she went along with describing acts of sexual abuse just so that the distressing interview would end.

Throughout the interview, Kathryn appeared eager to leave. Peters began the post-break interview by stating, "while the camera was off, [Kathryn] showed me something with the dolls, didn't you?" After some coaxing, Kathryn demonstrated, using two anatomically correct dolls, two acts of sexual abuse. Peters then asked, "anything else?" to which Kathryn responded, "I forgot the last thing." Peters later told his supervisor, in essence, that "I wouldn't charge [the case] and I don't want my name on the charging document."

On January 2, 1985, the prosecutor's office nevertheless charged Plaintiff with two counts of sexually abusing Kathryn. Plaintiff pleaded not guilty and was released.

By February 1985, Plaintiff and Shirley had separated, and Plaintiff was living at a motel. On February 16, Shirley dropped off four-year-old Hansen (Plaintiff's stepson) to spend the night with Plaintiff at the motel. Plaintiff's lawyer described this incident to the jury as a "set up." Counsel argued that Shirley would not have dropped off her own four-year-old son had she believed that Plaintiff was a child rapist and that the incident gave Krause an opportunity to cure the defects in the case that the earlier prosecutors had noted. For example, Krause reported that Hansen described certain details that one of the prosecutors had identified as conspicuously missing from Kathryn's account of sexual abuse.

After the night at the motel, Krause interviewed Hansen. According to the investigative report, Hansen told Krause that Plaintiff sexually abused him on that night, including having anal sex with him. Officers arrested Plaintiff. In a follow-up interview, Hansen recalled molestation by Plaintiff during the summer of 1984 of all three children—him, Matthew, and Kathryn. (Unlike Matthew and Kathryn, Hansen testified at trial that Plaintiff did, in fact, abuse him.)

Krause then re-interviewed Kathryn and Matthew separately and prepared further investigative reports. According to those reports, both children described, in detail, sexual abuse by Plaintiff of all three children. As with the earlier reports, both Kathryn and Matthew testified at trial that many of the quotations attributed to them were fabricated.

On May 3, 1985, the prosecutor charged Plaintiff with statutory rape of all three children. On May 16, 1985, Plaintiff pleaded guilty pursuant to North Carolina v. Alford, 400 U.S. 25, 37–38 (1970). An "Alford plea" allows a defendant to maintain his innocence but to plead guilty in the face of apparent evidence of his guilt. Plaintiff's theory at trial was that he entered an Alford plea because of the extensive fabricated evidence. Plaintiff has always maintained his innocence.

The state court sentenced Plaintiff to two life terms plus 171 months. In 2004, the Governor of Washington commuted his sentence to community supervision. In 2009, the state courts allowed Plaintiff to withdraw his Alford plea. In 2010, the prosecutor dismissed all charges against Plaintiff.

In 2011, Plaintiff brought this civil action, which was tried to a jury on three claims: (1) a violation of the Fourteenth Amendment by Defendant Krause for deliberate fabrication of evidence; (2) respondeat superior liability for Defendant Davidson; and (3) conspiracy by Defendants Krause and Davidson to fabricate evidence deliberately. The district court instructed the jury that, in order to find for Plaintiff on the substantive deliberate-fabrication claim, the jury must find that:

1. Defendant Krause deliberately fabricated evidence against plaintiff;

2. Defendant Krause acted with deliberate indifference toward the constitutional right of plaintiff;

3. Defendant Krause continued her investigation of plaintiff despite the fact that she knew or should have known that plaintiff was innocent of the charges stemming from that evidence;

4. The criminal charges filed against plaintiff were based on that evidence;

5. Plaintiff suffered injury as a result of that evidence; and

6. That evidence was so closely related to the deprivation of plaintiff's right as to be the moving force that caused the ultimate injury.

The jury returned a verdict for Plaintiff on the two substantive claims and a verdict for Defendants on the conspiracy claim. The jury awarded $9 million in damages. After trial, the district court granted judgment as a matter of law to Defendants on the ground that Plaintiff had introduced insufficient evidence to prove that Krause knew or should have known that Plaintiff was innocent.

Plaintiff timely appeals. Defendants timely cross-appeal.[3]

STANDARDS OF REVIEW

We review de novo a judgment as a matter of law. Velazquez v. City of Long Beach, 793 F.3d 1010, 1017 (9th Cir. 2015).

We review a district court's formulation of civil jury instructions for an abuse of discretion, but we consider de novo whether the challenged instruction correctly states the law. "Jury instructions must be supported by the evidence, fairly and adequately cover the issues presented, correctly state the law, and not be misleading." Peralta v. Dillard, 744 F.3d 1076, 1082 (9th Cir. 2014) (en banc). But if any error relating to the jury instructions was harmless, we do not reverse. "In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law

was not fairly and correctly covered. Harmless error review for a civil jury trial shifts the burden to the defendant to demonstrate that it is more probable than not that the jury would have reached the same verdict had it been properly instructed." Gantt v. City of L.A., 717 F.3d 702, 707 (9th Cir. 2013).

Wilkerson v. Wheeler, 772 F.3d 834, 838 (9th Cir. 2014) (alterations omitted).

We review for abuse of discretion the district court's admission of evidence. McEuin v. Crown Equip. Corp., 328 F.3d 1028, 1032 (9th Cir. 2003).

DISCUSSION

To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty. Costanich, 627 F.3d at 1111. To establish the second element of causation, the plaintiff must show that (a) the act was the cause in fact of the deprivation of liberty, meaning that the injury would not have occurred in the absence of the conduct; and (b) the act was the "proximate cause" or "legal cause" of the injury, meaning that the injury is of a type that a reasonable person would see as a likely result of the conduct in question. Whitlock v. Brueggemann, 682 F.3d 567, 582–83 (7th Cir. 2012).

A. Deliberate Fabrication

Plaintiff argues that the district court incorrectly granted judgment as a matter of law to Defendants. "[W]hen reviewing a motion for judgment as a matter of law, we apply the law as it should be, rather than the law as it was read to the jury." Pincay v. Andrews, 238 F.3d 1106, 1109 n.4 (9th Cir. 2001); accord Fisher v. City of San Jose, 558 F.3d 1069, 1074 (9th Cir. 2009) (en banc); cf. Musacchio v. United States, 136 S. Ct. 709, 715 (2016) ("All that a [criminal] defendant is entitled to on a sufficiency challenge is for the court to make a 'legal' determination whether the evidence was strong enough to reach a jury at all.").

As we explained in Costanich, 627 F.3d at 1111, "an interviewer who deliberately mischaracterizes witness statements in her investigative report . commits a constitutional violation." Here, Plaintiff introduced sufficient evidence for a reasonable juror to find that this standard was satisfied. Krause's investigative reports contained scores of quotations attributed to Kathryn and Matthew, both of whom unequivocally testified at trial that they had never made those statements. For example, Krause reported that, in October 1984, Kathryn described detailed acts of sexual abuse by Plaintiff, and Krause's report contained many specific quotations attributed to Kathryn. Kathryn testified at trial that, not only did she not make those statements to Krause, but she affirmatively told Krause that no abuse had occurred. The jury was permitted to credit Kathryn's testimony rather than Krause's contrary testimony. See, e.g., First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr., 631 F.3d 1058, 1069 (9th Cir. 2011) ("[I]t was the jury's province to make any credibility determinations and to resolve any factual disputes.").

CLYDE RAYMOND SPENCER v. SHARON KRAUSE MICHAEL DAVIDSON (2017) | FindLaw

To be sure, not all inaccuracies in an investigative report give rise to a constitutional claim. See, e.g., Black v. Montgomery County, 835 F.3d 358, 372 (3d Cir. 2016) (noting the limitations on a fabricated-evidence claim), cert. denied, 2017 WL 1540522 (U.S. May 1, 2017) (No. 16-846); Whitlock, 682 F.3d at 586 (same). Mere "careless[ness]" is insufficient, Gausvik v. Perez, 345 F.3d 813, 817 (9th Cir. 2003), as are mistakes of "tone," Costanich, 627 F.3d at 1113. Errors concerning trivial matters cannot establish causation, a necessary element of any § 1983 claim. Black, 835 F.3d at 372. And fabricated evidence does not give rise to a claim if the plaintiff cannot "show the fabrication actually injured her in some way." Whitlock, 682 F.3d at 585. But, if Kathryn's testimony is credited, the misquotations here cannot be explained as carelessness or as a mistake of tone; nor are they trivial or without consequence. Kathryn told Krause that no abuse had occurred. Krause falsely reported, in quotations attributed to Kathryn, that Kathryn had made detailed, explicit statements of abuse. Plaintiff testified that, due to the fabricated evidence, he entered an Alford plea, causing him to spend nearly two decades in prison.

Because Plaintiff introduced direct evidence of deliberate fabrication, he did not have to prove that Krause knew or should have known that he was innocent. The district court's contrary holding misapprehends our precedent.

In Devereaux, 263 F.3d at 1073–76, the plaintiff alleged that police officers used extremely aggressive interview techniques when questioning children, thus generating false evidence against him. In that context, we "assumed" that a plaintiff must

point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of Devereaux despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.

Id. at 1076. We later applied that standard in cases involving allegedly aggressive interviewing tactics. E.g., Gantt, 717 F.3d at 707–08.

Those two prongs make sense in the absence of direct evidence of deliberate fabrication of evidence. If an investigator knows that a person is innocent, yet continues the investigation nevertheless, then the evidence suggests circumstantially that the investigator has an unlawful motivation to frame an innocent person, which supports a claim that the investigator deliberately fabricated evidence. Similarly, if an investigator knowingly uses coercive and abusive techniques that likely will generate false information, then that circumstantial evidence suggests that the investigator is deliberately fabricating evidence.

But, as we made clear in Costanich, 627 F.3d at 1111–14, those methods of proving deliberate fabrication are unnecessary in a case involving direct evidence of deliberate fabrication. In Costanich, there was direct evidence that the investigator had fabricated evidence—for example, direct misquotation of witnesses in investigative reports. Id. at 1111. The district court had granted summary judgment to the

defendants on the ground that the record contained insufficient evidence of either of the two Devereaux prongs. Id. We reversed, with the following explanation:

The district court read the Devereaux standard too narrowly. Costanich alleges, and has produced evidence supporting her claim, that Duron deliberately misquoted and misrepresented witness statements, i.e., deliberately falsified statements in her investigative report and declaration. The Devereaux test envisions an investigator whose unlawful motivation is illustrated by her state of mind regarding the alleged perpetrator's innocence, or one who surreptitiously fabricates evidence by using coercive investigative methods. These are circumstantial methods of proving deliberate falsification. Here, Costanich argues that the record directly reflects Duron's false statements. If, under Devereaux, an interviewer who uses coercive interviewing techniques that are known to yield false evidence commits a constitutional violation, then an interviewer who deliberately mischaracterizes witness statements in her investigative report also commits a constitutional violation. Similarly, an investigator who purposefully reports that she has interviewed witnesses, when she has actually only attempted to make contact with them, deliberately fabricates evidence.

Id. Elsewhere in our opinion, we reiterated the point:

It is also true that, in the course of her investigation, Duron could have believed that Costanich was guilty of [a state-law crime]. . If the only evidence of deliberate fabrication were inferences from Duron's investigative methods, under Devereaux, Duron's subjective and personal belief of Costanich's guilt might have explained why Duron continued the investigation. 263 F.3d at 1076. That belief, however, does not permit or excuse deliberate falsification of evidence.

Id. at 1113.

In sum, the Constitution prohibits the deliberate fabrication of evidence whether or not the officer knows that the person is innocent. See Devereaux, 263 F.3d at 1074–75 ("[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government."); Halsey v. Pfeiffer, 750 F.3d 273, 292–93 (3d Cir. 2014) ("[N]o sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence."); see also Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997) ("No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee."). The district court erred by granting judgment as a matter of law to Defendants because, in this case involving direct evidence of fabrication, Plaintiff was not required to show that Krause actually or constructively knew that he was innocent.

B. Causation

Defendants challenge the jury instructions on causation, which required Plaintiff to prove that:

5. Plaintiff suffered injury as a result of that [fabricated] evidence; and

6. That evidence was so closely related to the deprivation of plaintiff's right as to be the moving force that caused the ultimate injury.

Defendants contend that the district court erred by not separately instructing the jury on "but for" causation and "proximate" causation, using those terms verbatim.

"In a § 1983 action, the plaintiff must . demonstrate that the defendant's conduct was the actionable cause of the claimed injury. To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation." Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008) (citation omitted). The "moving force" formulation given in this case is most commonly used in cases involving municipal liability: "official policy must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." Polk County v. Dodson, 454 U.S. 312, 326 (1981) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). But we need not decide whether the district court erred or abused its discretion in using the "moving force" formulation in this individual liability case, because any error was harmless.

The jury affirmatively found both that "Plaintiff suffered injury as a result of" the fabricated evidence and that the fabricated evidence was "the moving force that caused the ultimate injury." (Emphases added.) See Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1096 (9th Cir. 2013) (holding that "moving force" in the Monell context includes "both causation-in-fact and proximate causation"). Nor were Defendants prevented from arguing their theory of the case. Defendants argued to the jury that the fabricated evidence was not the moving force because of intervening events—such as non-fabricated evidence and Plaintiff's Alford plea. But the jury necessarily rejected that argument.

Ample evidence in the record supports the jury's findings on causation. If Kathryn's testimony is credited, very little evidence of Plaintiff's guilt actually existed. Indeed, even with the fabricated evidence in the file, two prosecutors independently recommended that charges not be brought. Moreover, roughly the same amount of evidence implicated Stone as implicated Plaintiff—yet prosecutors declined to charge Stone, strongly suggesting that, had Krause not fabricated any evidence, prosecutors likewise would have declined to charge Plaintiff.

Given the jury's findings on causation and all the other elements, we see no likelihood that the jury would have concluded that but-for causation or proximate causation was lacking. We therefore easily conclude that "it is more probable than not that the jury would have reached the same verdict," Gantt, 717 F.3d at 707, had the district court given Defendants' proffered instructions on causation.

C. Probable Cause

Defendants next argue that the district court erred by declining to instruct the jury that Plaintiff was required to prove that, setting aside the fabricated evidence, probable cause was lacking. We disagree.

The only two sister circuits to have addressed this issue directly have held that the plaintiff need not prove a lack of probable cause for the prosecution. Halsey, 750 F.3d at 292–93; Ricciuti, 124 F.3d at 129–31. Although we have not addressed the question squarely, our cases strongly suggest that a lack of probable cause to prosecute a defendant is not an element of a deliberate-fabrication claim. See Gausvik, 345 F.3d at 817–18 (analyzing whether the allegations met the standard for deliberate fabrication, even though probable cause existed); see also Costanich, 627 F.3d at 1113 (holding that the investigator's belief that a crime had been committed "does not permit or excuse deliberate fabrication of evidence"); Crowe v. County of San Diego, 608 F.3d 406, 432–37 (9th Cir. 2010) (upholding a Fourteenth Amendment coercive-interview claim while rejecting Fourth Amendment claims because of the existence of probable cause).

Defendants assert that, when probable cause exists, an investigator's deliberate fabrication of evidence does not shock the conscience. See Gantt, 717 F.3d at 707 ("[D]ue process violations under the Fourteenth Amendment occur only when official conduct shocks the conscience ." (citation and internal quotation marks omitted)). We join our sister circuits in rejecting that assertion as inconsistent with the Fourteenth Amendment's guarantee of due process: "Even if we agreed [that probable cause existed], we believe that no sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence." Halsey, 750 F.3d at 292–93; see id. at 293 ("A rule of law foreclosing civil recovery against police officers who fabricate evidence, so long as they have other proof justifying the institution of the criminal proceedings against a defendant, would not follow the statute's [§ 1983] command or serve its purpose."); Ricciuti, 124 F.3d at 130 ("To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice."); see also Black, 835 F.3d at 371 ("[D]eliberate framing by officials offends the most strongly held values of our nation." (internal quotation marks omitted)).

We have held that, to establish a Fourth Amendment violation where officers allegedly have included false information in a warrant affidavit, "the plaintiff must establish that the remaining information in the affidavit is insufficient to establish probable cause." Hervey v. Estes, 65 F.3d 784, 789 (9th Cir. 1995). But the reasoning of our Fourth Amendment cases does not apply here. Probable cause definitively resolves a Fourth Amendment claim for including false information in a warrant affidavit, because the Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. If bona fide information in the warrant affidavit establishes probable cause, then the plaintiff necessarily cannot state a Fourth Amendment violation because the warrant was, in fact, issued upon probable cause, supported by oath or affirmation. The warrant would have issued

regardless of the false information; the plaintiff cannot "establish that, but for the dishonesty, the challenged action would not have occurred." Liston v. County of Riverside, 120 F.3d 965, 973 (9th Cir. 1997). In other words, in the Fourth Amendment warrant-issuance context, the probable-cause inquiry collapses into the causation inquiry.

By contrast, the existence of probable cause does not resolve Plaintiff's Fourteenth Amendment claim for deliberate fabrication of evidence. Plaintiff's theory of the case—accepted by the jury—was that the fabricated evidence caused him to enter an Alford plea, which led to his serving nearly two decades in prison. Whether probable cause existed is entirely beside the point of that inquiry. The only causation question for the jury was whether the fabricated evidence did, in fact, cause his nearly two decades of imprisonment. See Part B, above. We therefore need not decide whether an instruction on probable cause would be proper in a case involving alleged damages stemming only from a prosecutor's charging decision.[4]

For those reasons, the district court properly declined to instruct the jury on the issue of probable cause.

D. Deliberate Indifference

The district court instructed the jury that, to find for Plaintiff, the jury must find that:

1. Defendant Krause deliberately fabricated evidence against plaintiff;

2. Defendant Krause acted with deliberate indifference toward the constitutional right of plaintiff; [and four other elements.]

Deliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions. It entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.

Defendants argue that the district court erred by giving the instruction on deliberate indifference and the accompanying definition. Necessarily, requiring that Plaintiff prove an additional element—an added burden—cannot, by itself, have prejudiced Defendants.

Defendants further argue that, because the first and second elements used similar words—"deliberately fabricated" and "deliberate indifference"—the jury may have misunderstood the first element as encompassing a deliberate indifference standard. We find no reasonable likelihood of confusion here. "A jury is presumed to follow its instructions." Weeks v. Angelone, 528 U.S. 225, 234 (2000). The first and second elements are plainly separate; the phrase "deliberately fabricated" is not a technical term likely to confuse the jury; and the definition in the paragraph at the end of the instruction clearly defines "deliberate indifference," not "deliberately fabricated." Nor does the jury's question regarding the

instruction establish a likelihood of confusion. Rather, the jury's question concerned the relationship between deliberate indifference and negligence, not between deliberate indifference and deliberate fabrication.

## E. Admission of Evidence

Finally, we hold that the district court did not abuse its discretion by permitting Plaintiff to introduce certain evidence. The district court identified the correct legal standard, Federal Rule of Evidence 403, and its application of that standard was not illogical, implausible, or without support in inferences that may be drawn from the facts in the record. United States v. Torres, 794 F.3d 1053, 1059 (9th Cir. 2015), cert. denied, 136 S. Ct. 2005 (2016). The evidence was relevant on many grounds, including to show credibility and state of mind, and the court gave a proper limiting instruction that is unchallenged on appeal. The fact that the evidence was also relevant to claims that were dismissed before or during trial does not affect the relevance of the evidence to the deliberate-fabrication claim that was presented to the jury. Evidence is often relevant to more than one claim.

REVERSED and REMANDED with instructions to reinstate the verdict.

FOOTNOTES

FOOTNOTE.   This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

1.     Because we are reviewing the district court's judgment as a matter of law following a verdict in favor of Plaintiff, we must view the evidence in the light most favorable to Plaintiff, and we must draw all reasonable inferences in his favor. Oracle Corp v. SAP AG, 765 F.3d 1081, 1086 (9th Cir. 2014).

2.     Sergeant Davidson was present, and Shirley met him for the first time. Plaintiff's theory at trial was that Davidson was immediately attracted to Shirley, which may have motivated Davidson to be less than scrupulous—or outright unethical—when it came to the investigation of Plaintiff's actions. For example, it was undisputed that Shirley and Plaintiff separated during the investigation; that Shirley and Davidson moved in together very shortly after Plaintiff was sentenced; and that Shirley and Davidson lived together for about five years. Similarly, Plaintiff introduced evidence that Davidson improperly visited Plaintiff while he was in jail pending trial and that, during those visits, Davidson pressured Plaintiff to sign a quitclaim deed to Shirley's benefit.

3.     The cross-appeal advances only alternative arguments in support of the judgment. Accordingly, a cross-appeal was unnecessary. See, e.g., El Paso Nat. Gas Co. v. Neztsosie, 526 U.S. 473, 479 (1999) ("Absent a cross-appeal, an appellee may urge in support of a decree any matter appearing in the record ." (internal quotation marks omitted)); Rivero v. City of San Francisco, 316 F.3d 857, 862 (9th Cir. 2002)

Case 9:25-cv-00083-DWM Document 59-1 Filed 05/04/26 Page 85 of 217

("Prevailing parties need not have filed cross-appeals in order to correct errors in the district court's reasoning nor to preserve alternative grounds for affirming the judgment." (internal quotation marks and alterations omitted)). Nonetheless, "[a] protective cross-appeal is permissible once an initial appeal is filed." Warfield v. Alaniz, 569 F.3d 1015, 1019 n.3 (9th Cir. 2009). We treat Defendants' arguments on cross-appeal as alternative arguments to affirm the judgment. See Stormans, Inc. v. Wiesman, 794 F.3d 1064, 1085 (9th Cir. 2015) ("Because the cross-appeal requirement is a rule of practice and not a jurisdictional bar, an appellate court has broad power to make such dispositions as justice requires." (internal quotation marks omitted)), cert. denied, 136 S. Ct. 2433 (2016); see also Shepard v. Quillen, 840 F.3d 686, 693 (9th Cir. 2016) ("We can affirm on any ground supported by the record." (internal quotation marks omitted)).

4. Our sister circuits have split on the closely related issue of whether a "deliberate fabrication of evidence" claim necessarily fails if the plaintiff was acquitted. See Black, 835 F.3d at 371 & n.12 (collecting cases). This case does not raise that issue because Plaintiff was not acquitted.

Opinion by Judge Graber

**Was this helpful?**   Yes 👍   No 👎



## Welcome to FindLaw's Cases & Codes

A free source of state and federal court opinions, state laws, and the United States Code. For more information about the legal concepts addressed by these cases and

FindLaw.

Find a Lawyer

Legal Forms & Services ∨

Learn About the Law ∨

Legal Professionals ∨

Blogs

Q

# COSTANICH v. WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES (2007)

## Court of Appeals of Washington,Division 1.

Kathie COSTANICH, Respondent, v. WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, Appellant.

## No. 57214–8–I.

## Decided: January 29, 2007

**Michael W. Collins, Attorney at Law, Seattle, WA, for Appellant. David Ruzumna, Carly Cozine Hansen, Seattle, for Other Party Valerie Rogan. Carol Farr, The Law Offices of Leonard W. Moen & Asso., Renton, WA, for Respondent.**

¶ 1 Kathie Costanich and her husband Ken were foster parents devoted to caring for some of the neediest and most difficult foster children in the system.   Costanich's foster home received accolades from the state, but she also regularly used profanity, sometimes swearing around her foster children. The Department of Social and Health Services (DSHS) found that Costanich's language was emotionally abusive and revoked her foster care license.   Both the Administrative Law Judge (ALJ) and the superior court disagreed, concluding that Costanich's language did not constitute emotional abuse and did not justify revocation of her license.   But the DSHS review judge substituted his own view of the evidence for that of the ALJ, based primarily on the hearsay testimony and reports of the Child Protective Services (CPS) investigator, and upheld the abuse finding and the revocation.   Because the review judge exceeded his authority under DSHS hearing rules, we agree with the superior court and the ALJ and reverse his decision.

FACTS

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 87 of 217

¶ 2 Costanich was a licensed foster parent in Washington for over 20 years.   Her license allowed her to provide foster care for up to six children at a time, and she sometimes had waivers to care for additional children.   All of these children had been victims of abuse or neglect and many had severe behavioral, developmental, and medical problems.   She specialized in violent, sexually aggressive youth (SAY) and medically fragile infants.   Costanich was also the president of Foster Parents of Washington State (FPAWS) and a trainer for DSHS. Before the abuse allegations, the most recent state evaluation described the Costanich foster home as a "unique and valuable resource . unsurpassed by any foster home in the State."

¶ 3 During the summer of 2001, DSHS investigated an allegation that Costanich emotionally and physically abused her foster children, based on what K, one of her foster children, told his therapist.[1]   At the time of the investigation, Costanich had six foster children living in her home:  F(17), K(15), J(12), P(10), and two sisters, E(8) and B(4).   Sandra Duron investigated the allegations for CPS and reported there was inconclusive evidence of physical abuse, but the emotional abuse allegations were "founded."

   This finding was based primarily on two specific incidents.   K claimed that Costanich said "I'll kill you bastard" to F, when she had to pull him off one of her female aides.   The aide and F had gotten into an altercation because F was spying on her while she was sunbathing.   K also said Costanich told P, the only African–American child in the house, to move his "black ass."   Additionally, he alleged Costanich had a general habit of swearing at the children and had called E a "cunt."   Later investigation resulted in allegations that Costanich also called E a "bitch."   On March 14, 2002, DSHS informed Costanich that it upheld the finding of emotional abuse after an internal review.   On August 16, 2002, DSHS revoked Costanich's foster care license based primarily on this finding of abuse.

¶ 4 Costanich appealed both the finding of abuse and the revocation of her license in an administrative hearing.   The ALJ overturned DSHS' decision, finding that the children had not been emotionally abused and were, in fact, "thriving" based on their therapists' and social workers' testimony.   DSHS appealed this decision to the DSHS Board of Appeals.   The review judge reversed the ALJ's initial decision.   He found there was substantial evidence that Costanich had threatened to kill F, told P to move his "black ass," called E names, and swore at the children in her home.   The review judge concluded this constituted emotional abuse and justified revoking her license.   Costanich sought judicial review, and the superior court reversed the review judge's final administrative decision.   The court awarded Costanich attorney fees under the Equal Access to Justice Act (EAJA), RCW 4.84.350.   DSHS appeals.

