644 F.3d 817

79 Fed.R.Serv.3d 533

11 Cal. Daily Op. Serv. 5206

2011 Daily Journal D.A.R. 6259

Pamela GOODMAN, an unmarried individual, Plaintiff–Appellant,

v.STAPLES THE OFFICE SUPERSTORE, LLC, a Delaware limited liability company; Does, I–X, Defendants–Appellees.

No. 10–15021.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 2010.Filed May 3, 2011.

Jeffrey S. Kaufman (argued), Jeffrey S. Kaufman, Ltd., Scottsdale, AZ, for the appellant.Jeffry A. Miller (argued), Matthew B. Stucky, and Carl F. Mariano of Lewis Brisbois Bisgaard & Smith LLP, San Diego, CA and Phoenix, AZ, for the appellee.Appeal from the United States District Court for the District of Arizona, James A. Teilborg, District Judge, Presiding. D.C. No. 2:08–cv–00445–JAT.Before: ROBERT E. COWEN,* A. WALLACE TASHIMA, and BARRY G. SILVERMAN, Circuit Judges.Opinion by Judge SILVERMAN; Concurrence by Judge TASHIMA.

# OPINION

SILVERMAN, Circuit Judge:

Federal Rule of Civil Procedure 26(a)(2) requires a party to timely disclose a written report of a witness "if the witness is one retained or specially employed to provide expert testimony in the case...." Generally speaking, treating physicians are excused from this requirement. They are a species of percipient witness. They are not specially hired to provide expert testimony; rather, they are hired to treat the patient and may testify to and opine on what they saw and did without the necessity of the proponent of the testimony furnishing a written expert report.

In this case, the plaintiff's treating doctors not only rendered treatment, but after the treatment was concluded, these very same doctors were provided with additional information by plaintiff's counsel and were asked to opine on matters outside the scope of the treatment they rendered. The district court ruled that these physicians would be allowed to testify to the opinions they formed in the course of caring for the patient, but because no Rule 26 expert witness report had been provided, the court precluded the treating doctors from testifying to opinions they formed afterward, opinions solicited from them solely for the purposes of the litigation.

We hold today that when a treating physician morphs into a witness hired to render expert opinions that go beyond the usual scope of a treating doctor's testimony, the proponent of the testimony must comply with Rule 26(a)(2). However, because the law regarding these hybrid experts was not settled, and because treating physicians are usually exempt from Rule 26(a)(2)'s requirements, we exercise our discretion to apply this clarification prospectively.

## I. Background

On the afternoon of May 9, 2007, Goodman and her business associate Jean Adams went to Staples in Scottsdale to purchase office supplies. The store was being remodeled, but it was open to the public. As she went to leave the store, Goodman turned a corner at the end of an aisle. She tripped on an "end cap" and fell.[1]

Goodman remained lying on the floor until paramedics arrived at the store. She was never unconscious. The paramedics took her by ambulance to Scottsdale Healthcare Emergency Department, where she complained of head, neck, and foot pain and of tingling in her arm. Goodman told the ER doctor that she thought she hit her head on the floor when she fell. According to Scottsdale Healthcare records, a CT scan of Goodman's head and cervical spine showed no fractures or subluxations and showed that the fusion plates in her neck from a cervical spinal fusion surgery six weeks earlier remained intact. She was diagnosed with acute closed-head injury, neck pain, and left foot contusion, given a prescription for pain medication, and discharged with instructions to follow up with her physician back home in California.

Four days after the fall, Goodman went to the emergency room at Century City Doctors Hospital in Los Angeles, complaining of severe neck pain. An x-ray taken while Goodman was in the emergency room showed no fracture, subluxation, or swelling to her cervical spine. She stayed in the hospital for six days until the pain subsided.

A couple months later, on July 26, 2007, Goodman returned to the doctor in Los Angeles who had performed her spinal fusion surgery. She told the doctor she had experienced severe neck pain since her fall at Staples. An MRI and CT scan were obtained, which revealed a fracture line adjacent to the fusion plate. Goodman was admitted to the hospital and underwent fusion revision surgery on July 31, 2007. The surgeon's operative report states that magnification during surgery confirmed the fracture.

Over the next few months, despite treatment by a pain management specialist, Goodman's neck pain persisted. She was re-admitted to the hospital on January 17, 2008, and underwent another fusion revision surgery on January 22.

On February 7, 2008, Goodman filed a complaint against Staples in Maricopa County Superior Court. Goodman alleged that Staples negligently allowed an unreasonably dangerous condition to exist in their store, resulting in her fall over the end cap. Staples removed the case to federal court based on complete diversity between the parties.

The district court issued a scheduling order that established deadlines for the exchanges of initial disclosures and expert disclosures and set a discovery cut-off date. On May 21, 2008, Goodman

provided Staples with her initial disclosures, identifying a number of her healthcare providers as potential witnesses. On November 7, 2008, the deadline for plaintiff expert disclosures, Goodman disclosed the identities and curricula vitae of two experts: Dr. Gary Bakken, a "human factors" expert, and Alex Balian, a store safety expert. She also provided a list of those of her healthcare providers whom she intended to call as expert witnesses. The list of providers included the name of the doctor or institution, the dates of service, and the bill amount. Goodman's disclosures did not include written reports by any experts.

A week later, after the deadline for her expert disclosures had already passed, Goodman disclosed two additional non-medical experts: Dr. Glenn Wilt, an economist, and Gretchen Bakkenson, a vocational consultant. This disclosure included the experts' contact information and one-paragraph summaries of the topics on which Goodman expected them to testify. The disclosures did not include the experts' written reports.

On February 13, 2009, the deadline for defense expert disclosures, Staples disclosed the identity and written reports of three experts: Dr. William Horsley, a radiologist; Dr. Zoran Maric, a spine surgeon; and Michael Kuzel, a human factors expert.

On March 30, 2009, the deadline for plaintiff rebuttal expert disclosures, Goodman disclosed written reports for previously identified non-medical experts Bakken, Balian, and Wilt. She also identified a number of rebuttal experts: Dr. Todd Lanman, Goodman's spinal surgeon; Dr. Mohammed Shamie, a psychiatrist; Dr. Natan Shaoulian, a neurologist; Dr. Daniel Wallace, Goodman's rheumatologist; and Dr. Behboush Zarrini, a pain management specialist.

Staples moved to preclude all of Goodman's experts as improperly disclosed. The district court granted Staples' motion in part, striking Bakken and Balian as witnesses and restricting Wilt's testimony to rebuttal. The court deferred ruling on the motion with respect to Goodman's medical experts.

Goodman subsequently filed a "Motion for Clarification of Prior Court Orders re Plaintiff's Witnesses." She asked the court to allow her healthcare providers, who she had disclosed as rebuttal experts, to testify in her case-in-chief and to allow Bakken and Balian to testify on rebuttal. After additional oral argument, the court clarified its earlier order, stating that Bakken, Balian, and Wilt were precluded from testifying in Goodman's case-in-chief but were *not* precluded from testifying on rebuttal. With respect to Goodman's healthcare providers, the court limited their case-in-chief testimony to opinions actually developed during the course of their treatment of Goodman, as evidenced by their office notes, hospital records, and consultation reports, giving the following rationale in its December 10, 2009 order:

[U]nder Federal Rules of Civil Procedure 26(a)(2)(B), the disclosure of an expert witness must be accompanied by a written report discussing the opinion of the expert, including the basis for the opinion.... In this case, Goodman failed to include any written reports of her retained experts in accordance with the deadlines imposed by this Court....

Rule 26(a)(2)(B) exempts from the requirement of a written report only those [experts] *not* "specifically retained to provide expert testimony in the case or one whose duties as the party's

employee regularly involve giving expert testimony." ... A treating physician is an expert and to the extent he or she treated the plaintiff, diagnosed the conditions and reached a prognosis, that testimony is not testimony for which the expert has been specially retained. But once the lawyer for the claimant undertakes to elicit an opinion whether a particular traumatic event caused the condition as opposed to another cause, the expert has been transformed into the same type of expert envisioned by the report requirement....

The court did not preclude or limit any testimony the doctors might be called upon to give in rebuttal.

After the district court clarified its order regarding the limits on Goodman's experts' testimony, Staples moved for summary judgment. On the same day that Staples moved for summary judgment, Goodman filed a number of motions in limine and moved for reconsideration of the court's order limiting her healthcare providers' case-in-chief testimony. In granting Staples' motion for summary judgment, the district court ruled that Goodman had not established a breach of duty by Staples, holding that the condition of the end cap was open and obvious as a matter of law. It also ruled that, even assuming a breach of duty, Goodman had not come forward with evidence proving that her injuries were caused by her fall because, as previously noted, her treating physicians had been precluded from opining on causation due to Goodman's failure to comply with disclosure requirements.

Goodman now appeals the district court's order.

## II. Discussion
## A. Standard of Review

We review the district court's grant of summary judgment de novo. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.1996). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether genuine issues of material fact exist and whether the district court correctly applied the relevant substantive law. *Id.* (citing *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995)).

We review the district court's rulings concerning discovery, including the imposition of discovery sanctions, for abuse of discretion. *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 379 (9th Cir.1988). But to the extent the imposition of sanctions turns on the resolution of an issue of law, review is de novo. See *Palmer v. Pioneer Inn Assocs., Ltd.*, 338 F.3d 981, 985 (9th Cir.2003).

## B. Grant of Summary Judgment in Favor of Staples

To establish a claim of negligence under Arizona law, a plaintiff must prove that (1) defendant owed plaintiff some duty, (2) defendant breached that duty, (3) defendant's breach caused plaintiff's injuries, and (4) plaintiff sustained actual damages. *Gipson v. Kasey*, 214 Ariz. 141, 150 P.3d 228, 230 (2007). The district court granted summary judgment for Staples on the grounds that Goodman failed to establish (1) that Staples breached its duty to Goodman and (2) that Goodman's injuries were caused by her fall, both essential elements of her claim. Because

we hold that Goodman raised triable issues of fact as to both of these elements, we reverse the district court's grant of summary judgment.

## 1. Breach of Duty

"Whether the defendant has met the standard of care—that is, whether there has been a breach of duty—is an issue of fact that turns on the specifics of the individual case." *Id.* A plaintiff can establish a breach of duty by a business owner by proving that the owner or his employees created a dangerous condition on the business premises. *Walker v. Montgomery Ward & Co.,* 20 Ariz.App. 255, 511 P.2d 699, 702 (1973). Generally, a business owner is not liable to an invitee for injuries from dangerous conditions that are open and obvious. *Tribe v. Shell Oil Co.,* 133 Ariz. 517, 652 P.2d 1040, 1042 (1982) (citing *Daugherty v. Montgomery Ward,* 102 Ariz. 267, 428 P.2d 419 (1967)). But a finding that a condition is open and obvious does not automatically preclude liability. "[I]f the proprietor should anticipate the harm from the condition despite its obviousness, he may be liable for physical injury caused by that condition." *Id.* If the business owner has reason to expect harm to the invitee because, for example, the invitee is likely to be distracted, then duty may require him to warn the invitee or take other steps to protect him. *Id.* (citing Restatement (Second) of Torts § 343A, comment f (1965)).

Here, the district court concluded that Goodman failed to establish the existence of a dangerous condition, and that she therefore could not prove any breach of duty by Staples. The court reviewed photos of the end cap and found that it was "of enough size and area to remain visible." The court also noted that the person walking immediately in front of Goodman—her business associate, Adams—successfully navigated the end cap. According to the district court, the end cap was not unreasonably dangerous as a matter of law because it was open and obvious.

Goodman argues that the district court erred in concluding that the end cap was not unreasonably dangerous as a matter of law. We agree. In Arizona, whether a hazard is open and obvious is almost always a jury question; breach of duty is a factual issue usually decided by the jury. *Gipson,* 150 P.3d at 230. A court may decide that the defendant did not breach his duty as a matter of law only when reasonable people could not conclude otherwise. *Flowers v. K–Mart Corp.,* 126 Ariz. 495, 616 P.2d 955, 957 (Ct.App.1980) (citing *Moore v. Maricopa Cnty.,* 11 Ariz.App. 505, 466 P.2d 56 (1970)).

We have reviewed the photos of the end cap on which the district court relied. It appears that the end cap was a few inches off the ground. At the time of Goodman's fall, there was no merchandise or shelving above the base deck. Although the end cap was bordered on two sides by contrasting dark-colored carpet, a third side was bordered by linoleum in a beige color similar to the base deck. Of course, when the end cap is depicted as the sole subject of a photograph, it appears obvious. But the picture does not necessarily rebut Goodman's testimony that the empty bottom shelf close to the floor, surrounded by other fully-stocked shelves higher up, created a sort of optical illusion. Nor was the photo taken from Goodman's vantage point as she encountered the end cap. This poses a quintessential jury question.

Moreover, even if the end cap were open and obvious, its open and obvious nature does not automatically preclude liability. *See Tribe,* 652 P.2d at 1042. In *Tribe,* the Arizona Supreme

Court reversed a grant of summary judgment in favor of the defendant in a negligence case involving a slip and fall at a gas station. The plaintiff and her daughter stepped up approximately six inches onto the sidewalk where the station's water fountain was located. *Id.* After getting a drink, while cautioning her daughter about passing traffic, the plaintiff stepped off a *sixteen* inch step in front of the sidewalk and fell, shattering her wrist. *Id.* Despite the fact that the higher step was painted a contrasting color, the court held that it was up to a *jury* to decide whether the step was open and obvious and whether the station owner should have anticipated that the step might cause injuries. *Id.* Writing for a unanimous Arizona Supreme Court, Justice Bales recently confirmed that foreseeability of harm may be a factor in determining whether a defendant breached his duty of care. *Gipson,* 150 P.3d at 231 (holding that foreseeability is a factor in determining the nature and extent of conduct necessary to fulfill the duty, and as such is a factual inquiry reserved for the jury).

Here, a jury could conclude that Staples knew or should have known that the empty end cap could cause harm. Stores encourage shoppers to look at merchandise, not at the floor. A Staples employee testified that his manager trained him not to leave end caps completely empty—no shelves or merchandise—because of safety concerns. Another employee testified that Staples trained him to make sure items in aisles were at least navel-high so they could be obviously seen. There is evidence from which a reasonable person could conclude that Staples should have anticipated that a customer might not notice the end cap under the circumstances and might fall and injure herself.

Genuine issues of material fact exist as to whether the end cap was an open and obvious condition and, even assuming obviousness, whether Staples should have anticipated the danger nevertheless. We hold that the district court erred in concluding as a matter of law that no unreasonably dangerous condition existed at the time of Goodman's fall.

## 2. Causation

Under Arizona law, causation is an essential element of a negligence claim. *Id.* It is not sufficient for a plaintiff to prove that her injuries *might* have been caused by the defendant's breach of duty; instead, the plaintiff must prove that the breach *probably* caused her injuries. *See Kreisman v. Thomas,* 12 Ariz.App. 215, 469 P.2d 107, 110 (1970) (affirming trial court's directed verdict for the defendant after close of plaintiff's case because plaintiff failed to establish breach of duty and causation). Causation is normally an issue for the jury. *Gipson,* 150 P.3d at 230.

Here, Goodman alleges that her fall at Staples resulted in a fracture to the fusion mass in her cervical spine, causing severe pain and necessitating fusion revision surgery. She also alleges that her injuries from the fall led to psychiatric problems, including depression, anxiety, and stress. To succeed in her negligence claim against Staples, she would have to prove that these injuries probably resulted from her fall. However, the district court prohibited her medical experts from testifying about causation in her case-in-chief due to her failure to comply with expert disclosure rules.

Rule 26 of the Federal Rules of Civil Procedure requires parties to disclose the identity of any expert witness. If the expert is "one retained or specially employed to provide expert testimony

in the case or whose duties as the party's employee regularly involve giving expert testimony," the disclosure must be accompanied by a written report containing (1) a complete statement of the expert's opinions and their bases, (2) the information relied upon by the expert in forming the opinions, (3) all exhibits to be used to summarize or support the opinions, (4) the expert's qualifications and list of publications, (5) a list of cases in which the expert testified, and (6) a statement of the expert's compensation. Fed.R.Civ.P. 26(a)(2)(B). Generally, a treating physician is not "retained or specially employed to provide expert testimony"—a treating physician is a percipient witness of the treatment he rendered—and therefore he is not subject to the written report requirement. Fed.R.Civ.P. 26(a)(2) advisory committee's note (1993).

The issue of when, if ever, a treating physician is transformed into an expert offering testimony on matters beyond the treatment rendered, for purposes of Rule 26 disclosures, is an issue of first impression for us. Goodman argues that Rule 26 does not require a written report before a treating physician testifies to virtually anything. In response, Staples acknowledges that written reports may not always be required of treating physicians, but argues that this exception to the written report requirement applies only when the treating physician formed his opinion *during the course of treatment.*

Goodman relies primarily on a decision from the Sixth Circuit in support of her argument that treating physicians do not need to provide written reports. In *Fielden v. CSX Transportation, Inc.,* 482 F.3d 866 (6th Cir.2007), the Sixth Circuit held that "a report is not required when a treating physician testifies within a permissive core on issues pertaining to treatment, based on what he or she learned through actual treatment and from the plaintiff's records up to and including that treatment." *Id.* at 871. Staples also relies on *Fielden,* but as supporting its argument that Rule 26 requires a treating physician to disclose a written report unless evidence shows that the physician formed his opinion during the course of treatment.

We agree with Staples that *Fielden* does not stand for the proposition that a treating physician *never* has to disclose an expert report. *Id.* at 870(noting the concern that permitting treating physicians to testify in all circumstances without providing expert reports would circumvent the policies underlying Rule 26(a)(2)(B)). Instead, the *Fielden* court concluded that evidence in the record showed that the physician in question had formed his opinion as to causation during the course of treatment. *Id.* at 871. Although the court did not elaborate on the type of evidence on which it relied in concluding that the physician formed his opinion during the course of treatment, it did distinguish *Fielden* from an unpublished Sixth Circuit case where there was "no evidence that the treating physician reached the same conclusions regarding causation at the time he treated the patient." *Id.* (citing *Mohney v. USA Hockey, Inc.,* 138 Fed.Appx. 804, 811 (6th Cir.2005)) (internal quotation marks and brackets omitted).

In addition to the Sixth Circuit, other courts hold that Rule 26 requires parties to disclose a treating physician's written report in the absence of some evidence that the physician formed his opinion during the course of treatment. The Seventh Circuit recently held that a treating physician who is offered to provide expert testimony as to the cause of the plaintiff's injury, but who did not make that determination in the course of providing treatment, is required to submit an expert report under Rule 26(a)(2). *Meyers v. Nat'l R.R. Passenger Corp.,* 619 F.3d 729, 734–35 (7th Cir.2010) (affirming grant of summary judgment where no evidence in the record

suggested that plaintiff's doctors considered or determined the cause of his injuries during the course of treatment). The Eighth Circuit goes further, requiring disclosure of a written report any time a party seeks to have a treating physician testify as to the *causation* of a medical condition, as opposed to merely the existence of the condition. *Brooks v. Union Pac. R.R. Co.,* 620 F.3d 896, 900 (8th Cir.2010) (affirming grant of summary judgment because, without expert testimony as to causation, plaintiff could not prove an essential element under the Federal Employers Liability Act). District courts within this circuit have limited treating physician testimony to opinions formed during the course of treatment when the party seeking admission of the testimony disclosed no expert report. *See, e.g., Durham v. Cnty. of Maui,* 729 F.Supp.2d 1188, 1195–96 (D.Haw.2010); *Armatis v. Owens–Brockway Glass Container, Inc.,* No. S–08–2538, 2010 WL 148692, at *1 (E.D.Cal. Jan. 14, 2010); *J.W. v. City of Oxnard,* No. CV 07–06191, 2008 WL 4810298, at *7 (C.D.Cal. Oct. 27, 2008); *Vines v. United States,* No. 2:05–cv–02370, 2008 WL 4470795, at *3 (E.D.Cal. Oct. 2, 2008); *Headley v. Ferro Corp.,* 630 F.Supp.2d 1261, 1266–67 (W.D.Wash.2008).

Today we join those circuits that have addressed the issue and hold that a treating physician is only exempt from Rule 26(a)(2)(B)'s written report requirement to the extent that his opinions were formed during the course of treatment. Goodman specifically retained a number of her treating physicians to render expert testimony beyond the scope of the treatment rendered; indeed, to form their opinions, these doctors reviewed information provided by Goodman's attorney that they hadn't reviewed during the course of treatment.2 For these reasons, we agree with the district court that those doctors fell outside the scope of the "treating physician" exception insofar as their additional opinions are concerned. Therefore, Rule 26(a)(2)(B) required disclosure of written reports. By failing to provide these reports until long after the deadline for plaintiff's expert disclosures had passed, Goodman failed to comply with Rule 26's disclosure requirements.

When a party fails to make the disclosures required by Rule 26(a), the party is not allowed to use the witness to supply evidence at trial unless it establishes that the failure was substantially justified or is harmless. Fed.R.Civ.P. 37(c)(1); *see also Torres v. City of L.A.,* 548 F.3d 1197, 1212–13 (9th Cir.2008) (citing *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir.2001)). Although we agree with the district court that Goodman failed to comply with Rule 26(a) when she did not timely disclose expert reports for her medical experts, we must also acknowledge that the law regarding the scope of the "treating physician" exception in the hybrid expert situation was unsettled in this circuit before today. While we do not fault the district court for its ruling limiting Goodman's physicians' testimony, we think that fairness counsels in favor of applying our newly-clarified rule regarding hybrid experts prospectively. Under the circumstances, it would be unjust to allow Goodman's mistake about a previously unsettled point of law to be the *coup de grâce* to her case.

Because we hold, as a matter of discretion, that Goodman should be allowed to rectify her error by disclosing reports for her treating physicians, we reverse the district court's summary judgment ruling on causation.

**C. Denial of Goodman's Motion for Reconsideration Regarding Testimony of Non–Medical Experts**

Goodman also appeals the district court's decision to preclude her non-medical experts from testifying in her case-in-chief. Goodman disclosed the identities of Dr. Gary Bakken, a "human factors" expert, and Alex Balian, a store safety expert, on November 7, 2008, the deadline for plaintiff's expert disclosures. A week later, Goodman disclosed the identities of two additional experts: Dr. Glenn Wilt, an economist, and Gretchen Bakkenson, a vocational consultant. But she failed to provide these experts' reports until four-and-a-half months after the deadline: on March 30, 2009, after Staples' deadline for disclosing defense experts had expired, and on the deadline for disclosure of plaintiff's rebuttal experts, Goodman finally produced reports for her non-medical experts. Staples filed a motion asking the court to preclude improperly disclosed experts under Rule 37, which the district court granted as to Goodman's non-medical experts, allowing them to testify only on rebuttal.

As discussed above, Rule 26 of the Federal Rules of Civil Procedure requires the parties to disclose the identities of each expert and, for retained experts, requires that the disclosure includes the experts' written reports. Fed.R.Civ.P. 26(a)(2). Parties must make these expert disclosures at the times and in the sequence that the court orders. *Id.* Rule 37 "gives teeth" to Rule 26's disclosure requirements by forbidding the use at trial of any information that is not properly disclosed. *Yeti by Molly Ltd.,* 259 F.3d at 1106 (citing Fed.R.Civ.P. 37(c)(1)). Rule 37(c)(1) is a "self-executing," "automatic" sanction designed to provide a strong inducement for disclosure. *Id.* (quoting Fed.R.Civ.P. 37 advisory committee's note (1993)). The only exceptions to Rule 37(c)(1)'s exclusion sanction apply if the failure to disclose is substantially justified or harmless. Fed.R.Civ.P. 37(c)(1).