DISCUSSION

   ¶ 5 The Washington Administrative Procedure Act (APA), chapter 34.05 RCW, governs judicial review of final agency action.[2]   When reviewing an agency action, we sit in the same position as the superior court, applying the standards of the APA directly to the record before the agency.[3]   There are a number

of statutory bases for setting aside an administrative decision, including: (1) the decision is not based on substantial evidence; (2) the agency has erroneously interpreted or applied the law; (3) the agency failed to follow a prescribed procedure; or (4) the order is inconsistent with a rule of the agency.[4] The party challenging an agency's decision has the burden of establishing error.[5]

I.    Authority of the Review Judge

¶ 6 The primary issue in this case is what level of deference the review judge owed the ALJ. DSHS relies on Tapper v. Employment Sec. Dep't for the proposition that the review judge has the power to make his or her own factual findings and to modify or set aside the findings of the ALJ.[6] But Tapper was not a DSHS case.   Here, DSHS hearing rules delineate the authority of the review judge, and DSHS is bound by those rules.[7]   WAC 388–02–0600(1) states that in licensing and similar administrative cases, the review judge has the same decision-making authority as an ALJ.[8] But, in all other cases, the review judge cannot change the ALJ's hearing decision unless:

(a)  There are irregularities, including misconduct of a party or misconduct of the ALJ or abuse of discretion by the ALJ, that affected the fairness of the hearing;

(b)  The findings of fact are not supported by substantial evidence based on the entire record;

(c)  The decision includes errors of law;

(d)  The decision needs to be clarified before the parties can implement it;  or

(e)  Findings of fact must be added because the ALJ failed to make an essential factual finding.   The additional findings must be supported by substantial evidence in view of the entire record and must be consistent with the ALJ's findings that are supported by substantial evidence based on the entire record. [9]

¶ 7 This standard requires significant deference to the ALJ, which is appropriate because an independent ALJ hears the case to "insure that the contestant has a fair and impartial fact finder."[10] If the review judge could simply substitute his own view of the evidence for that of the ALJ in every case, review by an ALJ would be superfluous.   As we explained in Deffenbaugh v. Dep't of Soc. & Health Servs., when considering a similarly-worded earlier version of the hearing rules, this deferential standard is "analogous" to appellate court review of a trial court's decision.[11]

¶ 8 DSHS fails to address WAC 388–02–0600(2) and essentially argues this case should be treated as a licensing case under WAC 388–02–600(1), the section that gives the review judge wide latitude to substitute his own evidentiary findings and legal conclusions for those of the ALJ. But DSHS predicated

its decision to revoke Costanich's license on a formal finding that she had emotionally abused the children.   Findings of abuse are separate from licensing decisions and require the review judge to use the more deferential standard of WAC 388–02–0600(2).[12]   DSHS cannot now argue that the licensing standard should apply to the abuse finding merely because the two decisions were reviewed together. This is particularly true because DSHS predicated the license revocation on its finding of abuse.   There was no independent basis for the revocation.   Thus, the review judge should have applied the standard of review for abuse cases, WAC 388–02–0600(2).

II.   Factual Findings

¶ 9 Under WAC 388–02–600(2), the review judge was justified in substituting his factual findings for those of the ALJ only if the ALJ's factual findings were not supported by substantial evidence or if the ALJ failed to make an essential factual finding.   Substantial evidence is that which is "sufficient to persuade a reasonable person that the declared premise is true." [13]   The reviewing agency or court must accept the fact finder's "views regarding the credibility of witnesses and the weight to be given reasonable but competing inferences." [14]   While hearsay is admissible in the administrative context, under WAC 388–02–0475(3) the fact-finder may only base a finding on hearsay evidence if he or she finds that "the parties had the opportunity to question or contradict it."

¶ 10 Here, the review judge purported to apply the correct standard, reciting that the ALJ's findings needed to be changed because they were not supported by substantial evidence and the ALJ failed to make an essential factual finding.   The ALJ found that, although Costanich used profanity around the children, her swearing was "never directed at the children."   He also found that she told P to move his "black ass."   There was substantial evidence for these findings.   He based them solely on the testimony of the adult witnesses at the hearing, including the children's therapists and the aides who worked in the Costanich home.   The ALJ explicitly chose not to rely on the CPS investigator's hearsay statements about what the children told her.   In contrast, the review judge based his decision to uphold the revocation of Costanich's license on four factual findings:  (1) Costanich's telling F, "I'll kill you bastard," (2) telling P to move his "black ass," (3) calling E a "bitch" and a "cunt," and (4) swearing at the children. The review judge added findings one and three, and finding four is in direct conflict with the ALJ's characterization of Costanich's swearing.   The propriety of these three findings is at the core of Costanich's appeal.

¶ 11 Costanich argues that the DSHS review judge erred by reversing the ALJ's decision because he substituted his own factual findings for the ALJ's and relied on hearsay evidence that the ALJ specifically found lacked credibility.   The review judge's three contested findings are all based primarily on the CPS investigators' hearsay statements which the ALJ found not credible.

¶ 12 The review judge relied heavily on the investigator's claim that she took near-verbatim notes from her interviews with E, F, and K, none of whom testified before the ALJ. The review judge stated: "[T]he undersigned presumes that the statements of the children reported in Ms. Duron's near-verbatim notes are the words of the children rather than the interpretation or summary of Ms. Duron."   But Duron herself admitted that she did not always take near-verbatim notes, stating on cross-examination that K "wouldn't say much, so I just kind of summarized what he was saying."   Duron conducted all but one of her interviews with the children without a third person present and did not record any of the interviews.

   The only documentary evidence of the interviews in the administrative record is her Service Episode Reports (SERs), which represent the data she entered into the computer from her handwritten notes. The original near-verbatim notes were not produced at the hearing.   And the SERs show that she put words in the mouth of at least one of the children.   When interviewing J, Duron asked "When you say [ ], 'go to your fucken [sic] room' whom does she [Costanich] say that to [ ]?" But J never claimed Costanich said that.   Additionally, even the review judge acknowledged that there were a number of problems with Duron's reporting of her conversations with adults, including that she made up the statement of one witness and misquoted a number of others.   The review judge acknowledged that Duron's reports of her interviews with adults were incredible, but assumed that her interviews with the children were accurate "near verbatim" recordings simply because she said so.   The review judge's decision to give greater weight to Duron's hearsay testimony than to all the other witnesses who testified before the ALJ is clearly inappropriate under WAC 388–02–0600(2).

¶ 13 Costanich also argues that the review judge failed to "give due regard" to the ALJ's opportunity to observe the witnesses, as required by RCW 34.05.464(4).   The review judge justified this lack of deference by asserting that the ALJ "failed to record any observations about 48 of the 49 witnesses."[15] This is a misreading of the record.   While the ALJ specifically recorded the demeanor of only one witness, four pages of his decision are devoted to a section entitled "Credibility of Witnesses."   In that section, the ALJ explicitly based his decision only on the testimony of the witnesses at the hearing, not on Duron's reports and hearsay statements.   He found it was impossible to determine whether she was "taking the answers out of context or to know whether or not the answering party fully understood the nature of the question being asked."   He also found K's statements as recorded by his therapist lacking in credibility.   The review judge not only ignored the ALJ's credibility determinations, he also chose to base his decision on the very evidence the ALJ rejected as lacking credibility, the testimony of the CPS investigator and K's hearsay statements to his therapist.   The review judge substituted his own view of the evidence for the ALJ's findings which are supported by substantial evidence.   This is clearly error under the deferential standard that applies to appeals from the ALJ's decision about abuse allegations.

¶ 14 The review judge also asserted that it was necessary to add his finding that Costanich called E names because the ALJ did not make a specific finding that Costanich did not call E a "bitch" or a "cunt."   But the absence of a finding does not mean that the ALJ omitted a finding directly contrary to his other

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 91 of 217

findings.   Although Costanich admitted swearing when speaking to the children, the ALJ found that she did not direct her swearing at the children.   Based on the non-hearsay testimony of all the adult witnesses, we conclude this finding meant that her swearing was not used to discipline, demean, or shame the children, but rather was just part of her vocabulary.   Certainly, calling a child "bitch" or "cunt" would be considered swearing directed at the children.   Thus, the ALJ's factual finding that Costanich did not direct her swearing at the children necessarily encompasses the worst of the statements the review judge attributes to her, including calling E names.   The review judge also added a finding that Costanich said "fuck you" to the children.   This would have been classified as swearing directed at the children.   As with his finding that Costanich called E names, this finding was also based solely on the hearsay statements Duron reported and is not "consistent with the ALJ's findings that are supported by substantial evidence." [16]   Because the review judge based his additional, contradictory factual findings solely on hearsay evidence the ALJ rejected as lacking credibility, we hold the review judge acted outside the scope his authority under WAC 388–02–0600(2) in adding them.

III.   Error of Law

¶ 15 Under WAC 388–02–0600(2)(c), a review judge may change an ALJ's decision if it includes an error of law.   As we noted earlier, this standard is analogous to an appellate court's standard of review.[17]   In reversing the ALJ and ruling that Costanich's language toward her foster children constituted emotional abuse and violated foster care licensing regulations, the review judge stated that the ALJ made two errors of law:  (1) he required evidence of actual harm, when only a "substantial risk" of harm is necessary to prove emotional abuse and (2) he failed to find that swearing violates WAC 388–148–0470, a foster care licensing regulation.

A.   Emotional Abuse

¶ 16 The review judge concluded that Costanich's language toward the children constituted emotional abuse under the regulation in effect at the time, former WAC 388–15–130(3), which provides in relevant part:

¶ 17 Abusive, neglectful, or exploitative acts defined in RCW 26.44.020 .

(d)  Committing acts which are cruel or inhumane regardless of observable injury.   Such acts include, but are not limited to, instances of extreme discipline demonstrating a disregard of a child's pain and/or mental suffering.

(g) Engaging in actions or omissions resulting in injury to, or creating a substantial risk to the physical or mental health or development of a child.[[[[[18]

Because there was no actual observable injury to the children, the ALJ had to determine whether telling an African–American child to move his "black ass" or swearing around the children was either cruel and inhumane or posed a "substantial risk" to the mental health or development of the children. Unfortunately, there is no case law interpreting former WAC 388–15–130(3) or providing examples of language that would create a substantial risk to the mental health of a child.   But even Duron, the CPS investigator, who regularly decides what is and is not abusive, admitted that cursing at one's children is not per se abusive and that the language must be considered in context.   Accordingly, the ALJ looked to the context of the language and considered the testimony of all of the medical professionals and social workers who had direct contact with the children as well as the DSHS experts who testified but had not interviewed the children.   He found:

None of the experts who provided testimony on behalf of DSHS could say with any degree of certainty that there was a risk of harm. They spoke in terms of possibility not in terms of likelihood.   All of those professionals who had direct contact with the children determined that they were thriving in the Costanich home environment. This is clearly a statement that the use of profanity around these children did not constitute a risk of harm because there was no harm.

¶ 18 It is clear from this statement that the ALJ found there was no "substantial risk" to the children from Costanich's use of profanity.   But his last sentence, evaluating the risk of harm in the context of actual harm, is a misstatement of the law.   The ALJ made several erroneous statements of this nature. Had the ALJ left out these statements, his opinion would have been unassailable.   But despite his occasional recitation of the wrong standard, his ultimate conclusion that the evidence does not support a finding of "substantial risk" of harm, is legally sound.   Because WAC 388–02–0600(2) imposes an appellate standard of review on the DSHS review judge, the mere recitation of the wrong standard in a few places by the ALJ does not warrant reversal where the ultimate legal conclusions were supported by the findings and those findings were based on substantial evidence.

B.   Violation of Foster Care Licensing Regulation

¶ 19 The review judge asserted that the ALJ erred by failing to find that Costanich violated WAC 388–148–0470, which prohibits discipline that is "cruel, unusual, frightening, unsafe or humiliating" and lists "name calling," and "threatening" as two practices which are per se violations of foster care licensing regulations.   The review judge erred in reversing the ALJ's conclusion because he relied primarily on his own additional findings, that Costanich called E names and threatened F, which he lacked the authority to add under WAC 388–02–0600(2).

¶ 20 He also ruled that the ALJ erred in finding that swearing does not constitute humiliating discipline because under Morgan v. Dep't of Soc. & Health Servs.,[19] "the use of profanity alone is sufficient to prove a violation."   This is an unwarranted extension of the holding in Morgan.   There, the court said the way in which Morgan used profanity was humiliating discipline, not that all profanity constitutes a per se violation.[20]   In Morgan, the court did not explain how Morgan's swearing was humiliating for the children and did not specify exactly which statements it considered humiliating.   The only specific allegation mentioned in Morgan is that the foster parent told one of the children to stop "acting like a little bitch."[21] While this is similar to the allegation that Costanich called E a "bitch," that allegation was not proven.   Further, the conclusion that all swearing is a violation of WAC 388–148–0470, is undercut by the fact that swearing is not on the list of per se violations.   Thus the review judge erred in reversing the ALJ's decision that Costanich's swearing did not constitute humiliating discipline in violation of WAC 388–148–0470.

## IV.   Attorney Fees

¶ 21 The superior court awarded Costanich attorney fees under the Equal Access to Justice Act (EAJA), RCW 4.84.350, which provides in relevant part:

(1)  Except as otherwise specifically provided by statute, a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust.

¶ 22 DSHS argues Costanich was not entitled to attorney fees because it was "substantially justified" in finding her language toward her foster children constituted emotional abuse and revoking her foster care license.   "[A]gency action is substantially justified if it has a reasonable basis both in law and fact."[22]   We review a determination that agency action was not substantially justified for abuse of discretion.[23]   A court abuses its discretion when it bases its decision on untenable grounds or reasons.[24]

¶ 23 The superior court awarded Costanich attorney fees, finding that DSHS' actions were not substantially justified primarily because the DSHS review judge exceeded the scope of his power in reversing the ALJ.   Although there are no cases holding that a DSHS review judge's decision falls within the definition of "agency action" for purposes of granting fees under the EAJA, the statutes defining agency action support such an award.   RCW 4.84.340 states that "agency action" is defined by chapter 34.05 RCW.   While RCW 34.05.010(3) does not specifically include or exclude adjudicative proceedings from the definition of agency action, a review board that conducts adjudicative proceedings falls within RCW 34.05.010(2)'s definition of what constitutes an "agency".   In Muckleshoot Indian Tribe v. Dept. of Ecology, we held that the APA's definition of "agency action" must be applied broadly.[25]   THUS, WE

HOLD THAT the review judge's decision constitutes agency action because he is part of the agency and his actions are not expressly excluded from the definition of "agency action."

¶ 24 Additionally, although DSHS was justified initially in its concerns about Costanich's use of profanity, the evidence before the ALJ shows that DSHS was not substantially justified in revoking her license once it became aware of the problems with Duron's investigation.

¶ 25 We conclude there was no abuse of discretion and affirm the superior court's award of fees.    For the same reasons, Costanich is entitled to attorney fees on appeal under RAP 18.1.

¶ 26 We set aside the DSHS review judge's decision and reinstate the ALJ's decision.    We affirm the superior court's decision to award Costanich attorney fees and award attorney fees on appeal on the same grounds.

FOOTNOTES

1.    In order to protect the privacy of the foster children, we refer to them by their first initials.

2.    RCW 34.05.510;  Conway v. Dep't of Soc. & Health Servs., 131 Wash.App. 406, 414, 120 P.3d 130 (2005) (citing Tapper v. Employment Sec. Dep't, 122 Wash.2d 397, 402, 858 P.2d 494 (1993)).

3.    Conway, 131 Wash.App. at 414, 120 P.3d 130.

4.    RCW 34.05.570(3).

5.    RCW 34.05.570(1)(a);  RCW 34.05.574(1).

6.    Tapper, 122 Wash.2d 397, 404, 858 P.2d 494 (1993).

7.    Deffenbaugh v. Dep't of Soc. & Health Servs., 53 Wash.App. 868, 871, 770 P.2d 1084 (1989).

8.    The other types of cases in which the review judge the same authority as the ALJ are certification and related fines, rate-making, and parent address disclosure.   WAC 388–02–0600(1).

9.    WAC 388–02–0600(2).

10.    Deffenbaugh, 53 Wash.App. at 871, 770 P.2d 1084.

11.    53 Wash.App. 868, 871, 770 P.2d 1084 (1989).

12.    See WAC 388–02–0215(l)–(m) (listing abuse findings and licensing decisions as two separate kinds of decisions for which a party may seek review).

13. Alberton's, Inc. v. Employment Sec. Dep't, 102 Wash.App. 29, 36, 15 P.3d 153 (2000) (citing Galvin v. Employment Sec. Dep't, 87 Wash.App. 634, 640–41, 942 P.2d 1040 (1997), review denied, 134 Wash.2d 1004, 953 P.2d 95 (1998)).

14. Freeburg v. City of Seattle, 71 Wash.App. 367, 371–72, 859 P.2d 610 (1993).

15. (Emphasis omitted.) See RCW 34.05.461(3) (requiring ALJ to identify "findings based substantially on credibility of evidence or demeanor of witnesses").

16. WAC 388–02–0600(2)(e).

17. Deffenbaugh, 53 Wash.App. at 871, 770 P.2d 1084.

18. Former WAC 388–15–130(3) (2001), repealed by WSR 02–15–098 and 02–17–045 (effective February 10, 2003). The current version of this regulation, WAC 388–15–009(5), is similarly worded.

19. 99 Wash.App. 148, 992 P.2d 1023 (2000).

20. Id. at 155, 992 P.2d 1023.

21. Id. at 151, 992 P.2d 1023.

22. H & H P'ship v. State, 115 Wash.App. 164, 171, 62 P.3d 510 (2003) (citing Pierce v. Underwood, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)).

23. Id. (citing Alpine Lakes Prot. Soc'y v. Dep't of Natural Res., 102 Wash.App. 1, 19, 979 P.2d 929 (1999)).

24. Cobra Roofing Serv. v. Dep't of Labor & Indus., 122 Wash.App. 402, 420, 97 P.3d 17 (2004) (citing Moreman v. Butcher, 126 Wash.2d 36, 40, 891 P.2d 725 (1995)), aff'd, 157 Wash.2d 90, 135 P.3d 913 (2006).

25. 112 Wash.App. 712, 722, 50 P.3d 668 (2002), review denied, 150 Wash. 2d 1016, 79 P.3d 446 (2003).

AGID, J.

WE CONCUR: MARLIN APPELWICK and RONALD COX, JJ.

Was this helpful?   Yes 👍   No 👎

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 96 of 217

4/29/26, 11:32 AM    Robert Devereaux, Plaintiff-appellant, v. Timothy David Abbey; Laurie Alexander; Kate Carrow; Linda Wood; Kenneth Badgley, in H...

# JUSTIA

# Robert Devereaux, Plaintiff-appellant, v. Timothy David Abbey; Laurie Alexander; Kate Carrow; Linda Wood; Kenneth Badgley, in His Official Capacity As Chief of Police of the City of Wenatchee; Washington State Dept of Social and Health Services; Robert Ricardo Perez, Opinion Defendants-appellees,andearl Tilly, in His Official Capacity As Public Safety Commissioner for the City of Wenatchee; City of Wenatchee, a Municipal Corporation, Defendants, 263 F.3d 1070 (9th Cir. 2001)

**Full Name:** Robert Devereaux, Plaintiff-appellant, v. Timothy David Abbey; Laurie Alexander; Kate Carrow; Linda Wood; Kenneth Badgley, in His Official Capacity As Chief of Police of the City of... **Show More**

**Citation:** 263 F.3d 1070

**Date:** September 5, 2001

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 97 of 217

## U.S. Court of Appeals for the Ninth Circuit - 263 F.3d 1070 (9th Cir. 2001)

**Argued and Submitted March 20, 2001Filed September 5, 2001**

[Copyrighted Material Omitted]

Steven C. Lacy, East Wenatchee, Washington, for the plaintiff-appellant.

Jeff Freimund, Assistant Attorney General, Olympia, Washington, for the defendants-appellees.

Appeal from the United States District Court for the Eastern District of Washington Robert H. Whaley, District Judge, Presiding D.C. No. CV 96-0115 RHW

Before: Mary M. Schroeder, Chief Judge, and Harry Pregerson, Diarmuid F. O'Scannlain, Ferdinand F. Fernandez, Thomas G. Nelson, Andrew J. Kleinfeld, A. Wallace Tashima, Sidney R. Thomas, Kim McLane Wardlaw, Richard A. Paez, and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Tashima; Concurrence by Judge Fernandez; Partial Concurrence and Partial Dissent by Judge Kleinfeld

Tashima, Circuit Judge.

Plaintiff Robert Devereaux brought suit in federal district court for alleged violations of his federal civil rights, and also on various state law grounds. The district court granted summary judgment in favor of all defendants as to the federal claims and then declined to exercise supplemental jurisdiction over the state law claims, dismissing them without prejudice. This timely appeal followed. We have jurisdiction pursuant to 28 U.S.C. §§ 1291, and we affirm.

This case arises out of the investigation and prosecution of Devereaux for alleged sexual abuse of foster children living in his home, an investigation that mushroomed into a sexual abuse "witch hunt" in which 43 adults were charged with over 29,000 counts of sexual molestation. We summarize the pertinent facts only briefly. The facts are set forth in detail

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 98 of 217

4/29/26, 11:32 AM    Robert Devereaux, Plaintiff-appellant, v. Timothy David Abbey; Laurie Alexander; Kate Carrow; Linda Wood; Kenneth Badgley, in H…

in the three-judge panel opinion. See Devereaux v. Perez, 218 F.3d 1045, 1047-51 (9th Cir.), reh'g en banc granted, 235 F.3d 1206 (9th Cir. 2000) ("Devereaux I").

On August 3, 1994, Detective Robert Ricardo Perez of the Wenatchee, Washington, Police Department interviewed A.R., a foster child of Devereaux's, to determine whether A.R. was being sexually abused by Devereaux. A.R. initially denied that she was being abused but, upon further questioning, went on to tell Perez that she had been both a victim of and a witness to sexual abuse by Devereaux. On this basis, Perez brought Devereaux to the police station for questioning. Perez interviewed Devereaux about the alleged abuse, and Devereaux denied that he had sexually abused any of his foster children.

While Perez was interviewing Devereaux, DefendantAppellee Linda Wood, an employee of the Washington Department of Social and Health Services ("DSHS"), arrived at the police station with A.S., another of Devereaux's foster children. Perez briefly interrupted his interview with Devereaux to talk to A.S., who denied that there was any sexual abuse taking place in the Devereaux home. Perez then finished his interview with Devereaux and had him booked on one count of rape of a child in the third degree, on the basis of the alleged abuse of A.R.

Later on the same day, Perez also interviewed two more of Devereaux's foster children and, with Wood, conducted a lengthy second interview of A.S. This interview lasted from 5:00 p.m. to 11 p.m. In it, A.S. repeatedly denied having been sexually abused by Devereaux. After six hours of questioning, however, she finally changed her story and said that he had abused her. Perez then had Devereaux booked for the rape and molestation of A.S.

From there the investigation grew and the accusations spread. Roughly one year later, the felony charges against Devereaux were dropped in exchange for his plea of guilty to two misdemeanor counts -one count of rendering criminal assistance and one count of fourth-degree assault (for having spanked one of his foster children). The conditions of his sentence prohibited him from having contact with certain children, from being a foster parent for two years, and from being employed in a field that caters to or has regular contact with minor children.

Devereaux then commenced this action under 42 U.S.C. §§ 1983, naming the following parties as defendants: Perez; Wood; DSHS; the City of Wenatchee; Timothy David Abbey, Laurie Alexander, and Kate Carrow, all of whom were employees of DSHS; Kenneth Badgley, in his official capacity as police chief for the Wenatchee Police Department; and Earl Tilly, the Wenatchee Public Safety Commissioner. Devereaux alleged violations of his federal rights and also brought several state law claims.

The defendants moved for summary judgment on the §§ 1983 claim, and the district court granted their motions. It declined to exercise supplemental jurisdiction over the state law claims, dismissing them without prejudice to their being prosecuted in state court. See 28 U.S.C.§§ 1367(c). This timely appeal followed. A divided panel of this court affirmed the district court. See Devereaux I, 218 F.3d at 1045. We subsequently granted rehearing en banc. 235 F.3d at 1206.

Pursuant to a settlement agreement, Devereaux's appeal with respect to Perez and Badgley was dismissed with prejudice. In addition, Devereaux has not challenged the dismissal of the state law claims or the grant of summary judgment in favor of the City of Wenatchee, DSHS, or Tilly.

Consequently, the only matter now before this court is Devereaux's challenge to the grant of summary judgment in favor of Abbey, Alexander, Carrow, and Wood (hereinafter "Defendants") on the §§ 1983 claim. The district court granted summary judgment to Defendants on that claim on the basis of qualified immunity, stating that Devereaux has"not cite [d], nor has this Court's research revealed, case law to suggest that any of the State Defendants violated Plaintiff's clearly established rights based upon the evidence in the record."

We review a grant of summary judgment de novo. Weiner v. San Diego County, 210 F.3d 1025, 1028 (9th Cir. 2000). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights. 42 U.S.C.§§ 1983. Qualified immunity, however, shields §§ 1983 defendants " [f]rom liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

In Saucier v. Katz, 121 S. Ct. 2151 (2001), the Supreme Court clarified the two-step qualified immunity inquiry. To decide whether a defendant is protected by qualified immunity, a court must first determine whether, " [t]aken in the light most favorable to the party asserting injury, . . . the facts alleged show the officer's conduct violated a constitutional right." Id. at 2156. If the plaintiff's factual allegations do add up to a violation of the plaintiff's federal rights, then the court must proceed to determine whether the right

was"clearly established," i.e., whether the contours of the right were already delineated with sufficient clarity to make a reasonable officer in the defendant's circumstances aware that what he was doing violated the right. Id. In essence, at the first step, the inquiry is whether the facts alleged constitute a violation of the plaintiff's rights. If they do, then, at the second step, the question is whether the defendant could nonetheless have reasonably but erroneously believed that his or her conduct did not violate the plaintiff's rights. See id. at 2158 ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.").