The district court did not abuse its discretion in deciding that Goodman's failure to comply with Rule 26 with respect to her non-medical experts was neither substantially justified nor harmless. Goodman has never argued that the failure was substantially justified; indeed, in her opposition to Staples' motion to preclude improperly disclosed experts, her attorney admitted that he simply failed to read the court's scheduling order and didn't realize that Goodman needed to disclose expert reports. Goodman's failure to comply with Rule 26 with respect to her non-medical experts was not substantially justified.

Nor has Goodman shown that the delay was harmless. The burden to prove harmlessness is on the party seeking to avoid Rule 37's exclusionary sanction. *Yeti by Molly Ltd.,* 259 F.3d at 1107. Goodman disclosed her expert reports more than a month after Staples' expert disclosure deadline had already passed. Because Goodman had not yet disclosed any expert reports, Staples made its decisions regarding defense experts under the belief that Goodman's non-medical experts would not be testifying in her case-in-chief. Staples' experts developed their opinions and wrote their reports without knowing the scope of Goodman's experts' opinions. Staples did not disclose an economist at all, because it thought Goodman would not be presenting an economist in her case-in-chief. The district court found that this was "obvious prejudice," and we agree.

Because Goodman's failure to disclose her non-medical experts' reports in a timely manner was neither substantially justified nor harmless, the district court did not abuse its discretion in precluding those experts from testifying in Goodman's case-in-chief. We affirm the denial of Goodman's motion for reconsideration with respect to this issue.

**D. Motions In Limine**

Goodman appeals the district court's denial as moot of (1) her motion in limine to prohibit Staples from contesting the reasonableness and necessity of her medical bills and (2) Staples' motion in limine to exclude medical bills disclosed after the close of discovery. The district court denied these motions as moot after granting summary judgment for Staples. These motions were not passed upon below and we decline to address them. *See Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). Because we reverse the district court's grant of summary judgment, we remand for the district court to rule on these motions in the first instance.

**III. Conclusion**

Accordingly, we REVERSE the district court's order granting summary judgment in favor of Staples, AFFIRM the denial of Goodman's motion for reconsideration of the district court's order limiting the testimony of Goodman's non-medical experts, and REMAND for further proceedings consistent with this opinion. Each side shall bear its own costs.

**AFFIRMED in part; REVERSED in part and REMANDED.**

**TASHIMA, Circuit Judge, concurring:**

Although I concur in all of the majority opinion, I write separately to explain why I do not disagree with the majority's conclusion that "fairness counsels in favor of applying our newly-clarified rule regarding hybrid experts prospectively." Maj. Op. at 826. The question is whether this case presents the appropriate circumstances in which to exercise our discretion to allow "Goodman ... to rectify her error by disclosing reports for her treating physicians." *Id.* at 826.

The broader question is when an appellate court's ruling should be a "purely prospective" one that does not apply to the parties before it, contrary to the generally applicable rule. *See James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 536, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991). We are told that we should declare rulings to be purely prospective only "infrequently." *Id.* Courts consider three factors in determining whether a decision should be applied nonretroactively: (1) whether the decision "establish[es] a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed;" (2) whether applying the rule retroactively will further or retard its operation; and (3) whether retroactive application will create substantial inequitable results. *See Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) (internal citations omitted); *see also N. Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 87–88, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982); *Holt v. Shalala,* 35 F.3d 376, 380 (9th Cir.1994); *Usher v. City of L.A.,* 828 F.2d 556, 559–60 (9th Cir.1987).

These *Chevron Oil* factors are so open ended that they can be applied to justify prospective application in virtually any case where a "new" rule or interpretation of a rule is announced. In practice, it appears to be a matter wholly within the discretion of the panel to conclude that "[u]nder the circumstances, it would be unjust to allow Goodman's mistake about a previously unsettled point of law to be the *coup de grace* to her case." Maj. Op. at 826. Here, the *Chevron*

*Oil* factors can be applied either to support retroactive application or to justify purely prospective application. Despite my misgivings at so open ended a rule, however, I conclude that this is a matter within the panel's broad discretion and the panel's decision to so exercise its discretion is not inconsistent with applicable case law.

Therefore, although this does not appear to me to be the unusual case in which the prospective application rule should be "infrequently" applied, I reluctantly concur in the panel's prospective only adoption of the hybrid expert disclosure rule. I concur without reservation in the remainder of the majority opinion.

\* The Honorable Robert E. Cowen, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

1. An "end cap" is a merchandise display area located at the end of a row of merchandise display shelves, with a display area or shelves perpendicular to the shelves along the row.

2. Goodman's attorney wrote to a number of Goodman's physicians enclosing a "Subjective Summary of Pamela Goodman's Condition Regarding Injury of May 9, 2007," a large number of unidentified medical records, the reports of Staples' medical experts, MRI and CT scan images, and, "perhaps other materials." Goodman's attorney asked the physicians to opine on the injuries caused by Goodman's fall "NOT ONLY based on your own observations but also based upon your understanding of the *patient's medical records as well.*" The physicians' rebuttal expert reports—i.e. their letters to the attorney answering his questions—do not distinguish between opinions based on observations made during the course of treatment and those based on a review of the records sent by the attorney.

884 F.3d 1218

Marlyn SALI, on behalf of themselves, all others situated and the general public ; Deborah Spriggs, on behalf of themselves, all others situated and the general public ; Bisnar Chase, LLP, Plaintiffs-Appellants,

v. CORONA REGIONAL MEDICAL CENTER; UHS of Delaware Inc., Defendants-Appellees.

No. 15-56389

United States Court of Appeals, Ninth Circuit.

Argued and Submitted February 6, 2017 Pasadena, California

Filed March 19, 2018

Jerusalem F. Beligan (argued) and Brian D. Chase, Bisnar Chase LLP Newport Beach, California, for Plaintiffs-Appellants.

Christina H. Hayes (argued), Khatereh Sage Fahimi, and Stacey E. James, Littler Mendelson P.C., San Diego, California, for Defendants-Appellees.

Before: Andrew J. Kleinfeld, Sandra S. Ikuta, and Jacqueline H. Nguyen, Circuit Judges.

NGUYEN, Circuit Judge:

The discovery process in theory should be cooperative and largely unsupervised by the district court. But when required disclosures aren't made or cooperation breaks down, Federal Rule of Civil Procedure 37 allows a party to move for an order compelling disclosures or discovery.

If the order is disobeyed, the court can impose contempt and other sanctions. Federal Rule of Civil Procedure 45, which governs the issuance of subpoenas, also provides for contempt sanctions when a subpoena is disobeyed.

The question here is whether Rule 45 is the exclusive mechanism for compelling a nonparty to appear at a deposition and obtaining sanctions for noncompliance. We hold that under Rule 37's general discovery enforcement provisions, a court can order a party to produce its nonparty expert witness at a deposition and, if the party makes no effort to ensure that its witness attends the deposition, sanction the party's counsel when the witness fails to appear unless the failure to produce the expert "was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). Because the Rule 37 sanctions were reasonable in this case, we affirm the district court's judgment.

I.

Marlyn Sali and Deborah Spriggs are registered nurses who instituted a class action against their former employer, Corona Regional Medical Center, and its corporate parent, UHS of Delaware Inc., for alleged violations of wage and hour laws. Plaintiffs moved for class certification with supporting declarations from their expert economist, Mark Falkenhagen, and expert statistician, Dr. Richard Drogin. As defendants were preparing their opposition, the parties became embroiled in a discovery dispute.

Defendants sought to depose Falkenhagen and Drogin in advance of the April 16, 2015 deadline for filing the opposition to class certification. After an unproductive email exchange, in which the parties' counsel dickered over fees, defendants subpoenaed Falkenhagen to be deposed on March 30, 2015. Plaintiffs interposed various objections, which defendants dismissed as "insufficient to prevent a *subpoenaed* deposition from moving forward." On the scheduled day of the deposition, neither Falkenhagen nor plaintiffs' counsel showed up.

The next day, on April 1, defendants informed plaintiffs that they would be applying ex parte for sanctions and to compel Falkenhagen's deposition. Counsel then met and conferred regarding the expert depositions as required under the local rules. *See* C.D. Cal. L.R. 37-1. Defendants agreed to pay Falkenhagen's fee prior to his deposition. They sought to depose him on April 9, but plaintiffs' counsel was taking a vacation that week and told defendants' counsel that Falkenhagen would be unavailable then. Plaintiffs offered to produce Falkenhagen for deposition on April 13,[1] but defendants didn't accept because they felt "it was imperative the depositions occur prior to April 10."

Defendants then applied ex parte to compel Falkenhagen's and Drogin's depositions on April 9 and 10, respectively. In an order dated April 7, 2015, the magistrate judge denied the request, finding that defendants were "not without fault in creating the circumstances" because they inexcusably waited to arrange the depositions. The magistrate judge acknowledged that plaintiffs' counsel "exacerbated this situation by apparently failing to respond to inquiries from Defendants, having extremely limited availability, and failing to seek a protective order concerning the noticed depositions." However, given plaintiffs' offer to make Falkenhagen available for deposition immediately after their attorney's vacation, the magistrate judge found that defendants would have sufficient time to incorporate his testimony into their opposition to class certification. The order concluded: "Plaintiffs are, however, instructed to produce Falkenhagen for deposition on April 13." Defendants subpoenaed him for that date.

Once again, Falkenhagen and plaintiffs' counsel failed to appear at the deposition.[2] Defendants moved for sanctions under Rule 37. The magistrate judge found that plaintiffs weren't substantially justified in disobeying the order to produce Falkenhagen for deposition and sanctioned counsel $15,112 for defendants' costs associated with the deposition and motion for sanctions. When counsel didn't pay, the district court entered a contempt judgment, from which plaintiffs and their counsel appeal.[3]

## II.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo whether the magistrate judge had the power under Rule 37 to order the plaintiffs' counsel to produce their expert at a

deposition and sanction them for noncompliance. *See Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp. , 982 F.2d 363, 367 (9th Cir. 1992) (per curiam)* (citing *Halaco Eng'g Co. v. Costle , 843 F.2d 376, 379 (9th Cir. 1988)* ). The sanctions order is reviewed for abuse of discretion, and the underlying factual findings for clear error. *Valley Eng'rs Inc. v. Elec. Eng'g Co. , 158 F.3d 1051, 1052 (9th Cir. 1998)* (citing *Anheuser-Busch, Inc. v. Nat. Beverage Distribs. , 69 F.3d 337, 348 (9th Cir. 1995)* ).

**III.**

Plaintiffs and their counsel contend that the district court lacked authority to compel Falkenhagen's deposition under Rule 37(a) and impose sanctions under Rule 37(b). They also contend that their actions were substantially justified and the sanctions unjust.

**A.**

When interpreting the scope of a Federal Rule of Civil Procedure, we begin with the text. *See Krupski v. Costa Crociere S. p. A. , 560 U.S. 538, 547, 130 S.Ct. 2485, 177 L.Ed.2d 48 (2010).* Rule 30 authorizes a party to take the deposition of "any person," generally without the court's permission. Fed. R. Civ. P. 30(a)(1). "The deponent's attendance may be compelled by subpoena under Rule 45." *Id.* If the deponent disobeys the subpoena, the district court can hold the deponent in contempt. Fed. R. Civ. P. 45(g). While a subpoena's judicial imprimatur and the threat of sanctions for noncompliance is one way to ensure that a deponent shows up for a deposition, it isn't the only way.

The magistrate judge issued sanctions under Rule 37(b), which empowers the court to take remedial action if a party "fails to obey an order to provide or permit discovery, including an order under Rule ... 37(a)." Fed. R. Civ. P. 37(b)(2)(A). Rule 37(a) provides generally that "a party may move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1). In particular, Rule 37(a) permits a party to seek to compel "an answer, designation, production, or inspection" under certain circumstances, Fed. R. Civ. P. 37(a)(3)(B), including when "a deponent fails to answer a question asked under Rule 30 or 31," Fed. R. Civ. P. 37(a)(3)(B)(i). Plaintiffs were ordered to produce their expert, Falkenhagen, for deposition, where he would be required to respond to questions and disclose his expert views, *see* Fed. R. Civ. P. 30. As we have recognized, Rule 37(a) encompasses an order to attend a deposition. *See SEC v. Seaboard Corp. , 666 F.2d 414, 416 (9th Cir. 1982)* ("Since the [ Rule 37(a) ] order required [the cross-defendant] not only to pay money, but also to give his deposition, it was clearly also 'an order to provide or permit discovery.' " (quoting Fed. R. Civ. P. 37(b)(2) ) ).

In the context of Rule 37(b) sanctions, we "read broadly" the term "order" under Rule 37(a). *Unigard , 982 F.2d at 368* (citing *Henry v. Sneiders , 490 F.2d 315, 318 (9th Cir. 1974)* ). Both the advisory committee notes and case law suggest that Rule 37's "requirement for an 'order' should ... include any order relating to discovery." *Halaco Eng'g , 843 F.2d at 379* ; *see* Fed. R. Civ. P. 37(b) advisory committee's note to 1970 amendment ("The scope of Rule 37(b)(2) is broadened by extending it to include any order 'to provide or permit discovery'.... Various rules authorize orders for discovery.... Rule 37(b)(2) should provide comprehensively for enforcement of all these orders.").

Rule 37 explicitly authorizes the court to sanction parties for failing to attend their own depositions. *See* Fed. R. Civ. P. 37(d)(1)(A)(i). No subpoena is needed. The only requirement is that the party be "served with proper notice" of the deposition beforehand. *Id.* ; *see* 7 James Wm. Moore et al., *Moore's Federal Practice* § 30.21 (3d ed. 2017); *see also Jules Jordan Video, Inc. v. 144942 Can. Inc. , 617 F.3d 1146, 1158 (9th Cir. 2010)* (observing that "a simple notice of deposition is sufficient to compel [a party's] attendance").

Although a nonparty's attendance generally can be compelled only by subpoena,4 *Jules Jordan Video , 617 F.3d at 1158*, here the court's discovery order and sanctions were directed not at the retained expert but rather at the parties themselves and their counsel. Rule 37 is largely silent as to whether the court can compel a party to produce its general employees or persons over whom the party might reasonably be expected to exert influence or control. However, the rule isn't entirely silent. Rule 37(b)(2)(B) provides for sanctions "[i]f a party fails to comply with an order under Rule 35(a) requiring it to produce another person for [physical or mental] examination." Rule 35(a), in turn, authorizes the court "to order a party to produce for examination a person who is in its custody or under its legal control." Fed. R. Civ. P. 35(a)(1). This means, for example, that "that a parent or guardian suing to recover for injuries to a minor may be ordered to produce the minor for examination." *Id.* advisory committee's note to 1970 amendment.

As to whether courts can order parties to produce nonparties generally, our interpretation of Rule 37(a)(5) is relevant. Rule 37(a)(5) requires, upon a party's successful motion to compel discovery, that the court order "the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." "It applies," we have explained, "to ... motions to compel nonparties to attend depositions." *Pennwalt Corp. v. Durand-Wayland, Inc. , 708 F.2d 492, 494 n.4 (9th Cir. 1983)*.5

Thus, *Pennwalt* strongly suggests that the district court's discovery order and sanctioning of plaintiffs for disobeying that order was within the scope of its Rule 37 powers. Other circuits have approved of similar orders and sanctions. *See Barrett v. Atl. Richfield Co. , 95 F.3d 375, 380 (5th Cir. 1996)* (concluding district court properly sanctioned plaintiffs for violating discovery-related scheduling order in part "by failing to produce their experts for scheduled depositions"); *Taylor v. Medtronics, Inc. , 861 F.2d 980, 986 (6th Cir. 1988)* (affirming sanction for discovery abuses under Rule 37(b)(2) where plaintiffs repeatedly failed to make their expert available for deposition); *Nat'l Life Ins. v. Hartford Accident & Indem. Co. , 615 F.2d 595, 600 (3d Cir. 1980)* (concluding district court should have granted Rule 37 motion to compel accountant to appear for deposition without asserting privilege indiscriminately). We see no reason why Rule 37, which broadly empowers the district court to issue orders enforcing a party's discovery obligations, wouldn't allow the court to compel a party to produce its expert for deposition.

Citing *Pennwalt* , plaintiffs concede that " Rule 37 used to authorize courts to compel nonparties to attend depositions," but claim without explanation that "that authority has since been eliminated." The rule's language, however, is the same as it was when *Pennwalt* was decided. We therefore disagree with plaintiffs that its meaning has changed.

Plaintiffs argue that the order compelling them to produce Falkenhagen "defies common sense" because their counsel doesn't represent him and they have no legal relationship with him that would enable them to compel him to attend a deposition against his will. It's true that without a subpoena neither plaintiffs nor the court could have compelled Falkenhagen to appear at the deposition. *See Jules Jordan Video* , 617 F.3d at 1158. But plaintiffs misunderstand the nature of the order.

While an order to produce a deponent under Rule 37 and a subpoena under Rule 45 are intended to bring about the same outcome, the order's focus and the consequences of noncompliance are different. A Rule 37 order is directed at the party. It compels the party to use its best efforts to secure the nonparty's attendance at the deposition. But it doesn't demand the impossible. The party can avoid sanctions by showing that it attempted in good faith to comply with the order but was unable to produce the nonparty—regardless of whether the nonparty's absence was justified. *See Falstaff Brewing Corp. v. Miller Brewing Co.* , 702 F.2d 770, 784 n.8 (9th Cir. 1983) ("[T]he use of Rule 37 sanctions must be tempered by due process.... [I]t is improper to dismiss a claim or to exclude evidence if the failure to comply with a discovery order is due to circumstances beyond the disobedient party's control."); *see also Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers* , 357 U.S. 197, 212, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958) (" Rule 37 should not be construed to authorize dismissal of this complaint because of petitioner's noncompliance with a pretrial production order when it has been established that failure to comply has been due to inability, and not to willfulness, bad faith, or any fault of petitioner.").

Thus, a party won't incur Rule 37 sanctions if, despite its efforts, a recalcitrant nonparty witness refuses to attend an ordered deposition. Even if the party could have produced the nonparty but fails to do so, the party can still avoid incurring "reasonable expenses ... caused by the failure" if it "was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

A subpoena under Rule 45, in contrast, is directed at the nonparty. It obligates the nonparty to appear at the scheduled deposition at pain of being held in contempt. None of the other sanctions available under Rule 37 are available against the nonparty.[6] And the standard for a contempt finding differs from a Rule 37 sanction. The court "may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it." Fed. R. Civ. P. 45(g). Although "[i]nability to comply with an order is ordinarily a complete defense to a charge of contempt," *United States v. Asay* , 614 F.2d 655, 660 (9th Cir. 1980), as it is with a motion for Rule 37 sanctions, the focus is on the deponent's rather than the party's ability to comply.

As a practical matter, a party seeking to compel a nonparty's deposition would be wise to use the subpoena process. Still, there may be good reason to seek an order compelling the opposing party to produce its witness. For example, if the party seeking the deposition suspects that the opposing party is the bottleneck—either directing or encouraging its witness not to appear—an order directed at the opposing party may be fruitful. Or the opposing party "may have ... practical reasons for not wanting its own witness to be served with a subpoena," and "service of an unnecessary subpoena ... against the wishes of [the opposing party's] counsel would [be]

unseemly and inordinately bellicose." *In re Keystone Foods, Inc.*, 134 B.R. 828, 830 (Bankr. W.D. Pa. 1991).

**B.**

The magistrate judge ordered Sali "to produce Falkenhagen for deposition on April 13, 2015," an order under Rule 37(a) to cooperate in discovery. There's no evidence that plaintiffs made any effort to secure Falkenhagen's attendance at the deposition, after counsel affirmatively represented to the court and opposing counsel that Falkenhagen would be available for deposition on April 13. To the contrary, plaintiffs' counsel went on vacation for a week knowing there was a pending ex parte application to compel the deposition but making no provision for responding to the court's ruling. Counsel didn't even read the order until after the time for the deposition had passed.

There was no justification for plaintiffs' failure to attempt to comply with the court's order. Accordingly, the court had authority under Rule 37(b)(2)(A) to "issue further just orders" in the nature of sanctions, including ordering the payment of expenses "unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). Here, the award of defendants' deposition-related costs wasn't unjust. Rather, it was the mildest of the possible Rule 37 sanctions.

\* \* \*

For the foregoing reasons, the district court's contempt judgment is **AFFIRMED.**

889 F.3d 623

**Marlyn SALI and Deborah Spriggs, on behalf of themselves, all others similarly situated and the general public, Plaintiffs-Appellants,**

**v.CORONA REGIONAL MEDICAL CENTER; Uhs of Delaware Inc., Defendants-Appellees.**

No. 15-56460

United States Court of Appeals, Ninth Circuit.

Argued and Submitted February 16, 2018—Pasadena, California

Filed May 3, 2018

Jerusalem F. Beligan (argued) and Brian D. Chase, Bisnar Chase LLP, Newport Beach, California, for Plaintiffs-Appellants.

Christina H. Hayes (argued), Khatereh Sage Fahimi, and Stacey E. James, Littler Mendelson P.C., San Diego, California, for Defendants-Appellees.

Before: M. Margaret McKeown and Kim McLane Wardlaw, Circuit Judges, and Salvador Mendoza, Jr.,* District Judge.

# OPINION

MENDOZA, District Judge

Marlyn Sali and Deborah Spriggs ("Sali and Spriggs") appeal the district court's denial of class certification in this putative class action alleging employment claims against Corona Regional Medical Center and UHS of Delaware, Inc. (collectively "Corona").1 Sali and Spriggs moved for certification of seven classes of Registered Nurses ("RNs") they allege were underpaid by Corona as a result of certain employment policies and practices. The district court denied certification on the basis that (1) Federal Rule of Civil Procedure 23(a)'s typicality requirement is not satisfied for any of the proposed classes because Sali and Spriggs failed to submit admissible evidence of their injuries; (2) Plaintiff Spriggs and proposed class counsel have not demonstrated they will adequately represent the proposed classes; and (3) several proposed classes fail to satisfy Rule 23(b)(3)'s predominance requirement. Because the district court abused its discretion by relying on each of these reasons to deny class certification, we reverse.

## BACKGROUND

Corona operates a hospital in Southern California that employs hourly-wage RNs. Sali and Spriggs are RNs formerly employed by Corona. They assert that a number of Corona's employment policies and practices with respect to RNs violate California law and have resulted

in underpayment of wages. They filed this putative class action in California State Court on behalf of "all RNs employed by Defendants in California at any time during the Proposed Class Period who (a) were not paid all wages at their regular rate of pay; (b) not paid time and a-half and/or double time for all overtime hours worked; and (c) denied uninterrupted, 'off-duty' meal-and-rest periods." They allege Corona violated California law by (1) failing to pay all regular hourly wages; (2) failing to pay time-and-a-half for all overtime; (3) failing to pay double time for all hours worked in excess of twelve hours in a day; (4) not providing compliant meal and rest breaks; (5) failing to timely pay all wages due to separated former employees within seventy-two hours of separation; and (6) failing to provide accurate itemized wage statements. Corona removed the case to the United States District Court for the Central District of California.

Sali and Spriggs moved for certification of the following seven classes:

1. Rounding Time Class:
All current and former nurses who work or worked for Defendants during the Proposed Class Period who were not paid all wages due them, including straight time, overtime, double time, meal premiums, and rest premiums due to Defendants' rounding time policy.
2. Short Shift Class:
All current and former nurses of Defendants who work or worked pursuant to an Alternative Workweek Schedule ("AWS") during the Proposed Class Period who were "flexed" between the 8th and 12th hour of work due to low patient census and not paid daily overtime.
3. Meal Period Class:
All current and former nurses of Defendants who work or worked pursuant to an AWS during the Proposed Class Period who signed an invalid meal period waiver, and (1) not provided a second meal break after 10 hours of work; (2) not provided meal periods before 5 and 10 hours of work; and/or, (3) not provided a second meal period after 12 hours of work.
4. Rest Break Class:
All current and former nurses who work or worked for Defendants during the Proposed Class Period who were not relieved of all duty and therefore not authorized and permitted to take 10-minute, uninterrupted rest breaks for every four hours worked.
5. Regular Rate Class:
All current and former nurses who work or worked for Defendants during the Proposed Class Period who were not paid at the correct regular rate for overtime, double time, meal premiums, and rest premiums.
6. Wage Statement Class:
All current and former nurses who work or worked for Defendants during the Proposed Class Period who were not provided pay stubs that complied with Labor Code § 226.
7. Waiting Time Class:
All former nurses who worked for Defendants from August 23, 2010 who were not paid all wages due at the time of separation from their employment with Defendants.