Undertaking the first step of the two-step qualified immunity inquiry, we are persuaded that there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government. Perhaps because the proposition is virtually self-evident, we are not aware of any prior cases that have expressly recognized this specific right, but that does not mean that there is no such right. Rather, what is required is that government officials have "fair and clear warning" that their conduct is unlawful. See United States v. Lanier, 520 U.S. 259, 271 (1997) (noting that "general statements of the law are not inherently incapable of giving fair and clear warning," and that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though `the very action in question has [not ] previously been held unlawful' " (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (alteration in original)); see also Giebel v. Sylvester, 244 F.3d 1182, 1189 (9th Cir. 2001) ("Precedent directly on point is not necessary to demonstrate that a right is clearly established. Rather, if the unlawfulness is apparent in light of pre-existing law, then the standard is met. In addition, even if there is no closely analogous case law, a right can be clearly established on the basis of common sense. " (emendations, internal quotation marks, and citations omitted)).

Under Pyle v. Kansas, 317 U.S. 213, 216 (1942), the knowing use by the prosecution of perjured testimony in order to secure a criminal conviction violates the Constitution. While Pyle does not deal specifically with the bringing of criminal charges, as opposed to the securing of a conviction, we find that the wrongfulness of charging someone on the basis of deliberately fabricated evidence is sufficiently obvious, and Pyle is sufficiently analogous, that the right to be free from such charges is a constitutional right.

We are also persuaded, however, that there is no constitutional due process right to have child witnesses in a child sexual abuse investigation interviewed in a particular manner, or to have the investigation carried out in a particular way. Interviewers of child witnesses of suspected sexual abuse must be given some latitude in determining when to credit

4/29/26, 11:32 AM Case 9:25-cv-00083-DWM Document 59-1 Filed 05/04/26 Page 101 of 217

Robert Devereaux, Plaintiff-appellant, v. Timothy David Abbey; Laurie Alexander; Kate Carrow; Linda Wood; Kenneth Badgley, in H...

witnesses' denials and when to discount them, and we are not aware of any federal law - constitutional, decisional, or statutory -that indicates precisely where the line must be drawn. See generally Myers v. Morris, 810 F.2d 1437, 1460-61 (8th Cir. 1987) (discussing in detail this "grey area of investigative procedure as to which there were, and probably still are, less than clearly established legal norms"). Cf. Idaho v. Wright, 497 U.S. 805, 819 (1990) (noting, in a Confrontation Clause context, that " [a]lthough the procedural guidelines propounded by the court below may well enhance the reliability of out-of-court statements of children regarding sexual abuse, we decline to read into the Confrontation Clause a preconceived and artificial litmus test for the procedural propriety of professional interviews in which children make hearsay statements against a defendant"). Consequently, mere allegations that Defendants used interviewing techniques that were in some sense improper, or that violated state regulations, without more, cannot serve as the basis for a claim under §§ 1983.

Given this legal background, the central issues presented on this appeal are the following: (1) Did Devereaux properly present to the district court and to this court a deliberate fabrication-of-evidence claim, or merely an improperinterview-techniques claim? (2) If the former, has Devereaux adduced sufficient evidence in support of such a claim to withstand summary judgment?For the reasons given below, we conclude that, to the extent that Devereaux has raised a deliberate-fabrication-ofevidence claim, he has not adduced or pointed to any evidence in the record that supports it. For purposes of our analysis, we assume that, in order to support such a claim, Devereaux must, at a minimum, point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of Devereaux despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information. See Devereaux I, 218 F.3d at 1063 (Kleinfeld, J., dissenting) (describing the "critical element" in Devereaux's deliberatefabrication-of-evidence claim, namely, "that the defendants who questioned the children knew or should have known that they were eliciting false accusations"); see also Myers, 810 F.2d at 1458 (requiring, in an analogous context,"a specific affirmative showing of dishonesty").

A. Devereaux's Arguments Before the District Court

The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of fact for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the nonmoving party has the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 102 of 217

4/29/26, 11:32 AM        Robert Devereaux, Plaintiff-appellant, v. Timothy David Abbey; Laurie Alexander; Kate Carrow; Linda Wood; Kenneth Badgley, in H…

Id. at 325; see also Fairbank v. Wunderman Cato Johnson, 212 F.3d 528, 532 (9th Cir. 2000) (holding that the Celotex "showing" can be made by "pointing out through argument -the absence of evidence to support plaintiff's claim"). Once the moving party carries its initial burden, the adverse party "may not rest upon the mere allegations or denials of the adverse party's pleading," but must provide affidavits or other sources of evidence that "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Celotex, 477 U.S. at 323-24; Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1107 (9th Cir. 2000) (holding that once the moving party carries its initial burden of production, "the nonmoving parties were obligated to produce evidence in response").

In their memorandum in support of their motion for summary judgment, Defendants argued that "there is no evidence that any of the defendant [s] actually believed plaintiff was innocent or that the children were lying when they participated in the interviews." On this basis (among others), Defendants argued that they were entitled to summary judgment.

In his memorandum in opposition to Defendants' motion for summary judgment, Devereaux never expressly accepted or rejected the proposition that his §§ 1983 claim required a showing of dishonesty, and he never purported to have made such a showing. Most of his memorandum indicated that Devereaux was raising only an improper-interviewtechniques claim. For example, he asserted that Defendants failed "to adhere to established guidelines and policies concerning the questioning of child witnesses," and that they departed "from accepted professional judgment, practice, and standards." He also claimed that " [w]hat is at issue for this action is the failure of the State Defendants to conduct and monitor these interrogations in a manner that would ensure the veracity of the information obtained." All of those allegations, even if supported by record evidence, are insufficient to support a deliberate-fabrication-of-evidence claim. Failing to follow guidelines or to carry out an investigation in a manner that will ensure an error-free result is one thing; intentionally fabricating false evidence is quite another.

Devereaux did, however, go on to claim that Defendants' "intentional attempt to alter the testimony of alleged child victims" was also "at issue." He did not, however, expressly develop that "issue" or connect it with other, more specific factual allegations, or with any record evidence. His "Statement of Material Facts" in opposition to Defendants' motion for summary judgment contains several descriptions of interviews of children in which the children initially denied abuse, were questioned further, and ultimately accused Devereaux of abusing them. These, as far as we can discern, are the only "attempts to alter the testimony of alleged child victims" to which Devereaux referred.

The problem with Devereaux's line of argument is that, as we noted earlier, interviewers of child witnesses of suspected sexual abuse must be permitted to exercise some discretion in deciding when to accept initial denials at face value and when to reject them (or withhold judgment on them) and proceed further. Consequently, an allegation that an interviewer disbelieved an initial denial and continued with aggressive questioning of the child cannot, without more, support a deliberate-fabrication-of-evidence claim, even if the allegation is amply supported by the evidence. What is required is an allegation or a showing that the interviewer knew or should have known that the alleged perpetrator was innocent, or that the interview techniques employed were so coercive and abusive that the interviewer knew or should have known that they would yield false information. Devereaux never even alleged facts of this sort, much less supported such allegations with citations to evidence in the record.

An example will illustrate the point. In his memorandum submitted to the district court, Devereaux emphasized the fact that in the August 3 interview of A.S., in which A.S. initially denied being a victim of abuse but later changed her story and accused Devereaux, Wood repeatedly admonished A.S. to tell the truth. It is difficult to see, however, how repeated admonitions to be truthful can amount to a constitutional violation for deliberate fabrication of evidence, in the absence of any independent allegations or evidence that Wood knew or should have known that Devereaux was innocent and that A.S., in testifying to that effect, had already told the truth. Because Devereaux never made that independent argument, his complaints about Wood's admonitions to the child to tell the truth cannot support a deliberate-fabrication claim. For similar reasons, the other incidents that Devereaux described before the district court also are inadequate to support such a claim.

Thus, to the extent that Devereaux's memorandum in opposition to Defendants' motion for summary judgment did raise a deliberate-fabrication-of-evidence claim, he failed to make or support any factual allegations that were logically capable of supporting such a claim. The district court's decision to grant the motion was therefore proper.

"It is well-established that an appellate court will not consider issues that were not properly raised before the district court." Slaven v. American Trading Transp. Co., 146 F.3d 1066, 1069 (9th Cir. 1998). Although our discussion above demonstrates that Devereaux barely presented and never supported his deliberate-fabrication-of-evidence claim before the district court, we nonetheless discuss the additional arguments that he has raised on appeal. As that discussion shows, his failure to allege and to offer proof of the requisite facts continues.

In his opening brief on appeal, Devereaux generally argues only that Defendants used improper methods in interviewing witnesses. He never argues that they pursued their investigation of him even though they knew or should have known that he was innocent. The closest that he comes to making such an argument is a vague reference to "evidence that the state defendants . . . held an animus and preconception against Devereaux which led to their intentional manipulation of child witnesses." But the "animus and preconception " referred to could just as well be Defendants' good-faith belief that Devereaux was guilty, which could lead to aggressive or manipulative questioning of the child witnesses in order to get them to testify truthfully, if reluctantly, to his guilt. We conclude that if Devereaux's brief is intended to raise a deliberate-fabrication-of-evidence claim, it is not based on any allegation that Defendants knew or should have known that he was innocent. [1]

Thus, if there is a deliberate-fabrication-of-evidence argument in Devereaux's opening brief on appeal, then it must be based on a claim that Defendants' interviewing techniques were so coercive and abusive that Defendants knew or should have known that the interviews would yield false information. Liberally construed, Devereaux's brief does raise this argument: It includes a discussion of Pyle, and it makes repeated reference to "coerc [ion] or influence [ ] to provide false testimony," and the like.

The problem once again, however, is that the improprieties Devereaux describes cannot possibly support his claim. The alleged improprieties are well described and addressed in the panel opinion. See Devereaux I, 218 F.3d at 1054-55. For example, Devereaux repeatedly focuses on the interview in which Perez, in Carrow's presence, confronted A.R. regarding her prior recantation of her allegations of abuse and threatened her with charges for "false reporting" if she stuck to her recantation. Devereaux emphasizes the fact that A.R. suffers from fetal alcohol syndrome and is therefore a particularly vulnerable witness. What Devereaux mentions only in passing is that, despite the coercive nature of the threat and despite A.R.'s heightened susceptibility, A.R. stuck to her recantation -Devereaux expressly recognizes that Perez " unsuccessfully applied pressure upon A.R." by threatening "to prosecute her for perjury." (Emphasis added.) Because this coercive technique did not, on Devereaux's theory of the facts, yield any false testimony even though it was applied to an especially vulnerable witness, it can hardly serve as a basis for a claim that Defendants violated Devereaux's rights by using techniques that they knew or should have known would yield false information.

We conclude that to the extent that Devereaux has raised a deliberate-fabrication-of-evidence claim in his opening brief, he has again failed to allege facts that would support

such a claim. The grant of summary judgment in favor of Defendants must therefore be affirmed.

When we granted rehearing en banc, we ordered supplemental briefing from the parties. As a general matter, " [w]e review only issues which are argued specifically and distinctly in a party's opening brief," Greenwood v. FAA, 28 F.3d 971, 977 (9th Cir. 1994), and an issue will therefore be deemed waived if it is raised for the first time in a supplemental brief, Kreisner v. City of San Diego, 1 F.3d 775, 778 n.2 (9th Cir. 1993). Despite these well-established principles and the fact that Devereaux's opening brief did not contain any meritorious arguments for reversal, we briefly address the arguments in his supplemental brief.

In his supplemental brief, Devereaux sensibly adopts the deliberate-fabrication-of-evidence argument that was so forcefully developed by Judge Kleinfeld in his dissent from the panel majority's opinion. See Devereaux I, 218 F.3d at 1057-63 (Kleinfeld, J., dissenting). Nonetheless, Devereaux still fails to allege any facts or point to any evidence in the record that supports the argument.

For example, Devereaux points out that Carrow was involved in the "parade of homes," an incident in which one of Devereaux's foster children was driven around Wenatchee and asked to point out the locations at which abuse had occurred. But driving a child around the community and asking where the crimes that the child allegedly witnessed took place is surely not such a coercive and abusive technique that Carrow should have known it would lead to false information. Devereaux points out that Carrow "ignored" another child's denials that Devereaux was abusing his foster children, but, again, interviewers of child witnesses of suspected sexual abuse surely must be given some latitude in determining when to credit witnesses' denials and when to discount them -the mere fact that an interviewer did not immediately believe such a denial cannot suffice to show that the interviewer violated the Constitution by using techniques that the interviewer knew or should have known would yield false information.

Devereaux also accuses Carrow of withholding exculpatory evidence, but (1) he does not argue that the requirements of Brady v. Maryland, 373 U.S. 83 (1963), apply to social workers at the investigative and charging stages, and (2) in any event, a Brady violation cannot in itself support a deliberatefabrication-of-evidence claim -if it did, then any prisoner with a successful Brady claim would be able to bring a §§ 1983 action against the prosecutor for deliberate fabrication of evidence, and would be able to get past summary judgment. The other accusations against Carrow are even less substantial than these.

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 106 of 217

4/29/26, 11:32 AM          Robert Devereaux, Plaintiff-appellant, v. Timothy David Abbey; Laurie Alexander; Kate Carrow; Linda Wood; Kenneth Badgley, in H...

Devereaux's only accusation regarding Wood is her participation in the "tell the truth" interview of A.S., which we have already addressed.

Devereaux points out that Alexander participated in the "parade of homes" as well, that she withheld exculpatory information, and that she used Linda Miller's confession in questioning Miller's daughter. None of this shows, however, that Alexander knew or should have known that Devereaux was innocent, and none of it amounts to the use of investigative techniques that were so coercive and abusive that Alexander knew or should have known that they would yield false information.

The only accusation that Devereaux levels against Abbey is that he participated in Perez's interview of D.E. after D.E. had been in Perez's foster care for six months. Without more, that does not show that Abbey knew or should have known that Devereaux was innocent, or that he used techniques that he knew or should have known would yield false information.

Again, Devereaux has not alleged that Defendants knew or should have known that he was innocent, or that their investigative techniques were so coercive and abusive that they knew or should have known that the techniques would yield false information. He has therefore failed, even in his supplemental brief, to support a claim that Defendants deliberately fabricated evidence to be used against him.

The partial dissent agrees that in order to support a deliberate-fabrication claim, Devereaux must show more than "that an interviewer disbelieved an initial denial and continued with aggressive questioning." Kleinfeld, J., dissenting in part at 12226 ("partial dissent"). The partial dissent's analysis of the evidence, however, is inconsistent with that requirement.

As part of its case against Wood, the partial dissent describes deposition testimony from A.S.'s mental health counselor to the effect that A.S. had threatened, on numerous occasions, to accuse the counselor of abusing her. Id. at 12228-29. The partial dissent fails to acknowledge, however, that the deponent was asked whether A.S. appeared to be capable of carrying out such a threat, but that the answer to that question was not included in the deposition excerpt that was provided to the district court and to this court. Most importantly, there is no evidence that Wood was aware of any of this, or even that the deponent had ever told anyone, let alone Wood, about any of A.S.'s threats. For all we know, the deponent never took the threats seriously enough to think them worth reporting.

The partial dissent also states that "in a later interview" A.S. both accused another social worker of participating in the alleged orgies and admitted having made false accusations of rape. The partial dissent concludes that " [a ] reasonable interviewer would have to be very wary indeed of accusations of sexual misconduct by this dangerous girl." Id. at 12229. The "later interview" in question was conducted by Devereaux's attorney and took place on June 26, 1995, nearly one year after Wood's allegedly improper interview of A.S., and approximately four months after Devereaux filed his complaint. The partial dissent fails to explain how A.S.'s statements in June 1995 should have made Wood aware in August 1994 of A.S.'s supposed "dangerousness."[2]

Apart from these unsupported or irrelevant allegations, the case against Wood comes to this: (1) A.S. initially did not accuse Devereaux, (2) she was subsequently left alone with Wood, and then, (3) after a lengthy interrogation by Wood and Perez, she accused Devereaux. The partial dissent notes that Devereaux, as the nonmoving party, is entitled to all reasonable inferences in his favor. It then concludes that a jury could infer that "Wood knew the story was false. " Id. at 12229.

There are several problems with this line of reasoning. The first is that a jury would be authorized to draw such an inference any time an interviewer discounts an initial denial and continues with aggressive questioning that produces an accusation -indeed, that is all that the inference would be based on in this case. Were we to reverse the grant of summary judgment as to Wood, then, we would thereby eliminate completely any latitude that interviewers of child victims of suspected sexual abuse must have, because pressing on past an initial denial would always give rise to potential liability. This we cannot do. Errors of this kind -inferring deliberate fabrication from the fact that an investigator discounted a witness's statement and pressed on -also occur elsewhere in the partial dissent's analysis. See, e.g., id. at 12233 (permitting the jury to infer that "Carrow . . . knew that Perez was making all the children lie" from the fact that A.R. said to Perez "you make all the children lie").[3]

Second, as we explained, supra, Devereaux has never alleged that Wood or any other Defendant knew that he was innocent. His claim must therefore be based entirely on improper interviewing techniques, i.e., techniques that are inherently so coercive or abusive as to give rise to liability even if used in good faith. By repeatedly basing its arguments on inferences to "guilty knowledge" on the part of Defendants, see id. at 12229-30 (Wood); id. at 12232, 12234 (Carrow); id. at 12235 (Alexander), the partial dissent grounds its analysis upon factual allegations that Devereaux has never made.[4]

Other, similar problems pervade the remainder of the partial dissent's analysis. For example, it discusses the interview in which Perez, with Carrow present, threatened A.R. with charges for false reporting. It concludes that a jury could draw inferences on this basis about Carrow's "modus operandi," to the effect that she "had probably used similarly coercive techniques" in other interviews with other girls. Id. at 12233. The flaw in this reasoning is that there is no evidence that Carrow has ever used this "coercive" technique (i.e., the making of threats), or any other, on anyone, including A.R. All that the record shows is that on one occasion Carrow was present when someone else used threats -we do not even have any evidence that Carrow approved use of the technique. How this evidence shows that the use of threats and "similarly coercive techniques" was Carrow's "modus operandi" has been left unexplained.

The partial dissent's case against Alexander is that, having received medical evidence that C.M. might have been abused but not to the full extent that C.M. claimed, Alexander subsequently "obtained reconfirmation" of C.M.'s story, in part by truthfully informing C.M. that C.M.'s mother had told a similar story. Id. at 12235.

At the time of this incident, Alexander had reason to believe that C.M. had been abused (because her hymen was partially torn and she had made allegations of abuse), but Alexander also had reason to believe that C.M.'s story could not be true in its entirety (because the condition of C.M.'s hymen was not consistent with the full extent of the abuse she had alleged). Notwithstanding the partial dissent's conclusions to the contrary, truthfully informing a witness about another witness' corroboration is not such an inherently coercive or abusive technique that Alexander knew or should have known it would lead to false information -rather, Alexander could have reasonably believed that by taking C.M.'s side, so to speak, she could gain C.M.'s trust and persuade her to describe what sort of abuse had really taken place. This may or may not be the wisest approach to a witness whose story has already been falsified in part, but it cannot serve as the foundation for a deliberate-fabrication-of-evidence claim.

Devereaux has had ample opportunity to marshal his evidence and focus his arguments on Defendants, rather than on Perez. If the partial dissent's observation that the"record and briefs are not as clear as we might like" because"the case was focused on Detective Perez," id. at 12227, is meant to excuse Devereaux's failure to marshal the evidence against Defendants, we are unpersuaded. In the district court, Abbey, Alexander, Carrow, and Wood moved for summary judgment separately from Perez. Devereaux then filed a memorandum in opposition to their motion separately from his opposition to Perez's motion. Devereaux has repeatedly been put on notice that he must present and argue the

evidence against Defendants. If his case was "focused" on Perez, it was only because the only evidence Devereaux had was against Perez, and he had none against Defendants. In that state of the record, it cannot be gainsaid that the district court correctly granted summary judgment in favor of Abbey, Alexander, Carrow, and Wood.

One final point merits emphasis: The partial dissent does not purport to present arguments that it finds in Devereaux's pleadings and briefs. Rather, it creates the factual allegations that Devereaux needs and then proceeds directly to the record, mining it for evidence to support the necessary allegations. We reject this approach for the simple reason that we are not Devereaux's attorneys. It is not the role of this court to "manufacture arguments for an appellant." Greenwood, 28 F.3d at 977.

The investigatory behavior of which Devereaux complains is indeed troubling, and we do not condone it. But, in three attempts to do so, Devereaux has never made or provided evidentiary support for allegations that warrant the imposition of §§ 1983 liability on Defendants. The judgment of the district court is, therefore,

AFFIRMED.

FERNANDEZ, Circuit Judge, concurring:

I concur in the majority opinion insofar as it rests on the ground of qualified immunity for investigative techniques. I do not, however, join the discussion regarding knowing[1] fabrication of evidence because I do not believe that Devereaux ever properly raised or developed that issue before the district court.

Thus, I express no opinion on whether the mere development of evidence (even knowingly false evidence) or the bringing of charges (even knowingly false ones) can by itself constitute a procedural or substantive due process violation within the meaning of the United States Constitution. That kind of conduct would surely be reprehensible, and only a rapscallion in official raiment would do such a thing. However, I would not establish (or refine) a possibly far reaching principle of constitutional law based on the record and presentation in this case.

It may be easy to decide the question here, although, as the dissent demonstrates, even that is not necessarily true. But if that right exists, we must answer a number of questions. For example, when does the violation accrue? Is it at the first evil interview, at the first presentation to the prosecutor, at the time charges are filed, at arraignment on those charges, or at some earlier or later point? All of those issues remain to be decided. And when should an officer have had such positive knowledge that the defendant was truly

innocent that the further conduct of the investigation, or presentation to the prosecutor, violated the defendant's constitutional rights? The dissent says that the evidence in this case would easily support a jury finding that the defendants have violated the newly delineated right. The majority says that the evidence is not even weighty enough to allow jury consideration. That is to say, no reasonable jury could decide that the right was violated. Given that degree of clarity, I must say that "a [social worker's] lot is not a happy one." W.S. Gilbert & A. Sullivan, The Pirates of Penzance (1879).

In short, along with the majority of the original panel, I would hold that Devereaux has not spelled out a constitutional right to have investigations conducted in any particular manner. Devereaux v. Perez, 218 F.3d 1045, 1054 (9th Cir. 2000). I would also declare that to the extent that there may be a constitutional right to be free from the development of knowingly false charges, Devereaux has not properly presented that issue. I would leave it at that.

With that caveat, I concur.

KLEINFELD, Circuit Judge, with whom PREGERSON and WARDLAW, Circuit Judges, join, concurring in part, and dissenting in part:

Use of children to satisfy adults' sexual cravings is a gravely serious crime, subject to very severe penalties. Manufacturing false evidence and using the criminal law system to ruin the lives of innocent people is also a gravely serious wrong. The more terrible the crime and penalties, the more terrible is the wrong of "framing" someone for it. The seriousness of a crime never justifies manufacturing evidence and convicting the innocent. Our system of justice does not allow for the position taken by the notorious Crusader general, "kill them all, God will know his own."[1]

Wenatchee Washington seems to have been among the many towns engulfed by sexual witchhunts in the 1980's and 1990's. Its newly appointed child abuse detective on his first child sex molestation case, together with its much more experienced social workers, and its prosecutors, filed 29,727 charges of child abuse against 43 men and women. At the end of it all, few charges stood up in court except against the government's own witness, Linda Miller, the woman whose implausible (and, as soon proved, impossible) story of sex orgies lay at the foundation of the charges against many or most of the others. Devereaux eventually was allowed to plead guilty to a minor misdemeanor with no sexual connotation, for spanking a disobedient foster child on the buttocks with an open hand. Many of the others convicted in the Wenatchee sex prosecutions have had their convictions overturned on appeal. The Washington Court of Appeals has appointed a judge to conduct a formal

inquiry into what went wrong in its criminal justice system. The affair has been popularly regarded as a Northwestern Salem.[2]

I concur in the majority opinion, insofar as it sets out the law to be applied to this case. I join in its express holdings, that (1) "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government";[3] (2) "there is no constitutional due process right to have child witnesses in a child sexual abuse investigation interviewed in a particular manner, or to have the investigation carried out in a particular way";[4] and (3) Devereaux must show, to avoid summary judgment as to deliberate fabrication, not just that an interviewer disbelieved an initial denial and continued with aggressive questioning, but that the interviewer knew or should have known that the alleged perpetrator was innocent or that the interview techniques were so abusive that the interviewer knew or should have known that they would yield false information.[5] These express holdings necessarily imply an additional holding: these rules of constitutional law apply not only to police, but also to the appellees in this case, who were social workers, and to others who act on behalf of the state. Anyone who acts on behalf of the government should know that a person has a constitutional right not to be "framed."

I respectfully dissent in part, but my dissent is limited to whether Devereaux's evidence established a genuine issue of material fact as to three of the four remaining appellants. Devereaux is, in my view, entitled to present his case to a jury as to Carrow, Wood and Alexander, because he has established a genuine issue of fact as to each of their claims for qualified immunity.[6] Devereaux has established a genuine issue of fact as to whether Carrow, Wood, and Alexander could have reasonably believed that their conduct did not violate Devereaux's constitutional rights.[7] I would therefore reverse the summary judgment against Devereaux as to those three appellees. I join fully in the majority opinion as to Abbey.

Reasonable jurors could conclude from Devereaux's evidence that Wood, Carrow and Alexander "continued their investigation of Devereaux despite the fact that they knew or should have known Devereaux was innocent" and "used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information."[8]

The record and briefs are not as clear as we might like, for two reasons. First, the case was focused on Detective Perez through the initial panel decision but he settled while the appeal was pending, leaving only the four social workers as defendants. Second, much of the appellant's brief focuses on the incorrect argument that section 1983 liability could be

based on the social workers' violations of state regulations as opposed to the United States Constitution or federal law. Nonetheless, Devereaux has both in the district court and here, provided sufficient argument and evidence to establish a genuine issue of fact as to the section 1983 claims. Our initial inquiry, under Katz, must be whether "the facts alleged show the officer's conduct violated a constitutional right," and the facts must be "taken in the light most favorable to the party asserting the injury."[9] The majority opinion acknowledges that the right at issue was clearly established, but asserts that Devereaux has not alleged facts sufficient to put any violation of the right at issue. I respectfully disagree with the majority's reading of the record, because it violates the requirement that the facts be "taken in the light most favorable to the party asserting the injury."[10]

Reasonable jurors could conclude that Wood "used investigative techniques that were so coercive and abusive that [she] knew or should have known that those techniques would yield false information"[11] and did so in circumstances where a reasonable person would have desisted if concerned about convicting an innocent individual. The new detective on the child sex abuse beat, Perez, had brought in A.S. for questioning. Devereaux himself had previously advised the social workers that this twelve year old girl had acted inappropriately on various occasions, including displaying sexual aggressiveness.