The district court denied certification of each of the proposed classes on multiple grounds. First, the district court concluded that Sali and Spriggs's proposed rounding-time, short-shift, rest-break, and wage-statement classes failed to satisfy Rule 23(b)(3)'s predominance requirement. Second, the district court held that Rule 23(a)'s typicality requirement was not satisfied for any of the proposed classes because Sali and Spriggs failed to submit admissible evidence of their

injuries. Third, the district court concluded that Spriggs was not an adequate class representative because she is not a member of the proposed class she is attempting to represent. Finally, the district court held the attorneys from the law firm Bisnar Chase had not demonstrated they will adequately serve as class counsel.

Sali and Spriggs appealed the district court's denial of class certification. Upon Sali and Spriggs's motion, we stayed proceedings in this appeal pending resolution in the California State Courts of *Gerard v. Orange Coast Memorial Medical Center* , a case involving issues related to certain of the proposed classes. *See* 208 Cal.Rptr.3d 271, 381 P.3d 219 (2016) ; 9 Cal.App.5th 1204, 215 Cal.Rptr.3d 778 (2017). In light of the *Gerard* decision, Sali and Spriggs chose to appeal only the district court's denial of class certification with respect to the proposed rounding-time, regular-rate, wage-statement, and waiting-time classes.

## STANDARD OF REVIEW

We review a district court's class certification decision for abuse of discretion. *Parra v. Bashas', Inc.* , 536 F.3d 975, 977 (9th Cir. 2008). "[A]n error of law is a per se abuse of discretion." *Abdullah v. U.S. Sec. Assocs., Inc.* , 731 F.3d 952, 956 (9th Cir. 2013) (citing *Yokoyama v. Midland Nat. Life Ins. Co.* , 594 F.3d 1087, 1091 (9th Cir. 2010) ). Accordingly, we first review a class certification determination for legal error under a de novo standard, and "if no legal error occurred, we will proceed to review the ... decision for abuse of discretion." *Yokoyama* , 594 F.3d at 1091. A district court applying the correct legal standard abuses its discretion only if "it (1) relies on an improper factor, (2) omits a substantial factor, or (3) commits a clear error of judgment in weighing the correct mix of factors." *Abdullah* , 731 F.3d at 956. Additionally, "we review the district court's findings of fact under the clearly erroneous standard, meaning we will reverse them only if they are (1) illogical, (2) implausible, or (3) without 'support in inferences that may be drawn from the record.' " *Id.* (quoting *United States v. Hinkson* , 585 F.3d 1247, 1262 (9th Cir. 2009) ).

## DISCUSSION

A representative plaintiff may sue on behalf of a class when the plaintiff affirmatively demonstrates the proposed class meets the four threshold requirements of Federal Rule of Civil Procedure 23(a) : numerosity, commonality, typicality, and adequacy of representation. *In re Hyundai and Kia Fuel Econ. Litig.* , 881 F.3d 679, 690 (9th Cir. 2018) (citing *Comcast Corp. v. Behrend* , 569 U.S. 27, 33, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013) ); *Leyva v. Medline Indus. Inc.* , 716 F.3d 510, 512 (9th Cir. 2016). Additionally, a plaintiff seeking certification under Rule 23(b)(3) must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *In re Hyundai* , 881 F.3d at 690–91 (quoting Fed. R. Civ. P. 23(b)(3) ).

The issues on appeal here concern only Rule 23's typicality, adequacy, and predominance requirements: Sali and Spriggs appeal the district court's determinations that (1) Sali and Spriggs failed to demonstrate their injuries were typical of the proposed classes; (2) plaintiff Spriggs is not an adequate class representative; (3) attorneys from the firm Bisnar Chase have not

demonstrated they will adequately serve as class counsel; and (4) the proposed rounding-time, wage-statement, and waiting-time classes fail Rule 23(b)(3)'s predominance requirement. We conclude that the district court abused its discretion in each of these determinations, excluding its finding that Spriggs was not an adequate class representative. And because plaintiff Sali remains as a representative plaintiff, Spriggs's inadequacy alone is not a basis to deny class certification. Accordingly, the district court abused its discretion by denying certification of the proposed rounding-time, regular-rate, waiting-time, and wage-statement classes.

## A. The district court's typicality determination was premised on an error of law.

The district court concluded that Sali and Spriggs "have not carried their burden of demonstrating that the injuries allegedly inflicted by Defendants on Plaintiffs are similar to the injuries of the putative class members because [they] do not offer any admissible evidence of [their] injuries in their motion for class certification." The district court further noted that the "motion does not contain sworn testimony from either of the named Plaintiffs." The district court reached this decision after striking the declaration of Javier Ruiz—upon which Sali and Spriggs relied to demonstrate their individual injuries—on the basis that the declaration contained inadmissible evidence. This was error. At this preliminary stage, a district court may not decline to consider evidence solely on the basis that the evidence is inadmissible at trial.

## 1. The district court's decision to strike the Ruiz declaration

In support of their motion for class certification, Sali and Spriggs submitted a declaration by Javier Ruiz to demonstrate their injuries. Ruiz, a paralegal at Bisnar Chase, reviewed time and payroll records for the named plaintiffs to determine whether they were fully compensated under Corona's rounding-time pay practice, as well as to address several other questions that are no longer at issue on this appeal. The rounding-time practice itself is not disputed. Corona paid RNs an hourly wage based on the time they punched in and out, rounded to the nearest quarter hour. For example, if an RN clocked in at 6:53 a.m. or at 7:07 a.m., his or her time was rounded to 7:00 a.m. Sali and Spriggs allege that this policy, over time, resulted in failure to pay RNs for all of their time worked. To determine the policy's effect on Sali and Spriggs individually, Ruiz used Excel spreadsheets to compare Sali and Spriggs's rounded times with their actual clock-in and clock-out times using a random sampling of timesheets. Ruiz's analysis demonstrated that on average over hundreds of shifts, Corona's rounded time policy undercounted Sali's clock-in and clock-out times by eight minutes per shift and Spriggs's times by six minutes per shift.

Corona objected to the Ruiz declaration, arguing that (1) the declaration constituted improper lay opinion testimony and must be excluded under Federal Rules of Evidence 701 and 702 ; (2) Ruiz's opinions were unreliable; (3) the declaration lacked foundation and Ruiz lacked personal knowledge of the information analyzed; and (4) the data underlying Ruiz's analysis was unauthenticated hearsay. In reply, Sali and Spriggs submitted declarations attesting to the authenticity and accuracy of the data and conclusions contained in Ruiz's declaration and the attached exhibits.

The district court agreed with Corona's arguments that the Ruiz declaration was inadmissible and struck the declaration on that basis. First, the district court concluded that "Ruiz cannot

authenticate the manipulated Excel Spreadsheets and other data that he relied upon to conduct his analysis because he does not have personal knowledge to attest to the fact that the data accurately represents Plaintiffs' employment records." Second, the district court concluded that Ruiz's declaration offered improper opinion testimony. Third, the district court found that Ruiz's "manipulation and analysis of raw data to reach cumulative conclusions is the technical or specialized work of an expert witness," and that Ruiz lacked the qualifications to conduct this analysis. The district court further concluded that the declarations submitted by Sali and Spriggs were new evidence improperly submitted in reply, and the court declined to consider the declarations.

**2. The district court erred by striking the Ruiz declaration on the basis of inadmissibility.**

A plaintiff seeking class certification bears the burden of affirmatively demonstrating "through evidentiary proof that the class meets the prerequisites of Rule 23(a)." *In re Hyundai* , 881 F.3d at 690 (citing *Comcast Corp.* , 569 U.S. at 33, 133 S.Ct. 1426 ). In other words, the plaintiff "must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes* , 564 U.S. 338, 350, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). Accordingly, "[b]efore certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *In re Hyundai* , 881 F.3d at 690 (quoting *Zinser v. Accufix Research Inst., Inc.* , 253 F.3d 1180, 1186 (9th Cir. 2001) ).

For practical reasons, we have never equated a district court's "rigorous analysis" at the class certification stage with conducting a mini-trial. District courts "must determine by order whether to certify the action as a class action" at "an early practicable time after a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c)(1)(A). The district court's class certification order, while important, is also preliminary: "An order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C) ; *see also Coopers & Lybrand v. Livesay* , 437 U.S. 463, 469 n.11, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) ("[A] district court's order denying or granting class status is inherently tentative."); *In re Zurn Pex Plumbing Prod. Liab. Litig.* , 644 F.3d 604, 613 (8th Cir. 2011) ("[A ] court's inquiry on a motion for class certification is 'tentative,' 'preliminary,' and 'limited.' " (quoting *Coopers & Lybrand* , 437 U.S. at 469 n.11, 98 S.Ct. 2454 ) ).

Applying the formal strictures of trial to such an early stage of litigation makes little common sense. Because a class certification decision "is far from a conclusive judgment on the merits of the case, it is 'of necessity ... not accompanied by the traditional rules and procedure applicable to civil trials.' " *Zurn Pex* , 644 F.3d at 613 (quoting *Eisen v. Carlisle & Jacquelin* , 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ). Notably, the evidence needed to prove a class's case often lies in a defendant's possession and may be obtained only through discovery. Limiting class-certification-stage proof to admissible evidence risks terminating actions before a putative class may gather crucial admissible evidence. And transforming a preliminary stage into an evidentiary shooting match inhibits an early determination of the best manner to conduct the action.

It follows that we have found an abuse of discretion where a "district court limited its analysis of whether" class plaintiffs satisfied a Rule 23 requirement "to a determination of whether Plaintiffs' evidence on that point was admissible."

*Ellis v. Costco Wholesale Corp.* , 657 F.3d 970, 982 (9th Cir. 2011). Although we have not squarely addressed the nature of the "evidentiary proof" a plaintiff must submit in support of class certification, we now hold that such proof need not be admissible evidence.

Inadmissibility alone is not a proper basis to reject evidence submitted in support of class certification.2 "Neither the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies" Rule 23. *Blackie v. Barrack* , 524 F.2d 891, 901 (9th Cir. 1975). Therefore, in evaluating a motion for class certification, a district court need only consider "material sufficient to form a reasonable judgment on each [ Rule 23(a) ] requirement." *Id.* The court's consideration should not be limited to only admissible evidence.

Other circuits have reached varying conclusions on the extent to which admissible evidence is required at the class certification stage. Only the Fifth Circuit has directly held that admissible evidence is required to support class certification. *See Unger v. Amedisys Inc.* , 401 F.3d 316, 319 (5th Cir. 2005) (holding that the court's "findings must be made based on adequate admissible evidence to justify class certification").

The Seventh Circuit, in holding that a district court erred by giving an expert report "the weight ... it is due" rather than ruling on the report's admissibility under *Daubert v. Merrell Dow Pharms., Inc.* , 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), has suggested that expert evidence submitted in support of class certification must be admissible. *Messner v. Northshore Univ. Health Sys.* , 669 F.3d 802, 812 (7th Cir. 2012) (quoting *In re Evanston Nw. Healthcare Corp. Antitrust Litig.* , 268 F.R.D. 56, 57 (N.D. Ill. 2010) ). The Third Circuit has similarly held that a plaintiff may rely on challenged expert testimony to satisfy the requirements of Rule 23 only if that expert testimony satisfies the evidentiary standard set out in *Daubert* . *In re Blood Reagents Antitrust Litig.* , 783 F.3d 183, 187 (3d Cir. 2015).

We agree with the Eighth Circuit, however, which has held that a district court is not limited to considering only admissible evidence in evaluating whether Rule 23's requirements are met. *Zurn Pex* , 644 F.3d at 612–13. Contrary to other courts' conclusory presumptions that Rule 23 proof must be admissible, the Eighth Circuit probed the differences between Rule 23, summary judgment and trial that warrant greater evidentiary freedom at the class certification stage:

Because summary judgment ends litigation without a trial, the court must review the evidence in light of what would be admissible before either the court or jury.
In contrast, a court's inquiry on a motion for class certification is "tentative," "preliminary," and "limited." The court must determine only if questions of law or fact common to class members predominate over any questions affecting only individual members [and if ] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. As class certification decisions are generally made before the close of merits discovery, the court's

analysis is necessarily prospective and subject to change, and there is bound to be some evidentiary uncertainty.

*Id.* at 613 (internal citations and quotation marks omitted). We find the Eighth Circuit's analysis persuasive.

The Supreme Court's guidance in the analogous field of standing is also instructive. Like standing, Rule 23 presents more than a "mere pleading standard." *Wal-Mart*, 564 U.S. at 350, 131 S.Ct. 2541. Because the elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required *at the successive stages of the litigation*." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (emphasis added). Hence, the proof required to establish standing varies at the complaint, summary judgment and trial phases. *Id.* Similarly, the "manner and degree of evidence required" at the preliminary class certification stage is not the same as "at the successive stages of the litigation"—*i.e.*, at trial.

The present case aptly illustrates why we license greater evidentiary freedom at the class certification stage: By relying on formalistic evidentiary objections, the district court unnecessarily excluded proof that tended to support class certification. Corona did not dispute the authenticity of the payroll data underlying Ruiz's analysis, nor did it directly dispute the accuracy of his calculations. Instead, Corona argued that Ruiz's declaration and spreadsheet were inadmissible because Ruiz extracted data without explaining his methods, and the district court agreed. But by relying on admissibility alone as a basis to strike the Ruiz declaration, the district court rejected evidence that likely could have been presented in an admissible form at trial. In fact, when Sali and Spriggs submitted their own sworn declarations to authenticate the payroll data and vouch for its accuracy, the district court again leaned on evidentiary formalism in striking those declarations as "new evidence" submitted in reply. That narrow approach tells us nothing about the satisfaction of the typicality requirement—"whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). The district court should have considered the declarations of Ruiz, Sali, and Spriggs in determining whether the typicality prerequisite was satisfied.

When conducting its "rigorous analysis" into whether the Rule 23(a) requirements are met, the district court need not dispense with the standards of admissibility entirely. The court may consider whether the plaintiff's proof is, or will likely lead to, admissible evidence. Indeed, in evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*. *Ellis*, 657 F.3d at 982. But admissibility must not be dispositive. Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage. This approach accords with our prior guidance that a district court should analyze the "persuasiveness of the evidence presented" at the Rule 23 stage. *Id*. The district court abused its discretion here by declining to consider the Ruiz declaration solely on the basis of inadmissibility. Because the district court applied the wrong standard for evaluating the plaintiffs' evidence, we do not reach

whether the plaintiffs have in fact demonstrated typicality and leave it to the district court to resolve in the first instance.

**B. Spriggs is not an adequate class representative, but Sali remains as an adequate representative plaintiff.**

The district court concluded that plaintiff Spriggs is not an adequate class representative because she is not a member of any class she seeks to represent. The district court reasoned that Spriggs cannot represent a class including "all current and former [RNs] of Defendants ... *who were classified by Defendants as either full-time or full-time equivalent employees* ," given that she was not classified as a full-time employee. We agree. A named plaintiff must be a member of the class she seeks to represent and Spriggs does not qualify. *Gen. Tel. Co. of Sw. v. Falcon* , 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Nevertheless, because Plaintiff Sali remains as an adequate class representative, Spriggs's inadequacy is not a basis to deny class certification. *See* Fed. R. Civ. P. 23(a) ("*One or more* members of a class may sue or be sued as representative parties on behalf of all members ...." (emphasis added) ).

**C. The district court abused its discretion by concluding that attorneys from Bisnar Chase cannot serve as adequate class counsel.**

Determining whether representation is adequate requires the court to consider two questions: "(a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Secs. Litig.* , 213 F.3d 454, 462 (9th Cir. 2000) (citing *Hanlon v. Chrysler Corp.* , 150 F.3d 1011, 1020 (9th Cir. 1998 ) ). Adequacy of representation also depends on the qualifications of counsel. *In re N. Dist. Cal., Dalkon Shield IUD Prods. Liab. Litig.* , 693 F.2d 847, 855 (9th Cir. 1982). "[T]he named representative's attorney [must] be qualified, experienced, and generally capable to conduct the litigation ...." *Jordan v. L.A. Cty.* , 669 F.2d 1311, 1323 (9th Cir. 1982), *vacated on other grounds by Cty. of L.A. v. Jordan* , 459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982). It is undisputed that there is no conflict here, so the only questions before the district court were whether proposed class counsel were qualified and would prosecute the action vigorously.

The district court concluded that proposed class counsel failed to demonstrate they would adequately serve as class counsel. The district court noted that "attorneys from Bisnar Chase failed to attend any of the depositions of Plaintiffs' putative class witnesses' (four scheduled depositions), failed to produce Plaintiffs' expert, Falkenhagen, for a deposition despite being ordered to do so by a Magistrate Judge,[3] and, as detailed in the typicality analysis, failed to submit any sworn testimony from Plaintiffs in support of the class certification motion." The court also noted that Bisnar Chase submitted nearly identical declarations from twenty-two putative class members attesting to their personal experiences with Corona's employment practices. The district court found that "Plaintiffs' counsel's 'lax approach' to personalizing declarations, ensuring that declarants knew and understood what they were signing, and verifying the accuracy of the statements is 'unacceptable' conduct."

The district court did not indicate what legal standard it relied on in evaluating the adequacy of class counsel. Moreover, the district court discussed only the apparent errors by counsel with no mention of the evidence in the record demonstrating class counsel's substantial and competent work on this case. Bisnar Chase attorneys have incurred thousands of dollars in costs and invested significant time in this matter, including preparing dozens of interrogatories and requests for production, taking numerous depositions, retaining experts, defending the named plaintiffs' depositions and the deposition of the plaintiffs' expert economist, reviewing and analyzing thousands of documents, interviewing hundreds of class members, obtaining signed declarations, and preparing and filing a motion for class certification. Additionally, attorney Jerusalem Beligan has extensive experience litigating class-action cases in state and federal court.

At this early stage of the litigation, the district court's decision that attorneys from Bisnar Chase could not adequately serve as class counsel was premature and an abuse of discretion. However, the district court is not precluded from considering counsel's prior sanctions as evidence of inadequacy if Bisnar Chase attorneys continue to neglect their duties.

**D. The district court erred by denying certification of the proposed rounding-time and wage-statement classes on the basis that they failed Rule 23(b)(3)'s predominance requirement.**

Rule 23(b)(3)'s predominance inquiry is "far more demanding" than Rule 23(a)'s commonality requirement. *Amchem Prods., Inc. v. Windsor* , 521 U.S. 591, 624, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). When evaluating predominance, "a court has a 'duty to take a close look at whether common questions predominate over individual ones,' and ensure that individual questions do not 'overwhelm questions common to the class.' " *In re Hyundai* , 881 F.3d at 691 (quoting *Comcast Corp.* , 569 U.S. at 34, 133 S.Ct. 1426 ). "The main concern of the predominance inquiry under Rule 23(b)(3) is 'the balance between individual and common issues.' " *Wang v. Chinese Daily News, Inc.* , 737 F.3d 538, 545–46 (9th Cir. 2013) (quoting *In re Wells Fargo Home Mortg. Overtime Pay Litig.* , 571 F.3d 953, 959 (9th Cir. 2009 ) ).

Because the district court concluded that the predominance requirement was met by the proposed regular-rate class, and because the parties agree that the waiting-time class is entirely derivative of other proposed classes, we review the district court's predominance analysis with respect to the rounding-time and wage-statement classes only.

**1. The district court's determination that individual questions predominated in the claims of the proposed rounding-time class was based on an error of law.**

For the purpose of class certification, the parties do not dispute how Corona's rounding-time pay system worked. Corona used an electronic timekeeping system that tracked when employees clocked in and clocked out and rounded the time to the nearest quarter hour. Corona paid RNs an hourly wage calculated based on that rounded time. For example, if an RN clocked in at 6:53 a.m. or 7:07 a.m., his or her time was rounded to 7:00 a.m. Kronos recorded both actual clock-in and rounded times.

Sali and Spriggs allege that Corona's rounding-time policy resulted in systematic underpayment of RNs. They seek certification of a rounding-time class consisting of:

All current and former nurses who work or worked for Defendants during the Proposed Class Period who were not paid all wages due them, including straight time, overtime, double time, meal premiums, and rest premiums due to Defendants' rounding time policy.

The district court concluded that individualized issues predominate in determining Corona's liability with respect to the proposed rounding-time class because "whether [Corona's] rounding policy resulted in the underpayment of the proposed class members, and was thus against California law, depends on individual findings as to whether RNs were actually working when punched in." In support of this conclusion, the district court cited Corona's explanation that "time records are not a reliable indicator of the time RNs actually spent working because RNs frequently clock-in for work and then perform non-compensable activities, such as waiting in the break room, getting coffee, or chatting with their co-workers, until the start of their scheduled shift." Thus, the court reasoned, "determining whether [Corona] underpaid members of the Rounding Time Class would entail factualized inquiries into whether particular RNs were actually working during the grace period, and whether the rounding of time during this period resulted in the underpayment of hours actually worked—the only conduct that is prohibited under California law."

Sali and Spriggs first argue that whether RNs were "actually working" is a merits question that should not have been considered at the class certification stage. In the alternative, Sali and Spriggs argue that the district court's analysis was based on an error of California law because compensable time is not measured by time employees spend "actually working." Sali and Spriggs's argument that the district court improperly reached a merits question fails because the district court plainly did not attempt to resolve whether RNs were actually working on the merits. Instead, the court merely concluded that, assuming clock-in times were on average rounded up to the shift-start time, individualized questions would predominate in determining whether RNs were "actually working" during any period between their clock-in time and the start of their shift. But the district court clearly misapplied California law in reaching that conclusion.

A rounding-time policy is permissible under California law if it "is fair and neutral on its face and 'it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have *actually worked* .' " *See's Candy Shops, Inc. v. Super. Ct.* , 210 Cal.App.4th 889, 148 Cal.Rptr.3d 690, 704–05 (2012) (quoting 29 C.F.R. § 785.48 ) (emphasis added). The district court therefore did not err by concluding that whether RNs were "actually working" during the time between their clock-in and shift-start time is a relevant inquiry in this case. But by suggesting that "non-compensable activities, such as waiting in the break room, getting coffee, or chatting with their co-workers" are categorically not time "actually worked," the district court incorrectly interpreted "actually worked" to mean only time spent engaged in work-related activities.

Under California law, compensable time is "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." *Morillion v. Royal Packing Co.* , 22 Cal.4th 575, 94

Cal.Rptr.2d 3, 995 P.2d 139, 141 (2000) (quoting Cal. Code Regs., tit. 8, § 11140, subd. 2(G) ). Both parties correctly interpret the term "actually worked" as used in *See's Candy* as referencing this compensable-time standard. The district court also nominally acknowledged "employer control" as part of the standard, but in doing so the court materially misstated the law. The district court stated that "[t]he punch times are only indicative of time 'actually worked' if RNs are working *and* under the control of their employer whenever they are punched into work." (emphasis added). In fact, under California law, time is compensable when an employee is working *or* under the control of his or her employer. *See Morillion* , 94 Cal.Rptr.2d 3, 995 P.2d at 141.