The evidence submitted, taken in a light most favorable to Devereaux, established that Wood knew or should have known that she was likely to be eliciting false accusations of sexual misconduct from A.S. In deposition testimony, A.S.'s mental health counselor acknowledged that A.S. "threatened to make a report of sexual abuse against [him ] specifically because she, at least in her perception, wasn't having one of her needs met," and that she made "numerous " threats of this kind.[12] A.S. later said in an interview that another of the Child Protective Services social workers "would attend the group sex sessions nearly every time," where "each of the adults would have intercourse with each of the children."[13] A.S. acknowledged in her statement that she "made false rape accusations against Mr. John B. who "worked at Albertson's and had caught her eating a doughnut without paying for it."[14] A reasonable interviewer would have to be very wary indeed of accusations of sexual misconduct by this dangerous girl.

In her interview with Wood and Perez, A.S. initially denied that Devereaux had done anything sexual to her. Perez then left A.S. alone with Wood.[15] A.S. eventually changed her story during this long interview.[16] Devereaux submitted evidence from which a jury could find that A.S. denied any sexual conduct from 5:00 P.M. to 10:00 P.M.[17] But after six hours of interrogation, A.S. changed her story, a change which A.S. said was "so she could get out of the office"[18] because she "got sick and tired of sitting there."[19] After that, her

stories got increasingly lurid, expanding to nightly orgies with Devereaux and numerous other men, women and children. [20]

On summary judgment, the respondent is entitled to have the evidence evaluated and reasonable inferences drawn in his favor. [21] Although a jury could find in Wood's favor, it could also, on this evidence, find against her. A jury could infer that Wood and Perez held this child against her will until after six hours of confinement, fairly late at night, she told the story they wanted. The jury could infer that Wood knew the story was false because it took so long to extract, because A.S. had a history of threatening and making false sexual accusations, and because the means of extracting it were reasonably calculated to produce a false accusation. Holding a child captive and alone in a police station, and drenching her with sex talk until a late hour likely to be past her bedtime, until she says what the interrogators want, has a strongly coercive element. If someone were to force a twelve year old girl to watch pornographic movies for six hours and told her she could stop watching only if she accused a man she knew of a crime, that might be the kind of coercive pressure that could make a girl lie in order to escape. Making a twelve year old girl talk about sex in the police station for many hours could be comparable (or worse, because of its personal aspect). A jury could infer that, combined with A.S.'s known tendency to make false sexual accusations, this was a technique that Wood knew was likely to produce a false accusation.

The majority finds fault with my analysis on two grounds, that A.S. might only have threatened to make false accusations and not actually have done so, and that Wood, the social worker obtaining and using A.S.'s accusations, might not have known about A.S.'s proclivity for these kinds of lies. I see little significance to the majority's contention that A.S. had threatened to make false charges, and not actually done so. By her own admissions, A.S. did in fact make false sex accusations and not just threaten them. As for whether Wood knew that A.S. was inclined to make false sex charges, the record allows for a jury inference either way. Devereaux is entitled to have the evidence taken in the light most favorable to him, and that is decisive. [22] Devereaux's own prior reports of inappropriate sexual aggressiveness by A.S. were made to Wood's office, which would suggest an inference that the girl had sexual problems and that Devereaux was not trying to keep the girl's sexual activity secret. A counselor in Wood's office knew of A.S.'s numerous threats to make false sex accusations to get things she wanted. A.S. had made an allegation against someone in Wood's own office. [23] A jury would be permitted to infer that she would know of A.S.'s history with other individuals in her own Child Protective Services office in the little town of Wenatchee. Wood has not denied that she knew of A.S.'s history. [24]

The majority opinion seems to suggest that if Wood does not get the benefit of qualified immunity, then it would be denied "any time an interviewer discounts an initial denial and continues with aggressive questioning that produces an accusation."[25] This ignores the length and time of the interview, the coercive technique, and the history of the person being interviewed. It is one thing to follow up on a denial with further questioning. Getting A.S. alone with a female interviewer after her initial denial to Perez and Wood together might have been entirely reasonable, had that been all there was. It is quite another to use a coercive method of questioning -five hours of isolation of a child while drenching her in sexual conversation -to obtain an accusation by a person known to threaten and make false sex accusations.

Carrow participated in about fifty interviews.[26] A jury could infer from the depositions of girls interviewed that Carrow's method was to harangue the girls as liars until they accused Devereaux of sexual misconduct. In D.E.'s first interview, D.E. said Devereaux "treated her fine."[27] But a jury could infer from the evidence that Carrow later prevented this exonerating remark from being disclosed to Devereaux's attorney and lied about it under oath.[28] A jury could infer from the remark, and from Carrow's subsequent dishonest nondisclosure, that she knew Devereaux was innocent and covered up exonerating evidence.

With another girl, A.R., Carrow and Perez interviewed her together.[29] A.R. had initially accused Devereaux of sexual abuse, but recanted the next day.[30] A.R. was quite an interview subject. The way the police became involved with Devereaux in the first place was when he called them to report that A.R. had attempted to poison another girl at his house, A.S., and also Devereaux himself, by putting iodine in their soft drinks.[31] Perez had initially interviewed A.R., but asked nothing about her attempt to poison A.S. and Devereaux; Perez's only interest was sex. Both Perez and Carrow knew that A.R. was a victim of fetal alcohol syndrome, a brain disorder of children impaired in utero by maternal alcohol consumption, some characteristics of which are "inappropriate social behavior, memory deficits . . . lack of judgment, lack of remorse for misbehavior, lying,. . . unusual aggressiveness, and wide variations in learning abilities at different times."[32] The police report about the interview states that A.R. "suffers from fetal alcohol syndrome and has difficulty in remembering some events."[33]

A jury could infer that Carrow had reason to know that A.R.'s accusation of Devereaux was false because she had recanted, was mentally impaired, and because the accusation had been forced out of her. When she recanted, Perez threatened her with prosecution for false reporting if she stuck to her recantation, yet she stuck to it[34] A jury could infer that Carrow

knew she must be telling the truth, because so vulnerable a girl was resisting such great pressure to give the detective and social worker what they wanted. The girl said to Perez "you make all the children lie,"[35] from which the jury could infer that Carrow, who was there when A.R. said this, knew that Perez was making all the children lie. The majority suggests that the proper inference to be drawn from this statement is that Carrow merely "discounted a witness's statement and pressed on."[36] That is one inference that a jury could draw, but not the most obvious one, and not the only one they could draw. As for the majority's suggestion that"we do not even have any evidence that Carrow approved use of the technique"[37] of threatening the girls to force accusations out of them, of course we do - she was present and acting in concert with Perez and she was silent when he made the threats.[38] A.R. told another of the social workers and Perez that Carrow lied to her, by telling her that Devereaux had been"found" guilty and that a semen sample had been found,[39] from which a jury could infer that Carrow knew Devereaux was innocent and was intentionally misleading a non-victim to make her testify falsely that she was a victim.

The majority opinion correctly notes that A.R., despite all the pressure, continued to maintain that her original accusation had been false and that Devereaux did not engage in any sexual misconduct with her.[40] A jury might nonetheless regard this evidence as material, on the theory that it showed that Carrow had probably used similarly coercive techniques to extract accusations she knew were false from other girls. Carrow participated in many interviews of girls who made accusations and did not recant, so her modus operandi was material to whether she was knowingly coercing production of false testimony, even if that modus operandi did not work with A.R. The majority opinion says "all we know is that on one occasion Carrow was present when someone else used threats," discounting the possibility of a "modus operandi" inference.[41] But with another interviewee who consistently maintained that Devereaux had not sexually molested her or anyone else in the home, Carrow showed the same pattern, simply refusing to take no as an answer.[42] Moreover, juries are generally allowed to hear evidence of conduct, even conduct not directly at issue as this was, to support an inference of similar conduct on other occasions.[43]

Again, a jury could find in Carrow's favor. It could interpret the evidence to be that Carrow had a good faith belief that Devereaux was guilty, and that any girl who denied it was lying, and ought reasonably to be questioned again and again until she found the "courage" to "tell the truth." But a jury would not have to interpret the evidence that way. A jury could also find that Carrow had every reason to think Devereaux was innocent, yet refused to accept this, and used all the coercion she could muster -lies to the girls, repeated

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 116 of 217

4/29/26, 11:32 AM          Robert Devereaux, Plaintiff-appellant, v. Timothy David Abbey; Laurie Alexander; Kate Carrow; Linda Wood; Kenneth Badgley, in H…

interrogations, dragging them to the police station, threats of prosecution if they recanted any accusatory statements -to make them lie, and that she succeeded with some of them.

Alexander together with Detective Perez repeatedly interviewed C.M.[44] C.M. told lurid stories of sexual ceremonies conducted by her pastor at church and sex orgies with numerous male and female adults and children. She also stated that she had participated over twenty times in sex orgies at Devereaux's house where he and other men, all wearing sunglasses so that they could not be identified, had sexual intercourse with her as well as other girls.[45] The bizarre nature of C.M.'s account is highlighted by her flat statement that a woman who had lived with her family was "a witch " and "I think she cast a spell on my brothers and sisters."[46]

After Alexander and Perez interviewed C.M. the first time, Alexander sent her to a physician for an examination. The examining physician reported that although she had had a tear in her hymen, indicating some penetration, it was healed, leaving a vaginal orifice with a diameter of six to seven millimeters (a little over a quarter of an inch).[47] This tear was consistent with sexual abuse, but not with frequent and repeated full penetration by numerous adult men. The physician sent the report to Alexander.[48] After receiving it, Alexander together with Perez conducted a second interview of C.M.[49] During this second interview, Alexander and Perez obtained reconfirmation of the story, which they now had to know was false, of the "over twenty times" when Devereaux and other men raped C.M.[50]

A jury might give Alexander the benefit of the doubt because C.M.'s interviews are somewhat vague and seem to veer off into fantasy, such as her witchcraft accusation. A jury might understand her to mean that the sexual abuse consisted of digital penetration, which would be consistent with the medical report, rather than repeated and frequent mass rape with full penile penetration, which would not. But a jury could also conclude that, despite having obtained medical verification establishing that C.M. had not been frequently and repeatedly penetrated genitally by numerous adult men, Alexander nevertheless took advantage of C.M.'s childish vulnerability to obtain what Alexander knew to be a false accusation that she had been.

C.M.'s statement in evidence says that Alexander told her that "everything I said was true" and that "my mom confessed to everything I said."[51] This bolstering of C.M. had to take place at the second interview, when Alexander had to know that the account was false, because Linda Miller's confession came after the first interview.[52] Linda Miller had confessed that she herself sexually abused her children, but that so did many other men and women in the town, in numerous mass orgies at the Pentecostal church and various other locations, lasting most of the night, in which numerous men frequently and

repeatedly had full genital sexual intercourse with C.M. and many other girls. The Wenatchee witch hunt may all stem from official acceptance of Linda Miller's excuse for her own sex crimes, that "everybody does it." C.M. told substantially the same story. But a jury could reasonably conclude that Alexander knew when she obtained it the second time (after she had obtained the medical report) that C.M.'s story was false, and that her use of C.M.'s mother's confession to obtain it was likely to elicit a false accusation of Devereaux consistent with C.M.'s mother's confession.

The majority argues for an inference exonerating Alexander: there was nothing wrong with "truthfully informing a witness about another witness' corroboration", and "by taking C.M.'s side, so to speak, she could gain C.M.'s trust and persuade her to describe what sort of abuse had really taken place."[53] Alexander's lawyer could make that argument to a jury, but the evidence would lend itself readily to Devereaux's side of the case. The jury could think that once a girl makes medically impossible claims, and alleges witchcraft and spells, a reasonable interviewer ought to be wary indeed of believing any accusations the girl makes. While a jury could draw the excusing inference the majority suggests, it could also draw a damning one, that continued interrogation of this disturbed girl was not a reasonable means of finding out "what sort of abuse had really taken place."[54]

Conclusion

Witch hunts seem to be something universally regretted in retrospect, yet abetted by the legal system while they proceed. During the 1980's and 1990's, many towns in America were convulsed by accusations of mass sexual abuse of children in day care and foster care settings such as Devereaux's.[55] The accusations have often been replete with physically unlikely or impossible events. The accusations here included a witch casting spells, the child victim of repeated group rape who nevertheless retained her hymen, sex orgies in church, and the ability of numerous middle aged men to stay awake all night, night after night, and perform sexually dozens of times each night. Other day care and foster care mass sex cases have involved witches who flew on broomsticks, sacrificed babies, and bizarre occurrences in tunnels, despite the absence of baby deaths and excavations demonstrating the absence of tunnels. Common sense gets trampled in the rush to affirm fashionable hysterias. The creaky rigidity of our mechanisms for importing common sense into legal disputes sometimes keeps them from working.

After C.M. had claimed that a woman was a "witch " who had "cast a spell on my brothers and sisters, " and a medical report had proved that C.M.'s sex story could not be true, most sensible people would think of the Salem witch trials, and say to themselves "here we go again." The Salem witch trials were part of a mania, mostly in Europe but also in Salem,

that ruined the lives of thousands of innocents.[56] The witchcraft accusations then, as now, often involved children and sex, such as the common accusation of being made to "submit to many unholy and disgusting ceremonies, " being "forced . . . to kiss . . . the superior on . . . the breech,"[57] roasting babies over fires,[58] and"every species of unmentionable debauchery,"[59] including "sexual intercourse with Satan."[60] In Salem, those who confessed to witchcraft generally received some leniency, but those who staunchly and truthfully maintained their innocence were hanged, as being what is now called "in denial." The Salem witch trials, like the modern ones, were based not on lynch mob action, but on formal trials based on expert witnesses' testimony. The Salem witch hunt began when a physician unable to relieve the apparently hysterical symptoms of a local minister's daughter, told the father "that the girls `were under the evil hand.' "[61] Both in Europe and the American colonies, highly educated people led the mania, instead of restraining it.[62]

Our judicial system ought not to be helpless to protect and vindicate the victims of witch hunts. Fortunately the majority opinion today clarifies the law of qualified immunity so that it will not continue to embolden those who manufacture false evidence to abet witch hunts. Unfortunately, it does not apply the law correctly. The fault in the majority opinion application of the law is that it overlooks the requirement that the evidence must be "taken in the light most favorable to the party asserting the injury."[63] As to the three remaining defendants with respect to whom we disagree, a jury could, on the evidence in the record before us, draw inferences either way. Devereaux is entitled, therefore, to get his case to a jury.

The doctrine of qualified immunity is useful when it enables government officials to do their duty with vigor, unafraid of enmeshment in lawsuits about new, doubtful or unclear constitutional claims they had no reason to know about. The doctrine would be harmful rather than useful if it protected government officials who deprived people of such fundamental and well known constitutional rights as the right not to have government officials manufacture false evidence against them. The vulnerability of government officials to lawsuits if they intentionally deprive people of their plain constitutional rights is an important deterrent to official abuse of individual rights. This is true regardless of whether they work in the police department or some other department. Nor can officials be immunized because they act with good underlying motives, such as to protect children from sexual exploitation. "The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."[64]

In this regard, it is worth noting that the medical examination of Linda Miller's daughter, which allegedly showed that Miller's allegations of abuse could not be true, took place after nearly all of the allegedly improper conduct of which Devereaux complains. Thus, even if the medical falsification of Miller's story proved that Devereaux was innocent (rather than just proving that Miller's story, or certain parts of it, were false), it happened too late to serve as evidence that Defendants knew Devereaux was innocent when they engaged in the conduct of which he complains.

Similarly, the partial dissent notes, in its case against Wood, that "A.S. had made an allegation against someone in Wood's own office." Id. at 12230. The allegation was made in the same June 1995 interview conducted by Devereaux's attorney. The record of the interview does not indicate that A.S. had ever voiced that allegation before that date.

We do not suggest that such inferences would, in all circumstances, be unreasonable. What we do hold is that such tenuous inferences, standing alone, do not constitute sufficient evidence to survive summary judgment.

We return to this point, infra.

By "knowing" the majority seems to mean knew or should have known.

Albigensian Crusade, (visited May 31, 2001)http://crusades. Boisestate.edu/Albi/.

See Dorothy Rabinowitz, Reckoning in Wenatchee, The Wall Street Journal, September 21, 1999. "The 1994-95 child sex abuse witch-hunt in Wenatchee, Wash., resulted in a massive frame-up. " Paul Craig Roberts, Saved by Pursuit of the Truth, The Washington Times, April 6, 2000; see also, Mike Barber, Wenatchee Haunted By Investigations, Seattle PostIntelligencer, September 10, 1999. Whitman County Superior Court Judge Friel stated that "no rational trier of fact would believe these allegations." Rabinowitz, Reckoning in Wenatchee, The Wall Street Journal, September 21, 1999.

Maj. Op. at 12209. Judge Fernandez's separate concurrence raises the question whether creation of false evidence, by itself, violates any constitutional right, even if there is no criminal proceeding based on it. Concurrence at 12223. We need not answer that question in this case, because the evidence did lead to a criminal proceeding. Devereaux was arrested and put in jail, See Doc. 27 Ex. 1; Doc. 50 Ex. A, formally charged with rape of a child and other crimes, See Doc. 49 Ex. F, and subjected to bail conditions on his release for an extended period. See Doc. 27 Ex. 4.

Maj. Op. at 12210.

Maj. Op. at 12211.

See Pierce v. Multnomah County, Oregon, 76 F.3d 1032, 1038-39 (9th Cir. 1996) (holding that when foundational facts regarding a qualified immunity claim remain in dispute, these facts must be decided by the jury); Act Up!/Portland v. Bagley, 988 F.2d, 868, 873 (9th Cir. 1993) ("If a genuine issue of fact exists preventing a determination of qualified immunity at summary judgment, the case must proceed to trial.").

See Saucier v. Katz, 121 S. Ct. 2151, 2158 (2001).

Maj. Op. at 12211.

Katz, 121 S. Ct. at 2156.

Id.

Maj. Op. at 12211.

Doc. 36 Ex. Z, p. 77.

Doc. 144 Ex. E p. 4.

Doc. 144 Ex. E. p. 8.

Doc. 36 Ex. E1 P. 8-9.

Doc. 36 Ex. E1 P. 8-9.

Doc. 144 Ex. E p. 6.

Doc. 144 Ex E p. 6.

Doc. 37 P. 2.

Doc. 144 Ex. E p. 3-5.

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Orsini v. O/S Seabrooke O.N., 247 F.3d 953, 958 (9th Cir. 2001).

See Katz, 121 S. Ct. at 2156.

Doc. 144 Ex. E p. 4.

Doc. 33.

Maj. Op. at 12220.

Case 9:25-cv-00083-DWM    Document 59-1    Filed 05/04/26    Page 122 of 217

4/29/26, 11:32 AM              Robert Devereaux, Plaintiff-appellant, v. Timothy David Abbey; Laurie Alexander; Kate Carrow; Linda Wood; Kenneth Badgley, in H...

Doc. 76 P. 5-6.

Doc. 36 Ex. N p. 1; Doc. 88 Ex. B Pippen Dep. p. 81.

Doc. 36 Lacey Aff. Pg. 7 l. 1-18; Doc. 36 Ex. U, Carrow Dep. p. 129-30.

Doc. 76 P. 8-9.

Doc. 36 Ex. W p. 5.

Doc. 149 Ex. 1 P. 2.

Barbara A. Morse, Information Processing: Identifying the Behavior Disorders of Fetal Alcohol Syndrome, in Fantastic Antone Succeeds: Experiences in Educating Children with Fetal Alcohol Syndrome 26-27 (1993, Judith S. Kleinfeld and Siobhan Wescott, editors).

Doc. 36 Ex. K p.3.

Doc. 36 Ex. K p. 6; Doc. 76 P. 51-52.

Doc. 36 Ex. K p. 4.

Maj. Op. at 12220.

Maj. Op. at 12221.

See 4 Wigmore on Evidence§§ 1071 (Chadbourn rev. 1972) (noting silence has traditionally been taken to support an inference of assent to a third party's statement).

**9**

Doc. 36 Ex. K p. 4.

**10**

Maj. Op. at 12216.

**11**

Maj. Op. at 12221.

**12**

Doc. 77 P. 1-2.

**13**

See Fed. R. Evid. 404(b).

**14**

Doc. 149 Ex. 3; Doc. 149 Ex. 7; Doc. 144 Ex. G.

**15**

Doc. 149 Ex. 3 P. 9.

**16**

Doc. 149 Ex. 7 P. 6.

**17**

Doc. 144 Ex. C p. 4.

**18**

Doc. 144 Ex. C p. 5.

**19**

Doc. 149 Ex. 7.

**20**

Doc. 149 Ex. 7 P. 8.

**21**

1
Doc. 36 Ex. N1 P. 26.

2
Doc. 36 Ex. F.

3
Maj. Op. at 12221.

4
Maj. Op. at 12221.

5
See People of the Territory of Guam v. McGravey, 14 F.3d 1344, 1350 n.1 (Reinhardt, J. dissenting) ("Simply put, I am aware of no trial since those held in Salem in which a group of adults suggested occurrences similar to those alleged in the McMartin and Akiki cases."); Dorothy Rabinowitz, The Hate-Crimes Bandwagon, The Wall Street Journal, June 27, 2000 (listing past child abuse hysterias based on false allegations); see also Dorothy Rabinowitz, "Finality" for the Amiraults, The Wall Street Journal, June 30, 1999; A Darkness in Massachusetts, The Wall Street Journal, February 15, 1995; Dorothy Rabinowitz, Television, Parents and Children on Trial, The Wall Street Journal, May 6, 1991.

6
See Charles M. Mackay, Extraordinary Popular Delusions and the Madness of Crowds 462-564 (Harmony Books 1980) (1852); Katherine W. Richardson, The Salem Witchcraft Trials 4 (1983).

7
See Mackay, supra note 40, at 475.

8
See id. at 476.

9
See id.

10
See id. at 481

Leo Bonfanti, 2 The Witchcraft Hysteria of 1692 3 (1977).

See generally, Mackay supra note 40; Richardson supra note 40; Bonfanti, supra note 45.

Katz, 121 S. Ct. at 2156.

Olmstead v. United States, 277 U.S. 438, 479 (1928) (Brandeis, J. dissenting).

Some case metadata and case summaries were written with the help of AI, which can produce inaccuracies. You should read the full case before relying on it for legal research purposes.

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WILLIAM J. RICHARDS,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>COUNTY OF SAN BERNARDINO;<br>MARK NOURSE; NORMAN PARENT;<br>TOM BRADFORD; JOHN NAVARRO;<br>DANIEL GREGONIS; NORMAN<br>SPERBER; DOES, 1 through 20,<br>inclusive,<br><br>*Defendants-Appellees*,<br><br>and<br><br>SAN BERNARDINO COUNTY DISTRICT<br>ATTORNEY OFFICE; SAN<br>BERNARDINO COUNTY SHERIFFS<br>OFFICE; RAMOS MICHAEL; MICHAEL<br>RISLEY; CRAIG OGINO,<br><br>*Defendants*. | No. 19-56205<br><br>D.C. No.<br>5:17-cv-00497-<br>SJO-SP<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted February 7, 2022
Pasadena, California

2      RICHARDS V. COUNTY OF SAN BERNADINO

Filed June 24, 2022

Before:  Kermit V. Lipez,* Richard C. Tallman, and
Kenneth K. Lee, Circuit Judges.

Opinion by Judge Tallman

## SUMMARY**

### Civil Rights

The panel reversed the district court's summary judgment for the County of San Bernardino and County investigator Daniel Gregonis in an action brought pursuant to 42 U.S.C. § 1983 alleging defendants violated plaintiff's constitutional rights during his murder investigation and prosecution, resulting in his erroneous conviction for the murder of his wife, Pamela Richards.

Plaintiff alleged that Gregonis fabricated evidence against him by planting, on Pamela's body, blue fibers from a shirt that plaintiff was wearing on the night of the murder. Plaintiff further alleged claims for municipal liability pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), against the County, arguing that the County's customs and policies, and the absence of better customs and policies, resulted in the alleged constitutional violations.

---

* The Honorable Kermit V. Lipez, United States Circuit Judge for the First Circuit, sitting by designation.

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

As a preliminary matter, the panel determined that the district court incorrectly held that plaintiff was required to show that Gregonis had a motive to manipulate the evidence. Plaintiff did not need to rely on motive evidence because he supported his claim with direct evidence of fabrication.

Viewing the facts in the light most favorable to the non-moving party, plaintiff raised a triable issue as to whether Gregonis deliberately planted the blue fibers under Pamela's fingernail. A jury could reasonably draw the inference that the blue fibers were not under Pamela's fingernail at the time of the autopsy and were planted on Pamela's body later after the autopsy was performed. Because Gregonis was the only person who accessed plaintiff's shirt and Pamela's severed fingers before the fibers were discovered, a reasonable jury could conclude that Gregonis was the person who planted the blue fibers. The panel further held that the very same rationale motivating the materiality causation standard for claims brought under *Brady v. Maryland*, 373 U.S. 83 (1963), is also present in § 1983 claims for deliberate fabrication of evidence, which implicate a plaintiff's fundamental right to a fair trial.

The panel held that because the district court erred by failing to find potential civil rights liability as to Gregonis, its derivative ruling as to potential County liability under *Monell* should also be reversed. The panel further held that the district court erred by not addressing whether plaintiff could show that he suffered a constitutional injury by the County unrelated to the individual officers' liability under § 1983. Plaintiff put forth at least two *Monell* claims that were not premised on a theory of liability that first required a finding of liability on the part of the individual officers: (1) that the County's policy of prohibiting coroner investigators from entering a crime scene until cleared by

4    RICHARDS V. COUNTY OF SAN BERNADINO

homicide detectives resulted in the loss of exculpatory time-of-death evidence, and (2) that the lack of any training or policy on *Brady* by the Sheriff's Department resulted in critical exculpatory evidence being withheld by the prosecution. The panel therefore remanded to the district court to consider these claims against Gregonis and the County in the first instance.