California's compensable-time standard encompasses two categories of time. First, time is compensable if an employee is "under the control" of his or her employer, whether or not he or she is engaging in work activities, such as by being required to remain on the employer's premises or being restricted from engaging in certain personal activities. *See id.* , 22 Cal.4th 575, 94 Cal.Rptr.2d 3, 995 P.2d at 145–47 (holding that compulsory travel time on bus from departure point to work site is compensable); *Aguilar v. Assn. of Retarded Citizens* , 234 Cal.App.3d 21, 285 Cal.Rptr. 515, 519–21 (1991) (holding that time employees are required to be on premises is included in hours worked). Second, time is compensable if an employee "is suffered or permitted to work, whether or not required to do so." *Morillion,* 22 Cal.4th 575, 94 Cal.Rptr.2d 3, 995 P.2d at 141 (citing Cal. Code Regs., tit. 8, § 11140, subd. 2(G) ). This may include "time an employee is working but *is not* subject to an employer's control," such as "unauthorized overtime, which the employer has not requested or required." *Id.* , 22 Cal.4th 575, 94 Cal.Rptr.2d 3, 995 P.2d at 145–47 (emphasis added).

The district court did not abuse its discretion to the extent it concluded that individualized questions predominate on whether the RNs fall within the second category, which amounts to a question of whether they engaged in work activities even if they were not required to do so. But the district court erred by assuming that was the only question to be decided. Under California law, the RNs were also actually working if they were subject to Corona's control even if they were not engaging in work activities—for example, if they were required to remain on the hospital premises during that time. *See Aguilar,* 234 Cal.App.3d 21, 234 Cal.Rptr. at 520. The district court failed to consider whether the RNs could establish on a class-wide basis that they were subject to Corona's control during the grace period even if the RNs were not always engaged in work-related activities during that time.

This "employer control" question necessarily requires an employer-focused inquiry into whether Corona had a policy or practice that restricted RNs in a manner that amounted to employer control during the period between their clock-in and clock-out times and their rounded shift-start and shift-end times. The types of activities RNs generally engaged in during this period are certainly relevant, but the activities of any particular RN are not dispositive of whether he or she was under Corona's control. Determination of this question does not depend on individualized factual questions and is capable of class-wide resolution. Accordingly, the district court abused its discretion by denying certification of the rounding-time class on the basis of predominance.

**2. The district court's determination that individual questions predominate in the claims of the proposed wage-statement class was premised on legal error.**

Corona issued wage statements to RNs that listed the employer as Corona Regional Medical Center, rather than Corona's corporate name, UHS-Corona, Inc. Sali and Spriggs allege this violated California law and seek certification of a class consisting of "[a]ll current and former nurses who work or worked for Defendants during the Proposed Class Period who were not provided pay stubs that complied with Labor Code § 226." The district court concluded that this proposed wage-statement class failed Rule 23(b)(3)'s predominance requirement because "demonstrating that each class member was damaged by the claimed inaccuracy in the wage statement is a critical individualized issue in determining liability that is not amenable to common systems of proof." In doing so, the district court noted that it agreed with Corona's argument that "common issues do not predominate 'because, in order to determine liability, each employee must prove for each paystub received during the relevant time period that he/she was damaged by the inadequate pay stub.' "

The California Labor Code requires that a wage statement include, among other things, "the name and address of the legal entity that is the employer." Cal. Lab. Code § 226(a)(8). The Code specifies the amount of damages for violation of this requirement.4 The Code further provides that "[a]n employee is deemed to suffer injury for purposes of this subdivision if the employer fails to provide accurate and complete information as required ... and the employee cannot promptly determine from the wage statement alone ... the name and address of the employer." Id. § 226(e)(2)(B)(iii).

The district court erred by concluding that damages for members of the wage statement class would require an individualized determination. Because the Code specifies that a violation of § 226 is a per se injury, there is no individualized issue of damages. If Corona knowingly and intentionally failed to provide the name of the legal entity that was the class members' employer, each class member was injured in precisely the same manner by each paystub in which Corona failed to provide that information. See id. Moreover, even if there is variation in the amount of each class members' damages, this is an insufficient basis by itself to deny certification.

See Yokoyama , 594 F.3d at 1094 (the "amount of damages is invariably an individual question and does not defeat class action treatment" (quoting Blackie , 524 F.2d at 905 ) ).

The district court abused its discretion by denying certification on the basis that individual questions predominate in the claims of the proposed wage-statement class.

**CONCLUSION**

For the reasons discussed, the district court's denial of class certification is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

* The Honorable Salvador Mendoza, Jr., District Judge for the U.S. District Court for the Eastern District of Washington, sitting by designation.

1 We refer to Corona Regional Medical Center and UHS of Delaware, Inc. collectively as the employer or former employer of the named plaintiffs and proposed class members. This does not reflect any judgment about the nature of the relationship between Corona Regional Medical

Center and UHS of Delaware, Inc. or their relative share of potential liability, which have not been addressed by the district court and are not at issue on this appeal.

2 Numerous district courts in this Circuit have long concluded that it is appropriate to consider evidence at the class certification stage that may ultimately be inadmissible. *See, e.g.* , *Garter v. Cty. of San Diego* , 2017 WL 5177028, at *2 (S.D. Cal. Nov. 7, 2017) ("District [c]ourts may consider all material evidence submitted by the parties and need not address the ultimate admissibility of evidence proffered by the parties."); *In re ConAgra Foods, Inc.* , 90 F.Supp.3d 919, 965 n.147 (C.D. Cal. 2015) ("[T]he court can consider inadmissible evidence in deciding whether it is appropriate to certify a class."); *Arredondo v. Delano Farms Co.* , 301 F.R.D. 493, 505 (E.D. Cal. 2014) ; *Keilholtz v. Lennox Hearth Prods., Inc.* , 268 F.R.D. 330, 337 n.3 (N.D. Cal. 2010) ("On a motion for class certification, the Court may consider evidence that may not be admissible at trial."); *Parkinson v. Hyundai Motor Am.* , 258 F.R.D. 580, 599 (C.D. Cal. 2008) ("[A] motion for class certification need not be supported by admissible evidence."); *Bell v. Addus Healthcare, Inc.* , 2007 WL 3012507, at *2 (W.D. Wash. Oct. 12, 2007) ("[Rule] 23 does not require admissible evidence in support of a motion for class certification ....").

3 The district court sanctioned Bisnar Chase under Federal Rule of Civil Procedure 37 for failing to produce Falkenhagen at deposition after being ordered to do so. We affirmed the sanctions order. *See Sali v. Corona Reg'l Med. Ctr.* , 884 F.3d 1218, 1225 (9th Cir. 2018).

4 California Labor Code § 226(e)(1) provides:

An employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not to exceed an aggregate penalty of four thousand dollars ($4,000), and is entitled to an award of costs and reasonable attorney's fees.

Page 943

**983 F.2d 943**

**24 Fed.R.Serv.3d 1164**

**Del P. HENRY, Jr., a single man, Plaintiff-Appellant-Cross-Appellee, v. GILL INDUSTRIES, INC., et al., Defendant-Appellee-Cross-Appellant.**

**Nos. 91-15727, 91-16004.**

**United States Court of Appeals, Ninth Circuit.**

**Argued and Submitted Nov. 2, 1992.**

**Decided Jan. 12, 1993.**

Kelly Reed, Scottsdale, AZ, for plaintiff-appellant-cross-appellee.

Douglas R. Painter, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, for defendant-appellee-cross-appellant.

Appeal from the United States District Court for the District of Arizona.

Before: BOOCHEVER, NOONAN, and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

In this appeal and cross-appeal we must decide whether a civil action can be dismissed as a sanction for failure to comply with discovery rules and whether a summary judgment motion on a counterclaim can be granted based solely on failure of the opposing party to file an answering memorandum under local court rules.

I

Del P. Henry, Jr., ("Henry") brought suit against Gill Industries, Inc. ("Gill") in January 1989 for alleged misconduct in connection with a 1985 securities transaction. Gill counterclaimed alleging that Henry's suit breached a settlement agreement between them. The proceedings did not run smoothly. In January 1990, the district court ordered Henry to pay attorney's fees as a sanction for discovery misconduct in violation of Federal Rule of Civil Procedure 37(d). In March 1991, the court dismissed Henry's suit with prejudice for "repeated noncompliance with discovery rules." Henry filed a timely notice of appeal. The district court then granted partial summary judgment against Gill on its counterclaim. Gill filed a timely notice of cross-appeal.

II

The district court awarded attorney's fees against Henry under Federal Rule of Civil Procedure 37(d), which permits an award of such "reasonable" fees as are "caused by" a failure to engage in discovery. Henry does not dispute the propriety of the district court's decision to impose sanctions. Rather, he argues that a proper evidentiary foundation for determining the amount of the award was never laid, and that the award must therefore be vacated.

"An appeal from a district court's award of attorney's fees is reviewed for abuse of discretion. The court abuses its discretion when it bases the award on clearly erroneous legal or factual findings." Drucker v. O'Brien's Moving and Storage, Inc., 963 F.2d 1171, 1173 (9th Cir.1992) (citations omitted).

Henry argues that Gill was "required to provide detailed time and expense records" to meet its burden of establishing its entitlement to fees, and that the affidavits of Gill's counsel on which the district court based its award were inadequate. Our precedents, however, have clearly established that an award of attorney's fees may be based on the affidavits of counsel, so long as they are "sufficiently detailed to enable the court to consider all the factors necessary in setting the fees." Williams v. Alioto, 625 F.2d 845, 849 (9th Cir.1980) (per curiam), cert. denied, 450 U.S. 1012, 101 S.Ct. 1723, 68 L.Ed.2d 213 (1981); accord Sablan v. Department of Fin. of N. Mariana Islands, 856 F.2d 1317, 1322 (9th Cir.1988) ("sufficiently detailed to provide an adequate basis for calculating the award"); Shakey's Inc. v. Covalt, 704 F.2d 426, 435 (9th Cir.1983) ("ample evidence to support the attorney's fee award"); Manhart v. City of Los Angeles, 652 F.2d 904, 908 (9th Cir.1981) ("sufficiently detailed to provide a basis for the award"), vacated on other grounds, 461 U.S. 951, 103 S.Ct. 2420, 77 L.Ed.2d 1310 (1983).

The district court expressly found that Gill's declarations and affidavits satisfied this requirement. The relevant documents disclosed the nature of the services rendered in connection with unavailing efforts to obtain discovery, the amount of attorney time so consumed, and the rates at which this time was billed to the client. The court noted that any doubts it may have had regarding the sufficiency of the documentation submitted in support of the fee application had been obviated by awarding only one-third of the amount of fees requested by Gill. There is nothing in the record to suggest that the district court committed clear error in finding that the fees awarded were "caused by" Henry's discovery misconduct and represented "reasonable" charges for the services of Gill's counsel. The award therefore did not constitute an abuse of discretion. [1]

III

A

We turn now to Henry's contention that the district court's eventual dismissal of his suit as a sanction under Rule 37 for "repeated and flagrant" discovery abuses was unwarranted.

"We review the imposition of discovery sanctions under Rule 37 for abuse of discretion. The district court's discretion will not be disturbed unless we have a definite and firm conviction that the court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors. Where the drastic sanctions of dismissal or default are imposed, however, the range of discretion is narrowed and the losing party's non-compliance must be due to willfulness,

fault, or bad faith." Fjelstad v. American Honda Motor Co., 762 F.2d 1334, 1337 (9th Cir.1985) (citations and internal punctuation omitted).

Henry offers a number of challenges to the legal and factual premises on which the district court proceeded in ordering dismissal under Rule 37. None has merit.

As a threshold matter, Henry appears to suggest that only so much of his discovery conduct as occurred after the court's imposition of monetary sanctions should have been considered in deciding whether dismissal was warranted. This circuit's law is to the contrary. See Adriana Int'l Corp. v. Thoeren, 913 F.2d 1406, 1411 (9th Cir.1990) (district court properly considered all of defendant's discovery conduct in ordering default judgment: "In evaluating the propriety of sanctions, we look at all incidents of a party's misconduct."), cert. denied, --- U.S. ----, 111 S.Ct. 1019, 112 L.Ed.2d 1100 (1991); Halaco Eng'g Co. v. Costle, 843 F.2d 376, 381 n. 2 (9th Cir.1988) ("court may indeed consider prior conduct that has already been subject to sanction, when it is weighing a subsequent sanction motion").

Next, Henry argues that he never "failed to appear" for his noticed deposition because each such deposition was vacated by agreement of the parties. He suggests that "the ordinary difficulties in coordinating calendars" should not be grounds for discovery sanctions. The record shows, however, and the district court found that Henry "twice notified defendants the business day before his properly noticed depositions were to have taken place that he would not attend...." Henry thus asks this court to hold that, even though he twice forced cancellation of his deposition by notifying Gill at the last minute that he would not appear, such conduct does not constitute a "failure to appear" because Gill's counsel, instead of sitting in a conference room waiting for Henry not to arrive, attempted to reschedule the deposition. We reject the suggestion that an unreasonable refusal to be deposed must be met with an unreasonable refusal to reschedule in order to warrant sanctions under Rule 37.

Next, Henry suggests that, even if he was guilty of "some failure" with regard to the scheduling of his deposition, "that failure [was] purged by ... his submitting to ... deposition...." He cites no authority for this proposition, and, indeed, this court has squarely rejected it. See North Am. Watch Corp. v. Princess Ermine Jewels, 786 F.2d 1447, 1451 (9th Cir.1986) (order of dismissal affirmed: "Belated compliance with discovery orders does not preclude the imposition of sanctions."); G-K Properties v. Redevelopment Agency of San Jose, 577 F.2d 645, 647-48 (9th Cir.1978) (order of dismissal affirmed: "last minute tender" of discovery does not cure effects of discovery misconduct).

Next, Henry challenges the district court's finding that he "failed to submit a complete response to [Gill's] Request for Production of Documents...." Henry asserts that he "made full and complete production of all responsive documents ... many months before [Gill] filed [its] first motion to compel," and that in this respect the court's order of sanctions was based on "imagined and unsubstantiated deficiencies in his document production." Henry cannot, however, demonstrate clear error in the district court's finding just by disagreeing with it. The record indicates, for example, that Henry failed to produce a copy of his 1986 tax return until some time after his suit had been dismissed, and failed to produce either a legible copy or the original of certain key documents repeatedly requested by Gill. Henry argues that his failure to produce

these documents caused Gill no prejudice, but this, even if true, would not establish that his conduct did not violate the discovery rules.

Finally, Henry insists that he complied fully with the district court's orders with respect to payment of the monetary sanctions. He apparently sees no inconsistency between this claim and his failure to dispute the court's finding to the contrary. The court found that Henry "failed to comply with the Court's ... order for discovery sanctions by depositing with the Court clerk a non-negotiable certificate of deposit made out to plaintiff's own lawyer instead of a negotiable certificate of deposit." The district court, in approving the posting of a supersedeas bond, expressly required use of a "negotiable" certificate of deposit. The court was justified in thinking its order entitled to be obeyed in all particulars. Henry's contention that he had an "absolute right" to post a bond rather than pay over the amount of the sanction to Gill has nothing to do with whether the court's order as to the form of the bond was heeded.

B

Having disposed of these preliminaries, we turn to the question whether dismissal of Henry's action was proper. "Because the sanction of dismissal is such a harsh penalty, the district court must weigh five factors before imposing dismissal: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." Porter v. Martinez, 941 F.2d 732, 733 (9th Cir.1991) (citations and internal punctuation omitted). "The first two of these factors favor the imposition of sanctions in most cases, while the fourth cuts against a ... dismissal sanction. Thus the key factors are prejudice and the availability of lesser sanctions." Wanderer v. Johnston, 910 F.2d 652, 656 (9th Cir.1990).

Henry argues that Gill suffered no prejudice by reason of his discovery misconduct because, eventually, Gill received all the discovery it had sought. We have noted, however, that "[a] defendant suffers prejudice if the plaintiff's actions impair the defendant's ability to go to trial or threaten to interfere with the rightful decision of the case." Adriana, 913 F.2d at 1412. Here, the district court concluded that the lengthy delays caused by Henry's refusal to engage in discovery had "irreparably prejudiced" Gill. The source of this prejudice was the fact that Allen T. Gilliland, one of the defendants and the only participant in the conversations with Henry that formed the basis of Henry's lawsuit, became unable to assist with the defense of the case. Gilliland was diagnosed with a brain tumor in June 1990. By October 1990, some nineteen months after Henry's suit had been filed, Gilliland had had two brain surgeries, and was no longer able to participate in the defense. Gilliland died in February 1991.

Henry argues that he "was not responsible for Gilliland's death and he cannot logically be charged with any 'prejudice' that allegedly resulted from his demise." However, Henry was responsible for the fact that the case had not progressed further at the time Gilliland became unable to assist with the defense. Because Gilliland became unavailable well before discovery was complete, and, indeed, before Gilliland's deposition had been finished, Henry's actions prejudiced Gill's ability to mount a defense. Furthermore, there is every reason to believe that this prejudice would in turn have threatened to interfere with the rightful decision of the case,

since whatever it was that passed between Henry and Gilliland in 1985 would apparently have been the key to the jury's decision. In short, the prejudice factor weighed in favor of dismissal.

As for the availability of a lesser sanction, the district court noted that lesser sanctions had been tried, and had failed. There was no reason to expect that Henry would respond more satisfactorily to a second round of intermediate sanctions than he did to the first. Thus, both of the "key factors" in our five-factor test here pointed towards dismissal as the appropriate sanction.

Henry argues, however, that his conduct did not rise to the level of "willfulness, bad faith, or fault" necessary to justify dismissal. This argument is without merit. This court has stated that "disobedient conduct not shown to be outside the control of the litigant" is all that is required to demonstrate willfulness, bad faith, or fault. Fjelstad, 762 F.2d at 1341. Henry offers various explanations for his discovery misconduct, but all are either legally irrelevant or factually implausible, and none persuades that circumstances outside his control caused his transgressions.

His failure to answer Gill's first set of interrogatories or to submit to deposition for eight months in 1989 Henry puts down to his inability to reach an understanding on a formal retainer agreement with counsel after her law firm disbanded, and the fact that he was out of town on business. Such matters are hardly "outside the control of the litigant." See United Artists Corp. v. La Cage Aux Folles, 771 F.2d 1265, 1270 (9th Cir.1985) (order of dismissal affirmed: that plaintiff's "travel schedule" prevented him from answering interrogatories for three months "indicated a lack of diligence in keeping abreast of the status of his case," and did not excuse failure to answer).

We have already noted Henry's explanation for his refusal to appear on two separate occasions for his properly noticed deposition. His claim that the depositions were continued by agreement of counsel, once rejected, leaves no basis for concluding that his failures to appear were not similarly within his control.

Finally, Henry tries to explain his failure to respond to Gill's second set of interrogatories as the result of a "misunderstanding" between counsel. Henry claims that his counsel was under the impression that the time to answer had been extended by Gill's counsel until after completion of the Gilliland deposition (which, of course, was never completed). That she could have entertained such a belief is doubtful in light of the fact that at least two letters were sent by Gill demanding the interrogatories and claiming they were overdue. Having ignored such correspondence, Henry cannot be heard to say that this second failure to answer was beyond his control.

In sum, all of the factors required by circuit law in order to justify dismissal were present in this case. The record thus amply supports the conclusion that the district court did not abuse its discretion in dismissing Henry's suit.

IV

We come now to Gill's cross-appeal from the district court's grant of Henry's motion for partial summary judgment on its counterclaim. Gill's opposition to Henry's motion was due on April 9, 1991. Gill timely filed its opposition papers with the court, but, for reasons that need not concern us here, Gill failed to serve Henry with copies of those papers by the established deadline. Gill thereby violated Local Rule 11(i) of the District Court of Arizona, which provides that "if the opposing party does not serve and file the required answering memoranda ... such non-compliance may be deemed a consent to the denial or granting of the motion summarily." D.Ariz.R. 11(i) (emphasis supplied). The district court applied this rule according to its terms, and treated Gill's failure to serve Henry with its opposition to the summary judgment motion as consent to the granting of that motion. The question before us is whether the court erred in doing so.

We have previously observed that "it is highly questionable in light of the standards of [Fed.R.Civ.P.] 56 that a local rule can mandate the granting of summary judgment for the movant based on a failure to file opposing papers where the movant's papers are themselves insufficient to support a motion for summary judgment or on their face reveal a genuine issue of material fact." Hamilton v. Keystone Tankship Corp., 539 F.2d 684, 686 n. 1 (9th Cir.1976); accord Mutual Fund Investors, Inc. v. Putnam Management Co., 553 F.2d 620, 625 (9th Cir.1977).

The doubts expressed in these cases were founded on an appreciation of the interrelationship between Rule 56 and Rule 83. Federal Rule of Civil Procedure 83 invites the district courts to formulate local rules, but only insofar as they are not inconsistent with the federal rules themselves. Under Federal Rule of Civil Procedure 56, a moving party is entitled to summary judgment only upon a showing that there are no genuine issues of material fact requiring a trial. The party opposing the motion is under no obligation to offer affidavits or any other materials in support of its opposition. Summary judgment may be resisted and must be denied on no other grounds than that the movant has failed to meet its burden of demonstrating the absence of triable issues. A local rule that requires the entry of summary judgment simply because no papers opposing the motion are filed or served, and without regard to whether genuine issues of material fact exist, would be inconsistent with Rule 56, hence impermissible under Rule 83. See Hibernia Nat'l Bank v. Administracion Central Sociedad Anonima, 776 F.2d 1277, 1279 (5th Cir.1985) ("A motion for summary judgment cannot be granted simply because there is no opposition, even if the failure to oppose violated a local rule.").

In this case, as in Hamilton and Mutual Fund Investors, the local rule at issue does not require the court to grant a motion for summary judgment when the non-moving party fails to file and/or serve its opposition thereto. The language of the rule is permissive, conferring discretion upon the district judge to determine whether non-compliance should be deemed consent to a given motion. That discretion, however, is necessarily abused when exercised to grant a motion for summary judgment where the movant's papers are insufficient to support that motion or on their face reveal a genuine issue of material fact.

Applying this standard to the case at hand, it is clear that the district court erred in entering partial summary judgment against Gill solely on the basis of the local rule violation. We may affirm, however, on any basis supported by the record. United States v. Washington, 969 F.2d

752, 755 (9th Cir.1992). We believe the grant of summary judgment was in order. Gill claimed that Henry's suit breached his agreement not to commence any action asserting obligations "that arise out of the payment of any dividends by [Gill]." Henry's action for Rule 10(b)(5) violations, fraud, and breach of fiduciary duty was premised on Gill's alleged attempts to squeeze him out of the corporation by forcing him to sell his shares on less favorable terms than were afforded to other stockholders. The damages that Henry sought were based on the difference between the price at which he was required to sell and the price he would have received had he been provided the same terms as other shareholders. He did not claim any damages based on the nonpayment of dividends. It is true that the complaint refers to Gill's failure to pay a dividend. However, this reference appears in a list of several activities which allegedly manifested Gill's intent to disenfranchise Henry and does not turn Henry's action into one "aris[ing] out of the payment of any dividends." At bottom, Gill's counterclaim was frivolous and was therefore properly disposed of on summary judgment.

AFFIRMED.

975 F.2d 604

23 Fed.R.Serv.3d 621

**Dairl JOHNSON; Claudine Johnson, Plaintiffs-Appellants, v. MAMMOTH RECREATIONS, INC., Defendant-Appellee.**

**No. 90-15975.**

**United States Court of Appeals, Ninth Circuit.**

**Argued and Submitted Aug. 20, 1992.**

**Decided Sept. 14, 1992.**

Thomas J. Brandi, Bianco, Brandi & Jones, San Francisco, Cal., for plaintiffs-appellants.

Paul S. Rosenlund and Philip D. Witte, Hancock, Rothert & Bunshoft, San Francisco, Cal., for defendant-appellee.

Appeal from the United States District Court for the Eastern District of California.

Before: WIGGINS, O'SCANNLAIN and FERNANDEZ, Circuit Judges.