In a concurrently filed memorandum disposition, the panel affirmed the district court's dismissal of plaintiff's remaining claims.

## COUNSEL

Caitlin S. Weisberg (argued), Marilyn E. Bednarski, David S. McLane, and Ben Shaw, McLane, Bednarski & Litt LLP, Pasadena, California, for Plaintiff-Appellant.

Susan E. Coleman (argued), Burke, Williams & Sorensen, LLP, Los Angeles, California, for Defendants-Appellees.

**OPINION**

TALLMAN, Circuit Judge:

In 1997, after four trials and two hung juries, Plaintiff-Appellant William Richards was convicted of the first-degree murder of his wife, Pamela. In 2016, the California Supreme Court vacated Richards's conviction, finding that it was based on "false evidence" as characterized in subsequently enacted legislation defining the term, Cal. Penal Code § 1473(e)(1), and Richards has since been exonerated of Pamela's murder, *see* Memorandum Decision, *People v. Richards*, No. FVI00826 (San Bernardino Super. Ct. June 18, 2021).

Richards now brings this 42 U.S.C. § 1983 action against Defendants-Appellees—various sheriff's officers and the County of San Bernardino—alleging that Defendants violated his constitutional rights during the 1993 murder investigation and prosecution, resulting in his erroneous conviction. The district court granted summary judgment for Defendants, finding that Richards did not "carry his burden to show that the investigating officers committed any [federal] constitutional errors in their investigation of Pamela's murder." We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse the district court's judgment regarding the claims discussed herein and remand for further proceedings solely as to them.[1]

---

[1] This opinion addresses only Richards's claim against Daniel Gregonis for deliberate fabrication of blue fiber evidence, and his municipal liability claims against the County, which we reverse. We affirm the district court's rulings on the remaining claims in a memorandum disposition filed concurrently with this opinion.

6    RICHARDS V. COUNTY OF SAN BERNADINO

## I

At 11:58 p.m. on the night of August 10, 1993, the San Bernardino Sheriff's Department (SBSD) received a call that a dead body had been discovered at a remote residential location in the Mojave Desert in San Bernardino County, California.[2] The victim, Pamela Richards, had been brutally beaten and suffered two fatal injuries—strangulation and blunt force trauma to the head.[3]

An SBSD deputy was first to arrive at the rural property at approximately 12:38 a.m., where he was met by Pamela's husband, William Richards. Richards told the deputy he had discovered Pamela's body lying face-down on the ground outside their home shortly after he returned from work. According to Richards, Pamela was "stone cold" and likely had been dead for hours.

The deputy conducted a visual and physical inspection of Pamela's body. Pamela's head had been crushed and there was a large pool of blood beside her. There were numerous bloodstains and spatter on Pamela's body and the surrounding area, and a bloody cinder block and steppingstone were lying nearby. The deputy felt for a pulse at Pamela's neck and wrist and, after determining that

---

[2] We summarize the facts on this summary judgment motion in the light most favorable to Richards, who resisted summary judgment below. *See E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 770 (2015).

[3] At Pamela's autopsy, the medical examiner determined that Pamela had been strangled, and that after Pamela was dead or nearly dead from the strangulation, blunt force trauma was inflicted on her skull.

RICHARDS V. COUNTY OF SAN BERNADINO          7

Pamela was deceased, called for homicide investigators to respond.

In the early morning hours of August 11, several homicide investigators arrived at the scene. Richards argues that the investigators fabricated evidence against him and otherwise performed a recklessly biased and unreliable investigation.[4]   One such investigator was Criminalist Daniel Gregonis, who was employed in the SBSD Crime Lab.  As a criminalist, Gregonis worked with homicide investigators to process the crime scene, to collect physical evidence, and to package and preserve that evidence so that it could be transported to the crime lab for further analysis. Gregonis was also responsible for later examining the forensic evidence at the lab.

Richards alleges that while forensic evidence was being examined at the crime lab, Gregonis deliberately fabricated inculpatory evidence against him.  Specifically, Richards claims that Gregonis planted blue fibers from a cotton work shirt that Richards was wearing on the night of the murder, fibers which Gregonis says he found under one of Pamela's fingernails.

---

[4] There are numerous disputes of fact amongst the parties concerning the adequacy of the murder investigation.  In this action, Richards brought § 1983 claims arguing that a reckless investigation was performed because investigators:   failed to erect a barrier or to preserve the scene; failed to keep a log of who came in and out of the scene; failed to call a coroner in time to collect time-of-death information; failed to take fingerprints at several locations, including the cement block that appeared to be the murder weapon; failed to properly record tire marks and shoe prints; failed to scrape Richards's nails for trace evidence; failed to seriously investigate other potential perpetrators; and more. These allegations are addressed in the concurrently filed memorandum disposition and will not be further discussed in this opinion.

8       RICHARDS V. COUNTY OF SAN BERNADINO

At the autopsy, the medical examiner had scraped Pamela's fingernails in search of "any type of trace evidence, anything that might be adhered to the nails," and then the examiner severed two of Pamela's fingers for further processing. On September 13, 1993, Gregonis checked out of evidence Pamela's two severed fingers for further examination. On September 14, Gregonis checked out Richards's clothing, including the blue cotton work shirt that Richards was wearing on the night of Pamela's murder. At that point in time, aside from Gregonis, no one else had examined either Richards's clothing or the severed fingers since the time they were first logged into evidence at SBSD's secure property section.

Gregonis claimed that, on September 13, he found a tuft of blue cotton fibers wedged in a crack of a broken fingernail on one of the severed fingers. Gregonis videorecorded his removal of the blue fibers on September 14—the same date that he had custody of both the severed fingers and Richards's clothing. The tuft of fibers was 1/2 centimeter long and contained 15 individual fibers, grouped together. Gregonis subsequently compared the blue fibers to a sample from Richards's shirt and concluded that "[t]he fibers recovered from the broken fingernail . . . from [Pamela] are consistent with originating from the light blue shirt . . . from [Richards]."[5]

The blue fibers were visible to the naked eye, yet they had not been observed by any other investigator prior to Gregonis's discovery. The blue fibers were not located during the autopsy, nor were they detected by the medical examiner during the finger-scraping, fingerprinting, or

---

[5] Gregonis later discarded the sample of Richards's shirt that he used for comparison, in violation of SBSD protocol.

finger-severing process in which the examiner was in close contact with Pamela's hands. Moreover, the fibers are clearly visible in photographs taken from Gregonis's removal video, but are noticeably absent from photographs taken of Pamela's hands during the prior autopsy.

On September 3, 1993, Richards was ultimately arrested and booked for his wife's murder. The evidence against him was circumstantial, and three attempts to prosecute Richards failed to result in a conviction. The first two trials ended in a hung jury, and the third trial ended in a mistrial during jury selection.

Before the prosecution's fourth and successful attempt to convict Richards, the County retained a forensic odontologist to present bitemark evidence on behalf of the prosecution. This bitemark evidence was based on a crescent-shaped bruise found on Pamela's right hand. During the autopsy, the medical examiner determined that the bruise was "most certainly" not a bitemark because "[b]asically it ha[d] none of the features of a bitemark." Therefore, standard bitemark procedure was not followed, and only a single, distorted photograph of the bruise was taken. Nevertheless, the County's expert forensic odontologist used the distorted photograph along with dental impressions of Richards's teeth to conclude that the bruise might be a bitemark, and that "[Richards's] remaining lower teeth are consistent with the bitemark." After the trial that included the bitemark evidence, Richards was finally convicted in 1997 for his wife's murder.

In 2007, Richards brought a habeas corpus petition in San Bernardino County Superior Court claiming that his 1997 murder conviction was based on false bitemark evidence, and that new evidence unerringly established his

innocence.[6] In support of the false evidence claim, Richards submitted with his petition a declaration by the County's expert forensic odontologist recanting his earlier opinion based, in part, on subsequently performed computer enhancement of the bitemark photograph. Based on this recantation and new evidence, the trial court granted Richards's habeas petition. The California Supreme Court, however, overturned this decision, finding that Richards "failed to establish that any of the evidence offered at his 1997 trial was false" and the "newly discovered evidence does not point unerringly to innocence or reduced culpability." *In re Richards*, 289 P.3d 860, 876 (Cal. 2012) (simplified).

The California Legislature subsequently enacted a new law that amended the California habeas statute to define "false evidence" as including the "opinions of experts that have either been repudiated by the expert who originally provided the opinion at a hearing or trial or that have been undermined by later scientific research or technological advances." Cal. Penal Code § 1473(e)(1). Richards then brought a second habeas proceeding on the basis of this legislative amendment to false evidence jurisprudence. Ultimately, the California Supreme Court granted Richards's second habeas petition and vacated his conviction. *In re Richards*, 371 P.3d 195, 211 (Cal. 2016). After nearly twenty years in custody, Richards was released from prison.

---

[6] The new evidence Richards offered included evidence that a third-party's DNA was discovered on the cinder block that could have been used to kill Pamela, that a hair from a third-party was recovered from Pamela's body, and that the tuft of blue fibers did not become lodged in Pamela's fingernail during her struggle with her killer.

After his conviction was vacated, Richards commenced the instant lawsuit in the Central District of California. Richards brought claims under 42 U.S.C. § 1983 against various sheriff's officers and the County of San Bernardino for constitutional violations allegedly committed during the murder investigation and prosecution. Relevant to this opinion, Richards brought a claim against Gregonis for deliberate fabrication of the blue fiber evidence, and claims for municipal liability pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), against the County, arguing that the County's customs and policies, and the absence of better customs and policies, resulted in the alleged constitutional violations that he suffered.

The district court ultimately granted summary judgment for all Defendants. The court found that even if it made all inferences in favor of Richards's version of the facts, Richards did "not carry his burden to show that the investigating officers committed any constitutional errors in their investigation of Pamela's murder." Accordingly, the district court also found that Richards's "allegations against the County fail because proving liability under *Monell* requires a predicate constitutional violation by a government official."

This appeal timely followed.

## II

"This court reviews a grant of summary judgment de novo." *Garris v. Fed. Bureau of Investigation*, 937 F.3d 1284, 1291 (9th Cir. 2019). "Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Grand Canyon Tr. v. Provencio*,

26 F.4th 815, 820 (9th Cir. 2022) (simplified). We "may affirm the district court on any ground supported in the record." *Miranda v. City of Casa Grande*, 15 F.4th 1219, 1224 (9th Cir. 2021).

### III

Richards alleges that Gregonis deliberately fabricated evidence by planting blue fibers on Pamela's body. The district court held that Richards could not establish a claim for deliberate fabrication because: (1) Richards was "unable to point to facts that show that Mr. Gregonis had a motive to deliberately manipulate the evidence"; (2) there were "far more plausible explanations for the late discovery of the blue fibers"; and (3) Richards had "not carried his burden of showing that any purported planting of the blue fibers resulted in his conviction." We reverse and remand this claim because there are contested issues of material fact, and the district court did not correctly apply the relevant substantive law.

"[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (en banc). A plaintiff can prove deliberate fabrication in two ways. "Most basically, a plaintiff can produce direct evidence of deliberate fabrication." *Caldwell v. City & Cnty. of S.F.*, 889 F.3d 1105, 1112 (9th Cir. 2018). "Alternatively, a plaintiff can produce circumstantial evidence related to a defendant's motive." *Id.* To prove fabrication using circumstantial motive evidence, a plaintiff must establish that either: (a) "[d]efendants continued their investigation of [plaintiff] despite the fact that they knew or should have known that he was innocent"; or (b) "[d]efendants used investigative techniques that were so

coercive and abusive that they knew or should have known that those techniques would yield false information." *Devereaux*, 263 F.3d at 1076.

## A

As a preliminary matter, the district court incorrectly held that Richards was required to show that Gregonis had a motive to manipulate the evidence. This conclusion misapprehends Ninth Circuit precedent. While motive is recognized as potentially strong circumstantial evidence in support of a claim of fabrication, *see Caldwell*, 889 F.3d at 1112, motive evidence is never *required*, *see id.* at 1113 ("[R]etaliatory motive is not an element of a fabrication of evidence claim . . . ."). Stated differently, motive is merely one type of circumstantial evidence that may be used to support a claim of deliberate fabrication. *Id.* at 1112; *see also Spencer v. Peters*, 857 F.3d 789, 798–800 (9th Cir. 2017). And here, Richards need not rely on motive evidence because he supports his claim with direct evidence of fabrication. The district court therefore erred in concluding Richards was required to show that "Gregonis had a motive to deliberately manipulate the evidence."

## B

The district court also granted summary judgment because it believed that "far more plausible explanations for the late discovery of the blue fibers" existed. But it was not the court's role on summary judgment to weigh the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). Instead, viewing the facts in the light most favorable to the non-moving party, Richards has

14      RICHARDS V. COUNTY OF SAN BERNADINO

raised a triable issue as to whether Gregonis deliberately planted the blue fibers under Pamela's fingernail.

First, Richards provides sufficient facts to plausibly establish that Gregonis was in exclusive control of the relevant evidence at the time of the alleged fabrication. Both Pamela's severed fingers and Richards's blue cotton work shirt had been checked into evidence at the SBSD's secure property storage unit. The fingers were logged into the evidence unit after the autopsy, and Richards's shirt was logged in the morning after the murder. Aside from Gregonis, no one else checked out either Richards's clothing or the severed fingers between the time that they were initially logged and the time that Gregonis removed them for further analysis and allegedly discovered the tuft of blue fibers. On September 14, 1993, Gregonis videorecorded his removal of the blue fibers—the same date on which Gregonis had exclusive custody of both the severed fingers and Richards's clothing.

Second, Richards raises a triable issue as to whether the blue fibers were planted. The tuft of fibers was made up of 15 individual fibers, all about 1/2 of a centimeter long—the approximate length of a 14-point-font em dash (—). Richards's expert stated that fibers of this size and length would be visible to the naked eye, and even Gregonis himself admits this to be true. Yet no one who was in close contact with Pamela's hands at the autopsy—including the medical examiner who scraped Pamela's fingernails for trace evidence—ever saw the blue fibers.

Further, the record contains several photographs of Pamela's fingers before and during the autopsy. In the autopsy photographs, no blue fibers are visible under Pamela's fingernails. Yet, in photographs from Gregonis's removal video, the blue fibers are clearly visible. A jury

reviewing the autopsy photographs could conclude that they would have depicted any blue fibers under Pamela's fingernails if they had been present. This conclusion would support a jury's finding that the blue fibers were not present under Pamela's fingernails at the time of the autopsy.

 


Autopsy photographs         Removal video photographs

Expert analysis provides further support for the false evidence claim. *See Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1270 (9th Cir. 1994) ("Expert opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion."). Richards's expert analytic forensic photographer concluded "with a high degree of certainty" that in the autopsy photographs "there is no visible tuft of blue fibers on the top of the . . . fingernail in the location demonstrated in the fiber removal video." The expert stated that the resolution of the camera and lens used in the autopsy photographs "were reasonably good enough to . . . depict a tuft of blue fibers if the fibers were present," and that certain variable factors— such as the difference in angle between the autopsy and removal video photographs, the resolution of the images, the color temperature of the light, and the direction of the light— would not "negatively impact the autopsy images to a degree that would obscure the mass of blue fibers if it was present

16      RICHARDS V. COUNTY OF SAN BERNADINO

at the time the photograph was taken." Moreover, a different expert using "Photoshop and color saturation techniques" also concluded that "no strands of blue clothing fiber are present under a fingernail of the decedent" in the autopsy photographs. In fact, the second expert went so far as to say that "[t]he forensic evidence brought forth . . . in relation to the fiber evidence" is "consistent with forensic deception."

From the foregoing evidence, a jury could reasonably draw the inference that the blue fibers were not under Pamela's fingernail at the time of the autopsy. A jury could further infer that, because the fibers were not present during the autopsy, they were later planted on Pamela's body after the autopsy was performed. Finally, because Gregonis was the only person who accessed Richards's shirt and Pamela's severed fingers before the fibers were discovered, a reasonable jury could conclude that Gregonis was the person who planted the blue fibers. *See Pelenty v. City of Seal Beach*, 588 F. App'x 623, 624–25 (9th Cir. 2014) (unpublished) (reversing summary judgment when defendant officers had access to the source of the allegedly planted evidence, which spontaneously appeared in crime scene photographs).

Even if, in the district court's view, "more plausible explanations" exist for the delayed discovery of the blue fibers, at the summary judgment stage the trial court must accept Richards's evidence as true without making credibility determinations or weighing the conflicting evidence. *Anderson*, 477 U.S. at 249. Applying this standard, we conclude that Richards has shown a triable issue as to whether Gregonis deliberately fabricated the blue fiber evidence. A jury will have to resolve it.

### C

As a final matter, the district court also granted summary judgment for Gregonis because it concluded that "the bite mark evidence, not the blue fiber evidence, was necessary to convict Plaintiff." We disagree.

The district court's holding here was based on its conclusion that Richards could not show that the blue fiber evidence was a factual cause of his conviction. The traditional means of proving factual causation is the "but for" causation test. "Under this standard, a plaintiff must demonstrate that, but for the defendant's unlawful conduct, [his or her] alleged injury would not have occurred." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020).

It is true that a showing of but-for causation regarding the blue fiber evidence cannot easily be made here. As the district court recognized, in the first two trials the prosecution presented significant circumstantial evidence, including the blue fibers discovered under Pamela's fingernail. Despite the blue fiber evidence, however, the first two trials resulted in a hung jury. It was not until the third trial, where the prosecution presented false bitemark evidence, that Richards was convicted of his wife's murder. Therefore, it could more readily be said that the false bitemark evidence, and not the blue fiber evidence, was the but-for cause of Richards's conviction.

But factual causation is not per se lacking when a showing of but-for causation cannot be made. As the Supreme Court has recognized, "alternative and less demanding causal standards are necessary in certain circumstances to vindicate the law's purposes." *Paroline v. United States*, 572 U.S. 434, 452 (2014); *see also Burrage v.*

18    RICHARDS V. COUNTY OF SAN BERNADINO

*United States*, 571 U.S. 204, 214 (2014) (acknowledging "the undoubted reality that courts have not *always* required strict but-for causality, even where criminal liability is at issue").[7] We find a less demanding causation standard is necessitated here.

The constitutional right at issue in this case is the fundamental due process right to a fair trial. *See Estelle v. Williams*, 425 U.S. 501, 503 (1976) ("The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment."). This is the very same constitutional right that is implicated when the prosecution suppresses evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). *See United States v. Bagley*, 473 U.S. 667, 678 (1985) ("[S]uppression of evidence amounts to a constitutional violation . . . if it deprives the defendant of a fair trial."). We have previously concluded that in the *Brady* context, a plaintiff's due process right to a fair trial is "not conditioned on his ability to demonstrate that he *would* or even *probably would* prevail at trial if the evidence were disclosed." *Osborne v. Dist. Atty's Off. for Third Jud. Dist.*, 521 F.3d 1118, 1132 (9th Cir. 2008), *rev'd on other grounds by*, 557 U.S. 52 (2009). This is because under *Brady* and its progeny, it is the suppression

---

[7] One such test is aggregate causation. Under this test, "[w]hen the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause in fact of the event." *Paroline*, 572 U.S. at 451 (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, 268 (5th ed. 1984)). "The Restatement adopts a similar exception for multiple sufficient causal sets . . . where a wrongdoer's conduct, though alone insufficient to cause the plaintiff's harm, is, when combined with conduct by other persons, more than sufficient to cause the harm." *Id.* at 451–52 (simplified) (quoting 1 Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 27, 380–81, cmt. f (2005)).

of material evidence—and not the plaintiff's ultimate conviction—that deprives the plaintiff of their liberty interest in a fair trial. *See Poventud v. City of N.Y.*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc) ("[P]roof of the constitutional violation need not be at odds with [the plaintiff's] guilt."). Accordingly, causation is satisfied for *Brady* claims if the plaintiff can show that the suppressed evidence was "material"—i.e., that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *Bagley*, 473 U.S. at 682).

The very same rationale motivating the materiality causation standard for *Brady* claims is also present in § 1983 claims for deliberate fabrication of evidence. The deliberate fabrication of evidence implicates a plaintiff's fundamental right to a fair trial. *See Devereaux*, 263 F.3d at 1074–75; *Smalls v. Collins*, 10 F.4th 117, 132 (2d Cir. 2021). And this right is implicated whenever the state deliberately fabricates evidence, regardless of the plaintiff's innocence or guilt. It would be anomalous to turn away a plaintiff who has been injured by deliberately fabricated evidence simply because that evidence alone was not sufficient to cause the conviction—the right to a fair trial is impinged either way. Accordingly, a plaintiff's due process right to a fair trial should not be conditioned on his ability to demonstrate that he *would* or even *probably would* prevail at trial if the evidence had not been deliberately fabricated. *Cf. Osborne*, 521 F.3d at 1132.

Presumably based on this rationale, most other federal circuits have applied variations of the *Brady* materiality causation standard to § 1983 claims for deliberate

fabrication of evidence.[8] For example, the Seventh Circuit has held a § 1983 plaintiff need only show that allegedly fabricated "evidence was material—that is, . . . there is a reasonable likelihood the evidence affected the judgment of the jury." *Patrick v. City of Chi.*, 974 F.3d 824, 835 (7th Cir. 2020). And a similar standard applies in the Second Circuit, which requires a § 1983 plaintiff to show that "the false information was likely to influence a jury's decision." *Smalls*, 10 F.4th at 132 (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016)).

Given the foregoing, we conclude that the less demanding materiality causation standard is necessary under these circumstances to vindicate Richards's fundamental right to a fair trial. *See Paroline*, 572 U.S. at 452. We therefore hold that Richards can establish factual causation if he can show a reasonable likelihood that the allegedly

---

[8] *See, e.g.*, *Truman v. Orem City*, 1 F.4th 1227, 1236 n.5 (10th Cir. 2021) ("To satisfy [the causation] element where . . . the plaintiff was allegedly deprived of a fair trial, the fabricated evidence must be material, meaning there is a reasonable likelihood that without the use of the fabricated evidence, the defendant would not have been deprived of a fair trial."); *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014) ("[T]he defendant has a stand-alone claim . . . if there is a reasonable likelihood that, without the use of that [fabricated] evidence, the defendant would not have been convicted."); *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006) ("It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury."); *cf. United States v. Agurs*, 427 U.S. 97, 103 (1976) (stating that when a conviction is obtained by the knowing use of false testimony it "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury").

fabricated blue fiber evidence could have affected the judgment of the jury.[9]

The district court did not apply this standard. Instead, the court's causation ruling made an improper leap from its conclusion that the false bitemark testimony was a *necessary* cause of Richards's conviction to it being the *sole* cause. Because Richards has shown a triable issue as to whether Gregonis deliberately planted the blue fibers on Pamela's body, *see supra*, Part III.B, we reverse and remand to the district court to reassess, in light of this opinion, whether a triable issue also exists as to causation.

## IV

The district court held that Richards's *Monell* claims fail because "proving liability under *Monell* requires a predicate constitutional violation by a government official." We disagree.

First, because potential civil rights liability as to at least one individual defendant (Criminalist Gregonis) was in error, *see supra*, the district court's derivative ruling as to the County on potential *Monell* liability should also be reversed.

Second, this Court has rejected the view that municipal liability is precluded as a matter of law under § 1983 when the individual officers are exonerated of constitutional wrongdoing. *See Fairley v. Luman*, 281 F.3d 913, 917 (9th

---

[9] Defendants argue that a "materiality" standard would eliminate causation, which is a necessary element of any § 1983 claim. That is not true. Under the materiality standard, there must be a reasonable probability that the defendant would not have been convicted without the wrongful fabrication of evidence. The materiality standard therefore integrates—and does not eliminate—causation.

Cir. 2002). Instead, "[i]f a plaintiff established he suffered constitutional injury *by the County*, the fact that individual officers are exonerated is immaterial to liability under § 1983." *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1250 n.12 (9th Cir. 2016) (simplified). "This is true whether the officers are exonerated on the basis of qualified immunity, because they were merely negligent, or for other failure of proof." *Fairley*, 281 F.3d at 917 n.4. Here, Richards puts forth at least two *Monell* claims that are not premised on a theory of liability that first requires a finding of liability on the part of the individual officers: (1) that the County's policy of prohibiting coroner investigators from entering a crime scene until cleared by homicide detectives resulted in the loss of exculpatory time-of-death evidence, and (2) that the lack of any training or policy on *Brady* by SBSD resulted in critical exculpatory evidence being withheld by the prosecution. Irrespective of the merits of these claims, the district court erred by not addressing whether Richards could show that he suffered a constitutional injury by the County unrelated to the individual officers' liability under § 1983.

We therefore remand to the court to consider these claims against Gregonis and the County in the first instance.

## V

Having concluded that the district court erroneously granted summary judgment for Defendant Gregonis as to the claims involving the blue fiber evidence and the County of San Bernardino, we **REVERSE these claims, and REMAND** for further proceedings consistent with this opinion. We **AFFIRM dismissal of the remaining claims** in the corresponding memorandum disposition.

Each party shall bear its own costs.

**FILED**

DEC 1 1 2017

Clerk, U.S District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DIST4RICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| ANTHONY PATRICK REED, | CV 13–17–BU–DWM |
| Plaintiff, | |
| vs. | OPINION and ORDER |
| DOUG LIEURANCE, in his individual capacity; BRIAN GOOTKIN, in his individual capacity; GALLATIN COUNTY SHERIFF'S OFFICE, a department of Gallatin County; and GALLATIN COUNTY, | |
| Defendants. | |

In May 2012, Defendant Doug Lieurance ("Deputy Lieurance" ) cited Plaintiff Anthony Reed ("Reed") for obstructing a bison[1] herding operation outside of Yellowstone National Park ("the Park"). Reed is a volunteer with the

___

[1] The *Encyclopedia Britannica* explains that buffalo "are indigenous to South Asia (water buffalo) and Africa (Cape buffalo), while bison are found in North America and parts of Europe." *What's the Difference Between Buffalo and Bison?* (https://www.britannica.com/demystified/whats-the-difference-between -bison-and-buffalo) (accessed 8 Dec. 2017). The Buffalo Field Campaign website addresses this issue, concluding "common usage has made the term 'buffalo' an acceptable synonym for the American bison." *Buffalo Basics* (http://www. buffalofieldcampaign.org/about- buffalo/buffalo-basics) (accessed 8 Dec. 2018). For the sake of consistency, the term "bison" is used throughout this opinion.