FERNANDEZ, Circuit Judge:

Dairl Johnson 1 appeals the district court's denial of his motion to amend his complaint. The court found that Johnson failed to demonstrate circumstances that would permit joining an additional party after the joinder cut-off date, and granted summary judgment in favor of Mammoth Recreations. We affirm.

BACKGROUND

The underlying facts are straightforward. On December 23, 1987 Johnson was enjoying a day of recreational skiing at the Mammoth Mountain ski resort in Mono County, California. Johnson alleges that he was injured when a "T-bar [ski] lift ... suddenly released" and threw him to the ground.

He filed a diversity action against the ski lift manufacturer, Dopplemayr Ski Lift Company, Ltd., 2 and Mammoth Recreations, Inc. Mammoth Recreations is a holding company which owns a majority of the stock of Mammoth Mountain Ski Area, Inc., the entity which actually owns and operates the ski resort. The complaint did not name Mammoth Mountain Ski Area, Inc. as a defendant despite the fact that it alleged that the ski resort had been negligently operated and maintained.

In his complaint, Johnson alleged:

At all times herein mentioned defendants, owned, controlled, maintained, managed, and operated a ski resort commonly known as Mammoth Ski Resort in Mono County, California....

In its answer, Mammoth Recreations "denie[d] each and every ... allegation" of this paragraph. Apparently, Johnson failed to note that Mammoth Recreations had denied ownership and control of the ski resort.

The litigation then proceeded. In due course, the district court filed a Scheduling Order pursuant to Federal Rule of Civil Procedure 16(b) which established, inter alia, a cut-off date for joining additional parties. The order stated:

JOINDER OF PARTIES/AMENDMENTS

All parties are granted six months to move to join additional parties; thereafter, the court will not entertain such motion unless extraordinary circumstances are demonstrated.

No further joinder of parties or amendments to pleadings is permitted except with leave of court, good cause having been shown.

Since the Scheduling Order was filed on April 17, 1989, the cut-off date for joining additional parties was October 17, 1989, six months later.

On July 7, 1989, a date still well within the amendment cut-off date, Mammoth responded to an interrogatory and again informed Johnson that "Mammoth Recreations, Inc. neither owns nor operates the [ski resort] premises." It further informed Johnson that "the lift was inspected by agents or employees of Mammoth Mountain Ski Area," not by Mammoth Recreations, Inc. Johnson still failed to amend his complaint to add Mammoth Mountain Ski Area, Inc. as a defendant.

Mammoth Recreations made one final overture. On July 10, 1989 its counsel sent Johnson's counsel a letter which expressly noted the complaint's deficiency:

As you should be able to determine, Mammoth Recreations, Inc. is not a proper defendant in this case. Mammoth Recreations, Inc. is merely a holding company for the majority of shares of Mammoth Mountain Ski Area, the corporation which owns, maintains and operates the ski resort by the same name. Please advise if you are willing to stipulate to dismiss Mammoth Recreations, Inc. from this action and substitute Mammoth Mountain Ski Area in its place.

Johnson's attorneys did not respond to this letter and now claim that they never received it. [3] They claim they were unaware of the existence of Mammoth Mountain Ski Area, Inc. and its relationship with Mammoth Recreations until February 15, 1990, four months after the joinder cut-off date, when Mammoth Recreations's counsel informed them of Mammoth Recreations's intention to move for summary judgment.

The district court considered Johnson's motion to amend and Mammoth Recreations's motion for summary judgment. The court found that Johnson had failed to establish the "extraordinary

circumstances" that would merit joinder of a party after the Scheduling Order's joinder cut-off date. It also found that the complaint failed to allege any theory of liability by which Mammoth Recreations might be liable. Accordingly, it granted summary judgment in Mammoth Recreations's favor.

JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction to hear this diversity action under 28 U.S.C. § 1332. We have jurisdiction to review the court's final judgment under 28 U.S.C. § 1291.

"The district court is given broad discretion in supervising the pretrial phase of litigation, and its decisions regarding the preclusive effect of a pretrial order ... will not be disturbed unless they evidence a clear abuse of discretion." Miller v. Safeco Title Ins. Co., 758 F.2d 364, 369 (9th Cir.1985).

DISCUSSION

This case turns on a single, narrow question: when and under what circumstances may a party join an additional defendant once the district court has entered an order limiting the time for joinder.

Johnson discusses at length the liberal amendment policy of Federal Rule of Civil Procedure 15(a). Mammoth Recreations does not dispute that Rule 15's policy favoring amendments is applied liberally by us. Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir.1989); DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 185-87 (9th Cir.1987). Under Rule 15(a), leave to amend should be granted as a matter of course, at least until the defendant files a responsive pleading. After that point, leave to amend should be granted unless amendment would cause prejudice to the opposing party, is sought in bad faith, is futile, or creates undue delay. Id.

Nonetheless, Rule 15 does not provide the standards by which we consider Johnson's motion to amend to add Mammoth Mountain Ski Area, Inc. as a defendant. Once the district court had filed a pretrial scheduling order pursuant to Federal Rule of Civil Procedure 16 which established a timetable for amending pleadings that rule's standards controlled. Rule 16 provides in part:

(b) [The district court] ... shall, after consulting with the attorneys for the parties and any unrepresented parties, by a scheduling conference, ... enter a scheduling order that limits the time

(1) to join other parties and to amend the pleadings;

(2) to file and hear motions; and

(3) to complete discovery.

....

The order shall issue as soon as practicable but in no event more than 120 days after filing of the complaint. A schedule shall not be modified except by leave of ... [the district court] upon a showing of good cause.

Thus, Johnson's ability to amend his complaint was governed by Rule 16(b), not Rule 15(a). See Forstmann v. Culp, 114 F.R.D. 83, 85 (M.D.N.C.1987) (party seeking to amend pleading after date specified in scheduling order must first show "good cause" for amendment under Rule 16(b), then, if "good cause" be shown, the party must demonstrate that amendment was proper under Rule 15); see also Financial Holding Corp. v. Garnac Grain Co., 127 F.R.D. 165, 166 (W.D.Mo.1989) (same).

Except in certain classes of cases not applicable here, 4 the district court is required to enter a pretrial scheduling order within 120 days of the filing of the complaint. 5 The scheduling order "control[s] the subsequent course of the action" unless modified by the court. Fed.R.Civ.P. 16(e). Orders entered before the final pretrial conference may be modified upon a showing of "good cause," Fed.R.Civ.P. 16(b), but orders "following a final pretrial conference shall be modified only to prevent manifest injustice." Fed.R.Civ.P. 16(e). In this case, the scheduling order was entered on April 17, 1989, and the final pretrial conference was set for August 13, 1990. Thus, Johnson could have sought to modify the order had he shown "good cause" for doing so.

Johnson did not specifically request that the court modify its scheduling order; he merely moved to amend his complaint. He points out that some courts have considered a motion to amend the complaint as a motion to amend the scheduling order and the court's denial of that motion a denial of a motion to amend the scheduling order. See Spiller v. Ella Smithers Geriatric Ctr., 919 F.2d 339, 343 (5th Cir.1990) (district court impliedly granted motion to amend scheduling order by allowing defendant to move for summary judgment after cut-off date for pretrial motions); R.L. Clark Drilling Contractors, Inc. v. Schramm, Inc., 835 F.2d 1306, 1308 (10th Cir.1987) (party's assertion of an issue not listed in the pretrial order was deemed a request to modify that order despite the fact that no formal motion to amend the pretrial order had been made). We have suggested the contrary. See Jauregui v. City of Glendale, 852 F.2d 1128, 1133-34 (9th Cir.1988) (party bound by facts stipulated to in pretrial order when party failed to seek a modification of order from the district court); U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff, 768 F.2d 1099, 1104 (9th Cir.1985) (court may deny as untimely a motion filed after the scheduling order cut-off date where no request to modify the order has been made); see also Dedge v. Kendrick, 849 F.2d 1398 (11th Cir.1988) (motion filed after the scheduling order cut-off date is untimely and may be denied solely on that ground). We see no reason to deviate from that approach here, but the result would not change if Johnson's motion to amend the complaint were treated as a de facto motion to amend the scheduling order rather than a motion to join a party after the binding cut-off date for the motion had passed. In the former case, Johnson needed to show "good cause" for the amendment. Fed.R.Civ.P. 16(b). In the latter, the terms of the order stated that no joinder would be permitted after the cut-off date unless "extraordinary circumstances [had been] demonstrated." 6 Johnson failed to make an adequate showing under either standard.

1. "Good Cause"

"A court's evaluation of good cause is not coextensive with an inquiry into the propriety of the amendment under ... Rule 15." Forstmann, 114 F.R.D. at 85. Unlike Rule 15(a)'s liberal amendment policy which focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party, Rule 16(b)'s "good cause" standard primarily considers the diligence of the party seeking the amendment. The district court may modify the pretrial schedule "if it cannot reasonably be met despite the diligence of the party seeking the extension." Fed.R.Civ.P. 16 advisory committee's notes (1983 amendment); Harrison Beverage Co. v. Dribeck Importers, Inc., 133 F.R.D. 463, 469 (D.N.J.1990); Amcast Indus. Corp. v. Detrex Corp., 132 F.R.D. 213, 217 (N.D.Ind.1990); Forstmann, 114 F.R.D. at 85; 6A Wright, Miller & Kane, Federal Practice and Procedure § 1522.1 at 231 (2d ed. 1990) ("good cause" means scheduling deadlines cannot be met despite party's diligence). Moreover, carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief. Cf. Engleson v. Burlington Northern R.R. Co., 972 F.2d 1038, 1043 (9th Cir.1992) (carelessness not a ground for relief under Rule 60(b)); Martella v. Marine Cooks & Stewards Union, 448 F.2d 729, 730 (9th Cir.1971) (same), cert. denied, 405 U.S. 974, 92 S.Ct. 1191, 31 L.Ed.2d 248 (1972); Smith v. Stone, 308 F.2d 15, 18 (9th Cir.1962) (same). Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification. See Gestetner Corp. v. Case Equip. Co., 108 F.R.D. 138, 141 (D.Me.1985). If that party was not diligent, the inquiry should end.

Johnson has failed to demonstrate good cause for his belated motion to amend. As discussed above, Mammoth Recreations's answer to the complaint and response to interrogatories amply indicated that Mammoth Recreations did not own and operate the ski resort, and thus that any theory of liability predicated upon that fact would fail. Moreover, the district court found that Mammoth Recreations's counsel had sent a letter explicitly offering to stipulate to a substitution of the "proper defendant," Mammoth Mountain Ski Area, Inc. Failing to heed clear and repeated signals that not all the necessary parties had been named in the complaint does not constitute diligence.

Johnson argues that Mammoth Recreations had a duty to raise this issue during a pretrial conference, and that its failure to do so cannot be held against Johnson. While it is true that "[e]ach party has an affirmative duty to allege at the pretrial conference all factual and legal bases upon which the party wishes to litigate the case," Trinity Carton Co. v. Falstaff Brewing Corp., 767 F.2d 184, 192 n. 13 (5th Cir.1985), cert. denied, 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986), it is not the case that Mammoth Recreations failed to be candid in this case. In its pretrial status conference report, Mammoth Recreations specifically noted "Mammoth [Recreations] believes plaintiff may wish to name additional parties as discovery progresses." (emphasis added). Mammoth Recreations honored its obligation. The burden was upon Johnson to prosecute his case properly. He cannot blame Mammoth Recreations for his failure to do so. The simple fact is that his attorneys filed pleadings and conducted discovery but failed to pay attention to the responses they received. That is precisely the kind of case management that Rule 16 is designed to eliminate. It is one of the reasons that the district courts have been forced to assume the burdens of case management themselves.

In short, Johnson failed to establish "good cause" for modifying the pretrial scheduling order. The district court did not abuse its discretion when it denied his motion to amend--a motion made four months after the cut-off date for amendment had expired.

2. "Extraordinary Circumstances"

By the same token, Johnson has not demonstrated that there were "extraordinary circumstances" permitting joinder after the cut-off date. 7 The district court did not define "extraordinary circumstances" but it is clear that it was not intended to be a less rigorous standard than good cause. The words belie that possibility. Moreover, were it a lesser standard, a party would, in effect, be able to obtain an amendment of the cut-off date without a showing of good cause. That would violate the spirit of Rule 16 itself and nothing suggests that the parties or the court intended such a thing. On the other hand, if the standard were significantly more rigorous than good cause, a party could still seek amendment of the order upon a showing of good cause. Thus, as a practical matter, extraordinary circumstances is a close correlate of good cause. Cf. Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc., 116 F.R.D. 363, 365-66 (M.D.N.C.1987) ("Good cause" shown when there are "extenuating circumstances.").

Johnson utterly failed to show good cause for his dilatory motion to amend. It follows that he also failed to establish "extraordinary circumstances." The district court did not abuse its discretion when it denied Johnson's motion.

3. Summary Judgment

The district court properly granted summary judgment in favor of Mammoth Recreations on Johnson's negligence cause of action against it. The claim hinged on Johnson's assertion that Mammoth Recreations owned, operated, controlled and maintained the ski resort. It is undisputed that Mammoth Recreations did not. Thus, Johnson could not prove that Mammoth Recreations was directly liable for his injuries, and did not even allege that the negligence of Mammoth Mountain Ski Area, Inc. could be imputed to Mammoth Recreations.

CONCLUSION

A scheduling order "is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." Gestetner Corp., 108 F.R.D. at 141. The district court's decision to honor the terms of its binding scheduling order does not simply exalt procedural technicalities over the merits of Johnson's case. Disregard of the order would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier. Rule 16 was drafted to prevent this situation and its standards may not be short-circuited by an appeal to those of Rule 15. Forstmann, 114 F.R.D. at 85; Financial Holding Corp., 127 F.R.D. at 166; see also Riofrio Anda v. Ralston Purina Co., 959 F.2d 1149, 1155 (1st Cir.1992) (permitting amendment under Rule 15(a) in violation of district court scheduling order "would have nullified the purpose of rule 16(b)(1)").

As the torrent of civil and criminal cases unleashed in recent years has threatened to inundate the federal courts, deliverance has been sought in the use of calendar management techniques. Rule

16 is an important component of those techniques. We will not snatch it away or destroy its effectiveness by requiring district courts to countenance the practices exemplified by the facts of this case.

AFFIRMED.

1 Dairl Johnson's wife, Claudine Johnson, also appeals. Because Dairl was the directly injured party, we refer to him for convenience. Our holding, however, applies equally to Claudine.

2 Dopplemayr has been dismissed from the action.

3 The district court found that the July 10, 1990 letter "was sent to plaintiffs' counsel ... informing plaintiffs not only that Mammoth Recreations, Inc. was the wrong defendant, but that Mammoth Mountain Ski Area was the proper defendant." Its factual finding can be overturned only if clearly erroneous. Moreover, insofar as it is based upon a credibility determination, it is entitled to heightened deference. See United States v. Bibo-Rodriguez, 922 F.2d 1398, 1401 (9th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2861, 115 L.Ed.2d 1028 (1991).

4 See Local Rule 240(c) of the Eastern District of California for exceptions to Rule 16(b)'s mandatory scheduling requirement.

5 Johnson argues that the fact that the scheduling order was entered 126 days after the complaint was filed somehow invalidates it. We disagree. Although Rule 16 states that the order "shall issue ... in no event more than 120 days after filing of the complaint," the Advisory Committee Note explains what steps should be followed if that deadline is missed. If a scheduling conference cannot be arranged within the 120 period, the court must issue the scheduling order after "some communication with the parties." Fed.R.Civ.P. 16 advisory committee's notes (1983 amendment). Nowhere is it implied that a late-filed order is invalid. Moreover, a reading of that sort would be self defeating. The rule is not a move in a game; it is designed to cause litigation to proceed at a reasonable pace.

6 Johnson argues that the order is ambiguous because its terms establish two standards under which modification is possible, "good cause" and "extraordinary circumstances." But Johnson misreads the order. As we read it, the order states that any motions to amend filed more than six months from the filing of the scheduling order would be considered only under "extraordinary circumstances." However, motions filed during the six-month window would be considered upon a showing of "good cause." Thus, the order sets up two different standards for two different periods. It is not disputed that Johnson's motion was filed after the six month grace period had expired. Thus, by the terms of the scheduling order, he was required to show "extraordinary circumstances."

7 Had the scheduling order simply barred further motions after the cut-off date, the district court could have denied any late-filed motion solely on that ground, absent a request to modify the order. See Dedge, 849 F.2d at 1398; U.S. Dominator, Inc., 768 F.2d at 1104.

715 F.3d 716

In re WESTERN STATES WHOLESALE NATURAL GAS ANTITRUST LITIGATION,

Learjet, Inc.; Topeka Unified School District 501, Plaintiffs–Appellants,

v.ONEOK, Inc.; ONEOK Energy Marketing & Trading Co., L.P.; The Williams Companies, Inc.; Williams Merchant Services Company, Inc.; Williams Energy Marketing & Trading Company; American Electric Power Company, Inc.; AEP Energy Services, Inc.; Duke Energy Corporation; Duke Energy Trading and Marketing, LLC; Dynegy Marketing and Trade; El Paso Corporation; El Paso Merchant Energy, L.P.; CMS Energy Corporation; CMS Marketing Services & Trading Company; CMS Field Services; Reliant Energy, Inc.; Reliant Energy Services, Inc.; Coral Energy Resources, L.P.; Xcel Energy, Inc.; e prime, Inc., Defendants–Appellees.

In re Western States Wholesale Natural Gas Antitrust Litigation,

Heartland Regional Medical Center; Prime Tanning Corp.; Northwest Missouri State University, Plaintiffs–Appellants,

v.ONEOK, Inc.; ONEOK Energy Marketing & Trading Co., L.P.; The Williams Companies, Inc.; Williams Merchant Services Company, Inc.; Williams Energy Marketing & Trading Company; American Electric Power Company, Inc.; AEP Energy Services, Inc.; Duke Energy Corporation; Duke Energy Trading and Marketing, LLC; Dynegy Marketing and Trade; El Paso Corporation; El Paso Merchant Energy, L.P.; CMS Energy Corporation; CMS Marketing Services & Trading Company; CMS Field Services; Reliant Energy, Inc.; Reliant Energy Services, Inc.; Coral Energy Resources, L.P.; Xcel Energy, Inc.; e prime, Inc., Defendants–Appellees.

In re Western States Wholesale Natural Gas Antitrust Litigation,

Breckenridge Brewery of Colorado, LLC; BBD Acquisition Co., Plaintiffs–Appellants,

v.Xcel Energy, Inc.; e prime, Inc., Defendants–Appellees.

In re Western States Wholesale Natural Gas Antitrust Litigation,

Reorganized FLI, Inc., Plaintiff–Appellant,

v.ONEOK, Inc.; ONEOK Energy Marketing & Trading Co., L.P.; The Williams Companies, Inc.; Williams Merchant Services Company, Inc.; Williams Energy Marketing & Trading Company; American Electric Power Company, Inc.; AEP Energy Services, Inc.; Duke Energy Corporation; Duke Energy Trading and Marketing, LLC; Dynegy Marketing and Trade; El Paso Corporation; El Paso Merchant Energy, L.P.; CMS Energy Corporation; CMS Marketing Services & Trading Company; CMS Field Services; Reliant

Energy, Inc.; Reliant Energy Services, Inc.; Coral Energy Resources, L.P.; Xcel Energy, Inc.; e prime, Inc., Defendants–Appellees.

In re Western States Wholesale Natural Gas Antitrust Litigation,

Sinclair Oil Corporation, Plaintiff–Appellant,

v.ONEOK Energy Services Company, L.P., Defendant–Appellee.

In re Western States Wholesale Natural Gas Antitrust Litigation,

Sinclair Oil Corporation, Plaintiff–Appellant,

v.e prime, Inc.; Xcel Energy, Inc., Defendants–Appellees.

In re Western States Wholesale Natural Gas Antitrust Litigation,

Arandell Corporation; Merrick's Inc.; Sargento Foods Inc.; Ladish Co., Inc.; Carthage College; Briggs & Stratton Corporation, Plaintiffs–Appellants,

v.Xcel Energy, Inc.; Northern States Power Company; e prime, Inc.; American Electric Power Company, Inc.; AEP Energy Services, Inc.; CMS Energy Corporation; CMS Field Services; CMS Marketing Services & Trading Company; Coral Energy Resources, L.P.; Duke Energy Carolinas, LLC; Duke Energy Trading and Marketing LLC; Dynegy Illinois Inc.; DMT G.P. L.L.C.; Dynegy GP Inc.; El Paso Corporation; El Paso Merchant Energy, L.P.; ONEOK, Inc.; ONEOK Energy Marketing & Trading Co., L.P.; RRI Energy, Inc., fka Reliant Energy, Inc.; RRI Energy Services, Inc., fka Reliant Energy Services, Inc.; The Williams Companies, Inc.; Williams Power Company, Inc.; Williams Energy Marketing & Trading Company; Williams Merchant Services Company, Inc., Defendants–Appellees.

In re Western States Wholesale Natural Gas Antitrust Litigation,

Newpage Wisconsin System, Inc., Plaintiff–Appellant,

v.CMS Energy Corporation; CMS Marketing Services & Trading Company; CMS Field Services; Xcel Energy, Inc.; Northern States Power Company; e prime, Inc.; Coral Energy Resources, L.P.; Duke Energy Trading and Marketing LLC; Dynegy Illinois Inc.; DMT G.P. L.L.C.; Dynegy GP Inc.; Dynegy Marketing and Trade; El Paso Corporation; El Paso Merchant Energy, L.P.; ONEOK, Inc.; ONEOK Energy Marketing & Trading Co., L.P.; RRI Energy Services, Inc., fka Reliant Energy Services, Inc.; The Williams Companies, Inc.; Williams Power Company, Inc.; Williams Energy Marketing & Trading Company; Williams Merchant Services Company, Inc., Defendants–Appellees.

In re Western States Wholesale Natural Gas Antitrust Litigation,

Arandell Corporation; Merrick's Inc.; Sargento Foods Inc.; Ladish Co., Inc.; Carthage College; Briggs & Stratton Corporation, Plaintiffs–Appellants,

v.CMS Energy Corporation; CMS Marketing Services & Trading Company; CMS Field Services, Defendants–Appellees.

Nos. 11–16786, 11–16798, 11–16799, 11–16802, 11–16818, 11–16821, 11–16869, 11–16876, 11–16880.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 19, 2012.

Filed April 10, 2013.

Jennifer Gille Bacon (argued), William E. Quirk, and Gregory M. Bentz, Polsinelli Shughart PC, Kansas City, MO, for Appellants Learjet, Inc., et al., Heartland Regional Medical Center, et al., Breckenridge Brewery of Colorado, LLC, et al., Reorganized FLI, Inc., and Sinclair Oil Corporation.

Robert L. Gegios, Alexander T. Pendleton, and William E. Fischer, Kohner, Mann & Kailas, S.C., Milwaukee, WI, for Wisconsin Plaintiffs–Appellants.

Mark E. Haddad (argued), Michelle B. Goodman, and Nitin Reddy, Sidley Austin LLP, Los Angeles, CA, for Defendants–Appellees CMS Energy Corp., CMS Energy Resources Management Co., and Cantera Gas Company.

Michael J. Kass and Douglas R. Tribble, Pillsbury Winthrop Shaw Pittman LLP, San Francisco, CA, for Defendants–Appellees Dynegy Marketing & Trade, Dynegy Illinois, Inc., DMT G.P. L.L.C., and Dynegy GP Inc.

Joshua D. Lichtman, Fulbright & Jaworski L.L.P., Los Angeles, CA, and Roxanna A. Manuel, Quinn Emanuel Urquhart & Sullivan, LLP, for Defendant–Appellee Coral Energy Resources, L.P.

Joel B. Kleinman, Adam Proujanski, and Lisa M. Kaas, Dickstein Shapiro LLP, Washington, D.C., for Defendants–Appellees Duke Energy Trading and Marketing, L.L.C. and Duke Energy Carolinas, LLC.