-1-

Buffalo Field Campaign ("Campaign"), a § 501(c)(3) non-profit conservation organization that sends volunteers to observe and document the herding or "hazing" of bison in or near the Park. *Reed v. Lieurance*, 863 F.3d 1196, 1201 (9th Cir. 2017). Pursuant to an interagency agreement, government personnel from a number of state and federal agencies carry out hazing operations as many as four or five times per week between December and July. *Id.* The Campaign provides video footage and information about the hazing to news outlets and government agencies. *Id.*

Reed brought this action pursuant to 42 U.S.C. § 1983, alleging that Deputy Lieurance's conduct violated Reed's First and Fourth Amendment rights and related Montana constitutional rights, and that Gallatin County, the Gallatin County Sheriff's Office, and Sheriff Brian Gootkin failed to train officers on Montana's obstruction statute and the First and Fourth Amendments. (Doc. 1.)

## FACTUAL BACKGROUND

The facts as outlined below are those the parties have agreed to, (*see* Addt'l Stip. Facts, Doc. 147), and those viewed in the light most favorable to Reed, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam).

## I.    Bison Hazing Operations

At all times relevant to this case, Agent Rob Tierney, a Bison Program

-2-

Specialist from the Montana Department of Livestock ("Livestock Department"), was responsible for overseeing bison management operations outside of the Park. ((Doc. 147 at ¶¶ 1, 2.) Operations within the Park were the responsibility of the National Park Service ("Park Service"). (*Id.*) At that time, and in accordance with the Operating Procedures agreed to as part of the Bison Management Plan, the Livestock Department frequently requested law enforcement assistance from the Gallatin County Sheriff's Office ("Sheriff's Office"). (*Id.* at ¶ 3.) When the Livestock Department planned a bison hazing operation, a briefing was held between officers of the Department, the Sheriff's Office, and any other agencies that had personnel involved in the operation. (*Id.* at ¶ 4.) At the briefing, the Livestock Department officer in charge of the operation, typically Agent Tierney, explained the planned operation and the approximate location, (*id.*), and the Sheriff's Office would coordinate haze-related law enforcement, (*id.* at ¶ 5).

## II. The Incident

On May 23, 2012, there was a hazing operation which involved moving bison from the area of the Madison Arm Resort eastward and then across U.S. Highway 191, and back into the Park. (*Id.* at ¶ 6.) Reed and Kasi Craddock-Crocker were in a vehicle driving ahead of the operation as it headed east on Madison Arm Road. (*Id.* at ¶ 7.) Reed left the operation and drove to the junction

-3-

of Highway 191, Madison Arm Road, and Conservation Lane and parked near that junction. (*Id.* at ¶ 8.) While Reed was parked in that spot, Agent Tierney approached Reed's vehicle and spoke with Reed. (*Id.* at ¶ 9.) After speaking with Agent Tierney, Reed drove north of the Madison River and parked on a gravel road that runs parallel to Highway 191. (*Id.* at ¶ 10.) Tierney then radioed Deputy Lieurance. (*Id.* at ¶ 11.) Lieurance in turn radioed to the riders with the operation and told them to stop moving the bison, (*id.* at ¶ 12), which they did, (*id.* at ¶ 13). Deputy Lieurance drove to Reed's location and after speaking with Reed, cited him for misdemeanor obstruction, Mont. Code Ann. § 45-7-302. (*Id.* at ¶¶ 14, 15.) On July 10, 2012, the county prosecutor moved to voluntarily dismiss the citation. (Doc. 154-4 at 2.)

## III.  The Recording

The parties dispute the specifics of Reed's conversations with Agent Tierney and Deputy Lieurance, primarily the nature of the directions Agent Tierney gave them when he initially told them to move their car as well as how exactly they were obstructing the haze. There is a 22-minute recording of the second portion of Deputy Lieurance's stop, recorded by Craddock-Crocker. (*See* DVD, Ex. D, Doc. 151-4.). The recording begins after the initial conversation between Lieurance and Reed. Reed and Craddock-Crocker discuss the stop.

-4-

Craddock-Crocker then has brief interaction with law enforcement, where law enforcement insists she and Reed "failed to follow directions" and she insists the directions were not clear. Reed and Craddock-Crocker repeatedly refer to the "selective enforcement" of the law based on the other vehicles driving on the highway and even note they could probably sue if Reed were to be arrested. The video shows Reed's citation being issued. At that point, Deputy Lieurance explains that Reed is being cited for obstruction, which, according to Deputy Lieurance, is basically "doing something you were told not to do" or "stopping an operation of some sort." (*Id.* at 15:40.) Lieurance further explains Reed's obligation to contact the court. At one point, Lieurance asks Craddock-Crocker, who is filming, to take a step back. Reed clarifies that he is receiving a ticket. After the citation is issued, Craddock-Crocker again asks why they are being "selectively enforced against," and Deputy Lieurance states that he is not going to argue about it, and that they can either leave or he can take them to jail. (*Id.* at 18:10.) After a bit more back and forth, Reed and Craddock-Crocker drive away.

Neither parties' story is "blatantly contradicted" by the recording. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). While the video does not depict all of the events at issue, it does show the relative distance from the haze area and numerous other cars and trucks driving by on the highway during the stop.

## PROCEDURAL BACKGROUND

In March 2013, Reed filed suit, asserting that Deputy Lieurance's conduct violated Reed's First and Fourth Amendment rights and related Montana constitutional rights, and that Gallatin County, the Sheriff's Office, and Sheriff Gootkin failed to train officers regarding Montana's obstruction statute and the First and Fourth Amendments. (*See* Doc. 1.) The parties filed cross-motions for summary judgment and motions in limine. On July 23, 2014, the Court granted the defendants' motion for summary judgment on Reed's unreasonable seizure and failure-to-train claims, denied summary judgment on the First Amendment claims, and excluded Reed's police practices expert witness. On August 20, 2014, Reed moved to amend his complaint; that motion was denied on October 6, 2014. A jury trial was held in January 2015 on Reed's First Amendment claims. After Reed presented his case, the defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50, which was granted as to all remaining claims.

Reed appealed.[2] On appeal, the Ninth Circuit held that: (1) the defendants were not entitled to summary judgment as to Reed's unlawful seizure claim; (2) it

---

[2] The trial judge also denied the defendants' motion for attorneys fees pending resolution of an appeal. The defendants cross-appealed that ruling, and the Ninth Circuit held that it lacked jurisdiction to consider fees in the absence of a "final decision" from the district court as to that issue. *Reed*, 863 F.3d at 1212.

was improper to *sua sponte* dismiss Reed's failure-to-train claim under Rule 12(b)(6); (3) the wrong legal standard was applied in excluding Reed's expert witness; and, (4) the defendants were not entitled to judgment as a matter of law as to Reed's First Amendment claims. *See Reed*, 863 F.3d at 1204-12. The case was remanded and reassigned. *See id.* at 1213.

Following remand, Reed filed a First Amended Complaint, alleging six causes of action, including: Count I (unreasonable seizure - Fourth Amendment), Count II (unreasonable restriction - First Amendment), Count III (retaliation - First Amendment), Count IV (failure to train - *Monell*[3]), Count V (privacy - Mont. Const. art. II, sections 10 and 11), and Count VI (unreasonable restriction - Mont. Const. art. II, sections 6 and 7). (Doc. 146.) Two defense motions are currently pending: (1) a motion for summary judgment as to Reed's failure-to-train claim, (Doc. 150) and (2) a motion to exclude the expert testimony of Reed's police practices expert, Timothy Longo, (Doc. 144). Having considered the parties' briefing and oral argument, both motions are denied.

**SUMMARY CONCLUSION**

The defendants argue that summary judgment is appropriate as to Reed's failure-to-train claim because the undisputed evidence shows that Deputy

---

[3] *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978).

-7-

Lieurance was trained and Reed fails to identify a "specific inadequacy" in the training deputies receive. However, there exists a genuine dispute of material fact as to: (1) whether the training received by deputies on Montana's obstruction statute, the First Amendment, and the Fourth Amendment was adequate; (2) whether there was an obvious or recurring need for more or better training; and (3) whether there is a causal link between a deficiency in training and the alleged constitutional harm. Drawing all reasonable inferences in favor of Reed, *Tolan*, 134 S. Ct. at 1866, a jury could find that the defendants' failure to train amounts to a "deliberate indifference to the rights of persons with whom [its] employees come into contact," *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (internal quotation marks and alteration omitted). Additionally, because the testimony of Reed's police practices expert, Timothy Longo, is reliable and relevant to that failure-to-train claim, Fed. R. Evid. 702, it is not excluded.

## ANALYSIS

### I.   Motion for Summary Judgment

#### A.   Legal Standard

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where

the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248.

### B. Failure to Train

The defendants seek summary judgment as to Reed's *Monell* claim, which alleges failure to train as to the First and Fourth Amendments and Montana's obstruction statute. (Doc. 150.) They previously moved for summary judgment on this claim, (*see* Doc. 13), but Reed's claim was dismissed *sua sponte* under Rule 12(b)(6). The Ninth Circuit reversed, holding that it was error not to provide proper notice and not give Reed an opportunity to amend. *Reed*, 863 F.3d at 1207-08. The Ninth Circuit further declined to consider Plaintiff's failure-to-train claim under Rule 56, "affording the district court a chance to consider this question." *Id.* at 1208 n.5.

Reed alleges that the defendants "do not provide adequate training for sheriff's deputies on the elements, meaning, and lawful application of Montana's obstruction statute, or on the constitutional rights of members of the public, namely the Fourth Amendment right to be free from unreasonable seizure and First

Amendment rights under the U.S. Constitution." (Doc. 146 at ¶ 147.) He further alleges that the defendants "have an unconstitutional policy that allows sheriff's deputies to use the Montana obstruction statute to arrest individuals who are engaged in constitutionally protected conduct." (*Id.* at ¶ 148.)

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Flores v. Cnty. of L.A.*, 758 F.3d 1154, 1158 (9th Cir. 2014) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Because "a municipality can be liable under § 1983 only where its policies are the moving force behind the constitutional violation," *City of Canton*, 489 U.S. at 388 (quotation marks and alteration omitted), Reed "must demonstrate a conscious or deliberate choice on the part of" the defendants, *Flores*, 758 F.3d at 1158 (quotation marks omitted). He must allege facts showing the defendants "disregarded the known or obvious consequence that a particular omission in their training program would cause [county] employees to violate citizens' constitutional rights." *Id.* at 1159 (quoting *Connick*, 563 U.S. at 62).

Although "a pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference," *id.*, the Supreme Court has "not foreclose[d] the possibility that evidence of a single

violation of federal rights, accompanied by a showing that a municipality has

failed to train its employees to handle recurring situations presenting an obvious

potential for such a violation, could trigger municipal liability," *Bd. of Cnty.*

*Com'rs of Bryan Cnty., Okl. v. Brown (Brown)*, 520 U.S. 397, 409 (1997). As

further explained:

> in a narrow range of circumstances, a violation of federal rights may be
> a highly predictable consequence of a failure to equip law enforcement
> officers with specific tools to handle recurring situations. The
> likelihood that the situation will recur and the predictability that an
> officer lacking specific tools to handle that situation will violate
> citizens' rights could justify a finding that policymakers' decision not to
> train the officer reflected 'deliberate indifference' to the obvious
> consequence of the policymakers' choice—namely, a violation of a
> specific constitutional or statutory right. The high degree of
> predictability may also support an inference of causation—that the
> municipality's indifference led directly to the very consequence that was
> so predictable.

*Id.* at 409-10. Construing the evidence in Reed's favor, a jury could find that the

defendants' failure to train amounts to deliberate indifference to the rights of

persons with whom deputies come into contact. *City of Canton*, 489 U.S. at 388.

### 1.    A Constitutional Violation

As a threshold matter, the defendants argue that because Reed cannot

establish a constitutional violation by Deputy Lieurance, he cannot maintain a

*Monell* claim. *See Jackson v. City of Bremerton*, 268 F.3d 646, 653-54 (9th Cir.

-11-

2001) ("Neither a municipality nor a supervisor . . . can be held liable under § 1983 where no injury or constitutional violation has occurred."). The Ninth Circuit, however, held that a reasonable jury could conclude that Deputy Lieurance's seizure of Reed was unreasonable, *see Reed*, 863 F.3d at 1205-07, or that Deputy Lieurance violated Reed's First Amendment rights, *see id.* at 1211-12.

## 2.    Deputy Lieurance's Training

The defendants further insist that Deputy Lieurance was more than adequately trained on the parameters of Montana's obstruction statute and the First and Fourth Amendments. They note Deputy Lieurance received BASIC police training and was certified through the Arizona Law Enforcement Academy, and then attended an equivalency program through the Montana Law Enforcement Academy. (Doc. 151, at ¶¶ 1-2.) However, Daniel Springer, the designated representative of the Sheriff's Office for training issues, merely states that the Montana Law Enforcement Academy and in the equivalency program spend time on training in these areas, (*see* Springer Depo., Doc. 151-2 at 4), but does not identify what it entails. *See Bordanaro v. McLeod*, 871 F.2d 1151, 1159-60 (1st Cir. 1989) (noting that reasonable inferences could be drawn in plaintiff's favor if there was little to no formal training at initial academy courses and then no updated training afterward). Moreover, Deputy Lieurance admits that he did not

-12-

receive any training specifically related to the First Amendment or the cross-section between the First Amendment, Fourth Amendment, and Montana's obstruction statute. (Doc. 151-1 at 5-6.) That lack of training is reflected in his training records. (*See* Doc. 154-7.) Yet the defendants insist that Craddock-Crocker's video depicting the issuance of the citation definitively establishes Deputy Lieurance was adequately trained. Such an interpretation of the video ignores the Ninth Circuit's conclusion to the contrary. *See Reed* 863 F.3d at 1211-12 (discussing the myriad of ways a jury could find a First Amendment violation).

The defendants then insist that it is not enough to show that Deputy Lieurance alone did not receive adequate training. While Deputy Lieurance's training alone is not dispositive, *Blankenhorn v. City of Orange*, 485 F.3d 463, 484-85 (9th Cir. 2007) (holding that showing individual officer was not adequately trained is not sufficient to show deliberate indifference), it is evidence of the alleged overarching inadequacy. Moreover, additional evidence indicates that deputies generally receive little to no training on First Amendment issues and that the Sheriff's Office believes no such training is necessary.

### 3. First Amendment Claim

"In resolving the issue of a [county]'s liability, the focus must be on the adequacy of the training program in relation to the tasks the particular officers

-13-

must perform." *See City of Canton*, 489 U.S. 389. The defendants insist that Reed's claim must fail because he does not identify a "specific inadequacy" in the training program. However, Reed raises a genuine factual dispute as to what First Amendment training the deputies receive, if any, and whether that training is adequate given the deputies' regular contact with Campaign volunteers.

Sheriff Gootkin testified in his deposition that the First Amendment may be part of the Field Training Program, but that he was not aware of the specific training his deputies receive. (Doc. 154-6 at 6-9.) Springer, contradicting Gootkin, stated that the Field Training Manual does not include anything specific to the First Amendment, (Doc. 151-2 at 4), and that during the time period of Deputy Lieurance's employment, "[t]here [wa]s nothing – there is no documented training on freedom of speech training that I am aware of," (Doc. 154-8 at 8). (*See also* Daugherty Depo., Doc. 154-9 at 6 (stating he also did not receive any First Amendment training).) A review of the table of contents of the Field Training Manual also shows no specific First Amendment entry. (*See* Doc. 154-3 at 3.) There is an entry related to obstruction citations, (*id.*), but no further detail.

Springer also implied such training is not necessary:

[The] First Amendment is very simple – we – we instruct our guys that you are – you cannot impede someone's ability to freedom [sic] of speech, you cannot impede their ability to film you unless there's a

particular – you know, reasonable time, place and manner for that. It's not a very difficult thing to train on. It's something that is discussed, but it's a very – it's fairly basic.

(Doc. 151-2 at 4.) He further stated, "there is a standard that is set at the basic level and it's not one that changes. Freedom of speech has been that way for a very long time, so it's a very simple concept." (Doc. 154-8 at 8.)

Based on the testimony of Sheriff Gootkin and Springer, there is a genuine issue of material fact as to whether the Sheriff's Office believes First Amendment training is necessary and what training, if any, deputies receive. Reed's police practices expert, Mr. Longo, opines that First Amendment issues are more complicated than Springer indicated and training on those issues is vital. (*See, e.g.*, Expert Report ¶¶ 118-19, 237-39.) Moreover, Longo's report presents evidence as to what type of training should be administered and why. (*See id.*, ¶¶ 191-94 (referencing guidance from the Rutherford Institute); *id.* at. ¶ 106 (referencing technical assistance letters produced by the Department of Justice).) The necessity and adequacy of such training is only made more acute considering the regular contact between the Sheriff's Office and volunteers of the Campaign. (*See* Springer Depo., Doc. 154-8 at 11 (stating that the Sheriff's Office supports hazing operations "a number of times a year," estimating "10 to 12")); *Reed*, 863 F.3d at 1201 (9th Cir. 2017) (estimating government personnel carry out hazing

-15-

operations as many as four or five times per week between December and July).

The defendants further argue that Reed fails to show the requisite causal connection between the perceived inadequacy and his alleged harm. However, the recurrent contact between the Sheriff's Office and Campaign volunteers "and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflect[s] 'deliberate indifference' to the obvious consequence of the policymakers' choice—namely the violation of [the] specific constitutional or statute rights" Reed identifies. *Brown.*, 520 U.S. at 409. That predictability "also support[s] an inference of causation—that the [defendants'] indifference led directly to the very consequence that was so predictable." *Id.* at 410.

Reed also presents evidence that the prosecutor's office has dismissed obstruction citations under similar circumstances on more than one occasion. (*See* Doc. 154-5 at 2, 4, and 6 (identical motions to dismiss in cases against Reed, Noah Richards, and Andrea Rightsell).) Although such evidence may not independently show "a pattern of similar constitutional violations by untrained employees," *Flores*, 758 F.3d at 1159, it supports Reed's contention that the interaction between deputies and Campaign members is a recurrent issue and that a resulting constitutional violation was predictable. The defendants present an

affidavit from the prosecuting attorney insisting that Reed's dismissal was not because the citation was infirm, but rather due to a "shortage of prosecutors," and "speedy trial concerns." (Aff. Murphy, Doc. 151-5 at 3.) The motions to dismiss themselves, however, state the grounds for dismissal as "best interests of justice." (*See* Doc. 154-5.) Drawing all reasonable inferences in favor of Reed, a jury could find that the citations were dismissed as improperly issued. A reasonable jury could therefore find that the Sheriff's Office "disregarded the known or obvious consequence" of its failure to train and that its failure caused the alleged constitutional violation. *Flores*, 758 F.3d at 1158-59. Even if Reed cannot show that Sheriff Gootkin knew of such dismissals or the reason for them, (Doc. 154-6 at 16), the admission that the Sheriff's Office did not even consider tracking dismissed citations may also be evidence of deliberate indifference, (*id.* at 18). *See Larez v. City of L.A.*, 946 F.2d 630, 645 (9th Cir. 1991) (explaining that policy or custom can be inferred from a subsequent acceptance of a subordinate's actions or a lack of discipline or reprimand in the face of such action).

### 4.    Fourth Amendment Claim

Reed comes precariously close to waiving his failure-to-train claim as it relates to the Fourth Amendment and probable cause under Montana's obstruction statute. That claim, while premised on much of the same argument and evidence

-17-

as his First Amendment claim, is more narrow. Essentially, Reed alleges that the deputies are inadequately trained on the limits Montana jurisprudence places on the obstruction statute. *See City of Kalispell v. Cameron*, 46 P.3d 46, 47 (2002). The Ninth Circuit held that a jury could find either that Deputy Lieurance lacked probable cause to believe Reed was obstructing the haze or, alternatively, lacked probable cause to believe Reed had the necessary specific intent to impede the haze. *Reed*, 863 F.3d at 1205-06. It also held that a jury could find that Deputy Lieurance "issued the citation for one or more reasons that do not satisfy the Fourth Amendment." *Id.* at 1206. Based on the evidence discussed above and the previous rulings of the Ninth Circuit, genuine factual disputes prevent summary disposition of this claim. That said, depending on the evidence presented at trial, this claim—like all others—may be subject to a Rule 50 motion.

## C.   Sheriff's Office

The defendants argue in a footnote that the Sheriff's Office should be dismissed from the case as an improper defendant. Reed correctly argues that the request is improperly made, *City of Emeryville v. Robinson*, 621 F.3d 1251, 1262 n.10 (9th Cir. 2010) ("By failing to address the issue in its opening brief except in a footnote, Sherwin-Williams waived [its] claim . . . ."), and is without support in the law, *Streit v. Cnty .of L.A.*, 236 F.3d 552, 555-56 (9th Cir. 2001) (concluding

that the Los Angeles Sheriff's Department "is separately suable in federal court").

Accordingly, the defendants' motion for summary judgment is denied.

## II.    Motion to Exclude

The defendants also seek to exclude the opinions and testimony of Reed's

expert, Timothy Longo, Sr., the Chief of Police of Charlottesville, Virginia. (Doc.

144.) The Court previously excluded Mr. Longo from offering expert testimony

on various grounds.[4] (*See* Doc. 45 at ¶ 4.) On appeal, the Ninth Circuit

determined that an improper legal standard was applied. *See Reed*, 863 F.3d at

1208-09. It further clarified that Mr. Longo's testimony may be relevant to the

revived failure-to-train claim, but that this Court may consider on remand whether

Mr. Longo's testimony may be stricken "under the proper legal standard." *Id.*

At issue here, the defendants seek to exclude Mr. Longo's testimony as

irrelevant. Rule 702, Fed. R. Evid., provides that:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise
> if:
> (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in

---

[4] First, the trial judge concluded that an expert may only rely upon evidence
that is in the record or is "of the sort that any expert would rely on." *Reed*, 863
F.3d at 1208. Second, he found Mr. Longo's testimony commented on the ability
of others to do their job. *Id.* at 1208-09. Third, he found the report made
disparaging comments about the prosecution. *Id.* at 1209.

issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Expert testimony on police practices has generally been found to be admissible in cases involving allegations of police misconduct. *See, e.g., Larez*, 946 F.2d at 635 (discussing trial testimony of police practices expert); *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc) (offering expert testimony as to police dog use and training); *Davis v. Mason Cnty.*, 927 F.2d 1473, 1484-85 (9th Cir. 1991) (allowing expert testimony as to failure-to-train claim). However, under Rule 702, the district court has an independent duty to ensure that such testimony is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *see also Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007). The question of reliability asks "whether an expert's testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (quoting *Kumho Tire*, 526 U.S. at 149). But even reliable expert testimony must still be helpful to the jury's determination of the material factual questions at hand. *See Stilwell*, 482 F.3d at 1192 (requiring "a link between the expert's testimony and the matter to be

-20-

proved"). The opinion must be sufficiently tied to the facts of the case to aid the trier of fact in resolving a disputed fact, "fit" the facts of the case, and serve a "helpful" purpose to the jury. *Daubert*, 509 U.S. at 591.

Here, Mr. Longo's report describes his background and experience, (¶¶ 1-12), and outlines a factual summary of the case, (¶¶ 13-30). The report then outlines two questions presented:

31. Whether the actions taken by Deputy Doug Lieurance on the morning of May 23, 2012, were consistent with generally accepted law enforcement practices at the time of the incident.

32. Whether the policies, training, and supervision of the Gallatin County Sheriff's Office were consistent with generally acceptable law enforcement practices at the time of this incident.

(Report, Doc. 145-1.) The report first addresses Deputy Lieurance's actions, (¶¶ 33-82), and then addresses municipal liability in the context of "Policy," (¶¶ 94-119), "Practices," (¶¶ 120-65), "Training," (¶¶ 166-200), and "Supervision and Investigation," (¶¶ 201-36). Finally, the report states Mr. Longo's conclusions as to both issues, (¶¶ 237-79).

Although the defendants primarily challenge the relevancy—not the reliability—of Mr. Longo's testimony, both elements of Rule 702 are discussed below. *See Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004) (requiring district courts to make a reliability determination).

-21-

### A.    Reliability

Mr. Longo's testimony is reliable.  He has an extensive history as a law enforcement officer with the Baltimore Police Department and additional experience training and teaching other law enforcement officers.  (*See* Report, ¶¶ 1-9.)  As of the date of his report, he was the Chief of Police in Charlottesville, Virginia, and was consistently involved with police training and procedure programs throughout the nation.  (*Id.*)  His methods are also those used by other experts in this field and applied in a predictable, reasonable manner.  Mr. Longo reviewed relevant documents in the case, including video and audio recordings, as well as the Gallatin County training manuals.  (*Id.* at ¶¶ 10, 166.)  He then reached an opinion as to the facts he reviewed "based upon [his] education, specialized experience, training, and knowledge of police practices as well as [his] continued research and work with law enforcement nationally."  (*Id.* at ¶ 11.)  His report specifically states that his opinions are not based on credibility determinations, (*id.* at ¶ 12), and that he did not make any findings as to probable cause, (*id.* at ¶ 33), or whether Deputy Lieurance's actions amounted to a constitutional violation, (*id.* at ¶ 34).  As his report makes clear, Mr. Longo lays out the facts that form the basis of his opinions and explains how he reached his conclusions.

## B.    Relevance

Mr. Longo's testimony is relevant.  Specifically, Mr. Longo's testimony will help the jury assess Reed's failure-to-train claim.[5]  The crux of the defendants' argument is that Mr. Longo's opinions should be excluded because they relate to questions of negligence, as opposed to constitutional deficiency.  *See Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) ("Mere negligence in training . . . does not give rise to a *Monell* claim.").  The defendants' distinction is one without difference in this context.  *See* Fed. R. Evid. 401(a).  Following the defendants' argument to its logical conclusion, a police practices expert cannot testify to mere adequacy of training because to do so would be irrelevant, but that expert also cannot testify as to the constitutionality of police conduct because that would be an impermissible legal conclusion.  The defendants' argument would effectively foreclose any expert testimony under these circumstances.  That position is not tenable.  As discussed above, for the failure to train to serve as a basis for § 1983 liability, it must "amount[] to deliberate indifference to the rights of persons with whom the police come into contact."  *Flores*, 758 F.3d at 1158 (quoting *City of Canton*, 489 U.S. at 388).  Mr. Longo's proffered opinions

---

[5] Reed's response is limited to Mr. Longo's testimony about failure-to-train, and he agrees that Mr. Longo will not testify as to whether individual constitutional violations occurred.  (Doc. 149 at 28.)