Robert B. Wolinsky, Hogan Lovells US LLP, Washington, D.C., and Steven J. Routh, Orrick, Herrington & Sutcliffe, L.L.P., Washington, D.C., for Defendants–Appellees American Electric Power Company, Inc. and AEP Energy Services, Inc.

Brent A. Benoit and Stacy Williams, Locke Lord Bissell & Liddell LLP, Houston, TX, for Defendants–Appellees El Paso Corporation, El Paso Merchant Energy, L.P., and El Paso Marketing, L.P.

Amelia A. Fogleman, Oliver S. Howard, and Craig A. Fitzgerald, Gable Gotwals, A Professional Corporation, Tulsa, OK, for Defendants–Appellees ONEOK, Inc., ONEOK Energy Services Company L.P.

J. Gregory Copeland and Mark R. Robeck, Baker Botts LLP, Houston, TX, for Defendant–Appellee Reliant Energy Services, Inc.

Graydon Dean Luthey, Jr. and Sarah Jane Gillett, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, OK, for Defendants–Appellees The Williams Companies, Inc., Williams Merchant Services Company, Inc., Williams Power Company, Inc., and Williams Energy Marketing & Trading Company.

Michael John Miguel, K & L Gates LLP, Los Angeles, CA, for Defendants–Appellees Xcel Energy, Inc., e prime, Inc., e prime Energy Marketing, Inc., and Northern States Power Company.

Appeal from the United States District Court for the District of Nevada, Philip M. Pro, District Judge, Presiding. D.C. Nos. 2:03–cv–01431–PMP–PAL, 2:06–cv–00233–PMP–PAL, 2:07–cv–00987–PMP–PAL, 2:06–cv–01351–PMP–PAL, 2:05–cv–01331–PMP–PAL, 2:06–cv–00282–PMP–PAL, 2:06–cv–00267–PMP–PAL, 2:07–cv–01019–PMP–PAL, 2:09–cv–00915–PMP–PAL, 2:09–cv–01103–PMP–PAL.

Before: **CARLOS T. BEA and PAUL J. WATFORD, Circuit Judges, and WILLIAM K. SESSIONS, District Judge.**[*]

# OPINION

**BEA, Circuit Judge:**

These cases arise out of the energy crisis of 2000–2002. Plaintiffs (retail buyers of natural gas) allege that Defendants (natural gas traders) manipulated the price of natural gas by reporting false information to price indices published by trade publications and engaging in wash sales.[1] Plaintiffs brought various claims in state and federal court beginning in 2005, and all cases were eventually consolidated into the underlying multidistrict litigation proceeding. In July 2011, the district court entered summary judgment against Plaintiffs in most of the cases,[2] finding that their state law antitrust claims were preempted by the Natural Gas Act, 15 U.S.C. § 717 *et seq.* ("NGA"). Plaintiffs appeal the district court's order granting summary judgment, as well as orders denying as untimely Plaintiffs' motions to amend their complaints, orders dismissing the AEP Defendants from two cases for lack of personal jurisdiction, and an order granting partial summary judgment to Defendant Duke Energy Trading and Marketing, LLC.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We reverse the district court's order granting summary judgment to the Defendants, reverse in part the district court's orders dismissing the AEP Defendants from the Wisconsin *Arandell* and Missouri *Heartland* suits, and affirm all of the other orders at issue in this appeal. We remand to the district court for further proceedings consistent with this opinion.

**I. Facts and Regulatory FrameworkA. Energy Crisis of 2000–2002**

A brief recitation of the background of this litigation, as well as a description of the regulatory framework governing this case, is useful to set the stage for our holding. These cases arise out of claims that the Defendants violated antitrust laws by manipulating the natural gas market and selling natural gas at artificially inflated prices, leading to the energy crisis of 2000–2002. The Federal Energy Regulatory Commission ("FERC") conducted a fact-finding investigation of the energy crisis, and concluded that "[s]pot gas prices rose to extraordinary levels, facilitating the unprecedented price increase in the electricity market." This market distortion stemmed in part from efforts of energy trading companies to manipulate price indices compiled by trade publications.

The natural gas industry relied on two trade publications, *Gas Daily* and *Inside FERC,* which published the most widely-used price indices. *Gas Daily* published a daily gas price index, while *Inside FERC* published a monthly gas price index. *Gas Daily* relied on telephone interviews with natural gas market participants (traders, end users,[3] and producers) to collect pricing data. *Inside FERC* collected pricing data through standardized spreadsheets, which traders filled out and emailed to *Inside FERC.* Buyers and sellers relied on these indices as reference points to determine the market price for natural gas transactions. In short, the prices for actual transactions were pegged to price indices that were subject to manipulation by energy traders.

After the energy crisis of 2000–2002, a number of energy trading companies admitted that their employees provided false pricing data to *Gas Daily* and *Inside FERC.* Government investigations revealed that the companies had few, if any, internal controls in place to ensure the accuracy of the data reported to the trade publications. A 2003 FERC report described the process as follows:

Traders from all companies describe a typical trading day as hectic, pressure packed, and frenetic. One of their many tasks was to report trading data to the Trade Press; this was viewed as bothersome but necessary. Often it was a job given to the newest employee. Many companies report passing around a form and using a spreadsheet on a shared drive.... There was nothing to stop a trader from changing the numbers someone else had entered. In other cases, traders took an oral "survey" to get a sense of where the market was trading. Sometimes they represented it to the Trade Press as an actual survey, but in other cases they made up trades to average out to a number that was consistent with this "survey."

In addition to reporting false data to the price indices, traders also manipulated the market by engaging in "wash sales," or prearranged sales in which traders "agreed to execute a buy or a sell on an electronic trading platform ... and then to immediately reverse or offset the first trade by bilaterally executing over the telephone an equal and opposite buy or sell."

**B. Overview of Natural Gas Regulation**

Whether Plaintiffs' state law antitrust claims are cognizable depends, for one thing, on whether the field of natural gas regulation has been preempted by federal regulation. This court's preemption analysis is governed by the framework of natural gas regulation, and more

importantly, the distinction between categories of sales that fall within FERC's jurisdiction ("jurisdictional sales") and the categories of sales that fall outside of FERC's jurisdiction ("non jurisdictional sales").

Individual states were originally responsible for the regulation of the production, sale, and transportation of natural gas. However, as the volume of gas sold and transported along interstate pipelines increased, state regulations became regarded by Congress as ineffective. *See Panhandle Eastern Pipe Line Co. v. Pub. Serv. Comm'n of Ind., 332 U.S. 507, 515, 68 S.Ct. 190, 92 L.Ed. 128 (1947)*. In 1938, Congress enacted the Natural Gas Act ("NGA") in response to the demand for federal regulation and to curb the market power of interstate pipelines. *Id.* at 516, 68 S.Ct. 190;*see also E. & J. Gallo Winery v. Encana Corp., 503 F.3d 1027, 1036 (9th Cir.2007)*. FERC is the agency charged with the administration of the NGA, and its jurisdiction is laid out in Section 1(b) of the Act as follows:

The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importationor exportation, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

15 U.S.C. § 717(b). Put simply, the NGA applies to: (1) transportation of natural gas in interstate commerce, (2) natural gas sales in interstate commerce for resale (i.e., wholesale sales), and (3) natural gas companies 4 engaged in such transportation or sale. The NGA does *not* apply to retail sales (i.e., direct sales for consumptive use). *See Panhandle Eastern Pipe Line Co., 332 U.S. at 517, 68 S.Ct. 190* ("The line of the statute [is] thus clear and complete. It cut[s] sharply and cleanly between sales for resale and direct sales for consumptive uses.").

Since the passage of the NGA, Congress has removed other categories of sales from the scope of FERC's jurisdiction as part of a general effort to reduce federal regulation of the natural gas industry. In 1989, Congress passed the Natural Gas Wellhead Decontrol Act of 1989, Pub.L. No. 101–60, which removed "first sales" 5 from FERC's jurisdiction, therefore completely eliminating FERC's authority to set prices at the wellhead. In 1992, to give effect to the North American Free Trade Agreement, Congress amended the NGA to provide that all natural gas sales from Canadian and Mexican sellers to buyers in the United States are also first sales, and therefore not subject to FERC's jurisdiction. *See* Energy Policy Act of 1992, Pub.L. No. 102–486 (codified at 15 U.S.C. § 717b(b)).

The final aspect of the natural gas regulatory scheme relevant to this appeal is FERC's practice of issuing "blanket marketing certificates." 6 Following congressional efforts to reduce federal regulation of the industry, FERC began its own deregulation process. In 1992, FERC promulgated Order 636, which "required all interstate pipelines to 'unbundle' 7 their transportation from their own natural gas sales." *General Motors Corp. v. Tracy, 519 U.S. 278, 284, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997)*; Pipeline Service Obligations and Revisions to

Regulations Governing Self–Implementing Transportation; and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 57 Fed.Reg. 13,267 (Apr. 16, 1992). FERC also issued blanket sale certificates to interstate pipelines that allowed them to offer "unbundled" natural gas at market-based rates, rather than at rates filed with FERC. *See*57 Fed.Reg. at 13,270. FERC continued its own deregulation process by issuing blanket sales certificates for all other resales of natural gas. *See*Regulations Governing Blanket Marketer Sales Certificates, 57 Fed.Reg. 57,952; 57,957–58 (Dec. 8, 1992). These blanket certificates had the effect of allowing all natural gas companies subject to FERC's jurisdiction to charge market-based rates, as opposed to rates filed with and approved by FERC.

## II. Procedural History

Beginning in 2001, a series of class action lawsuits were filed around the country and were eventually consolidated into a multi-district litigation in the District of Nevada. Two of the earliest cases, *Texas–Ohio Energy, Inc. v. AEP Energy Services, Inc., et al.* (" *Texas–Ohio* ") and *Abelman v. AEP Energy Services, Inc., et al.* (" *Abelman* ") alleged both Sherman Act and parallel state antitrust claims. *See In re Western States Wholesale Natural Gas Antitrust Litig.,* 368 F.Supp.2d 1110 (D.Nev.2005); *In re Western States Wholesale Natural Gas Antitrust Litig., 408 F.Supp.2d 1055 (D.Nev.2005)*. The core allegations in *Texas–Ohio* and *Abelman*—that the defendant energy companies conspired to manipulate the price indices—were similar to the allegations in the present case.

The defendants in *Texas–Ohio* and *Abelman* moved to dismiss the complaints in those cases on the grounds that all claims were barred by the filed-rate doctrine 8 and that the state-law claims were preempted by the NGA. In 2005, four months before the first of the present cases was filed, the District Court granted summary judgment to the *Texas–Ohio* and *Abelman* defendants. It held that because the plaintiffs asked for actual damages, any judgment by the court would necessarily decide whether the privately-published price indices (which the court concluded were effectively FERC-approved rates) were reasonable. Since the price indices used to set the rates were FERC-approved, the federal and state law claims were barred by the filed-rate doctrine. *Texas–Ohio,* 368 F.Supp.2d at 1116;*Abelman,* 408 F.Supp.2d at 1069.

Shortly after the judgments in *Texas–Ohio* and *Abelman*, plaintiffs in *Farmland,*9*Learjet, Breckenridge, Arandell,* and *Heartland* began filing suits alleging state antitrust claims in Colorado, Kansas, Missouri, and Wisconsin state courts. Plaintiffs in *Sinclair v. E–Prime* and *Sinclair v. Oneok* brought suit in federal court, alleging various state and federal causes of action. The state cases were removed to federal court on grounds of diversity of citizenship and all cases were consolidated into the present multidistrict litigation.

Defendants in the present case filed a number of motions for summary judgment, alleging that the Plaintiffs' claims were barred by the filed-rate doctrine, or that their state claims were preempted by the NGA. In 2006, the District Court granted the Defendants' motion to dismiss in *Farmland*, finding that the NGA preempted the Plaintiffs' claims under Kansas antitrust statutes. The District Court reasoned that because the Defendants possessed blanket marketing certificates that subjected Defendants and their conduct to FERC's jurisdiction under the NGA, FERC had exclusive jurisdiction over the alleged anti-competitive misconduct at issue. In July 2007, the

District Court reconsidered and vacated its prior ruling granting Defendants' motion to dismiss after Plaintiffs clarified that they did not concede the factual question of whether Defendants possessed blanket marketing certificates.

In September 2007, this court issued its decision in *E. & J. Gallo Winery v. Encana Corp.*, holding that the filed-rate doctrine does not bar state or federal antitrust claims arising out of manipulation of the price indices because the challenged price indices were compiled using transactions outside of FERC's jurisdiction as well as transactions within FERC's jurisdiction. 503 F.3d at 1048.

In November 2007, Defendants filed a new motion for summary judgment in all of the present cases, arguing that Plaintiffs' state claims were preempted by the NGA. In May 2008, the District Court denied the motion, relying in part on this court's decision in *Gallo*.

In July 2008, Defendants filed a motion for reconsideration of the District Court's May 2008 order, arguing that FERC had jurisdiction during the relevant time period to regulate "any practice" affecting a rate subject to the jurisdiction of the Commission (i.e., a "jurisdictional rate"). In November 2009, the District Court held that because the same price indices are used to set the prices in transactions falling within and outside FERC's jurisdiction, any manipulation of these indices falls within FERC's exclusive jurisdiction under Section 5(a) of the NGA. Section 5(a) provides:

[Whenever FERC finds] that *any* rate, charge, or classification ... [or] *rule, regulation, practice, or contract affecting such rate, charge, or classification* is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed or in force, and shall fix the same by order.

15 U.S.C. § 717d (emphases added). The District Court reasoned that pursuant to Section 5(a) of the NGA, FERC has jurisdiction to regulate any "practice" by a jurisdictional seller that affects a jurisdictional rate. The court ordered Defendants to re-file their motion for summary judgment, and in July 2011, the court granted the Defendants' motion for summary judgment as applied to all Plaintiffs. This appeal followed.

### III. The Natural Gas Act and PreemptionA. Standard of Review

This court reviews a district court's grant of summary judgment *de novo. See Lee v. Gregory*, 363 F.3d 931, 932 (9th Cir.2004). Summary judgment is appropriate only where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1075 (9th Cir.2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c)). "Viewing the evidence in the light most favorable to the non-moving party," this court "must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir.2001). This court also reviews a district court's decisions

regarding preemption *de novo*. See *Whistler Investments, Inc. v. Depository Trust & Clearing Corp.*, 539 F.3d 1159, 1163 (9th Cir.2008).

## B. Preemption

The "touchstone in every pre-emption case" is expressed congressional intent. *Wyeth v. Levine*, 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009). The Supreme Court recently emphasized that in preemption cases, courts should "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* In the present case, the presumption against preemption applies with particular force in light of Congress's deliberate efforts to preserve traditional areas of state regulation of the natural gas industry.

The question presented by this appeal is as follows: does Section 5(a) of the NGA, which provides FERC with jurisdiction over any "practice" affecting jurisdictional rates, preempt state antitrust claims arising out of price manipulation associated with transactions falling outside of FERC's jurisdiction? We conclude that such an expansive reading of Section 5(a) conflicts with Congress's express intent to delineate carefully the scope of federal jurisdiction through the express jurisdictional provisions of Section 1(b) of the Act. Our analysis is guided by several circuit court decisions counseling in favor of a narrow reading of Section 5(a). As a result, we hold that the NGA does not preempt the Plaintiffs' state antitrust claims, and reverse the district court's order granting summary judgment to the Defendants.

1. When Congress enacted the NGA in 1938, it expressly limited federal jurisdiction over natural gas to "the sale in interstate commerce of natural gas for resale." 15 U.S.C. § 717(b). An early Supreme Court case interpreting the scope of the NGA described Congress's intent as follows:

The omission of any reference to other sales, that is, to direct sales for consumptive use, in the affirmative declaration of coverage was not inadvertent. It was deliberate. For Congress made sure its intent could not be mistaken by adding the explicit prohibition that the Act "shall not apply to any other ... sale."

*Panhandle Eastern Pipe Line Co. v. Pub. Serv. Comm'n of Ind.*, 332 U.S. 507, 516, 68 S.Ct. 190, 92 L.Ed. 128 (1947). A later Supreme Court decision further emphasized Congress's intent to limit the reach of the NGA:

When it enacted the NGA, Congress carefully divided up regulatory power over the natural gas industry. It did not envisage federal regulation of the entire natural gas field to the limit of constitutional power. Rather it contemplatedthe exercise of federal power as specified in the Act.

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 510, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989). Since the passage of the NGA, Congress has further demonstrated its intent to limit the scope of federal regulation by enacting statutes removing first sales from FERC's jurisdiction. *See* Natural Gas Wellhead Decontrol Act of 1989, Pub.L. No. 101–60, 103 Stat. 157.[10]

**2.** This court's decision in *Gallo* provides further support for our holding that the NGA does not preempt all state antitrust claims. The claims in *Gallo* were essentially the same as the Plaintiffs' claims in the present case. E. & J. Gallo Winery alleged that Encana Corp., a natural gas supplier, conspired to inflate the price of natural gas by manipulating the prices reported to private indices published by natural gas trade publications and the execution of wash trades. *Gallo,* 503 F.3d at 1030–32. Gallo's complaint consisted of federal and state antitrust actions, as well as state-law damages claims. *Id.* at 1032. Encana Corp. moved for summary judgment, claiming that the filed-rate doctrine barred all of Gallo's federal claims, and federal preemption principles barred Gallo's state claims. *Id.* at 1032. The district court denied Encana's summary judgment motion, and this court affirmed the district court. *Id.* at 1030.

We noted in *Gallo* that although FERC did not set the rates charged by the natural gas companies, it did engage in market oversight by granting blanket market certificates after determining that the seller lacked market power. *Id.* at 1041. As a result of FERC's market oversight, the court found "that the market-based rate for natural gas transactions *under FERC's jurisdiction* are FERC-authorized rates, and cannot be the basis of a federal antitrust or state damage action" because of the filed-rate doctrine. *Id.* at 1043 (emphasis added).

Although this court found that the filed-rate doctrine barred claims based on FERC-authorized rates, it distinguished claims based on FERC-authorized rates from claims based on the rates reported in the price indices. *Id.* at 1045. It stated that the record reflected that "the indices potentially include transactions that are under FERC's jurisdiction as well as transactions outside FERC's jurisdiction." *Id.* There were two relevant categories of non-FERC-authorized rates included in the challenged price indices:

First, there is evidence in the record some index pricing inputs were misreported or wholly fictitious. Misreported rates and rates reported for fictitious transactions are not FERC-approved rates, and barring claims that such fictitious transactions damaged purchasers in the natural gas market would not further the purpose of the filed rate doctrine.

Moreover, as part of its investigation of the indices, FERC concluded that it "has jurisdiction over *most* of the transactions that form the basis for the indices." ... This language indicates that at least some of the transactions included in the indices are not subject to FERC's jurisdiction, and thus would be subject to challenge by Gallo.

*Id.* at 1045 (internal citations omitted). The non-jurisdictional transactions includedin the price indices included first sales at the wellhead or via imports from Canada or Mexico. *Id.*

We explained in depth why the removal of certain transactions from FERC's jurisdiction meant that claims arising out of those transactions were not preempted by the NGA. *Id.* at 1046. Most importantly, we assumed that Congress was aware of the existing context of state and federal antitrust law when it enacted the Wellhead Decontrol Act and other statutes limiting FERC's jurisdiction. *Id.* State and federal antitrust laws complement Congress's intent to move to a less regulated market, because such laws support fair competition. *Id.* ("By enabling private parties to combat market manipulation and other anti-competitive actions, the laws under which Gallo brought its claim support Congress's determination that the supply, the demand, and the price of

high-cost first sale gas be determined by market forces.") (internal quotations omitted). For these reasons, we concluded that "Congress did not preclude plaintiffs from basing damage claims on rates associated with first sales." *Id.* Our reasoning in *Gallo* applies with equal force to the question presented by this case: federal preemption doctrines do not preclude state law claims arising out of transactions outside of FERC's jurisdiction.

**C. The NGA's Jurisdictional Limitations**

The district court in the present case acknowledged this court's holding in *Gallo*, but distinguished that case on the grounds that "*Gallo* did not address whether FERC's exclusive jurisdiction over natural gas companies *and their practices which affect jurisdictional rates* preempts state jurisdiction over the same subject matter." It reasoned that Defendants' status as FERC-regulated entities, combined with FERC's authority under Section 5(a) of the NGA to regulate "any rule, regulation, practice, or contract" affecting a jurisdictional rate, conferred exclusive jurisdiction on FERC to regulate the conduct at issue in this case.

The district court read the word "practices" in Section 5(a) of the NGA to preempt impliedly the application of state laws to the same transactions (first sales and retail sales) that Congress expressly exempted from the scope of FERC's jurisdiction in Section 1(b) of the Act. However, this reading runs afoul of the canon of statutory construction that statutory provisions should not be read in isolation, and the meaning of a statutory provision must be consistent with the structure of the statute of which it is a part. *See, e.g., Waggoner v. Gonzales,* 488 F.3d 632, 636 (5th Cir.2007) ("When interpreting statutes ... each part or section of a statute should be construed in connection with every other part or section to produce a harmonious whole."). The district court's reading is also inconsistent with case law interpreting the provisions of Section 5(a) of the NGA narrowly to comport with the jurisdictional limitations established by Section 1(b) of the Act. While the Ninth Circuit has not had the opportunity to define the scope of Section 5(a), the Supreme Court and other circuits have read Section 5(a) narrowly to define the scope of FERC's jurisdiction within the limitations imposed by Section 1(b).

**1.** In *Northwest Central Pipeline Corp. v. State Corporation Commission of Kansas,* the Supreme Court relied on the jurisdictional limitations established in Section 1(b) of the NGA to uphold a state regulation on the production of gas. 489 U.S. 493, 496, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989). The State Corporate Commission of Kansas (KCC) had adopted a regulation governing the timing of natural gas productionfrom the Kansas–Hugoton field. *Id.* The regulation provided that the right to extract assigned amounts of gas from the field would be lost if pipelines delayed production for too long. *Id.* at 497, 109 S.Ct. 1262. Northwest Central Pipeline Corporation challenged the regulation, arguing that it was preempted by federal regulation of the interstate gas industry because the regulation exerted pressure on pipelines to increase their purchases from the Hugoton field and therefore affected the pipelines' cost structures. *Id.* at 497, 507, 109 S.Ct. 1262 (noting that Northwest Central argued that "the federal regulatory scheme pre-empts state regulations that may have either a direct or indirect effect on matters within federal control").

The Supreme Court rejected Northwest Central's argument, relying on the fact that Section 1(b) of the NGA "expressly carve[d] out a regulatory role for the States" and provided that states

would retain jurisdiction over the production of natural gas. *Id.* at 507, 109 S.Ct. 1262. It also rejected the pipeline's claim that federal regulations preempted all state regulations that may affect rates within federal control, stating:

To find field pre-emption of Kansas' regulation merely because purchasers' costs and hence rates might be affected would be largely to nullify that part of NGA § 1(b) that leaves to the States control over production, for there can be little if any regulation of production that might not have at least an incremental affect on the costs of purchasers in some market and contractual situation.

*Id.* at 514, 109 S.Ct. 1262.