-23-

regarding the adequacy of the training received are relevant to that question. *See* Ninth Cir. Model Civ. Jury Instr. No. 9.8 (2017) (outlining the elements of a failure-to-train claim, including the requirement the plaintiff prove the defendant's training policies "were not adequate").

In arguing that Mr. Longo's testimony should be excluded, the defendants rely heavily on *Smith v. State of New Jersey*, 2013 WL 3658786 (D.N.J. 2013), a case also involving Mr. Longo's expert opinion. There, the plaintiffs alleged claims pursuant to 42 U.S.C. § 1983 on the grounds of unlawful arrest, excessive force in making an arrest, and unlawful warrantless entry. *Smith*, at *1. In excluding Mr. Longo's proffered testimony, the court ultimately concluded that "Rule 702 . . . does not permit the testimony of a police practices expert who is rendering opinions about whether particular conduct violated the relevant constitutional provisions." *Id.* at *5. However, the *Smith* plaintiffs did not raise a failure-to-train claim. *See id.* at *4 (noting the plaintiffs "do not claim that the State failed to properly train [the officer]" or that officer training was an issue). *Smith* therefore provides limited guidance here.

The defendants also rely on Judge Lynch's decision regarding Mr. Longo's testimony in *Chaney v. Wadsworth*, 2015 WL 4388420 (D. Mont. 2015). In *Chaney*, Mr. Longo was asked to opine as to the use of force and detention arising

-24-

out of a physical altercation between law enforcement and two brothers outside of a bar. In his opinion, Judge Lynch excluded certain portions of Mr. Longo's report and testimony based on specific objections by the defendants. However, the determination in *Chaney* that Mr. Longo's testimony may be relevant to a claim for negligent failure to train, *id.* at *8, does not foreclose its potential relevance to a § 1983 claim for failure to train as well, *see id.* at *15 (holding that the "ultimate determination as to the relevance of th[at] opinion is deferred until trial to be made in the proper context of the evidence presented at trial"). As discussed above, adequate training for identifying and addressing the intersection between the First Amendment, Fourth Amendment, and Montana's obstruction statute is disputed. Because Mr. Longo has specialized experience with police practices, his testimony may help the jury interpret and understand the evidence, *see Muktar v. Cal. St. Univ. Hosp.*, 299 F.3d 1053, 1063 n.7 (9th Cir. 2002) ("Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the 'central concern' of Rule 702."), and determine whether the deputies receive adequate training, *Davis*, 927 F.2d at 1483 ("The issue is not whether the officers had received *any* training—most of the deputies involved had some training, even if it was minimal at best—rather the issue is the adequacy of that training.").

That said, as was the case in *Chaney*, Mr. Longo's testimony is limited in certain respects by the Federal Rules of Evidence and related case law. First, his testimony is limited insofar as portions of his report state the facts of the case, (*see* ¶¶ 13-30, 66, 54-81, 176-78, 186-88), comment on the evidence (*see* ¶¶ 68, 69, 72, 73, 75, 76, 78, 79, 124, 183-85, 189), or outline the applicable law, (*see* ¶¶ 36-52, 65, 67, 70, 83-93, 137-44, 179). While those facts and legal principles are those upon which Mr. Longo may rely in forming his opinion, they need not be presented through his testimony, *Chaney*, at *7, and the Court will instruct the jury on the law, *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993).

Additionally, Mr. Longo "cannot give an opinion as to h[is] *legal conclusion, i.e.*, an opinion on an ultimate issue of law." *See Muktar*, 299 F.3d at 1065 n.10 (emphasis in original); *see also Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058-60 (9th Cir. 2008). Rule 704(a) explicitly allows expert witnesses such as Mr. Longo to express an opinion that "embraces an ultimate issue." And, as stated in the previous appeal in this matter, "a police practices expert may provide helpful testimony regarding whether there was a failure to train without veering into improper legal opinions." *Reed*, 863 F.3d at 1209 (citing *Johnson v. Hawe*, 388 F.3d 676, 686 (9th Cir. 2004)); *Hangarter*, 373 F.3d at 1016. Nevertheless, the Ninth Circuit recently emphasized the fine line

drawn by Rule 704(a):

> Although the value of expert testimony lies in the specialized knowledge that an expert brings to bear on an issue in dispute, Fed. R. Evid. 702(a), it is sometimes impossible for an expert to render his or her opinion on a subject without resorting to language that recurs in the applicable legal standard. We hold that if the terms used by an expert witness do not have a specialized meaning in law and do not represent an attempt to instruct the jury on the law, or how to apply the law to the facts of the case, the testimony is not an impermissible legal conclusion. *See* Fed. R. Evid. 702(a), 704(a).

*United States v. Diaz*, ___ F.3d ___, 2017 WL 6030724, at *4 (9th Cir. Dec. 6, 2017) (holding that expert testimony that prescriptions were not given for "legitimate medical purpose" did not contain impermissible legal conclusion) (footnotes omitted). The primary term of art that raises concern here is "constitutional." Mr. Longo's report indicates that he may offer an opinion as to whether the training provided by the Sheriff's Office was constitutionally adequate or whether there is a causal connection between the failure to train and the constitutional harm alleged. During oral argument, Reed's counsel indicated Mr. Longo does not plan to open this particular pandora's box. We shall see. Such testimony may be properly subject to objection and further discussion in the context of trial.

Finally, the defendants raise specific relevancy objections in only four areas. The ultimate determination as to the relevance of Mr. Longo's testimony in these

-27-

four areas is more appropriately "made in the proper context of the evidence presented at trial." *Chaney*, at \*15. However, these topics are discussed below as to establish threshold relevancy to meet the requirements of Rule 702. *See Kumho Tire Co.*, 526 U.S. at 147. First, the defendants object to statements and testimony related to a lawsuit against the City of Baltimore alleging First and Fourth Amendment violations. (*See* Report, ¶¶ 100-117.) These paragraphs describe the circumstances upon which the Department of Justice issued a technical assistance letter to the Baltimore Police Department regarding First Amendment training. (*See, e.g.*, ¶ 106.) This portion of Mr. Longo's report is relevant to the nature and necessity of First Amendment training and the bases for his opinion. While Mr. Longo may not restate legal standards or principles of law, his testimony will not be prematurely excluded.

Second, the defendants challenge the portions of Mr. Longo's report that opine on "contempt of cop." (*See* Report, ¶¶ 146-157.) Judge Lynch excluded such testimony in *Chaney*, explaining that it speaks to the legal application of probable cause to arrest as it "may influence a law enforcement officer to unlawfully arrest a citizen in the absence of probable cause." *Chaney*, at \*5. Such testimony is more relevant here than it was in *Chaney* as Reed is likely to argue that Deputy Lieurance issued the citation based on Reed's perceived failure to

follow law enforcement's directions, not based on obstructing the hazing operation. While Mr. Longo cannot instruct the jury on the applicable law or opine as to whether Deputy Lieurance had probable cause, the Court will not prematurely exclude such testimony.

Third, the defendants seek to exclude Mr. Longo's report and testimony as it relates to the Rutherford Institute, (*see* Report, ¶¶ 190-97), a civil liberties organization that is used by law enforcement to aid in the development of policy and training for officers, (*id.* at ¶¶ 190-91). Because this Institute and its work are generally relevant to both the necessity and nature of First Amendment training, as well as the bases for Mr. Longo's opinions, it is not excluded. Once again, however, Mr. Longo's testimony is limited as outlined above.

Finally, the defendants seek to exclude testimony as to supervisory issues and the failure to track dismissed citations. The actions taken by law enforcement in response to an officer's conduct (such as reporting, discipline, reprimand) may be relevant to a "deliberate indifference" inquiry. *See Larez*, 946 F.2d at 645. It would be premature to exclude any of this testimony until Reed presents evidence under his theory of *Monell* liability at trial.

Because Mr. Longo's testimony meets Rule 702's threshold requirements, the defendants' motion to exclude Mr. Longo's testimony on those grounds is

denied, subject to the limits outlined above. The defendants are also permitted to renew the specific objections discussed above in the context Mr. Longo's trial testimony. *See* Fed. R. Evid. 103(b).

## C.    Rule 403

Rule 403 states, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In their briefing, the defendants do not identify a Rule 403 concern. At oral argument, however, defense counsel intimated that allowing Mr. Longo to testify to an industry standard of care, i.e., a negligence standard, would confuse the jury and could cause the jury to find liability despite the heightened requirements of municipal liability under § 1983. Not only is that concern not borne out by the Mr. Longo's report or the opinions proffered therein, but the jury instructions issued prior to deliberation will prevent prejudice as they specifically outline the standard for "deliberate indifference." *See* Ninth Cir. Model Civ. Instr. No. 9.8. Rule 403 does not compel the exclusion of Mr. Longo's testimony.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that the defendant's motion for

-30-

summary judgment (Doc. 150) is DENIED. The defendants' motion to exclude

Mr. Longo's expert testimony (Doc. 144) is also DENIED, but that testimony is

subject to the limitations outlined above. The defendants may renew their specific

relevancy objections in the context of trial. *See Bechtold v. Billings Police Dep't,*

2010 WL 11534416, at *1 (D. Mont. 2010).

DATED this ⎵⎵ day of December, 2017.

Donald W. Molloy, District Judge
United States District Court

-31-

**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

MAR 3 0 2016

Clerk, U.S. District Court
District Of Montana
Missoula

| | |
|---|---|
| LLOYD SCOTT MAIER,<br><br>Plaintiff,<br><br>vs.<br><br>MARTIN FRINK and<br>CHRISTOPHER ROST,<br><br>Defendants. | CV 13–92–GF–DWM–JTJ<br><br><br>ORDER |

This matter comes before the Court on Plaintiff Lloyd Scott Maier's Motion

for Summary Judgment (Doc. 40), Defendant Christopher Rost, P.A.'s Motion for

Summary Judgment (Doc. 49), and Defendant Warden Martin Frink's Cross-

Motion for Summary Judgment (Doc. 57). Magistrate Judge John Johnston

entered Findings and Recommendations on February 12, 2016, recommending the

Court deny all three motions. (Doc. 71.) Warden Frink and Rost filed timely

objections (Docs. 72, 73), and Maier did not file objections.

On dispositive motions, the parties are entitled to de novo review of the

specified findings or recommendations to which they object. 28 U.S.C. §

636(b)(1); *McDonnell Douglas Corp. v. Commodore Bus. Mach., Inc.*, 656 F.2d

-1-

1309, 1313 (9th Cir. 1981). Where there are no objections, the court is to give the level of consideration it deems appropriate, *Thomas v. Arn*, 474 U.S. 140, 150 (1985), and this Court reviews for clear error. Clear error exists if the court is left with a "definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., Inc.*, 508 U.S. 602, 623 (1993) (internal quotation marks omitted).

## I.   Warden Martin Frink

Warden Frink argues that he cannot be held deliberately indifferent because he properly relied upon the judgment and expertise of medical professionals and that case law supporting this assertion was not considered in the Findings and Recommendations. (Doc. 72.) The case law Warden Frink relies on is relevant and renders the inquiry a closer question, but Warden Frink's objection is overruled. In *Peralta v. Dillard*, the Ninth Circuit held that a Chief Medical Officer was not deliberately indifferent despite having signed off on the plaintiff's second-level appeal concerning his dental treatment plan. 744 F.3d 1076, 1086–87 (9th Cir. 2014). The court reasoned that because the Officer, who had no dental expertise, had "ensur[ed] that the proper personnel had signed off on a reasonable course of treatment," and relied on the medical opinions of the dental staff who had "investigated" the plaintiff's complaints, the plaintiff failed to show

-2-

that the Officer "actually was aware" of any risk the treatment plan posed to the

plaintiff's health. *Id.* at 1086. Other circuits have similarly held that, absent

knowledge that medical staff are not treating a prisoner, non-medical staff are not

deliberately indifferent for failing to take further action once they have

investigated the prisoner's complaints, verified the prisoner is receiving treatment,

and referred the complaints to medical providers. *Greeno v. Daley*, 414 F.3d 645,

655–56 (7th Cir. 2005); *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).

Viewing the record in a light most favorable to Maier, disputed facts

prevent summary judgment here. Although it was proper for Warden Frink to rely

upon medical staff in responding to Maier's two grievance appeals, (Doc. 61 at 4),

and he sufficiently investigated the appeals insomuch as both were granted, (Docs.

41-1 at 6; 37-1 at 2), it is disputed whether the medical department looked at

Maier's hearing aid after the first appeal was granted. Thus, there is a genuine

issue of material fact as to the extent Warden Frink ensured that the proper

personnel had established a treatment plan or verified that Maier was receiving

treatment. Additionally, Warden Frink indicates he was "not directly involved"

and had only an "understanding" that medical personnel sent Maier's hearing aid

for evaluation and then attempted to return it to him, (Doc. 61 at 3–4), and

therefore he may have responded reasonably by granting Maier's appeals given his

-3-

limited awareness. Yet the record could support the conclusion that Warden

Frink's actions of granting the first appeal and directing the second appeal to the

Montana Department of Corrections' health services shows he was aware of an

ongoing violation, of which he had the opportunity and authority to prevent.

## II.     Christopher Rost, P.A.

Rost argues that a truncated analysis was used in the Findings and

Recommendations and that, based on the alleged facts, he cannot be found to be a

state actor. (Doc. 73.) Rost's objection is without merit and overruled. Rost

engaged in a public function by tending to Maier at Crossroads Correctional

Center while Maier was involuntarily in custody. It is appropriate to attribute

Rost's conduct to the state because he performed a function—the provision of

medical services—that the state is traditionally obligated to carry out. *West v.*

*Atkins*, 487 U.S. 42, 54–55 (1988); *Carl v. Muskegon Cnty.*, 763 F.3d 592, 596–97

(6th Cir. 2014); *Conner v. Donnelly*, 42 F.3d 220, 224–25 (4th Cir. 1994).

The Court finds no clear error in the remainder of Judge Johnston's analysis

and findings.

Accordingly, IT IS ORDERED that the Findings and Recommendations

(Doc. 71) are ADOPTED IN FULL.

IT IS FURTHER ORDERED that Plaintiff Maier's Motion for Summary

Judgment (Doc. 40) is DENIED, Defendant Rost's Motion for Summary Judgment

(Doc. 49) is DENIED, and Defendant Frink's Cross-Motion for Summary

Judgment (Doc. 57) is DENIED.

DATED this 30th day of March, 2016.

Donald W. Molloy, District Judge
United States District Court

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

| | | |
|---|---|---|
| OLIVER EMANUEL PEARSON, | ) | CV 10-35-H-DWM-RKS |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | ORDER |
| | ) | |
| LARRY PASHA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Oliver Pearson, a state prisoner proceeding pro se, brought this action alleging Defendant Larry Pasha, a Correctional Officer employed by the Montana Department of Corrections, is liable under 42 U.S.C. § 1983 for excessive use of force in violation of his constitutional rights. Specifically, Pearson alleges Officer Pasha squeezed his genitals with enough force to bring tears to his eyes during a pat search. Both parties moved for summary judgment.

1

Pursuant to 28 U.S.C. § 636(b), the matter was referred to Magistrate Judge Strong, who issued Findings and Recommendations on June 2, 2011, recommending that both motions be dismissed. In doing so, Judge Strong found Officer Pasha presented evidence calling into question the veracity of Pearson's allegation, but Pearson's allegation in his verified complaint nevertheless created a genuine issue of material fact.

Both sides timely objected to Judge Strong's Findings and Recommendations, and are thus entitled to de novo review of the specified findings or recommendations to which they object. 28 U.S.C. § 636(b)(1). Despite the parties' objections, I agree with Judge Strong's analysis and conclusions. Because the parties are familiar with the factual and procedural background, it will not be restated here.

Officer Pasha objects that Pearson presented no evidence to support his claim of excessive force beyond his uncorroborated assertions. The objection is not well taken. Judge Strong correctly found Pearson's verified pleading includes allegations that Pasha squeezed his genitals producing tears in his eyes, these facts are within Pearson's personal knowledge, and thus the alleged facts are treated as if they were presented in an affidavit. See Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995).

Officer Pasha next objects that given the state of the record there is no genuine issue of material fact for a jury to resolve. The record shows (1) Pasha originally complained that Pasha took too long in conducting a pat search and failed to mention he squeezed his testicles, (2) the eyewitness Pearson identified saw nothing inappropriate occur during the pat search, and (3) no one can corroborate Pearson's allegation. To find, as Defendant implores, no genuine issue despite the statements in Pearson's verified complaint would require the Court to inappropriately weigh the evidence and resolve the issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-55 (1986). The jury will address the discrepancies between Pearson's testimony and the countering evidence. If the jury believes Pearson, it could return a verdict for him.

Pearson brings his own objections. He first objects that an affidavit submitted in support of Pasha's motion contradicts official procedures on how an officer should conduct a pat search of an inmate's groin area. The objection is irrelevant. Judge Strong did not use the contested statement to deny Pearson's motion. Moreover, the contested statement does not impact the fact that there is a genuine issue of material fact for a jury to resolve.

He also objects that the pat search at the heart of this action resulted in the most "unpleasant feeling" and he told his counselor about what took place. This

objection is also irrelevant.  Presuming both points are true, there still remains a genuine issue to be resolved at trial.

Accordingly,

IT IS HEREBY ORDERED that Judge Strong's Findings and Recommendations (dkt #37) are adopted in full;

IT IS FURTHER ORDERED that both Plaintiff Pearson's Motion for Summary Judgment (dkt #26) and Defendant Pasha's Motion for Summary Judgment (dkt #28) are DENIED.

Dated this 30th day of August, 2011.

 

 

_____
DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT

4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | | |
|---|---|---|
| ADAM KENNETH JACKSON | ) | CV 10-98-M-DWM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| JASON JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I. Introduction

Plaintiff Adam Jackson brings this action under 42 U.S.C. § 1983 alleging

violations of his federal constitutional rights stemming from a June 2009 incident

in which Missoula County Deputy Sheriff Jason Johnson tasered Jackson on a

residential street. Jackson states federal claims for unlawful seizure and excessive

1

use of force. The Amended Complaint also alleges pendent state claims for violation of Jackson's rights under the Montana Constitution, as well as a claim for punitive damages. Deputy Johnson seeks summary judgment arguing he is entitled to qualified immunity on the federal claim and he asks that the Court decline to exercise supplemental jurisdiction over the state claim.

## II. Factual Background

The facts, presented in the light most favorable to Plaintiff and non-movant Jackson, are as follows: At 12:55 a.m. on June 10, 2009, Deputy Johnson was dispatched to the scene of a one-car accident near the corner of South 7th Street West and Como Drive in Missoula, Montana. Upon arrival at the scene, Deputy Johnson observed two vehicles, one that had been crashed and one parked in the middle of the street. Near the damaged vehicle were a man and two women. The man claimed responsibility for the accident, telling Deputy Johnson, "It's me, I did it, I was driving, I am going to jail, take me to jail." The two women told Deputy Johnson that they were not involved in the accident, but had stopped and gotten out of their car to see if anyone needed help.

Deputy Johnson then spotted the Plaintiff, Adam Jackson, 70 yards from the scene walking along the street in the opposite direction. Jackson was not involved with the car accident and did not witness the accident. Deputy Johnson ran after

2

Jackson. Jackson did not quicken his pace or attempt to flee from Deputy Johnson. When Deputy Johnson got within 15 to 20 feet of Jackson, he shined his flashlight on Jackson and ordered him to stop walking. Jackson, who was sober, stopped and turned to face Deputy Johnson, at which point Deputy Johnson ordered Jackson to get to his knees. Jackson put his hands in the air and asked Deputy Johnson why he was being stopped, stating he had done nothing wrong. Deputy Johnson responded by pulling out his taser and pointing it at Jackson, again ordering Jackson to get to his knees. Jackson kept his hands in the air and did not approach Deputy Johnson. Jackson again asked what he had done wrong, stated that Deputy Johnson had not told him he was under arrest, and asked Deputy Johnson to talk to him. Without warning Jackson or identifying himself as a sheriff's deputy, Deputy Johnson shot Jackson with his taser at a distance of 15 to 20 feet. Deputy Johnson then arrested Jackson on charges of obstructing a peace officer and resisting arrest.[1]

------

[1]Deputy Johnson's account differs from Jackson's in several ways. According to Deputy Johnson's Affidavit:

He did not know who was the driver of either car at the time he approached Jackson;

He "perceived Jackson to be intoxicated and belligerent";

He "suspected that Jackson was involved in the accident, or had committed a crime, or was attempting to flee the scene";

3

For the reasons set forth below Johnson's motion is granted with respect to the illegal seizure claim and denied in all other respects.

### III. Analysis

**A.    Summary Judgment Standard**

A party is entitled to summary judgment if it can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986). On a motion for summary judgment, this Court must determine whether a fair-minded jury could return a verdict for the nonmoving party. Id. at 252. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment; factual disputes which are irrelevant or unnecessary to the outcome are not considered. Id. at 248.

---

When he approached Jackson, Jackson "suddenly snapped around and stated in an aggressive and challenging manner, 'What the fuck do you want, I didn't do anything.'"

Jackson advanced toward Deputy Johnson, "yelling and posturing as if to fight."

Before tasering Jackson he identified himself as a sheriff's deputy, told Jackson to get to his knees four times, and warned Jackson that he would be tasered if he did not comply.

Johnson Affidavit, Doc. No. 17-1 at 2-3.

**B.     Qualified Immunity**

Qualified immunity shields a government actor from a suit for damages if the actor could have reasonably believed his conduct was lawful, in light of clearly established law and the information possessed by the official.  Anderson v. Creighton, 483 U.S. 635, 637-39, 641 (1987).  Not a mere defense to liability, qualified immunity entitles a government official "not to stand trial or face the other burdens of litigation."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  Accordingly, even when a constitutional violation occurs, "law enforcement officers nonetheless are entitled to qualified immunity if they act reasonably under the circumstances."  See KRL v. Estate of Moore, 512 F.3d 1184, 1189 (9th Cir. 2008) (citing Wilson v. Layne, 526 U.S. 603, 614 (1999)).

The United States Supreme Court outlined a two-step qualified immunity analysis in Saucier v. Katz, 533 U.S. 194 (2001), requiring district courts to first determine whether the officer's conduct violated a constitutional right.  Saucier, 533 U.S. at 201.  If there are disputed issues of material fact, the court must adopt the version of the facts presented by, and draw all reasonable inferences in favor of, the non-movant.  Bryan v. MacPherson, 630 F.3d 805, 823 (9th Cir. 2010).  If no constitutional right was violated, the court need not inquire further.  If a constitutional violation has occurred, the court's second inquiry under Saucier is to

5

ask whether the law was "clearly established" at the time of defendant's alleged misconduct. Saucier, 533 U.S. at 201. In deciding if a right is clearly established, the Court must ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202.

Recently the Supreme Court held that "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory." Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 818 (2009). Following Pearson, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 129 S.Ct. at 818. Analysis pursuant to the sequence set forth in Saucier remains useful in many situations, Pearson, 129 S.Ct. at 818, and will be followed here, first as to the illegal seizure claim, and second as to the excessive force claim.

### 1. Illegal Seizure

"For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen." United States v. Chan-Jimenez, 125 F.3d 1324, 1326 (9th Cir. 1997). The Fourth Amendment provides protection against two

types of seizures: investigatory stops and arrests.  An investigatory stop, or Terry[2]

stop, is a brief detention and interrogation and must be founded on reasonable

suspicion.  United States v. Miles, 247 F.3d 1009, 1012-13 (9th Cir. 2001).  An

arrest is a more intrusive detention and requires probable cause.  Beck v. Ohio,

379 U.S. 89, 91 (1964).

Deputy Johnson contends he only seized Jackson one time, when he used

his taser to arrest Jackson.  Johnson relies on California v. Hodari D., 499 U.S.

621 (1991), to argue that his initial stop of Jackson was not a Fourth Amendment

seizure because Jackson did not comply with Deputy Johnson's commands and

therefore had not submitted to authority.  Hodari D. involved a fleeing suspect

who discarded a rock of crack cocaine while running from police officers.  499

U.S. at 623.  The Supreme Court held that where there is a show of authority but

the suspect does not yield in response, a seizure has not occurred.  Id. at 626.

Hodari D. has no application here because in this instance Jackson yielded

instantly in response to Johnson's instructions to stop.  Once Jackson had turned

to face Deputy Johnson and put his hands in the air, Jackson had submitted to

authority and his freedom to walk away had been restrained.  Jackson's refusal to

get to his knees does not constitute non-compliance sufficient to rob the encounter

---

[2]Terry v. Ohio, 392 U.S. 1 (1968).

of its status as a seizure under <u>Hodari D.</u>  Consequently in this case, there are two seizures to be considered, the <u>Terry</u> stop and Jackson's subsequent arrest.

The first question to resolve is whether the <u>Terry</u> stop was supported by reasonable suspicion.  If Deputy Johnson had reasonable suspicion to make the stop, it is then necessary to determine at what point the <u>Terry</u> stop became an arrest.  After determining when the arrest occurred, it is further necessary to decide whether the facts gave rise to probable cause at the moment the arrest occurs.  If there is a constitutional violation at any stage, the next inquiry is whether the rights violated were clearly established at the time of the incident.

### a.      Was There Reasonable Suspicion For a <u>Terry</u> Stop?

For a <u>Terry</u> stop to be lawful under the Fourth Amendment, the officer must have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot[.]'" <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989) (quoting <u>Terry</u>, 392 U.S. at 30).  "The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause." <u>United States v. Tiong</u>, 224 F.3d 1136, 1140 (9th Cir. 2000).  Whether reasonable suspicion exists for a Terry stop depends on the totality of the circumstances. <u>United States v. Arvisu</u>, 534 U.S. 266, 273 (2002).