In *American Gas Association v. Federal Energy Regulatory Commission,* the D.C. Circuit examined FERC's refusal to use its authority under Section 5 of the NGA to modify "take-or-pay" contracts 11 between natural gas producers and pipelines. 912 F.2d 1496, 1503 (D.C.Cir.1990). A "major premise" of FERC's refusal to act was its conclusion that its Section 5 power did not reach nonjurisdictional contracts. *Id.* at 1505. The court concluded, "As we read the Natural Gas Act, the Commission was absolutely right: Congress clearly limited its § 5 powers to jurisdictional contracts." *Id.*

The petitioners in *American Gas Association* had offered an argument similar to the one offered by the Defendants in the present case: they isolated the phrase "contract affecting such rates" and argued that FERC had jurisdiction to assess the justness and reasonableness of the provisions of *any* contract that would likely influence a pipeline's end-of-pipelines prices. *Id.* FERC, on the other hand, interpreted "contract affecting such rates" as being limited to contracts involving a jurisdictional seller and directly governing the rate in a jurisdictional sale. *Id.* at 1506. The D.C. Circuit agreed with FERC, stating that "petitioners' theory is, more generally, an oxymoron—Commission jurisdiction over nonjurisdictional contracts." *Id.* The court also noted that the petitioners' expansive reading of Section 5 had no "conceptual core" because under their interpretation, Section 5 would reach "pipelines' contracts for every other possible factor of production—even legal services." *Id.* at 1507.

We find the analysis of these cases persuasive, and apply them here. Interpreting the jurisdictional provision in Section 5(a) broadly to find FERC jurisdiction over price manipulation associated with nonjurisdictional sales would risk nullifying the jurisdictional provisions of Section 1(b), which reserve to the states regulatory authority over nonjurisdictional sales, such as first sales at the wellhead or from sellers in Canada and Mexico. Under the broad reading of Section 5(a) that Defendants propose, there is no "conceptual core" delineating transactions falling within FERC's jurisdiction and transactions outside of FERC's jurisdiction. There would be nothing stopping a future court from finding that first sales themselves (which are exempted from FERC's jurisdiction pursuant to Section 1(b) of the Act) are "practices" affecting jurisdictional rates that fall within the jurisdictional provision in Section 5(a). We reject this broad reading and hold that the district court erred in concluding that FERC had jurisdiction over the reporting practices associated with nonjurisdictional sales under Section 5(a).

**2.** Another D.C. Circuit case, *California Independent System Operator Corporation v. Federal Energy Regulatory Commission,* does not address the interplay between the jurisdictional limits

outlined in Section 1(b) and the jurisdictional provision in Section 5(a), but it does provide further support for a narrow interpretation of the word "practices" in Section 5(a). 372 F.3d 395 (D.C.Cir.2004). The California Independent System Operator Corporation (CAISO) was a non-profit entity created by the state of California to operate electric grid facilities in California. *Id.* at 397. By statute, CAISO was obligated to follow certain procedures for selecting a board of directors composed exclusively of California residents. *Id.* After the energy crisis of 2000, FERC directed CAISO to utilize a different selection method for its board of directors. *Id.* at 397–98. FERC claimed that it had authority to issue such a directive under Section 206 of the Federal Power Act, 12 which provided, "Whenever the Commission [shall find] that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential," the Commission shall determine the just and reasonable practice to be observed thereafter. *Id.* at 399 (quoting 16 U.S.C. § 824e(a)). Specifically, FERC claimed that the composition and method of selection of a utility company's governing board was a "practice ... affecting [a] rate," and that because FERC had found that CAISO's selection method was discriminatory, FERC had authority to determine a just and reasonable practice. *Id.*

The D.C. Circuit began its analysis with the "plain language" of the statutory text. *Id.* at 400. It found that the word "practices" is a word of sufficiently diverse meanings that the proper method for determining Congressional intent was to apply the canon of statutory construction " *noscitur a sociis.*" 13 The court looked at the word "practices" in context, finding that Section 5(a) comes into play only after the Commission has a hearing and determines that a "rate, charge, or classification" employed by a regulated utility in a jurisdictional transaction is unjust or unreasonable. *Id.* Therefore, the court found that by using the word "practice," Congress had intended to empower FERC to "effect a reformation of some 'practice' in a more traditional sense of actions habitually being taken by a utility in connection with a rate found to be unjust or unreasonable." *Id.* The court noted that the implications of a broader reading of the word "practices" would be "staggering" because FERC would have jurisdiction over a plethora of activities, such as the methods of contracting for services, labor, or office space, as long as FERC found that such "practices" affected the jurisdictional rates. We agree with the D.C. Circuit's approach to reading the word "practices" narrowly as to not expand unduly the scope of FERC's jurisdiction.

**3.** Defendants rely on *Mississippi Power & Light Co. v. Mississippi ex rel. Moore,* 487 U.S. 354, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988) ("*MP & L* ") for the proposition that "FERC's jurisdiction over a practice or contract affecting a jurisdictional rate preempts state law from being used to regulate that practice or contract." *Mississippi Power & Light* involved a FERC order requiring four utility companies to purchase a particular share of a nuclear power plant's output at rates FERC determined to be just and reasonable. *Mississippi Power & Light Co.,* 487 U.S. at 364, 108 S.Ct. 2428. One of the utility companies, Mississippi Power & Light, filed an application with the Mississippi Public Service Commission ("MPSC") seeking a substantial increase in its retail rates to recoup the costs of purchasing a portion of the nuclear power plant's output. *Id.* at 365, 108 S.Ct. 2428. The Mississippi Supreme Court eventually ruled that the MPSC was required, in accordance with state law, to review the prudence of incurring costs associated with purchasing the nuclear power plant's output. *Id.* at 367, 108 S.Ct. 2428.

The Supreme Court reversed. The Court stated that FERC's exclusive jurisdiction over wholesale rates also encompassed "power allocations that affect wholesale rates." *Id.* at 371, 108 S.Ct. 2428. Because the "prudence inquiry" mandated by the Mississippi Supreme Court required the state commission to review the prudence of the FERC order determining the allocation of costs associated with the nuclear power plant, the inquiry was preempted by FERC's exclusive jurisdiction. *Id.* The Court concluded, "FERC-mandated allocations of power are binding on the States, and States must treat those allocations as fair and reasonable when determining retail rates." *Id.* at 371, 108 S.Ct. 2428.

We do not find Defendants' reliance on *Mississippi Power & Light Co.* to be persuasive. *Mississippi Power & Light Co.* stands for the proposition that states cannot use their jurisdiction over retail rates to second-guess or review FERC-authorized rates that may affect retail rates. *See Gallo,* 503 F.3d at 1044 (relying on *Mississippi Power & Light Co.* to "support EnCana's position that wholesale sellers such as EnCana may raise the filed rate doctrine as a defense to actions putatively attacking retail rates, but having the effect of disallowing FERC-approved wholesale rates."). However, *Mississippi Power & Light Co.* does not support Defendants' broad reading of the phrase "practice ... affecting [jurisdictional] rates." In *Mississippi Power & Light Co.,* FERC had used its jurisdiction over practices affecting wholesale rates to determine an equitable allocation of nuclear power costs. Defendants attempt to analogize the power allocations at issue in *Mississippi Power & Light Co.* with the market manipulation associated with nonjurisdictional transactions at issue in the present case. However, that analogy cannot be squared with the *Gallo* court's holding that the NGA does not preempt state antitrust challenges to rates and practices associated with such nonjurisdictional sales.

### D. FERC's Regulatory Authority

One final issue dividing the parties in this appeal is the extent to which FERC had authority to regulate the market manipulation that gave rise to the energy crisis in 2000–2001. The Defendants point to the Code of Conduct promulgated by FERC in 2003 as evidence that FERC had regulatory authority over the anticompetitive conduct at issue, including the false price reporting and wash sales. FERC promulgated the Code of Conduct by amending the blanket market certificates governing jurisdictional sellers. *See*Amendments to Blanket Sales Certificates, 68 Fed.Reg. 66,323 (Nov. 26, 2003). The Commission stated that the need for the Code of Conduct "was informed by the types of behavior that occurred in the Western markets during 2000 and 2001." *Id.* ¶ 2. The Code prohibited *jurisdictional* sellers 14 "from engaging in actions without a legitimate business purpose that manipulate or attempt to manipulate market conditions, including wash trades and collusion." *Id.* ¶ 4. The Code further provides that jurisdictional sellers are required to provide complete and accurate transactional information to publishers of gas price indices. *Id.* ¶ 5.

While Defendants rely on the promulgation of the Code of Conduct as evidence that FERC had jurisdiction over the market manipulation at issue, there are two significant flaws in their argument. First, two years after the promulgation of the Code, Congress enacted the Energy Policy Act of 2005 ("EPA"),15 which prohibits market manipulation and authorizes FERC to promulgate rules and regulations to protect natural gas ratepayers. There is a canon of statutory interpretation that counsels against reading acts of Congress to be superfluous. *See American*

*Nat'l Red Cross v. S.G.,* 505 U.S. 247, 263, 112 S.Ct. 2465, 120 L.Ed.2d 201 (1992). This canon suggests that Congress enacted the relevant provision of the EPA *because* FERC did not already have regulatory authority over the anticompetitive conduct at issue.

The second flaw in Defendants' argument is more relevant to our jurisdictional analysis. Even if FERC did have the statutory authority to promulgate the 2003 Code of Conduct and to make it applicable to "first sales" and other nonjurisdictional sales, a close reading of the Code reveals that FERC limited the application of the Code to sales within its jurisdiction. FERC acknowledged that because of acts deregulating first sales of natural gas, such sales were outside the scope of FERC's jurisdiction. Amendments to Blanket Sales Certificates, 68 Fed.Reg. 66,323 ¶ 14 (Nov. 26, 2003). FERC further noted that some commenters had raised "concerns regarding the potential adverse effect of imposing the proposed code of conduct only on the portion of the natural gas market under the Commission's jurisdiction," *id.* ¶ 16, and responded by stating, "The fact that the Commission does not regulate the entire natural gas market does not compel the Commission to refrain from exercising its authority over that portion of the gas market which is within its jurisdiction to prevent the manipulation of prices." *Id.* ¶ 21. The discussion of jurisdictional limitations within the Code of Conduct itself suggests that the Code does *not* support the Defendants' argument that FERC had jurisdiction over the anticompetitive behavior related to nonjurisdictional sales. For these reasons, the 2003 enactment of the Code of Conduct does not affect our conclusion that the NGA does not grant FERC jurisdiction over claims arising out of false price reporting and other anticompetitive behavior associated with nonjurisdictional sales.

**IV. The District Court's Orders Denying Plaintiffs Leave to Amend**

The *Farmland, Breckenridge, Learjet*, and *Heartland* Plaintiffs appeal the district court's October 29, 2010, order denying them leave to amend their complaints to add federal antitrust claims. Their motions for leave to amend their complaints were filed nine months after the March 2, 2009, scheduling deadline to amend pleadings. The *Breckenridge* Plaintiffs also appeal the district court's April 21, 2008, order denying them leave to amend their complaint to add a state law treble damages remedy.

We review a district court's decision denying leave to amend pleadings for abuse of discretion. *See Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 607 (9th Cir.1992). We hold that in the present case, the district court did not abuse its discretion in denying either of the two motions for leave to amend complaints, and therefore affirm both the October 29, 2010, order denying the *Farmland, Breckenridge, Learjet,* and *Heartland* Plaintiffs leave to amend their complaints to add federal antitrust claims, as well as the April 21, 2008, order denying the *Breckenridge* Plaintiffs leave to amend their complaint to add a state law treble damages claim.

**A. October 29, 2010, Order**

We summarize briefly the procedural history of this case to provide context for our decision to affirm the district court's October 29, 2010, order.

On April 8, 2005, the district court granted summary judgment to the defendants in the *Texas–Ohio* and *Abelman* cases on the ground that the plaintiffs' claims in those cases were barred by the filed-rate doctrine. *See In re Western States Wholesale Natural Gas Antitrust Litig.*, 368 F.Supp.2d 1110 (D.Nev.2005), *rev'd by* 243 Fed.Appx. 328 (9th Cir.2007) and *In re Western States Wholesale Natural Gas Antitrust Litig., 408 F.Supp.2d 1055 (D.Nev.2005)*, *rev'd by* 248 Fed.Appx. 821 (9th Cir.2007). Four months later, the first of these present actions was filed. In September 2007, this court issued its decision in *Gallo* and simultaneously reversed *Texas–Ohio* and *Abelman*, holding that the filed-rate doctrine does not bar state or federal antitrust claims arising out of the allegations that energy traders manipulated the price index. *See E. & J. Gallo Winery v. Encana Corp., 503 F.3d 1027 (9th Cir.2007)*; *In re Western States Wholesale Natural Gas Antitrust Litig.*, 243 Fed.Appx. 328 (9th Cir.2007) (reversing *Texas–Ohio* ); *In re Western States Wholesale Natural Gas Antitrust Litig.*, 248 Fed.Appx. 821 (9th Cir.2007) (reversing *Abelman* ). In November 2007, Defendants in the present case filed a new motion for summary judgment, and in May 2008, the District Court denied the motion, relying in part on *Gallo*. In July 2008, Defendants asked the District Court to reconsider its May 2008 order denying their preemption-based motion for summary judgment. Finally, in November 2009 the District Court agreed to reconsider its May 2008 order.

The deadline to amend pleadings in this case was March 2, 2009. On December 15, 2009 (approximately one month after the District Court agreed to reconsider its May 2008 order denying summary judgment), Plaintiffs filed motions to modify the scheduling order and for leave to amend their complaints to add claims under the federal Sherman Antitrust Act.

The district court denied the Plaintiffs' motions to amend their pleadings, noting that when a party seeks to amend a pleading after the pretrial scheduling order's deadline for amending the pleadings has expired, the moving party must satisfy the "good cause" standard of Federal Rule of Civil Procedure 16(b)(4), which provides that "[a] schedule may be modified only for good cause and with the judge's consent," rather than the liberal standard of Federal Rule of Civil Procedure 15(a). "Unlike Rule 15(a)'s liberal amendment policy which focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party, Rule 16(b)' s 'good cause' standard primarily considers the diligence of the party seeking the amendment." *Johnson*, 975 F.2d at 609. While a court may take into account any prejudice to the party opposing modification of the scheduling order, "the focus of the [Rule 16(b) ] inquiry is upon the moving party's reasons for seeking modification ... [i]f that party was not diligent, the inquiry should end." *Id.*

The district court in the present case noted, "The good cause standard typically will not be met where the party seeking to modify the scheduling order has been aware of the facts and theories supporting amendment since the inception of the action." The district court found that Plaintiffs were not diligent in seeking the amendment to add federal Sherman Antitrust Act claims, because they had known since 2007 (after this court held in *Gallo* that federal antitrust claims were not barred by the filed-rate doctrine) that federal antitrust claims may be viable.

We hold that the district court did not abuse its discretion in concluding that the Plaintiffs were not diligent in seeking to amend their complaints to add federal antitrust claims. Our analysis is guided by this court's decision in *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604 (9th

Cir.1992). In *Johnson,* Dairl Johnson was injured while skiing at Mammoth Mountain ski resort. *Id.* at 606. He filed a diversity action against the ski lift manufacturer and Mammoth Recreations, Inc., a holding company that owned a majority of the stock in Mammoth Mountain Ski Area, Inc., the entity that actually owned and operated the ski resort. *Id.* The district court filed a scheduling order which established a cut-off date of October 17, 1989, for joining additional parties. *Id.* Four months after this deadline passed, Johnson moved to join Mammoth Mountain Ski Area, Inc., claiming that he was unaware of the existence of Mammoth Mountain Ski Area, Inc., and its corporate relationship with Mammoth Recreations, Inc. *Id.* at 607. The court found that Johnson had failed to demonstrate good cause for his belated motion to amend, since "Mammoth Recreation's answer to the complaint and response to interrogatories amply indicated that Mammoth Recreations did not own and operate the ski resort, and thus any theory of liability predicated upon that fact would fail." *Id.* at 609. As in *Johnson,* the Plaintiffs here have failed to demonstrate good cause for their untimely motion to amend, and thus, the district court did not abuse its discretion in denying that motion. We therefore affirm the district court's October 29, 2010, order denying Plaintiffs leave to amend their complaints to add federal antitrust claims.

**B. April 21, 2008, Order**

On March 4, 2008, the *Heartland* Plaintiffs filed a motion for leave to amend their complaint to add a treble damages claim under the Colorado state antitrust statute. Previously, their complaint had sought only a full refund. The district court denied the motion, stating, "Plaintiffs have been aware of the availability of an actual damages claim under the Colorado antitrust statutes since the inception of the case, but chose to plead under the full refund provision only." The district court found that Plaintiffs' failure to seek leave to add an actual damages claim was explicable during the time between the district court's 2005 ruling in *Texas–Ohio* and *Abelman* that such claims were barred by the filed-rate doctrine and this court's decision in *Gallo* holding that such claims were *not* barred. However, this court decided *Gallo* in September 2007, and Plaintiffs did not move to amend their complaint to add an actual damages claim until March 4, 2008.

The district court considered it relevant that Plaintiffs had requested leave to amend to add an additional defendant on October 12, 2007, but did not make a request to add the treble damages claim at that time. The court denied the Plaintiffs' March 4, 2008, motion for leave to amend to add a treble damages claims, finding that Plaintiffs unduly delayed amendment by waiting "until after this Court granted summary judgment on the full consideration claim, several months after *Gallo,* to seek leave to amend to add a new theory of liability of which Plaintiffs have been aware since the inception of this suit."

Although Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires," it "is not to be granted automatically." *Jackson v. Bank of Hawaii,* 902 F.2d 1385, 1387 (9th Cir.1990). This court considers the following five factors to assess whether to grant leave to amend: "(1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment; and (5) whether plaintiff has previously amended his complaint." *Allen v. City of Beverly Hills,* 911 F.2d 367, 373 (9th Cir.1990).

The district court in the present case relied heavily on the fifth factor. It noted that a "district court's discretion [whether to grant leave to amend] is 'particularly broad' in deciding subsequent motions to amend where the court previously granted leave to amend." This court's decision in *Royal Insurance Company of America v. Southwest Marine,* 194 F.3d 1009 (9th Cir.1999) is instructive. Royal Insurance Company sued Southwest for breach of contract, breach of warranty, and negligence after Southwest allegedly caused $900,000 of damage to a boat insured by Royal Insurance. *Id.* at 1013. Royal Insurance amended its complaint twice—once to correct minor deficiencies in the original complaint, and once to assert additional claims against Southwest. *Id.* at 1013 n. 1. However, the district court denied Royal Insurance's motion for leave to file a third amended complaint to assert further claims against Southwest, which Royal filed after the district court granted summary judgment in favor of Southwest. *Id.* at 1013.

On appeal, this court stated, "Late amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action." *Id.* at 1016–17 (internal quotation marks omitted). We relied on the fact that Royal Insurance had knowledge of the relevant facts from the inception of the lawsuit, and also the fact that Royal had twice before amended its complaint, to hold that the district court did not abuse its discretion by denying Royal's motion for leave to file a third amended complaint. *Id.* at 1017 ("Considering that Royal had twice before amended its complaint and moved to amend a third time only after the district court dismissed its claims on summary judgment, the district court did not abuse its discretion by denying Royal's motion to amend.").

In the present case, we find that the district court did not abuse its discretion in denying the *Heartland* Plaintiffs' motion for leave to amend to add a treble damages state law claim. We therefore affirm the district court's order denying that motion.

## V. Dismissal of the AEP Defendants from the *Arandell* and *Heartland* Lawsuits

The district court entered separate orders dismissing the AEP Defendants 17 from the *Arandell* suit filed in Wisconsin state court and dismissing the AEP Defendants from the *Heartland* suit filed in Missouri state court prompted by the AEP Defendants' motions to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). This court reviews *de novo* a district court's determination that it does not have personal jurisdiction over a defendant. *See Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 800 (9th Cir.2004).

### A. Facts

The operative facts alleged in each case are substantially similar. The *Arandell* Plaintiffs filed a class action in Wisconsin pursuant to the Wisconsin Antitrust Act, Wisconsin Statutes ch. 133, brought by and on behalf of a class consisting of all Wisconsin industrial and commercial purchasers of natural gas for consumption in Wisconsin between January 1, 2000 and October 21, 2002. Their complaint alleged that during the relevant time period, the Defendants conspired to restrain trade or commerce relating to natural gas.

The *Heartland* Plaintiffs filed a class action in Missouri pursuant to the Missouri Antitrust Laws, Missouri Statutes § 416.010 *et seq.*, brought by and on behalf of a class consisting of all Missouri industrial and commercial purchasers of natural gas for consumption in Missouri between January 1, 2000 and October 21, 2002. Their complaint alleged that during the relevant time period, the Defendants conspired to restrain trade or commerce relating to natural gas.

None of the following basic facts about AEP's corporate structure are in dispute. AEP is a New York corporation with its principal place of business in Columbus, Ohio. During the relevant time period in each case, AEP wholly owned and controlled its subsidiary, AEP Energy Services, Inc. (AEPES), an Ohio corporation with a principal place of business in Columbus, Ohio. AEP is a holding company that derives its income from dividends on its subsidiaries' stocks; the AEP Defendants have no office, bank accounts, property, or employees in either Wisconsin or Missouri; the AEP Defendants have not qualified to do business in either Wisconsin or Missouri and have not appointed a registered agent for service of process in either of those states; the AEP Defendants have not paid taxes, manufactured products, or performed services in either Wisconsin or Missouri; and the AEP Defendants have not directed advertising specifically at Wisconsin or Missouri residents.

In the *Arandell* case, the Plaintiffs claim specific personal jurisdiction 18 over the AEP Defendants because their actions pursuant to the alleged conspiracy "were intended to have, and did have, a direct, substantial, and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period." Plaintiffs alleged that personal jurisdiction existed over AEP based on the activities of its corporate affiliates, namely AEPES, which entered into a long-term "natural gas supply agreement with Wisconsin Electric Power Company during the Relevant Time Period, and sold natural gas to Wisconsin Electric Power Company pursuant to that agreement."

The district court found that from 1998–2003, AEPES entered into natural gas supply agreements with various Wisconsin companies, and that trade confirmations evince numerous sales made to companies with Wisconsin addresses throughout 2001–2003. AEP acted as a guarantor for AEPES during the relevant time period to facilitate AEPES's business, including issuing guarantees on AEPES's behalf to several Wisconsin-based entities. However, AEPES has never entered into a contract or delivered gas to any of the named plaintiffs in the case.

The *Heartland* case presents substantially similar facts. The *Heartland* Plaintiffs claim specific personal jurisdiction 19 over the AEP Defendants because their actions pursuant to the alleged conspiracy "were intended to have, and did have, a direct, substantial, and reasonably foreseeable effect on commerce in Missouri during the Relevant Time Period." Plaintiffs allege that personal jurisdiction existed over AEP based on the activities of its corporate affiliates, namely AEPES, which sold natural gas to Missouri entities during the relevant time period. The Plaintiffs also allege that one of the primary Missouri entities that AEP traded with, Aquila Merchant Services, was "an active member of the conspiracy to manipulate natural gas prices."

The district court found that from 1997–2001, AEPES entered into natural gas supply agreements with various Missouri companies. From 2000–2002, AEPES sold billions of dollars worth of natural gas to Missouri-based entities. AEP acted as a guarantor for AEPES during the

relevant time period to facilitate AEP Energy Services's business, including issuing guarantees on AEPES's behalf to several Missouri-based entities. However, AEPES has never entered into a contract with either of the named Plaintiffs in this case.

## B. Analysis

When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction. *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.,* 328 F.3d 1122, 1128–29 (9th Cir.2003). However, the plaintiff must make "only a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Doe v. Unocal Corp.,* 248 F.3d 915, 922 (9th Cir.2001). For the purposes of deciding whether a prima facie showing has been made, "the court resolves all disputed facts in favor of the plaintiff." *Pebble Beach Co. v. Caddy,* 453 F.3d 1151, 1154 (9th Cir.2006).

Personal jurisdiction over a nonresident defendant is proper if permitted by a state's long-arm statute [20] and if the exercise of that jurisdiction does not violate federal due process. *Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.,* 103 F.3d 888, 893 (9th Cir.1996). For the exercise of jurisdiction to satisfy due process, a nonresident defendant, if not present in the forum, must have "minimum contacts" with the forum such that the assertion of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (internal quotation marks omitted). A federal district court may exercise either general or specific personal jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–15, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). To establish general jurisdiction, the plaintiff must demonstrate that the defendant has sufficient contacts to "constitute the kind of continuous and systematic general business contacts that approximate physical presence." *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d 1114, 1124 (9th Cir.2002) (internal quotation marks omitted). However, because the Plaintiffs do not claim that the district court could exercise general jurisdiction in either Wisconsin or Missouri over the AEP Defendants in this case, the only relevant question on appeal is whether the district court could exercise specific personal jurisdiction over the AEP Defendants.

This court uses the following three-part test to analyze whether a party's "minimum contacts" meet the due process standard for the exercise of specific personal jurisdiction:

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable

*Schwarzenegger,* 374 F.3d at 802. "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." *Omeluk v. Langsten Slip & Batbyggeri A/S,* 52 F.3d 267, 270 (9th Cir.1995). While all three requirements must be met, this court has stated that in its consideration of the first two prongs, "[a] strong showing on one axis

will permit a lesser showing on the other." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1210 (9th Cir.2006) (en banc)*. That means that a single forum state contact can support jurisdiction if the cause of action arises out of that particular purposeful contact of the defendant with the forum state. *Id.* (citing *Lake v. Lake, 817 F.2d 1416, 1421 (9th Cir.1987)*). The district court in the *Arandell* and *Heartland* cases focused its analysis on the allegations that AEPES made sales to Wisconsin- and Missouri-based entities and found that the Plaintiffs had not met their burden of proving the second requirement for specific jurisdiction. [21] This court has referred to the second prong of the specific jurisdiction test as a "but for" test. *See Shute v. Carnival Cruise Lines, 897 F.2d 377, 385 (9th Cir.1990), rev'd on other grounds, Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991).* [22] Under the "but for" test, "a lawsuit arises out of a defendant's contacts with the forum state if a direct nexus exists between those contacts and the cause of action." *Fireman's Fund Ins. Co.,* 103 F.3d at 894. The district court found that there was no causal nexus between AEP Defendants' activities in the forum states (selling natural gas to non-Plaintiff third parties) and the harm allegedly suffered by the Plaintiffs (buying gas at inflated prices from third party sellers).

We need not decide whether personal jurisdiction could be grounded on the AEP Defendants' sales of natural gas in the forum states to third parties. The *Arandell* and *Heartland* Plaintiffs also predicated their antitrust claims on the AEP Defendants' manipulation of the price indices pursuant to a conspiracy to inflate natural gas prices. The district court conducted the personal jurisdiction analysis based on the natural gas sales only. We find that the district court erred in failing to analyze whether Plaintiffs' allegations of anticompetitive behavior directed at the forum states are sufficient to support the exercise of specific personal jurisdiction.

There is no question that the Plaintiffs' state antitrust claims arise out of the AEP Defendants' collusive manipulation of the gas price indices.[23] In other words, their claims "arise[ ] out of or relate[ ] to" the Defendants' alleged forum-related activities. *Schwarzenegger, 374 F.3d at 802*. The second prong of the test for specific personal jurisdiction is therefore satisfied. The key issue in this analysis is therefore whether the AEP Defendants' price manipulation satisfies the *first* prong of the specific personal jurisdiction inquiry, i.e., whether "[t]he non-resident defendant ... purposefully direct[ed] his activities or consummat[ed] some transaction with the forum or resident thereof; or perform[ed] some act by which he purposefully avail[ed] himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws." *Id.* This first prong is satisfied by showing either purposeful availment or purposeful direction, which are two distinct concepts. *See Washington Shoe Co. v. A–Z Sporting Goods, Inc., 704 F.3d 668, 672 (9th Cir.2012)*.

"Purposeful direction" requires that the defendant allegedly must have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Washington Shoe, 704 F.3d at 673* (quoting *Mavrix Photo, Inc. v. Brand Techs., Inc., 647 F.3d 1218, 1228 (9th Cir.2011)*). This test for "purposeful direction" is based on the Supreme Court's test in *Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)*. [24]

The facts alleged in these causes of action present a compelling case for finding that the AEP Defendants "purposefully directed" their anticompetitive behavior at the forum states. The first two prongs of the "purposeful direction" test ask whether there was an "intentional act" 25 that was "expressly aimed at the forum state." 26 Here, the pleadings contain allegations of "intentional acts" in the form of anticompetitive behavior expressly aimed at the forum states. The Wisconsin *Arandell* Plaintiffs alleged, for example, that AEP "either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information," actions which were "intended to have, and did have, a direct, substantial and reasonably foreseeableeffect on commerce in Wisconsin." By alleging acts "intended to have" an effect in Wisconsin, the Plaintiffs went beyond alleging acts with a "mere foreseeable effect" in the forum. *See Pebble Beach,* 453 F.3d at 1156 (citing *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.,* 223 F.3d 1082, 1087 (9th Cir.2000)). They alleged intentional acts by the AEP Defendants that were "directed at the forum state" itself. *Id.* at 1158.

The *Arandell* Plaintiffs further alleged that AEP's officers or directors made agreements "which tended to advance or control the market prices of natural gas that its affiliates sold in the United States or in Wisconsin" and that these officers or directors made "strategic marketing policies and decisions" to report prices to natural gas price indices "that affected the market prices of natural gas." The policies and decisions, alleged the *Arandell* Plaintiffs, were "implemented on an operational level by affiliates, such as [AEPES]." The *Arandell* Plaintiffs also claimed that all Defendants (including the AEP Defendants) "worked together to fraudulently increase the retail price of natural gas paid by commercial entities in Wisconsin." This conspiracy was allegedly carried out through unlawful acts that were "ordered and performed by their officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of defendants' business or affairs." For example, the Plaintiffs alleged that "American Electric Power Company and AEP Energy Services, Inc. traders were instructed by their superiors to adjust the prices and volumes of trades they had made and, in some cases, to report trades that never occurred." The "purpose and effect" of this was to "collusively and artificially inflate the price of natural gas paid by commercial entities in Wisconsin." These alleged facts, taken as true, establish that the AEP Defendants' price manipulation was "expressly aimed" at Wisconsin, because the AEP Defendants knew and intended that the consequences of their price manipulation would be felt in Wisconsin. *Ibrahim v. Dep't of Homeland Sec.,* 538 F.3d 1250, 1258 (9th Cir.2008).

The third prong of the "purposeful direction" test asks whether the intentional acts caused harm that the defendant knows is likely to be suffered in the forum state. In the present case, the *Arandell* Plaintiffs further alleged that each defendant "committed one or more acts or omissions outside of Wisconsin, which caused an injury to person or property within Wisconsin." Such injury included increases in the price of gas, which was specifically alleged in the complaint— for example, the Plaintiffs alleged that the city gate price for natural gas in Wisconsin nearly quadrupled in the span of a year, while the price for commercial consumers more than doubled. The harm was magnified by increased price volatility, which "caused commercial entities in Wisconsin to incur greater expenses associated with hedging natural gas costs," further injuring the Plaintiffs by "depriving them of the right and ability to make risk management, resource

allocation and other financial decisions relating to natural gas, in a full and free competitive market."

In this case, the amount of harm in Wisconsin, and the specificity with which it was alleged, is sufficient to satisfy the third prong of the "purposeful direction" test. Our case law does not require that the "brunt" of the harm be suffered in the forum state; as long as "a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state." *La Ligue*, 433 F.3d at 1207. For these reasons, we find that the *Arandell* Plaintiffs have alleged sufficient facts to support the exercise of specific personal jurisdiction over the AEP Defendants on the theory that the AEP Defendants "purposefully directed" their anticompetitive conduct at the forum state of Wisconsin.

The district court did not address the third prong of the personal jurisdiction inquiry, whether the exercise of jurisdiction would "comport with fair play and substantial justice"—in other words, whether the exercise of jurisdiction would be reasonable. *Schwarzenegger*, 374 F.3d at 802. Once the Plaintiffs have shown that the exercise of personal jurisdiction satisfies the first two prongs of the personal jurisdiction test, the burden shifts to the defendant to make a "compelling case" that the exercise of jurisdiction would be unreasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–77, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). This court considers the following seven factors in determining whether the exercise of jurisdiction would be reasonable:

(1) the extent of the defendant's purposeful interjection into the forum state, (2) the burden on the defendant in defending in the forum, (3) the extent of the conflict with the sovereignty of the defendant's state, (4) the forum state's interest in adjudicating the dispute, (5) the most efficient judicial resolution of the controversy, (6) the importance of the forum to the plaintiff's interest in convenient and effective relief, and (7) the existence of an alternative forum.

*Bancroft*, 223 F.3d at 1088. We find that the AEP Defendants have not made a "compelling case" based upon any of these factors that the exercise of personal jurisdiction in Wisconsin would be unreasonable.

For these reasons, we reverse the district court's order dismissing the AEP Defendants from the Wisconsin *Arandell* case for lack of personal jurisdiction. The Missouri *Heartland* Plaintiffs alleged similar facts as the Wisconsin *Arandell* Plaintiffs, and therefore our analysis applies with equal force to the *Heartland* case. We note, however, that the *Heartland* Plaintiffs appeal the district court's dismissal of AEPES for lack of personal jurisdiction, but do not challenge the district court's dismissal of AEP, the parent company. 27 The *Heartland* Plaintiffs thus appear to have waived any argument for personal jurisdiction over AEP and we reverse the district court's order in *Heartland* dismissing the AEP Defendants for lack of jurisdiction in *Heartland* as to AEPES only.

## VI. Order Granting Duke Energy Trading and Marketing's Motion for Partial Summary Judgment

Several Plaintiffs in *Arandell Corp. v. Xcel Energy, Inc.* appeal the district court's order granting Defendant Duke Energy Trading and Marketing, LLC's ("DETM") motion for partial summary

judgment based on the district court's interpretation of Wisconsin Statutes § 133.14.28 This court reviews *de novo* a district court's interpretation of state law. *See Hauk v. J.P. Morgan Chase Bank USA,* 552 F.3d 1114, 1118 (9th Cir.2009).

Several Wisconsin corporations (Arandell Corp., Merrick's, Inc., Safety–Kleen Systems, Inc., and Sargento Foods) brought suit against natural gas sellers in Wisconsin state court, alleging two causes of action under Wisconsin state law. Count One arose under Wisconsin Statutes § 133.14, which voids contracts to which an antitrust conspirator is a party and allows recovery of payments made pursuant to such a contract. Count Two sought treble damages under Wisconsin Statutes § 133.18, which provides that "any person" injured, directly or indirectly, by a violation of the Wisconsin Antitrust Act may recover treble damages.

All but one of the named Defendants moved to dismiss or for summary judgment on Count One of Plaintiffs' Amended Complaint. They argued that the Plaintiffs lacked standing to assert a claim against them under Wisconsin Statutes § 133.14 because none of the named Plaintiffs purchased natural gas directly from any of the moving defendants. Wisconsin Statutes § 133.14 provides:

All contracts or agreements made by any person while a member of any combination or conspiracy prohibited by [§ ] 133.03, and which contract or agreement is founded upon, is the result of, grows out of or is connected with any violation of such section, either directly or indirectly, shall be void and no recovery thereon or benefit therefrom may be had by or for such person. *Any payment made upon, under or pursuant to such contract or agreement to or for the benefit of any person may be recovered from any person who received or benefitted from such payment in an action by the party making any such payment or the heirs, personal representative or assigns of the party.*

Wis. Stat. § 133.14 (emphasis added). In interpreting a state statute, a federal court applies the relevant state's rules of statutory construction. *See In re Lieberman,* 245 F.3d 1090, 1092 (9th Cir.2001). In Wisconsin, to determine the meaning of a statutory provision, courts begin with the statute's plain language, "taking into consideration the context in which the provision under consideration is used," and furthermore, "[s]tatutory language is given its common, ordinary, and accepted meaning." *Burbank Grease Servs., LLC v. Sokolowski,* 294 Wis.2d 274, 717 N.W.2d 781, 788 (2006).

We agree with the district court's conclusion that the statutory text at issue is unambiguous. Section 133.03 makes illegal every contract, combination, or conspiracy in restraint of trade or commerce. *See* Wis. Stat. § 133.03(1). The first sentence of Section 133.14 therefore provides that any contract made by a member of an antitrust conspiracy is void, and no conspirator who is a party to that contract may recover or benefit therefrom. The second sentence of Section 133.14 permits the party making a payment "upon, under or pursuant to such contract" to recover those payments. There is no provision authorizing recovery by indirect purchasers or other non-parties to the voided contract.29

Plaintiffs argue that the Wisconsin legislature intended for the Wisconsin Antitrust Act to be interpreted as broadly as possible.For example, they quote Wisconsin Statutes § 133.01, which

provides, "It is the intent of the legislature that this chapter be interpreted in a manner which gives the most liberal construction to achieve the aim of competition." However, evidence that the legislature intended the Act to be applied broadly cannot overcome the plain text of Section 133.14, which does not provide for recovery for indirect purchasers or other non-parties to the contract.

After the district court held on February 19, 2008, that "the party seeking the recovery [under Section 133.14] must have been a party to the void contract, or at least have made payments based on the contractual obligation set forth in the conspirator's contract," Plaintiffs Sargento, Merrick's, and Ladish admitted that they had no direct purchase agreements with DETM. Therefore, the district court concluded, "No genuine issue of material fact remains that Sargento, Merrick's, and Ladish did not purchase natural gas directly or through an agent from DETM," and granted summary judgment on Count One of Plaintiffs' Amended Complaint as to these three Plaintiffs. Because we agree with the district court's conclusion that the plain text of Wisconsin Statutes § 133.14 allows recovery only by plaintiffs who were direct purchasers under the voided contract, we affirm the district court's order granting partial summary judgment to DETM.

## VII. Conclusion

We **REVERSE** the district court's order granting summary judgment to Defendants on preemption grounds, **REVERSE** in part the district court's orders dismissing the AEP Defendants from the Wisconsin *Arandell* and Missouri *Heartland* suits, and **AFFIRM** all other orders at issue in this appeal. We **REMAND** to the district court for further proceedings consistent with this opinion.30

**REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.**

\* The Honorable William K. Sessions, III, District Judge for the U.S. District Court for the District of Vermont, sitting by designation.

1. Wash sales are prearranged sales in which traders execute a trade on an electronic trading platform, and then immediately offset that trade by executing an equal and opposite trade.

2. The district court's judgment is final in all cases except *Sinclair v. EPrime,* No. 11–16821, and *Sinclair v. Oneok,* No. 11–16818. The Plaintiffs' complaints in the *Sinclair* cases contain federal claims that were not preempted, but the District Court declared that there was "no just reason for delay," making the preemption rulings in *Sinclair v. E–Prime* and *Sinclair v. Oneok* final and appealable pursuant to Federal Rule of Civil Procedure 54(b).

3. The term "end users" refers to industrial, commercial, and residential consumers of gas, such as the Plaintiffs in this case.

4. A "natural-gas company" is defined as "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale." 15 U.S.C. § 717a(6).

5. The statutory definition of "first sales" is quite complex, *see* 15 U.S.C. § 3301(21), but as this court stated in *Gallo,* "first sales are, in essence, merely sales of natural gas that are not preceded by a sale to an interstate pipeline, intrastate pipeline, local distribution company, or retail customer. In other words, sales by pipelines, local distribution companies, and their affiliates cannot be first sales unless these entities are selling gas of their own production." *Gallo,* 503 F.3d at 1037.

6. Under blanket certificates issued pursuant to Section 7(c) of the NGA, "a natural gas company may undertake a restricted array of routine activities without the need to obtain a case-specific certificate for each individual project." *See* Blanket Certificates, Federal Energy Regulatory Commission (last visited on March 25, 2013), http:// www. ferc. gov/ industries/ gas/ indus- act/ blank- cert. asp. A company with a blanket certificate may "construct, modify, acquire, operate, and abandon a limited set of natural gas facilities, and offer a limited set of services, provided each activity complies with constraints on costs and environmental impacts set forth in the Commission's regulations." *Id.*

7. "Prior to the early 1980s, most natural gas was sold at or near the wellhead to the intrastate or interstate pipeline in the field.... The pipeline purchasers typically provided a bundled service which included the gathering, processing, storage and transmission of the gas to market." Judith M. Matlock, *Federal Oil and Gas Pipeline Regulation: An Overview,* Rocky Mountain Mineral Law Found. Paper No. 4 (Feb. 23–24, 2011).

8. The filed-rate doctrine "is a judicial creation that arises from decisions interpreting federal statutes that give federal agencies exclusive jurisdiction to set rates for specified utilities" and bars "challenges under state law and federal antitrust laws to rates set by federal agencies." *E. & J. Gallo Winery v. Encana Corp.,* 503 F.3d 1027, 1033 (9th Cir.2007). *See also Arkansas Louisiana Gas Company v. Hall,* 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (stating that because the Natural Gas Act required sellers of natural gas in interstate commerce to file their rates with FERC for FERC's approval, "[n]o court may substitute its own judgment on reasonableness for the judgment of the Commission").

9. As a result of bankruptcy proceedings, the name of the Plaintiff in this case has changed to "Reorganized FLI, Inc." For the sake of simplicity we refer to this Plaintiff as "Farmland" in this opinion.

10. In 1978 Congress enacted the Natural Gas Policy Act ("NGPA"), Pub.L. No. 95–621, 92 Stat. 3352, which eliminated the low price ceilings on wellhead sales. However, the Natural Gas Wellhead Decontrol Act of 1989 ("WDA") completely eliminated FERC's authority to set prices at the wellhead.

11. Certain contracts entered into by producers and pipelines between 1977–1982 contained "take-or-pay" clauses requiring the pipelines either to purchase a specified percentage of the producer's deliverable gas or to make "pre-payments" for that percentage. *See Associated Gas Distribs. v. FERC,* 824 F.2d 981, 1021 (D.C.Cir.1987).

12. The language at issue from the Federal Power Act in *CAISO* is identical to the language at issue from the NGA in the present case. The Supreme Court noted in *Arkansas Louisiana Gas Company v. Hall* that the relevant provisions of the Federal Power Act and the Natural Gas Act "are in all material respects substantially identical," and therefore the Court's established practice is to "cit[e] interchangeably decisions interpreting the pertinent sections of the two statutes." 453 U.S. 571, 577 n. 7, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (internal quotations omitted).

13.*Noscitur a sociis* means that "a word is known by the company it keeps," and this canon is applied "where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961).

14. Section III.A of the Commission's final order is titled "Application of Code of Conduct to Jurisdictional Sellers," and paragraphs 14–22 discuss the scope of FERC's jurisdiction over the natural gas industry.

15. The EPA provides, in relevant part:

It shall be unlawful for any entity, directly or indirectly, to use or employ, in connection with the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission, any manipulative or deceptive device or contrivance.... in contravention of such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of natural gas ratepayers.

Pub.L. No. 109–58 tit. III, § 315 (codified at 15 U.S.C. § 717c–1).

.Fed.R.Civ.P. 15(a) provides that a party may amend its pleadings once as a matter of course within certain deadlines, and that in "all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. *The court should freely give leave when justice so requires.*" (emphasis added).

17. The "AEP Defendants" are American Electric Power Company ("AEP") and its subsidiary, AEP Energy Services, Inc ("AEPES").

18. The *Arandell* Plaintiffs do not argue that the district court could exercise general personal jurisdiction over AEP or AEPES.

19. The *Heartland* Plaintiffs do not argue that the district court could exercise general personal jurisdiction over AEP or AEPES.

20. The Wisconsin Supreme Court has held that Wisconsin's long-arm statute, Wis. Stat. § 801.05, allows for the exercise of jurisdiction to the full extent allowed by the due process clause. *See Rasmussen v. General Motors Corp.*, 335 Wis.2d 1, 803 N.W.2d 623, 630 (2011) (stating that "§ 801.05 was intended to provide for the exercise of jurisdiction over nonresident defendants to the full extent consistent with the requisites of due process of law") (internal citations omitted). The "jurisdictional inquiries under state law and federal due process merge

into one analysis" when, as here, the state's long-arm statute is "coextensive with federal due process requirements." *Roth v. Garcia Marquez,* 942 F.2d 617, 620 (9th Cir.1991). In Missouri, however, the Missouri Supreme Court has held that there are two separate inquiries: "one inquiry to establish if a defendant's conduct was covered by the long-arm statute, and a second inquiry to analyze whether the exercise of jurisdiction comports with due process requirements." *Myers v. Casino Queen, Inc.,* 689 F.3d 904, 909 (8th Cir.2012) (citing *Bryant v. Smith Interior Design Grp., Inc.,* 310 S.W.3d 227, 231 (Mo.2010)).

21. The district court assumed, without expressly deciding, that AEPES's sales to Wisconsin- and Missouri-based entities and delivery of natural gas to the forum were sufficient to satisfy the "purposeful availment" prong of the specific jurisdiction inquiry. Because it found that Plaintiffs failed to show that their claims arose out of AEPES's contacts with Wisconsin and Missouri, it did not address the third prong of the specific jurisdiction inquiry (whether the exercise of jurisdiction would be reasonable).

22.*See Doe v. American Nat'l Red Cross,* 112 F.3d 1048, 1051 n. 7 (9th Cir.1997) (noting that even after the Supreme Court's decision in *Shute,* "the 'but for' test is still employed in determining whether a plaintiff's injuries arose out of the defendant's forum-related activities.").

23. For example, the *Arandell* Plaintiffs allege, "The actions of the defendants resulted in the plaintiffs paying inflated prices for natural gas during the Relevant Time Period. During the Relevant Time Period, natural gas prices in Wisconsin more than doubled. The plaintiffs paid higher prices for natural gas than they otherwise would have paid if the defendants' conspiracy had not existed."

24. The plaintiff in *Calder* was an entertainer who lived and worked in California. 465 U.S. at 785, 104 S.Ct. 1482. She brought suit in California state court against the National Enquirer after the tabloid published a story alleging that the plaintiff had an alcohol problem. *Id.* at 784, 788 n. 9, 104 S.Ct. 1482. The article was written in Florida, and the National Enquirer was published in Florida with a large circulation in California. *Id.* at 785, 104 S.Ct. 1482. The California courts "concluded that a valid basis for jurisdiction existed on the theory that [the defendants] intended to, and did, cause tortious injury to [the plaintiff] in California." *Id.* at 787, 104 S.Ct. 1482. The Supreme Court affirmed, holding that jurisdiction in California was proper because the defendants' intentional conduct in Florida was calculated to cause injury to the plaintiff in California. *Id.* at 791, 104 S.Ct. 1482.

25. This court has recently defined "intentional act" as "an external manifestation of the actor's intent to perform an actual, physical act in the real world, not including any of its actual or intended results." *Washington Shoe,* 704 F.3d at 674.

26. "We have repeatedly stated that the 'express aiming' requirement is satisfied, and specific jurisdiction exists, when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." *Washington Shoe,* 704 F.3d at 675 (internal quotation marks omitted).

27. The *Heartland* Plaintiffs' opening brief states, "the *Heartland* plaintiffs are appealing the District Court's dismissal of one defendant—AEP Energy Services, Inc.—from that case for lack of personal jurisdiction."

28. The Plaintiffs have filed a Motion to Certify Question of Wisconsin State Law to the Wisconsin Supreme Court. Because we find that the plain text of Wisconsin Statutes § 133.14 is clear, we do not believe that certification is necessary as a "means to obtain authoritative answers to unclear questions of state law," and we therefore deny the motion. *Toner v. Lederle Labs., Div. of Amer. Cyanamid Co.,* 779 F.2d 1429, 1432 (9th Cir.1986).

29. This is in contrast to Section 133.18, which does permit indirect purchasers to recover treble damages. *See*Wis. Stat. § 133.18 (providing, in relevant part, that "any person injured, *directly or indirectly,* by reason of anything prohibited buy this chapter may sue therefor and shall recover threefold the damages sustained by the person") (emphasis added).