Deputy Johnson had reason to conduct a <u>Terry</u> stop.  He encountered an

8

accident scene on a residential street at one o'clock in the morning. A man at the scene immediately claimed responsibility for the accident. Deputy Johnson observed a different man walking over 200 feet away from the scene in the opposite direction. Under the circumstances, it was reasonable for Deputy Johnson to have a suspicion about a person walking away from the scene of a wreck. Johnson had the unprompted confession he received upon arrival at the scene as another figure walked away.[3] A law enforcement officer in that position could reasonably decide that the admission of guilt came a bit too easily, and wonder whether it was an attempt to cover up the wrongdoing of another. And while the presence of a retreating figure in the distance might not be a basis for suspicion if the accident scene is a busy downtown intersection at midday, the presence of a passerby on a residential street at one o'clock in the morning would naturally arouse much more suspicion. Taking into account the totality of the circumstances, Deputy Johnson had reasonable suspicion to justify a brief investigatory stop. Deputy Johnson is entitled to summary judgment on Jackson's illegal seizure claim to the extent that claim alleges a Terry stop without

---

[3]In both his Opening Brief and Reply Brief, Deputy Johnson repeatedly describes Jackson as "hastening" or "walking hastily" away from the scene. See, e.g., Doc. No. 16 at 15, Doc No. 20 at 3. There is no support in the record for such descriptions; the affidavits of both Deputy Johnson and Jackson merely state that Jackson was "walking." Doc. No. 17-1 at ¶ 4; Doc. No. 19-1 at ¶ 8.

9

reasonable suspicion.

### b. At What Point Did the <u>Terry</u> Stop Become an Arrest?

Before evaluating whether Jackson's arrest was supported by probable cause, it is necessary to decide when the arrest occurred. There is no dispute that the <u>Terry</u> stop had been converted to an arrest when Deputy Johnson used his taser on Jackson. The question is whether earlier events escalated the encounter from a <u>Terry</u> stop to an arrest.

Whether a Terry stop escalated to an arrest cannot be determined by reference to a "mechanical checklist," <u>United States v. Parr</u>, 843 F.2d 1228, 1231 (9th Cir. 1988), but must instead be judged according to the totality of the circumstances. <u>Gallegos v. City of Los Angeles</u>, 308 F.3d 987, 991 (9th Cir. 2002). In assessing the totality of the circumstances, a court must consider "both the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted, and the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." <u>Washington v. Lambert</u>, 98 F.3d 1181, 1185 (9th Cir. 1996) (citation omitted). "While certain police actions constitute an arrest in certain circumstances, e.g., where the 'suspects' are cooperative, those *same* actions may <u>not</u> constitute an arrest where the suspect is

10

uncooperative or the police have specific reasons to believe that a serious threat to the safety of one of the officers exists." Id. (emphasis in original).

In a typical Terry stop for which an officer has no reason to suspect danger, it is a Fourth Amendment violation for the officer to employ aggressive tactics such as drawing a weapon, forcing a subject to lie prone on the ground, and using handcuffs. United States v. Del Vizo, 918 F.2d 821, 825 (9th Cir. 1990). "The police may not employ such tactics *every time* they have an 'articulable basis' for thinking that someone may be a suspect in a crime." Lambert, 98 F.3d at 1187 (emphasis in original). The Ninth Circuit has voiced the following examples of "special circumstances" under which intrusive techniques may be used to effectuate a Terry stop:

> 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur. Clearly, some combination of these factors may also justify the use of aggressive police action without causing an investigatory stop to turn into an arrest.

Lambert, 98 F.3d at 1189.

A number of Ninth Circuit cases illustrate the types of conditions under which aggressive police actions during a Terry stop are warranted, and therefore

11

do not constitute an arrest. See, e.g., United States v. Miles, 247 F.3d 1009, 1011-13 (9th Cir. 2001) (approaching suspect with guns drawn, forcing him to kneel and handcuffing him before conducting any investigation did not constitute an arrest where officers had a report of an armed suspect and were outnumbered three to two in the immediate vicinity); United States v. Allen, 66 F.3d 1052, 1055-57 (9th Cir. 1995) (intoxicated passenger forced to lie on the ground and handcuffed at gunpoint, held not to constitute an arrest where companion was combative, passenger was drunk and stop was preceded by a high-speed car chase); United States v. Alvarez, 899 F.2d 833, 836-839 (9th Cir. 1990) (no arrest where police approached with weapons drawn after receiving credible tip that subject possessed explosives); United States v. Greene, 783 F.2d 1364, 1366-68 (9th Cir. 1986) (police ordered subject seated in a car to place hands on the headliner and drew weapons when he did not immediately comply, held not to constitute an arrest where police had informant's report that the suspect was in possession of a pistol); United States v. Taylor, 716 F.2d 701, 708-09 (9th Cir. 1983) (no arrest when police handcuffed companion of suspected drug dealer at gunpoint where police had strong evidence of drug activity and received briefing that dealer and his companions should be considered dangerous); and United States v. Bautista, 684 F.2d 1286, 1287-90 (9th Cir. 1982) (handcuffing of two subjects justified, and not

12

an arrest, where police suspected subjects of armed robbery and knew that a third suspect might still be in the vicinity).

By contrast, where officers have no reason to suspect danger, or where the suspected offense is minor or non-violent, aggressive actions during an investigative stop may constitute an arrest. For example, in Del Vizo, officers stopped the driver of a van after surveillance indicated that the driver had just completed a drug transaction. Police approached with weapons drawn, ordered the driver out of the van, forced him to lie down on the street, and handcuffed him. Del Vizo, 918 F.2d at 823. The Ninth Circuit held that the police conduct constituted an arrest under the circumstances, and therefore required a showing of probable cause. Id. at 824. The court of appeals went on to say that mere suspicion of drug trafficking did not justify the extent of the restraints to effectuate an investigative stop, noting that the driver was compliant and there was no evidence suggesting he was dangerous. Id. at 825.

Handcuffing "substantially aggravates the intrusion and aggressiveness" of a Terry stop, Bautista, 684 F.2d at 1289, but it is not a pre-requisite to finding an arrest has occurred. "In fact, even markedly less intrusive police action has been held to constitute an arrest when the inherent danger of the situation does not justify the intrusive police action." Lambert, 98 F.3d at 1187. In United States v.

13

Ricardo D., 912 F.2d 337 (9th Cir. 1990), the Ninth Circuit found an arrest had occurred where officers took a non-fleeing, non-threatening juvenile subject by the arm, told him not to run, and placed him in a patrol car for questioning. In United States v. Robertson, 833 F.2d 777, 781 (9th Cir. 1987), officers were held to have arrested a female companion of a known methamphetamine manufacturer when they detained her at gunpoint, though they did not handcuff or touch her. The court noted that the police "had not the slightest indication that she was armed," and there was "[n]othing in the record suggest[ing] that the display of force was necessary to insure her compliance with a request to stop." Robertson, 833 F.2d at 781. In light of those facts the court concluded that "the purpose of the asserted 'Terry stop'–to allow the officers to investigate without fear of flight or violence–was not served by the intrusion imposed." Id. (citation omitted). The dissent in Robertson determined no arrest had occurred, but suggested an arrest likely would have occurred had the officers taken the further step of making the subject "prone out." Id. at 787 (Noonan, J., dissenting). Similarly, in United States v. Kraus, police officers confronted subjects with spotlights and weapons drawn, and ordered them to raise their arms and drop to their knees. 793 F.2d 1105, 1109 (9th Cir. 1986). The court of appeals determined these actions constituted an arrest where there was no information linking the subjects to a

14

crime, stating "the officers' commands led Kraus and Montgomery reasonably to believe that they had no choice but to raise their arms and drop to their knees. A reasonable person in this situation would have believed that he was not free to leave and was effectively under arrest." Id. at 1109.

In light of these cases, the Terry stop in this case became an arrest when Johnson drew his taser and pointed it at Jackson after Jackson failed to immediately comply with Deputy Johnson' first command that Jackson drop to his knees. Only one of the four Lambert factors is even arguably present. Deputy Johnson had no information that Jackson was armed. The stop did not closely follow a violent crime, and there was no reason for Deputy Johnson to believe a crime involving violence was about to occur. In fact, there was scant reason for Deputy Johnson to believe that Jackson was involved in any criminal activity at all. Jackson's actions at the scene did not support a reasonable belief that he presented a danger or a flight risk. The only conceivable fact supporting the intrusive action of pointing a taser at Jackson was Jackson's failure to immediately drop to his knees on the first command.

Under Robertson and Kraus, and in light of the four factors identified in Lambert, there is a credible argument to be made that the stop was converted to an arrest as soon as Deputy Johnson gave the initial order for Jackson to drop to his

15

knees. Any doubt was erased, however, when Deputy Johnson drew his taser. Once he had drawn a weapon and ordered to Jackson to his knees, Johnson had escalated the encounter to an arrest under the Fourth Amendment. Other than Jackson's minimal act of non-compliance in refusing to act as a supplicant, Deputy Johnson had no reason to suspect that he was dangerous, that he would attempt to flee, or that he had committed or was planning to commit a violent offense. Moreover, Jackson's non-compliance was partial; he had stopped walking when asked and placed his arms in the air in response to the order to drop to his knees. At that point, Jackson, like the subjects in Kraus, reasonably would have believed he was not free to leave. See also Robertson, 833 F.2d at 781 (suspect approached at gunpoint "was not free to 'choose between terminating or continuing the encounter'") (quoting United States v. Johnson, 626 F.2d 753, 755 (9th Cir. 1980)). In the moment before he drew his taser, Deputy Johnson faced no impediment to his achievement of the purposes of a Terry stop, i.e., the brief investigatory detention and questioning of a subject without fear for his safety.

In each of the Ninth Circuit cases cited above the weapons drawn by officers were guns rather than tasers. See, e.g., Lambert, 98 F.3d at 1188 ("[I]f the police draw their guns it greatly increases the seriousness of the stop."). Unlike a firearm, a taser does not constitute deadly force, and therefore the threatened use

16

of a taser cannot be deemed as severe an intrusion as the brandishing of a firearm. But the non-deadly nature of a taser does not render meaningless its use in deciding whether a Terry stop escalated to an arrest. The taser properly falls among that class of other non-deadly tactics, such as the use of handcuffs, that may "substantially aggravate[] the intrusiveness of an otherwise routine investigatory detention and [are] not part of a typical Terry stop." Bautista, 98 F.2d at 1289.

Moreover, it is unclear the degree to which the average person would appreciate the distinction between a taser and a firearm when the weapon is drawn from the holster of a uniformed officer in the dark of night. It suffices to say that an officer who draws his taser has significantly heightened the degree intrusion associated with the stop and the restraint placed upon the subject.[4] Taking the view of the facts most favorable to Jackson, Deputy Johnson's actions were not reasonably necessary under the circumstances to safely effectuate a Terry stop, and therefore constituted an arrest as of the moment he drew his taser.

---

[4]In Lambert, the Ninth Circuit quoted with approval the Seventh Circuit's observation that "[i]t would be a sad day for the people of the United States if police had carte blanche to point a gun at each and every person of whom they had an 'articulable suspicion' of engaging in criminal activity." 98 F.3d at 1188-89 (quoting United States v. Serna-Barreto, 842 F.2d 965, 967 (7th Cir. 1988)). It would be only marginally less disturbing to our constitutionally rooted notions of individual liberty if police had the freedom to conduct every investigatory stop from behind a drawn taser.

17

### c.   Did Deputy Johnson Have Probable Cause to Arrest Jackson When He Drew His Taser?

If Deputy Johnson did not have probable cause when he drew his taser, his arrest of Jackson was a false arrest in violation of the Fourth Amendment. Lambert, 98 F.3d at 1186. "Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." Dubner v. City and County of San Francisco, 266 F.3d 959, 966 (9th Cir. 2001). Reasonable suspicion may ripen into probable cause based on events that occur after the initial investigative stop. Greene, 783 F.2d at 1368 (quoting United States v. Medina-Gasca, 739 F.2d 1451, 1453 (9th Cir. 1984)).

Deputy Johnson asserts he had probable cause to arrest Jackson because "[Jackson's] non-compliance interfered with Johnson's ability to accomplish his lawful investigation and, at some point, became a crime." Def.'s Reply Brief, Doc. No. 20 at 5. Jackson was charged with two offenses under Montana law, resisting arrest and obstructing a peace officer. Johnson Affidavit, Doc. No. 17-1 at 3. A person commits the offense of resisting arrest under Mont. Code Ann. § 45-7-301 if he "knowingly prevents or attempts to prevent a peace officer from effecting an arrest," either by use or threat of force or violence, or by any other

18

means that places another person at risk of physical harm.  A reasonable law enforcement officer could not have believed there was probable cause to arrest Jackson for resisting arrest.  What Johnson espouses is plenary authority to arrest so an office is never wrong in making an arrest.  Jackson did not use or threaten violence, and Deputy Johnson had no reason to perceive a risk that he or anyone else would suffer physical injury due to Jackson's actions.

That leaves obstructing a peace officer as the lone offense for which Deputy Johnson might have had probable cause to arrest Jackson.   Under Mont. Code. Ann. § 45-7-302(1), "A person commits the offense of obstructing a peace officer or public servant if the person knowingly obstructs, impairs, or hinders the enforcement of the criminal law, the preservation of the peace, or the performance of a governmental function, including service of process."  Under Jackson's version of the facts, the only conduct that conceivably could have given rise to probable cause was Jackson's failure to comply with Deputy Johnson's first command to drop to his knees.  The question is whether the failure to immediately comply with an officer's command to assume a supplicant's position during an investigative stop is a violation of Mont. Code Ann. § 45-7-302.

The Montana Supreme Court addressed the question in <u>City of Kalispell v. Cameron</u>, 46 P.3d 46 (Mont. 2002).  The defendant in <u>Cameron</u> was a passenger in

a truck that two officers had observed driving erratically. Id. at 46. After the

truck parked at a restaurant, the officers approached to investigate, one officer

confronting the driver on the driver's side of the truck and another confronting the

defendant on the passenger side. Id. at 46-47. As the defendant exited the truck

to enter the restaurant the officer called to him and told him to get back in the

truck. Id. The defendant did not comply, telling the officer he was going into the

restaurant to eat. Id. at 47. The officer repeated the command, and the defendant

responded by swearing at the officer and turning to enter the restaurant. Id. At

that point the officer forced the defendant against the truck in a "control position"

and handcuffed him. Id. The defendant charged with obstructing a peace officer

in violation of Mont. Code Ann. § 45-7-302. He was convicted following a jury

trial after his motion for directed verdict failed.

On appeal, the Montana Supreme Court reversed the lower court and

directed a judgment acquitting the defendant, holding that mere non-compliance

with a police officer's command is not obstruction unless it is done with the

knowledge that non-compliance will hinder the officer's investigation. The court

explained:

> Sections 45-2-101(34) (statutory definition of "knowingly") and
> 45-7-302(1), MCA, require that an individual obstructing a peace
> officer must engage in conduct under circumstances that make him or

her aware that it is highly probable that such conduct will impede the performance of a peace officer's lawful duty. In other words, the City had to prove that Cameron was aware that his conduct would hinder the execution of the Officers' duties.

We conclude that Cameron did not obstruct the Officers. Brenden testified that he arrested the driver without incident and was not impaired by Cameron. Moreover, Brenden testified that he did not require Zimmerman's assistance to arrest the driver. Finally, there was no reason for arresting Cameron and he had no reason to know why he was being investigated or arrested.

Cameron, 46 P.3d at 47.

Like the defendant in Cameron, here Jackson had no reason to know why he was being investigated and he was not informed of the purpose of the stop by Deputy Johnson. This was despite Jackson's asking Johnson what he did wrong. Jackson did not hinder Deputy Johnson's ability to investigate, as Jackson had his arms raised and in fact claims he was inviting questioning. In light of Cameron, Deputy Johnson did not have probable cause to believe Jackson's conduct was obstruction of a peace officer under Mont. Code Ann. § 45-7-302.

This result is consistent with the Ninth Circuit's decision in Mackinney v. Nielsen, 69 F.3d 1002 (9th Cir. 1995). In Mackinney, the plaintiff was arrested for obstruction for continuing to write on a sidewalk with chalk after officers told him to stop. 69 F.3d at 1004. The plaintiff filed a § 1983 action alleging false arrest, and the district court granted summary judgment for the defendants. The

21

court of appeals held that the officers did not have probable cause to arrest the plaintiff for the offense of obstructing a peace officer in California, citing California case law in which outright refusal to comply with police commands was held not to constitute obstruction under the state statute. Id. at 1006. In concluding its analysis, the Ninth Circuit panel stated, "Of course, people must obey the police in most situations. But here, the police overreacted to Mackinney's momentary disobedience." 69 F.3d at 1006.[5]

Cameron was decided in 2002, well before the events at issue here took place. Since then, it has been clearly established under Montana law that mere momentary non-compliance with a peace officer's commands is not obstruction under Mont. Code Ann. § 45-7-302. At a minimum, there exists a triable issue of fact regarding whether, under Jackson's allegations, Deputy Johnson unreasonably violated clearly established law when he arrested Jackson. Deputy Johnson has failed to carry his summary judgment burden with respect to Jackson's false arrest

---

[5]Deputy Johnson's reliance on Hiibel v. Sixth Judicial District Court of Nevada, Hombolt County, 542 U.S. 177 (2004), is misplaced. Although Deputy Johnson's Reply Brief characterizes the Nevada statute at issue in Hiibel as a "stop and frisk" statute "which is similar to Montana's," Doc. No. 20 at 5, the Nevada law is in fact a "stop and identify" statute which requires the subject of a Terry stop to disclose his or her identity at the request of a peace officer–a feature not found in the Montana stop and frisk statute, Mont Code Ann. § 46-5-401. Hiibel, 542 U.S. at 181. In Hiibel, the Supreme Court held that failure to respond to such a request is grounds to arrest the subject of a Terry stop for violation of the "stop and identify statute." Id. at 187-89. Hiibel has no application here, because the subject in Hiibel committed a clear violation of state law in the presence of the arresting officer.

22

claim, and his motion for summary judgment is denied as it relates to that claim.

### 2.   Excessive Force

Deputy Johnson argues that he is entitled to qualified immunity on the excessive force claim because the law on excessive force involving tasers was not clearly established when this incident occurred on June 10, 2009. Deputy Johnson does not attempt to argue that the quantum of force he used was constitutionally permissible, instead urging the Court to skip the excessive force inquiry and proceed directly to the question whether the law was clearly established. If that approach is followed, Deputy Johnson argues, he is entitled to qualified immunity under the Ninth Circuit's recent decision in Bryan.

### a.   Did Deputy Johnson Use Excessive Force?

An officer will not be found to have used excessive force so long as his actions are objectively reasonable in light of the facts and circumstances confronting him. Graham v. Connor, 490 U.S. 386, 395-97 (1989). In assessing the reasonableness of an officer's use of force, a court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Bryan, 630 F.3d at 823 (internal quotation marks omitted).

The nature and quality of the intrusion in this case is the use of a taser,

which the Ninth Circuit has deemed an intensely painful and frightening blow. Bryan, 630 F.3d at 825-26. The Bryan panel held that a taser constitutes an "intermediate, significant level of force[.]" Id. at 826.

The Court must balance that intrusion against the countervailing governmental interests at stake. Three core factors are used to assess the government's interest in the use of force: "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Bryan, 630 F.3d at 826 (quoting Graham, 490 U.S. at 396). These factors are not exclusive; in each case, any factor that is appropriate under the specific circumstances should be considered. Bryan, 630 F.3d at 826. Such factors include, where relevant, whether the officer warned the subject before using force, and whether the officer considered less intrusive means to effect arrest. Id. at 831.

When considered in the context of the Graham factors, the governmental interests at issue here do not justify the use of a taser in this case. Jackson had his arms raised and he did not approach or otherwise threaten Deputy Johnson, who was 15 to 20 feet away. Jackson twice asked the officer what he had done wrong, stated that Deputy Johnson had not told him he was under arrest, and asked Deputy Johnson to talk to him. To the extent that Jackson's failure to drop to his

knees after two commands constituted resistance, his resistance was entirely passive. Furthermore there was nothing about the situation that could reasonably have caused Johnson to believe forcing Jackson to his knees was required for any reason including officer safety. The first Graham factor, severity of the crime, does not support any use of force. Assuming Jackson was in the wrong, the severity of his offense in this instance was *de minimis*, if indeed there was reason to suspect him of any offense at all. No fact gave rise to a reasonable suspicion he had committed or was about to commit a violent crime. As for the second Graham factor, Jackson did not pose an immediate threat to Deputy Johnson. Finally, Jackson did not actively resist arrest or attempt to flee. His minimal, passive resistance to an uncalled for order to get on his knees does not come close to justifying the use of a taser, particularly where Jackson had raised his arms and asked Deputy Johnson to tell him why he had been stopped, and Deputy Johnson did not warn Jackson that he would use the taser.

As alleged by Jackson, Deputy Johnson's use of force in this case was excessive under Graham in violation of the Fourth Amendment. With that determination it is necessary to turn to the second step in the qualified immunity analysis, i.e., whether the right violated by Deputy Johnson was clearly established in the law as of June 10, 2009.

b.    Did Deputy Johnson Violate Jackson's Clearly Established
Rights?

The Ninth Circuit has conceded that the law on excessive force regarding

the use of tasers was to some degree unsettled prior to its decision in Bryan. 630

F.3d at 833.[6] In Bryan, the driver of a car was stopped at an intersection when an

officer stationed there to enforce seatbelt laws stepped in front of the car. Id. at

822. When the officer approached the driver's window and asked if the driver

knew why he had been stopped, the driver stared straight ahead and said nothing.

Id. The officer then instructed the driver to turn down the radio and pull over, and

as the driver complied, he began to punch the steering wheel and repeatedly yell

expletives. Id. The driver then exited the vehicle despite having been instructed

by the officer to stay in the car. Id. The driver wore only boxer shorts and tennis

shoes, and was visibly agitated. Id. He stood outside his car, yelling gibberish

and pounding his thighs with his fists. Id. The court of appeals characterized the

driver's behavior as a "bizarre tantrum." Id. at 832. The driver did not make any

attempt to advance toward the officer. Id. at 822. Beholding the driver's conduct

from 20 to 25 feet away, the officer drew and fired his taser without warning,

---

[6]Bryan is one of three excessive force cases involving tasers decided by the Ninth Circuit
in 2010. The court has granted rehearing en banc in the other two, Brooks v. City of Seattle, 599
F.3d 1018 (9th Cir. 2010), rehr'g en banc granted by 623 F.3d 911 (9th Cir. 2010), and Mattos v.
Agarano, 590 F.3d 1082 (9th Cir. 2010), rehr'g en banc granted by 625 F.3d 1132 (9th Cir.
2010).

26

causing the driver to fall to the ground and suffer injuries to his face and teeth.  Id.

The driver filed a § 1983 action, and the district court denied the

defendant's motion for summary judgment on qualified immunity.  On appeal, the

panel concluded that the officer's use of the taser in Bryan was excessive under

the Fourth Amendment because the situation did not call for an intermediate level

of force.  630 F.3d at 832.  The court of appeals held that under the circumstances

"the government had, at best, a minimal interest in the use of force against Bryan."

Id. at 831.  The court then went on to find that the officer was entitled to qualified

immunity because prior to the Bryan opinion there had been no Ninth Circuit case

declaring a taser to constitute an intermediate use of force.  Id. at 833.  In other

words, while it was clearly established in the law that intermediate force was not

reasonably called for in the situation, it was not clearly established that a taser

constitutes intermediate force.  The effect of Bryan's qualified immunity analysis

is that before the Bryan opinion, a police officer was entitled qualified immunity

against any excessive force claim based on the use of a taser, provided that at least

some degree of force was reasonable under the circumstances.  Whether Deputy

Johnson is entitled to qualified immunity therefore turns on whether it was

reasonably necessary to use any level of force under the circumstances.  It merits

comment that law enforcement officers are not required to check in their common

27

sense when they check out their taser, regardless of the state of the law.

"Where there is no need for force, *any* force used is constitutionally unreasonable." Headwaters Forest Defense v. County of Humboldt, 240 F.3d 1185, 1199 (9th Cir. 2000), vacated and remanded on other grounds sub nom. County of Humboldt v. Headwaters Forest Defense, 534 U.S. 801 (2001) (emphasis in original). Headwaters involved the use of pepper spray on peaceful protesters who had linked themselves together using steel locking devices while demonstrating on lumber company property and in a politician's office. The Ninth Circuit concluded that the use of pepper spray constituted excessive force in those circumstances, 240 F.3d at 1205-06, and re-affirmed its excessive force analysis on remand from the Supreme Court. See Headwaters Forest Defense v. County of Humboldt, 276 F.3d 1125, 1131 (9th Cir. 2002) (holding the use of pepper spray was "plainly in excess of the force necessary under the circumstances"). The circuit faulted the officers for not considering less intrusive force because alternatives such as using a grinder to cut the locking devices or physically removing the protesters by carrying them were reasonable options to the force used. Headwaters, 240 F.3d at 1205.

Unlike Bryan and Headwaters, this is a case in which no force was reasonably necessary. In both Bryan (seat belt infraction) and Headwaters

(trespass), the officers had probable cause to believe a crime had been committed, and therefore were justified in effecting an arrest. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." Michigan v. DeFillippo, 443 U.S. 31, 37 (2001). Deputy Johnson has no probable cause to arrest Jackson, so he was not entitled to use any force. When an officer illegally makes a false arrest, the "countervailing governmental interest" required by Graham is entirely absent. No level of force can be reasonably justified in such circumstances.

Viewing the facts in the light most favorable to Jackson, Deputy Johnson is not entitled to qualified immunity on the excessive force claim because tasering Jackson to effectuate a false arrest constituted a use of force where none was necessary, and no reasonable officer could have concluded otherwise. Deputy Johnson's motion for summary judgment on the excessive force claim is denied.

## IV.  Conclusion

Based on the foregoing, Deputy Johnson's motion for summary judgment (dkt #15) is GRANTED with regard to Jackson's illegal seizure claim based on the absence of reasonable suspicion for an investigative stop, and DENIED in all other respects.

Dated this 18th day of July, 2011.

DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT